FILED

2025 Jan-14  AM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP<br><br>    *Plaintiffs*,<br><br><br>   v .<br><br>KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN  VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees<br><br>    *Defendants*. | Case No. |

## <u>COMPLAINT</u>

1.    Plaintiffs Cassandra Simon, Richard C. Fording, Dana Patton, Sydney Testman, Miguel Luna, Isabella Campos, and the Alabama State Conference of the NAACP ("Alabama NAACP") (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against Alabama Governor Kay Ivey and members of the Board of Trustees for the University of Alabama

System in their official capacities (collectively, "Defendants"). This lawsuit challenges the constitutionality of Alabama Senate Bill 129 (2024) under the First and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.  For their Complaint against Defendants, Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

2.      Alabama's history entails a devastating and violent history of racial discrimination against Black communities in the United States, but it also chronicles a deep resolve to resist and eliminate racial discrimination through civil rights advocacy. Alabama served as the first capital of the Confederacy during the initial few months of the U.S. Civil War. After the war, Alabama was among the first of the former Confederate states to enact "Black Codes," limiting the citizenship rights of formerly enslaved African Americans. Yet, acts of resistance such as the Montgomery Bus Boycott,[1] the March on Selma,[2] Bloody Sunday,[3] and the Birmingham Campaign[4] organized by Dr. Martin Luther King Jr. and the Southern Christian Leadership

---

[1] *The Montgomery Bus Boycott*, U.S. DEP'T OF THE INTERIOR: NAT'L PARK SERV., https://www.nps.gov/articles/montgomery-bus-boycott.htm (last visited Jan. 10, 2025).

[2] *See* CNN Editorial Research, *1965 Selma to Montgomery March Fast Facts*, CABLE NEWS NETWORK, (Feb. 21, 2024, 2:26 PM), https://www.cnn.com/2013/09/15/us/1965-selma-to-montgomery-march-fast-facts/index.html.

[3] Christopher Klein, *How Selma's 'Bloody Sunday' Became a Turning Point in the Civil Rights Movement*, HIST.: A&E TELEVISION NETWORKS (Apr. 16, 2024), https://www.history.com/news/selma-bloody-sunday-attack-civil-rights-movement.

[4] *Birmingham Campaign*, STANFORD UNIV., https://kinginstitute.stanford.edu/birmingham-campaign (last visited Jan. 10, 2025).[6] State Representative Bedsole, Vice Chair of the Ala. H. State Gov't Comm. and SB 129 Proponent, The Ala. Channel, *Alabama State Government Committee*, YOUTUBE (Mar. 5, 2024) at 1:06:43-1:06:48,https://www.youtube.com/watch?v=Igz9KZ92W78. [6] "Named for its fertile soil," the Black Belt has a "high proportion" of Black people "who share a rural geography, concentrated poverty, unequal access to government services, lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in

Conference, shaped the trajectory of the Civil Rights Movement and the dismantling of racial apartheid in the United States.

3. Despite notice of the undeniable past discrimination of Black Americans and its lasting legacy to the present day—and Alabamians' central role in the United States' history of racial oppression, as well its history of racial liberation—the Alabama Legislature passed legislation that restricts both professors and students from engaging in certain discussions involving race-based and sex-based inequalities. The Alabama Legislature also requires allocation of university funding along ideological lines and the restriction of campus spaces and resources for disfavored student groups—all to impose the Legislature's specific viewpoints in public education that are unrelated to legitimate educational pedagogy.

4. Specifically, the Alabama Legislature, in "the cradle of the confederacy but also the birthplace of the civil rights era," [5] enacted Alabama Senate Bill 129 ("SB 129"), a ban on "Diversity, Equity, and Inclusion" ("DEI") programs. SB 129 restricts the teaching of academic viewpoints constituting what the Legislature has unilaterally determined to be "divisive concepts." In addition, SB129 prohibits the state funding and support of physical campus spaces to student groups associated with or espousing particular viewpoints considered to be "divisive concepts" or

---

the antebellum period." *Allen v. Milligan*, 599 U.S. 1, 21 (2023) (cleaned up). It is the site of the Montgomery Bus Boycott, the Selma March, and Bloody Sunday. *See supra* note 1-4.

[6] State Representative Bedsole, Vice Chair of the Ala. H. State Gov't Comm. and SB 129 Proponent, The Ala. Channel, *Alabama State Government Committee*, YOUTUBE (Mar. 5, 2024) at 1:06:43-1:06:48,https://www.youtube.com/watch?v=Igz9KZ92W78. [6] "Named for its fertile soil," the Black Belt has a "high proportion" of Black people "who share a rural geography, concentrated poverty, unequal access to government services, lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in the antebellum period." *Allen v. Milligan*, 599 U.S. 1, 21 (2023) (cleaned up). It is the site of the Montgomery Bus Boycott, the Selma March, and Bloody Sunday. *See supra* note 1-4.

particular viewpoints on race, sexual orientation, gender identity, or groups that fall under the state's own definition of DEI. At the same time, SB 129 allows the teaching of academic viewpoints that denounce "divisive concepts" and permits the same university funding, support, and provision of space for student groups whose viewpoints do not constitute "divisive concepts" or the state's own definition of DEI.

5.      Following the passage of SB 129, multiple Alabama public universities closed their offices that were dedicated to advancing programs designed to create belonging and integration for communities who have suffered historical and contemporary discrimination, exclusion, and marginalization in their educational institutions. These programs, included in the state's broad definition of DEI, work to ensure that Black students, other students of color, Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, and Asexual ("LGBTQIA") students feel welcomed in university campuses and have equal opportunities to achieve academic success. These universities have also restricted funding for affinity-based and social justice focused student groups, and dismantled spaces assigned to student organizations that were intended to serve Black and LGBTQIA students.

6.      The freedom to teach, the freedom to learn, and the freedom for students to have rich extracurricular experiences without viewpoint censorship are core foundations of our higher education system and are zealously protected by the First Amendment of the United States Constitution.

7.       Plaintiffs are professors and students at the University of Alabama ("UA") and students at the University of Alabama at Birmingham ("UAB"), together with the Alabama NAACP whose members include students at UA, all of whom have experienced direct and continued harm due to SB 129.

8.      Dr. Simon, Dr. Fording, and Dr. Patton (collectively, the "Professor Plaintiffs") have either specifically received threats of discipline from university administrators for alleged noncompliance with SB 129 if they do not alter their curriculum to avoid certain viewpoints and/or fear that they will be accused of violating SB 129 if they do not alter their curriculum to excise certain viewpoints. They have cancelled class projects, changed curriculum, and elected not to teach certain classes as a result of SB 129. Outside of the classroom, Plaintiffs Testman, Luna, Campos, and the members of the Plaintiff Alabama NAACP (collectively, the "Student Plaintiffs") have suffered harm because student organizations to which they belong have lost on-campus office spaces and/or university funding due to their purported viewpoint or their purported inclusion in the Legislature's definition of DEI in violation of SB 129. Inside of the classroom, Student Plaintiffs have well-founded concerns that they will not receive a robust and comprehensive education because SB 129 censors professors' viewpoints disfavored by the Legislature. SB 129 has likely harmed Plaintiff Alabama NAACP, including through limitations on student chapter's ability to receive university funding and to secure university space due to purported violations of the statute's provisions regarding DEI and divisive concepts, and harm suffered by its members.

9.      SB 129 violates Plaintiffs' due process rights with language that is so vague as to prevent educators, academic officials, and students from sufficiently understanding the scope of the law's prohibitions, thereby broadening the law's chilling effect on classroom discussions. For example, SB 129 purports to allow the teaching of "divisive" concepts if they are taught in an "objective manner and without endorsement" or in a "historically accurate context." But there is no indication in the legislation as to how to determine whether something is "objective and without endorsement" or "historically accurate."  Indeed, for many of the topics covered by SB 129, there are multiple viewpoints and lines of scholarship. Accordingly, no reasonable person can determine

what does and does not violate SB 129. Moreover, the vagueness of SB 129's terms results in arbitrary enforcement without sufficient standards which has invited discrimination in the interpretation of the law's prohibitions. University administrators have applied concepts found nowhere in the text of SB 129, instructing professors that topics violate SB 129 simply because they are "political" or that professors should include university approved SB 129 disclaimers in their course materials.

10.    Indeed, racial discrimination was the motivation, at least in part, behind SB 129. Although the Alabama Legislature may have used race neutral language, the circumstances surrounding the statute establish a clear intent to discriminate against Black people; and, in fact, the law has caused—and will continue to cause—disproportionate harm to Black people through its implementation, including Professor Dr. Simon, Testman and UA student members of the Alabama NAACP (collectively, the "Equal Protection Plaintiffs").

11.    The Supreme Court has long recognized that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). The dangers of chilling free thought and expression are especially prevalent "in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995).

12.    As the United States Supreme Court has recognized, "[n]o one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would

5

imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). This is especially "true in the social sciences"—the disciplines most directly impacted by SB 129— "where few, if any, principles are accepted as absolutes." *Id*. Thus, it is imperative that students and instructors alike: "always remain free to inquire, to study, and to evaluate, to gain new maturity, and understanding; otherwise our civilization will stagnate and die." *Id*.

13.     Rather than allow these important issues to be debated and explored in public discourse, the Alabama Legislature endeavored to impose its own viewpoints in public higher education, restricting the ability of students to learn and engage in robust discussions about past and present impacts of racial discrimination on Black people in Alabama or elsewhere in the United States, as well as efforts to remediate those impacts. In doing so, SB 129 prevents professors and others from teaching accurate and inclusive curriculum about this same subject matter.

14.     The architects of SB 129 enacted the law with the intent to censor dissenting viewpoints and stifle speech on a range of topics concerning racism and inequality. Throughout the development of the bill, its sponsors repeatedly identified "ideologies" related to racial discrimination and inequality that the bill was meant to suppress.

15.     SB 129 attempts to evade classroom discussions about racial discrimination and oppression, and undermine support for student groups and university offices and programs that were created to address unfair disadvantages experienced by Black students due to ongoing racial discrimination and/or the effects of racial discrimination. Thus, the Alabama Legislature passed and enacted SB 129 with the intent to discriminate against Black people—the known beneficiaries of academic scholarship, university programs, and student activities aimed to address the ongoing effects of racial discrimination in the United States.

16.     SB 129 violates the First and Fourteenth Amendments to the United States Constitution. SB 129 unconstitutionally abridges the First Amendment right of the students to receive information and the right of the professors to disseminate ideas without undue imposition of governmental viewpoints. SB 129 violates the Equal Protection Clause of the Fourteenth Amendment because it was enacted with intent to discriminate against Black professors and students, and those who ally with them. SB 129's vague and ambiguous language violates the Due Process Clause of the Fourteenth Amendment because students and professors are unable to discern what is, and is not, permissible under the bill's terms. Plaintiffs, therefore, will continue to suffer serious injuries unless this court intervenes, declares SB 129 unconstitutional, and enjoins its enforcement.

## PARTIES

### PLAINTIFFS

17.     Plaintiff Dr. Cassandra E. Simon is a Black woman and an Associate Professor in the UA School of Social Work. Plaintiff Dr. Simon has been employed at UA since 2000. Her research focuses on the intersection of race and health, with a particular focus on cancer and culture. She is a member of the Black Faculty and Staff Association at UA. Plaintiff Dr. Simon has won awards for her teaching and leadership at UA, including the Morris L. Mayer Premier Award, the Autherine Lucy Award, and the Buford Peace Award. In the Fall of 2024, UA officials threatened Plaintiff Dr. Simon with termination for teaching a class entitled *Anti-Oppression and Social Justice* for having a curriculum, including a student-led advocacy assignment, that violated SB 129. Plaintiff Dr. Simon plans to teach the course again this spring. She is reasonably concerned that university officials will determine that her courses and the discussions in her classes violate SB 129, and that she will be terminated or again threatened with termination.

18.    Plaintiff Dr. Dana Patton is a White woman and a Professor of Political Science at UA. She is the Director of UA's Dr. Robert E. Witt University Fellows Program, which is part of the Honors College. Her research interests include health policy, gender politics, and leadership. Plaintiff Dr. Patton has received notice from university officials that her course *Understanding Poverty* may violate SB 129 due to its focus on systemic racism, and its support for antiracism and social justice. Plaintiff Dr. Patton is concerned that her other courses, including *Politics of Health Policy* and *Social Investment and the Role of Innovation*, a course about the Black Belt,[6] will likewise be deemed by university officials to violate SB 129. Plaintiff Dr. Patton is concerned about having to choose between not teaching courses that are integral to her scholarship or facing the risk of discipline or termination.

19.    Plaintiff Dr. Richard Fording is a White man and a Professor of Political Science at UA. Plaintiff Dr. Fording's courses study the intersection between race, ethnicity, and politics. His courses include *Politics of Poverty*, *Politics and Voting Rights*, and *Social Movements of U.S. Politics*, all of which include subject matter pertaining to discrimination on the bases of race and sex against people of color, women, and LGBTQIA people. Plaintiff Dr. Fording is concerned that his courses and the discussions in these courses will be deemed to violate SB 129. Plaintiff Dr. Fording is concerned about having to choose between not teaching courses that are integral to his scholarship or facing the risk of discipline or termination.

---

[6] "Named for its fertile soil," the Black Belt has a "high proportion" of Black people "who share a rural geography, concentrated poverty, unequal access to government services, lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in the antebellum period." *Allen v. Milligan*, 599 U.S. 1, 21 (2023) (cleaned up). It is the site of the Montgomery Bus Boycott, the Selma March, and Bloody Sunday. *See supra* note 1-4.

20.     Plaintiff Sydney Testman is a Black woman and a junior at UAB. She is majoring in political science and is also currently pursuing a Master of Public Administration degree. She is a former member of the Social Justice Advocacy Council ("SJAC"), a university group defunded and demoted due to SB 129, and previously served as the group's finance coordinator. The finance coordinator position within SJAC was eliminated due to the demotion of SJAC in compliance with SB 129.

21.     Plaintiff Isabella Campos is a Lesbian Latina woman and a senior at UAB majoring in political science. She is a co-founder of Esparanza, a student group for Latine[7] students at UAB. Plaintiff Campos is also a former member of SJAC, a student group prohibited by SB 129 from receiving university funding. She was previously on the executive board of SJAC.

22.     Plaintiff Miguel Luna is a Gay Latino man and a junior at UAB majoring in political science and history. He is a co-founder of Esparanza, a student group for Latine students at UAB. A UAB administrator informed Plaintiff Luna that UAB will not provide university funding to Esparanza due to SB 129 should an event or initiative focus on a "divisive concept."

23.     In the Spring 2025 semester, Plaintiff Luna plans to enroll in *Environmental Politics*, a course that he fears will be modified significantly due to SB 129 because his professor is now prohibited from endorsing concepts that are central to the course such as the disproportionate impact of environmental hazards on communities of color and the impact of race and gender on environmental policy. This modification will hinder his academic enrichment and professional development.

24.     Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. in Alabama. The Alabama NAACP was founded in 1913

---

[7] The term Latine means of, relating to, or marked by Latin American heritage.

and is the oldest and one of the most significant civil rights organizations in Alabama. The Alabama NAACP works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. The Alabama NAACP has thousands of members in branches across the state, including college chapters with members who are students in public universities including UA.

25.    The UA chapter of the Alabama State Conference of the NAACP ("UA NAACP") is a student chapter of Plaintiff Alabama NAACP and shares its parent organization's mission of "ensur[ing] a society in which all individuals have equal rights without discrimination based on race."[8] UA NAACP has about forty-five dues-paying student members who are African American, ranging in class year from freshmen to senior, who have or will suffer harm as a result of SB 129's prohibitions against DEI and divisive concepts, as defined by state legislators. Specifically, members of the UA NAACP have been denied access to university funding and campus spaces for Black students, such as the Black Student Union ("BSU"), and fear that SB 129 has likewise made the UA NAACP ineligible for any state support.

**DEFENDANTS**

26.    Defendants, members of the University of Alabama Board of Trustees in their official capacities are responsible for the "entire management and control over the activities, affairs, operations, business, and property of the University of Alabama System."[9] Members of the University of Alabama Board of Trustees "establish policies and goals of the University and direct

---

[8] *The University of Alabama's Chapter of the National Association for the Advancement of Colored People*, THE SOURCE: UNIV. OF ALA., https://mysource.ua.edu/organization/naacp (last visited Jan. 10, 2024).

