FILED
2025 Jan-30  AM 07:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP<br><br>Plaintiffs,<br><br>v.<br><br>KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore, University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees<br><br>Defendants. | Case No. 2:25-cv-00067-MHH |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The "chief mission" of public colleges and universities "is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). To achieve this mission, professors and students must be allowed to grapple with complex histories and social theories, and to encourage discussion of difficult topics, both inside the classroom and in extracurricular campus activities.

Yet, Senate Bill 129 violates Plaintiffs' First Amendment rights by restricting their speech, their receipt of information, and their access to university space and funding, simply because the views expressed by these students and educators are disfavored by elected politicians. For example, SB 129 identifies eight so-called "divisive concepts"—concepts concerning race, color, religion, sex, ethnicity and national origin—that the Alabama Legislature has unilaterally disfavored. Professors who "advocate[] for" such concepts in their classes or in their assigned course materials face discipline or termination. Ex. A 4:77. At the same time, SB 129 places no restrictions on the speech of professors who express opposition to these so-called "divisive concepts." Concomitantly, SB 129 prevents students from receiving important information that may be considered a "divisive concept," thereby depriving them of contrasting views. SB 129 further engages in

1

constitutionally impermissible viewpoint discrimination by barring university funding and physical space for student organizations that are deemed to be operating "diversity, equity, and inclusion programs." Ex. A 4:68-71.

To make matters worse, the text of SB 129 is unconstitutionally vague, making it impossible to determine what falls within the scope of the law. The law contains supposed safe harbors for "divisive concepts" that are taught in an "objective" or "historically accurate" manner but fails to provide sufficient guidance on what constitutes a "divisive concept" or what would constitute teaching in an "objective" or "historically accurate" manner. *See* Ex. A. Indeed, some of the concepts at issue may be hotly debated with competing viewpoints while other concepts may be widely acknowledged as research-based facts.

Plaintiffs Dr. Cassandra Simon, Miguel Luna, Sydney Testman, and Alabama NAACP seek a preliminary injunction to stop the ongoing, irreparable harm flowing directly from SB 129's unconstitutional restrictions. Professor Simon, an Associate Professor of Social Work at the University of Alabama ("UA") currently teaches a course titled *Anti-Oppression and Social Justice* that likely implicates all of SB 129's "divisive concepts." She faces the constitutionally untenable position of either self-censoring her classroom instruction or materials or facing severe consequences for violating the law. Simon Decl. ¶¶ 21-25. Last fall, while teaching this same class, she was accused of violating SB 129 and threatened with discipline or termination.

Plaintiffs Luna, Testman, and Alabama NAACP, who are students—or have members who are students—in public universities (University of Alabama Birmingham and UA), are deprived of their right to receive information when professors do not provide the full breadth of their knowledge, expertise, and scholarship for fear of promoting a banned viewpoint. Both student Plaintiffs Luna and Testman also were officers of student organizations that lost funding as a result of SB 129. SB 129 likewise has harmed student members of Plaintiff Alabama NAACP, who lost access to programming and use of space when UA, citing SB 129, withdrew funding for certain student organizations, including the Black Student Union ("BSU") and the Safe Zone Resource Center (which focuses on issues confronting LGBTQIA students). Alabama NAACP Decl. ¶ 12. Alabama NAACP's UA student chapter similarly risks losing access to state university funding and the use of university space if it is considered to be a "diversity, equity, and inclusion program."

This case stands on all fours with *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla., 2022), in which a federal district court enjoined the enforcement of similar restrictions in Florida public universities. In *Pernell*, a group of college professors and students moved for a preliminary injunction against Florida's "Stop W.O.K.E." Act, which prohibited any "instruction" that "promotes" or "compels" belief in eight specified divisive

3

concepts—a law with language that is nearly identical to SB 129. *Id.* at 1231. Judge Walker granted the preliminary injunction, holding that the "dystopian" law violated the United States Constitution because it constituted impermissible viewpoint discrimination and vagueness grounds. *Id.* at 1291 ("[T]he First Amendment does not permit the State of Florida to muzzle its university professors, impose its own orthodoxy of viewpoints, and cast us all into the dark.").

Accordingly, Plaintiffs respectfully request that the Court preliminarily enjoin SB 129 and protect them from the irreparable harm of violations to their First Amendment and Fourteenth Amendment due process rights.

