# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP<br><br>Plaintiffs,<br><br>v.<br><br>KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore, University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees<br><br>Defendants. | Case No. 2:25-cv-00067-MHH |

**DECLARATION OF DR. CASSANDRA SIMON**

I, Cassandra Simon, hereby declare and state as follows:

1. My name is Cassandra Simon. I am over 18 years of age and identify as a Black woman.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

**<u>Professional Background</u>**

3. I currently serve as an Associate Professor of Social Work, with tenure, at the University of Alabama ("UA"). I have been a professor at UA since 2000.

4. I graduated from the University of New Orleans with a B.S. in psychology in 1982. I obtained a Master of Social Work from Louisiana State University in 1986, and a Ph.D. in Social Work from the University of Texas at Arlington in 1992.

5. I have over twenty-five years of professional experience in higher education. My research interests include social justice, race relations, health disparities, community engagement, and human rights. My interest in this area stems from growing up in an economically marginalized community in Louisiana where I witnessed my family and my community experience racism, homophobia, and various types of discrimination. My work has been published in multiple peer-reviewed academic journals, including the Journal of Ethnic and Cultural

Diversity in Social Work, the Journal of Community Psychology, and the Journal of Social Work Education.

6. I have received numerous awards during my tenure at UA for my teaching, service, and community engagement activities. I was the inaugural recipient of the Buford Peace Award, which recognizes faculty members who are professionally and personally active in causes that promote justice and peace. In 2006, I became the first Black UA faculty member to receive the Premier Morris Mayer Award. This is an annual award that recognizes one faculty member who demonstrates leadership, integrity, and service. In 2013, I was awarded the Autherine Lucy Foster Award, which is given annually to a faculty member who has made a commitment to service to students of color.

7. I am the founding editor of the Journal of Community Engagement and Scholarship under UA's Office of Community Affairs.

8. Throughout my career, I have also designed and conducted professional development workshops for businesses, non-profit organizations, and other institutions on culture, multiculturalism, diversity, and social justice. Additionally, I have studied the development, implementation, and evaluation of diversity, equity, and inclusion initiatives in business, educational, and community settings.

9. I teach undergraduate and graduate courses in human behavior, family and child welfare, and social justice.

**Impact of SB 129 on My Courses**

10. I understand that SB 129 was signed by Governor Kay Ivey in March 2024 and went into effect on October 1, 2024. SB 129 includes eight "divisive concepts" that instructors may not advocate for or require assent to, even though instructors may denounce these same concepts. I understand that "divisive concepts" include:

    - "That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." SB 129 § 1(2)(a).

    - "That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin." SB 129 § 1(2)(b).

    - "That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." SB 129 § 1(2)(c).

    - "That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." SB 129 § 1(2)(d).

    - "That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past

4

by other members of the same race, color, religion, sex, ethnicity, or national origin." SB 129 § 1(2)(e).

- "That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin." (Section 1(2)(f)). "That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin." SB 129 § 1(2)(g).

- "That meritocracy or traits such as a hard work ethic are racist or sexist." SB 129 § 1(2)(h).

11. I also understand that SB 129 subjects me and other professors to discipline or termination for knowingly violating its provisions. Specifically, SB 129 states: "All state agencies and political subdivisions, including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who knowingly violates this act . . . ."

12. All of my courses involve conversations, readings, or other exercises about the concepts of racial and gender superiority, unconscious bias, privilege, and oppression. These conversations often can be deeply uncomfortable for students. When students in my course learn that certain processes and

institutions that they previously thought were race-neutral actually originated from or are motivated by racist or sexist intent, they may feel discomfort about how they or their ancestors benefited from these racist or sexist systems.

13. This semester, I am teaching *Anti-Oppression and Social Justice,* a course I have taught consistently every year since arriving at the University of Alabama over twenty-four years ago. The course is a junior-level course that sophomores may take and is required for both the Social Work and Social Welfare majors. It focuses on issues related to the oppression of people on the basis of their race, gender identity, ethnicity, culture, sexual orientation, and/or other characteristics and the responsibility of social workers to work to counter discriminatory and oppressive conditions.

14. The University of Alabama 2024-25 Course Catalog describes the *Anti-Oppression and Social Justice* course as follows: "This course examines issues related to the lived experiences of people based on age, culture, race, ethnicity, gender/gender identity/gender expression, sexual orientation, socioeconomic status/class, ability, religion/spirituality, and national origin. It is designed to introduce the student to social, economic, and political systems of power that serve to oppress communities that have been minoritized." We cover topics including, but not limited to, White privilege,

implicit bias, structural racism, mental health disparities, homophobia, racism, sexism, and systemic oppression of minority communities.

