FILED
2025 Mar-07  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | Case No. 2:25-cv-00067-MHH |
| KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART AND KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## THE BOARD DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ...................................................................................................1

**ARGUMENT** ..........................................................................................................2

**I.** **THE BOARD DID NOT VIOLATE THE PROFESSOR PLAINTIFFS' FIRST AMENDMENT RIGHTS** ..........................................................................2

     A.    The Board has the final say regarding what is taught in its classrooms ...................................................................................4

     B.    In light of *Bishop*, the Professor Plaintiffs are not likely to succeed on the merits of their claims against the Board. ...................11

**II.** **THE BOARD DID NOT VIOLATE THE STUDENT PLAINTIFFS' FIRST AMENDMENT RIGHTS** ........................................................................18

     A.    Plaintiff Luna's First Amendment rights do not limit UAB's ability to determine what is taught during class time.........................18

     B.    The Student Plaintiffs do not allege that any group was denied an opportunity to apply for student organization funding..................20

**III.** **THE BOARD DID NOT VIOLATE THE ALABAMA NAACP'S FIRST AMENDMENT RIGHTS** .........................................................................25

**CONCLUSION** .....................................................................................................28

# TABLE OF AUTHORITIES

### CASES

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023)..............................................................................17

*Ala. Student Party v. Student Gov't Asso. of Univ. of Ala.,*
    867 F.2d 1344 (11th Cir. 1989) ............................................................9

*Bishop v. Arnov,*
    926 F.2d 1066 (11th Cir. 1991) ...................................................*passim*

*Bd. of Educ. v. Pico,*
    457 U.S. 853 (1982)..............................................................................19

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
    561 U.S. 661 (2010)................................................................................2

*Doe v. Governor of N.J.,*
    783 F.3d 150 (3d Cir. 2015) ................................................................19

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006)........................................................................7, 8, 9

*Ga. Republican Party v. SEC,*
    888 F.3d 1198 (11th Cir. 2018) ..........................................................26

*Gundy v. City of Jacksonville,*
    50 F.4th 60 (11th Cir. 2022) ...............................................................10

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967)................................................................................8

*Leake v. Drinkard,*
    14 F.4th 1242 (11th Cir. 2021) ...........................................................24

*Mech v. Sch. Bd. of Palm Beach Cty.,*
    806 F.3d 1070 (11th Cir. 2015) ..........................................................10

*Moss v. City of Pembroke Pines*,
    782 F.3d 613 (11th Cir. 2015) ...............................................................7

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) .......................................*passim*

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995).............................................................10, 22, 23, 24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..............................................................................26

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..............................................................................16

*Widmar v. Vincent*,
    454 U.S. 263 (1981)..............................................................................27

## OTHER AUTHORITY

*Opinion of the Alabama Attorney General 2019-026*
    2019 Ala. AG LEXIS 16 (March 20, 2019) ......................................3

*Opinion of the Justices 299,*
    417 So. 2d 946 (Ala. 1982)..................................................................3

## **INTRODUCTION**

Plaintiffs ask this Court to find that: 1) the University violated their First Amendment rights because it does not allow the Professor Plaintiffs to advocate for—and the Student Plaintiffs to hear advocacy for—their preferred positions within the University's classrooms; 2) the University violated the Student Plaintiffs' First Amendment rights when it denied their student groups funding, even though those groups never applied for funding; and 3) the University infringed the NAACP's right to freedom of association when the Black Student Union and Safe Zone lost designated physical spaces on campus. Properly viewed, none of the Board's alleged actions violated any of Plaintiffs' rights.

*First*, the Professor Plaintiffs' claim that the University has no ability to determine whether concepts should be promoted or endorsed, rather than just taught, by its employees during class time has already been rejected by the Eleventh Circuit. *See Bishop v. Arnov*, 926 F.2d 1066, 1076 (11th Cir. 1991) (a professors "interest in academic freedom and free speech do not displace the University's interest inside the classroom.").

*Second*, the Student Plaintiffs have not been denied funding by the University, as none of the Student Plaintiffs' organizations have applied for or been denied funding as a Registered Student Organization ("RSO").

*Third*, the Alabama NAACP's right to freedom of association has not been violated by the University's decision to reallocate limited campus space.[1]

## ARGUMENT

## I.    THE BOARD DID NOT VIOLATE THE PROFESSOR PLAINTIFFS' FIRST AMENDMENT RIGHTS.

The Board only addresses the constitutionality of its actions as the Attorney General's response, on behalf of Governor Ivey, will address the Constitutionality of SB 129.[2] The fact that SB 129 may have prompted the Board to make certain changes does not mean that the Board could not have taken the same actions prior to SB 129, or that the legality of its actions is contingent upon the facial validity of SB 129. The Act's limitation that "[n]othing in this Act . . . [m]ay be construed to inhibit or violate the First Amendment rights of any student or employee," was critical to the Board's response to SB 129, just as it should be to this Court's decision here. *See Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,* 561 U.S. 661, 690 (2010) ("State law, of course, may not command that public universities take action impermissible under the First Amendment. But so long as a public

---

[1] The Board does not address Plaintiffs' Fourteenth Amendment vagueness claim because it is based on the text of SB 129 rather than a University policy. (Doc. 12-1 at 18) ("SB 129 is unconstitutionally vague in violation of the Fourteenth Amendment"); id. at 24 ("Due to the vagueness of SB 129's provisions, there are no clear parameters to know what conduct constitutes a violation subject to discipline."). Whether SB 129 is unconstitutionally vague will be addressed in the Attorney General's response on behalf of Governor Ivey.

