FILED
2025 Mar-07 PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, and THE ALABAMA STATE CONFERENCE OF THE NAACP, | ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | No. 2:25-cv-00067-MHH |
| KAY IVEY, in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees; SCOTT PHELPS, in his official capacity as President Pro Tempore of the University of Alabama Board of Trustees; and MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART, AND KENNETH VANDERVOORT, in their official capacities as members of the University of Alabama Board of Trustees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

# RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. 12) BY DEFENDANT KAY IVEY IN HER OFFICIAL CAPACITY AS GOVERNOR OF ALABAMA

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 7

    A.   In March 2024, Alabama Enacts Act 2024-34. .................................. 7

    B.   In January 2025, Plaintiffs Seek a Preliminary Injunction to Upend the Status Quo. ........................................................................ 12

LEGAL STANDARD .......................................................................... 13

ARGUMENT ...................................................................................... 13

  I.   Plaintiffs Lack Standing To Challenge Most Of The Act's Provisions. ........................................................................................ 13

    A.   Plaintiffs Have Not Made a "Clear Showing" of Likely Impending Harm Related To Each and Every Provision of the Act. ..................................................................................................... 15

        1.   Professor Plaintiffs ....................................................... 15

        2.   Student Plaintiffs ........................................................... 19

        3.   Alabama NAACP ......................................................... 24

    B.   Plaintiffs Have Not Made a "Clear Showing" That Any Harm Is Likely Traceable To or Redressable By Governor Ivey. .............. 26

  II.   Plaintiffs' First Amendment Claims Are Not Likely To Succeed Because They Challenge The Government's Regulation Of Its Own Speech. .............................................................................................. 28

    A.   Public University Professors Are Subject to the State's Curricular Choices in the Classroom. ................................................ 30

B.     Public University Students Are Subject to the State's
       Curricular Choices in the Classroom..................................................36

C.     Public University Student Groups Promoting Divisive
       Concepts Do Not Have a First Amendment Right to
       Preferential Treatment. ...................................................................37

III.   Plaintiffs' Vagueness Challenge Is Unlikely To Succeed Because
       The Act Is Readily Understood. ..................................................43

IV.    Plaintiffs' Facial Challenge To The Act In Its Entirety Is Unlikely
       To Succeed Because The Act Is Not Overbroad And Any
       Unconstitutional Provisions Can Be Severed..........................................50

V.     The Other Preliminary Injunction Factors Weigh Against Plaintiffs ......53

VI.    Any Injunction Must Be Narrowly Tailored And A Bond Required.......55

CONCLUSION ..........................................................................................56

CERTIFICATE OF SERVICE ...............................................................58

# TABLE OF AUTHORITIES

## Cases

*Ali v. Woodbridge Twp. Sch. Dist.*,
  957 F.3d 174 (3d Cir. 2020) ................................................................. 36

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  103 F.4th 765 (11th Cir. 2024) ...................................................... 16, 25

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*,
  717 F.3d 851 (11th Cir. 2013) .............................................................. 51

*Anders v. Hometown Mortg. Servs., Inc.*,
  346 F.3d 1024 (11th Cir. 2003) ............................................................ 52

*Arnett v. Kennedy*,
  416 U.S. 156 (1974) .............................................................................. 44

*Bazaar v. Fortune*,
  476 F.2d 570 (5th Cir. 1973) ............................................................... 29

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) .............................................................................. 37

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
  529 U.S. 217 (2000) ...................................................................... 29, 31

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991) .................................. 3, 32, 33, 34, 35, 36, 37, 52

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
  297 F.R.D. 633 (N.D. Ala. 2014) ......................................................... 56

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) (en banc) ............................................. 6

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006) ............................................................ 15

*City of S. Miami v. Governor*,
  65 F.4th 631 (11th Cir. 2023) .............................................................. 28

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ...................................................................................15

*Edwards v. Calif. Univ. of Penn.*,
   156 F.3d 488 (3d Cir. 1998).........................................................................32

*Ex parte Young*,
   209 U.S. 123 (1908) ...................................................................................28

*Foy v. Fla. Comm'n on Offender Rev.*,
   742 F. Supp. 3d 1148 (N.D. Fla. 2024).......................................................15

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ...................................................................... 31, 32, 52

*Garrett v. Matthews*,
   625 F.2d 658 (5th Cir. 1980).......................................................................44

*Garrido v. Dudek*,
   731 F.3d 1152 (11th Cir. 2013)...................................................................55

*Gettman v. Drug Enf't Admin.*,
   290 F.3d 430 (D.C. Cir. 2002) ....................................................................22

*Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*,
   186 F. App'x 885 (11th Cir. 2006)...............................................................31

*Glob. Marine Expl., Inc. v. Republic of France*,
   33 F.4th 1312 (11th Cir. 2022)....................................................................49

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ...................................................................................44

*Hand v. Scott*,
   888 F.3d 1206 (11th Cir. 2018)...................................................................54

*Harrell v. The Florida Bar*,
   603 F.3d 1241 (11th Cir. 2010)...................................................................15

*Henry v. Att'y Gen. of Ala.*,
   45 F.4th 1272 (11th Cir. 2022)................................................................5, 40

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004).............................................................28

*Honeyfund.com, Inc. v. DeSantis*,
622 F. Supp. 3d 1159 (N.D. Fla. 2022).................................................46

*Honeyfund.com, Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024)..............................................................47

*Hunt v. Washington State Apple Advertising Comm'n*,
43 U.S. 333 (1977) .................................................................................25

*In re Dinnan*,
661 F.2d 426 (5th Cir. 1981)..................................................................29

*Jacobson v. Fla. Sec'y of State*,
974 F.3d 1236 (11th Cir. 2020)..............................................................27

*Jefferson Cnty. Com'n v. Edwards*,
49 So. 3d 685 (Ala. 2010) ......................................................................52

*Johnson-Kurek v. Abu-Absi*,
423 F.3d 590 (6th Cir. 2005)..................................................................34

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) ........................................................................ 29, 33

*Labrador v. Poe by & through Poe*,
144 S. Ct. 921 (2024) .............................................................................55

*Leavitt v. Jane L.*,
518 U.S. 137 (1996) ...............................................................................52

*Lee v. York Cnty. School. Div.*,
484 F.3d 687 (4th Cir. 2007)..................................................................32

*Lewis v. Casey*,
518 U.S. 343 (1996) ...............................................................................55

*Lewis v. Governor of Ala.*,
944 F.3d 1287 (11th Cir. 2019) (en banc)............................................27

*Loving v. Virginia*,
388 U.S. 1 (1967) ...............................................................................1

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................... 14, 23, 26, 27

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976).......................................................6, 54

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................54

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
474 F.3d 477 (7th Cir. 2007)............................................................32

*Moms for Liberty-Brevard County v. Brevard Public Schools*,
118 F.4th 1324 (11th Cir. 2024).......................................................28

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ...................................................................51

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................. 2, 13, 14, 19, 22

*Nat'l Ass'n of Mfrs. v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009)............................................................44

*Nat'l Endowment for Arts v. Finley*,
524 U.S. 569 (1998) ...................................................................30

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990)......................................................6, 53

*O'Laughlin v. Palm Beach Cnty.*,
30 F.4th 1045 (11th Cir. 2022)............................................... 4, 43, 44

*Pernell v. Comm'r of the Fla. State Bd. of Educ.*,
No. 22-13992 (11th Cir. argued June 14, 2024)..................................35

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
641 F. Supp. 3d 1218 (N.D. Fla. 2022)................................. 35, 37, 46

*Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*,
   462 U.S. 476 (1983) ............................................................45

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ............................................................42

*Plessy v. Ferguson*,
   163 U.S. 537 (1896) ..............................................................1

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) .................................... 3, 4, 28, 29, 31, 37, 39, 40, 41, 42, 52

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ............................................................42

*San Filippo v. Bongiovanni*,
   961 F.2d 1125 (3d Cir. 1992) ....................................... 43, 44

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ............................................................49

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ............................... 5, 13, 54

*SpeechFirst, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .......................... 16, 17, 28, 47

*Stardust, 3007 LLC v. City of Brookhaven*,
   899 F.3d 1164 (11th Cir. 2018) ...........................................46

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ..........................................................1, 4

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................... 14, 25

*Summit Med. Assocs., P.C. v. Pryor*,
   180 F.3d 1326 (11th Cir. 1999) ...........................................28

*Suntrust Bank v. Houghton Mifflin Co.*,
   252 F.3d 1165 (11th Cir. 2001) ............................. 5, 13, 53

*Swain v. Junior,*
　　958 F.3d 1081 (11th Cir. 2020) ........................................................................54

*Sweezy v. New Hampshire,*
　　354 U.S. 234 (1957) .........................................................................................29

*Texas v. Seatrain Int'l S.A.,*
　　518 F.2d 175 (5th Cir. 1975) ...........................................................................13

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
　　413 U.S. 548 (1973) .........................................................................................45

*United States v. Lambert,*
　　695 F.2d 536 (11th Cir. 1983) .................................................................... 13, 14

*United States v. Nat'l Dairy Prods. Corp.,*
　　372 U.S. 29 (1963) ...........................................................................................46

*United States v. Salerno,*
　　481 U.S. 739 (1987) .........................................................................................51

*United States v. Williams,*
　　553 U.S. 285 (2008) .........................................................................................46

*Urofsky v. Gilmore,*
　　216 F.3d 401 (4th Cir. 2000) (en banc) ...........................................................34

*Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.,*
　　455 U.S. 489 (1982) .........................................................................................46

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
　　576 U.S. 200 (2015) .........................................................................................30

*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
　　900 F.3d 250 (6th Cir. 2018) ...........................................................................15