[9] *Article 1: The Board of Trustees*, UNIV. OF ALA. SYS.: BD. OF TR. OF UNIV. OF ALA., https://uasystem.edu/board/manual/article1 (last visited Jan. 10, 2024).

the Chancellor to implement and achieve those policies and goals."[10] They also have the power to enforce SB 129 as applied to public institutions of higher learning.[11]

27.    Defendant Kay Ivey is President Ex-Officio of the University of Alabama Board of Trustees and Governor of Alabama. Governor Ivey signed SB 129 into law. The President Ex-Officio has the power to vote on decisions made by the board. Plaintiffs bring claims against Governor Ivey in her official capacity as President Ex-Officio of the University of Alabama Board of Trustees and as Governor.

28.    Defendant Scott Phelps is President pro tempore of the University of Alabama Board of Trustees. The President Pro Tempore, "shall preside at all Board meetings in the absence of the Governor and shall call special meetings of the Board upon conditions hereinbefore set out,"[12] and has the power to vote on decisions made by the board. Defendant Phelps is sued in his official capacity as President pro tempore.

29.    Defendants Mike Brock, Karen Brooks, Myla E. Calhoun, Ronald Gray, Jeff Gronberg, O.B. Grayson Hall Jr., Barbara Humphrey, W. Davis Malone III, Evelyn VanSant Mauldin, Harris Morrissette, J. Steven Roy, Kenneth Simon, Marietta Urquhart, and Kenneth Vandervoort are members of the University of Alabama Board of Trustees.  Each board member duties entail establishing: "policies and goals of the University and direct the Chancellor to implement and achieve those policies and goals," reviewing and approving "academic plans, including new programs and new units, and major modifications in existing programs and units,"

---

[10] *Id.*, at *Section 6: Primary Functions of the Board.*

[11] S.B. 129, 2024 Gen. Assemb., Reg. Sess. (Ala. 2024).

[12] Univ. of Ala. Sys.: Bd. of Tr. of Univ. of Ala. *, supra* note 9 at *Section 2: Election and Term of Office.*

reviewing and approving "annual budgets and budget changes."[13] Defendants Mike Brock, Karen Brooks, Myla E. Calhoun, Ronald Gray, Jeff Gronberg, O.B. Grayson Hall Jr., Barbara Humphrey, W. Davis Malone III, Evelyn VanSant Mauldin, Harris Morrissette, J. Steven Roy, Kenneth Simon, Marietta Urquhart, and Kenneth Vandervoort are sued in their official capacities as members of the University of Alabama Board of Trustees.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Plaintiffs reside within this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

32.    The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57.

## FACTUAL ALLEGATIONS

### I.    ALABAMA'S HISTORY OF ANTI-BLACK DISCRIMINATION IN EDUCATION

33.    The 1901 Alabama Constitution mandated segregation in education, stating "separate schools shall be provided for white and colored children."[14] This language was not removed until 2022.

---

[13] *Id.* at *Section 6: Primary Functions of the Board.*

[14] *School Segregation in Alabama*, EQUAL JUST. INITIATIVE (Feb. 28, 2019) https://eji.org/news/history-racial-injustice-school-segregation-in-alabama/.

34.     Racial discrimination in education, including unequal access to certain courses and advanced curriculum, continues to harm Black students across Alabama. *See, e.g.*, *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1007-1009 (11th Cir. 2018); *Lee v. Chambers Cnty. Bd. of Educ.*, 693 F. Supp. 3d 1223, 1254 (M.D. Ala. 2023); *United States v. Carter*, 614 F. Supp. 3d 1081, 1110 n.6 (M.D. Ala. 2022); *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-cv-00109, 2015 WL 13398941, at *2-3 & n.4 (N.D. Ala. Apr. 21, 2015); *Lee v. Butler Cnty. Bd. Of Educ.*, 2000 WL 33680483 (M.D. Ala. Aug. 30, 2000); *Lee v. Autauga County Bd. of Educ.*, 59 F. Supp. 2d 1199, 1202 (M.D. Ala. 1999); *Lee v. Chambers Cnty. Bd. of Educ.*, 849 F. Supp. 1474 (M.D. Ala. 1994).

## A. Discrimination in the University of Alabama System

### 1. Racial Discrimination at UA

35.     UA, the flagship of the University of Alabama system, was founded in 1831 and is located in Tuscaloosa, Alabama.[15]

36.     The City of Tuscaloosa, whose Black residents experienced longstanding racial discrimination, was a key site of the Civil Rights Movement of the mid-twentieth century.

37.     First African Baptist Church in Tuscaloosa is the site of "Bloody Tuesday," the largest law enforcement-led assault on a Black church during the Civil Rights Movement.[16]

38.     Bloody Tuesday occurred on Tuesday, June 9, 1964, when a group of Black protestors gathered at the church ahead of a planned march to the Tuscaloosa County Courthouse.[17]

---

[15] *See About*, UNIV. OF ALA., https://www.ua.edu/about/ (last visited Jan. 10, 2025).

[16] *See* John M. Giggie, *How Tuscaloosa's 'Bloody Tuesday' Changed the Course of History*, TIME USA, (June 7, 2024, 9:00 AM), https://time.com/6985577/tuscaloosa-bloody-tuesday/.

[17] *Id.*

As the marchers attempted to leave the church, Tuscaloosa police blasted a fire hose at the windows and threw tear gas into the building.[18] As the marchers attempted to proceed with the march, they were beaten by police officers and attacked with billy clubs and axe handles by White residents.[19] Thirty-three marchers were hospitalized and ninety-four were arrested.[20]

39.      White residents of Tuscaloosa resisted integration after the passage of the Civil Rights Act of 1964 and *Brown v. Board of Education*.[21] In July 1964, a group of Black teenagers were attacked at Druid Theatre, a formerly Whites-only theater in downtown Tuscaloosa.[22] A mob of White people threw rocks and bottles at the Black teenagers as they attempted to attend a film screening.

40.      Former Alabama Governor George Wallace, a strident segregationist and governor of the state in the 1960s and 70s, who declared "segregation now, segregation tomorrow, segregation forever" in his inauguration speech, went to great lengths to block school desegregation.[23] Governor Wallace is known for his "Stand at the Schoolhouse Door," an attempt

---

[18] *Id.*

[19] *See At Large: Tuscaloosa's 'Bloody Tuesday'*, TUSCALOOSA NEWS (Feb. 21, 2009, 10:00 PM), https://www.tuscaloosanews.com/story/news/2009/02/22/at-large-tuscaloosas-bloody-tuesday/27789543007/.

[20] The Associated Press, *"Bloody Tuesday": Tuscaloosa Remembers Civil Rights Marchers Brutalized 50 Years Ago*, ADVANCE LOC. MEDIA (June 10, 2014, 3:26 PM), https://www.al.com/news/tuscaloosa/2014/06/bloody_tuesday_tuscaloosa_reme.html.

[21] *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954).

[22] Scott Bridges, *Tuscaloosa Civil Rights Trail*, ALA. HUMANITIES ALL. (July 10, 2024), https://encyclopediaofalabama.org/article/tuscaloosa-civil-rights-trail/.

[23] *See* Claire Suddath, *Alabama's Anti-DEI Bill Fits Nicely With Its History of School Segregation,* BLOOMBERG (Feb. 29, 2024, 3:00 PM), https://www.bloomberg.com/news/newsletters/2024-02-29/alabama-s-anti-dei-bill-fits-nicely-with-its-history-of-school-segregation.

to physically block Vivian Malone and James Hood from enrolling at and desegregating UA in 1963.[24]

41.     At Auburn University ("Auburn"), graduate student Harold Franklin became the first Black student at Auburn in 1964, after winning a federal lawsuit and facing troops ordered by Governor Wallace to stop him from registering for classes on his first day.[25] The FBI had to escort Franklin to Auburn.[26] The school assigned him to an empty dormitory hall, to be shared one semester later with Auburn's first two Black undergraduates.[27] White students refused to sit next to him in classes, and professors created greater roadblocks and scrutiny for Franklin.[28]

42.     Over three decades after Governor Wallace's "Stand in the Schoolhouse Door," courts recognized that racial segregation persisted in Alabama's public universities. In 1995, Black alumni, students, and faculty of Alabama State University succeeded in convincing a court to order expansive changes to state policies, including admissions policies, that had fostered segregation at UA, UAB, Auburn, and other institutions for higher education, including admissions policies.[29] *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995). The state remained under supervision for

---

[24] *See Segregation in America: Massive Resistance*, EQUAL JUST. INITIATIVE (2018), https://segregationinamerica.eji.org/report/massive-resistance.html.

[25] Rebecca Griesbach, *Harold Franklin Became Auburn's First Black Student on This Day ion 1964. Why Couldn't He Graduate?*, ADVANCE LOC. MEDIA (Jan. 8, 2024, 11:07 AM), https://www.al.com/news/2024/01/harold-franklin-became-auburns-first-black-student-on-this-day-in-1964-why-couldnt-he-graduate.html.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Susan Pace Hamill, *Knight v. State of Alabama*, ALA. HUMANITIES ALL. (Oct. 10, 2023), https://encyclopediaofalabama.org/article/knight-v-state-of-alabama/.

over ten years until 2006 to implement the court's remedial orders.[30] *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

43.    Alabama continued to discriminate against Black college students and professors at UA, UAB, and other universities in other ways. *See, e.g.*, *Allen v. Ala. State Bd. of Educ.*, 190 F.R.D. 602 (M.D. Ala. 2000) (settling statewide class action on behalf of Black college students and colleges to remedy discriminatory teacher exams); *Shuford v. Ala. State Bd. of Educ.*, 846 F. Supp. 1511 (M.D. Ala. 1994) (settling statewide class action to resolve allegations of racial discrimination in promotions of Black professors at community colleges); *Groves v. Ala. State Bd. of Educ.*, 776 F. Supp. 1518 (M.D. Ala. 1991) (finding that Alabama's policy of requiring certain test scores for college students applying to teacher programs discriminated against Black students).

44.    As recently as 1993, a Black UA student who was running for student government had a cross burned on her front lawn and received an accompanying note in her mailbox, "Tonight crossbones burn, the next time your skeleton head will burn."[31]

45.    Yet, even in more recent history, as UA became formally integrated, Black students at UA have been excluded from campus life and face barriers to opportunities that are available to their White peers.

46.    For example, the Machine, a powerful secret society on UA's campus that was founded in 1888, did not support a Black candidate for student body president until 2017.[32]

---

[30] *Id.*

[31] Craig Horowitz, *Schooled in Intimidation*, PEOPLE (Mar. 15, 1993, 12:00 PM),
       https://people.com/archive/schooled-in-intimidation-vol-39-no-10/.

[32] The Associated Press, *Black Alabama Student Backed by 'Machine' Wins SGA President: 'Everything Has Changed'*, ADVANCE LOC. MEDIA (Mar. 8, 2017, 7:39 PM),
       https://www.al.com/news/tuscaloosa/2017/03/alabama_sga_president.html.

47.    In addition, racial segregation has persisted in Greek life at UA. The nation's largest sorority rush is at UA, yet a historically White sorority did not accept a Black woman until 2003.[33] Traditionally, White sororities did not accept additional Black pledges for another decade.

48.    On September 18, 2013, a 500-person protest on UA's campus took place to challenge segregation in Greek life.[34] That same year, a UA student newspaper article revealed rampant racism within traditionally White sororities, including alumni interfering to exclude Black pledges.[35] After the protest, the recruitment process eventually extended to include Black students. Despite formal integration, however, racial discrimination persists, as demonstrated by a White sorority member posting videos of herself in 2020 saying racial slurs.[36]

### 2.    Racial Discrimination at the University of Alabama at Birmingham (UAB)

49.    UAB[37] is one of three schools in the University of Alabama system and is located in Birmingham, Alabama.

50.    Birmingham served as a major battleground in the fight for racial equality during the Civil Rights Movement. Birmingham's segregated transportation system was an early focus of

---

[33] Peter Jacobs, *Hundreds of University of Alabama Students Marched This Morning to Protest Racism in Sororities*, INSIDER (Sept. 18, 2013, 11:31 AM), https://www.businessinsider.com/university-alabama-students-protest-racism-greek-2013-9.

[34] Asher Elbein, *A Shifting Tide?*, THE BITTER SOUTHERNER, https://bittersoutherner.com/elliot-spillers-a-shifting-tide (last visited Jan. 10, 2025).

[35] *See* Matt Ford and Abbey Crain, *The Final Barrier: 50 Years Later, Segregation Still Exists*, THE CRIMSON WHITE (Sept. 11, 2013), https://thecrimsonwhite.com/16498/news/the-final-barrier-50-years-later-segregation-still-exists/.

[36] Mahita Gajanan, *'I Feel Horrible.' Former University of Alabama Student Apologies After Using Racial Slur in Video*, TIME USA (Jan. 17, 2018, 7:55 PM), https://time.com/5107228/harley-barber-alabama-racist-video/.

[37] The campus existed as an extension of the University of Alabama until 1969, when the University of Alabama at Birmingham was formally established.

civil rights activists in the city. On March 6, 1957, Reverend Fred Shuttlesworth and his wife Ruby Shuttlesworth challenged the segregated seating arrangements in the waiting area at the Birmingham Terminal Station by sitting in the space reserved for White passengers.[38] Birmingham police escorted the Shuttlesworths through the station after an angry mob initially tried to stop them from entering the station.[39] Lamar Weaver, a White civil rights activist who went to the station to demonstrate support for the Shuttlesworths, was attacked by the mob as he left the station.[40]

51.    On May 14, 1961, a Trailways bus carrying a multiracial group of Freedom Riders arrived in Birmingham.[41] Eugene "Bull" Connor, Birmingham's Commissioner of Public Safety, was aware that a violent mob was waiting for the bus but refused to provide police protection for the Freedom Riders, and promised the imperial wizard of the Alabama Ku Klux Klan that officers would not intervene for at least fifteen minutes after the bus arrived.[42] An angry White mob forced the Freedom Riders off the bus and violently assaulted them.[43]

---

[38] *5 Things You Should Know About Birmingham's Terminal Station*, VULCAN PARK & MUSEUM (Oct. 6, 2019), https://visitvulcan.com/articles/5-things-you-should-know-about-birminghams-terminal-station/.

[39] *Id.*

[40] *Id.*

[41] *Freedom Riders*, BILL OF RTS. INST., https://billofrightsinstitute.org/essays/freedom-riders (last visited Jan. 10, 2025).

[42] *Freedom Rides*, STANFORD UNIV., https://kinginstitute.stanford.edu/freedom-rides (last visited Jan. 10, 2025); *We Were Prepared to Die: Freedom Riders*, NAT'L CIV. RTS. MUSEUM, https://www.civilrightsmuseum.org/news/posts/unsung-freedom-riders (last visited Jan. 10, 2025).

[43]*Freedom Riders*, *supra* note 41.

52.     In 1962, a group of Birmingham college students embarked on a "selective buying campaign" by boycotting White-owned stores that had racially discriminatory practices.[44] After the success of the selective buying campaign, local civil rights groups committed to a campaign to desegregate Birmingham through economic pressure on Birmingham businesses. In April 1963, Dr. Martin Luther King Jr. and the Southern Christian Leadership Conference collaborated with the Alabama Christian Movement for Human Rights to launch the Birmingham Campaign.[45] The goal of the campaign was to challenge the city's segregationist policies through various forms of direct action, including sit-ins, marches, and boycotts.[46]

53.     On April 10, 1963, an Alabama circuit court judge granted Birmingham officials' request for an injunction banning demonstrations.[47] Two days later, civil rights leaders Dr. King, Reverend Shuttlesworth, and Reverend Ralph Abernathy led a march of over 1,000 anti-segregation demonstrators in downtown Birmingham.[48] Bull Connor ordered patrolmen to stop the marchers.[49] Dr. King and at least fifty-five other marchers were arrested and held in the Birmingham jail for several days.[50] While there, Dr. King penned his famous "Letter from

---

[44] *Selective Buying Campaign*, THE HIST. MARKER DATABASE, https://www.hmdb.org/m.asp?m=187758 (last visited Jan. 10, 2025).