## FACTUAL BACKGROUND

Under SB 129, an Alabama university may not "[r]equire its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept." Ex. A 4:74-77. The legislation lists eight divisive concepts:

> [A] That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior; (b) That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin; (c) That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin; (d) That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously; (e) That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color,

4

religion, sex, ethnicity, or national origin; (f) That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin; (g) That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin; (h) That meritocracy or traits such as a hard work ethic are racist or sexist.

Ex. A 2:23-3:50.

In addition, SB 129 prohibits Alabama public colleges and universities and their contractors from taking various actions related to "diversity, equity, and inclusion" programs and "divisive concepts." Ex. A 2:23-2:50, 3:51-4:58. "Diversity, equity, and inclusion" programs are defined as "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." Ex. A 3:51-3:55.

Pursuant to SB 129, any public university professor who is found to have violated the law may face discipline or termination. Ex. A 5:98-6:117. The members of the UA Board of Trustees have the primary responsibility for ensuring compliance with SB 129 on campuses in the system. *See id.* Professors in a variety of disciplines, including Professor Simon at the University of Alabama School of Social Work, fear they will be penalized for instructing students or requiring course work on these eight "divisive concepts." Professor Simon currently teaches a university-approved course titled *Anti-Oppression and Social Justice* and has taught this class for the past

5

twenty years without issue until the enactment of SB 129. Due to SB 129, Professor Simon fears discipline or termination for teaching this class and indeed has already been threatened once with discipline or termination. Simon Decl. ¶ 31.

Similarly, student academic instruction and student extracurricular life have been impacted by SB 129. Plaintiff Miguel Luna is junior at the University of Alabama at Birmingham ("UAB") and fears that his curriculum will be censored due to SB 129. Luna Decl. ¶¶ 10, 13. In addition, Plaintiff Luna cannot apply for university funding for a Latine[1] student group he co-founded at UAB due to SB 129. Luna Decl. ¶¶ 19-21. Similarly, Plaintiff Sydney Testman formerly served as the finance coordinator of UAB's Social Justice Advocacy Council ("SJAC"), a former University Funded Organization ("UFO")[2] that hosted programs on social justice issues or provided funding to other student groups to host social justice related programming on campus. Due to SB 129 this group was also defunded and caused Plaintiff Testman to lose access to state funding and a stipend. Testman Decl. ¶¶ 8-10. Members of Plaintiff Alabama NAACP have lost access to both the BSU office and Safe Zone because of SB 129. Alabama NAACP Decl. ¶ 12.

---

[1] Latine is defined as of, relating to, or marked by Latin American heritage.

[2] At the University of Alabama at Birmingham, UFOs receive automatic funding from the University, as compared to Registered Student Organizations ("RSO"), which do not receive any designated funding but instead must submit a request that may be granted at the University's discretion.

**ARGUMENT**

A preliminary injunction is warranted under Fed R. Civ. P. 65 if Plaintiffs show: "(1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). As set forth below, Plaintiffs satisfy all four prongs of this standard.

**I.      Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

**A.      SB 129 Imposes Viewpoint-Based Restrictions in Higher Education in Violation of the First Amendment.**

It is a cardinal principle of the First Amendment that "the government may not regulate speech based on . . . the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). When the government targets not subject matter but rather the particular views of the speaker on that subject matter, the First Amendment violation "is all the more blatant." *Id.* at 829 (citing *R.A.V. v. St. Paul*, 505 U. S. 377, 391 (1992)). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829. Thus, viewpoint-based discrimination is one of the most "egregious types of First Amendment violations,"

7

and is "presumptively unconstitutional." *Id*. at 829-830; *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004); *Moms for Liberty - Brevard Cnty. v. Brevard Pub. Sch.*, 118 F.4th 1324, 1332 (11th Cir. 2024).