15. My instruction in my *Anti-Oppression and Social Justice* course is rooted in the understanding that racism and sexism are deeply embedded in American society. I endeavor to train future social workers about how the impact of systemic racism on their future clients cannot be divorced from their professional mission.

16. Within my field, there is longstanding consensus that an individual's social, political, and economic advancement is deeply affected by institutional racism and sexism rather than solely based on the individual traits, such as their talent or abilities. I teach my students about how commonly understood notions of "meritocracy" and "fairness" often ignore the ways in which racial and gender bias impact an individual's life and health outcomes. I assign course materials on this topic, including course materials that discuss how life and health outcomes are often influenced by racial and gender bias. As someone who trains future social workers, it is important to provide my students with information that will enable them to conduct effective interventions in the lives of their clients and that factors in systemic racism and sexism and how social inequality impacts the life trajectory of minority communities. I am

concerned that this line of instruction will be deemed to violate SB 129 §§ 2(g), 2(b), 2(f), and 2(e).

17. I also teach about implicit bias in *Anti-Oppression and Social Justice*. I explain to my students that implicit bias is well-documented, and I assign readings about the existence of implicit bias. In addition, I have my students complete the Harvard Implicit Association Test, which "measures the strength of associations between concepts (e.g., Black people, gay people) and evaluations (e.g., good, bad) or stereotypes (e.g., athletic, clumsy)." The main purpose of the test is to "educate about implicit bias" and to "raise awareness and encourage self-reflection." Although I do not assign a letter grade for the assignment or review their test results, the purpose of this assignment is to help my students understand how implicit bias operates and what impacts it may have. I am concerned that this line of instruction will be deemed to violate SB 129 §§ 2(d), 2(g), and 2(f).

18. In *Anti-Oppression and Social Justice*, I teach about how race- and gender-based stereotypes can exacerbate health disparities. For example, Black queer people face unique barriers to receiving HIV care and treatment that relate to historical lack of access to high quality medical care. I am concerned that this line of instruction will be deemed to violate SB 129 §§ 2(h) and 2(f).

8

19. I have shown my students episodes from the award-winning documentary, *Eyes on the Prize*, and have seen their shock and dismay to learn about the civil rights history of the United States. I also show the documentary film *Slavery by Another Name*, which challenges the belief that American slavery ended with the Emancipation Proclamation, and tells how thousands of African Americans were pulled back into forced labor with force and brutality. Even though my courses do not explicitly assign blame or guilt to any individual students, it is not uncommon for some students to react with feelings of guilt after watching these films. I am concerned that this line of instruction will be deemed to violate SB 129 §§ 2(g), 2(f) and 2(e).

20. SB 129's definition of "divisive concepts" puts me at risk of violating the law by teaching my students that structural racism and sexism exist, and the many ways they impact Black individuals and other minorities. Specifically, I am concerned that teaching and assigning course materials that address the existence of implicit basis and White privilege, and the fact that American society is not a colorblind meritocracy, might violate SB 129.

**Confusion About SB 129**

21. As a university professor, it is critically important that I am allowed to teach about subject matter that the legislature has designated as a "divisive concept," and to share my professional, evidence-based views regarding "divisive

concepts" with my students. It is particularly concerning to me that SB 129 permits some viewpoints regarding "divisive concepts" but not others.

22. In addition, I am unable to determine precisely what portions of my teaching violate SB 129. I understand that, under SB 129, I am permitted to discuss "divisive concepts" as long as I do so "in an objective manner and without endorsement as part of a large course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with the provisions of this act."

23. I do not know what it means to discuss a divisive concept "in an objective manner" and "without endorsement." For example, there is robust empirical evidence of implicit bias, White privilege, and the absence of a colorblind meritocracy. I am unable to determine whether continuing to present these scholarly findings, and assigning readings on these subjects, would violate SB 129.

24. Similarly, SB 129 does not explain, and I am unable to determine, what it means to "compel assent to any divisive concept." UA administration officials decided that a sit-in to protest SB 129, which was organized by my students as part of my *Anti-Oppression and Social Justice* course, could be perceived as both endorsing and compelling assent to a "divisive concept," even though my students came up with the idea of the sit-in on their own.

25. I also am unable to determine what does and does not fall within SB 129's exception for "the teaching of topics or historical events in a historically accurate context." What is "historically accurate" is often hotly debated and subject to competing views. It is unclear to me whether teaching about structural racism and White privilege—and how they have been intentionally built into many of our country's institutions throughout our history—would violate SB 129 or whether such teaching would be fall within the exception allowing the teaching of historical events in a "historically accurate context."