[2] The Board adopts and incorporates the arguments in Governor Ivey's brief regarding the constitutionality of SB 129.

university does not contravene constitutional limits, its choice to advance state-law goals through the school's educational endeavors stands on firm footing."); *Bishop*, 926 F.2d at 1069 (describing the Board as "perched" upon a "first amendment tight rope"). Even if the Court were to find SB 129 unconstitutional, Plaintiffs' Motion should be denied to the extent it seeks to enjoin the Board from managing its institutions, because the law is clear that, in doing so, the Board has not violated Plaintiffs' First Amendment rights.[3]

Before going further, it is worthwhile to clarify exactly what SB 129 prohibits and what the University has requested from its faculty. Plaintiffs' filings set forth a parade of horribles claiming they will be prohibited from teaching basic concepts in their respective fields. Properly read, however, SB 129's prohibitions—and the University's alleged actions in this case—are quite limited. In the classroom context, SB 129 only prohibits advocating for, or requiring assent to, a divisive concept. SB 129 specifically allows for the "teaching or discussion of any divisive concept in an

---

[3] In previous cases, the Board has argued that legislation directing the Board to manage or control its institutions in a manner prescribed by the legislature violates Article XIV, § 264 of the Alabama Constitution which states, in relevant part, that the University of Alabama System "shall be under the management and control of a board of trustees." *See also Opinion of the Justices 299*, 417 So. 2d 946, 947 (Ala. 1982) ("[T]he legislature has no authority…to deprive the board of trustees of their discretion as to the management and control of" its institutions); *Opinion of the Alabama Attorney General 2019-026* (March 20, 2019) ("[T]he University of Alabama is under the management and control of the Board and that the Legislature has no authority by act to deprive the Board of their discretion as to such management and control."). The Board does not make that argument here, as its response addresses only the constitutionality of the Board's own actions, not SB 129.

objective manner and without endorsement." Neither SB 129 nor the University prevent the teaching of concepts that might make a student uncomfortable, or feel shame. In sum, the University is only preventing the Professor Plaintiffs from advocating for, or requiring assent to, their personal views while they teach the University's classes.

## A.    The Board has the final say regarding what is taught in its classrooms.

The Eleventh Circuit has instructed this Court: if "[professors] and the University disagree about a matter of content in the course[s] [the professors] teach[,] [t]he University must have the final say in such a dispute." *Bishop*, 926 F.2d at 1068. Instead of addressing *Bishop's* binding precedent, Plaintiffs completely ignore it. In *Bishop's* place, Plaintiffs rely on the Northern District of Florida's non-binding decision in *Pernell v. Florida Board of Governors of the State University System*, which is currently on appeal. 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

*Bishop* involved a professor who taught exercise physiology at the University of Alabama who, in class, "expressed certain personal (perhaps even professional) opinions about his work that happen to have a religious source." 926 F.2d at 10676. The professor also organized an optional after-class meeting for his students on the topic of "God in human physiology." *Id.* at 1068-69. After receiving student complaints, the professor's supervisor ordered him to stop interjecting his religious beliefs during class time and to discontinue any optional classes where a Christian

perspective of an academic topic is delivered. *Id.* at 1069. The professor filed suit under 42 U.S.C. § 1983 against the Board of Trustees in their official capacities.

The Eleventh Circuit reversed the district court's grant of summary judgment, holding that "the University necessarily has dominion over what is taught by its professors," *id.* at 1078, and that professors have no right to override a university's decisions about course content. *Id.* at 1077 ("The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments."). In reaching this conclusion, the Court considered: (a) the context of the speech, which occurred in a "university classroom during specific in-class time"; (b) the "university's position as a public employer" and as "a place of schooling," which allows it to control the "content imparted during class time"; and (c) the "predilection for academic freedom." *Id.* at 1074-75.

The Court unequivocally held that when a professor and a university "disagree about a matter of content" in the professor's course, "**[t]he University must have the final say**." *Id.* at 1076 (emphasis added). *See also id.* at 1077 ("The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments."). The holding includes restrictions on the specific viewpoints professors may express during class time.[4] *Id.* at 1076 ("The University

---

[4] The *Pernell* Court erroneously held that a university's authority to regulate its curriculum is limited to overarching decisions like which subjects are taught, and that a university may not prohibit professors from advocating certain viewpoints about the subject of the curriculum during

has concluded that those opinions should not be represented in the courses he teaches at the University."); *id.* at 1077 ("[T]he University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings.").[5]

*Bishop* makes clear that any time a university's interest in controlling course content comes into conflict with a professor's interest in academic freedom, the university has the "final say" because the professor's "interest in academic freedom and free speech do[es] not displace the University's interest inside the classroom." *Id.* at 1076. As the Eleventh Circuit has instructed, judges "cannot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators." *id.* at 1075.