*Widmar v. Vincent,*
　　454 U.S. 263 (1981) .........................................................................................42

*Wieman v. Updegraff,*
　　344 U.S. 183 (1952) .........................................................................................29

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................13

*Women's Emergency Network v. Bush*,
   323 F.3d 937 (11th Cir. 2003).........................................................28

*Wood v. Raffensperger*,
   981 F.3d 1307 (11th Cir. 2020).......................................................14

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016)....................................................5, 53

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .........................................................................1

## Constitutional Provisions

Ala. Const. Art. XIV, § 256 (2022) .......................................................7

Ala. Const. Art. XIV, § 264 (2022) .....................................................27

## Statutes

42 U.S.C. § 1983 ................................................................................12

Ala. Act 2024-34, Ala. Code §§ 41-1-90 *et seq.* ............................ *passim*

Ala. Code § 15-21-30(a) ....................................................................49

Ala. Code § 16-1-20.5(b) ...................................................................49

Ala. Code § 16-47-30..........................................................................27

## Other Authorities

Judicial Council of the United States Eleventh Judicial Circuit,
   *Pattern Jury Instructions, Civil Cases*  (2024 revision).......................47

*Objective*, MERRIAM-WEBSTER'S DICTIONARY,
   https://www.merriam-webster.com/dictionary/objective....................47

*Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024) ......................47

## INTRODUCTION

Does the Constitution allow Alabama to prohibit the professors it pays to teach its curriculum from compelling students at its universities to affirm, as part of their coursework, that white students are inherently superior to black students? That Jewish students should be discriminated against? That Germans are inherently racist?

To ask these questions should be to answer them. *Of course* the State can refuse to fund such "teaching." "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). And "[d]istinctions between citizens solely because of their ancestry" are "odious to a free people whose institutions are founded upon the doctrine of equality." *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (cleaned up). The Constitution thus mandates that States treat students equally, "'without regard to any differences of race, of color, or of nationality.'" *SFFA*, 600 U.S. at 205-06 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). While Alabama regrettably "played its own role" in our country's "ignoble history" of racial discrimination, *see id.* at 203, it is steadfastly committed to "eliminat[ing] all official state sources of invidious racial discrimination," *Loving*, 388 U.S. at 10. "Eliminating racial discrimination means eliminating all of it"—particularly at public institutions of higher learning. *SFFA*, 600 U.S. at 206.

Plaintiffs nonetheless contend that they have a First Amendment right to override the State's curricular choices and to, in the words of the statute they challenge, "[d]irect," "compel," and "require[] assent to" eight racialized concepts that the State has identified as particularly odious. *See* Ala. Act 2024-34, Ex. 1, Doc. 25-1 at 5-6, § 2; Plfs' PI Mem., Doc. 12-1 at 30.[1] They also contend that Alabama must sponsor "Diversity, Equity, and Inclusion Programs," "where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation" or students are "[d]irect[ed]," "compel[led]," or "require[d] to assent to" one of the prohibited concepts. *See* Doc. 25-1 at 4-5, § 1(3); Doc. 12-1 at 15-19. And they contend that Alabama's law prohibiting such compulsion is unconstitutionally vague, even though its terms are easily understood, the law includes a scienter requirement, and the standard for vagueness in the employment context is minimal. Doc. 12-1 at 19. Plaintiffs seek an order preliminarily enjoining enforcement of all parts of the law (even parts they do not directly challenge) against everyone (even individuals not before the Court).

The Court should deny the motion. *First*, Plaintiffs are unlikely to succeed on the merits. At the outset, Plaintiffs' silence about standing means they have necessarily failed to "make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

---

[1] Citations are to the pagination in the ECF header.

Even if they had not forfeited the issue, the limited and conclusory affidavits from some (but not all) Plaintiffs discussing some (but not all) aspects of Alabama's law are insufficient to "'support each element of standing'" with the "factual evidence" needed at the preliminary injunction stage. *Id.* (citation omitted).

Plaintiffs' jump to the merits fares no better. In skipping over any consideration about *whose* speech is being burdened, Plaintiffs simply assume that Alabama is regulating the viewpoint of ordinary citizens speaking on their own behalf in public forums. *See* Doc. 12-1 at 8. Not so. Though Plaintiffs don't cite it, the Eleventh Circuit's decision in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), controls: "[A] university classroom" is not "an open forum during instructional time," *id.* at 1071, and "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," *id.* at 1072. Because "a teacher's [course-related] speech can be taken as directly and deliberately representative of the school," *id.* 1073, it is considered the State's *own* speech under the First Amendment, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995). For that reason, the State can indeed "regulate the content of what is or is not expressed" in its classrooms. *Id.* And where a professor and the State "disagree about a matter of content in the courses he teaches," caselaw is clear: "The University must have the final say." *Bishop*, 926 F.2d at 1076.

3

As for Plaintiffs' complaints about Alabama's refusal to directly sponsor programs "where attendance is based on an individual's race" or that (for instance) "[d]irect or compel" students "to personally affirm, adopt, or adhere to a divisive concept," Doc. 25-1 at 4-5, §§ 1(3), 2(2), the Supreme Court's decision in *Students for Fair Admissions*—also absent from Plaintiffs' brief—answers that objection. Every "student must be treated based on his or her experiences as an individual—not on the basis of race." 600 U.S. at 231. The State *cannot* sponsor racially discriminatory programs without running afoul of the Equal Protection Clause. But neither does the State discriminate against students or student organizations who wish to discuss the very concepts Alabama considers odious; under the law, all student organizations can apply for student activity funding on an equal footing, just as *Rosenberger* teaches. *See* Doc. 25-1 at 6, § 2(8). Plaintiffs complain that Alabama's universities no longer treat them *more* favorably than other student groups by directly sponsoring their activities, but nothing in the First Amendment requires that. Plaintiffs are unlikely to succeed on this claim.

That leaves Plaintiffs' vagueness challenge, which fails because "ordinary persons using ordinary common sense" can read the State's law and know "that certain conduct" in the educational environment is off limits. *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (quotation omitted). For instance, a professor violates the Act if he "[p]enalize[s] or discriminate[s] against a student … on

the basis of his or her refusal to support, believe, endorse, embrace, confess, or oth-erwise assent to" the idea "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." *See* Doc. 25-1 at 3-4, §§ 2(6), 1(2)(a). Plain-tiffs may not like that result, but it is clear. And even if there were "doubt" on this score, it should be resolved through a saving construction that "avoids constitutional infirmities," *Henry v. Att'y Gen. of Ala.*, 45 F.4th 1272, 1292 (11th Cir. 2022) (cita-tion omitted), just as the Act commands, Doc. 25-1 at 6-9, § 4. Plaintiffs' claims are likely to fail.

*Second*, separate and apart from their merits problems, Plaintiffs have not "clearly" established that they are entitled to the "extraordinary and drastic remedy" of a preliminary injunction. *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001). The Act was signed by Governor Ivey on March 20, 2024, and took effect six months later, on October 1, 2024. *See* Doc. 25-1 at 9. Three-and-a-half months after that, Plaintiffs finally filed suit, Doc. 1—and then waited an ad-ditional two weeks to seek "extraordinary" relief, Doc. 12. Such delay cannot be reconciled with the purpose of "a *preliminary* injunction," which "is premised on the need for speedy and urgent action" to protect a plaintiff from "'imminent' irrep-arable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (en banc)). Plaintiffs' delay "militates against a finding of irreparable harm." *Id.*

Their delay also means that Plaintiffs must ask the Court to *upend* the status quo and enjoin Defendants from enforcing a law universities have been implementing for months. But the "chief function of a preliminary injunction" is to "*preserve the status quo until the merits of the controversy can be fully adjudicated.*" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (emphasis added). And Plaintiffs' request for "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).[2]

The facts and law do not clearly favor Plaintiffs here. Alabama's law is constitutional, protecting students from discrimination that sorts students by race and compels assent to racial concepts at odds with the State's curricular choices and our Constitution's promise of equality under the law. The State has a compelling interest in enforcing its law, and a preliminary injunction would do the State grave harm. With the law and equities against Plaintiffs, the Court should deny their motion for a preliminary injunction.

---

[2] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

# BACKGROUND

## A.    In March 2024, Alabama Enacts Act 2024-34.

Alabama's Constitution provides that "[i]t is the policy of the State of Alabama to foster and promote the education of its citizens" and tasks the State Legislature with "provid[ing] for or authoriz[ing] the establishment and operation of schools … upon such conditions as it may prescribe." Ala. Const. Art. XIV, § 256 (2022). Consistent with that responsibility, in March 2024 the Alabama Legislature passed an education bill—Senate Bill 129—to forbid State funding of discriminatory programs and prohibit teachers from requiring students in public schools, including colleges and universities, to assent to eight listed discriminatory "divisive concepts." *See* Doc. 12-2. Governor Ivey signed the bill into law—Act 2024-34—on March 20, 2024. *See* Doc. 25-1 at 10 (codified at Ala. Code §§ 41-1-90 *et seq.*) [3] The Act took effect on October 1, 2024. *Id.* at 9, § 7.

Given Plaintiffs' claims, it is worth describing the Act in some detail. Section 1 of the Act provides definitions, two of which are pertinent here. First, the Act defines "divisive concepts" as "any of the following concepts":

> a. That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior.

---

[3] Plaintiffs purport to challenge "SB 129" and attach as an exhibit to their preliminary injunction motion the enrolled Senate Bill that was passed in both houses of the Alabama Legislature before it received the Governor's signature and became Act 2024-34. Presumably they mean to challenge the Act, not the Senate Bill. A copy of the Act is submitted as Exhibit 1. *See* Doc. 25-1. It is, in all other aspects, identical to Plaintiffs' Exhibit A. *See* Doc. 12-2.

b. That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.

c. That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.

d. That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.

e. That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin.

f. That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.

g. That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.

h. That meritocracy or traits such as a hard work ethic are racist or sexist.