[45] *Birmingham Campaign*, STANFORD UNIV., https://kinginstitute.stanford.edu/birmingham-campaign (last visited Jan. 10, 2025).

[46] *Id.*

[47] *Birmingham Timeline*, PA. STATE, https://sites.psu.edu/civilrightsrhetoric/civil-rights-timeline/birmingham-timeline/ (last visited Jan. 10, 2025).

[48] *Bull Connor Orders Dr. Martin Luther King Jr. and Dozens More Civil Rights Marchers Violently Arrested in Birmingham*, EQUAL JUST. INITIATIVE, https://calendar.eji.org/racial-injustice/apr/12#:~:text=On%20Apr%2012%2C%201963:%20Bull,Marchers%20Violently%20Arrested%20in%20Birmingham (last visited Jan. 10, 2025).

[49] *Id.*

[50] *Id.*

Birmingham Jail,"[51] in which he remarked that Birmingham was "probably the most thoroughly segregated city in the United States."[52]

54.     On May 2, 1963, over 1,000 Birmingham students—between the ages of eight and eighteen years old—were arrested after gathering ahead of a planned march downtown.[53] The next day, hundreds of students gathered for a protest march.[54] Bull Connor deployed fire hoses and attack dogs on the marchers, and over 3,000 demonstrators were arrested.[55]

55.     Between 1945 and 1962, at least fifty unsolved, racially motivated bombings occurred in Birmingham, leading the city to acquire the nickname "Bombingham."[56] These bombings continued after city officials and civil rights activists announced the May 1963 "Birmingham Truce Agreement," which included commitments from the city and local businesses to desegregate certain public facilities and improve economic advancement for Black workers.[57] The night after the Truce Agreement was announced, bombs exploded at the home of Alfred Daniel King, Dr. King's brother, and a Black-owned motel where Dr. King and other campaign organizers had stayed during their time in Birmingham.[58]

---

[51] *Id.*

[52] *"Letter from a Birmingham Jail [King, Jr.],"* AFR. AM. STUD. CTR., UNIV. OF PA., https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html (last visited Jan. 10, 2025).

[53] *Theophilus Eugene "Bull" Connor (1897-1973)*, U.S. DEP'T OF THE INTERIOR: NAT'L PARK SERV., https://www.nps.gov/people/bull-connor.htm (last visited Jan. 10, 2025).

[54] *Id.*

[55] *Id.*

[56] *See* Jeremy Gray, *Bombingham: Racist Bombings Captured in Chilling Photos*, ADVANCE LOC. MEDIA (Feb. 19, 2020, 7:23 PM), https://www.al.com/news/erry-2018/07/f39190a3553390/bombingham.html.

[57] *See Birmingham Campaign*, AFR. AM. CIV. RTS. MOVEMENT, http://www.african-american-civil-rights.org/birmingham-campaign/  (last visited Jan. 10, 2025).

[58] *Id.*

20

56.     Along with the homes of civil rights leaders, Black churches were also frequent targets for bombings. One of the most violent attacks during this period was the bombing of the 16th Street Baptist Church. During the Birmingham Campaign, the 16th Street Baptist Church served as a headquarters for civil rights organizers and protestors to meet, give speeches, hold trainings, and strategize.[59] On September 15, 1963, members of the Ku Klux Klan ("KKK") placed nineteen sticks of dynamite outside the church basement.[60] The explosion killed four young Black girls: Addie Mae Collins, Carole Robertson, Cynthia Wesley, and Denise McNair.[61] Additionally, more than twenty members of the congregation were injured.[62]

57.     Despite persistent violence and racism against Black Alabamians, Black students in Alabama achieved several racial justice gains at UAB. For example, Autherine Lucy, the first Black student admitted to the University of Alabama system, was admitted to the Birmingham campus in 1956.[63] Lucy, however, "had her admission rescinded" due to violent White mobs and a reversal of administrators' decision to let Black students attend Alabama public universities.[64]

---

[59] *Our History*, SIXTEENTH ST. BAPTIST CHURCH, https://www.16thstreetbaptist.org/our-history/ (last visited Jan. 10, 2025).

[60] C. Herbert Oliver, *Bombing of the Sixteenth Street Baptist Church, 1963*, THE GILDER LEHRMAN INST. OF AM. HIST., https://www.gilderlehrman.org/history-resources/spotlight-primary-source/bombing-sixteenth-street-baptist-church-1963 (last visited Jan. 10, 2025).

[61] *16th Street Baptist Church Bombing (1963)*, U.S. DEP'T OF THE INTERIOR: NAT'L PARK SERV., https://www.nps.gov/articles/16thstreetbaptist.htm (last visited Jan. 10, 2025).

[62] *Our History*, *supra* note 59.

[63] Kerri Lee Alexander, *Autherine Lucy*, NAT'L WOMEN'S HIST. MUSEUM (2018), https://www.womenshistory.org/education-resources/biographies/autherine-lucy.

[64] Mary Ashley Canevaro, *Teaching About the Unsung Heroes of Black History*, BIRMINGHAM TIMES (Feb. 25, 2021), https://www.birminghamtimes.com/2021/02/teaching-about-the-unsung-heroes-of-black-history/.

58.    In 1963, two of the first Black students to successfully enroll in courses in the University of Alabama system, James Hood and Vivian Malone, attended the University of Alabama campus which would later become UAB.[65] Malone became the first Black graduate of the University of Alabama system in 1965.[66]

59.    Despite formal integration, racial discrimination at UAB has persisted. For example, Identity Evropa, a White nationalist organization,[67] targeted UAB with posters in 2016 and 2018, depicting European statutes with slogans that included, "our future belongs to us."[68] Members of Identity Evropa helped organize the 2017 Unite the Right Rally, an event where White supremacists, neo-Nazis, and neo-confederates wielded tiki torches and sparked a violent riot in Charlottesville, Virginia.[69]

60.    In 2019, several faculty members of the UAB Department of Biology were uncovered to have promoted White supremacist views.[70] One faculty member served as pledge

---

[65] *See History: Desegregation*, UNIV. OF ALA., https://www.ua.edu/about/history/desegregation/ (last visited Jan. 10, 2025).

[66] Adam Bernstein, *James Hood, Who Integrated University of Alabama, Dies at 70*, THE WASH. POST (Jan. 18, 2013), https://www.washingtonpost.com/local/obituaries/james-hood-who-integrated-university-of-alabama-dies-at-70/2013/01/18/c990b724-6198-11e2-9940-6fc488f3fecd_story.html.

[67] *See Identity Evropa/American Identity Movement*, S. POVERTY L. CTR., https://www.splcenter.org/fighting-hate/extremist-files/group/identity-evropaamerican-identity-movement  (last visited Jan. 10, 2025). *See also Hate Map*, S. POVERTY L. CTR., https://www.splcenter.org/hate-map  (last visited Jan. 10, 2025).

[68] Connor McDonald, *Far-Right Group Seeks to Spread Ideology,* UAB STUDENT MEDIA (Oct. 10, 2016), https://www.uab.edu/studentmedia/?view=article&id=835&catid=14.

[69] Michael Edison Hayden et al., *'Unite the Right' 5 Years Later: Where Are They Now?,* S. POVERTY L. CTR., https://www.splcenter.org/hatewatch/2022/08/11/unite-right-5-years-later-where-are-they-now.

[70] *See* Hycall Brooks, *Does the UAB Biology Department Have a Nationalist Problem?,* UAB BLAZER MEDIA CO. (Aug. 13, 2019), https://uabblazermedia.com/2019/08/does-the-uab-biology-department-have-a-nationalist-problem/.

coordinator of the White supremacist group Identity Evropa.[71] UAB students staged a protest after learning of department members' affiliation with Identity Evropa.[72]

61.    Only four years ago, in 2021, UAB's Board of Trustees voted in favor of removing Former Governor Wallace's name from UAB's physical education center.[73]

62.    Despite its long history of discriminatory policies and practices, UAB did not hire its inaugural Vice President for Diversity, Equity, and Inclusion until less than a decade ago in 2015.[74] Similarly, UA hired its first vice president and associate provost for diversity, equity, and inclusion in 2017,[75] and the school's Division of Diversity, Equity, and Inclusion was established the following year.

## II.  RECENT EVENTS PRIOR TO PASSAGE OF SB 129

### A.  Widespread Demonstrations for Racial Justice in 2020

63.    In the wake of the murder of George Floyd in 2020, millions of Americans—and people across the globe—participated in worldwide protests against police brutality and racial

---

[71] *Id.*

[72] *UAB Students Protest White Supremacy on Campus,* TRUSSVILLE TRIB. (Apr. 17, 2019), https://www.trussvilletribune.com/2019/04/17/uab-students-protest-white-supremacy-on-campus/.

[73] Greta Anderson, *UAB Removes Late Segregationist's Name from Building,* INSIDE HIGHER ED. (Feb. 8, 2021), https://www.insidehighered.com/quicktakes/2021/02/09/uab-removes-late-segregationists-name-building.

[74] Jim Bakken, *UAB Names Vice President for Diversity, Equity and Inclusion*, UNIV. OF ALA. AT BIRMINGHAM (Oct. 12, 2015), https://www.uab.edu/news/people/item/6598-uab-names-vice-president-for-diversity-equity-and-inclusion.

[75] Richard LeComte, *Taylor Named UA's Vice President and Associate Provost for Diversity, Equity and Inclusion*, UNIV. OF ALA. (June 13, 2017), https://news.ua.edu/2017/06/taylor-named-uas-vice-president-and-associate-provost-for-diversity-equity-and-inclusion/.

injustice. The demonstrations in the United States during the summer of 2020 became the largest civil rights movement in American history.[76]

64.     Alabama university students participated in these demonstrations for racial justice. UA football coach Nick Saban led a march for equality organized by student athletes.[77] In 2020, Troy University renamed a campus building that had been named after a KKK leader.[78] After UA students petitioned  to rename academic buildings that bore the names of White supremacists, the Board of Trustees created a committee to review building names.[79] Similar efforts at Auburn failed after the school's cited the Memorial Preservation Act of 2017, which the Alabama Legislature passed to stop the removal of Confederate monuments.[80] The Alabama Attorney General also used this law to sue Birmingham, which has a majority-Black population and Black mayor, after it removed the Confederate Monuments from city property.[81]

---

[76] Larry Buchanan, et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. TIMES (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[77] Theresa Waldrop, *Alabama Football Players' March for Equality Ends at the Spot Where Blacks Were Told They Weren't Welcome Years Ago*, CABLE NEWS NETWORK (Sept. 1, 2020, 12:42 AM), https://www.cnn.com/2020/08/31/us/alabama-football-players-march-for-equality/index.html,

[78] Allen Kim, *A Building at Troy University Once Named After KKK Leader Has Been Renamed After John Lewis*, CABLE NEWS NETWORK (Aug. 27, 2020, 1:12 PM), https://www.cnn.com/2020/08/27/us/john-lewis-troy-trnd/index.html.

[79] Keely Brewer and Jeffrey Kelly, *'It's Really Getting Old': The Ongoing Reckoning of UA Building Namesakes*, THE CRIMSON WHITE (Aug. 3, 2020), https://thecrimsonwhite.com/65325/top-stories/its-really-getting-old-the-ongoing-reckoning-of-ua-building-namesakes/.

[80] Jennifer Brooks, *While Auburn Hides Behind Law, Troy University Takes Racist Name Off Building*, MONTGOMERY ADVERTISER (Aug. 30, 2020, 1:48 PM), https://www.montgomeryadvertiser.com/story/opinion/2020/08/30/while-auburn-hides-behind-law-troy-university-takes-racist-name-off-building/5674551002/.

[81] Erik Ortiz, *'I Chose My City': Birmingham, Alabama, Removes Confederate Monument, Faces State Lawsuit*, NBC NEWS (June 3, 2020, 12:32 PM),

65.    UA also attempted to address longstanding complaints about racial discrimination and segregation within the university's Greek life through a "DEI passport" program. This program tracked the number of "cultural" events that students attended and rewarded campus groups with priority seating in the school's football stadium based on their members' attendance at these events.[82]

66.    Student activism to advance racial justice also invoked responses from White supremacists. For example, in June 2020 UAB was forced to close campus due to rumors of violent unrest, including a planned KKK rally.[83]

**B. Backlash to 2020 Racial Justice Advancements**

**1. Federal Executive Orders in 2020**

67.    In 2020, President Trump issued EO 13958, which established the "1776 Commission,"[84] a group created to "promote patriotic education." The commission was defined by its opposition to Critical Race Theory, which is an advanced academic analysis to understand the persistence of racial discrimination despite the availability of federal equal protection and anti-discrimination laws, and its opposition to the New York Times' publication *The 1619 Project*,

---

https://www.nbcnews.com/news/us-news/i-chose-my-city-birmingham-alabama-removes-confederate-monument-faces-n1223511.

[82] Alex Gravlee, *SGA DEI Passport Program Institutes New Point System*, THE CRIMSON WHITE (Sept. 10, 2023), https://thecrimsonwhite.com/110505/news/sga-dei-passport-program-institutes-new-point-system/.

[83] Sam Prickett, *UAB, Some Downtown Businesses Close in Response to Rumors of Violence; Woodfin Stressed City Will Enforce Protest Rules*, BIRMINGHAMWATCH (June 4, 2020), https://birminghamwatch.org/uab-downtown-businesses-close-response-rumors-violence-woodfin-stresses-city-will-enforce-protest-rules/.

[84] Executive Order 12958—Establishing the President's Advisory 1776 Commission, Trump White House, EO 13958 (Nov. 2, 2020), https://www.presidency.ucsb.edu/documents/executive-order-13958-establishing-the-presidents-advisory-1776-commission.

which centered the experiences of Black Americans in its recounting of the founding of the United States.

68.      The 1776 Commission's report, released in January 2021,[85] has been criticized by organizations such as the American Association of University Professors as being "based on falsehoods but pos[ing] as history."[86] The American Historical Association issued a statement condemning the report that was joined by signatories such as the Society of Civil War Historians and the Society for U.S. Intellectual History.[87]

69.      President Trump's Executive Order 13950 ("EO 13950"), issued in September 2020, prohibited federal agencies and institutions, federal contractors, and federal grant recipients from engaging in certain speech pertaining to race and sex-based systemic discrimination.[88] Specifically, Executive Order 13950 outlawed nine topics that were unilaterally defined to be "divisive concepts" ("Divisive Concepts"). [89]

---

[85] Michael Crowley & Jennifer Schuessler, *Trump's 1776 Commission Critiques Liberalism in Report Derided by Historians,* N.Y. TIMES, https://www.nytimes.com/2021/01/18/us/politics/trump-1776-commission-report.html (Jan. 20, 2021).

[86] *1776 Report Distorts the Past and Disregards the Truth,* AM. ASS'N OF UNIV. PROFESSORS, https://www.aaup.org/news/1776-report-distorts-past-and-disregards-truth (last visited Jan. 10, 2025).

[87] *AHA Statement Condemning Report of Advisory 1776 Commission,* AM. HIST. ASS'N, https://www.historians.org/news/aha-statement-condemning-report-of-advisory-1776-commission/ (last visited Jan. 10, 2025).

[88] *Id.*

[89] "'Divisive concepts' means the concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her

70.     EO 13950's preamble asserted that its prohibition of Divisive Concepts was intended to address a "destructive ideology . . . grounded in misrepresentations" of American history that suggest the country was founded "by white men, for the benefit of white men."[90]

71.     EO 13950 asserted that the proposition of the United States being founded "by white men, for the benefit of white men" is a misrepresentation of American history without explaining why such a proposition is inaccurate.

72.     On December 29, 2020, a federal district court issued a nationwide preliminary injunction, enjoining the enforcement of EO 13950 as violative of the First Amendment.[91] Soon after, President Biden rescinded the executive order when he came into office in January 2021.[92]

73.     Despite repudiation of the Divisive Concepts' prohibitions by a federal court and President Biden, supporters of the now-defunct executive order replicated its provisions in state legislation, including SB 129. Multiple legal challenges to such state legislation, thus far, have

---

race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term 'divisive concepts' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating."