"[T]he dangers of viewpoint discrimination are heightened in the university setting." *Speech First*, 32 F.4th at 1127 n.6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)); *see also Bazaar v. Fortune*, 476 F.2d 570, 572-73, 579-80 (5th Cir. 1973), *modified on reh'g*, 489 F.2d 225 (5th Cir. 1973).[3] "Time after time the Supreme Court has upheld academic freedom in the face of government pressure." *In re Dinnan v. Bd. of Regents of Univ. Sys. of Ga.*, 661 F.2d 426, 430 (5th Cir. 1981) (citing *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 82 (1961); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957); *Wieman v. Updegraff*, 344 U.S. 183 (1952)). Academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

A state has the right to regulate, within constitutional bounds, the curriculum taught in public universities. *Rosenberger*, 515 U.S. at 833; *see Bd. of Regents of the Univ. of Wis. v. Southworth*, 529 U.S. 217, 238 (2000) (quoting *Sweezy*, 354 U.S. at

---

[3] The U.S. Court of Appeals for the Eleventh Circuit has adopted, as binding precedent, decisions issued by the former U.S. Court of Appeals for the Fifth Circuit prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

263 (Frankfurter J., concurring)). For example, a state may decide which languages are taught in its foreign languages department or how many professors it will fund in a math department. But once the state has allowed inclusion of a subject into the curriculum, "it cannot impose its own orthodoxy of viewpoint about the content it allowed within the university classrooms." *Pernell,* 641 F. Supp. 3d at 1273; *Rosenberger*, 515 U.S. at 835 (holding that once the university offers funding to student groups, it may not withhold funding from groups with religious viewpoints).

By its own terms, SB 129 imposes viewpoint discrimination that violates the First Amendment. SB 129 expressly prohibits "course work that advocates for or requires assent to a divisive concept." Ex. A 4:76-77. Each of the "divisive concepts" is framed as a viewpoint. For example, one "divisive concept" provides "[t]hat, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." Ex. A 3:32-35. Another defined concept is "[t]hat meritocracy or traits such as a hard work ethic are racist or sexist." Ex. A 3:49-50. Thus, a professor who presents scholarly evidence showing that the theory of implicit bias is well-founded, or that we do not live in a color-blind meritocracy is likely at risk of being found to have advocated for a "divisive concept" and thus to have violated SB 120. However, SB 129 places no restrictions on a professor advocating for, or indeed insisting upon, the contrary viewpoint that implicit bias does not exist or that

professional achievement is color blind. The same is true for the other six "divisive concepts"—SB only prohibits the viewpoint with which the legislature disagrees. *See*, *e.g.*, *Iancu v. Brunetti,* 588 U.S. 388, 394 (2019) (finding viewpoint-based restriction because law "favors" views "aligned with conventional moral standards" and "disfavors" views "hostile to them").

The consequences of this First Amendment violation in the university setting are particularly dangerous and undermine the "historical role of the University in . . . serving in the vanguard in the fight for freedom of expression and opinion." *Bazaar*, 476 F.2d at 58; *see also Speech First*, 32 F.4th at 1127 n.6. SB 129's sweeping suppression of disfavored speech is presumptively unconstitutional. Moreover, were the suppression subject to strict scrutiny, it is neither narrowly tailored nor with a legitimate—let alone compelling—governmental interest because it is impermissible to silence viewpoints merely for being disfavored. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited.").

### 1. *Viewpoint-Based Restriction of Professors' Right to Free Speech and Academic Freedom*

SB 129 is a broad and sweeping legislation that prophylactically bans public college and university professors from expressing certain viewpoints about eight divisive concepts. The law's chill on protected speech is expansive, causing serious

harm to thousands of instructors across Alabama.[4] *See Pernell,* 641 F. Supp. 3d at 1277 (finding that Florida's sweeping viewpoint-based prohibition on professors' protected speech weighed against state's interest in the ban); *see also United States v. Nat'l Treas. Emp's Union*, 513 U.S. 454, 468 (1995) (noting that state faces a heavy burden to justify a broad restriction on expression of protected speech).

The First Amendment harms inflicted by SB 129 are particularly clear "in the social sciences, where few, if any, principles are accepted as absolutes[,] . . . [and t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Professor Simon currently teaches a class at UA titled *Anti-Oppression and Social Justice*. UA's course catalogue describes the class as follows: "This course examines issues related to the lived experiences of people based on age, culture, race, ethnicity, gender/gender identity/gender expression, sexual orientation, socioeconomic status/class, ability, religion/spirituality, and national origin. It is designed to introduce the student to social, economic, and political systems of power that serve to oppress communities that have been minoritized." Simon Decl. ¶ 14.