26. Every year students in my *Anti-Oppression and Social Justice* course are given the opportunity to complete a project. The project allows students to voice their support or opposition to a social issue of their choosing. In addition to choosing the social issue, students also choose the manner in which they advocate for or against their chosen topic. The students who chose to participate in the project pick their topic collectively and work as a group to plan and complete the advocacy portion of the project. My involvement in the project is limited to ensuring that students are complying with university policies.

27. Throughout the first few weeks of the course, I assist students with narrowing down their social issue topic based on their passions and interests. On the day that students choose their project topic, I provide students with guidelines for

11

a topic selection discussion before leaving the classroom to give the students an opportunity to choose their topic without my supervision or influence. The students inform me when they have chosen their social issue and invite me back into the class. Any student who feels uncomfortable with the chosen topic or does not want to participate in the project is given the opportunity to complete an alternative assignment.

28. This semester, students chose SB 129 as their social issue. As I have every other year, I left the room when it was time for students to choose their topic. The students informed me that, through their project, they hoped not only to voice their opposition to SB 129 but also to receive information from the university about how students' needs would be accommodated in the wake of SB 129. My students also shared with me that they wanted an opportunity to gather information from other students about how they had been affected by SB 129. Ultimately, the students decided to fulfill the advocacy component of the project by organizing a sit-in on November 13, 2024. The sit-in would have taken place on campus in a quad in an area that has held similar events before without issue.

29. The day before the sit-in was scheduled to take place, on November 12, 2024, I received an email from the Dean of the UA School of Social Work, Schnavia Smith Hatcher. Dean Hatcher informed me that she had seen a flyer promoting

the sit-in and asked me to ensure that the students had complied with university policy regarding the reservation of event space for the sit-in. I responded to Dean Hatcher's email, letting her know that the students had submitted a grounds permit form and were informed by a university employee that they did not need approval to use campus grounds for the sit-in.

30. After exchanging a few messages with Dean Hatcher regarding the expected turnout for the event, she asked if I would be cancelling a class session or mandating participation in the sit-in for the course, noting that this could be a concern if issues were to arise regarding the sit-in. I responded that I would not be cancelling class, as the sit-in was not scheduled during a regular course session, and explained that students were not required to participate in the sit-in. I also provided information about the project selection process.

31. The next morning, on November 13, 2024, the day of the scheduled-sit in, Dean Hatcher emailed informing me that she and Provost James Dalton had concluded that the sit-in may violate SB 129 and should be cancelled immediately. Specifically, Dean Hatcher shared her opinion that the sit-in was "tied to the classroom" and therefore may be considered to be forcing a student to "assent to a position and/or unwillingly take part in political activity." Dean Hatcher also noted UA's policies regarding timely event approvals and cited Chapter 3.II.B of the Faculty Handbook, which states "[i]t

13

is the responsibility of faculty members to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including termination."

32. In my response to Dean Hatcher's message, I expressed my confusion regarding the mandate to cancel the sit-in. First, because Dean Hatcher did not cite any specific university policies that may have governed the sit-in, I asked her to identify the specific policies or procedures that may have been violated. Second, because Dean Hatcher's message referenced the alleged "political" nature of the scheduled sit-in, I asked for clarification regarding how an event concerning a topic chosen by students, at which students would discuss how the chosen topic had impacted them, could be considered a "political" activity. I also noted that School of Social Work instructors had previously been told by university administrators that SB 129 would not impact our teaching due to the Social Work accreditation standards and expressed my concern about academic freedom given the university's response. I also shared that I would inform my students that the sit-in would no longer be part of their grade.

33. After receiving Dean Hatcher's message, I informed my students that I had been told by the university that they must cancel the sit-in, and my students said they were both afraid of getting in trouble and fearful that I would be fired.

34. After my students cancelled the sit-in, Provost Dalton responded to my message and stated that the sit-in could be considered a violation of SB 129 by "sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept, and/or other portions of the law."

35. Provost Dalton also indicated that the students may continue with the sit-in as long as I informed them that the gathering was not related to the course or their grade. However, the students had already informed others that the sit-in had been cancelled by the time I received Provost Dalton's message.

36. The students held a rescheduled sit-in that they organized on their own on November 18, 2024.

37. Because I am teaching *Anti-Oppression and Social Justice* again this semester and my students will once again select a class project, I am concerned that selection of a project related to a "divisive concept" will be considered a violation of SB 129.

**Confusion About Accreditation Status**

38. Shortly after SB 129 became law, faculty within the School of Social Work began questioning the administration about the law's impact on the School of Social Work's accreditation status. The Council on Social Work Education

("CSWE") governs the accreditation of baccalaureate and master's social work programs in the United States. CWSE's 2022 Educational and Policy Accreditation Standards ("EPAS") include multiple social work competencies that seem to directly conflict with SB 129.