_____

class time. 641 F. Supp. 3d at 1237-38. Not a single controlling case cited in the opinion directly supports this proposition, and *Bishop* explicitly rejects it. *Bishop* had nothing to do with the subject of the curriculum (physiology), and everything to with the professor's viewpoint about the subject (that human physiology is the result of a creative force). 926 F. 3d at 1068. Moreover, the effect of the *Pernell* court's proposed rule would be crippling to universities. Under its proposed rule, a university could not restrict a professor hired to teach a class about World War II from advocating a pro-Nazi viewpoint. While this is an extreme example, it highlights the legitimate interest that universities have in regulating which viewpoints their professors thrust upon students during class time.

[5] Contrary to the *Pernell* Court's insistence that *Bishop* was driven largely by the university's interest in avoiding an Establishment violation, *Bishop* was decided solely on First Amendment grounds, and its application is not limited to cases that involve Establishment concerns. The *Bishop* Court did not even reach the Establishment issue, nor did it cabin its holding to cases involving Establishment concerns. *Id.* at 1077 ("We do not reach the establishment questions raised by Dr. Bishop's conduct. The University can restrict speech that falls short of an establishment violation, and we have already disposed of the University's restrictions of Dr. Bishop under the free speech clause."); *see also id.* at 1078 ("[W]e hold that" the university's action "was reasonable and within its powers to control the content of curriculum in the classroom, regardless of the Establishment Clause.").

After *Bishop*, the Supreme Court decided *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Court's seminal government-speech case. In *Garcetti*, the Court held that when public employees make statements "pursuant to their official duties," their speech is not protected by the First Amendment. *Id.* at 421. *See also Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (per *Garcetti*, "speech made pursuant to an employee's job duties is not speech made as a citizen and is therefore not protected by the First Amendment"). Speech "that owes its existence to a public employee's professional responsibilities" is government speech, and restrictions on such speech do "not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti,* 547 U.S. at 421-22.

Although *Garcetti* left open the question of whether government speech doctrine applies in cases "involving speech related to scholarship or teaching," *id.* at 425, that does not allow Plaintiffs to ignore the reasoning of *Garcetti* or excuse their failure to follow *Bishop*.[6] A professor's classroom speech "owes its existence" to the professor's professional responsibilities. Under the reasoning of *Garcetti*, classroom instruction is government speech susceptible to regulation. *Bishop* recognizes this

---

[6] The *Pernell* court suggests that because *Garcetti* left open the question of academic speech, *Garcetti* may not be applied to university professors' classroom speech. 641 F. Supp 3d at 1243. This is incorrect, because the opinion did not decide either way, and left the issue completely open. 547 U.S. at 425 ("We need not, and for that reason do not, decide . . . ."). Because the question was left open, courts in our circuit must defer to *Bishop*, which gives universities the final say over professors' classroom speech.

much. 926 F.2d 1073 ("[W]here the in-class speech of a teacher is concerned, the school has an interest . . . in scrutinizing expressions that 'the public might reasonably perceive to bear [its] imprimatur[.]'"); *id.* at 1076-77 ("Bishop's . . . educational judgment can be questioned and redirected by the University when he is acting under its auspices as a course instructor.").

Plaintiffs do not discuss *Garcetti* in their brief, nor do they offer any compelling argument as to why the Court should recognize an academic exception to *Garcetti*. They only argue that the Professor Plaintiffs possess a right to "academic freedom" that outweighs the Board's interest in what is taught in its classrooms. Their Motion includes excerpts from several cases[7] proclaiming the importance of academic freedom, including the often-cited language from the Supreme Court's *Keyishian* case that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." (Doc. 12-1 at 8) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

The *Bishop* Court, however, quoted the same excerpt from *Keyishian* and swiftly dismissed its applicability, explaining that "[t]he Court's pronouncements

---

[7] None of these cases address a university's power to regulate course content or a professor's in-class speech. The *Pernell* Court cited many of these same cases for the nebulous proposition that professors' academic freedom is a "special concern" of the First Amendment, despite *Bishop*'s holdings that those cases cannot be "extrapolated to deny schools command of their own courses," that academic freedom is not "an independent First Amendment right," and that courts "cannot supplant [their] discretion for that of the University." *Id.* at 1075.

about academic freedom . . . cannot be extrapolated to deny schools command of their own courses." 926 F.2d at 1075. Moreover, *Bishop* held that "at the post-secondary level, **we do not find support to conclude that academic freedom is an independent First Amendment right**" and that, "in any event, we cannot supplant our discretion for that of the University." *Id.* (emphasis added). Further, academic discretion to determine what is said in the classroom belongs to institutions, not individual professors. *See Ala. Student Party v. Student Gov't Asso. of Univ. of Ala.,* 867 F.2d 1344, 1345 (11th Cir. 1989) ("The . . . Supreme Court has consistently reaffirmed the right of state universities . . . to determine independently on academic grounds 'who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'"); *Bishop*, 926 F.2d at 1076 (professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom").