*Id.* at 3, § 1(2).

Second, the Act defines a "Diversity, Equity, and Inclusion Program" as:

Any program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act. This term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order.

*Id.* at 3, § 1(3).

Section 2 of the Act defines prohibited actions:

8

A state agency, local board of education, or public institution of higher education may not do any of the following:

(1) Sponsor any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs, as defined in subdivision (3) of Section 1.

(2) Direct or compel a student, employee, or contractor to personally affirm, adopt, or adhere to a divisive concept.

(3) Require its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept.

(4) Require a student, employee, or contractor to share his or her personal point of view on any divisive concept outside of an academic setting, as provided in Section 4(3)b.

(5) Require its students, employees, or contractors to participate, as part of any required curriculum or mandatory professional training, in an activity that involves lobbying at the state or local level for legislation related to a divisive concept.

(6) Penalize or discriminate against a student, employee, or contractor on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept or diversity statement.

(7) Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color.

(8) Authorize or expend funding, or apply for or accept a grant, federal funding, or private funding, for the purpose of compelling assent to any divisive concept or any other purpose prohibited in this act, provided that such funding may be provided to student, faculty, or staff organizations or associations.

*Id.* at 5-6, § 2.

Section 3 of the Act provides that universities "may discipline or terminate the employment of any employee or contractor who knowingly violates" the Act, "provided that," as relevant here, "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall remain subject to relevant policies established by the institution." *Id.* at 6, § 3.

Section 4 provides instructions on how to interpret the Act and offers certain safe harbors:

Nothing in this act:

(1) Prevents student, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to sponsor these programs. If a student, staff, or faculty organization or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event.

(2) Prevents an employee or a contractor of a state agency, local board of education, or public institution of higher education who provides, as part of his or her job duties, orientation, course work, or training from responding to questions that are raised by participants in the orientation, course work, or training and that pertain to divisive concepts or diversity, equity, and inclusion.

(3)a. Prohibits a public institution of higher education from providing any instruction or taking any action in furtherance of satisfying any accreditation standard or requirement.

b. Prohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with this act.

c. Prohibits the required collection or reporting of demographic data by public institutions of higher education.

(4) Prohibits the teaching of topics or historical events in a historically accurate context.

…

(6) Prevents state agencies from promoting racial, cultural, or ethnic diversity or inclusiveness, provided these efforts are consistent with the requirements of this act.

(7) Prohibits a public institution of higher education from providing space or ancillary services to any student or employee on a non-discriminatory basis, including, but not limited to, support and guidance to ensure compliance with applicable university policies and laws, assistance with security needs, and registration of events.

…

(9) May be construed to inhibit or violate the First Amendment rights of any student or employee, or to undermine the duty of a public institution of higher education to protect, to the greatest degree, academic freedom, intellectual diversity, and free expression.…

*Id.* at 7-9, § 4.

Section 5 notes the Legislature's intent that "all constitutionally created boards of trustees comply with the requirements of th[e] act." *Id.* at 9, § 5.

Section 6 is a severability provision: "The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, the declaration shall not affect the part which remains." *Id.* at 9, § 6.

Section 7 lists the date the Act took effect: "October 1, 2024." *Id.* at 9, § 7.

11

**B.    In January 2025, Plaintiffs Seek a Preliminary Injunction to Upend the Status Quo.**

Once the Governor signed SB 129 into law in March 2024, Alabama's public universities had roughly six months to prepare faculty and students for how the law would be implemented (and, it should be said, for any plaintiffs to seek a preliminary injunction preserving the status quo before the law took effect). The law then took effect on October 1, 2024.

Over three months later, on January 14, 2025, Plaintiffs—three professors, three students, and the Alabama NAACP—filed suit pursuant to 42 U.S.C. § 1983 to challenge the Act as unconstitutional under the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Four-teenth Amendment. *See* Doc. 1 at 83. Two weeks after that, on January 30, 2025—316 days after Governor Ivey signed SB 129 into law and 121 days after the law took effect—a subset of Plaintiffs sought a preliminary injunction to upend the status quo and enjoin Defendants from enforcing any part of the Act against anyone. *See* Doc. 12-1 at 3. Those Plaintiffs rely only on their First Amendment and Due Process Clause claims—not their Equal Protection Clause claim—in seeking preliminary re-lief. Doc. 12 at 2.

According to Plaintiffs, only "Plaintiffs Dr. Cassandra Simon, Miguel Luna, Sydney Testman, and Alabama NAACP seek a preliminary injunction." Doc. 12-1 at 3. And only those Plaintiffs provide declarations or other evidence in support of

12

their motion. *See* Docs. 12-4 through 12-7. Plaintiffs Richard C. Fording, Dana Patton, and Isabella Campos have thus waived any request for a preliminary injunction or access to its benefits.

## LEGAL STANDARD

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. "Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff[s] must clearly carry the burden of persuasion" as to each of the prerequisites. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (quoting *Texas v. Seatrain Int'l S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)); *see Suntrust Bank*, 252 F.3d at 1166.

## ARGUMENT

**I.   Plaintiffs Lack Standing To Challenge Most Of The Act's Provisions.**

"At the preliminary injunction stage," a "plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). Yet Plaintiffs here do not even try to carry their "burden of persuasion."

*Lambert*, 695 F.2d at 539. Their preliminary injunction brief makes no mention of the standing requirements nor why Plaintiffs are "likely" to meet them. It is not Defendants' job, nor the Court's, to comb through Plaintiffs' various allegations and factual submissions and evaluate the legal standard for them. It is *Plaintiffs'* burden, which they forfeited by failing to establish all three elements of Article III standing in their opening brief. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314-1316 (11th Cir. 2020).[4] Without having even argued a likelihood of standing, Plaintiffs cannot show a likelihood of success on the merits. Their motion fails at the outset.

Even were the Court to overlook the forfeiture, it would not help Plaintiffs in their quest for facial and universal relief. The "irreducible constitutional minimum of standing contains three elements": (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And because Plaintiffs "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" their request for a preliminary injunction means they cannot "rest on 'mere allegations,' but must instead point to factual evidence" for each element. *Murthy*, 603 U.S. at 58 (quoting *Lujan*, 504 U.S. at 561); *see Foy v. Fla. Comm'n on Offender Rev.*, 742 F. Supp. 3d 1148,

---

[4] To be sure, the Court "has an independent obligation to assure that standing exists," *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), but that is a one-way ratchet: It remains Plaintiffs' "burden of proving that [their] suit falls within [this Court's] jurisdiction," and ordinary principles of forfeiture apply where Plaintiffs fail to "satisfy this burden," *Wood*, 981 F.3d at 1313, 1316.

1157 (N.D. Fla. 2024) ("[W]here a plaintiff moves for a preliminary injunction, the district court … should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" (quoting *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018)).

Not only that, but because "[s]tanding is not dispensed in gross," Plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). They must do that for each and every provision of the Act they challenge, whether facially or as applied. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006); *see Harrell v. The Florida Bar*, 603 F.3d 1241, 1254-55 (11th Cir. 2010). In other words, they must establish "likely" standing Plaintiff by Plaintiff, claim by claim, and provision by provision. Plaintiffs did not do this.

### A. Plaintiffs Have Not Made a "Clear Showing" of Likely Impending Harm Related To Each and Every Provision of the Act.

#### 1. Professor Plaintiffs

Professor Simon is the only professor plaintiff to seek injunctive relief or to submit any evidence in support of that request. *See* Doc. 12-1 at 3 (listing Professor Simon as the only professor "seek[ing] a preliminary injunction"); Doc. 12-4 (Simon Declaration). According to Plaintiffs, Professor Simon "faces the unconstitutionally untenable position of either self-censoring her classroom instruction or materials or

facing severe consequences for violating the law." Doc. 12-1 at 3. Such chill can indeed be considered a First Amendment harm, but only if it is objectively reasonable. The "fundamental question" is "whether the challenged policy 'objectively chills' protected expression" and would cause a "reasonable would-be speaker to self-censor." *SpeechFirst, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

The first problem for Professor Simon is that she never explains in her declaration how she is even potentially harmed by many of the Act's provisions. She does not state, for instance, that she wants to—and would but for fear of violating the Act—"[c]ondition enrollment or attendance in a class, training, or orientation solely on the basis of race or color." Doc. 25-1 at 6, § 2(7). Nor does she claim that she would like to—and would but for fear of violating the Act—"[d]irect or compel a student, employee, or contractor to personally affirm, adopt, or adhere" to the concepts "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior" or "[t]hat the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." *Id.* at 3-5, §§ 2(2), 1(2)(a), (c). Professor Simon *at least* lacks standing to challenge these provisions, as well as the many others she has not shown she intends to violate. *See Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024) ("[W]hen a plaintiff requests prospective relief, we evaluate whether she has sufficiently demonstrated an intent to take the action that she asserts is prohibited.").