[90] Executive Order on Combating Race and Sex Stereotyping, Trump White House, EO 13950 (Sept. 22, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-combating-race-sex-stereotyping/.

[91] *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (2020).

[92] Adam Harris, *The GOP's 'Critical Race Theory' Obsession*, THE ATLANTIC (May 7, 2021), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.

prevailed. For example, federal courts have preliminarily enjoined legislation with these Divisive Concepts in Florida,[93] New Hampshire,[94] and Oklahoma.[95]

## III. ALABAMA LEGISLATURE'S PASSAGE OF SB 129

### A. Purported Justifications for SB 129

74.    In 2021, the Alabama Department of Education passed a resolution entitled "The Preservation of Intellectual Freedom and Non-Discrimination in Alabama's Public Schools." It bans from K-12 classrooms "concepts that impute fault, blame, a tendency to oppress others, or the need to feel guilt or anguish to persons solely because of their race or sex."[96] The resolution states that "racism and slavery are betrayals of the founding principles of the United States," despite the testimony of Benard Simelton, President of the Alabama NAACP, that slavery and racism are well-documented founding tenets of the United States.[97] The resolution was incorporated into the Board of Education's Administrative Code in October 2021, over the objections of several members of the public.[98]

---

[93] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

[94] *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024).

[95] *Black Emergency Response Team v. Drummond*, No. CIV-21-1022-G, 2024 WL 3015359 (W.D. Okla. June 14, 2024).

[96] Krista Johnson, *Alabama Board of Education Resolution Bans Critical Race Theory-Type Teachings in Schools*, MONTGOMERY ADVERTISER (Aug. 21, 2021, 11:40 AM), https://www.montgomeryadvertiser.com/story/news/education/2021/08/12/alabama-board-education-bans-critical-race-theory-teaching-public-schools/5543324001/.

[97] Brandon Moseley, *Alabama State School Board Passes Resolution Banning Critical Race Theory*, ALA. POL. REP. (Aug. 16, 2021, 8:05 AM), https://www.alreporter.com/2021/08/16/alabama-state-school-board-passes-resolution-banning-critical-race-theory/.

[98] Kyra Miles, *Alabama Board of Education Cements State's Ban on Critical Race Theory*, WBHM (Oct. 15, 2021), https://wbhm.org/2021/alabama-board-of-education-cements-states-ban-on-critical-race-theory/.

75.    Though the resolution does not reference critical race theory by name, Alabama Governor Kay Ivey stated in comments about the resolution, "CRT[99] doesn't belong in Alabama schools. . . . CRT currently isn't being taught in Alabama classrooms, and I've previously called on the Alabama School Board to keep it that way."[100]

76.    SB 129 reflects the culmination of actions by Alabama state officials that were hostile to recent efforts to advance racial justice. For example, on April 21, 2023, Governor Ivey fired Barbara Cooper, the head of the Alabama Department of Early Childhood Education, over a pre-kindergarten teacher training book by the National Association for the Education of Young Children (NAEYC), a nationally recognized education group.[101]

77.    The 881-page teacher training book, *Developmentally Appropriate Practice Book*, 4th edition, included topics such as LGBTQIA inclusion and structural racism.[102] The passages implicating LGBTQIA inclusion stated, "[e]arly childhood programs also serve and welcome families that represent many compositions. Children from all families (e.g., single parent, grandparent-led, foster, LGBTQIA+) need to hear and see messages that promote equality, dignity,

---

[99] CRT or Critical Race Theory "critiques how the social construction of race and institutionalized racism perpetuate a racial caste system that relegates people of color to the bottom tiers. CRT also recognizes that race intersects with other identities, including sexuality, gender identity, and others. CRT recognizes that racism is not a bygone relic of the past. Instead, it acknowledges that the legacy of slavery, segregation, and the imposition of second-class citizenship on Black Americans and other people of color continue to permeate the social fabric of this nation." Janel George, *A Lesson on Critical Race Theory*, AM. BAR ASS'N (Jan. 11, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/.

[100] Moseley, *supra* note 97.

[101] The Associated Press, *Alabama Governor Ousts a Top Education Official Over a Book's 'Woke Concepts' on Race,* NPR (Apr. 22, 2023, 2:46 PM), https://www.npr.org/2023/04/22/1171474014/alabama-governor-education-director-woke-book.

[102] *Id.*.

and worth."[103] The passages mentioning structural racism stated, "systemic and structural racism ... has permeated every institution and system through policies and practices that position people of color in oppressive, repressive, and menial positions."[104] It explained that the early education system is not immune to these forces and that preschool is one place where children "begin to see how they are represented in society" and that the classroom should be a place of "affirmation and healing."[105]

78.    Governor Ivey claimed these were "woke[106] concepts" and said "the education of Alabama's children is my top priority as governor, and there is absolutely no room to distract or take away from this mission. Let me be crystal clear: Woke concepts that have zero to do with a proper education and that are divisive at the core have no place in Alabama classrooms at any age level, let alone with our youngest learners."[107]

79.    SB 129's sponsors assert without evidentiary support that, "diversity, equity, and inclusion" or "DEI" is an ideology. For example, Alabama State Representative Ed Oliver claims, without factual evidence, that DEI "indoctrinate[s] students into a far-left political ideology."[108] Without citing any specific examples, Alabama State Senator Will Barfoot said "DEI offices at higher institutions of education and public universities have really worked to divide us rather than

---

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] Woke is defined as aware of and actively attentive to important societal facts and issues (especially issues of racial and civil rights). *Woke,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/woke (last visited Jan. 13, 2025).

[107] *Id.*

[108] Curtis Bunn, *Alabama Bans DEI Programs in Public Colleges and the Teaching of 'Divisive Concepts'*, NBC News (Mar. 20, 2024, 4:38PM), https://www.nbcnews.com/news/nbcblk/alabama-passes-dei-ban-rcna144300.

unite us. DEI sounds inviting and sounds like something we should all get behind, but in fact those DEI offices around the state have been used to silo people by race, by color, by religion, ethnicity or national origin."[109]

80.    When asked about the origins of DEI during an Alabama House State Government Committee meeting on March 5, 2024, Rep. Oliver claimed, without factual support that DEI "[s]prung out of CRT" and that it was an "[i]deology rooted in Marxism."[110]

81.    Governor Ivey also considers DEI to be a political viewpoint with which she disagrees. After signing SB 129, she said, "[m]y administration has and will continue to value Alabama's rich diversity, however, I refuse to allow a few bad actors on college campuses – or wherever else for that matter – to go under the acronym of DEI, using taxpayer funds, to push their liberal political movement counter to what the majority of Alabamians believe."[111]

**B. Text of SB 129 Enacted into Law**

82.    Section 1(2) of SB 129 defines the following as "divisive concepts":

a. That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior.

b. That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.

---

[109] Michael Brauner, *State Sen. Barfoot: DEI Has Worked to Divide Us Rather Than Unite Us*, YELLOWHAMMER (Feb. 26, 2024), https://yellowhammernews.com/state-sen-barfoot-dei-has-worked-to-divide-us-rather-than-unite-us/

[110] *State Government Standing Meeting: Hearing on S.B. 129 Before the Alabama House State Government Committee,* 2024 Reg. Sess. (Mar. 5, 2024); *see* The Ala. Channel, *Alabama State Government Committee*, YOUTUBE (Mar. 5, 2024) at 37:49-38:01, https://www.youtube.com/watch?v=Igz9KZ92W78.

[111] Ryan Quinn, *Alabama Governor Signs Bill Targeting DEI, 'Divisive Concepts'*, INSIDE HIGHER EDUC. (Mar. 22, 2024), https://www.insidehighered.com/news/quick-takes/2024/03/22/alabama-governor-oks-bill-targeting-dei-divisive-concepts.

c. That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.

d. That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.

e. That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin.

f. That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.

g. That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.

h. That meritocracy or traits such as a hard work ethic are racist or sexist.[112]

83.    Section 1(3) of SB 129 defines a "diversity, equity, and inclusion program" as "any program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." [113]

84.    SB 129 prohibits state agencies, local boards of education, and public institutions of higher education from taking any of the following actions:

---

[112] *Id.*

[113] *Id.*

(1) Sponsor any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs, as defined in subdivision (3) of Section 1.

(2) Direct or compel a student, employee, or contractor to personally affirm, adopt, or adhere to a divisive concept.

(3) Require its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept.

(4) Require a student, employee, or contractor to share his or her personal point of view on any divisive concept outside of an academic setting, as provided in Section 4(3)b.

(5) Require its students, employees, or contractors to participate, as part of any required curriculum or mandatory professional training, in an activity that involves lobbying at the state or local level for legislation related to a divisive concept. [114]

(6) Penalize or discriminate against a student, employee, or contractor on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept or diversity statement.

(7) Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color.

(8) Authorize or expend funding, or apply for or accept a grant, federal funding, or private funding, for the purpose of compelling assent to any divisive concept or any

---

[114] *Id.*

other purpose prohibited in this act, provided that such funding may be provided to student, faculty, or staff organizations or associations.

85.    SB 129 provides that nothing in this act:

(1) Prevents students, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to sponsor these programs. If a student, staff, faculty, organization, or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event.

(2) Prevents an employee or a contractor of a state agency, local board of education, or public institution of higher education who provides, as part of his or her job duties, orientation, course work, or training from responding to questions that are raised by participants in the orientation, course work, or training and that pertain to divisive concepts or diversity, equity, and inclusion. [115]

(3) a. Prohibits a public institution of higher education from providing any instruction or taking any action in furtherance of satisfying any accreditation standard or requirement.

b. Prohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a large course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with the provisions of this act.

---

[115]*Id.*

c. Prohibits the required collection or reporting of demographic data by public institutions of higher education.

(4) Prohibits the teaching of topics or historical events in a historically accurate context.

(5) Prohibits an institution of higher education from performing research, collecting data, engaging in recruiting and outreach programs, offering academic support services, engaging in clinical trials, or providing medical, mental, or any health care or clinical services targeted to support individuals of any specific demographic.

(6) Prevents state agencies from promoting racial, cultural, or ethnic diversity or inclusiveness, provided these efforts are consistent with the requirements of this act.

(7) Prohibits a public institution of higher education from providing space or ancillary services to any student or employee on a non-discriminatory basis, including, but not limited to, support and guidance to ensure compliance with[116] applicable university policies and laws, assistance with security needs, and registration of events.

(8) Prohibits housing, athletic programming, or social organizations that are segregated by sex. Each public institution of higher education shall ensure that every multiple occupancy restroom be designated for use by individuals based on their biological sex, as defined by Section 16-1-54, Code of Alabama 1975.

(9) May be construed to inhibit or violate the First Amendment rights of any student or employee, or to undermine the duty of a public institution of higher education to

---

[116] *Id.*

protect, to the greatest degree, academic freedom, intellectual diversity, and free expression.

(10) Shall be deemed to affect or revise any provision in state law requiring that membership of a state board, commission, or authority be inclusive and reflect the racial, gender, geographic, urban, rural, and economic diversity of the state, nor impact any public official appointed to a state board, commission, or authority as of October 1, 2024.

(11) May be construed to affect or limit the activities of the Alabama Office of Minority Affairs.[117]

89. SB 129 provides: "All state agencies and political subdivisions, including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who knowingly violates this act."[118]

## IV. AFTERMATH OF SB 129 IMPLEMENTATION

### A. SB 129's Impact on Professors' Classroom Teaching

86.    Although SB 129 provides exceptions for "First Amendment rights" and academic freedom, the law has had a chilling effect on Professor Plaintiffs, who have received threats of discipline and/or are self-censoring out of fear of discipline or termination because they do not know what in their lessons may constitute a "divisive concept."

87.    University officials have even recommended and provided disclaimer language for professors to add to their syllabi in order to curtail certain classroom discussions. On several syllabi at UA, the language reads: "All University faculty, instructors and teaching staff have the academic

---

[117] *Id.*

[118] *Id.*

freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting. This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective scholarly lens designed to encourage critical thinking. Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered 'divisive' under Alabama law, nor penalized for refusing to support or endorse such a concept. All students are strongly encouraged to think independently and analytically about all material presented in class and may express their views in a time, place, and manner consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry and expressions."[119]

88.    Nevertheless, Professor Plaintiffs do not fully know or understand what concept would be considered "divisive" under SB 129.  Nor do they fully know or understand what it means for a student to be required to assent or agree with any "divisive concept." Thus, Professor Plaintiffs cannot fully know or understand how to comply with their own disclaimer and, thus, may feel compelled to overly self-censor on the side of caution to avoid any complaints or discipline for purported violation of SB 129.

89.    Plaintiff Dr. Simon included the recommended disclaimer on her syllabus for her Fall 2024 classes.  Both Plaintiff Dr. Patton and Plaintiff Dr. Fording plan to add UA's recommended disclaimer to their syllabi for their Spring 2025 classes. UA university officials told Plaintiff Dr. Patton that it would have been easier to respond to the complaint against her had she included the UA disclaimer in her syllabus, and she was instructed to add it mid-semester despite

---

[119] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, UNIV. OF ALA., https://deiguidance.ua.edu/ (last visited Jan. 13, 2025).

having a similar statement already in her syllabus that did not explicitly reference SB 129 or the phrase "divisive concepts."

90.    Prior to the beginning of the Fall 2024 semester, UA offered a legal training workshop to professors within the College of Arts & Sciences. In a PowerPoint presentation shown during that training, UA recommended that professors "do not directly test" on any material that could be considered a divisive concept or "include them as specific criteria on other kinds of assignments (like papers)." Assessments are an important tool that professors use to facilitate student learning because students study for, and thus better understand, topics on which they will be tested. Moreover, professors may assign papers so that students can independently engage in depth with a topic, thereby learning more about that topic. Yet, according to this guidance from UA, Plaintiff Professors are unable to utilize these methods of instruction to better instruct students and better evaluate them.

91.    UA directs its professors to err on the side of caution when teaching "divisive concepts" in class. Its guidance states that faculty should not say anything that "can be construed as an effort" to get students to agree with a "divisive concept." Professor Plaintiffs, therefore, cannot make a statement that could be interpreted as an endorsement of a "divisive concept." It is unclear who determines whether a statement could be construed in that manner or what the basis of that determination would be.

92.    In response to Plaintiff Dr. Simon's student led advocacy assignment, UA administrators informed Plaintiff Dr. Simon of SB 129's impact on her classroom instruction and explained, "Despite the way you've framed it, it is difficult to see how this exercise is not tied to the classroom or does not create a situation where students are being forced to assert a position and/or unwillingly take part in political activity. Similarly, the way this has been organized runs

afoul of the Board's commitment to institutional neutrality. For example, your correspondence with the grounds use permit office clearly indicates that the event is tied to your classroom (e.g. 'students in my class will be hosting . . . .', 'We completed a grounds use permit form . . . .'). As such, the class sit in scheduled for today should be canceled immediately."

93.    In addition to the canceled advocacy assignment, Plaintiff Dr. Simon has concerns about the impact of SB 129 on other portions of her curriculum. Plaintiff Dr. Simon does not know how she can meet the instructional standards of her academic field, social work, without violating SB 129. In her courses, she often assigns and cites social science that endorses the concept that historical discrimination has a significant impact on communities of color and LGBTQIA communities and needs to be considered when serving those populations.

94.    In addition, during the course *Anti-Oppression and Social Justice*, Plaintiff Dr. Simon shows her class six episodes of *Eyes on the Prize*, an award-winning 14-hour television program that covers the major events of the Civil Rights Movement from 1954 to1985. In the past, after the showing, her students have expressed experiencing feelings of anger, guilt, complicity and shame, which may run afoul of SB 129.

95.    Plaintiff Dr. Simon also requires an assignment where her students take the Harvard Implicit Association Test. The test "measures the strength of associations between concepts (e.g., black people, gay people) and evaluations (e.g., good, bad) or stereotypes (e.g., athletic, clumsy)."[120] The test is commonly used in academic and professional settings to "educate about implicit bias" and "raise awareness and encourage self-reflection."[121] Although Plaintiff Dr. Simon does not review their results or assign a letter grade to the assignment, she fears the assignment to

---

[120] *Ethical Considerations,* Proj. Implicit, Harvard Univ.,
https://implicit.harvard.edu/implicit/ethics.html (last visited Jan. 13, 2025).