---

[4] University of Alabama boasts over 2,000 faculty in 2024. *Faculty by Rank, Tenure Status, and Job Status*, Univ. Ala., https://oira.ua.edu/factbooklegacy/reports/faculty-and-staff/faculty-by-rank-tenure-status-and-job-status/ (last accessed Jan. 27, 2025). UAB had over 3,000 in 2023. *Facts and Figures*, Univ. Ala. at Birmingham (June 2024), https://www.uab.edu/institutionaleffectiveness/images/documents/facts-figures/factsfigures2023-2024.pdf#page=68.

This course potentially implicates every one of SB 129's divisive concepts. For example, Professor Simon teaches her students about structural racism, implicit bias, White privilege, inequity of health care, and the lack of a color-blind meritocracy. Every time that Professor Simon, for example, explains that implicit bias or White privilege is a real and evidence-based, she runs the risk of violating SB 129 and thus risks discipline or termination. *See* Ex. A 4:72-77, 5:86-89.

SB 129 requires Professor Simon to make the untenable choice of self-censoring her classroom instructions or materials, or expressing views in her course that, as a result, risk violating SB 129 and leading to severe penalties despite these "divisive topics" being key to prepare her students for a future career in social work. Simon Decl. ¶¶ 3, 5, 17, 42, 48. Professor Simon's fears of discipline or termination are not only well-founded based on the text of SB 129, but she has also already been accused of violating SB 129 and threatened with adverse consequences by UA administrators. Simon Decl. ¶ 31. During the fall 2024 semester, administrators in the School of Social Work informed her that a protest of SB 129, selected and organized by her students as part of a class project, violated SB 129.

### 2. *Viewpoint-Based Restriction on Students' Right to Receive Information*

The Supreme Court has long held that the First Amendment protects not only the right to speak but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This, too, applies with special force in the higher

12

education context. *Speech First*, 32 F.4th at 1128; *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (recognizing that students' "First Amendment right to receive information" was implicated by an Arizona law seeking to suppress a Chicano Studies curriculum).

Students are better prepared for participation in a diverse society if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603 (parenthetical in original) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). SB 129 denies students that training. Indeed, it denies them the opportunity to sharpen their minds by engaging in debate with differing viewpoints and instead mandates which views students are permitted to learn.

For example, Plaintiff Luna has taken several classes about race and gender at UAB and credibly fears that SB 129 will cause his professor to refrain from providing all the information available in past versions of the course and limit expert views and opinions about topics that may fall under the divisive concept ban of SB 129. Luna Decl. ¶¶ 3, 10, 11, 12, 14. Plaintiff Luna is currently enrolled in a course titled *Environmental Politics*, which addresses multiple "divisive concepts" in its coverage of environmental justice, and how race, class, and gender may affect inequitable outcomes with regard to environmental health. Luna Decl. ¶ 13-14. His

professor has placed an SB 129 "disclaimer" on course materials. Luna Decl. ¶ 10, 11. Last semester, in a course titled *Human Rights,* the same professor was visibly uncomfortable and tentative when discussing the incarceration of minorities in Alabama. This discomfort reflects the chill on speech caused by SB 129. When that chill occurs, students, including Plaintiff Luna, are directly harmed.

      3.     *Viewpoint-Based Restrictions on Student Groups' Public Funding and Freedom of Association*

"[E]xtracurricular programs are, today, essential parts of the educational process." *Christian Legal Soc. Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 686 (2010). When a university has "created a forum generally open for use by student groups," it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).

The Supreme Court's decision in *Rosenberger v. Rector & Visitors of Univ. of Virginia* is instructive. In *Rosenberger*, the Supreme Court held that a university funding policy violated the First Amendment because it "cast disapproval on particular viewpoints." 515 U.S. at 836. The university denied a student group funding for its newspaper, "Wide Awake: A Christian Perspective at the University of Virginia," based on guidelines prohibiting funding for activities that "primarily promote[] or manifest[] a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 826. The Court held that the student activities fund served as a limited public

14

forum, which must provide funding without discrimination against a specific viewpoint— in that case, the view related to the existence of a deity—once the fund was available to university sponsored publications. *Id*. at 830-31. The *Rosenberger* Court dismissed, as unconstitutional, statutes like SB 129, stating that "[i]f the topic of debate is, for example, racism, then exclusion of [targeted] views on that problem is . . . offensive to the First Amendment . . . ." *Id.* at 831.