39. For example, the second social work competency standard included in EPAS recognizes the role of the social work profession in advancing racial, social, and economic justice. Specifically, EPAS notes that the role of social workers includes "critically evaluat[ing] the distribution of power and privilege in society in order to promote social, racial, economic, and environmental justice" and "advocat[ing] for . . . strategies to eliminate oppressive structural barriers to ensure that social resources, rights, and responsibilities are distributed equitably."[1] I am concerned that this competency standard may conflict with SB 129.

40. EPAS's third social work competency standard asserts that social workers must recognize the various ways in which oppression and privilege impact human experiences and shape life outcomes. Specifically, the EPAS states that social workers should understand "the pervasive impact of White

---

[1] *Educational Policy and Accreditation Standards for Baccalaureate and Master's Social Work Programs*, The Council on Soc. Work Educ.'s Comm'n on Accreditation and Comm'n on Educ. Pol'y, https://www.cswe.org/getmedia/bb5d8afe-7680-42dc-a332-a6e6103f4998/2022-EPAS.pdf.

16

supremacy and privilege," "the societal and historical roots of social and racial injustices" and "the forms and mechanisms of oppression and discrimination."[2] I am concerned that this competency standard also may violate SB 129.

41. When questioned about how SB 129 would impact our ability to instruct our students in a manner consistent with the field's accreditation standards, the UA administration originally told instructors that SB 129 would not affect our classrooms due to CWES's accreditation standards. Following the bill's passage, UA created a webpage with information about compliance with SB 129, which states: "SB129 specifically does not apply to actions taken in furtherance of satisfying any accreditation standard or requirement."[3] However, despite this assurance, the actual language in the CWES accreditation standards seem to be explicitly prohibited by SB 129.

42. In order to competently and responsibly fulfill my duties as a social work professor, I must teach my students about past patterns of discrimination and how they are contributing to current disparities in health, employment, generational wealth, and other life outcomes. Students pursuing careers in social work must be aware of and understand these patterns to effectively

---

[2] *Id.*
[3] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, Univ. Ala., https://deiguidance.ua.edu/#faculty (last visited January 28, 2025).

engage in practice with diverse groups of people. Yet, I am concerned that my obligations as a professor teaching future social workers will be compromised by the prohibitions in SB 129.

**Professional Harms from SB 129**

43. As discussed above, educating my students about numerous subjects that may fall within SB 129's prohibited "divisive concepts" is critical to my teaching, including in the *Anti-Oppression and Social Justice* course that I am currently teaching. Structural racism—including implicit bias, White privilege, and absence of a colorblind meritocracy—is a central focus of this class. Yet, my teaching and the readings and course work that I assign in this course appear to violate SB 129.

44. I am faced with the untenable options of either self-censoring by changing the way I teach my classes to try and omit teaching about "divisive concepts," even when it is not clear what precisely would be considered a "divisive concept," or risk enforcement and disciplinary action against me. The UA administration has already threatened me with disciplinary action based on the project my students selected last fall, causing me to have a credible fear of enforcement. Both of these options would cause great harm to me professionally.

45. My situation is all the more perilous because, given its vague and confusing language, I am unable to understand SB 129's prohibitions and exceptions.

46. SB 129 hinders my ability to provide effective instruction to my students because I do not know how I can meet the instructional standards of my discipline without violating the law. Members of my academic field have produced decades of research on the existence of systemic inequalities and the consequences of systems of oppression. However, if I include any of this research in my courses, I run the risk of possibly violating SB 129.

47. Due to SB 129, I am unable to teach lessons concerning social injustice or past discrimination in the manner that I did prior to the law's passage due to the significant risk that a student or administrator will claim that I am violating certain provisions of SB 129.

48. Students enrolled in my courses will become counselors, community advocates, and social workers after they graduate. In order to be effective in their practice, these students need to gain the skills necessary to understand and respect individuals with cultures, backgrounds, and viewpoints that differ from their own. SB 129 limits my ability to introduce diverse perspectives and lived experience into my classroom instruction, which harms my students by not allowing them to become conversant in the issues that would inform their work as social workers.

49. My students cannot effectively serve their future clients if they do not learn about structural racism and systemic inequality—topics that may violate SB 129.

50. SB 129 has created a chilling effect among instructors whose courses cover topics related to race, sex, sexual orientation, and other topics that may be considered "divisive."

51. I have had discussions with colleagues that feel pressured to make changes to their course instruction to avoid the appearance of violating the law.

52. I also am aware that activist organizations outside the university are encouraging students to enroll in certain courses to surveil specific professors for possible violations of the law. For example, I am included on Turning Point USA's "professor watchlist."[4]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on January 29, 2025.

_____
Dr. Cassandra Simon

---

[4] *Cassandra Simon,* Professor Watchlist, https://www.professorwatchlist.org/professor/cassandrasimon.