This Court should not create an exception to *Garcetti* that has never been recognized by the Supreme Court and cannot be reconciled with *Bishop*. Course content and classroom instruction are government speech subject to regulation by the university, not by interest groups or the courts. As government speech, contrary to Plaintiff's arguments, the University is free to express those viewpoints it chooses. "'[W]hen the government exercises the right to 'speak for itself,' it can freely 'select the views that it wants to express,' including 'choosing not to speak' and 'speaking

through the . . . removal' of speech that the government disapproves."' *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (quoting *Mech v. Sch. Bd. of Palm Beach Cty.*, 806 F.3d 1070, 1074 (11th Cir. 2015)). *See also Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking.").

University professors are free to hold whatever views they like and to "express them, on [their] own time, far and wide and to whomever will listen; or write and publish, no doubt authoritatively, on them." *Bishop*, 926 F.2d at 1076. However, they do not possess an absolute right to express their personal views "under the guise of University courses," and the Board has sovereignty over what is taught in its classrooms. When professors disagree with the Board about the content of their courses, the "University's conclusions . . . must be allowed to hold sway." *Id.* at 1077. In other words, "[t]he University must have the final say." *Bishop*, 926 F.2d at 1076.[8] To hold otherwise gives professors rights held by no other government employee and prevents the University from controlling what is taught in its classrooms.

---

[8] Notably, in the Appellee's Brief to the Eleventh Circuit in the appeal of the *Pernell* decision, the appellees seem to concede that the university has authority to regulate what professors say in the classroom and argue only that the legislature is prohibited from such regulation. *See* (Case No. 22-13992, Doc. 52 at 31) ("[T]he Instructors do not challenge a decision made by 'the academy itself,' as in *Bishop*."); *id.* at 26 ("Such viewpoint-based discrimination by the legislature is a political act of censorship, not a state university's reasonable judgement about pedagogy."). This is likely in recognition that the Eleventh Circuit is not likely to ignore its own *Bishop* decision.

**B.    In light of *Bishop*, the Professor Plaintiffs are not likely to succeed on the merits of their claims against the Board.**

The core of the Professor Plaintiffs' claims against the Board is that the University of Alabama's decisions, guidance, and actions following the enactment of SB 129 violated their rights to free speech and academic freedom. Plaintiffs, however, have not alleged any facts that could entitle them to relief in light of *Bishop*.

Dr. Fording[9] alleges that he "is concerned that his courses and the discussions in these courses will be deemed to violate SB 129," (Doc. 1 ¶ 19), that he plans to add a university-recommended disclaimer to a course syllabus, *id.* at ¶ 89, and that during a training session the University "recommended that professors 'do not directly test' on any material that could be considered a divisive concept or 'include them as specific criteria on other kinds of assignments (like papers),'" *id.* at ¶ 90.

Dr. Patton alleges similar concerns to Dr. Fording, but also alleges that she has removed certain topics and assignments from her syllabus due to SB 129, *id.* at ¶¶ 98, 108, and that she "plans to record all of her lectures in order to reduce the risk that she will be punished for an SB 129 complaint," *id.* at ¶ 99. She also alleges that she was "targeted by university administrators" when they called to inform her about

---

[9] It should be noted that the Complaint is unverified and Dr. Fording, Dr. Patton, and Isabella Campos did not submit declarations. The Court should not accept their unverified allegations as evidence supporting the issuance of a preliminary injunction.

a complaint they received about one of her courses. *Id.* at ¶ 140. The administrators allegedly told Dr. Patton that her course "may conflict with SB 129," *id.* at ¶ 141, and asked her to provide information "about her class, course materials, and instruction," *id.* at ¶ 143, "about the manner in which she facilitated classroom discussions and the political content of her course materials," *id.* at ¶ 144, and about "how she 'consciously avoids' compelling assent," *id.* at ¶ 145. According to Dr. Patton, she had "never before…been asked, let alone required, to provide details about her courses."

Dr. Simon alleges that she is no longer able to advocate her own professional viewpoints during class time. She also alleges that university administrators required her to cancel a "sit-in" protest organized by her students as part of their coursework, *id.* at ¶31, and "threatened" her "with disciplinary action" based on the assignment, *id.* at ¶ 44.[10]

None of these allegations, if true, could support a First Amendment claim against the Board. *Bishop* clearly held that the Board's authority to regulate course content includes the authority to prohibit professors from advocating their own viewpoints during class time. Notably the Professors have not, and cannot, allege that the University has prevented them from teaching any concept. To the contrary,

---

[10] Dr. Simon's allegations regarding the sit-in assignment and the University's response are riddled with inconsistencies, as explained in detail below.

the University has only instructed them not to advocate for certain, limited concepts. In *Bishop*, "[t]he University's chief concern is that its courses be taught without personal . . . bias unnecessarily infecting the teacher or the students." 926 F.2d at 1076. Plaintiffs ask this Court to turn *Bishop* on its head and find that the Professors are the sole arbiters not only of what concepts are taught, but also what concepts can be promoted in the University's classrooms. But, *Bishop* makes clear that the University has the final say. *Bishop*, 926 F.2d at 1076; *id.* (a professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom.").