16

Professor Simon's second problem is that most of her assertions regarding her purported fear of violating the provisions she does name do not show "an intention to engage in a course of conduct" that is "arguably proscribed" by the Act, making any self-censorship not "reasonable." *SpeechFirst*, 32 F.4th at 1119-20 (quotations omitted). Professor Simon notes, for instance, that she has shown her "students episodes from the award-winning documentary, *Eyes on the Prize*, and have seen their shock and dismay to learn about the civil rights history of the United States." Doc. 12-4 at 9, ¶ 19. She continues: "Even though my courses do not explicitly assign blame or guilt to any individual students, it is not uncommon for some students to react with feelings of guilt after watching these films. I am concerned that this line of instruction will be deemed to violate SB 129 §§ 2(g), 2(f) and 2(e)."[5] *Id.*

But an objectively reasonable professor would have no reason to think that merely presenting and discussing *Eyes on the Prize*—which is all that Professor Simon claims to be doing—violates any provision of the Act. Does Professor Simon really think that showing and discussing the PBS documentary would "[d]irect or compel," "advocate[] for or require[] assent to," or "[p]enalize or discriminate

---

[5] Divisive concept 2(g) is "[t]hat any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin." Doc. 25-1 at 4, § (1)(2)(g). Divisive concept 2(f) is "[t]hat fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin." *Id.* § (1)(2)(f). Divisive concept 2(e) is "[t]hat individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin." *Id.* § (1)(2)(e).

against a student … on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept"? *See* Doc. 25-1 at 5-6, §§ 2(2), 2(3), 2(6). She does not say, but if she does, such a belief would not be reasonable. Because the Act expressly does not forbid mere discussion of *any* topic, *see id.* at 7, § 4(3)(b), Professor Simon does not have standing to challenge any provision of the Act based on such conduct.[6]

After all this, it may be that Professor Simon could show (if she had not forfeited the issue) that some of her intended conduct "arguably" fits within certain proscriptions of the Act. For instance, Professor Simon states that in her *Anti-Oppression and Social Justice* course she requires students to choose a project that "advocate[s] for or against" a certain topic, often related to concepts listed in the Act. Doc. 12-4 at 11-12, ¶¶ 26-27. Because such forced activity could be seen to go beyond mere academic discussion to using the power of the State to "[r]equire" students "to participate, as part of any required curriculum[,] … in an activity that involves lobbying at the state or local level for legislation related to a divisive

---

[6] Likewise, Professor Simon says she teaches "about structural racism and White privilege—and how they have been intentionally built into many of our country's institutions throughout our history." Doc. 12-4 at 11, ¶ 25. Again, merely teaching "about" such concepts does not run afoul of the Act. But if Professor Simon were to jump from teaching "about" structural racism to requiring her students to agree "[t]hat individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin," Doc. 25-1 at 4, § 1(2)(e), or "[t]hat fault, blame, or bias should be assigned to members of a race … on the basis of race," *id.* § 1(2)(f), then Professor Simon's conduct would fall into the ambit of the Act. But Professor Simon claims nothing of the sort.

concept," Doc. 25-1 at 5, § 2(5), or to "[r]equire" students to "participate in any diversity, equity, and inclusion program … or course work that advocates for or requires assent to a divisive concept," *id.* at 5, § 2(3), it is arguable that such conduct is proscribed by the Act. But at least based on Professor Simon's declaration, such conduct is the exception rather than the rule. Professor Simon remains unable to challenge most of the Act's provisions because she has not shown that she intends to engage in conduct that arguably violates the Act.

### 2.  Student Plaintiffs

The student plaintiffs suffer from similar problems. Only two of the three students—Miguel Luna and Sydney Testman—seek a preliminary injunction and submit evidence in support, *see* Doc. 12-1 at 3, meaning that Plaintiff Isabella Campos has necessarily failed to establish standing at the preliminary injunction stage.

As for Plaintiff Luna, he discusses vaguely and generally in his declaration that he fears that the Act will cause his professors to "feel compelled to limit conversations about race and gender and how they relate to the political system," in turn denying him "instruction that would have helped [him] become a more informed and effective policymaker." Doc. 12-5 at 7, ¶ 16. Such "speculat[ion] about the decisions of third parties" not before the Court is "no more than conjecture" and insufficient to "establish a likelihood of future injury." *Murthy*, 603 U.S. at 72 (citations omitted).

Even if he could rely on the conduct of third parties to show injury, the specific examples Luna provides do not do so. He says, for instance, that he has "already witnessed the impacts of SB 129 on [his] professors and [his] classes." Doc. 12-5 at 5, ¶ 11. Exhibit A?

> Last semester, I took a course titled *Human Rights.* The professor added language to the syllabus that read: "Note on Academic Freedom: All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting. This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective, scholarly lens designed to encourage critical thinking. Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered 'divisive' under Alabama law, nor penalized for refusing to support or endorse such a concept. All students are strongly encouraged to think independently and analytically about all material presented in class and may express their views in a time, place, and manner, consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry, and expressions."

*Id.*; *see also id.* at 6, ¶ 12 ("[T]his professor included the same language in the *Environmental Politics* syllabus that had been in the *Human Rights* syllabus."). It is utterly unclear, and Luna never explains, how a statement in a course syllabus *assuring* students that they "are strongly encouraged to think independently and analytically about all materials presented in class and may express their views … in accordance with the University's commitment to free and open thought, inquiry, and expressions" could be construed as harming Luna's (or his professor's, or anyone else's) First Amendment rights in any way.

Nor does Luna connect his general fears about his professors' teaching to any specific provision of the Act. After discussing the syllabus language, for instance, Luna concludes: "During my class on *Human Rights*, I observed my professor speak very timidly about topics that could possibly fall under SB 129. For example, he seemed wary of how he presented course materials to students about human rights violations experienced by incarcerated African American[s] in the Alabama prison system." *Id.* But Luna does not connect his professor's purported timidity to any provision of the Act, nor does he explain what he thinks the professor wanted to say in class but felt he could not. That is understandable because Luna cannot represent the professor or raise standing on his behalf, but those limitations make it difficult for Luna to show how *he* was injured. Like Professor Simon, Luna does not claim that his professor wanted to—and would have but for fear of violating the Act— "[c]ondition enrollment or attendance in a class, training, or orientation solely on the basis of race or color." Doc. 25-1 at 6, § 2(7). Nor does he claim that his professor would have liked to—and would have but for fear of violating the Act—"[d]irect or compel a student, employee, or contractor to personally affirm, adopt, or adhere" to the concepts "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior" or "[t]hat the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." *Id.* at 3-5, §§ 2(2), 1(2)(a), (c). Like Professor Simon, Luna *at least* lacks standing to

21

challenge those provisions, as well as the many other provisions he has not con-nected to *anyone*'s harm or self-censorship. Indeed, Luna has not shown injury *to himself* from *any* of the Act's effects on third parties.

Luna next turns to purported harms based on loss of university sponsorship of a student group he leads, Esperanza, which "is open to all UAB students regardless of race or ethnicity" but focuses on "issues of importance to Latine students." Doc. 12-5 at 8, ¶ 20. Luna states that Esperanza received funding in the past directly from UAB's since-closed DEI office and from another student organization—the Social Justice Advocacy Council (SJAC)—that also lost its direct sponsorship and funding from UAB. *Id.* at 8-9, ¶¶ 8, 22. Luna fears that Esperanza will not receive sponsor-ship from UAB in the future "for an event that is deemed to be related to a 'divisive concept' under SB 129." *Id.* at 9, ¶ 21.

A couple of problems. First, to the extent Luna claims harm from the activities of third parties like SJAC, that is again insufficient to show that the Act caused *Luna* harm. *See Murthy*, 603 U.S. at 72; *Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("[T]he courts have reiterated that such speculative claims depend-ent upon the actions of third parties do not create standing for the purposes of estab-lishing a case or controversy under Article III.").

Second, Luna's concern about the possibility of being denied funds in the fu-ture is too speculative to establish injury because he has not shown that either he or

22

Esperanza has applied and been denied funding or that they have concrete plans to apply for funding in the future. Instead, all Luna raises is the "conjectural or hypothetical"[7] fear that "*if* Esperanza held a program focused on implicit bias in hiring or on White privilege, the topic *might* be considered a 'divisive concept' under SB 129." Doc. 12-5 at 9, ¶ 21 (emphasis added); *see also id.* at 9-10 ¶¶ 23-24 (discussing other potential events Esperanza may "like to host" one day). "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [is] require[d]." *Lujan*, 504 U.S. at 544.

Plaintiff Testman has the inverse problem. She "previously served as the finance coordinator of the Social Justice Advocacy Council" at UAB and "lost a $600 stipend that [she] had previously received for [her] work" when "SJAC lost its funding" from UAB "due to SB 129." Doc. 12-6 at 2 ¶ 5, 4 ¶ 10. But Testman does not say that she still serves as a leader of SJAC, or indeed that she is still involved with SJAC at all. Thus, while she may be able to show past injury, that "does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 555 (cleaned up). And like Luna, Testman's theorizing about events that SJAC may "one day" hold cannot establish "actual or imminent" injury. *See* Doc. 12-6 at 6, ¶ 15 (hypothesizing that

---

[7] *Lujan*, 504 U.S. at 560 (cleaned up).

"*if* SJAC sponsored an event focused on racism on campus … the program *may* be considered to be associated with a prohibited 'divisive concept'" (emphasis added)).

Nor can Testman show injury *to her* based on the Act's purported effects on others. Testman claims that the Black Student Awareness Committee (BSAC) lost direct funding from UAB, but she does not claim to be a member of BSAC or otherwise to be affected by any funding decisions related to that organization. Doc. 12-6 at 5, ¶ 13 ("I am not a scholarship recipient [of BSAC], but it was an important source of funding for many of my Black peers on campus."); *id.* ("The withholding of state financial support from these groups limits *their* ability to support Black students at UAB…." (emphasis added)). Testman cannot bring claims on behalf of her peers or rely on their harms for her standing.