[121] *Id.*

take the test may constitute the prohibited divisive concept that, "by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously."

96.    Plaintiff Dr. Simon believes that to train culturally competent and effective future social workers, her students must learn about diverse communities and evidence-based research regarding implicit bias.  Plaintiff Dr. Simon fears she could face termination, however, for teaching future social workers in an accurate and empirically supported manner. Plaintiff Dr. Simon plans to keep teaching these subjects and thus risks enforcement.

97.    SB 129, the complaint lodged against her pursuant to SB 129, and subsequent threats of discipline have impacted Plaintiff Dr. Patton's teaching. Plaintiff Dr. Patton is reviewing old lesson plans in preparation for the Spring 2025 semester and is planning to omit certain topics or materials that may be the subject of a SB 129 investigation or may spark another complaint.

98.    For example, in her *Politics of Health Policy* class, Plaintiff Dr. Patton previously presented students with a series of articles that discuss the "Fundamental Causes" theory. Proponents of this theory have long argued that socioeconomic status is a fundamental cause of health disparities, and more recent iterations of the theory have proposed that racism should also be considered a fundamental cause of these disparities. The Fundamental Causes theory is widely accepted and supported by research in her field. Nevertheless, Plaintiff Dr. Patton has decided to remove instruction about this theory from the Spring 2025 version of this course due to fear that her presentation of this theory will be deemed an attempt to "compel assent" to this theory.

99.    Plaintiff Dr. Patton also plans to record all of her lectures in order to reduce the risk that she will be punished for an SB 129 complaint.

100.    This is the first time in Plaintiff Dr. Patton's academic career that she has removed content from a course or recorded her classes due to fear of discipline or termination and she believes this will lead to less comprehensive and accurate information being shared with her students.

101.    Plaintiff Dr. Patton is also concerned that she will receive additional SB 129 complaints based solely on the subject matter of her courses, which explore the intersection between race and poverty. For example, in her *Understanding Poverty* course this semester, her students watched a documentary titled *Slavery by Another Name*. The documentary explores the history of convict leasing, a system which began in the Reconstruction era and continues today whereby the state leases incarcerated people to private companies for labor. Many of her students were not aware of convict leasing as a practice and expressed shock and disappointment about the practice in general and Alabama's role in facilitating convict leasing throughout the state.

102.    Plaintiff Dr. Patton believes information about convict leasing or other historical and contemporary practices that could make students feel upset may be prohibited by SB 129 because students may perceive her instruction to be an endorsement of the prohibited view that White people are inherently responsible, or should feel shame, for past actions.

103.    During the Spring 2025 semester, Plaintiff Dr. Patton also plans to teach *Social Investment and the Role of Innovation*, a required course for freshmen in the Honors College Fellows Program about Alabama's Black Belt. In the course, students engage in an in-depth study of many issues impacting the Black Belt region of Alabama, including poverty and race relations. Part of the program includes a visit to the Equal Justice Initiative's Legacy Museum and the National Memorial for Peace and Justice, and a two-week service trip to Marion, Alabama. Marion has a rich civil rights history, as it is the hometown of Coretta Scott King and the site of the murder

of Jimmie Lee Jackson, a civil rights protestor who was shot and killed by state troopers on February 18, 1965. Plaintiff Dr. Patton fears that discussions spurred by these trips, including the discrimination and racial violence that Black Marion residents faced at the hands of White government officials and community members, may be viewed as espousing the prohibited viewpoint that the moral character of an individual can be determined by attributes such as their race.

104.    Although SB 129 provides that nothing in SB 129 "may be construed to inhibit or violate the First Amendment rights of any student or employee, or to undermine the duty of a public institution of higher education to protect, to the greatest degree, academic freedom, intellectual diversity, and free expression," the repercussions that Plaintiff Dr. Patton already experienced for teaching her courses cause her to believe that UA will not safeguard her academic freedom.

105.    Plaintiff Dr. Fording does not know how he can meet the instructional standards of his academic field, political science, without violating SB 129. In his courses, he often assigns and cites to social science that endorses the concept that historical discrimination has a significant impact on present conditions. For example, in his *Politics and Voting Rights* course, Plaintiff Dr. Fording discusses research demonstrating that structural forces such as racial prejudice and racial gerrymandering inhibit political mobilization, and that these barriers then influence the policies and programs that the government supports and implements. Although these research conclusions are widely accepted as accurate within his discipline, Plaintiff Dr. Fording feels limited in his ability to present this information to and discuss this data with his students due to SB 129's prohibitions.

106.    Moreover, Plaintiff Dr. Fording is concerned that SB 129 may prohibit teaching certain social science research that contains viewpoints that the Alabama Legislature finds disagreeable. Plaintiff Dr. Fording teaches about systemic racism and how laws and policies target Black communities in Alabama and across the country. For example, in his *Politics of Voting Rights* course, he discusses *Allen v. Milligan*, a recent case that involves racial discrimination by the state of Alabama. In the past, Plaintiff Dr. Fording presented the *Milligan* case as an example of the historical discrimination against Black voters and how that suppression has continued into the present. Although this interpretation of the case is supported by research and data, his discussion of the historical origins of the case may be interpreted to violate the SB129's prohibition on endorsing the concept that "individuals, by virtue of race . . . are inherently responsible for actions committed in the past by other members of their race."

107.    Plaintiff Dr. Fording also fears that SB 129 will prevent him from engaging in critical discussions about how race and racial stereotypes operate in students' own lives, which is crucial to their understanding of how to be effective political scientists and policymakers. Similar to Plaintiff Dr. Simon, Plaintiff Dr. Fording asks his students in his *Politics of Poverty* course to complete the Harvard Implicit Association Test. Student have at times expressed discomfort after taking the test, and the creators of the test even note that "results might cause defensiveness or negative emotions."[122] However, the test has also sparked important conversations about how students can recognize and combat racial prejudice in their personal and professional lives.

108.    Plaintiff Dr. Fording believes that, due to SB 129, he can no longer discuss "implicit" bias in his courses because a student's discomfort may lead to a complaint that he is advocating for, directing, or compelling certain students to adhere to the concept that they are

---

[122] *Id.*

43

"inherently racist, sexist, or oppressive, whether consciously or subconsciously." Similarly, Plaintiff Dr. Patton is removing assignments about implicit associations and bias due to fear of accusations of violating SB 129.

### B.  SB 129's Impact on Students' Receipt of Information

109.    Because SB 129 prevents instructors from sharing their expertise and expressing certain viewpoints in their instruction, students are denied the right to learn from that expertise or engage in open and robust discussion in the classroom. The lack of comprehensive instruction will disadvantage Alabama's students both academically and professionally.

110.    For example, Plaintiff Luna fears that his professors may decrease or eliminate discussions of race and racial justice in the classroom due to SB 129. In his *Human Rights* course this semester, his syllabus contained a disclaimer that UAB suggested all instructors include in their syllabi as part of its guidance on academic instruction to comply with SB 129. Specifically, the disclaimer states that "[t]hough students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered 'divisive' under Alabama law."[123]

111.    His professor also gave a verbal warning to the class indicating that the course would include discussion of certain controversial topics. Throughout his time as a student at UAB, Plaintiff Luna has not seen or heard a similar disclaimer in any of his courses prior to the passage of SB 129. He fears that these disclaimers indicate that professors are being encouraged to avoid controversial topics in order avoid any complaints for the violation of SB 129.

---

[123] *Guidance for Compliance with Federal Law and SB 129,* Off. of Compliance and Risk Assurance, UNIV. OF ALA. AT BIRMINGHAM, https://www.uab.edu/compliance/areas-of-focus/emerging-laws-regulations-policies/guidance-for-compliance-with-federal-law (last visited Jan. 10, 2025).

112.    Next semester Plaintiff Luna plans to enroll in Environmental Politics. He believes SB 129 will lead his professor to avoid altogether discussions that are central to the course, such as how characteristics such as race, class, and gender impact the development and implementation of environmental regulations and policies. Plaintiff Luna fears SB 129 will lead his professor to shy away from discussions about how systemic inequalities impact environmental conditions such as access to clean water and exposure to air pollution. Additionally, because of UAB's mixed and sometimes contradictory interpretations of SB 129, Plaintiff Luna believes that his instructor will avoid certain topics that are not implicated by the law but may be considered politically controversial, such as climate change.

113.    UAB students have observed that professors have been less willing to share their opinions, for example stopping mid-sentence or making comments such as "I could go to jail for saying this." Plaintiff Campos observed one of her professors becoming less active in class discussions after SB 129 went into effect and refraining from providing their opinion about issues that may be seen as implicating a divisive concept. Plaintiff Luna also observed that after SB 129 went into effect, his professors were more "timid" in conversations about sensitive topics such as the national origin and race-based discrimination of the Holocaust.

114.    UA's official SB 129 guidance demands that, if a student brings up a "divisive concept," the professor must course correct through an objective statement that ensures the student's "statements do not stifle discussion from other students."[124] Even if the student's statement is belied by actual facts or scholarship, the professor must remain "objective" in their response.

---

[124] *Resources and Recommendations for Handling Difficult Topics in a Academic Setting,* UA TEACHING ACADEMY, https://uateachingacademy.ua.edu/resources-and-recommendations-for-handling-difficult-topics/ (last visited Jan. 10, 2025).

115.    This guidance harms student's academic experience because it may require equating viewpoints that are false with those supported by evidence because professors may not be able to respond fully to the students' false or inaccurate statements under the guise of "objectivity." Students may believe that viewpoints unsupported by evidence are appropriate, given the lack of appropriate context from faculty.

116.    Under UA's guidance, everything a professor cannot say for the purposes of purported "objectivity" is something a student cannot learn.

117.    Moreover, despite disclaimers regarding the preservation of freedom of speech, student speech is still being stifled by SB129, including a sit-in regarding SB 129 that was organized by Plaintiff Dr. Simon's students for *Anti-Oppression and Social Justice* course.

### C. SB 129 Impact on University Resources for Students and Student Organizations

118.    Across UA and UAB, SB 129 caused the defunding of student groups that serve students of color, female students, and LGBTQIA students.

119.    Upon information and belief, UAB automatically provides university funding to University Funded Organizations ("UFOs") each year. In contrast, Registered Student Organizations ("RSOs") must apply to the Undergraduate Student Government Association ("USGA") each semester or secure an alternate source of funding, such as alumni donations. UAB's student government association distributes about $170,000 in state funding to student groups every year, and about $53,000 of that funding goes to RSOs. UFOs each have their own budget and the funding comes directly from the university.

120.    Upon information and belief, affinity-based, student organizations that support students of color and LGBTQIA students, including both UFOs and RSOs, were denied university

funding, had to change their names or operations, or became defunct in the Fall 2024 semester, due to UAB's effort to comply with SB 129.

121.    At UAB, Plaintiffs Testman, Luna, and Campos were members of SJAC, a UFO open to students of all races, whose mission is "to celebrate diversity of identity, broaden cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about identity related issues, and promote intercultural interactions between all communities of people at UAB." Prior to SB 129, SJAC contained two executive boards: a programming board and an affiliates board. The programming board was in charge of planning SJAC's signature programming, such as the Organizing Radical Collegiate Activism conference. The affiliates board worked with other student groups on campus that supported its mission by hosting workshops, inviting guest speakers, and distributing funding for social justice-related student organization programming.

122.    Two weeks before the start of the Fall 2024 semester, SJAC held a meeting with the former director of UAB Student Multicultural and Diversity Programs Office. At the meeting, SJAC's executive board was informed that, due to SB 129, SJAC was not going to receive any of the funding that it had previously received from the university, which typically totaled between $5,000 and $10,000.  They were also told that SJAC was losing its UFO status and was being demoted to an RSO.

123.    Because SJAC provided resources to other student groups that promoted its mission on campus through its affiliates board, SJAC's loss of university funding caused these student groups to also lose funding. For example, in prior semesters, SJAC had provided funding for the Indian Cultural Association's celebration of the Diwali holiday, the Spanish and Latino Student Association's celebration of the Day of the Dead, and the Korean Student Association's volleyball

game. Multiple UAB administrators informed Plaintiffs Luna, Campos, and Testman that under SB 129, these types of events cannot receive state funding based on UAB's interpretation of SB 129. SJAC is also no longer able to host internal programming.

124.    Plaintiffs Luna and Campos are also members of Esperanza, a Latine[125] RSO that was established in Spring of 2024. Esperanza's mission is to be "a networking organization designed for Hispanic/Latine students. Professional development, mentorship, and community are important aspects addressed where students will have the opportunity to learn more about how to successfully progress within their career goals. Support and encouragement are provided to ensure students are receiving resources necessary for completion of their degree and understanding of their goals to maximize their potential."[126]

125.    UAB administrators informed Plaintiffs Luna and Campos that pursuant to UAB's interpretation of SB 129, Esperanza cannot receive any funding from UAB should an event or initiative focus on a "divisive concept." Without funding, Esperanza cannot fulfill its mission of serving as a resource for Latine students and enriching their academic, personal, and professional development.

126.    UAB has expressed to students that certain student cultural, affinity, and social-justice related student groups cannot receive funding due to the university administration's interpretation of SB 129.

127.    SJAC, Esperanza, other UFOs, and RSOs do not, on their face, violate SB 129. These organizations do not express support or endorsement of any divisive concepts, and their membership is not based on adherence to any divisive concepts.

---

[125] of, relating to, or marked by Latin American heritage.

[126] Esperanza, UAB Campus Calendar, https://calendar.uab.edu/group/esperanza (last visited Jan. 13, 2025).

128.    Additionally, UAB's SB 129 guidance states that "[r]egistered student affinity organizations should be treated consistent with all other registered student organizations."[127] However, university administrators have repeatedly told Plaintiffs Testman, Luna, and Campos that these student affinity organizations are no longer receiving funding due to SB 129.

129.    At UA, several student organizations lost thousands of dollars in university funding and supportive resources, including the Black Student Union ("BSU") and Safe Zone (a physical space with programming for LGBTQIA students at UA), as part of UA's compliance with SB 129.

130.    UA NAACP, a chapter of Plaintiff Alabama NAACP, has members who are part of the BSU at UA. Before SB 129 went into effect, the BSU received at least $20,000 per year in funding from UA. After SB 129 went into effect, the BSU did not receive any funding from UA, harming UA NAACP members who are also members of UA's BSU. LGBTQIA members of the UA NAACP are also harmed by the loss of UA support for LGBTQIA student spaces due to SB 129.

131.    In addition to losing university funding and UFO status, several UA student groups serving Black and LGBTQIA students had their offices in the UA campus student center closed by the UA administration.  For example, the UA BSU office, a space in the student center that had supported Black students since at least 2017, was transformed into a food pantry. SafeZone, which was granted space in the UA student center in 2013 to support LGBTQIA students, was converted into the Student Leadership Lounge due to SB 129. UA explicitly cited SB 129 as the reason for

---

[127] *Guidance for Compliance with Federal Law and SB129*, Off. of Compliance & Risk Assurance, UNIV. OF ALA. AT BIRMINGHAM, https://www.uab.edu/compliance/areas-of-focus/emerging-laws-regulations-policies/guidance-for-compliance-with-federal-law-sb129 (last visited Jan. 11, 2025).

the closure of these student offices.[128] Both the BSU and Queer Students Association at UA were forced to scramble for other funding for programming because they lost university funding pursuant to SB 129. In a social media post, BSU commented about the importance of its office in the student center to the Black student community at UA, noting that it served "as a place where we could be ourselves, support one another, and celebrate our culture and heritage."[129]

132. The importance of these spaces is underscored by ongoing harassment. For example, after news of the 2024 election, several Black UA NAACP students received racist text messages implying they were enslaved and requesting that they report to plantations—an incident that is currently the subject of an FBI investigation.[130]

### D. Confusion and Ambiguity about Compliance with SB 129

133. During the legislative process, Black state legislators expressed concerns about ambiguities in the proposed SB 129. For example, during the Alabama Senate County and Municipal Government Committee meeting on February 21, 2024, Black Senator Linda Coleman-Madison expressed concerns that the professors in public colleges and universities would not be certain as to what they could and could not teach under the law because the Alabama Legislature tends to have "very vague" laws.[131]

---

[128] Jemma Stephenson, *University of Alabama Closes Spaces for Black Student Union and LGBTQ+ Center*, ALA. REFLECTOR (Aug. 27, 2024, 6:59 AM), https://alabamareflector.com/2024/08/27/university-of-alabama-closes-spaces-for-black-student-union-and-lgbtq-center/.