Similarly to *Rosenberger*, UAB created a limited public forum by providing state university funding to its student organizations. In compliance with SB 129, that funding process is based, in part, on the student group's perceived support of any "divisive concept" through its programmatic activities, thus failing to ensure viewpoint neutrality in the university funding process. *See* Ex. A 4:68-71, 5:92-97. As Plaintiff Testman explains, UAB downgraded Social Justice Advocacy Council ("SJAC") from a UFO to an RSO following SB 129's passage, causing the student organization to lose thousands of dollars in university funding. Testman Decl. ¶¶ 8-9. University officials notified Plaintiff Testman that both the demotion of SJAC to an RSO and the restriction on university funding resulted from mandatory enforcement of SB 129. *Id*. Notably, "social justice" is not included in any of the eight divisive concepts nor does SJAC fall within SB 129's definition of a "diversity, equity, and inclusion program;" thus, UAB's demotion and funding restriction was

due to some presumed association between "social justice" and the divisive concepts banned by SB 129.

SB 129 restricted SJAC from receiving state funds to host any social justice events themselves or to provide money to other RSOs to host their own social justice events. Last year, SJAC contributed funding for a multitude of student-led events, but this year SJAC is unable to provide financial support for its own programming or any of these or other similar campus events due to SB 129. Testman Decl. ¶ 8, Luna Decl. ¶ 22. Moreover, UAB rescinded stipends that had been provided to some executive members of the student groups targeted by SB 129—like Plaintiff Testman, who lost opportunities to contribute to the UAB community and receive financial compensation for that work. Testman Decl. ¶ 10.

Plaintiff Luna co-founded Esperanza, an organization for Latine students at UAB, in the Spring of 2024. Because Esperanza does not receive university funding as a UFO, it previously relied on financial support from other sources, such as UAB's former Office of Diversity, Equity, and Inclusion, and student organizations like SJAC. Luna Decl. ¶¶ 18, 22. However, Plaintiff Luna was informed by a university official that UAB would deny funding to Esperanza for any event that is deemed to be related to a "divisive concept." Luna Decl. ¶ 21. Thus, Esperanza very likely cannot access state university funding sources and consequently cannot

provide the same level of support to its members that it had provided prior to SB 129's implementation. Luna Decl. ¶¶ 21, 23, 24.

UAB's denial of university funding to Esperanza, SJAC, and other student organizations, based simply on whether the group may promote or espouse viewpoints disfavored by the Alabama Legislature, constitutes viewpoint-based discrimination against these groups in violation of the First Amendment. *See Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 102 (2d Cir. 2007) ("Favoritism of majority views is not an acceptable principle for allocating resources in a limited public forum.").

Similarly, UA's allocation of student funding based on the student organization's viewpoint, pursuant to SB 129, infringes on Plaintiff Alabama NAACP's freedom of association rights. According to the Supreme Court, implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in "pursuit of a wide variety of political, social, economic, educational, religious, and culture ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (citations omitted). Yet, due to SB 129's restrictions, members of previously funded student groups are no longer able to fully associate with their peers at UA.

Specifically, SB 129 has caused members of Plaintiff Alabama NAACP at UA to lose access to programs and space provided by student organizations (BSU

17

and Safe Zone) focused on UA's Black and/or LGBTQIA communities. Alabama NAACP Decl. ¶ 12. For example, members of the Alabama NAACP who used the BSU and Safe Zone lost designated physical campus spaces and a variety of programming due to SB 129 which has harmed members of the Alabama NAACP. *Id.* Black and LGBTQIA members of the Alabama NAACP previously used these spaces to network, host student leaders' offices and have a space to socialize with peers who share common affinities. Alabama NAACP Decl. ¶ 16. SB 129 harms these students by restricting them from continuing to have these opportunities. SB 129, therefore, infringes on the rights of Plaintiff NAACP of Alabama's members to have full access to campus spaces and programming while allowing campus spaces and programming for other university groups that are not at risk of falling within the state's definition of "diversity, equity, and inclusion" or "divisive concepts."

### B.    SB 129 is Impermissibly Vague in Violation of the Fourteenth Amendment's Due Process Clause.

SB 129 is unconstitutionally vague in violation of the Fourteenth Amendment. The Supreme Court has held that vague laws implicating speech are particularly concerning. *See Ashton v. Kentucky*, 384 U.S. 195, 200 (1966); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (holding that a vague regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech"). Indeed, the Supreme Court has warned that, especially in education contexts, "[t]he danger of [the] chilling effect upon the exercise of vital First

Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604. SB 129's lack of clarity forces Plaintiffs to sanitize classroom discussions, thus having the exact "chilling effect" that the Supreme Court cautioned to avoid.