The Professor Plaintiffs cannot escape University regulation by labeling their views as "professional opinions." (*See* Doc. 12-4 ¶ 21) (expressing Dr. Simon's desire to "share [her] professional, evidence-based views regarding 'divisive concepts' with [her] students."). The Board has every right to limit professors from advocating their own personal "viewpoint during instructional time, even to the extent that it represents [their] professional opinion about [their] subject matter." *Bishop*, 926 F.2d at 1077; *see also id.* at 1076 n.7 ("[S]imply renaming . . . views as professional . . . does not deny the authority of his employer to request that he sequester the personal from the professional."); *id.* at 1071 ("[T]he University asks only that he separate his personal and professional beliefs and that he not impart the

13

former to his students during 'instructional time' or under the guise of the courses he teaches in so-called optional classes.").

Providing professors with a "recommended disclaimer," (Doc. 1 ¶ 89), and making recommendations during legal trainings, *id.* at ¶ 90, also does not infringe on the Professor Plaintiffs' First Amendment rights. On a basic level, the Board must be able to make recommendations to its professors about academic standards.

Universities must also be able to investigate student complaints. *See Bishop*, 926 F.2d at 1074 ("The University's interest is most obvious when student complaints suggest apparent coercion."). Dr. Patton alleges she was "targeted by university administrators" when they "inform[ed] her" that the "administration had received a complaint," (Doc. 1 ¶ 140), and when they "asked . . . for information about her class, course materials, and instruction procedures," *id.* at ¶ 143. The Professor Plaintiffs cannot seriously argue that a student complaint amounts to "targeting" by the administration, or that asking a professor "to provide details" about a course she is being paid to teach amounts to a threat of discipline. *Id.* at 151.

Finally, when a university believes that a professor's course materials have an unduly coercive effect on students, they are entitled to intervene. Dr. Simon alleges in her declaration that her rights were violated when the administration instructed her to cancel a sit-in protesting SB 129 that was organized "as part of [her] Anti-Oppression and Social Justice course." (Doc. 12-4 ¶ 24). The administration

allegedly had concerns because the sit-in was "tied to the classroom" and would force students to "assent to a position and/or unwillingly take part in political activity."[11] *Id.* at ¶ 31.

Dr. Simon downplays the nature of the protest in her declaration, stating that her "students came up with the idea . . . on their own," *Id.* at ¶ 24, and that "[a]ny student who feels uncomfortable with the chosen topic or does not want to participate" may "complete an alternative assignment." *Id.* at ¶ 27. But the Complaint makes clear that the protest was "part of her final evaluation," which "requires students" to collectively "design a project that addresses an injustice of some sort." (Doc. 1 ¶ 136). While an alternative assignment may have been an option, the sit-in was clearly tied to the class and would have pressured students to engage in a political protest. According to the Complaint, this was precisely the University's concern:

> Despite the way you've framed it, it is difficult to see how this exercise is not tied to the classroom or does not create a situation where students are being forced to assert a position and/or unwillingly take part in political activity. Similarly, the way this has been organized runs afoul of the Board's commitment to institutional neutrality.

*Id.* at ¶ 92.

---

[11] Dr. Simon complains that she did not receive clarification regarding how the event could be considered a "political" activity. *Id.* at 32. The Board cannot imagine a scenario in which a sit-in protesting a legislative enactment would be not considered "political activity."

This "optional" sit-in assignment mirrors the "optional class" in *Bishop*. There, the professor organized an after-class meeting on the topic of "evidences of god in human physiology." *Bishop*, 926 F.2d at 1068-69. Attendance was optional and did not affect grades, and the professor used a "blind" grading system. *Id.* at 1069. The Eleventh Circuit upheld the University's ability to restrict such meetings because they "gave the impression of official sanction, which might have unduly pressured students into attending and . . . adopting the beliefs expressed by" the professor. *Id.* at 1076. It reasoned that "[t]he University's interest is most obvious when student complaints suggest apparent coercion—even when not intended by the professor." *Id.* at 1074.

As described, Dr. Simon's sit-in assignment was more coercive than the after-class meeting in *Bishop*, since it was part of her final evaluation, and the only way a dissenting student could have avoided participation was to single themselves out and complete an alternate assignment. Additionally, Dr. Simon admits in her declaration that the sit-in was initially going to be factored into students' grades. (Doc. 12-4 ¶ 32) ("I also shared that I would inform my students that the sit-in would no longer be part of their grade."). No reading of *Bishop* could support Dr. Simon's claims that cancelling[12] the sit-in assignment violated her First Amendment rights. *See W. Va.*

---

[12] It is worth noting that Dr. Simon's students ended up holding a rescheduled sit-in after going through the proper University procedures to reserve campus space. (Doc. 12-4 ¶ 36).