### 3. Alabama NAACP

That leaves Plaintiff Alabama NAACP and its declaration from its statewide president, Bernard Simelton. *See* Doc. 12-7. Simelton says that the UA NAACP Chapter "has approximately forty-five members, comprised of students at the University of Alabama in Tuscaloosa." *Id.* at 3, ¶ 8. To the extent the NAACP claims harm to its members, Simelton's declaration must include evidence that the "members would otherwise have standing to sue in their own right," that the interests the NAACP "seeks to protect are germane to the organization's purpose," and that "neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 43 U.S. 333, 343 (1977). To show that "any [NAACP] member has standing to sue in her own right, we ask, of course, whether she has (1) suffered an injury in fact that is both (2) fairly traceable to [Defendants'] conduct and (3) redressable by the requested injunction." *Am. All. For Equal Rts.*, 103 F.4th at 772 (quotations omitted).

The NAACP fails at step one. None of its members are plaintiffs in this case, and none submit declarations—not even anonymous ones. Though the NAACP need not identify any of its members "by name," it must still establish "'that at least one identified member had suffered or would suffer harm.'" *Id.* at 772-73 (quoting *Summers*, 555 U.S. at 498). Simelton's declaration does not do this. Indeed, the closest Simelton comes is to note that *other* groups like the "Black Student Union ('BSU') and the Safe Zone Resource Center ('Safe Zone')" lost dedicated office space that UA had previously provided them. Doc. 12-7 at 4, ¶ 12. But even if (unidentified) "members of the UA NAACP Chapter attended events and spent time in the BSU and Safe Zone spaces," *id.* at 6, ¶ 16, any harm from the closure of those spaces would only have affected those (unidentified) students personally, not as members of the NAACP. And in any event, Simelton does not claim that those other organizations are prohibited from reserving space on campus to meet, that they have tried to reserve space and been denied the opportunity, or even that they have plans to

reserve meeting space in the future. The NAACP has not established associational standing.

As for purported harm to the NAACP itself, all Simelton says is that he is "deeply concerned that the UA NAACP Chapter will be ineligible for university funding or university space on campus in light of the University of Alabama's decision to deny office space to the BSU and Safe Zone." Doc. 12-7 at 6, ¶ 17. Again, such "conjectural or hypothetical" harms are insufficient. *Lujan*, 504 U.S. at 560 (cleaned up). And again, Simelton does not say that UA has threatened the organization with loss of funding or that the NAACP has applied for funding and been denied it. Nor does he assert that the NAACP or any of its members (identified or not) are otherwise self-censoring for fear of running afoul of the Act. And while he says that "Alabama NAACP and its UA NAACP Chapter regularly address issues concerning structural racism … that *may* be considered prohibited 'divisive concepts,'" *id.* at 7, ¶ 18 (emphasis added), Simelton does not explain what prohibited actions the NAACP would take if the Act were enjoined. The NAACP has not made a "clear showing" of likely impending harm.

## B. Plaintiffs Have Not Made a "Clear Showing" That Any Harm Is Likely Traceable To or Redressable By Governor Ivey.

Even if ever Plaintiff had established injury sufficient to challenge every provision of the Act, *no* Plaintiff could show that her injuries are traceable to or redressable by Governor Ivey in her capacity as Governor. "To satisfy the causation

requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Likewise, to satisfy the redressability prong, Plaintiffs must show that a decision in their favor would "significantly increase the likelihood that [they] would obtain relief that directly redresses the injury" and that it is "the effect of the court's judgment *on the defendant*—not an absent third party—that" does so. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up and emphasis altered).

These principles explain why many of the statements Plaintiffs submit about the harm they purportedly suffered via third parties are insufficient to establish standing against any of the Defendants. More to the point for *this* Defendant, they also show why Plaintiffs cannot establish that Governor Ivey either caused or could remedy any such harm. Governor Ivey in her capacity as Governor does not enforce the Act; the Act makes no mention of her office. Though she serves as ex officio president of the University of Alabama Board of Trustees (and is sued separately in that capacity), as Governor she does not appoint members to that Board. *See* Ala. Const. Art. XIV, § 264; Ala. Code § 16-47-30. And any indirect authority she has related to the Board is insufficient to establish that she has caused or could remedy any of Plaintiffs' purported injuries. *Cf. City of S. Miami v. Governor*, 65 F.4th 631,

643 (11th Cir. 2023) (rejecting argument that "the governor's ability to suspend officials for cause" could "establish[] traceability").[8] Plaintiffs cannot establish likely standing to sue the Governor.

## II. Plaintiffs' First Amendment Claims Are Not Likely To Succeed Because They Challenge The Government's Regulation Of Its Own Speech.

In the handful of pages they devote to the merits of their First Amendment claims, Plaintiffs rely almost entirely on cases standing for the unremarkable proposition that the government may not regulate the viewpoint of private citizens in public forums. *See* Doc. 12-1 at 8-14. Plaintiffs' lead case (at 8), *Rosenberger*, concerned whether a state university could withhold funding to an independent student newspaper solely because of its religious viewpoint; the Court went out of its way to emphasize that the case did *not* bear on when a university can "itself speak or subsidize transmittal of a message it favors." 515 U.S. at 834. Their next cases, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004), and *Speech-First*, 32 F.4th at 1110, concerned public schools disciplining students for *their* protected speech. *Moms for Liberty-Brevard County v. Brevard Public Schools*, 118 F.4th 1324 (11th Cir. 2024), was a challenge to school board regulations prohibiting

---

[8] For similar reasons, Governor Ivey is entitled to sovereign immunity from Plaintiffs' claims. Where a state officer has no "responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999); *see Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003) ("Where the enforcement of a statute is the responsibility of parties other than the governor …, the governor's general executive power is insufficient to confer jurisdiction.").

parents from expressing certain viewpoints at PTA meetings. *Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973), concerned censorship of a student literary magazine. *In re Dinnan*, 661 F.2d 426, 427 (5th Cir. 1981), "simply involve[d] the law of evidence," and the Court rejected a professor's reliance on principles of "academic freedom" to avoid providing testimony. And so on.[9]

These cases are inapposite because none involve the government's regulation of its own speech. Yet that is what is at issue here. As the Court in *Rosenberger* put it: "When the University determines the content of the education it provides, it is the University speaking, and [the Constitution] permit[s] the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger*, 515 U.S. at 833. The Court emphasized the point: "A holding that [a] University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* at 834. The Court made the point again five years later: "Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties," "principles applicable to government speech" likely govern. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

_____

[9] Plaintiffs also rely on a trilogy of Cold War cases that are discussed below at pp. 33-34. *See* Doc. 12-1 at 9 (citing *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967), and *Wieman v. Updegraff*, 344 U.S. 183 (1952)).

Applying "principles applicable to government speech" here confirms that Plaintiffs are unlikely to succeed on the merits of their First Amendment claims. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Indeed, when it comes to its own speech, "[i]t is the very business of government to favor and disfavor points of view." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring).

### A. Public University Professors Are Subject to the State's Curricular Choices in the Classroom.

Begin with Professor Simon, the only professor plaintiff to seek a preliminary injunction. Plaintiffs' theory is that the Act "requires Professor Simon to make the untenable choice of self-censoring her classroom instructions or materials, or expressing views in her course that, as a result, risk violating [the Act] and leading to severe penalties despite these 'divisive concepts' being key to prepare her students for a future career in social work." Doc. 12-1 at 13.

The theory fails because Professor Simon is not teaching students as a private citizen but as a state employee—at a state university, in a state classroom, on the State's time and paid by the State's dime. Professor Simon does "not act as a citizen when" she "conduct[s] h[er] daily professional activities" teaching students at UA; rather, when she goes "to work and perform[s] the tasks [s]he [is] paid to perform, [Simon] act[s] as a government employee." *Garcetti v. Ceballos*, 547 U.S. 410, 422

(2006). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. As the Supreme Court explained in *Garcetti*, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen" but "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22 (citing *Rosenberger*, 515 U.S. at 833).

Though the specific facts of *Garcetti* concerned the speech of a deputy district attorney and the Court reserved ruling on whether its holding applies in full to the classroom setting, *id.* at 425, there is no reason to think—and the Court did not suggest—that its analysis would somehow *not* apply to professors teaching at public universities. Indeed, the Court in both *Southworth* and *Rosenberger* indicated that "speech by an instructor or a professor in the academic context" *is* governed by "principles applicable to government speech." *Southworth*, 529 U.S. at 235; *see Rosenberger*, 515 U.S. at 834. And the Eleventh Circuit expressly "appl[ied] *Garcetti*" in a persuasive, though not binding, decision to "conclude that [a high school teacher's] speech was not protected by the First Amendment because she spoke 'pursuant to [her] official duties.'" *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 886 (11th Cir. 2006) (unpublished) (quoting *Garcetti*, 547 U.S. at 421).

31

Other courts are in accord. *E.g.*, *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (relying on *Garcetti* to reject teacher's First Amendment claim because "teachers hire out their own speech and must provide the service for which employers are willing to pay"); *cf. Lee v. York Cnty. School. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007) (holding that teacher speech that is "curricular in nature" is "not protected by the First Amendment"). Writing for the Third Circuit before *Garcetti*, then-Judge Alito explained the rule clearly: "[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom" because those decisions implicate "the state's ability to say what it wishes when it is the speaker." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998).

Even if the employer-speech rule from *Garcetti* did not apply directly to university professors, that would mean only that the rule from the Eleventh Circuit's earlier decision in *Bishop* would govern—and that rule is not much different, if it is at all. In *Bishop*, UA restricted a physiology professor from interjecting his religious beliefs in class and from hosting an optional class devoted to a "Christian Perspective" on human physiology. *See* 926 F.2d at 1069. The professor's remarks were, to him, related to the curriculum for his physiology class because they concerned "his understanding of the creative force behind human physiology." *Id.* at 1068. The optional class he offered likewise "covered various aspects of the human body

including the complexity of its design and operation, concluding that man was created by God." *Id.* at 1068-69.