[129] *Id.*

[130] Ayron Lewallen, *Black University of Alabama Students, Parents Outraged After Getting Racist Text Message*, WVTM13 (Nov. 8, 2024, 3:19 PM), https://www.wvtm13.com/article/tuscaloosa-university-alabama-students-racist-text-message/62845475.

[131] *Alabama Senate County and Municipal Government Meeting: Hearing on S.B. 129 Before the Alabama State Senate Government Committee,* 2024 Reg. Sess. (Feb. 21, 2024).

134.    Professor Plaintiffs have also experienced confusion and ambiguity around how to interpret the law. For example, UA officials threatened to terminate Plaintiff Dr. Simon unless she canceled a class project that the Dean of the School of Social Work deemed to violate SB 129.

135.    This past fall, Plaintiff Simon taught *Anti-Oppression and Social Justice* and plans to teach the course again in the Spring of 2025. *The Anti-Oppression and Social Justice* course is a mandatory course for all junior level social work and social welfare majors. The course covers topics such as White privilege and implicit bias along with discussions involving race and LGBTQIA communities.

136.    As part of her final evaluation for students in the *Anti-Oppression and Social Justice* course, Plaintiff Simon requires students to design a project that addresses an injustice of some sort. In the Fall of 2024, students selected as their project a demonstration to highlight the negative effects of SB 129. The Dean of the School of Social Work threatened Plaintiff Dr. Simon with termination if she allowed the class project to go forward, citing SB 129. In the face of this threat, Professor Simon canceled the class project.

137.    Notwithstanding the forced cancellation of a protest, Plaintiff Dr. Simon is unclear about how to comply with SB 129. When Plaintiff Simon asked how the class project violated SB 129, UA's Provost responded that the planned demonstration "can be viewed as . . . tacitly requir[ing] a student's assent to a divisive concept." This response did not provide any clarity to Plaintiff Simon about compliance with SB 129.

138.    In addition, Dr. Simon and her colleagues were prepared to write a letter in support of students who received nationally publicized racist text messages in the aftermath of the 2024

presidential election.[132] The Dean of the School of Social Work said this would be political activity in violation of SB 129 and that university resources could not be used for the project.  The project was stopped based on the dean's assertion. It is unclear how this activity would violate SB 129 as suggested by the Dean of the School of Social Work.

139.    Likewise, Plaintiff Dr. Simon fears that SB 129's prohibition on fully discussing "divisive concepts" conflicts with national accreditation requirements for social work that require students to remedy discrimination. UA administrators initially told her that nothing in SB 129 would impact accreditation requirements. Yet, Plaintiff Dr. Simon believes that a list of FAQs on compliance with SB 129 that UA posted online[133] do in fact conflict with accreditation requirements because the code of ethics to which future social workers must adhere require fluency in some topics considered "divisive" under SB 129. For example, the divisive concept in SB 129 that prohibits teaching that "any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior" could conflict with accreditation standards that require understanding an individual's racial background, gender identity, sexual orientation, and the manners in which those implicate societal inequalities.

140.    Similarly, Plaintiff Dr. Patton has been targeted by university administrators for teaching in a manner which they considered to violate SB 129. UA Honors College Dean called Dr. Patton in October 2024 to inform her that the UA administration had received a complaint

---

[132] Jemma Stephenson, *Black Students at University of Alabama Targeted by Racist Text Messages*, ALA. REFLECTOR (Nov. 8, 2024, 7:01AM), https://alabamareflector.com/2024/11/08/racist-text-messages-sent-to-black-students-at-the-university-of-alabama/.

[133] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, UNIV. OF ALA., https://deiguidance.ua.edu/ (last visited Jan. 10, 2025).

about her *Understanding Poverty* course.  This course is required for the Social Innovation and Leadership minor, which is associated with the Honors College Fellows program she leads.

141.    University officials told Plaintiff Dr. Patton that the course's perceived focus on learning about systematic racism, supporting anti racism, correcting social injustice, and producing engaged global citizens may conflict with SB 129.

142.    University officials further told Plaintiff Dr. Patton that a current student complained about being asked to discuss White privilege after the law went into effect on October 1, 2024. University officials also told her that students had complained about the alleged "liberal" viewpoint expressed through her assigned course materials, the nature of class discussions on racism and bigotry, and her instruction on topics such as the American Dream and the redistribution of wealth.

143.    As a result of these complaints, the Senior Associate Provost for Academic Affairs asked Plaintiff Patton for information about her class, course materials, and instruction procedures. For example, she was asked to provide "specific examples of opportunities for classroom discussions of varying opinions," any information she shared with students to "clarify" her "position on open discussion," and a response to allegations that some of her assigned readings were "political." Never before had Plaintiff Dr. Patton been asked, let alone required, to provide details about her courses, other than posting her syllabus to the school's course roster every semester. The Senior Associate Provost told her if she refused to answer these questions, she could receive progressive discipline and may be fired even though she is tenured.

144.    SB 129 does not mandate that professors share opinions on open discussion or provide only apolitical materials, but after a SB 129 complaint was lodged against her, university

officials asked Plaintiff Dr. Patton to provide information about the manner in which she facilitated classroom discussions and the political content of her course materials.

145. University officials further asked Plaintiff Patton how she "consciously avoids" compelling assent, but she did not understand the question nor how to answer it.

146. SB 129 does not explain the difference between instruction that provides information about a divisive concept, instruction that "advocates for" a divisive concept, and instruction that would "direct or compel" a student to adhere to that concept. It is further unclear what activities by a student or staff organization at a public college or university would constitute "compelling assent" to a divisive concept. Additionally, SB 129 allows for the authorization of the "teaching or discussion of any divisive concept in an objective manner and without endorsement," but does not explain what constitutes an "objective manner" or "without endorsement."

147. The divisive concepts themselves are not clearly defined and leave open multiple interpretations so that topics touching upon racism, including slavery, segregation or even more recent examples of discrimination by the state, *see, e.g.*, *Milligan*, 599 U.S. at 22-23; *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011), could arguably be considered a divisive concept if discussed or taught in a robust and comprehensive manner disfavored by university or other state officials.

148. Due to SB 129's vagueness and ambiguity, Professor Plaintiffs are unable to ascertain how to comply with its prohibitions. For example, SB 129 fails to provide a definition of what it means to "compel" assent or what constitutes a "knowing[]" violation of the law.[134] Plaintiff Dr. Patton's discussions of systemic racism in the *Social Investment and the Role of Innovation* course about the Alabama Black Belt could be interpreted as advocating for or

---

[134] S.B. 129, 2024 Gen. Assemb., Reg. Sess. (Ala. 2024).

compelling assent to certain views about race even if she does not explicitly ask her students to assent to those views.

149.    Moreover, the conduct that would constitute a violation of SB 129 remains unclear. Despite being the subject of an SB 129 complaint, for purported violation of SB 129, Plaintiff Dr. Patton still has not received clear guidance about what activities violate the law.

150.    Guidance from public colleges and universities does not provide any additional clarity about compliance with SB 129. For example, UA's guidance on what constitutes a "divisive concept" under SB 129 merely recites language from SB 129 itself.[135] Specifically, its published guidance for professors, under the heading "What is a 'divisive concept,'" recites the text of the law instead of providing any explanations of "divisive concepts" or explanations about compliance with SB 129.[136]

151.    The only practical suggestion that UA provided at an internal training for faculty was not to test or evaluate students on any divisive concepts. However, Plaintiff Dr. Patton was threatened with discipline even though her course did not include any assessments related to divisive concepts.

152.    For over twenty years, Plaintiff Dr. Fording has taught a *Politics of Poverty* course, which he designed as a Ph.D. student. This course is a variation of the *Understanding Poverty* course that was taught by Dr. Patton last semester and includes many of the same concepts in the *Understanding Poverty* course that could be considered "divisive," such as racial disparities and structural inequality.

---

[135] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, *supra* note 132.

[136] *Resources and Recommendations for Handling Difficult Topics in an Academic Setting,* THE UNIV. OF ALA., https:// uateachingacademy.ua.edu/resources-and-recommendations-for-handling-difficult-topics/ (last visited Jan. 10, 2025).

153.    Plaintiff Dr. Fording is aware that Plaintiff Dr. Patton was accused of violating SB 129 due to her instruction and course materials in *Understanding Poverty*. Because UA has failed to clarify what SB 129 prohibits and permits, he fears that he also will be found to have violated SB 129 if he teaches *Politics of Poverty* during the Spring 2025 semester.

154.    Additionally, Plaintiff Dr. Fording is unable to determine whether and to what extent teaching about voter disenfranchisement of Black Alabamian citizens might run afoul of the divisive concepts' prohibition in SB 129.

155.    Plaintiff Dr. Fording would teach *Politics of Poverty* in Spring 2025 if SB 129 did not exist. Plaintiff Dr. Fording has concerns that this course may lead to discipline or termination for violation of SB 129.

156.    Section 3 of SB 129 authorizes state agencies and political subdivisions to "discipline or terminate the employment of any employee or contractor who knowingly violates" the law. Without understanding the parameters of what constitutes a violation of SB 129, professors do not know how to avoid violating the law and, thus, avoid termination or discipline for any violation.

157.    In addition, upon information and belief, various entities within the University of Alabama system have taken steps to avoid violating SB 129 that do not seem necessary under its provisions due to the vagueness of the law. For example, UA College of Education instructed professors to avoid using the words "diversity," "equity," or "inclusion" in their course descriptions or materials even though those words are not prohibited in the list of divisive concepts.

158.    For the past 35 years, UA School of Social Work has had a program to celebrate Dr. Ethel H. Hall, the first woman and African American to graduate from UA's School of Social Work's doctoral program. The program was called the Dr. Ethel H. Hall African-American

Heritage Month Celebration, but will be renamed the Dr. Ethel H. Hall Symposium. University officials informed Plaintiff Dr. Simon that the university changed the name of the program because SB 129 requires the erasure of the reference to race.

159.    Upon information and belief, UA administrators asked faculty to replace a poster in a female dormitory displaying examples of "women scientists" with a sign that says "great scientists" instead, in an effort to comply with SB 129. Yet, it is unclear what specific provision within SB 129 would prohibit a poster celebrating female scientists.

160.    In addition, and in response to SB 129, UA is rewriting its Capstone Creed, which is meant to reflect the "shared values" of the UA community. The Creed is read aloud at convocation by the school's approximately 8,000 new students each year. The current proposed revision replaces the words "promote equity and inclusion" with "embrace and uphold the dignity of all" although the words "equity" and "inclusion" are not prohibited by SB 129 or in UA's compliance guidance.

161.    SB 129 bans DEI offices and programs while defining DEI programs as "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates" SB 129. SB 129 does not define what constitutes attendance being based on race. Many groups on campus, including UA NAACP (a student chapter of Plaintiff Alabama NAACP), host programs, classes, trainings, seminars, and other events which are open to individuals of all racial backgrounds, but may focus on issues pertaining to Black individuals.

162.    Upon information and belief, UA instructed its faculty DEI committee to change its name and not to conduct committee activities using university resources, such as computers and listservs. UA did not explain to faculty members of the DEI committee whether any of the

committee's activities were forbidden by SB 129 or whether any activities would be acceptable under the law as long as the committee changed its name.

163.    In addition, Black students are unsure and have not received clarity from administrators about how SB 129 may impact their extracurricular activities. UA NAACP does not know if they qualify for funding from UA because the group's programming and activities may implicate a divisive concept.

164.    UAB students have lost funding for affinity-based groups to which they belong even though SB 129 does not expressly ban funding for affinity-based groups or activities. For example, UAB Society of Women Engineers, an organization for female engineering students, has been denied university funding to travel to an off-campus conference even though the organization is not associated with any divisive concept.  UAB Her Science, an organization supporting STEM fields and female STEM students, was advised not to apply for funds from UAB by university officials.

## V.  DISCRIMINATION FROM SB 129

### A.  Legislative History of SB 129

165.    Prior legislative efforts to ban "divisive concepts" indicate the specific intent of SB 129 to disadvantage Black students in Alabama public colleges and universities.

166.    In 2022, the Alabama House and Senate advanced four bills—SB 7, HB 8, HB 312, and HB 9—which largely mirror SB 129. All three bills banned "divisive concepts" in higher education, but none banned diversity, equity, and inclusion programs in higher education.

167.    On the contrary, HB 8 explicitly provided that "public institution[s] of higher education" could still promote "racial, cultural, or ethnic diversity or inclusiveness," as long as

those efforts did not run afoul of the requirements of the bill.[137] Likewise, SB 7 and HB 9 did not ban diversity, equity, and inclusion programs outright, but instead required that contractors and the state Department of Labor review programs to ensure they did not "encourage agency employees . . . to judge each other."[138]

168.    SB 7, HB 8, and HB 9 all failed to receive meaningful consideration through public hearings, public hearings, or floor votes in the 2022 state legislative session.

169.    HB 312 was similar to SB 7 and HB 9 but included an additional provision that banned teaching that "slavery and racism are anything other than deviations from . . . the founding principles of the United States."[139] That provision was eventually struck from HB 312, and the bill died during the 2022 legislative session.[140]

170.    In 2023, the Alabama House and Senate introduced two bills—SB 247 and HB 7— that substantially mirrored the "divisive concept" bills —SB 7, HB 8, and HB 9— that failed in 2022. As in 2022, the Alabama Legislature failed to pass either SB 247 or HB 7 in the 2023 legislative session. SB 247 included the provision that was first introduced in—and later dropped from— 2022's HB 312, which banned teaching that "slavery and racism are anything other than deviations from … the founding principles of the United States."[141]

---

[137] As a protype for SB 129, the text of H.B. 8 makes clear that race constituted a "divisive concept." H.B. 8, 2022 Leg., Reg. Sess. (Ala. 2022). H.B. 8 would have prohibited "certain concepts regarding race or sex" from being taught in public institutions of higher education. *Id.*

[138] S.B. 7, 2022 Leg., Reg. Sess. (Ala. 2022).

[139] H.B. 312, 2022 Leg., Reg. Sess. (Ala. 2022).

[140] Tara Bailey, *Review of the Divisive Concepts Bills in Alabama*, THE ALA. CHANNEL (Feb. 8, 2023), https://www.thealabamachannel.org/post/divisive-concepts.

[141] S.B. 247, 2022 Leg., Reg. Sess. (Ala. 2022).

171.    SB 129 was introduced in the Senate on February 20, 2024, by Senator Will Barfoot. Like its predecessors from the 2022 and 2023 sessions, SB 129 bans "divisive concepts" in higher education.

172.    New provisions in SB 129 include the explicit prohibition that no department at a public university could "promote[]" a "program, class, training, seminar, or other event when attendance is based on an individual's race" or other human traits—what the bill defines to be "diversity, equity, and inclusion."[142]

173.    Notably, the Alabama Legislature's definition of "diversity, equity, and inclusion" is not commonly used.  By contrast, the Merriam-Webster Dictionary defines "diversity, equity, and inclusion" as: "a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against."[143]

174.    When SB 129 was referred to the Committee on County and Municipal Government, State Senator Coleman successfully amended the bill to clarify that SB 129 would not modify other sections of state law seeking to maintain efforts to diversify state boards and commissions and ensure that the boards and commissions reflect the demographic breakdown of Alabama.

175.    State Senator Coleman's amendment indicates legislators' awareness of the possibility that SB 129 would affect the racial demographics of students in Alabama's institutions of higher education.

---

[142] *Id.*

[143] *Diversity, Equity, and Inclusion*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/diversity%2C%20equity%20and%20inclusion (last visited Jan. 1, 2025).