There are two independent reasons why a statute may be void for vagueness. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc). SB 129 fails on both counts. The language in SB 129 makes it impossible to discern what does, and does not, fall within the prohibited "divisive concepts" or "diversity, equity, and inclusion programs" and what might be excused as permissible activity under the various caveats to the law. Additionally, the law provides no guidance or standards on how to ascertain violations of SB 129, as demonstrated by the confusing enforcement of SB 129 by university administrators thus far.

Notably, in 2020, a federal court preliminarily enjoined enforcement of Executive Order 13950, which was issued by President Trump in his prior

administration and first introduced the banned "divisive" concepts in SB 129.[5] *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). The court held that the plaintiffs in that case were likely to succeed on the merits of their claim that the "divisive" concepts were unconstitutionally vague, thus justifying the preliminary injunction. *Id.* Further, in *Honeyfund.com, Inc. v. DeSantis*, a district court considered the "Individual Freedom Act," a law containing prohibited concepts similar to SB 129's divisive concepts and concluded that several of those concepts were "certainly" void for vagueness. 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024). For example, the court examined the Individual Freedom Act's prohibited concept that "[m]embers of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin." *Id.* at 1168-69. The *Honeyfund* court found this concept to be "mired in obscurity," and noted that the text of the law did not clarify "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'" *Id.* at 1181.

---

[5] The language the Alabama Legislature deployed to describe SB 129's divisive concepts is identical to the language used by the Trump administration to define several of the divisive concepts in Executive Order 13950. For example, the first divisive concept included in the Executive Order states "one race or sex is inherently superior to another race or sex." Executive Order on Combatting Race and Sex Stereotyping, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020). Similarly, SB 129's first divisive concept reads "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." SB 129 § (2)(a).

The *Honeyfund* court also found that, regardless of the vagueness of the individual "divisive concepts," a provision allowing discussion of the prohibited concepts "in an objective manner without endorsement" provided another basis for finding the law impermissibly vague. *Id.* at 1183. Noting that "few terms are as loaded and contested as 'objective,'" the court held that the lack of clarity between "objective discussion" and "endorsement" rendered the entire law unconstitutionally vague. *Id.* at 1183-84. Similarly, in *Pernell*, a federal district court found that the plaintiffs were likely to succeed on the merits of their claim that Florida's "Stop W.O.K.E. Act"[6] was unconstitutionally vague, concluding that the bill's provision allowing for "objective" instruction of the prohibited divisive concepts provided "without endorsement" rendered the statute impermissibly vague on its face. 641 F. Supp. 3d at 1281-1286.

As in *Honeyfund*, *Pernell*, and *Santa Cruz*, SB 129's divisive concept "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior" provides no guidance about what precisely would constitute expressing that one population is "inherently superior or inferior" to another. Similarly, SB 129 contains a qualifier that the law permits the "teaching or discussion of any divisive concept in an *objective manner and without endorsement* . . . provided the institution and its employees *do not compel assent* to any divisive concept." SB 129 § 3(3)(b)

---

[6] The Stop W.O.K.E. Act was later renamed the Individual Freedom Act.

21

(emphasis added). SB 129 fails to explain the difference between a discussion of the divisive concepts that would be deemed, on the one hand, "objective" and "without endorsement" and, on the other hand, "compel[ling] assent." SB 129's apparent safe harbor for the teaching of "divisive concepts" in a "historically accurate" manner is further mired in vagueness, especially given that the histories concerning many of the concepts are subject to competing views. Accordingly, the law fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" in violation of due process under the Fourteenth Amendment. *Honeyfund*, 622 F. Supp. 3d at 1184 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

SB 129's vague and ambiguous language also encourages inconsistent, arbitrary, and discriminatory enforcement. University students are confused about which student groups can be funded under SB 129 due to the lack of standards or criteria to determine why a particular group's mission or activities might be considered a "diversity, equity, or inclusion program" or supportive of a "divisive concept." Testman Decl. ¶ 14; Luna Decl. ¶ 20; Alabama NAACP Decl. ¶ 19. Multiple student organizations at UA and UAB have arbitrarily lost state university funding and resources for their efforts to contribute to student life through programs that support and celebrate the diverse members of their campuses. Testman Decl. ¶ 8; Luna Decl. ¶¶ 19-22; Alabama NAACP Decl. ¶¶ 12-16. This includes at least seven organizations, including SJAC, the Black Student Awareness Committee, the