*State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (requiring public school students to salute the flag "transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."); *303 Creative LLC v. Elenis,* 600 U.S. 570, 596 (2023) (state cannot "force [] individual[s] to 'utter what is not in [their] mind[s]' about a question of political . . . . significance.").

As for Dr. Simon's claim that she was "threatened with disciplinary action based on the project [her] students selected last fall," (Doc. 12-4 ¶ 44), she has not actually alleged that any threat was made, only that an email from an administrator cited Chapter 3.II.B of the University of Alabama Faculty Handbook.[13] This is a lengthy section of the Handbook titled "Compliance with Laws, University Policies, and Professional Licensure Standards of Conduct." Simon's Declaration contains a single cherry-picked sentence from this chapter of the Faculty Handbook. (Doc. 12-4 ¶ 31).[14] She does not allege that the email quoted or referenced this sentence or that any administrator ever made any reference to or threat of disciplinary action. Even if Dr. Simon did allege an actual threat of disciplinary action, such a threat

---

[13] A copy of the Faculty Handbook is attached as <u>Exhibit A</u> to the Affidavit of James T. Dalton. An electronic version of the Faculty Handbook can be accessed at the following URL: https://ua-public.policystat.com/policy/16777367/latest/#autoid-bw6j7.

[14] The sentence reads: "It is the responsibility of faculty members to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including termination."

would not have violated her First Amendment rights because, as demonstrated in *Bishop*, the Board may discipline professors who ignore its decisions regarding course content, especially for assignments as coercive as Dr. Simon's. *See Bishop*, 926 F.2d at 1074 ("The University's interest is most obvious when student complaints suggest apparent coercion.").

Plaintiffs' Motion ignores binding precedent and, instead, relies on general pronouncements about academic freedom. *Bishop*, however, already rejected Plaintiffs' approach. 926 F.2d at 1075 ("The Court's pronouncements about academic freedom . . . cannot be extrapolated to deny schools command of their own courses."). Even if the Court accepts the Professor Plaintiffs' allegations as true, they have not demonstrated a substantial likelihood—or any real possibility—that they could succeed on the merits of their First Amendment claims against the Board.

## II. THE BOARD DID NOT VIOLATE THE STUDENT PLAINTIFFS' FIRST AMENDMENT RIGHTS.

### A. Plaintiff Luna's First Amendment rights do not limit UAB's ability to determine what is taught during class time.

Plaintiff Luna alleges that his "right to receive information and ideas" was violated when his professor added a disclaimer to a course syllabus and when he "observed [his] professor speak very timidly about topics that could possibly fall under SB 129." (Doc. 12-5 ¶ 11). Luna claims that his right to receive information is threatened because the same professor might "avoid topics that are central to the

course" in the future, *id.* at ¶ 14, and that his "ability to learn is materially hampered if a professor feels compelled to change their curriculum," *id.* at ¶ 9.

Luna's argument, however, fails for the same reason as the Professor Plaintiffs': the Board has the sovereignty not only to decide what is taught but also to limit professors from promoting their personal views in its classrooms. Plaintiff Luna's "right to receive information is reciprocal to the [Professor Plaintiffs'] right to speak." *Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015); *see also Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them."). Thus, given that the Professor Plaintiffs do not have a First Amendment right to advocate for their preferred position in the classroom, Plaintiff Luna does not have a First Amendment right to hear advocacy for his preferred position.

Even if Plaintiff Luna does possess a right to receive his professors' viewpoints on all topics during class time without university oversight (he does not), the Complaint, Motion, and Luna's declaration do not allege facts sufficient to support a preliminary injunction. Luna has not alleged any of his professors actually altered their course instruction due to SB 129 or any Board policy. Luna only alleges that a professor added a disclaimer to his syllabus and that Luna observed the professor "speak…timidly." (Doc. 12-5 ¶ 11). Plaintiffs assume that because Luna felt like his professor was speaking timidly, the professor must have been self-

censoring for fear of discipline by the university. Plaintiffs do not allege facts in support of this assumption, but rather rely purely on Luna's projection about what the professor might have been thinking.

The Court should deny Plaintiff Luna's request for a preliminary injunction because the Board's decisions and recommendations about course content do not conflict with Luna's First Amendment rights.

### B.    The Student Plaintiffs do not allege that any group was denied an opportunity to apply for student organization funding.

The Student Plaintiffs allege that various student groups were denied funding in violation of their First Amendment rights. (Doc. 12-1 at 17-18). Specifically, Plaintiff Testman alleges in her declaration that Social Justice Advocacy Council ("SJAC"), a student group that she is a member of, was "demoted" from a University Funded Organization ("UFO") to a Registered Student Organization ("RSO") and no longer receives funding from the University. (Doc. 12-6 ¶¶ 8-10). Plaintiff Luna alleges that Esperanza, a student organization that he co-founded, no longer receives funding directly from UAB's former Office Diversity, Equity, and Inclusion or indirectly from SJAC (Doc. 12-5 ¶¶ 18, 22).