Concerned that the professor's religious teaching was inconsistent with its own view of the curriculum, UA instructed the professor to stop discussing his religious viewpoints in any version of his class, optional or not. *Id.* at 1069-70. The district court upheld the professor's First Amendment challenge, and the Eleventh Circuit reversed. The Court considered three factors in doing so.

First, "the context: the university classroom during specific in-class time," "the visage of the classroom as part of a university course in an after-class meeting," and the "coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* at 1074.

Second, "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than … those of other persons" given its "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.*

"Last and somewhat countervailing," the general "predilection for academic freedom" discussed in cases like *Keyishian*, which Plaintiffs here rely on (at 9). Though acknowledging the "abundant claims" in those cases "which acclaim academic freedom," the Eleventh Circuit emphasized that the decisions "cannot be extrapolated to deny schools command of their own courses" and that academic

freedom is not "an independent First Amendment right." *Id.* at 1075. The Court also explained that, in any event, academic freedom belongs primarily to a university as an institution and cannot serve to "supplant [the Court's] discretion for that of the University." *Id.*[10] "Federal judges should not be ersatz deans or educators," the Court instructed, and "we trust that the University will serve its own interests as well as those of its professors in pursuit of academic freedom." *Id.*

Based on these factors, the Court recognized a general rule of deference to state universities on curricular matters. Though the professor's "sincerity cannot be doubted," the Court reasoned, "his educational judgment can be questioned and re-directed by the University when he is acting under its auspices as a course instructor." *Id.* at 1076-77. The Court thus ruled that when a professor "and the University disagree about a matter of content in the courses he teaches," "even to the extent that it represents his professional opinion about his subject matter," "[t]he University must have the final say in such a dispute." *Id.* Again: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077.

---

[10] *See also Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) (en banc) (noting that "the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom" and that such a right, to the extent it exists, protects only the institution's "right of self-governance in academic affairs"); *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) (agreeing that "any right of 'academic freedom' … inheres in the University, not in individual professors" (quoting *Urofsky*, 216 F.3d at 410)).

*Bishop* makes this case easy. Just as the professor there wanted to exercise his "professional opinion about his subject matter" and discuss his religious viewpoints about human physiology, *id.* at 1077, Professor Simon here wishes to teach certain subjects and viewpoints related to race in her social work classes, Doc. 12-1 at 13. The professor's teaching in *Bishop* was prohibited by UA, as is Dr. Simon's here to the extent it violates the Act. When such a conflict arises, "[t]he University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Bishop*, 926 F.2d at 1077. It really is that simple.[11]

Rather than engage (or even mention) the Supreme Court's and Eleventh Circuit's binding decisions in *Garcetti* and *Bishop*, Plaintiffs instead rely on a Florida district court's since-appealed decision in *Pernell v. Florida Board of Governors of State University System* to argue that "once the state has allowed inclusion of a subject into the curriculum, 'it cannot impose its own orthodoxy of viewpoint about the content it allowed within the university classrooms.'" Doc. 12-1 at 10 (quoting 641 F. Supp. 3d 1218, 1273 (N.D. Fla. 2022)).[12] But that is *precisely* what the Court approved in *Bishop*: The university "allowed inclusion of a subject into the

---

[11] The Court in *Bishop* noted that UA was also concerned about a possible Establishment Clause violation by the professor's religious teaching. 926 F.2d at 1069. The Court expressly "d[id] not reach the question," *id.* at 1077, and the Establishment Clause concern did not factor into its Free Speech analysis at all, *see id.* at 1070-77. And regardless, the Equal Protection Clause presents a similar concern here that the Establishment Clause did in *Bishop*.

[12] *Pernell* is pending appeal at the Eleventh Circuit. *See Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992 (11th Cir. argued June 14, 2024).

curriculum"—human physiology—and then "impose[d] its own orthodoxy of viewpoint about the content it allowed within the university classrooms" by prohibiting the professor from discussing his religious viewpoint in class, even though "it represent[ed] his professional opinion about his subject matter." 926 F.2d at 1077.

Any other reading of *Bishop* leads to absurdity. Under Plaintiffs' theory, once a university greenlights a course on the history of civil rights in Alabama, it becomes powerless to stop a professor from teaching—and requiring students to agree—that Bull Connor was, by virtue of his race, inherently superior to the black protestors and thus justified in his brutal tactics. Or—to take a real fact pattern from a high school in New Jersey—if a university agreed to offer a course on world history, it would then have to allow a professor to teach students that what Jews "claim happened in the concentration camps did not really happen." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 178, 184 (3d Cir. 2020) (rejecting teacher's claim that his First Amendment rights were violated when he was fired for teaching anti-Semitic views in class). Thankfully, that is not the law. And because it is not, Professor Simon's First Amendment claim is not likely to succeed.

**B.    Public University Students Are Subject to the State's Curricular Choices in the Classroom.**

Plaintiffs next address the First Amendment claims brought by students based on their purported "right to receive information." Doc. 12-1 at 13. These claims fail. To the extent any such right exists, "the students' right to receive information is

coextensive with the university professors' asserted right to free speech with respect to their in-class speech," as even the *Pernell* court recognized. 641 F. Supp. 3d at 1243 n.18. That is because any right to receive information necessarily depends on "the *sender*'s First Amendment right to send [it]." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). Because no professor at a public university has a "First Amendment right to send" information in a classroom setting that the State prohibits, *Bishop*, 926 F.2d at 1077, no student at a public university has a First Amendment right to "receive" such information. Again, were it otherwise, States would be in a quandary if students wanted to learn, and professors wanted to teach, that the Holocaust never happened or that one race is inherently superior to another. The First Amendment does not mandate such absurdity.

### C. Public University Student Groups Promoting Divisive Concepts Do Not Have a First Amendment Right to Preferential Treatment.

Plaintiffs' next claim is a remarkable red herring. Asserting that the Act mandates discrimination against university student groups "based simply on whether the group may promote or espouse viewpoints disfavored by the Alabama Legislature," Plaintiffs claim the mantle of *Rosenberger* and argue that the Act "constitutes viewpoint-based discrimination against these groups in violation of the First Amendment." Doc. 12-1 at 16-17. Not quite—though this will take a bit to unpack.

*First*, start with *Rosenberger*, which indeed is the seminal case in the area. In that case, the University of Virginia created a limited public forum for student groups

37

to compete on equal footing for access to student activity funds distributed by the student council. 515 U.S. at 823-24. To be eligible for that funding, each student group had to be a "Contracted Independent Organization," or "CIO"—basically, a student organization recognized but not directly controlled by the university—and fit within certain categories for funding. *Id.* at 824-25. One of the funded categories was for student news and opinion organizations. *Id.* Even so, UVA denied funding to a recognized "CIO" wishing to establish a student magazine for philosophical and religious expression. *Id.* at 825-26. The reason for its denial? Because the organization's viewpoint was "religious." *Id.*

Unsurprisingly, the Supreme Court held that UVA's decision constituted unlawful viewpoint discrimination under the First Amendment. *Id.* at 829-30. The Court explained that UVA had created a limited public forum when it decided to "expend[] funds to encourage a diversity of view from private speakers"—the "CIOs." *Id.* at 834. Having done so, the Court held, "the State must respect the lawful boundaries it has itself set" and may not "discriminate against speech on the basis of its viewpoint." *Id.* at 829. UVA thus had to treat student magazines offering a religious viewpoint the same as other student magazines.

*Next*, consider the structure of student groups at UAB. As Plaintiff Testman describes in her declaration, UAB recognizes both "University Funded Organizations" and "Registered Student Organizations." Doc. 12-6 at 3, ¶ 8. The Board's

briefing and affidavits flesh out these distinctions. *See* Board Defs' Br., Doc. 26 at 24-29; Affidavit of Mary Wallace, Doc. 26-1. In essence, a "University Funded Organization" is directly sponsored by the university; it is controlled, advised, and supported by a department at the university, and it can use the university's name and logo in its branding. Its speech is thus directly controlled by the university because it is the university's speech. *See Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes…."). A "Registered Student Organization," on the other hand, is like the "CIO" in *Rosenberger*. It is a student group or club that is recognized by the university, but only at arm's length; the group is run by students (with a voluntary faculty advisor), and its speech is, for most purposes, not considered the university's. *See* Wallace Affidavit, Doc. 26-1 at 2-3, ¶¶ 4-8.

*Third*, turn to the Act. Section 2(1) provides that state universities may not "*[s]ponsor* any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs." Doc. 25-1 at 5, § 2(1) (emphasis added). And Section 2(8) provides that universities may not "[a]uthorize or expend funding … for the purpose of compelling assent to any divisive concept or any other purpose prohibited in this act, provided that such funding *may* be provided to student, faculty, or staff organizations or associations." *Id.* at 6, § 2(8) (emphasis added). The Act then includes this safe harbor

in Section 4: "Nothing in this act … [p]revents students, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to *sponsor* these programs. If a student, staff or faculty organization or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event." *Id.* at 7, § 4(1) (emphasis added).