176.    Statements by supporters of SB 129 demonstrate their intent to curtail certain discussions about race and race-related issues in higher education classrooms.

177.    Senator Barfoot, who introduced SB 129, publicly stated that the bill was inspired by a constituent student attending UA, who felt compelled to agree with other students during a classroom discussion about law enforcement[144]—an issue that has been inextricably linked to Black communities in public discourse, especially since the worldwide racial justice demonstrations in 2020.

178.    During the Alabama House State Government Committee hearing, Rep. Oliver made comments describing DEI programs as "radical and divisive offshoots" of critical race theory that "their effect of college campuses is to deepen divisions set up race exclusionary programs . . . ."[145]

179.    The Alabama Legislature's unique focus on censoring race-related topics that endeavor to advance civil rights for Black people and other people of color reveal a clear intent to selectively constrain the teaching of racism in the past and the present day. In other words, SB 129's legislative supporters intended to prevent discussions, academic scholarship, and programs in higher education that would help Black people secure greater equality, thereby injuring Black people—by having less equality—through SB 129's implementation.

180.    On the other hand, the freedom to teach and to learn about other viewpoints remains uninhibited, and university resources in support of other viewpoints remain available.

---

[144] Kelsey Shelton, *Anti-DEI Bill Faces Opposition from Students Across Alabama*, WBHM (Mar. 18, 2024), https://wbhm.org/2024/anti-dei-bill-faces-opposition-from-students-across-alabama/.

[145] S.B. 129, Reg. Sess.; *Hearing on S.B. 129 Before the S.* (as reported by S. Comm. on Cnty. and Mun. Gov., Feb. 21, 2024), Reg. Sess. (Ala. 2024) (statement of Senator Barfoot).

181.    Any concerns about discrimination against students on campus could have been addressed to existing anti-discrimination law. In addition, any concerns about what university students were learning could have been addressed by the Alabama Commission on Higher Education instead of the Alabama Legislature so that any curricular changes would be focused on pedagogy versus the preferences of the legislature.

**B. Legislators' Departure from Ordinary Procedures to Pass SB 129**

182.    The Alabama Legislature enacted SB 129 through a rushed and atypical legislative process. Senate Bill 129 was introduced in the Senate on February 20, 2024, by Senator Barfoot, and referred to the Senate Committee on County and Municipal Government.

183.    The following day, on February 21, 2024, at 11:00 a.m., the Alabama Senate County and Municipal Government the Senate Committee discussed the bill at a standing meeting and hosted a public hearing concerning the bill.

184.    During the Senate Committee on County and Municipal Government's session on February 21, 2024, Jerome Dees, the Policy Director for the Southern Poverty Law Center, noted that the bill was filed and appeared on Alison, the Alabama Legislative website, the prior day at around 4 p.m. on February 20, 2024. He noted that although the bill was listed as meeting, no agenda was attached to the posting, which is a common practice for the Committee.[146] Despite numerous requests for public hearings, as of the morning of the Committee hearing on February 21, 2024, no public hearing had been assigned to the bill and resulted in members of the public having to scramble to attend a last minute hearing on SB 129 on the same day it was announced.[147]

---

[146] *Id.* (statement of Jerome Dees).

[147] *Id.*

185.    In addition, Senator Coleman raised another issue regarding the bill being posted belatedly, stating: "[n]ormally ... we would've had a bill that would've posted at 4 p.m. the night before so we would've had time to have a discussion."[148] Due to the bill not being posted the previous night, the Committee expressed their inability to thoroughly review and engage with the bill. For example, Senator Coleman-Madison repeatedly requested additional time to examine the bill during the meeting.[149]

186.    On February 22, 2024, the bill underwent its third reading in the Senate and passed on the same day. During the Alabama Senate's meeting, Black Senator Bobby Singleton explained, "It's ironic that this bill has moved through the body as fast as any piece of legislation that I have ever seen. Prior to Tuesday, this bill had not been pre-filed. It had not even been introduced . . . and so as of Tuesday, this bill got dropped. Normally, it takes about four to five days before we see a piece of legislation. The [Committee on County and Municipal Government] had met on Tuesday already. We usually don't meet but once a week . . . . None of the other bills ha[ve] gone through the process as fast this one."[150]

187.    SB 129 was read for the first time in the House and referred to the House Committee on State Government on February 27, 2024. On March 5, 2024, the Committee held a hearing and Black Representative Kevin Lawrence commented that the hearing was taking place on an atypical day, explaining that "[w]e normally have these types of meetings on Wednesday, state government meetings. For some reason today, this week, we decided to change our meeting to Tuesday."[151]

---

[148] *Id.* (statement of Senator Coleman).

[149] *Id.*

[150] *Id.* (statement of Senator Singleton).

[151] S.B. 129, Reg. Sess., *Hearing on S.B. 129 Before the Al. H. State Gov. Comm.*, Reg. Sess. (Ala. 2024).

188.    SB 129 was read for a third time and passed on March 7, 2024. SB 129 was enrolled and delivered to Governor Ivey on March 19, 2024. The bill was enacted on March 19, 2024.

189.    Upon information and belief, legislation in Alabama normally takes at least two months to become law. By contrast, it took less than a month for the Legislature to introduce SB 129 and enact it into law.

190.    Upon information and belief, SB 129 marks the first time that the Alabama Legislature has regulated what is taught in public universities. As noted by Senator Coleman-Madison during the legislative process,[152] Alabama typically regulates public primary and secondary education through the Alabama State Board of Education and higher education through the Alabama Commission on Higher Education ("Commission"), not through the state legislature.

191.    The Commission approves new policies, academic majors, programs, and "Substantiative Inventory Change[s]" at public universities.[153] For example, in June 2024, the Commission approved a new graduate program at UAB, a Master of Science in Artificial Intelligence in Medicine.[154]

---

[152] The Ala. Channel, *Alabama Senate County and Municipal Government Committee*, YOUTUBE, at 54:00-55:00 (Feb. 21, 2024), https://www.youtube.com/watch?v=-M07sp8IkeU.)

[153] Ala. Comm'n on Higher Educ, *Changes to the Commission's Academic Program Inventory Instructions and Forms,* AUBURN UNIV. https://www.auburn.edu/academic/provost/curriculum-management/_assets/pdf/changes-academic-program-inventory.pdf (last visited Jan. 11, 2025).

[154] Alander Rocha, *New AI in Medicine Graduate Program Approved at University of Alabama at Birmingham*, ALA. REFLECTOR (June 17, 2024), https://alabamareflector.com/2024/06/17/new-ai-in-medicine-graduate-program-approved-at-university-of-alabama-at-birmingham/; *About the Agency,* Ala. Comm'n on Higher Educ, https://www.ache.edu/index.php/about-the-agency (last visited Jan. 11, 2025).

192.    At the same time, state lawmakers failed to give advance notice of any public hearings that would have allowed experts in higher education pedagogy to comment on the need and efficacy of SB 129's provisions.

### C.  Notice of SB 129's Foreseeable Harm to Black People

193.    Prior to enacting SB 129, Alabama legislators had notice of the ways in which SB 129 would harm Black people, including through statements from fellow legislators and testimony from community members.

194.    For example, during Alabama House State Government Committee meeting, a Black legislator, Representative Chestnut, explained that the bill's language would "threaten the essence" of Historically Black Colleges and Universities ("HBCU's") in Alabama because SB 129 has language that constitutes "going after things for trying to have a outreach to a specific demographic" and would "handicap and potentially destroy" the opportunities that HBCUs represent.[155]

195.    In the Alabama Senate's meeting on February 22, 2024, Senator Smitherman warned of the harmful effects of SB 129 and explained, "[w]hether it is the intent or not this is killing us as a people. This will set us back for years and decades and generations. It's gonna take 50 years for us to get back to this point in life. . . if not longer."[156] Senator Smitherman also explained that SB 129 represented a "move to segregate."[157]

---

[155] The Ala. Channel, *Alabama House State Government Committee*, YOUTUBE (Mar. 5, 2024), https://www.youtube.com/watch?v=Igz9KZ92W78.

[156] The Ala. Channel, *Alabama Senate*, YOUTUBE, at 6:10-6:11 (Feb. 22, 2024), https://www.youtube.com/watch?v=VYVAEd9XJKc.

[157] *Id.* at 1:29:11.

196.    On February 21, 2024, during her testimony on SB 129 before the Alabama Senate County and Municipal Government Committee, Camille Bennett, founder and director of Project Say Something, described the bill as "inherently racist" and criticized the hypocrisy of advancing this legislation while selectively celebrating Confederate monuments and history, stating "the omission and erasure of Black History itself is divisive."[158]

197.    When Senator Rodger Smitherman cautioned about the discriminatory impact of SB 129 on Black students, and the need for all to work to remedy the vestiges of slavery and Jim Crow in Alabama, Sen. Barfoot quipped: "we are not responsible for that."[159]

198.    The ACLU of Alabama submitted testimony in opposition to SB 129, stating that this legislation's vagueness regarding prohibitions against diversity, equity, and inclusion programs could lead to censorship of affinity groups in public universities.[160]

199.    Alabama legislators also had notice of SB 129's likely illegality based on court rulings regarding similar laws in other states. In Florida, the "Individual Freedom Act"—also called the "Stop W.O.K.E. Act"—prohibits instructors and students from expressing viewpoints disfavored by the Florida legislature on a range of topics related to race and gender inequalities, and its implementation in Florida higher education has been preliminarily enjoined by a federal district court for over two years[161] due to First Amendment and Fourteenth Amendment Due

---

[158] The Ala. Channel, *Alabama Senate County and Municipal Government Committee*, YOUTUBE, at 26:30 (Feb. 21, 2024).

[159] The Ala. Channel, *Alabama Senate*, YOUTUBE, 1:18:51-1:20:25 (Feb. 22, 2024), https://www.youtube.com/watch?v=VYVAEd9XJKc.

[160] S.B. 129, Reg. Sess., *Hearing on S.B. 129 Before the S. Comm. on Cnty. and Mun. Gov.*, Reg. Sess. (Ala. 2024).

[161] The preliminary injunction is currently on appeal in the 11th Circuit Court of Appeals. *Honeyfund.com, Inc. v. Governor, St. of Fla.*, No. 22-13135 (Mar. 4, 2024).

Process violations.[162] In Oklahoma, a federal district court enjoined HB 1775, which restricted instruction on race and gender in public universities and impacted the ways educators could, for example, teach about mass shootings in Black communities.[163]

### D. SB 129's Disproportionate Harms to Black People

#### 1. Viewpoint Restrictions

200.    Since it went into effect, SB 129 has been utilized to chill important speech in classroom discussions and in extracurricular activities that advance a viewpoint in support of racial equality for Black people, including Black LGBTQIA people.

201.    Research shows that when Black students take courses in gender studies and ethnic studies, they perform better academically. One 2020 study found, that amongst students at San Francisco State University, Black students who took a minor in Ethnic Studies had a 78.4 percent graduation rate, compared to the 17.8 percent graduation rate of African American students who did not take the minor and who did not take any Ethnic Studies classes.[164]

202.    Thus, the censorship of instruction on race and gender inequalities in public university classes has a profound impact on academic engagement and outcomes for Black students in those classes.

203.    Since the implementation of SB 129, public university professors, including Professor Plaintiffs, can no longer espouse viewpoints on certain topics related to race and racism

---

[162] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

[163] *See Black Emergency Response Team v. Drummond*, No. CIV-21-1022-G, 2024 WL 3014659, at *12 (W.D. Okla. June 14, 2024) (granting preliminary injunction partly on Equal Protection claims); *see also Arce v. Douglas*, 793 F.3d 968 (2015).

[164] Amy Sueyoshi & Sutee Sujitparapitaya, *Why Ethnic Studies: Student Success for the Twenty-First Century*, 43 ETHNIC STUDS. REV. 86, 86-102 (2020).

that may include instruction on the histories of racism in America and present-day social inequalities.

204.    Due to this governmental viewpoint restriction on public higher education, Black students are deprived of the opportunity to learn about the ways in which racial discrimination affects them, their families, and their communities and how one can remedy those harms and disadvantages.

205.    Moreover, any curtailment of academic scholarship on remedying the effects of racial discrimination harms not only Black students, but Black people all across Alabama.

206.    Due to intervention from UA administrators, Plaintiff Dr. Simon had to cancel a class project involving a student led diversity, equity, and inclusion advocacy event. This harms Black students in particular who are training to be future social workers as it stifles their ability to have an opportunity to practice using their voice for particular issues and interests that may impact their future clients.

207.    SB 129 censors university programming, and causes curricular restrictions that disproportionately harm Black students. An example of this disproportionate harm is SB 129's effect on UA's Diversity Passport program. UA implemented the Diversity Passport as a remedial measure following national news in 2013 that the school's non-multicultural fraternities and sororities were racially segregated. The passport system benefited Black students by requiring all students on campus to attend events themed around diversity and cultural awareness, and creating a point system from attending the events that encouraged members of student organizations to attend them to gain the most points and, as a result, receive priority seating at UA football

games.[165] Yet, because of SB 129, the Diversity Passport was replaced by the Capstone Wellness Explorer, through which students accrue points from other programs that do not, like the Diversity Passport, expose students to diversity or cultural awareness and, thus, do not similarly benefit Black students.

### 2. Loss of University Support

208.    SB 129's mandate to ban offices, programs, and staff in connection with public universities' diversity, equity, and inclusion efforts disproportionately harms Black members of Alabama's public university communities.

209.    At UA, the closure of spaces such as the BSU and Safezone have harmed Black students, including Black LGBTQIA students, by taking away student led spaces that have been used for community, connection, and social programming. Black students no longer have a designated location where they know they can create community, provide support, and host events in connection with the experiences of Black student life on campus. In a similar fashion, the lack of a designated space for Safezone has led to a decrease in the ability to organize programs and trainings that work to create more safety and inclusion for Black LGBTQIA students on campus.

210.    SB 129's curtailment on university funding for student organization disproportionately impacts Black students. Based on information and belief, all Black student organizations whose missions are dedicated to serving Black members of UAB and UA have lost funding due to SB 129.

211.    Based upon information and belief, at UAB, for example, six UFOs lost funding, or otherwise had to change their operations.  Two groups that provided resources and services to

---

[165] A big prize indeed: as of this complaint's filing, the Alabama Crimson Tide was ranked 11 in the AP Top 25 poll. *Alabama Crimson Tide Football*, AP News, https://apnews.com/hub/alabama-crimson-tide-football (last visited Jan. 10, 2025).

Black students on campus were affected by SB 129. The Black Student Awareness Committee was demoted from a UFO to an RSO because it continued its mission of serving Black students. Blazer Male Excellence Network maintained its UFO status but had to change its mission of providing services to Black male students to continue receiving university funding. Yet, based on information and belief, groups at UAB such as the Anthropology Student Association, First Love at UAB, the Eastern European Association and Turning Point USA at UAB, all which may contain specific viewpoints and ideologies, are still eligible to receive state funding.

212. SB 129's broad and vague definition of diversity, equity, and inclusion and the UFOs perceived association with viewpoints deemed divisive and illegal under SB 129 have resulted in this defunding based on information UAB administrators provided to Plaintiffs Testman, Luna, and Campos.

213. At UA, the BSU lost all funding from the university, and now must independently raise funds to put on events. As BSU's membership is overwhelmingly Black, stripping the group of thousands of dollars in funding disproportionately harms Black students because they can no longer receive school support to fund social events, bring in guest speakers or provide services to the campus's Black community.

214. Likewise, UA NAACP does not believe it qualifies for event-specific funding from the Student Government because of the dismantling of the BSU pursuant to SB 129's broad definition of diversity, equity, and inclusion and/or divisive concepts.

215. By contrast, based on information and belief, other RSOs not related to viewpoints perceived to relate to Black identity— such as the Economics Student Association, the Environmental Council, First Fellows, the Latter-Day Saints Student Organization, the Philosophy

Club and the Saint Thomas More Society— are still able to receive state university funding under SB 129.

216.    SB 129's requirement that universities do not "authorize or expend funding … for the purpose of compelling assent to any divisive concept" or "sponsor" programs that relate to the state's definition of DEI, further disproportionately impacts Black students by denying Black-focused student affinity groups physical spaces on campuses while allowing other student groups not related to race, gender identity or sexual orientation to continue to keep their on campus spaces and resources.