Indian Student Association, Spanish and Latino Association, and Korean Student Association at UAB and the BSU, and the Safe Zone at UA. *Id.* And under the vague rubric of what SB 129 considers to be a "diversity, equity, and inclusion program" or a "divisive concept," the law invites discriminatory enforcement against organizations that support students of color and LGBTQIA students. Plaintiff Testman still does not understand, due to the vagueness of SB 129, however, which student groups' missions and which student group activities would violate the law. Testman Decl. ¶ 14.

Professors like Dr. Simon also have received confusing and conflicting guidance about SB 129, indicating that neither administrators nor educators know what SB 129 means or how to enforce it. Simon Decl. ¶¶ 22-24, 41. For example, UA published guidance[7] about SB 129 that fails to clarify the meaning of "divisive concepts," merely instructing professors to rely on their own individual interpretations of the law and UA has offered training to professors where they have advised professors to refrain from conducting tests or evaluations on "divisive concepts."

Despite this guidance, Professor Simon received a complaint of purported violations of SB 129 based on a student-led class project, which did not entail any

---

[7] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, Univ. Ala., https://deiguidance.ua.edu/#faculty (last visited January 29, 2025).

test or evaluation on any divisive concept. Furthermore, Professor Simon received an initial notice that SB 129 would not impact how she could teach her curricula. Simon Decl. ¶ 41. However, Professor Simon was reprimanded later for teaching subject matter that neither specifically fell within the statutory definition of any "divisive concept" nor the statutory definition of a "diversity, equity, or inclusion program." Simon Decl. ¶ 31. This arbitrary enforcement of SB 129 pressures professors like Dr. Simon to overcompensate their compliance with SB 129, thereby expanding the chilling effect on their First Amendment rights.

Due to the vagueness of SB 129's provisions, there are no clear parameters to know what conduct constitutes a violation subject to discipline; how instructors must modify their curriculum and teaching style to be in compliance with the law; what students must do for their student organizations to qualify for university funding or have access to university designated spaces; or what it means to "compel" assent to divisive concepts.

## II. Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Injury.

SB 129 has caused Plaintiffs to experience ongoing irreparable injury from the violations of their First and Fourteenth Amendment rights, justifying a preliminary injunction in this case. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *N.E. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Monetary

24

remedies, of course, cannot undo the harms of chilled speech. For that reason, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 67 (2020) (per curiam) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). *See also Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.")). Accordingly, the substantial likelihood that Plaintiffs will succeed on their First Amendment claims establishes irreparable harm *per se*.

Public university professors' irreparable harm from the violation of their First and Fourteenth Amendments is evident from these first few months of enforcement of SB 129. For example, Professor Simon must censor the content of her courses to comply with SB 129 or face discipline and possible termination from UA—a risk that already occurred last semester. Simon Decl. ¶¶ 31, 34. Moreover, in violation of her Fourteenth Amendment due process rights, she does not know what precisely constitutes a violation of SB 129, which broadens the breadth of the censorship necessary to minimize the possibility of discipline. Simon Decl. ¶¶ 21-23.

Similarly, students like Plaintiff Luna face irreparable harm from the violation of their First Amendment right to receive information. As a History and Political Science double major, Plaintiff Luna has focused his studies on learning about the impact of race and gender in past historical events and how those historical events influence contemporary political behavior and outcomes. Luna Decl. ¶ 15. Much of the information seemingly censored by SB 129 is central to Plaintiff Luna's main areas of study, and his inability to receive comprehensive instruction about these concepts constrain the scope of his higher education. *Id.*

Student Plaintiffs Testman and Luna also suffer irreparable harm from SB 129's viewpoint-based restrictions barring certain student organizations from receiving funding and dedicated university spaces. Plaintiff Testman was an executive member of SJAC, which lost all university funding for programming because it presumably did not hold the legislature's viewpoint, as expressed in SB 129. Testman Decl. ¶ 8. Additionally, Plaintiff Testman lost a stipend provided to SJAC'S executive members for their contributions to UAB's student programming. Testman Decl. ¶ 10.