To understand Plaintiffs' argument—and why it lacks merit—some context is necessary regarding the distinction between UFOs and RSOs. A UFO is defined as:

> [A] club or organization whose membership is composed of UAB students and is directly supported through a University department or division. The University Funded

> Organization's purpose aligns with that of the department
> or division and is directly advised and financially
> supported by that unit. University Funded Organizations
> are required to participate in all registration processes in
> order to remain in good standing with the University.

(Exhibit A to the Affidavit of Mary Wallace, at 1). An RSO, on the other hand, is

defined as:

> [A] club or organization whose membership is composed
> of UAB students. RSOs are created by students and
> supported by a voluntary faculty/staff advisor, as well as
> student governance. The University supports the creation
> of RSOs whose purposes and activities enhance the social,
> cultural, recreational, and educational functions of the
> University.

*Id.* UFOs may use UAB's name and logo as part of their branding. *Id.* at 3. RSOs

may not. *Id.* at 6.

UFOs receive their funding directly from a University office or department

that sponsors them, while RSOs must apply for funding each semester from the

Undergraduate Student Government Association ("USGA"). (Doc. 1 ¶ 119). In other

words, RSOs receive funding from a pool of money that is available to all student

groups that apply,[15] while UFOs are, in essence, part of the University department

or division that funds them.

---

[15] Before submitting a budget request to USGA, an RSO must register with the University, obtain
an active bank account, and obtain an active iSupplier account. (Exhibit B to the Affidavit of Mary
Wallace, at 50). Each RSO must attend a budget hearing before the USGA before they can receive
funds. *Id.* at 51.

Plaintiffs claim that their rights were violated when their organizations lost funding as a result of losing their UFO status. However, nowhere in the Complaint, Motion, or declarations do Plaintiffs allege that any of the student organizations at issue were told they could not submit a budget request to USGA, or that they were denied funding from USGA after properly submitting a budget request. In fact, the Student Plaintiffs' organizations did not even attempt to submit budget requests to USGA for the spring 2025 semester. (Affidavit of Mary Wallace, ¶¶ 9-16).

Instead, Plaintiffs insist that the loss of UFO funding denied them access to a "limited public forum" based on their viewpoint. (Doc. 12-1 at 15-17). The case they cite in support, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, exposes precisely why their argument lacks merit.

*Rosenberger* involved claims that a university withheld reimbursement for the printing costs of a student newspaper for the sole reason that the paper promoted a religious viewpoint. 515 U.S. 819, 822-23 (1995). The organization at issue in *Rosenberger* was a "Contracted Independent Organization," or "CIO" at the University of Virginia. CIO status at UVA is available to all student groups, and CIOs may apply for funding from the Student Activities Fund ("SAF"). *Id.* at 824. SAF funds are allocated by UVA's Student Council. At issue in *Rosenberger* was the Student Council's denial of a funding request on the stated grounds that the student publication was a "religious activity." *Id.* at 827.

The Supreme Court held that the SAF funding was a "limited public forum," and that the denial of funding constituted an impermissible viewpoint restriction. *Id.* at 829-30 ("Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set."); *id.* at 834 (viewpoint restrictions are improper when funds are meant "to encourage a diversity of views from private speakers"). However, the Court made clear that when a university disburses funds to promote its *own* favored message, it may determine the content of its speech. *Id.* at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").

The Court reasoned that "[t]he distinction between the University's own favored message and the private speech of students" was evident in *Rosenberger* because CIOs are independent from the University. *Id.* at 834-35. ("[S]tudent groups eligible for RAF support are not the University's agents, are not subject to its control, and are not its responsibility.")

RSOs at UAB are analogous to the CIOs in *Rosenberger* because they are independent from UAB and receive their budget from a fund that is available to all student organizations that apply. *Id.* at 834; *id.* at 829-30 (describing UVA's student activity fund as a "limited public forum"). UFO funding at UAB is not analogous to the CIO funding in *Rosenberger* because UFO funds are only available to organizations that a department or division hand-selects because "their purpose

23

aligns with that of the department or division." (<u>Exhibit A</u> to the Affidavit of Mary Wallace, at 1). In other words, when a UAB department provides funding to a UFO, it does so because the UFO promotes the department's "own favored message." *Rosenberger*, 515 U.S. at 834. UFO funding is therefore the "University's own speech" rather than a limited public forum. *Id.* at 834. This explains why UFOs are permitted to market themselves using UAB's name and marks while RSOs are not. *See* (<u>Exhibit A</u> to the Affidavit of Mary Wallace, at 3, 6) (allowing UFOs, but not RSOs, to market themselves using UAB's "core university logo" and the "full official university name").

Because UFO funding is the University's speech, the University has discretion to fund or defund a UFO for any reason. *Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."); *id.* ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.").