The Act thus distinguishes between activities and organizations a university directly "sponsors"—such as "University Funded Organizations" or particular events—and student organizations it merely "funds"—such as "Registered Student Organizations." The university cannot directly "sponsor" a DEI program or any other activity that violates the Act—and that comports with *Rosenberger* because the restrictions are of the university's *own* speech. But the university can provide general "funding" to student organizations *not* directly "sponsored" by the university, no matter their viewpoint. In this way, all "Registered Student Organizations" are treated the same, and none are denied funding because of their viewpoint. The Act complies with *Rosenberger*.[13]

---

[13] Even if there were doubt about whether this is the best reading of the Act standing alone, that doubt must be resolved in a way that construes the Act in a constitutional manner—as the Act itself requires. *See* Doc. 25-1 at 9, § 4(9) ("Nothing in this act … [m]ay be construed to inhibit or violate the First Amendment rights of any student"); *Henry*, 45 F.4th at 1292 (instructing courts to

*Fourth*, return now to Plaintiffs' claims. Plaintiff Testman complains that "UAB downgraded Social Justice Advocacy Council ('SJAC') from a UFO to an RSO," while Plaintiff Luna complains that "Esperanza does not receive university funding as a UFO" and "previously relied on financial support from other sources, such as UAB's former Office of Diversity, Equity, and Inclusion." Doc. 12-1 at 15-16. In other words, Plaintiffs' complaint is that their organizations are no longer within the umbrella of the university's own speech and are now—horror of horrors—treated *just like other student organizations on campus*.

Such treatment, of course, is precisely what the student magazine in *Rosenberger* sought: to be able to apply, on equal footing with other student organizations, for funding from the student government without regard to its viewpoint. *See* 515 U.S. at 823-28. And to be clear, Plaintiffs here do *not* assert that they applied for and were denied such funding based on their viewpoints (or for any other reason); indeed, according to the Board's records, they did not even apply for funding for the spring 2025 semester. *See* Wallace Affidavit, Doc. 26-1 at 4 ¶ 14. Plaintiffs never explain why they think *Rosenberger* entitles them to preferential treatment, which it does not.

---

"uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities" (quotation omitted)).

*Fifth*, as for Plaintiffs' complaints (at 19) that UA reallocated campus spaces into offices and a food pantry, these claims fail because Plaintiffs have not shown that UA is operating a public forum of any kind in those spaces. It is blackletter law that the State has control over its spaces, may use those spaces to promote its preferred messages, and may even condition funding or access to benefits based on a recipient's agreement to promote the government's message. *E.g.*, *Rosenberger*, 515 U.S. at 829 (noting that public schools "may legally preserve the property under [their] control for the use to which it is dedicated" and can, in so doing, reserve such spaces "for certain groups or for the discussion of certain topics" (quotation omitted)).[14] To the extent UA's decisions about how best to use its own facilities involved expressive conduct of any kind, it was necessarily the university's own. "[T]he Free Speech Clause has no application." *Summum*, 555 U.S. at 467.

Even if Plaintiffs had shown that UA was operating a limited public forum, their claims would still be foreclosed. Again, *Rosenberger* does not guarantee student organizations preferential treatment; it guarantees them equal treatment without regard to their viewpoint. *See also Widmar v. Vincent*, 454 U.S. 263, 277 (1981).

---

[14] *See also, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (holding that "[a] government entity may exercise … freedom to express its views" even "when it receives assistance from private sources for the purpose of delivering a government-controlled message").

But Plaintiffs' complaints are about the loss of *dedicated* office space for third-party organizations like the Black Student Union and the Safe Zone Resource Center, similar to UAB's reclassification of Esperanza and SJAC from "University Funded Organizations" to "Registered Student Organizations." Once again, Plaintiffs cannot explain why they think the Constitution requires UA to treat these groups more favorably than other student groups. Nor do they claim that these groups have been treated *less* favorably than other student groups when it comes to reserving event space or hosting events on campus—or, indeed, that these groups have even tried to reserve such space. These claims cannot succeed.

## III.  Plaintiffs' Vagueness Challenge Is Unlikely To Succeed Because The Act Is Readily Understood.

Plaintiffs' vagueness challenge also fails. To begin, Plaintiffs once again ignore the context of their primary complaint: Alabama's oversight of its curriculum taught by its teachers in its classrooms. At least for the professor plaintiffs, that means that a lower vagueness standard applies. "In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin*, 30 F.4th at 1055 (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)). Provisions regulating such conduct are "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (quoting *Bongiovanni*, 961 F.2d at 1136).

This is not a stringent standard. The Supreme Court in *Arnett v. Kennedy* rejected a public employee's argument that an employment provision "authorizing removal or suspension without pay 'for such cause as will promote the efficiency of the service'" was "vague and overbroad." 416 U.S. 134, 156 (1974). The former Fifth Circuit in *Garrett v. Matthews* rejected a claim by a UA professor who argued that "the term 'adequate cause' [was] too vague to meet due process standards" for revoking tenure. 625 F.2d 658, 660 (5th Cir. 1980). And the *Bongiovanni* court—relied on by the Eleventh Circuit in *O'Laughlin*—rejected a vagueness challenge to a provision requiring professors "to maintain 'standards of sound scholarship and competent teaching.'" 961 F.2d at 1137.

If those amorphous standards are not vague, Alabama's law certainly is not. The Act clearly defines its terms and states in everyday English the acts that are prohibited. *See* Doc. 25-1 at 3-6, §§ 1-2. "To the extent that any vagueness concerns still linger, they are mitigated by two additional characteristics of the [Act]: (1) scienter requirements that must be satisfied …, and (2) a safe harbor option." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 27 (D.C. Cir. 2009); Doc. 25-1 at 6, § 3 ("knowingly" scienter requirement); *id.* at 7-9, § 4 (safe harbor provisions); *see Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."). The Act also requires that "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall

remain subject to relevant policies established by the institution," further alleviating vagueness concerns. Doc. 25-1 at 6, § 3(1); *see U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973). And if any ambiguity remains after all that, the Act itself instructs how to resolve it: by construing its provisions in a way that does not "inhibit or violate the First Amendment rights of any student or employee." Doc. 25-1 at 9, § 4(9); *see Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493 (1983) ("Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality."). While there are always "limitations in the English language with respect to being both specific and manageably brief," and the Act's "prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Letter Carriers*, 413 U.S. at 578-79.

Plaintiffs nevertheless assert that the Act "fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited in violation of due process under the Fourteenth Amendment." Doc. 12-1 at 23 (quotation omitted). But even where a heightened vagueness standard applies, "[t]he strong presumptive validity that attaches to" legislation means "that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods.*

*Corp.*, 372 U.S. 29, 32 (1963). "Close cases can be imagined under virtually any statute," but "the mere fact that close cases can be envisioned" does not "render[] a statute vague," even where First Amendment speech rights are involved. *United States v. Williams*, 553 U.S. 285, 305-06 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. Accordingly, "[t]o succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'" *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)). If there is conduct that is clearly proscribed by the statute, the statute is not vague.

That is the case here. As Plaintiffs seem to admit, a professor who requires his students to assent to the concept that "White people are superior to Black people" has clearly violated the Act. *See* Doc. 12-1 at 21 (quoting *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022)). That being so, Plaintiffs cannot complain about any "close cases" they conjure.

Nor do Plaintiffs' gripes about individual terms in the Act get them closer. Plaintiffs complain, for instance, about the word "objective," embracing the *Honeyfund* (and *Pernell*) court's conclusion that "few terms are as loaded and contested as

46

'objective.'" Doc. 12-1 at 22 (quoting 622 F. Supp. 3d at 1183).[15] That is an odd conclusion to say the least. "Objective" is not a difficult concept for college professors (or jurors,[16] or courts[17]) to understand: In the Act's context, it means discussing concepts "without distortion by personal feelings, prejudices, or interpretations." *Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/objective. The safe harbor provision that contains the term makes that clear: "Nothing in this act … [p]rohibits … the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept." Doc. 25-1 at 8, § 4(3)(b). Plaintiffs may not like the meaning of this provision, but that meaning is not hard to grasp.

More fundamentally, Plaintiffs' objections primarily concern terms like "objective" and "without endorsement" in Section 4 of the Act listing various safe harbors. But a safe harbor simply "afford[s] protection from liability or penalty." *Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024). Its purpose is not to define the

---

[15] *Honeyfund* concerned a challenge to a Florida statute that governed private employers' conduct outside the education context; it has little bearing on this case, and the Eleventh Circuit's affirmance explicitly did not address or affirm the district court's vagueness analysis. *See* 94 F.4th 1272, 1283 n.6 (11th Cir. 2024).

[16] *E.g.*, Judicial Council of the United States Eleventh Judicial Circuit, *Pattern Jury Instructions, Civil Cases* 4.19 (2024 revision) (instructing jurors to determine whether a "belief was objectively reasonable" under the circumstances).

[17] *E.g.*, *SpeechFirst*, 32 F.4th at 1120 (explaining that the "fundamental question" for assessing First Amendment harm is "whether the challenged policy *objectively* chills protected expression" (emphasis added and quotations omitted).

world of prohibited conduct (though it can certainly clarify that world, which is why courts recognize that such provisions resolve ambiguity). Though Plaintiffs barely discuss it, it is Section 2 of the Act that lists what conduct is prohibited. Under that section, a state university may not:

- "Sponsor" a DEI program;

- "Direct or compel a student … to personally affirm, adopt, or adhere to a divisive concept";

- "Require" students "to attend or participate" in "course work that advocates for or requires assent to a divisive concept";

- "Require a student …to share his or her personal point of view on any divisive concept outside of an academic setting";

- "Require" students "to participate, as part of any required curriculum … in an activity that involves lobbying … related to divisive concept";

- "Penalize or discriminate against a student … on the basis of his or her refusal to support, believe, endorse embrace, confess, or otherwise assent to a divisive concept or diversity statement";

- "Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color";

- "Authorize or expend funding … for the purpose of compelling assent to any divisive concept."