217.    At UA, the BSU lost their university-sponsored office as a direct result of SB 129. The office, in the middle of the Student Center at UA, was taken from the BSU in the Summer of 2024 and converted into a food pantry as the university prepared for SB 129 to go into effect. University officials specifically told BSU student leaders that BSU could not maintain its university-sponsored office in compliance with SB 129 and did not offer any alternative for BSU. Similarly, at UA, the Black Faculty and Staff Association ("BFSA") had their space, the "Capitol Room" in Honor's Hall revoked.

218.    Black students, including student members of the UA NAACP, used the BSU office to socialize, organize campus events for the Black community, and connect with one another. The BSU office was a central location for Black student life on UA's campus, and closing it left a void that Black students have found difficult to fill.

219.    Affinity spaces defunded—and, in some cases, removed—by SB 129 provided critical support for Black students.[166] Black student affinity spaces assisted Black students to find

---

[166] Drisana Hughes, *The Proven Impact of Affinity Spaces*, RACE, RSCH. & POL'Y PORTAL OF THE IARA PROJECT, https://rrapp.hks.harvard.edu/how-to-guide/the-proven-impact-of-affinity-

social networks among peers on campus, and resources from students who share similar cultural contexts. These spaces also empower Black students to become campus leaders and gain access to educational resources to help them succeed in the classroom. Members of the UA NAACP found community and support in the BSU and a critical place of belonging on a campus where Black students may experience racial isolation or exclusion.[167]

### E.  Disproportionate Harms to Black Faculty in Alabama's Public Universities

220.    Black faculty at universities are more likely than their White colleagues to teach and research topics on race. "Nationally, a disproportionate number of instructors of color (that is, faculty members or graduate student instructors who identify or are identified as "non-White") are engaged in teaching diversity courses in higher education."[168] Black sociologists, for example, more often than their White colleagues focus their research on "race/ethnicity."[169]

221.    Even within similar courses, Black professors are more likely than their White colleagues to engage their students in diversity related activities. For example, Black professors are more likely to assign "writing assignments that include diverse perspectives" and to allow

---

spaces/; Tori Stevenson, *The Importance of Black Cultural Centers, Student Unions, and Faculty Organizations in Higher Education*, BLACK HIST. RSCH. LAB, https://www.lib.uidaho.edu/blackhistory/features/importance-of-blackculturalcenters.html (last visited Jan.11, 2025).

[167] *The University of Alabama Higher Education Act Student Population Information*, OFF. OF INSTITUTIONAL RSCH. AND ASSESSMENT (Fall 2024), https://oira.ua.edu/HEA/reports/general-information/student-population/.

[168] Gary Perry et al., *Maintaining Credibility and Authority as an Instructor of Color in Diversity-Education Classrooms: A Qualitative Inquiry*, 85 SOCIO. DEP'T, FAC. PUBL'NS (2009).

[169] Jasmine Harris, *Black on Black: The Vilification of "Me-Search," Tenure, and the Economic Position of Black Sociologists*, 4 J. OF ECON., RACE, AND POL'Y 1, 1-14 (2021).

"students [to] have serious conversations in [the] course with students of a different race or ethnicity."[170] SB 129 likely bar these types of instruction.

222.     Black faculty are also more likely than White faculty to apply for research funding to study questions around race and social inequality. After reviewing 157,549 research applications, the National Institutes of Health found that Black researchers were more likely to be associated with topics like health disparities, disease prevention and intervention, socioeconomic factors, healthcare, lifestyle, psychosocial, adolescent, and risk.[171]

223.     Students of all races have higher expectations that courses focusing on race will be taught by faculty of color, and that is frequently the case.[172]

224.     Black faculty are also more likely to support Black students. One of the ways in which Black professors responded to the racism they experienced on campus is by engaging in service-related activities on behalf of their Black students. For example, Black professors are more likely to engage with race-related issues through their work on committees. Black professors also often serve as advisors and supporters to Black students, providing professional and personal guidance to aid in their development.[173]

---

[170] Paul D. Umbach, *The Contribution of Faculty of Color to Undergraduate Education*, 47 RSCH. IN HIGHER EDUC. 317, 323 (2006).

[171] Mike Lauer, *Delving Further into the Funding Gap Between White and Black Researchers*, NAT'L INST. OF HEALTH (Oct. 10, 2019), https://nexus.od.nih.gov/all/2019/10/10/delving-further-into-the-funding-gap-between-white-and-black-researchers/.

[172] Rosemary B. Closson et al., *Toward a Race Pedagogy for Black Faculty*, 25 ADULT LEARNING 82, 86 (May 2014).

[173] Kimberly A. Griffin et al., *(Re)Defining Departure: Exploring Black Professors' Experiences with and Responses to Racism and Racial Climate*, 117 AM. J. EDUC. 495, 520 (Aug. 2011).

225.    UA leadership informed Plaintiff Dr. Simon, for example, that she could not utilize university resources to support Black students, like those in the UA NAACP, who received racist text messages after the 2024 election without violating SB 129.

## CLAIMS FOR RELIEF

### COUNT ONE

### First Amendment to the U.S. Constitution – Right to Speak Free from Viewpoint Discrimination (Professor Plaintiffs Against Defendants) 42 U.S.C. § 1983

226.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

227.    Specifically, Plaintiff Dr. Simon, Plaintiff Dr. Patton, and Plaintiff Dr. Fording have been harmed by the curriculum restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129.

228.    All instructors on college campuses have the First Amendment right to speak free from viewpoint-based restrictions.

229.    Instructors understand that SB 129 prohibits them from providing instruction that advances students' belief in certain concepts, while allowing them to provide instruction that denounces those concepts.

230.    SB 129 prohibits instructors from teaching about topics which are disfavored by the Alabama Legislature and is creating censored classrooms.

231.    Due to SB 129, Plaintiff Professors are forced to modify their reading lists, exclude instruction and classroom discussion on certain subject matters, refrain from evaluating students on certain skills or expertise, and otherwise deprive students of the full range of academic scholarship, expertise, and opinions that they would otherwise provide in their courses in public universities.

74

232.    Instructors' right to speak freely from viewpoint-based restrictions is infringed upon by SB 129.

## COUNT TWO

**First Amendment to the U.S. Constitution – Right to Receive Information Free from Viewpoint-Based Discrimination (Plaintiff Luna Against Defendants) 42 U.S.C. § 1983**

233.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

234.    Specifically, Plaintiff Luna has been harmed by the curriculum restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129.

235.    The First Amendment binds the State of Alabama pursuant to the incorporation doctrine of the Fourteenth Amendment. In all the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

236.    Viewpoint-based discrimination is presumptively unconstitutional in any setting. *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 828 (1995); *Honeyfund. com Inc. v. Governor*, 94 F. 4th 1272 (11th Cir. 2024); *Pernell v. Fla. Bd. of Governors of State Univ*., No. 22-13992-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023). But the dangers of viewpoint-based restrictions are elevated in the university setting, because they interfere with academic freedom principles long recognized and bolstered by the Supreme Court, the Eleventh Circuit of Appeals and Alabama's colleges and universities. *Keyshian v. Board of Regents of Uni. Of State of N.Y.*, 385 U.S. 589, 603 (1967); *Speech First, Inc. v. Cartwright,* 32 F.4th 1110, 1127 n. 6 (11th Cir. 2022).

237.    Individuals have the First Amendment right to receive information as well as the right to disseminate ideas. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

238.    By prohibiting public university professors from advancing particular viewpoints in the course of instruction, SB 129 denies public university students the right to learn from those viewpoints.

239.    Universities' "chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

240.    Students cannot be prepared for civic and political participation if they are not: "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian,* 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y. 1943)).

241.    SB 129 blocks educators' mission to provide resources to students "to participate in the civic and political life of our democratic republic," because it censors truth about specific histories while allowing others to speak their own version of truth.

242.    Professors have been directed to refrain from testing on the divisive concepts listed within SB 129 and face sanctions for testing on subjects unrelated to the subjects specifically mentioned in SB 129, leading to an arbitrary and authoritarian enforcement scheme that provides a limited view of the truth. Further, instructors must limit their discussion of subjects, notwithstanding whether they appear on the list of prohibited subject matter within the text of SB 129.

243.    The censorship of certain viewpoints, under SB129 limits truth taught to students, including the exclusion of certain voices and experiences of Black and LGBTQIA people. Censored classrooms significantly impair students' ability to gain the full benefits of their higher

education and training for their chosen disciplines because they are denied academic scholarship and expertise and the free exchange of ideas about issues disfavored by the Legislature.

244.    SB 129 infringes on students' right to receive information in public university classrooms, uninhibited by state-imposed and sanctioned viewpoint-based restrictions.

## COUNT THREE

### First Amendment to the U.S. Constitution - Loss of Student Funding (Student Plaintiffs Against Defendants) 42 U.S.C. § 1983

245.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

246.    Specifically, Plaintiffs Testman, Campos, Luna, and Alabama NAACP have been harmed by funding restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129.

247.    The Supreme Court has noted that: "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("[O]ur cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities.") Thus, all student organizations within publicly funded universities are entitled to have their access to available state funds determined by viewpoint-neutral policies.

248.    When a university has "created a forum generally open for use by student groups" it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar*, 454 U.S. at 267. "Favoritism of majority views is not an acceptable principle for allocating resources in a limited public forum." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 102 (2d Cir. 2007) (citing *Rosenberger*, 515 U.S. at 835).

249.    Under the unconstitutional cover of SB 129, Defendants are discriminating against certain student groups by revoking funding and other resources provided to student organizations while continuing to support and empower other student organizations based on the purported viewpoints of those organizations and/or their members.

250.    Student organizations to which Student Plaintiffs belong lost funding pursuant to compliance with SB129. Meanwhile, other student groups at these same universities which are associated with viewpoints disfavored in SB129, are able to maintain access to funding and university spaces.

251.    Because the divisive concepts in SB 129 ban impermissible viewpoint-based discrimination, restricting student group funding based on the purported viewpoints associated with the student organizations, it violates the First Amendment rights of those student groups' members, including Student Plaintiffs.

## COUNT FOUR

### First Amendment to the U.S. Constitution - Freedom of Association (Plaintiff Alabama NAACP Against Defendants) 42 U.S.C. § 1983

252.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

253.    Specifically, Plaintiff Alabama NAACP have been harmed by campus space restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129.

254.    The Supreme Court has "... long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and culture ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

255.    SB 129 discriminates against students' First Amendment rights by empowering universities to rescind funding and student organization resources based on whether the student organization is associated with a viewpoint disfavored by Legislature through the statute.

256.    By determining the provision of physical spaces on campus to student organizations, such as BSU, BSFA, and SafeZone, pursuant to SB 129, Defendants violate the First Amendment rights of student members of those organizations, including those student members who are also members of Plaintiff Alabama NAACP, to be free from viewpoint discrimination.

257.    Because the provision of physical spaces on campus also substantially affects the ability of students to associate with each other on campus, Defendants likewise violate the First Amendment rights of students, including students who are members of Plaintiff Alabama NAACP, to freely associate as members of the university student organizations that were denied physical spaces on campus based on viewpoint discrimination.

## COUNT FIVE

### Violation of the Fourteenth Amendment – Void for Vagueness (All Plaintiffs Against Defendants) 42 U.S.C. § 1983

258.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

259.    Specifically, Plaintiff Dr. Simon, Plaintiff Dr. Patton, Plaintiff Dr. Fording, Plaintiff Testman, Plaintiff Campos, Plaintiff Luna and Plaintiff Alabama NAACP have been harmed by the vagueness associated with curricular, funding and space restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129.

260.    A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague if it either "fails to

provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000).

261.    SB 129 is unconstitutionally vague on its face because its language that confused educators about how they must follow or implement the law. There are no clear parameters for conduct that constitutes a violation subject to discipline, no clear definition of what it means to "advocate for" or "compel" assent to divisive concepts, and no clear parameters on what instructors and students must do to remain in compliance. Students face confusion as to which student groups can be funded under SB 129 and why a group's mission violates divisive concepts.

262.    This web of confusing, conflicting, and seemingly random enforcement and interpretations of SB 129 shows that statute's language fails to provide sufficient specificity as to what SB 129 prohibits and how it should be enforced.

263.    The lack of sufficiently discernible terms and prohibitions in SB 129 results in enforcement that is arbitrary and inconsistent, which invites discrimination and violates the due process rights of both Professor Plaintiffs and Students Plaintiffs.

## COUNT SIX

**Fourteenth Amendment – Equal Protection Intentional Discrimination Violation (Equal Protection Plaintiffs Against Defendants) 42 U.S.C. § 1983**

264.    Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

265.    Specifically, Plaintiff Dr. Simon, Plaintiff Testman, and Plaintiff Alabama NAACP have been harmed by intentional discrimination of SB 129 as implemented by the University of Alabama system pursuant to enforcement of SB 129.

266.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

267.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Rather, as is the case with SB 129, the discriminatory purpose must have been a motivating factor, rather than the primary or sole purpose. *Id.* At 265-66.

268.    "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

269.    The U.S. Supreme Court recognizes several non-exhaustive factors to inform an analysis on discriminatory intent, including: (1) evidence that defendants' decision "bears more heavily on one race than another;" (2) "the historical background of the decision;" (3) "the specific sequence of events leading up to the challenged decision;" (4) "departures from the normal procedural sequences;" (5) "substantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; and (6) :legislative or administrative history" including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Id.* at 266-68.

270.    By recognizing factors indicative of discriminatory intent, the U.S. Supreme Court acknowledges that legislation motivated by a discriminatory purpose historically has often been crafted so that it "appears neutral on its face," *Id.* at 266.

271.    Additionally, the Eleventh Circuit has articulated "supplement[al]" factors that courts should consider when determining discriminatory intent: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021).

272.    Applying the *Arlington Heights* and Eleventh Circuit factors, SB 129 was enacted, at least in part, with the purpose of discriminating against Black people

273.    SB 129 explicitly targets concepts related to race, racism, and efforts to overcome racism. As such, the law's impact will bear more heavily on Black people, specifically Black students and Black educators, who are more likely to benefit from discussions on these topics. Black students are more likely to benefit academically from courses that include these topics, Black educators are more likely to engage in scholarship on these topics, and all Black people are disadvantaged by the suppression of speech and the sharing of information that seeks to advance racial equality, especially the equality of Black people.

274.    SB 129 also discriminates against Black students by limiting funding for Black student groups like the UA NAACP and eliminating on campus spaces for student organizations that were created to support Black students and faculty like the BSU and BSFA. By limiting speech, university funding and campus space, the law also exposes Black students and other students of color to increased harassment and discrimination.

275.    The known and reasonably foreseeable discriminatory impact of SB 129, as well as concerns about the statute's disproportionate harm to Black people in the legislative record, among other factors, support a finding of racially discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

276.    Moreover, any legitimate purpose behind SB 129 could be achieved through less discriminatory means, such as enforcement of existing anti-discrimination laws and/or the normal procedures regulating higher education, which encompasses the pedagogical expertise of trained educators rather than favored viewpoints of political actors in the Alabama Legislature.

## **PRAYER FOR RELIEF**

**WHEREFORE,** in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

277.    Declare SB 129 unconstitutional for impeding the right to receive and provide information in violation of the First Amendment to the United States Constitution;

278.    Declare SB 129 unconstitutional for being void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

279.    Declare SB 129 unconstitutional for being intentionally discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

280.    Issue preliminary and permanent injunctive relief restraining Defendants from enforcing SB 129;

281.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

282.    Grant such additional relief as the interests of justice may require.

DATED this 14th day of January 2025.          Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
ASB-8397-A33C
ACLU OF ALABAMA
PO Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@acualalabama.org

/s/ Daniel A. Cantor
Daniel A. Cantor*
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000

/s/ Michael Rogoff
Michael Rogoff*
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684

/s/ Antonio L. Ingram II
Antonio L. Ingram II*
Mide Odunsi*
NAACP LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

/s/ Carmen Lo
Carmen Lo*
ARNOLD & PORTER KAYE
SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500

*Pro hac vice application forthcoming