Moreover, the student groups that SJAC supported through its programming funding, such as Plaintiff Luna's student group Esperanza, are harmed by the loss of access to resources that were previously available to support their activities. Luna Decl. ¶¶ 22-23. For example, Plaintiff Luna is harmed because Esperanza is no

longer able to host many of the community, membership, and professional development events that it hosted prior to SB 129 because it no longer has access to funding from SJAC and other sources. Luna Decl. ¶¶ 22-25. Because Esperanza's mission demonstrates that its programming is specifically geared towards Latine students, Plaintiff Luna fears that any events that it holds will be considered related to a divisive concept, and its event funding applications will therefore be denied. Luna Decl. ¶ 19. Likewise, student members of the Alabama NAACP no longer have access to supportive and affirming physical spaces and programming provided by student organizations focused on the needs of Black and LGBTQIA students at UA, which causes them to be disadvantaged by virtue of their perceived viewpoints, rather than a legitimate reason. Alabama NAACP Decl. ¶¶ 14-17.

In a mere few months, SB 129 swiftly censored the academic life of the UA system. Collectively, SB 129 creates a vague and confusing web of uncertainty that undermines the First Amendment and Fourteenth Amendment due process rights of students and educators in Alabama. The Court should issue an injunction to halt these constitutional violations causing irreparable injury to the academic community, including Plaintiffs, in Alabama's public universities.

### III.    The Balance of Equities Favors Granting a Preliminary Injunction.

The ongoing injury to Plaintiffs' First Amendment and Fourteenth Amendment due process rights outweighs any hypothetical damage an injunction

would cause Defendants. These constitutional violations are ongoing: SB 129 has chilled the speech of public university educators, including Professor Simon, to impose the Alabama Legislature's favored viewpoint; it has denied to students like Plaintiffs Luna and Testman their right to receive information from university professors; and it has caused students, including Plaintiffs Luna and Testman and student members of Plaintiff Alabama NAACP, to lose university funding for certain student organizations and designated campus spaces for certain student organizations, based on the presumed viewpoint of the student organizations and their student leaders. The harms from these constitutional violations are *per se* irreparable.

On the other hand, Defendants do not risk any irreparable damage from a preliminary injunction.[8] *See KH Outdoor v. City of Trussville*, 458 F.4d 1261, 1272 ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute"). Similarly, Defendants have no legitimate interest in a law that is unconstitutional. *Id.* Since there is no legitimate government interest in SB 129, the balance of equities tips with full weight in Plaintiffs' favor.

---

[8] Plaintiffs request that the Court waive the bond requirement under Fed. R. Civ. P. 65(c). While courts in the Eleventh Circuit generally require a bond before issuing injunctive relief under Rule 65(c), it is within the district court's discretion to waive this requirement. *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2019); *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 n.5 (5th Cir. 1978). Irreparable harm to constitutional rights is ongoing, and Defendants cannot show an injunction would cause them any injury necessitating a bond. Therefore, waiver is warranted.

## IV.    A Preliminary Injunction Would Serve the Public Interest.

Courts in this circuit have consistently recognized that "it is always in the public interest to protect First Amendment liberties." *Id.* at 1272. More broadly, courts recognize "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

Here, these principles have particular importance because constitutional violations are occurring in higher education. As the Eleventh Circuit and the Supreme Court have recognized, "[n]owhere is free speech more important than in our leading institutions of higher learning.*" Speech First*, 32 F.4th at 1128; *see also Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

Until the Court has an opportunity to fully consider the merits of Plaintiffs' claims, the Court should preliminarily enjoin SB 129 so Alabama's public universities can continue to "advance the intellectual and social condition of the people of the state, the nation and the world."[9]

---

[9] *Mission and Objectives*, Univ. Ala., https://www.ua.edu/about/mission/ (last accessed Jan. 27, 2025).

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from enforcing SB 129 for the reasons set forth above.

Dated this 30th day of January 2025.

Respectfully submitted,

*/s/ Alison Mollman*
Alison Mollman
ASB-8397-A33C
ACLU of Alabama
PO Box 6179,
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

*/s/ Daniel A. Cantor*
Daniel A. Cantor*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000

*/s/ Michael Rogoff*
Michael A. Rogoff*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684

*/s/ Antonio L. Ingram II*
Antonio L. Ingram II*
Mide Odunsi*
NAACP Legal Defense
& Educational Fund, Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

*/s/ Carmen Lo*
Carmen Lo*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
    (650) 319-4500

*Admitted *pro hac vice*