The Student Plaintiffs are not likely to succeed on their First Amendment claims relating to student organization funding because they have no First Amendment right for UAB to endorse their groups' purposes, as UFO funding is government speech rather than a limited public forum. *See Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) ("The First Amendment works as a shield to

protect *private* persons from 'encroachment[s] by the government' on their right to speak freely, not as a sword to compel the government to speak for them."). The Student Plaintiffs do not allege that their organizations were denied the opportunity to receive USGA funding, nor do they allege that they even attempted to apply for USGA funding for the spring 2025 semester.[16] *See also* (Affidavit of Mary Wallace, ¶¶ 9-16). The "injury" alleged is that their organizations no longer "receive automatic funding from the university" and must now "submit a request" for funding like the other groups on campus. (Doc. 12-1 at 6 n.2). Instead of being denied access to a limited public forum, the Student Plaintiffs are upset that their organizations must share a limited public forum with everyone else. If the Student Plaintiffs would like to receive funding for their organizations, they are encouraged to submit budget requests to USGA each semester, just like every other RSO is required to.

## III. THE BOARD DID NOT VIOLATE THE ALABAMA NAACP'S FIRST AMENDMENT RIGHTS.

Similarly, Plaintiff Alabama NAACP alleges that its members' rights to freedom of association were violated when student groups lost designated physical campus spaces at the University of Alabama ("UA"). (Doc. 12-1 at 17-18). Specifically, Bernard Simelton's declaration alleges that the UA "closed office space

---

[16] The Board also notes that each of the Student Plaintiffs is keenly aware of the USGA budgeting process, as all three currently sit on the Executive Council of the USGA. (Affidavit of Mary Wallace, ¶ 17).

that had been previously available to the Black Student Union ("BSU") and the Safe Zone Resource Center ("Safe Zone")." (Doc. 12-7 ¶ 12). The Motion asserts that the repurposing of these office spaces "infringes on Plaintiff Alabama NAACP's freedom of association rights" because its members no longer have "full access to campus spaces and programming." (Doc. 12-1 at 17-18). Mr. Simelton's affidavit alleges that "[p]rior to the closure of the BSU and Safe Zone offices, members of the UA NAACP Chapter attended events and spent time in the BSU and Safe Zone spaces." (Doc. 12-7 ¶ 16). Nowhere, do Plaintiffs identify any student UA NAACP member who actually attended any such event.

As an initial matter, The Alabama State Conference of the NAACP lacks standing to assert a claim on behalf of its unnamed members who are alleged to have used the BSU and Safe Zone spaces. In order to satisfy the requirements for associational standing "an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.' We cannot accept an organization's 'self-descriptions of [its] membership . . . . regardless of whether it is challenged.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009)). In other words, there is a "requirement that an organization name at least one member who can establish an actual or imminent injury." *Id.* Here, the Alabama NAACP has not identified any of its members who are alleged to have suffered any actual or

imminent injury. As a result, it lacks standing to pursue the freedom of association claim.

Even assuming the Alabama NAACP had standing (it does not), the freedom of association claim still fails on the merits. Alabama NAACP's argument boils down to a belief that certain student organizations deserve permanent office space in the Student Center and should not have to reserve space on campus like most other student organizations do. Plaintiffs have not articulated how the loss of dedicated office space means that students are "no longer able to fully associate with their peers." (Doc. 12-1 at 17). They do not allege that UA has prohibited any organization from existing, from applying for and receiving funds, or from reserving space and registering to host events on campus.

The seminal case on this issue is *Widmar v. Vincent*, 454 U.S. 263 (1981). In that case, a public university that "routinely provide[d] University facilities for the meetings of registered organizations" informed a registered student organization that it could no longer meet in university buildings "for purposes of religious worship or religious teaching." *Id.* at 265. The Supreme Court held that the university violated the First Amendment because it placed content-based restrictions on a forum that was open to all student groups. *Id.* at 277 ("Having created a forum generally open to student groups, the University seeks to enforce a content-based exclusion of religious speech.").

The Board acknowledges that it may not prevent student groups from reserving space on campus based on their viewpoint, and it encourages all student organizations at UA to take advantage of the resources that UA provides. However, *Widmar* does not support Plaintiffs' argument that certain student organizations are entitled to their own dedicated office space in the Student Center. Plaintiffs claim that, by repurposing the offices, UA "infringe[d]" on Alabama NAACP members' "rights . . . to have full access to campus spaces and programming." (Doc. 12-1 at 18). This allegation ignores the reality that most other student organizations have never had their own office space and have always been required to reserve space for events.

Again, Plaintiffs' claims arise not from the denial of access to a limited public forum, but from the fact that they must now share a limited public forum with everyone else. The Board recognizes that the Plaintiffs are frustrated with changes that have been made throughout the University of Alabama System, but their allegations do not indicate any likelihood of success on the merits of their First Amendment claims.

## **CONCLUSION**

Plaintiffs are not likely to succeed on the merits of their First Amendment claims to the extent those claims are based on the Board's alleged conduct because the Board's alleged actions were within the scope of its institutional decision-making

authority, with or without SB 129. Therefore, should the Court find SB 129 unconstitutional, the Board requests that any injunction be limited to the enforcement of SB 129 and that the Board be permitted to continue managing its institutions pursuant to its discretion.

Respectfully submitted this 7th Day of March, 2025.

/s/ Jay M. Ezelle
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

**Counsel for the Board Defendants**

29