Doc. 25-1 at 5-6, § 2(1)-(8). Each of these provisions gives a reasonable person notice of what conduct is prohibited by the Act. Plaintiffs never argue otherwise and

never support their blanket assertion that *each and every* one of these prohibitions is so unintelligible that the Act is unconstitutionally vague in its entirety.[18]

Last, Plaintiffs say the Act's definition of a "diversity, equity, and inclusion" program makes the Act vague and unenforceable. But the definition is clear: A DEI program is "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." Doc. 25-1 at 4, §1 (3). The "term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order." *Id.* Plaintiffs never say why they think this definition is unintelligible. As with the rest of the Act, the terms in the definition are readily understood, and the only possibly unclear term—"based on"—is one that is regularly used to denote something akin to proximate cause. *E.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-58 (1993) (explaining that "based upon" "calls for something more than a mere connection with, or relation to"); *Glob. Marine Expl., Inc. v. Republic of France*, 33 F.4th 1312, 1324 (11th Cir. 2022). Plaintiffs' vagueness challenge is unlikely to succeed.

---

[18] These terms also litter the code books, yet litigants elsewhere seem to be getting by alright. *E.g.*, Ala. Code § 15-21-30(a) ("compel"); Ala. Code § 16-1-20.5(b) ("discriminate against"), (c) ("penalize").

IV.    **Plaintiffs' Facial Challenge To The Act In Its Entirety Is Unlikely To Succeed Because The Act Is Not Overbroad And Any Unconstitutional Provisions Can Be Severed.**

Plaintiffs ask the Court to enjoin enforcement of the Act in its entirety. Doc. 12-1 at 31. This request, too, is unlikely to succeed.

First, as explained above in Section I.A, Plaintiffs have made no argument about, or established standing to challenge, many of the Act's provisions. It does not appear, for example, that any of the Plaintiffs seeking an injunction wish to "[c]ondition enrollment or attendance in a class, training, or orientation solely on the basis of race or color," Doc. 25-1 at 6, § 2(7), and they do not contend that the Act's prohibition of such racial discrimination is unconstitutional. Nor do they appear to challenge the Act's prohibition on "[d]irect[ing] or compel[ling] a student, employee, or contractor to personally affirm, adopt, or adhere" to the concepts "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior" or "[t]hat the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." *Id.* at 3-5, §§ 2(2), 1(2)(a), (c). Plaintiffs are not entitled to a court order enjoining enforcement of parts of the law they do not challenge.

Next, Plaintiffs' facial challenge cannot stand. Despite focusing on the Act's application to a handful of individuals, Plaintiffs seek facial invalidation. *See* Doc. 12-1 at 31. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S.

707, 723 (2024). "A facial challenge to a legislative Act is, of course, the most dif-

ficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745

(1987). Because "facial challenges threaten to short circuit the democratic process

by preventing duly enacted laws from being implemented in constitutional ways,"

they are, by design, "hard to win." *Moody*, 603 U.S. at 723 (quotation omitted). To

succeed, Plaintiffs ordinarily must show "that the law could never be applied in a

constitutional matter." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*,

717 F.3d 851, 863 (11th Cir. 2013) (quotation omitted). "Put another way, 'the chal-

lenger must establish that no set of circumstances exists under which the Act would

be valid.'" *Id.* (quoting *Salerno*, 481 U.S. at 745).

    This stringent standard applies to Plaintiffs' void-for-vagueness challenge,

and Plaintiffs cannot meet it. As explained in Section III above, the Act is not un-

constitutionally vague generally; it certainly is not unconstitutionally vague under

the lax standard applicable to state employees; and in any event Plaintiffs have not

shown that *all* provisions of the Act are unconstitutionally vague in *all* their appli-

cations. Plaintiffs' facial challenge under the Due Process Clause is destined to fail.

    Plaintiffs' burden is slightly less for their First Amendment claims: They must

show that "a substantial number of the law's applications are unconstitutional,

judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723

(alteration and quotation omitted). "[O]nly if the law's unconstitutional applications

substantially outweigh its constitutional ones" can Plaintiffs show a likelihood of success for facial relief under the First Amendment. *Id.* at 724.

Plaintiffs cannot meet this burden, either. As recounted in Section II, the law's sweep with regard to the State's own speech is plainly constitutional under binding Supreme Court and Eleventh Circuit precedents like *Garcetti* and *Bishop*. Even if Plaintiffs were likely to succeed on their other claims, that is enough to foreclose facial invalidation. But the law is also constitutional as applied to students and student organizations, treating them just as *Rosenberger* demands: on equal footing with each other, no matter their viewpoints. Plaintiffs are unlikely to succeed in their quest for facial relief.

Last, per its terms, every aspect of the Act must stand if any other "part of th[e] act is declared invalid or unconstitutional." Doc. 25-1 at 9, § 6. Such a "declaration shall not affect the part which remains." *Id.* "Severability is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996), and "Alabama law favors severability," giving "full force and effect to severability clauses," *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1032 (11th Cir. 2003). Accordingly, even if the Court finds some aspects of Alabama's law likely to be unconstitutional, it must "leave the remainder intact and in force." *Jefferson Cnty. Com'n v. Edwards*, 49 So. 3d 685, 693 (Ala. 2010) (quotation omitted).

## V.    The Other Preliminary Injunction Factors Weigh Against Plaintiffs.

In addition to failing to show a likelihood of success on the merits, Plaintiffs fail to "clearly" establish that they are entitled to the "extraordinary and drastic remedy" of a preliminary injunction. *Suntrust Bank*, 252 F.3d at 1166. Just the opposite: The balance of the equities weighs decisively in Defendants' favor.

Plaintiffs' delay alone "militates against a finding of irreparable harm." *Wreal, LLC*, 840 F.3d at 1248. The Governor signed the Act nearly a year ago, on March 20, 2024. The law took effect at the beginning of October. Yet Plaintiffs waited until mid-January 2025 to file suit—and then delayed an additional two weeks to seek relief from purportedly "imminent, irreparable harm." *Id.* (quotation omitted). Their actions belie their claims. Plaintiffs' "failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.*

Making matters worse, their delay means that Plaintiffs must seek no ordinary preliminary injunction but an affirmative one—what might be deemed an *extra* "extraordinary" remedy. *Suntrust Bank*, 252 F.3d at 1166. As the Eleventh Circuit has taught, "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1284. Here, the status quo is that the law is fully in effect, as it has been for months. Schools are in the middle

of the spring semester, so any injunction upending the status quo would be particularly disruptive. No wonder requests for "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, [are] particularly disfavored." *Martinez*, 544 F.2d at 1243.

Plaintiffs also fail to show that an injunction would be in the public interest. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). Thus, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (cleaned up); *see Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (recognizing that a state "would be harmed if it could not apply its own laws"). Plaintiffs claim that the Court can disregard this interest because they've argued that the Act is unconstitutional. Doc. 12-1 at 30. But that approach would make the harm inquiry irrelevant whenever a party seeks to preliminarily enjoin enforcement of a state law on constitutional grounds because the likelihood-of-success inquiry would always decisively resolve the irreparable-harm inquiry. At least for Plaintiffs' claims under the Due Process Clause, the Eleventh Circuit has squarely rejected the proposition "that a violation of constitutional rights always constitutes irreparable harm." *Siegel*, 234 F.3d at 1177. Plaintiffs are not entitled to a preliminary injunction.

## VI.    Any Injunction Must Be Narrowly Tailored And A Bond Required.

In the event an injunction does issue, it must be narrowly tailored, "go[ing] no further than necessary to provide interim relief to the parties." *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 921 (2024) (Gorsuch, J., concurring in grant of partial stay of district court's universal injunction). Plaintiffs instead demand a universal injunction "enjoin[ing] Defendants from enforcing" *any* aspect of Alabama's law against *anyone*. Doc. 12-1 at 30. But surely the Plaintiffs who did not even seek a preliminary injunction should not benefit from one. *See id.* at 3 (noting that only Plaintiffs Simon, Luna, Testman, and the Alabama NAACP seek a preliminary injunction).

Neither should third parties who are not before the Court. This is not a class action, and Plaintiffs offer no justification for the Court to depart from its narrow authority to adjudicate an Article III "case or controversy." The "axiomatic" rule is just the opposite: "Injunctive relief should be limited in scope to the extent necessary to protect the interests *of the parties*." *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013) (cleaned up and emphasis added). And any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). An injunction "prohibiting a State from enforcing any aspect of its duly enacted law against anyone" ventures far beyond a court's equitable powers and constitutes an abuse of discretion. *Labrador*,

144 S. Ct. at 921 (Gorsuch, J., concurring). Thus, if the Court were to find that these Plaintiffs have proven that they are entitled to a preliminary injunction, only these Plaintiffs should receive relief, and that relief must be narrowly tailored to protect Plaintiffs from only those portions of the Act they have demonstrated are likely un-constitutional and causing them harm.

Finally, if this Court does provide preliminary relief of any form, Plaintiffs should be required to post a bond. Rule 65(c) speaks in mandatory terms: "The court may issue a preliminary injunction or a temporary restraining order *only if* the mo-vant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or re-strained." (Emphasis added.) The bond acts "as a contract by which the amount posted is the consideration or 'price' paid for a wrongful injunction." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 297 F.R.D. 633, 635 (N.D. Ala. 2014). The Court should thus require a bond in such amount that Defendants are made whole if it turns out the injunction was wrongfully entered.

## CONCLUSION

For these reasons, the Court should deny the motion for a preliminary injunc-tion.

Date: March 7, 2025                     Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

George Muirhead (ASB-7345-K00L)
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
George.Muirhead@AlabamaAG.gov

*Counsel for Defendant Kay Ivey in her
official capacity as Governor of Alabama*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on March 7, 2025, which will serve all counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendant Kay Ivey in her official capacity as Governor of Alabama*