FILED

2025 Mar-25  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, and THE ALABAMA STATE CONFERENCE OF THE NAACP, | ) ) ) ) ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) No. 2:25-cv-00067-MHH ) |
| KAY IVEY, in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees; SCOTT PHELPS, in his official capacity as President Pro Tempore of the University of Alabama Board of Trustees; and MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART, AND KENNETH VANDERVOORT, in their official capacities as members of the University of Alabama Board of Trustees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants*. | ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT KAY IVEY IN HER OFFICIAL CAPACITY AS GOVERNOR OF ALABAMA

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................1

    A.   Alabama Act 2024-34.........................................................1

    B.   Plaintiffs' Complaint .........................................................6

LEGAL STANDARD.......................................................................8

ARGUMENT ...................................................................................9

   I.   This Court Lacks Jurisdiction To Hear Plaintiffs' Claims Against Governor Ivey In Her Official Capacity As Governor...............................9

    A.   Plaintiffs Fail To Show Injury-in-Fact From Each Provision of the Act They Seek to Challenge. ....................................................10

       1.   Professor Plaintiffs .......................................................10

       2.   Student Plaintiffs .........................................................16

       3.   Alabama NAACP .........................................................19

       4.   Equal Protection Plaintiffs.............................................22

    B.   Plaintiffs Fail To Show That Any Harm Is Likely Traceable To or Redressable By Governor Ivey. ...............................................24

    C.   Plaintiffs Cannot Abrogate Governor Ivey's Sovereign Immunity.......................................................................26

   II.   Plaintiffs' First Amendment Claims Fail Because They Challenge The Government's Regulation Of Its Own Speech..................................27

A.  Public University Professors Are Subject to the State's Curricular Choices in the Classroom...................................................28

B.  Public University Students Are Subject to the State's Curricular Choices in the Classroom...................................................35

C.  Public University Student Groups Promoting Divisive Concepts Do Not Have a First Amendment Right to Preferential Treatment. ....................................................36

III.  Plaintiffs' Vagueness Challenge Fails Because The Act Is Readily Understood...................................................................41

IV.  Plaintiffs Have Not Alleged Facts That, If True, Would Show Intentional Discrimination........................................................48

A.  Plaintiffs Have Not Alleged Facts Showing That the Act Disparately Impacts Black Individuals (Factor 1)............................51

B.  Plaintiffs' Allegations Regarding the Legislature's Knowledge of the Law's Impact Do Not Suggest Intentional Discrimination (Factors 6 & 7).........................................................53

C.  The Historical Background Does Not Suggest Intentional Discrimination by the Alabama Legislature in 2024 (Factor 2). .........................................................55

D.  Plaintiffs' Allegations Concerning Events Leading Up to the Act's Passage and the Contemporary Statements of Legislators Do Not Evince a Discriminatory Legislative Purpose (Factors 3 & 5)...................................................58

E.  Plaintiffs Have Not Identified Any Meaningful Procedural or Substantive Departures in the Legislative Process That Indicate Animus (Factor 4)............................................60

F.  The Act Accomplishes the State's Compelling Interests In a Way Plaintiffs' Proposed Alternatives Would Not (Factor 8). ........62

CONCLUSION .......................................................64

CERTIFICATE OF SERVICE ..................................................................66

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ................................................................... 50, 51

*Alexander v. S.C. State Conf. of the NAACP*,
   602 U.S. 1 (2024) ...........................................................................50

*Ali v. Woodbridge Twp. Sch. Dist.*,
   957 F.3d 174 (3d Cir. 2020) ...........................................................35

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) .................................................. 12, 20

*Arnett v. Kennedy*,
   416 U.S. 156 (1974) .......................................................................42

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................. 57, 61

*Barmapov v. Amuial*,
   986 F.3d 1321 (11th Cir. 2021) ........................................................7

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982) .......................................................................35

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
   529 U.S. 217 (2000) ................................................................. 28, 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................... 9, 19, 53, 57

*Bishop v. Aronov*,
   926 F.2d 1066 (11th Cir. 1991) ............................... 31, 32, 33, 34, 35

*Black Emergency Response Team v. Drummond*,
   737 F. Supp. 3d 1158 (W.D. Okla. 2024) ........................................55

*Brnovich v. Democratic Nat'l Comm.*,
   594 U.S. 647 (2021) .......................................................................60

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
   451 F.3d 1257 (11th Cir. 2006) ............................................................... 10

*City of S. Miami v. Governor*,
   65 F.4th 631 (11th Cir. 2023) ................................................................... 26

*D.N. by Jessica N. v. DeSantis*,
   -- F. Supp. 3d --, No. 21-CV-61344,
   2024 WL 5165857 (S.D. Fla. Dec. 19, 2024) ........................................ 50

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) .......................................................................... 10, 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ..................................................................................... 49

*E & T Realty v. Strickland*,
   830 F.2d 1107 (11th Cir. 1987) ............................................................... 48

*Edwards v. Calif. Univ. of Penn.*,
   156 F.3d 488 (3d Cir. 1998) .................................................................... 30

*Einhorn v. Axogen, Inc.*,
   42 F.4th 1218 (11th Cir. 2022) ................................................................. 9

*Ex parte Young*,
   209 U.S. 123 (1908) ................................................................................. 27

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ...................................................................... 29, 30, 33

*Garrett v. Matthews*,
   625 F.2d 658 (5th Cir. 1980) .................................................................... 42

*Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*,
   186 F. App'x 885 (11th Cir. 2006) .......................................................... 30

*Gill as Next Friend of K.C.R. v. Judd*,
   941 F.3d 504 (11th Cir. 2019) ............................................................ 23, 53

*Glob. Marine Expl., Inc. v. Republic of France*,
   33 F.4th 1312 (11th Cir. 2022)..................................................................47

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ...................................................................................43

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
   992 F.3d 1299 (11th Cir. 2021)................................. 49, 50, 51, 56, 59, 60, 62, 63

*Harrell v. The Florida Bar*,
   603 F.3d 1241 (11th Cir. 2010).................................................................10

*Henry v. Att'y Gen., Ala.*,
   45 F.4th 1272 (11th Cir. 2022)..................................................................39

*Hunt v. Washington State Apple Advertising Comm'n*,
   43 U.S. 333 (1977) ....................................................................................20

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ..................................................................................49

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020).................................................................24

*Johnson-Kurek v. Abu-Absi*,
   423 F.3d 590 (6th Cir. 2005).....................................................................32

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) ..................................................................................32

*Laird v. Tatum*,
   408 U.S. 1 (1972) ......................................................................................11

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
   66 F.4th 905 (11th Cir. 2023)....................................... 51, 53, 54, 56, 62

*Lee v. York Cnty. School. Div.*,
   484 F.3d 687 (4th Cir. 2007).....................................................................30

*Lewis v. Governor of Ala.*,
   944 F.3d 1287 (11th Cir. 2019) (en banc)................................................25

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................. 10, 18, 19, 22, 24

*M.H. On behalf of C.H. v. Omegle.com LLC*,
   122 F.4th 1266 (11th Cir. 2024) ...........................................................9

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
   474 F.3d 477 (7th Cir. 2007) ...........................................................30

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) (en banc) .............................................8

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ...........................................................16

*Nat'l Ass'n of Mfrs. v. Taylor*,
   582 F.3d 1 (D.C. Cir. 2009) ...........................................................43

*Nat'l Endowment for Arts v. Finley*,
   524 U.S. 569 (1998) ...........................................................28

*O'Laughlin v. Palm Beach Cnty.*,
   30 F.4th 1045 (11th Cir. 2022) ...........................................................42

*Pernell v. Comm'r of the Fla. State Bd. of Educ.*,
   No. 22-13992 (11th Cir. argued June 14, 2024) ...................................34

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
   641 F. Supp. 3d 1218 (N.D. Fla. 2022) ....................................... 34, 35

*Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*,
   462 U.S. 476 (1983) ...........................................................43

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ....................................................... 40, 41

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ................................................. 28, 29, 36, 37, 38, 39, 40, 41

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ...........................................................40

*San Filippo v. Bongiovanni,*
  961 F.2d 1125 (3d Cir. 1992) ...............................................................42

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ..................................................58

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993) ..............................................................................47

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ............................................... 11, 14, 45

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ................................................................................9

*Stardust, 3007 LLC v. City of Brookhaven,*
  899 F.3d 1164 (11th Cir. 2018) ............................................................44

*State ex rel. Hennepin Cnty. v. Brandt,*
  31 N.W.2d 5 (Minn. 1948) ....................................................................26

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ........................................................ 33, 48, 56, 63

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ..............................................................................20

*Summit Med. Assocs., P.C. v. Pryor,*
  180 F.3d 1326 (11th Cir. 1999) ............................................................27

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ................................................................................2

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile,*
  980 F.3d 821 (11th Cir. 2020) ..............................................................60

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
  413 U.S. 548 (1973) ..............................................................................43

*United States v. Nat'l Dairy Prods. Corp.,*
  372 U.S. 29 (1963) ................................................................................44

*United States v. Williams*,
    553 U.S. 285 (2008) ...........................................................................44

*Urofsky v. Gilmore*,
    216 F.3d 401 (4th Cir. 2000) (en banc) ............................................32

*Vibe Micro, Inc. v. Shabanets*,
    878 F.3d 1291 (11th Cir. 2018) ...........................................................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................ 49, 50, 53, 55, 58, 60, 61, 62, 63

*Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ...........................................................................44

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ...........................................................................28

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ...........................................................7

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .............................................................................8

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ...........................................................................41

*Women's Emergency Network v. Bush*,
    323 F.3d 937 (11th Cir. 2003) ...........................................................27

## Statutes

Ala. Act 2024-34 .................................................................... *passim*

Ala. Code § 15-21-30(a) .......................................................................47

Ala. Code § 16-1-20.5(b) .......................................................................47

Ala. Code § 16-47-30 ...........................................................................26

Ala. Code §§ 41-1-90 *et seq.* .................................................................2

**Other Authorities**

67 C.J.S. *Officers* § 17 (Dec. 2024 Update) ...........................................................25

Judicial Council of the United States Eleventh Judicial Circuit, *Pattern Jury Instructions, Civil Cases* (2024 revision)...........................................................45

*Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/objective..........................................................................45

*Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024) ......................................46

**Constitutional Provisions**

Ala. Const. Art. XIV, § 256 (2022) ...........................................................................1

Ala. Const. Art. XIV, § 264 (2022) .........................................................................25

Ala. Const., Art. V, § 130 (2022).............................................................................25

# INTRODUCTION

At the motion-to-dismiss stage, plaintiffs are generally entitled to their own facts but not their own law. The result of applying that rule here is dismissal of all claims against Governor Ivey in her official capacity as Governor of Alabama. Even assuming the truth of the factual allegations in their Complaint, Plaintiffs lack standing to sue Governor Ivey and have failed to state a claim upon which relief can be granted.[1]

# BACKGROUND

## A.    Alabama Act 2024-34

Alabama's Constitution provides that "[i]t is the policy of the State of Alabama to foster and promote the education of its citizens" and tasks the State Legislature with "provid[ing] for or authoriz[ing] the establishment and operation of schools … upon such conditions as it may prescribe." Ala. Const. Art. XIV, § 256 (2022). Consistent with that responsibility, in March 2024 the Alabama Legislature passed an education bill—Senate Bill 129—to forbid State funding of discriminatory programs and prohibit teachers from requiring students in public schools, including colleges and universities, to assent to eight listed discriminatory "divisive concepts."

---

[1] Governor Ivey adopts and incorporates the Board Defendants' arguments in support of their motion to dismiss.

*See* Alabama Senate Bill 129 (2024).[2] Governor Ivey signed the bill into law—Act 2024-34—on March 20, 2024. *See* Ala. Act 2024-34 (codified at Ala. Code §§ 41-1-90 *et seq.*).[3] The Act took effect on October 1, 2024. *Id.* § 7.

Given Plaintiffs' claims, it is worth describing the Act in some detail. Section 1 of the Act provides definitions, two of which are pertinent here. First, the Act defines "divisive concepts" as "any of the following concepts":

a. That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior.

b. That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.

c. That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.

d. That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.

e. That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the

---

[2] Alabama Senate Bill 129 (2024) is available at https://perma.cc/V6CW-SLUR and Doc. 12-2. Though not attached to their Complaint, Plaintiffs incorporate SB 129 into their Complaint by reference, so the Court should take judicial notice of the bill in its entirety when ruling on the motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[3] Alabama Act 2024-34 is available at https://perma.cc/6FH4-ZKN9 and Doc. 25-1. Though Plaintiffs purport to challenge "SB 129" and attached as an exhibit to their preliminary injunction motion a copy of the Senate Bill as it existed before it was signed into law, Plaintiffs presumably mean to challenge the signed Act. Governor Ivey thus treats the Complaint as incorporating the Act by reference and asks the Court to take judicial notice of the Act. *See Tellabs, Inc.*, 551 U.S. at 322.

past by other members of the same race, color, religion, sex, ethnicity, or national origin.

f. That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.

g. That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.

h. That meritocracy or traits such as a hard work ethic are racist or sexist.

*Id.* § 1(2).

Second, the Act defines a "Diversity, Equity, and Inclusion Program" as:

Any program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act. This term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order.

*Id.* § 1(3).

Section 2 of the Act defines prohibited actions:

A state agency, local board of education, or public institution of higher education may not do any of the following:

(1) Sponsor any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs, as defined in subdivision (3) of Section 1.

(2) Direct or compel a student, employee, or contractor to personally affirm, adopt, or adhere to a divisive concept.

3

(3) Require its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept.

(4) Require a student, employee, or contractor to share his or her personal point of view on any divisive concept outside of an academic setting, as provided in Section 4(3)b.

(5) Require its students, employees, or contractors to participate, as part of any required curriculum or mandatory professional training, in an activity that involves lobbying at the state or local level for legislation related to a divisive concept.

(6) Penalize or discriminate against a student, employee, or contractor on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept or diversity statement.

(7) Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color.

(8) Authorize or expend funding, or apply for or accept a grant, federal funding, or private funding, for the purpose of compelling assent to any divisive concept or any other purpose prohibited in this act, provided that such funding may be provided to student, faculty, or staff organizations or associations.

*Id.* § 2.

Section 3 of the Act provides that universities "may discipline or terminate the employment of any employee or contractor who knowingly violates" the Act, "provided that," as relevant here, "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall remain subject to relevant policies established by the institution." *Id.* at 6, § 3.

Section 4 provides instructions on how to interpret the Act and offers certain safe harbors:

Nothing in this act:

(1) Prevents student, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to sponsor these programs. If a student, staff, or faculty organization or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event.

(2) Prevents an employee or a contractor of a state agency, local board of education, or public institution of higher education who provides, as part of his or her job duties, orientation, course work, or training from responding to questions that are raised by participants in the orientation, course work, or training and that pertain to divisive concepts or diversity, equity, and inclusion.

(3)a. Prohibits a public institution of higher education from providing any instruction or taking any action in furtherance of satisfying any accreditation standard or requirement.

b. Prohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with this act.

c. Prohibits the required collection or reporting of demographic data by public institutions of higher education.

(4) Prohibits the teaching of topics or historical events in a historically accurate context.

…

5

(6) Prevents state agencies from promoting racial, cultural, or ethnic diversity or inclusiveness, provided these efforts are consistent with the requirements of this act.

(7) Prohibits a public institution of higher education from providing space or ancillary services to any student or employee on a non-discriminatory basis, including, but not limited to, support and guidance to ensure compliance with applicable university policies and laws, assistance with security needs, and registration of events.

…

(9) May be construed to inhibit or violate the First Amendment rights of any student or employee, or to undermine the duty of a public institution of higher education to protect, to the greatest degree, academic freedom, intellectual diversity, and free expression.…

*Id.* § 4.

Section 5 notes the Legislature's intent that "all constitutionally created boards of trustees comply with the requirements of th[e] act." *Id.* § 5.

Section 6 is a severability provision: "The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, the declaration shall not affect the part which remains." *Id.* § 6.

Section 7 lists the date the Act took effect: "October 1, 2024." *Id.* § 7.

### B.    Plaintiffs' Complaint

On January 14, 2025, Plaintiffs filed suit pursuant to 42 U.S.C. § 1983 to challenge the Act as unconstitutional and seek declaratory and injunctive relief. *See* Plfs' Compl., Doc. 1 ¶¶ 277-82. They named as Defendants the individual members of the University of Alabama Board of Trustees in their official capacities and

Governor Kay Ivey in her official capacities as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees. *Id.* ¶¶ 26-29.

Plaintiffs brought six claims for relief. In Count One, three professors at the University of Alabama (UA)—Cassandra E. Simon, Dana Patton, and Richard Ford-ing—claim that the Act infringes on their purported "First Amendment right to speak free from viewpoint-based restrictions" in the classroom setting. *Id.* ¶ 228; *see id.* ¶¶ 226-32.

In Count Two, a student at the University of Alabama at Birmingham (UAB)—Miguel Luna—claims that the Act infringes on his purported "First Amendment right to receive information" by allegedly "prohibiting public university professors from advancing particular viewpoints in the course of instruction." *Id.* ¶ 238, *see id.* ¶¶ 233-44.[4]

In Count Three, three students at UAB—Sydney Testman, Isabella Campos, and Miguel Luna—and the Alabama State Conference of the NAACP claim that the

---

[4] Luna also purports to assert claims on behalf of the Professor Plaintiffs by "incorporat[ing] and realleg[ing] each and every allegation" of the Complaint, including those listed in Count One, at the beginning of Count Two. Doc. 1 ¶ 233. Each remaining count—Counts Three through Six—also "adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Barmapov v. Amuial*, 986 F.3d 1321, 1324-25 (11th Cir. 2021) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015)); *see* Doc. 1 ¶¶ 245, 252, 258, 264. This makes Plaintiffs' Complaint a "flatly forbidden" shotgun pleading. *Barmapov*, 986 F.3d at 1324 (quoting *Weiland*, 792 F.3d at 1320). Dismissal without prejudice or leave to amend would ordinarily be the appropriate remedy, but here the Complaint is clear enough to rule against Plaintiffs on the merits. *See id.* at 1326 (noting that a court must give a plaintiff "one chance to replead before dismissing his case with prejudice on *non-merits* shotgun pleading grounds" (emphasis added) (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018)).

Act violates the First Amendment by allegedly "restricting student group funding based on the purported viewpoints associated with the student organizations." Doc. 1 ¶ 251; *see id.* ¶¶ 245-51.

In Count Four, the Alabama NAACP claims that the Act violates "the First Amendment rights of students, including students who are members of Plaintiff Alabama NAACP, to freely associate as members of the university student organizations that were denied physical spaces on campus based on viewpoint discrimination." *Id.* ¶ 257; *see id.* ¶¶ 252-57.

In Count Five, all Plaintiffs claim that the Act is void for vagueness under the Due Process Clause of the Fourteenth Amendment. *See id.* ¶¶ 258-63.

And in Count Six, three of the plaintiffs—Professor Simon, UAB student Testman, and the Alabama NAACP—claim that the Act constitutes intentional race discrimination under the Equal Protection Clause of the Fourteenth Amendment. *See id.* ¶¶ 264-76.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), the Court must dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction if Plaintiffs have not "'clearly and specifically set forth facts'" that, if true, would "satisfy the requirements of Article III." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924-25 (11th Cir. 2020) (en banc) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "[A]s

the party invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Likewise, under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted if Plaintiffs have failed to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must accept "the complaint's well-pleaded factual allegations as true and constru[e] them in the light most favorable to the plaintiff," "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts will not prevent dismissal." *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1222 (11th Cir. 2022) (quotations omitted). "Similarly, a formulaic recitation of the elements of a cause of action is not adequate to survive a Rule 12(b)(6) motion to dismiss." *M.H. On behalf of C.H. v. Omegle.com LLC*, 122 F.4th 1266, 1270 (11th Cir. 2024) (cleaned up).

## ARGUMENT

### I.    This Court Lacks Jurisdiction To Hear Plaintiffs' Claims Against Governor Ivey In Her Official Capacity As Governor.

Plaintiffs "bear[] the burden of establishing" that this Court has jurisdiction to decide their claims. *Spokeo, Inc.*, 578 U.S. at 338. Plaintiffs must therefore provide sufficient facts in their Complaint showing that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

likely to be redressed by a favorable judicial decision." *Id.* And because "[s]tanding is not dispensed in gross," they must do that "for each claim [they] seek[] to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). This Court must determine, plaintiff by plaintiff, claim by claim, and challenged provision by challenged provision, whether Plaintiffs have established the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see Harrell v. The Florida Bar*, 603 F.3d 1241, 1254-55 (11th Cir. 2010); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006). For the majority of the claims they bring and the provisions of the Act they seek to enjoin, Plaintiffs have not done so.

## A.    Plaintiffs Fail To Show Injury-in-Fact From Each Provision of the Act They Seek to Challenge.

### 1.    Professor Plaintiffs

The Professor Plaintiffs—Professors Simon, Patton, and Fording—seek to enjoin enforcement of each and every provision of the Act. Yet they fail to show how each and every provision of the Act harms them. So they lack standing to challenge most of the Act's provisions.

To support their First Amendment claims in Count One, the Professor Plaintiffs allege that the Act "has had a chilling effect on" them because they "are self-censoring out of fear or discipline or termination." Doc. 1 ¶ 86. Such chill can indeed be considered a First Amendment harm, but only if it is objectively reasonable. The

"fundamental question" is "whether the challenged policy 'objectively chills' pro-
tected expression" and would cause a "reasonable would-be speaker to self-censor."
*Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). "Allegations
of a subjective 'chill' are not an adequate substitute for a claim of specific present
objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 14
(1972).

The problem for the professors is that none of them explain how they are even
arguably harmed by many of the Act's provisions. At least some of the Act's provi-
sions have no conceivable application to them. *E.g.*, Act § 3(2) (describing protec-
tions for "an employee or contractor of a local board of education"). And for those
provisions that *could* apply to college professors, the professors have not shown how
many of those provisions harm *them*. They do not allege, for instance, that they
would like to—and would but for fear of violating the Act—"[s]ponsor any diver-
sity, equity, and inclusion program." Act § 2(1). They do not allege that they would
like to—and would but for fear of violating the Act—"[r]equire a student, employee,
or contractor to share his or her personal point of view on any divisive concept out-
side of an academic setting." *Id.* § 2(4). They do not allege that they would like to—
and would but for fear of violating the Act—"[c]ondition enrollment or attendance
in a class, training, or orientation solely on the basis of race or color." *Id.* § 2(7). And
they do not allege that they would like to—and would but for fear of violating the

Act—"[a]uthorize of expend funding, or apply for or accept a grand, federal funding, or private funding, for the purpose of compelling assent to any divisive concept." *Id.* § 2(8). Because the Professor Plaintiffs have not "sufficiently demonstrated an intent to take the action that [they] assert[] is prohibited," *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024), they lack standing to seek prospective relief from many of the Act's provisions.

The same is true even for the provisions of the Act that directly regulate classroom instruction. Once again, none of the Professor Plaintiffs allege facts showing that they would like to—and would but for fear of violating the Act—"[d]irect or compel a student, employee, or contractor to personally affirm, adopt, or adhere" to any of the listed divisive concepts. *Id.* § 2(2). Likewise for Section 2(6), which prohibits professors from "[p]enaliz[ing] or discriminat[ing] against a student … on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept or diversity statement," *id.* § 2(6); the Professor Plaintiffs are mum about this provision.

The closest the Professor Plaintiffs come to alleging arguable injury from a provision of the Act concerns enforcement of Section 2(3), which prohibits professors from "[r]equir[ing] … students … to attend or participate in … course work that advocates for or requires assent to a divisive concept." *Id.* § 2(3). Yet even here Plaintiffs do not allege facts that would give them standing to challenge *every*

"divisive concept." Professors Simon and Fording, for instance, allege that they assign coursework related to "implicit associations and bias" and fear that the assignments could be viewed as advocating for the divisive concept "[t]hat, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." *See* Doc. 1 ¶¶ 95-96, 107-08; Act § 1(2)(d). To begin, that fear is not objectively reasonable if, as they allege, all the professors are doing is teaching "about" implicit associations and bias. But even if the professors had standing to challenge the divisive concept they list—concept "d"—that would not give them standing to challenge every other concept because "[s]tanding is not dispensed in gross." *Davis*, 554 U.S. at 734. *No* Professor Plaintiff alleges that he would like to—and would but for fear of violating the Act—"[r]equire … students … to attend or participate in … course work that advocates for or requires assent to," Act § 2(3), the following divisive concepts:

- "That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior," *id.* § 1(2)(a);

- "That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin," *id.* § 1(2)(b);

- "That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin," *id.* § 1(2)(c);

- "That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin," *id.* § 1(2)(e);

- "That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin," *id.* § 1(2)(f);

- "That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin," *id.* § 1(2)(g); or

- "That meritocracy or traits such as a hard work ethic are racist or sexist," *id.* § 1(2)(h).

True enough, the Professor Plaintiffs allege other facts that they contend bring them within the zone of conduct that is "arguably proscribed" by certain provisions of the Act. *Speech First*, 32 F.4th at 1120 (quotation marks omitted). But these allegations cannot show either that the Professors face a real risk of enforcement or that any self-censorship is "reasonable." *Id.*

For example, Professor Simon alleges that she "shows her class six episodes of *Eyes on the Prize*, an award-winning 14-hour television program that covers the major events of the Civil Rights Movement from 1954 to 1985." Doc. 1 ¶ 94. Because past "students have expressed experiencing feelings of anger, guilt, complicity and shame" after watching these episodes, Professor Simon fears that showing the program in class "may run afoul" of the Act. *Id.*

14

This is insufficient. Even construing these allegations as true and viewing them in the light most favorable to Plaintiffs, Professor Simon's fear is not objectively reasonable because simply showing and discussing a PBS documentary— which is all that Professor Simon claims to be doing—does not "[d]irect or compel," "advocate[] for or require[] assent to," or "[p]enalize or discriminate against a student … on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept." *See* Act §§ 2(2), 2(3), 2(6). Indeed, the Act expressly *protects* discussion of *all* topics, including those discussed in PBS documentaries. *See id.* § 4(3)(b). Accordingly, based on the facts she alleged and the plain text of the Act she challenged, Professor Simon does not have standing to challenge any provision of the Act based on such conduct. The same is true of the other Professors' allegations regarding their subjective fears that teaching "about" topics could violate the Act.[5]

Of course, it may be that the Professor Plaintiffs are really engaging in conduct that jumps from teaching "about" certain concepts to requiring their students to

---

[5] Professor Patton alleges that she "previously presented students with a series of articles that *discuss* the 'Fundamental Causes' theory," and that "[p]roponents of this theory have long argued that socioeconomic status is a fundamental cause of health disparities, and more recent iterations of the theory have proposed that racism should also be considered a fundamental cause of these disparities." Doc. 1 ¶ 98 (emphasis added). Professor Patton "has decided to remove instruction *about* this theory" from her course and "also plans to record all of her lectures." *Id.* ¶¶ 98-99. Voluntary actions like recording her own lectures, of course, cannot count as "harm" for standing purposes. And, like Professor Simon's, Professor Patton's fear of being disciplined for merely "discussing" a theory is not objectively reasonable. The same is true of Professor Fording's fear about "discuss[ing] research." *Id.* ¶ 105.

agree with those concepts. If so, they should say so and identify which divisive concepts they require their students to endorse. But because the Professor Plaintiffs disclaim such actions in their Complaint, they have not established standing to challenge most of the Act's provisions under the First Amendment. Count One should therefore be dismissed.

### 2.  Student Plaintiffs

The Student Plaintiffs suffer from similar problems. Start with Plaintiff Luna, who is the only Plaintiff to allege harm "by the curriculum restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129." Doc. 1 ¶ 234. Luna "fears that his professors *may* decrease or eliminate discussions of race and racial justice in the classroom due to SB 129." *Id.* ¶ 110 (emphasis added). Such "speculat[ion] about the decisions of third parties" not before the Court is "no more than conjecture" and insufficient to "establish a likelihood of future injury." *Murthy v. Missouri*, 603 U.S. 43, 72 (2024) (citations omitted).

Even if he could rely on the conduct of third parties to show injury *to him*, the specific examples Luna provides do not do so. To support his "fears" that his professors "may" alter their discussions of race and racial injustice, Luna relates that "[i]n his *Human Rights* course this semester, his syllabus contained a disclaimer that UAB suggested all instructors include in their syllabi as part of its guidance on academic instruction to comply with SB 129." Doc. 1 ¶ 110. "Specifically, the

disclaimer states that '[t]hough students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered 'divisive' under Alabama law.'" *Id.* (alteration in original); *see also id.* ¶111 ("[Luna's] professor also gave a verbal warning to the class indicating that the course would include discussion of certain controversial topics."). It is utterly unclear, and Luna never explains, how a statement in a course syllabus *assuring* students that they will not "be required to assent or agree with any concept considered 'divisive' under Alabama law" could be construed as harming Luna's (or his professor's, or anyone else's) First Amendment rights in any way.

Nor does Luna connect his general fears about what his professors "may" teach to any provision of the Act. After discussing the syllabus language, Luna notes his "fear[]" that "SB 129 will lead his professor" in his upcoming *Environmental Politics* course "to shy away from discussions about how systemic inequalities impact environmental conditions such as access to clean water and exposure to air pollution." *Id.* ¶ 112. But Luna does not connect his speculation about what his future professor might or might not say in class to any provision of the Act, nor does he explain what he thinks the professor wants to say but won't. That is understandable because Luna cannot represent the professor or raise standing on his behalf, but those limitations make it difficult for Luna to show how the Act has or will injure *him*. As a result, no Plaintiff has alleged facts sufficient to establish standing Count Two.

17

To support their standing to bring Count Three, Plaintiffs Luna, Testman, and Campos allege that the Act caused student groups to which they belong or belonged to suffer reduced funding from UAB. They start by discussing the Social Justice Advocacy Council (SJAC), which these Plaintiffs "were"—past tense—members of. Doc. 1 ¶ 121 ("Plaintiffs Testman, Luna, and Campos *were* members of SJAC" (emphasis added)); *id.* ¶20 (Testman "is a former member of" SJAC); *id.* ¶21 ("Plaintiff Campos is also a former member of SJAC."). None of the Plaintiffs say they are still members of SJAC, nor do they claim that enforcement of the Act killed SJAC and that, if it were resurrected, they would become members once more. Instead, they admit, as they must, that the organization they once belonged to is now treated like every other "Registered Student Organization" on campus (rather than receiving preferential funding directly from the university, as it once did). *Id.* ¶ 122. So even if the university's revocation of preferential treatment could constitute past injury to these Plaintiffs when they were members of SJAC, that "does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 555 (cleaned up).

Plaintiffs Luna and Campos allege that they are also "members of Esperanza, a Latine"-focused Registered Student Organization, and that "UAB administrators informed [them] that pursuant to UAB's interpretation of SB 1229, Esperanza cannot receive any funding from UAB should an event or initiative focus on a 'divisive

concept.'" Doc. 1 ¶ 124-25. "Without funding," they claim, "Esperanza cannot fulfill its mission of serving as a resource for Latine students and enriching their academic, personal, and professional development." *Id.* ¶ 125.

Plaintiffs again fail to include sufficient allegations to "nudge[] their claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Denial of funding could indeed constitute injury, but Plaintiffs never allege that they asked for funding or even that they have concrete plans to do so.  They simply raise the "conjectural or hypothetical"[6] fear that "should" Esperanza host a program focused on a divisive concept, and should Esperanza seek funding for that program, then UAB might deny funding. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [is] require[d]." *Lujan*, 504 U.S. at 544.

The Student Plaintiffs thus lack standing to bring Counts Two and Three. As a result, Count Two should be dismissed, and Count Three can remain only if the Alabama NAACP has standing to bring it—which, as discussed, next, it does not.

### 3.  Alabama NAACP

Turning to the last Plaintiff, the Alabama NAACP asserts both a loss-of-student-funding claim (Count Three) and a freedom-of-association claim (Count Four).

---

[6] *Lujan*, 504 U.S. at 560 (cleaned up).

The group alleges that its student chapter at UA "has about forty-five dues-paying student members who are African American, ranging in class year from freshmen to senior, who have or will suffer harm as a result of SB 129's prohibitions against DEI and divisive concepts." Doc. 1 ¶ 25.

To the extent the NAACP claims harm to its members, it must include allegations showing that (1) its "members would otherwise have standing to sue in their own right," (2) the interests the NAACP "seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 43 U.S. 333, 343 (1977). To show that "any [NAACP] member has standing to sue in her own right, we ask, of course, whether she has (1) suffered an injury in fact that is both (2) fairly traceable to [Defendants'] conduct and (3) redressable by the requested injunction." *Am. All. for Equal Rts.*, 103 F.4th at 772 (quotations omitted).

The NAACP fails at step one. None of its members are plaintiffs in this case, and there are no allegations in the Complaint showing that any individual member would have standing to sue. Though the NAACP need not identify any of its members "by name," it must still establish "'that at least one identified member had suffered or would suffer harm.'" *Id.* at 772-73 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). The NAACP tries to meet this burden by vaguely alleging

that "members of the UA NAACP have been denied access to university funding and campus spaces for Black students." Doc. 1 ¶ 25. That sounds ominous until one reads the rest of the allegations, which explain that some UA NAACP members also happen to be members of the Black Student Union (BSU) and *that* organization lost its preferential status and is now treated like other Registered Student Organizations on campus. *Id.* ¶ 130-31. BSU and another student organization that also includes some NAACP members—Safe Zone—thus no longer have dedicated office space on campus. *Id.*

Plaintiffs never explain how this purported harm to *other organizations* gives NAACP standing to sue on behalf of its members. Even if (unidentified) members of the UA NAACP chapter enjoyed spending time in the BSU and Safe Zone spaces, any harm from the closure of those spaces would only have affected those (unidentified) students personally, not as members of the NAACP. And in any event, Plaintiffs do not allege any facts showing that those other organizations are prohibited from reserving space on campus to meet, that they have tried to reserve space and been denied the opportunity, or even that they have plans to reserve meeting space in the future. The NAACP has not established associational standing.

As for purported harm to the NAACP itself, all Plaintiffs say is that the "UA NAACP does not believe it qualifies for event-specific funding from the Student Government because of the dismantling of the BSU pursuant to SB 129's broad

21

definition of diversity, equity, and inclusion and/or divisive concepts." Doc. 1 ¶ 214. Again, such "conjectural or hypothetical" harms are insufficient. *Lujan*, 504 U.S. at 560 (cleaned up). And again, Plaintiffs do not allege that UA has threatened the NAACP with loss of funding or that the NAACP has applied for funding and been denied it. Nor do they assert that the NAACP or any of its members (identified or not) are otherwise self-censoring for fear of running afoul of the Act, or what prohibited actions the NAACP would take if the Act were enjoined.

Because the NAACP has not alleged facts showing that it was injured or will be injured by enforcement of the Act, it lacks standing to bring Counts Three and Four. Since no Plaintiffs have standing to bring those claims, they should be dismissed.

### 4. Equal Protection Plaintiffs

Plaintiffs Simon (the UA professor), Testman (the UAB student), and the Alabama NAACP allege that they "have been harmed by intentional discrimination of SB 129 as implemented by the University of Alabama system." Doc. 1 ¶ 265. According to these Plaintiffs, "SB 129 explicitly targets concepts related to race, racism, and efforts to overcome racism," and "[a]s such, the law's impact will bear more heavily on Black people, specifically Black students and Black educators, who are more likely to benefit from discussions on these topics." *Id.* ¶ 273; *see also id.* ¶ 179 (alleging that "SB 129's legislative supporters intended to prevent discussions,

academic scholarship, and programs in higher education that would help Black people secure greater equality, thereby injuring Black people—by having less equality—through SB 129's implementation").

Again, Plaintiffs are entitled to their own facts at this stage but not their own law. So when the language of the Act itself contradicts Plaintiffs' conclusory allegations, the Act controls. *Cf. Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019) (noting that "when exhibits attached to a complaint contradict the general and conclusory allegations of the pleading, the exhibits govern"). Whatever Plaintiffs may say about the Act, its terms are clear that (1) "discussions" about any topic are protected, Act §§ 4(3), (4); and (2) to the extent the Act targets "concepts related to race [and] racism," Doc. 1 ¶ 273, it does so only to prevent professors and university programs from requiring or compelling students to agree with racist concepts like "any race … is inherently superior or inferior" to another, Act § 1(2)(a). Plaintiffs do not allege facts explaining why they believe they are harmed by students *not* being compelled to agree that one race is inherently superior to another. One might think that Plaintiffs would welcome such antidiscrimination protections, but, regardless, they have not alleged facts showing that they are *harmed* by them. Count Six should be dismissed.

* * *

This leaves Plaintiffs' void-for-vagueness claim in Count Four and, at most, a narrow sliver of the Professor Plaintiffs' First Amendment claims in Count One. Though the Student Plaintiffs and the NAACP lack standing to bring Count Four because they have not shown harm *to them*, it is at least arguable that the Professor Plaintiffs have standing to bring their vagueness challenge since they are directly regulated by the Act. As for the Professor Plaintiffs' First Amendment claims, while the better reading is that the professors have not alleged facts sufficient to challenge *any* provision of the Act, *at most* they should be limited to challenging Section 2(3) of the Act and any specific divisive concepts incorporated by that provision that they wish to violate. The Court should dismiss all other claims.

### B.    Plaintiffs Fail To Show That Any Harm Is Likely Traceable To or Redressable By Governor Ivey.

Even if every Plaintiff had established injury sufficient to challenge every provision of the Act, *no* Plaintiff could show that her injuries are traceable to or redressable by Governor Ivey in her capacity as Governor. "To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Likewise, to satisfy the redressability prong, Plaintiffs must show that a decision in their favor would "significantly increase the likelihood that [they] would obtain relief that directly redresses

24

the injury" and that it is "the effect of the court's judgment *on the defendant*—not an absent third party—that" does so. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up and emphasis altered).

These principles explain why many of the statements Plaintiffs submit about the harm they purportedly suffered via third parties are insufficient to establish standing against any of the Defendants. More to the point for *this* Defendant, they also show why Plaintiffs cannot establish that Governor Ivey either caused or could remedy any such harm. Governor Ivey in her capacity as Governor does not enforce the Act; the Act makes no mention of her office. And though she serves as ex officio president of the UA Board of Trustees—and is sued separately in that capacity— that is a separate office with separate and distinct duties.

The general rule is that "where a public officer is declared by law by virtue of the office to be also, ex officio, the incumbent of another public office, the two offices are distinct and separate." 67 C.J.S. *Officers* § 17 (Dec. 2024 Update). That is why the Alabama Constitution speaks of "other office[s]" the Governor may hold as "provided in th[e] Constitution." Ala. Const., Art. V, § 130 (2022). Those "other office[s]" include the constitutional requirement that the Governor serve as "ex officio president" of the Board of Trustees of the University of Alabama system. *See* Ala. Const. Art. XIV, § 264 (2022).

When the Governor acts as president ex officio, she "is governed by one law," and when she acts as Governor, she is "governed by a different and independent law." 67 C.J.S. *Officers* § 17, *supra.* As *Governor*, she does not appoint members to the Board of Trustees. *See* Ala. Const. Art. XIV, § 264; Ala. Code § 16-47-30. And as *Governor*, any indirect authority she has related to the Board is insufficient to establish that she has caused or could remedy any of Plaintiffs' purported injuries— regardless of her responsibilities under the "different and independent law" governing her office as president ex officio. *Cf. City of S. Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023) (rejecting argument that "the governor's ability to suspend officials for cause" could "establish[] traceability"). "[T]he two offices are as independent of each other as if occupied by different persons, in that the duties of the two offices … are separate and distinct and are governed … by different laws." *State ex rel. Hennepin Cnty. v. Brandt*, 31 N.W.2d 5, 7 (Minn. 1948). Plaintiffs lack standing to sue the Governor in her office *as Governor*.

### C.    Plaintiffs Cannot Abrogate Governor Ivey's Sovereign Immunity.

For similar reasons, Plaintiffs' claims against Governor Ivey must be dismissed because the Governor is entitled to sovereign immunity. The most Plaintiffs say about the Governor in her capacity as Governor is that she "signed SB 129 into law." Doc. 1 ¶ 27. It is apparently for that reason that "Plaintiffs bring claims against Governor Ivey in her official capacity … as Governor." *Id.* But not only does this

allegation get Plaintiffs nowhere on standing, it runs headlong into the Governor's sovereign immunity. "Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law." *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003). Likewise, where a state officer has no "responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate," making that officer entitled to sovereign immunity. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999); *see Women's Emergency Network*, 323 F.3d at 949-50 ("Where the enforcement of a statute is the responsibility of parties other than the governor …, the governor's general executive power is insufficient to confer jurisdiction.").

Whether for Plaintiffs' lack of standing or the Governor's sovereign immunity, Governor Ivey must be dismissed as a defendant.

## II. Plaintiffs' First Amendment Claims Fail Because They Challenge The Government's Regulation Of Its Own Speech.

Even if Plaintiffs could bring their claims against the Governor, those claims would fail and should be dismissed under Rule 12(b)(6). To begin, Plaintiffs' First Amendment claims in Counts One through Four all rely on the proposition that the Act regulates the viewpoint of ordinary citizens speaking on their own behalf in public forums. *See* Doc. 1 ¶¶ 226-251. But as Plaintiffs' lead case itself explains, "[w]hen the University determines the content of the education it provides, it is the University speaking, and [the Constitution] permit[s] the government to regulate the

27

content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). The Supreme Court emphasized the point: "A holding that [a] University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* at 834. The Court made the point again five years later: "Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties," "principles applicable to government speech" likely govern. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

Applying "principles applicable to government speech" here confirms that Plaintiffs have failed to state any First Amendment claim upon which relief can be granted. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Indeed, when it comes to its own speech, "[i]t is the very business of government to favor and disfavor points of view." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring).

### A.    Public University Professors Are Subject to the State's Curricular Choices in the Classroom.

Start with the Professor Plaintiffs' claims in Count One. Plaintiffs' theory is that the Act infringes on their purported "right to speak freely from viewpoint-based

restrictions" in the classroom. Doc. 1 ¶ 232. The theory fails because the Professor Plaintiffs are not teaching students as private citizens but as state employees—at a state university, in a state classroom, on the State's time and paid by the State's dime. The Professors do "not act as a citizen when" they conduct their "daily professional activities" teaching students at UA; rather, when they go "to work and perform[] the tasks [they are] paid to perform, [the Professors] act[] as [] government employee[s]." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. As the Supreme Court explained in *Garcetti*, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen" but "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22 (citing *Rosenberger*, 515 U.S. at 833).

Though the specific facts of *Garcett* concerned the speech of a deputy district attorney and the Court reserved ruling on whether its holding applies in full to the classroom setting, *id.* at 425, there is no reason to think—and the Court did not suggest—that its analysis would somehow *not* apply to professors teaching at public universities. Indeed, the Court in both *Southworth* and *Rosenberger* indicated that

29

"speech by an instructor or a professor in the academic context" *is* governed by "principles applicable to government speech." *Southworth*, 529 U.S. at 235; *see Rosenberger*, 515 U.S. at 834. And the Eleventh Circuit expressly "appl[ied] *Garcetti*" in a persuasive, though not binding, decision to "conclude that [a high school teacher's] speech was not protected by the First Amendment because she spoke 'pursuant to [her] official duties.'" *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 886 (11th Cir. 2006) (unpublished) (quoting *Garcetti*, 547 U.S. at 421). Other courts are in accord. *E.g.*, *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (relying on *Garcetti* to reject teacher's First Amendment claim because "teachers hire out their own speech and must provide the service for which employers are willing to pay"); *cf. Lee v. York Cnty. School. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007) (holding that teacher speech that is "curricular in nature" is "not protected by the First Amendment"). Writing for the Third Circuit before *Garcetti*, then-Judge Alito explained the rule clearly: "[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom" because those decisions implicate "the state's ability to say what it wishes when it is the speaker." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998).

Even if the employer-speech rule from *Garcetti* did not apply directly to university professors, that would mean only that the rule from the Eleventh Circuit's

earlier decision in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), would govern—and that rule is not much different, if at all. In *Bishop*, UA restricted a physiology professor from interjecting his religious beliefs in class and from hosting an optional class devoted to a "Christian Perspective" on human physiology. *See* 926 F.2d at 1069. The professor's remarks were, to him, related to the curriculum for his physiology class because they concerned "his understanding of the creative force behind human physiology." *Id.* at 1068. The optional class he offered likewise "covered various aspects of the human body including the complexity of its design and operation, concluding that man was created by God." *Id.* at 1068-69.

Concerned that the professor's religious teaching was inconsistent with its own view of the curriculum, UA instructed the professor to stop discussing his religious viewpoints in any version of his class, optional or not. *Id.* at 1069-70. The district court upheld the professor's First Amendment challenge, and the Eleventh Circuit reversed. The Court considered three factors in doing so.

First, "the context: the university classroom during specific in-class time," "the visage of the classroom as part of a university course in an after-class meeting," and the "coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* at 1074.

Second, "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than … those of other

persons" given its "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.*

"Last and somewhat countervailing," the general "predilection for academic freedom" discussed in cases like *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967). Though acknowledging the "abundant claims" in those cases "which acclaim academic freedom," the Eleventh Circuit emphasized that the decisions "cannot be extrapolated to deny schools command of their own courses" and that academic freedom is not "an independent First Amendment right." *Bishop*, 926 F.2d at 1075. The Court also explained that, in any event, academic freedom belongs primarily to a university as an institution and cannot serve to "supplant [the Court's] discretion for that of the University." *Id.*[7] "Federal judges should not be ersatz deans or educators," the Court instructed, and "we trust that the University will serve its own interests as well as those of its professors in pursuit of academic freedom." *Id.*

Based on these factors, the Court recognized a general rule of deference to state universities on curricular matters. Though the professor's "sincerity cannot be doubted," the Court reasoned, "his educational judgment can be questioned and

---

[7] *See also Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) (en banc) (noting that "the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom" and that such a right, to the extent it exists, protects only the institution's "right of self-governance in academic affairs"); *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) (agreeing that "any right of 'academic freedom' … inheres in the University, not in individual professors" (quoting *Urofsky*, 216 F.3d at 410)).

redirected by the University when he is acting under its auspices as a course instructor." *Id.* at 1076-77. The Court thus ruled that when a professor "and the University disagree about a matter of content in the courses he teaches," "even to the extent that it represents his professional opinion about his subject matter," "[t]he University must have the final say in such a dispute." *Id.* Again: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077.

*Bishop* makes this case easy. Just as the professor there wanted to exercise his "professional opinion about his subject matter" and discuss his religious viewpoints about human physiology, *id.* at 1077, the Professor Plaintiffs here wish to teach certain subjects and viewpoints related to race in their classes, Doc. 1 ¶¶ 86-108. The professor's teaching in *Bishop* was prohibited by UA, as is the Professor Plaintiffs' here to the extent it violates the Act. When such a conflict arises, "[t]he University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Bishop*, 926 F.2d at 1077. It really is that simple.[8]

Plaintiffs mention that a district court in Florida has seemingly disregarded the teachings of *Garcetti* and *Bishop* and preliminarily enjoined enforcement of

---

[8] The Court in *Bishop* noted that UA was also concerned about a possible Establishment Clause violation by the professor's religious teaching. 926 F.2d at 1069. The Court expressly "d[id] not reach the question," *id.* at 1077, and the Establishment Clause concern did not factor into its Free Speech analysis, *see id.* at 1070-77. Regardless, the Equal Protection Clause presents a similar concern here that the Establishment Clause did in *Bishop*. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230-31 (2023).

(somewhat) similar legislation in Florida. Doc. 1 ¶ 73 (citing *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022)[9]). In *Pernell*, the Florida court sought to distinguish *Bishop* by reasoning that the State "cannot impose its own orthodoxy of viewpoint about the content it allow[s] within the university classrooms." 641 F. Supp. 3d at 1273. But that is *precisely* what the Eleventh Circuit approved in *Bishop*: The university "allowed inclusion of a subject into the curriculum"—human physiology—and then "impose[d] its own orthodoxy of viewpoint about the content it allowed within the university classrooms" by prohibiting the professor from discussing his religious viewpoint in class, even though "it represent[ed] his professional opinion about his subject matter." 926 F.2d at 1077.

Any other reading of *Bishop* leads to absurdity. Under the *Pernell* court's theory, once a university greenlights a course on the history of civil rights in Alabama, it becomes powerless to stop a professor from teaching—and requiring students to agree—that Bull Connor was, by virtue of his race, inherently superior to the black protestors and thus justified in his brutal tactics. Or—to take a real fact pattern from a high school in New Jersey—if a university agreed to offer a course on world history, it would then have to allow a professor to teach students that what Jews "claim happened in the concentration camps did not really happen." *Ali v. Woodbridge Twp.*

---

[9] *Pernell* is pending appeal at the Eleventh Circuit. *See Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992 (11th Cir. argued June 14, 2024).

*Sch. Dist.*, 957 F.3d 174, 178, 184 (3d Cir. 2020) (rejecting teacher's claim that his First Amendment rights were violated when he was fired for teaching anti-Semitic views in class). Thankfully, that is not the law. And because it is not, the Professor Plaintiffs have failed to state a claim in Count One upon which relief can be granted.

**B.    Public University Students Are Subject to the State's Curricular Choices in the Classroom.**

Plaintiff Luna's First Amendment claim in Count Two fails for similar reasons. To the extent any purported "right to receive information" exists, "the students' right to receive information is coextensive with the university professors' asserted right to free speech with respect to their in-class speech," as even the *Pernell* court recognized. 641 F. Supp. 3d at 1243 n.18. That is because any right to receive information necessarily depends on "the *sender*'s First Amendment right to send [it]." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). Because no professor at a public university has a "First Amendment right to send" information in a classroom setting that the State prohibits, *Bishop*, 926 F.2d at 1077, no student at a public university has a First Amendment right to "receive" such information. Again, were it otherwise, States would be in a quandary if students wanted to learn, and professors wanted to teach, that the Holocaust never happened or that one race is inherently superior to another. The First Amendment does not mandate such absurdity. Count Two should be dismissed.

### C.    Public University Student Groups Promoting Divisive Concepts Do Not Have a First Amendment Right to Preferential Treatment.

Plaintiffs' claims in Counts Three and Four rely on a remarkable red herring. Asserting that the Act mandates discrimination against university student groups "based on the purported viewpoints of those organizations and/or their members," Plaintiffs claim the mantle of *Rosenberger* and argue that the Act violates the First Amendment. Doc. 1 ¶¶ 250-51. Not quite—though this will take a bit to unpack.

*First*, start with *Rosenberger*, which indeed is the seminal case in the area. In that case, the University of Virginia created a limited public forum for student groups to compete on equal footing for access to student activity funds distributed by the student council. 515 U.S. at 823-24. To be eligible for that funding, each student group had to be a "Contracted Independent Organization," or "CIO"—basically, a student organization recognized but not directly controlled by the university—and fit within certain categories for funding. *Id.* at 824-25. One of the funded categories was for student news and opinion organizations. *Id.* Even so, UVA denied funding to a recognized "CIO" wishing to establish a student magazine for philosophical and religious expression. *Id.* at 825-26. The reason for its denial? Because the organization's viewpoint was "religious." *Id.*

Unsurprisingly, the Supreme Court held that UVA's decision constituted unlawful viewpoint discrimination under the First Amendment. *Id.* at 829-30. The Court explained that UVA had created a limited public forum when it decided to

36

"expend[] funds to encourage a diversity of view from private speakers"—the "CIOs." *Id.* at 834. Having done so, the Court held, "the State must respect the lawful boundaries it has itself set" and may not "discriminate against speech on the basis of its viewpoint." *Id.* at 829. UVA thus had to treat student magazines offering a religious viewpoint the same as other student magazines.

*Next*, consider the structure of student groups at UAB. As Plaintiffs explain, UAB recognizes both "University Funded Organizations" and "Registered Student Organizations." Doc. 1 ¶ 119. Because a "University Funded Organization" is directly sponsored and funded by the university, *id.*, its speech is directly controlled by the university. *See Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes…."). A "Registered Student Organization," on the other hand, is like the "CIO" in *Rosenberger*. It is a student group or club that is recognized by the university, but only at arm's length; it "must apply to the Undergraduate Student Government Association ('USGA') each semester or secure an alternative source of funding." Doc. 1 ¶ 119. "UAB's student government association distributes about $170,000 in state funding to student groups every year, and about $53,000 of that funding goes to RSOs." *Id.* As in *Rosenberger*, the speech of a "Registered Student Organization" is, for most purposes, not considered the university's.

*Third*, turn to the Act. Section 2(1) provides that state universities may not "*[s]ponsor* any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs." Act § 2(1) (emphasis added). And Section 2(8) provides that universities may not "[a]uthorize or expend funding … for the purpose of compelling assent to any divisive concept or any other purpose prohibited in this act, provided that such funding *may* be provided to student, faculty, or staff organizations or associations." *Id.* § 2(8) (emphasis added). The Act then includes this safe harbor in Section 4: "Nothing in this act … [p]revents students, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to *sponsor* these programs. If a student, staff or faculty organization or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event." *Id.* § 4(1) (emphasis added).

The Act thus distinguishes between activities and organizations a university directly "sponsors"—such as "University Funded Organizations" or particular events—and student organizations it merely "funds"—such as "Registered Student Organizations." The university cannot directly "sponsor" a DEI program or any other activity that violates the Act—and that comports with *Rosenberger* because the restrictions are of the university's *own* speech. But the university can provide

general "funding" to student organizations *not* directly "sponsored" by the university, no matter their viewpoint. In this way, all "Registered Student Organizations" are treated the same, and none are denied funding because of their viewpoint. The Act complies with *Rosenberger*. And even if there were doubt about whether this is the best reading of the Act standing alone, that doubt must be resolved in a way that construes the Act in a constitutional manner—as the Act itself requires. *See* Act § 4(9) ("Nothing in this act … [m]ay be construed to inhibit or violate the First Amendment rights of any student"); *Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1292 (11th Cir. 2022) (instructing courts to "uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities" (quotation omitted)).

*Fourth*, return now to Plaintiffs' claims. Plaintiffs complain that the Social Justice Advocacy Council (SJAC) was "demoted" from a "University Funded Organization" to a "Registered Student Organization." Doc. 1 ¶ 122. Plaintiffs' complaint is thus that SJAC is no longer within the umbrella of the university's own speech and is now—horror of horrors—treated *just like other student organizations on campus*. *See also* Doc. 1 ¶¶ 124-25 (discussing similar complaints regarding treatment of Esperanza).

Such treatment, of course, is precisely what the student magazine in *Rosenberger* sought: to be able to apply, on equal footing with other student organizations,

for funding from the student government without regard to its viewpoint. *See* 515 U.S. at 823-28. And to be clear, Plaintiffs here do *not* assert that they applied for and were denied such funding based on their viewpoints (or for any other reason). *See generally* Doc. 1 ¶¶ 118-32. Plaintiffs never explain why they think *Rosenberger* entitles them to preferential treatment, which it does not.

*Fifth*, as for Plaintiffs' complaints that UA reallocated campus spaces into offices and a food pantry, *see* Doc. 1 ¶¶ 131-32, these claims fail because Plaintiffs have not shown that UA is operating a public forum of any kind in those spaces. It is blackletter law that the State has control over its spaces, may use those spaces to promote its preferred messages, and may even condition funding or access to benefits based on a recipient's agreement to promote the government's message. *E.g.*, *Rosenberger*, 515 U.S. at 829 (noting that public schools "may legally preserve the property under [their] control for the use to which it is dedicated" and can, in so doing, reserve such spaces "for certain groups or for the discussion of certain topics" (quotation omitted)).[10] To the extent UA's decisions about how best to use its own

---

[10] *See also, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (holding that "[a] government entity may exercise … freedom to express its views" even "when it receives assistance from private sources for the purpose of delivering a government-controlled message").

facilities involved expressive conduct of any kind, it was necessarily the university's own. "[T]he Free Speech Clause has no application." *Summum*, 555 U.S. at 467.

Even if Plaintiffs had shown that UA was operating a limited public forum, their claims would still be foreclosed. Again, *Rosenberger* does not guarantee student organizations preferential treatment; it guarantees them equal treatment without regard to their viewpoint. *See also Widmar v. Vincent*, 454 U.S. 263, 277 (1981). But Plaintiffs' complaints are about the loss of *dedicated* office space for third-party organizations like the Black Student Union and the Safe Zone Resource Center, similar to UAB's reclassification of SJAC from a "University Funded Organization" to a "Registered Student Organization." Once again, Plaintiffs cannot explain why they think the Constitution requires UA to treat these groups more favorably than other student groups. Nor do they claim that these groups have been treated *less* favorably than other student groups when it comes to reserving event space or hosting events on campus—or, indeed, that these groups have even tried to reserve such space. Counts Three and Four should be dismissed.

## III.  Plaintiffs' Vagueness Challenge Fails Because The Act Is Readily Understood.

Plaintiffs' vagueness challenge in Count Five also fails. To begin, Plaintiffs once again ignore the context of their primary complaint: Alabama's oversight of its curriculum taught by its teachers in its classrooms. At least for the Professor Plaintiffs, that means that a lower vagueness standard applies. "In the public employment

context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)). Provisions regulating such conduct are "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (quoting *Bongiovanni*, 961 F.2d at 1136).

This is not a stringent standard. The Supreme Court in *Arnett v. Kennedy* rejected a public employee's argument that an employment provision "authorizing removal or suspension without pay 'for such cause as will promote the efficiency of the service'" was "vague and overbroad." 416 U.S. 134, 156 (1974). The former Fifth Circuit in *Garrett v. Matthews* rejected a claim by a UA professor who argued that "the term 'adequate cause' [was] too vague to meet due process standards" for revoking tenure. 625 F.2d 658, 660 (5th Cir. 1980). And the *Bongiovanni* court—relied on by the Eleventh Circuit in *O'Laughlin*—rejected a vagueness challenge to a provision requiring professors "to maintain 'standards of sound scholarship and competent teaching.'" 961 F.2d at 1137.

If those amorphous standards are not vague, Alabama's law certainly is not. The Act clearly defines its terms and states in everyday English the acts that are prohibited. *See* Act §§ 1-2. "To the extent that any vagueness concerns still linger,

they are mitigated by two additional characteristics of the [Act]: (1) scienter requirements that must be satisfied …, and (2) a safe harbor option." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 27 (D.C. Cir. 2009); Act § 3 ("knowingly" scienter requirement); *id.* § 4 (safe harbor provisions); *see Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."). The Act also requires that "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall remain subject to relevant policies established by the institution," further alleviating vagueness concerns. Act § 3(1); *see U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973). And if any ambiguity remains after all that, the Act itself instructs how to resolve it: by construing its provisions in a way that does not "inhibit or violate the First Amendment rights of any student or employee." Act § 4(9); *see Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493 (1983) ("Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality."). While there are always "limitations in the English language with respect to being both specific and manageably brief," and the Act's "prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Letter Carriers*, 413 U.S. at 578-79.

Indeed, even where a heightened vagueness standard applies, "[t]he strong presumptive validity that attaches to" legislation means "that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). "Close cases can be imagined under virtually any statute," but "the mere fact that close cases can be envisioned" does not "render[] a statute vague," even where First Amendment speech rights are involved. *United States v. Williams*, 553 U.S. 285, 305-06 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. Accordingly, "[t]o succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'" *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)). If there is conduct that is clearly proscribed by the statute, the statute is not vague.

That is the case here. To take just a couple of examples, a professor who requires his students to assent to the concept that "White people are inherently superior to Black people" has clearly violated the Act. *See* Act §§ 2(3), 1(2)(a). So has a professor who compels her students to personally affirm that all Germans are

44

inherently responsible for actions committed in the past by the Nazis. *See* Act §§ 2(2), 1(2)(e). Other clear examples abound. That being so, Plaintiffs cannot complain about any "close cases" they can conjure.

Nor do Plaintiffs' gripes about individual terms in the Act get them closer. Plaintiffs complain, for instance, about the word "objective," claiming that "no reasonable person can determine" what "objective" means in the context of the Act. Doc. 1 ¶ 9. But "objective" is not a difficult concept for college professors (or jurors,[11] or courts[12]) to understand: In the Act's context, it means discussing concepts "without distortion by personal feelings, prejudices, or interpretations." *Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/objective. The safe harbor provision that contains the term makes that clear: "Nothing in this act … [p]rohibits … the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept." Act § 4(3)(b). Plaintiffs may not like the meaning of this provision, but that meaning is not hard to grasp.

---

[11] *E.g.*, Judicial Council of the United States Eleventh Judicial Circuit, *Pattern Jury Instructions, Civil Cases* 4.19 (2024 revision) (instructing jurors to determine whether a "belief was objectively reasonable" under the circumstances).

[12] *E.g.*, *Speech First*, 32 F.4th at 1120 (explaining that the "fundamental question" for assessing First Amendment harm is "whether the challenged policy *objectively* chills protected expression" (emphasis added and quotations omitted).

More fundamentally, Plaintiffs' objections primarily concern terms like "objective" and "without endorsement" in Section 4 of the Act listing various safe harbors. *See* Doc. 1 ¶¶ 9, 146. But a safe harbor simply "afford[s] protection from liability or penalty." *Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024). Its purpose is not to define the world of prohibited conduct (though it can certainly clarify that world, which is why courts recognize that such provisions resolve ambiguity). And here, it is Section 2 of the Act that lists what conduct is prohibited. Under that section, a state university may not:

- "Sponsor" a DEI program;

- "Direct or compel a student … to personally affirm, adopt, or adhere to a divisive concept";

- "Require" students "to attend or participate" in "course work that advocates for or requires assent to a divisive concept";

- "Require a student …to share his or her personal point of view on any divisive concept outside of an academic setting";

- "Require" students "to participate, as part of any required curriculum … in an activity that involves lobbying … related to divisive concept";

- "Penalize or discriminate against a student … on the basis of his or her refusal to support, believe, endorse embrace, confess, or otherwise assent to a divisive concept or diversity statement";

- "Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color";

- "Authorize or expend funding … for the purpose of compelling assent to any divisive concept."

46

Act§ 2(1)-(8). Each of these provisions gives a reasonable person notice of what conduct is prohibited by the Act. Plaintiffs cannot show that *each and every* one of these prohibitions is so unintelligible that the Act is unconstitutionally vague in its entirety.[13]

Last, Plaintiffs say the Act's definition of a "diversity, equity, and inclusion" program makes the Act vague and unenforceable. Doc. 1 ¶ 212. But the definition is clear: A DEI program is "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." Act § 1(3). The "term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order." *Id.* Plaintiffs never say why they think this definition is unintelligible. As with the rest of the Act, the terms in the definition are readily understood, and the only possibly unclear term—"based on"—is one that is regularly used to denote something akin to proximate cause. *E.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-58 (1993) (explaining that "based upon" "calls for something more than a mere connection with, or relation to"); *Glob. Marine Expl., Inc. v. Republic of France*, 33 F.4th 1312, 1324 (11th Cir. 2022).

---

[13] These terms also litter the code books, yet litigants elsewhere seem to be getting by alright. *E.g.*, Ala. Code § 15-21-30(a) ("compel"); Ala. Code § 16-1-20.5(b) ("discriminate against"), (c) ("penalize").

Because Plaintiffs' vagueness challenge fails as a matter of law, Count Five should be dismissed.

## IV. Plaintiffs Have Not Alleged Facts That, If True, Would Show Intentional Discrimination.

Plaintiffs' last claim alleges intentional race-based discrimination under the Fourteenth Amendment's Equal Protection Clause. *See* Doc. 1 ¶¶ 264-76. This claim also fails and should be dismissed.

Plaintiffs do not claim that the Act "discriminates on its face" or that Defendants are "unequally administering a facially neutral statute." *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). That makes sense because the law is facially neutral and is applied even handedly. The law applies to professors, students, and student groups of any race, religion, sex, ethnicity, or national origin, and it protects students of any race, religion, sex, ethnicity, or national origin from being compelled to affirm (for instance) that "any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." Act § 1(2)(a). Alabama's antidiscrimination law is color blind and prohibits race-based discrimination in public schools and universities, just as the Equal Protection Clause requires. *See Students for Fair Admissions*, 600 U.S. at 230.

Plaintiffs instead rely on a theory of intentional discrimination to claim that the State's facially neutral law is nonetheless unconstitutional. There are two prongs to such a claim. "Plaintiffs must first show that the State's decision or act had a

discriminatory purpose and effect." *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1321 (11th Cir. 2021) (quotation omitted) ("*GBM*"). "If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Id.* Second, if both "discriminatory intent and effect are established," the burden shifts "to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor." *Id.* (alteration in original) (quoting *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985)). Plaintiffs cannot meet either requirement of prong one.

"To plead animus, [Plaintiffs] must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To evaluate whether they have met their burden, the Court must conduct a "sensitive inquiry into … circumstantial and direct evidence of intent" based on Plaintiffs' allegations. *Arlington Heights*, 429 U.S. at 266. The Supreme Court and Eleventh Circuit have suggested considering the following factors: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; … (5) the contemporary statements and actions of key legislators[;] … (6) the foreseeability of the disparate

impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1322.

In conducting this analysis, the Court should keep in mind two overarching presumptions. First, Plaintiffs "bear[] the burden of showing that the *Arlington Heights* factors weigh in favor of a finding that the [Alabama] Legislature enacted SB [129] with a discriminatory purpose." *D.N. by Jessica N. v. DeSantis*, -- F. Supp. 3d --, No. 21-CV-61344, 2024 WL 5165857, at *5 (S.D. Fla. Dec. 19, 2024) (dismissing claims of intentional discrimination under Rule 12(b)(6)); *see Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State.").

Second, "[t]h[e] presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024). That is because the entire point of the *Arlington Heights* exercise is to determine whether "judicial deference" to the Legislature "is no longer justified"—a conclusion that can be arrived at only *after* there is "proof" of "discriminatory purpose." *Arlington Heights*, 429 U.S. at 265-66. Here, then, the Court must consider whether Plaintiffs' factual allegations are "strong enough to

50

*overcome* the presumption of legislative good faith." *Abbott*, 585 U.S. at 610 (emphasis added). As explained next, they are not.

### A. Plaintiffs Have Not Alleged Facts Showing That the Act Disparately Impacts Black Individuals (Factor 1).

Nothing on the face of the Act lends credence to Plaintiffs' theory that it disparately impacts black professors and students. Indeed, Plaintiffs simply ignore who else might be affected by the Act, and they fail to allege any meaningful comparisons of the law's impact on black individuals compared to individuals of other races. But it is the comparison that matters—whether the Act "bears more heavily on one race *than another.*" *GBM*, 992 F.3d at 1321 (quotation omitted; emphasis added); *see League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 932-38 (11th Cir. 2023). It is not enough for Plaintiffs to repeat their legal conclusion that the law "disproportionately harms" black individuals, Doc. 1 ¶ 207; they must allege facts showing that.

As the Board Defendants explain in their memorandum, the first clue that Plaintiffs fail to allege disparate impact against black students and professors is that *non*-black students and professors allege the very harms the Equal Protection Plaintiffs rely on to show disparate impact against them. Professor Patton is a white woman. Doc. 1 ¶ 18. Professor Fording is a white man. *Id.* ¶ 19. Both claim that the Act harms their purported First Amendment right to advocate for the prohibited divisive concepts in class—the same allegations underpinning the Equal Protection

Plaintiffs' allegation of "disproportionate harms to black faculty." *Compare id.* ¶¶ 97-108 *with id.* ¶¶ 220-25.

Similarly, "Plaintiff Miguel Luna is a Gay Latino man." *Id.* ¶ 22. He is the only Plaintiff to allege harm based on the Act's purported "impact on students' receipt of information." *Id.* ¶¶ 109-17, 233-44. Yet the Equal Protection Plaintiffs rely on the exact same harm to claim that the Act "chill[s] important speech in classroom discussions … that advance a viewpoint in support of racial equality for Black people." *Id.* ¶ 200.

Luna and Plaintiff Isabella Campos—"a Lesbian Latina woman," *id.* ¶ 21— also run the Latine-focused student group Esperanza, which they claim has been harmed by being treated like other student organizations rather than receiving preferential funding from the university, *id.* ¶¶ 124-25. Once again, those are the same harms the Equal Protection Plaintiffs rely on for their claim that the Act's "curtailment on university funding for student organization disproportionately impacts Black students." *Id.* ¶ 210.

To be sure, it is theoretically possible that a law could disparately impact more than one race. But that is not what Plaintiffs allege in their Equal Protection claim; it is certainly not what Plaintiffs show; and the facts Plaintiffs do allege undermine such a theory. Plaintiffs' complaint "is plagued not by what it lacks, but by what it contains": "All of the paths to relief which the pleading suggests are blocked by the

allegations" supporting Plaintiffs' other claims. *Gill*, 941 F.3d at 512 (quotation omitted). No amount of idle comparison to race-neutral groups like "the Economics Student Association" and "the Philosophy Club," Doc. 1 ¶ 215, can "nudge[] their claim[]" of disparate impact on black students and faculty "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

Plaintiffs also ignore the wider scope of the Act, which applies not just to Alabama's universities but to state agencies and local school boards overseeing K-12 schools. *See* Act § 2. Nowhere do Plaintiffs provide any allegations regarding how individuals in those contexts may be affected by the Act; understandably, they do not, for instance, claim that a disproportionate share of black kindergarten teachers will be harmed by not being able to compel the children in their care to parrot the idea that "the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." Act § 1(2)(c). The first *Arlington Heights* factor weighs against Plaintiffs.

### B.    Plaintiffs' Allegations Regarding the Legislature's Knowledge of the Law's Impact Do Not Suggest Intentional Discrimination (Factors 6 & 7).

Given that Plaintiffs have not shown that the Act disparately impacts black individuals, the Court should be "skeptical that the Legislature could have foreseen a disparate impact." *League of Women Voters*, 66 F.4th at 938. "In any event, the evidence of foreseeability on which [Plaintiffs] rel[y] [is] deficient." *Id.*

To show that "Alabama legislators had notice of the ways in which SB 129 would harm Black people," Plaintiffs rely on: (1) a statement from Representative Chestnut that the Act "would 'threaten the essence' of Historically Black Colleges and Universities," (2) a statement from Senator Smitherman that the passage of the bill "will set [black people] back for years and decades and generations," (3) a statement from Camille Bennett that the bill was "inherently racist," (4) a statement from Plaintiffs' counsel the ACLU of Alabama that the bill "could lead to censorship of affinity groups in public universities," and (5) a preliminary ruling from a district court in Florida enjoining that state's law "due to First Amendment and Fourteenth Amendment Due Process violations." Doc. 1 ¶¶ 193-99.

First, "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters*, 55 F.4th at 940.

Second, and in any event, Plaintiffs do not explain why they think these allegations could show that the entire legislative body foresaw that the Act would disparately impact black individuals. In light of the presumption of legislative good faith, it is much more plausible that any legislator who was aware of these statements simply rejected them in good faith—which, given Plaintiffs' allegations, they had ample reason to do. Plaintiffs have provided no factual allegations showing that "the essence" of Historically Black College and Universities has in fact been threatened

54

by Alabama's nondiscrimination law. Or that the law set black people back "for years and decades and generations." Or that that the law is "inherently racist" by *prohibiting* professors from compelling students to agree "[t]hat any race … is inherently superior or inferior." Act § 1(2)(a). Or that the law has "le[d] to censorship of affinity groups in public universities." Or that a preliminary ruling by a district court in another state about that state's law on grounds *other than equal protection* would lead anyone to reasonably infer anything about the impact Alabama's law would have on black individuals here.[14] Factors 6 and 7 of the *Arlington Heights* analysis do not help Plaintiffs in their quest to show intentional discrimination.

### C. The Historical Background Does Not Suggest Intentional Discrimination by the Alabama Legislature in 2024 (Factor 2).

Plaintiffs' discussion of the historical background of the Act starts … in 1831, with the founding of the University of Alabama system. Doc. 1 ¶ 35. It continues through the enactment of the State Constitution in 1901, then camps out in the Civil Rights Movement of the 1960s before jumping to isolated events—largely by private actors—in the 2000s. *See id.* ¶¶ 36-62. No doubt about it: Alabama regrettably

---

[14] Plaintiffs also invoke a preliminary injunction issued by the Western District of Oklahoma, which Plaintiffs note was granted "partly on Equal Protection claims." Doc. 1 ¶199 n.163. That injunction was entered on June 14, 2024—three months *after* Alabama enacted SB 129. *Compare Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1158 (W.D. Okla. 2024) (entering injunction on June 14, 2024), *with* Doc. 1 ¶ 188 (alleging that SB 129 "was enacted on March 19, 2024). Plaintiffs cannot rely on that ruling as evidence of the Alabama Legislature's knowledge about the impact its law would have.

"played its own role" in our country's "ignoble history" of racial discrimination. *Students for Fair Admissions, Inc.*, 600 U.S. at 203.

The Eleventh Circuit has instructed courts to be "mindful of the danger of allowing the old, outdated intentions of previous generations to taint Alabama's legislative action forevermore on certain topics." *GBM*, 992 F.3d at 1325. So while "Plaintiffs point to the racist history of Alabama as a significant barrier for [Defendants] to overcome in defending this law," "it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws." *Id.* The appellate court has "rejected the argument that a racist past is evidence of current intent" and explained that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *League of Women Voters of Fla.*, 66 F.4th at 923 (cleaned up). "[T]he presumption of legislative good faith," the Court has emphasized, applies "even in the light of a finding of past discrimination." *Id.* (quotation omitted). Plaintiffs' discussion of Alabama's past history does not show intentional discrimination by the Alabama Legislature in 2024.

Coming closer to the right time horizon, Plaintiffs pick up their narrative in 2016, when "Identity Evrope, a White nationalist organization, targeted UAB with posters depicting European slogans that included, 'our future belongs to us.'" Doc. 1 ¶ 59 (footnotes omitted). And "[i]n 2019," Plaintiffs allege, "several faculty

members of the UAB Department of Biology were uncovered to have promoted White supremacist views." *Id.* at ¶ 60.

These allegations, too, fail to show intentional discrimination by the Alabama Legislature in 2024. Plaintiffs do not allege that the Legislature was involved in these incidents; and to the extent these incidents played a role at all in the legislative process, the "'obvious alternative explanation'" to "purposeful, invidious discrimination" is that the Legislature enacted SB 129 precisely to *prohibit* professors from compelling their students to accept the kinds of racially discriminatory views Plaintiffs complain occurred at UAB. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Twombly*, 550 U.S. at 567).

Plaintiffs next turn to 2020, when "millions of Americans—and people across the globe—participated in worldwide protests against police brutality and racial injustice." Doc. 1 ¶ 63. Plaintiffs allege that "Alabama university students participated in these demonstrations" and that "the Board of Trustees created a committee to review building names." *Id.* ¶ 64. According to Plaintiffs, "UA also attempted to address longstanding complaints about racial discrimination and segregation within the university's Greek life through a 'DEI passport' program," which "tracked the number of 'cultural' events that students attended and rewarded campus groups with priority seating in the school's football stadium based on their members' attendance at these events." *Id.* ¶ 65.

Plaintiffs note that 2020 was also when President Trump issued an executive order that "prohibited federal agencies and institutions, federal contractors, and federal grant recipients from engaging in certain speech," including certain "divisive concepts"—such as that "one race or sex is inherently superior to another race or sex." *Id.* ¶ 69 & n.89. Plaintiffs highlight that a district court preliminarily enjoined enforcement of the executive order and that President Biden rescinded it. *Id.* ¶ 72.

These events, too, fail to create a plausible inference that the Alabama Legislature acted with racial animus when it passed SB 129 in 2024. The Legislature had nothing to do with these events. And President Trump's order was enjoined on First Amendment and Due Process grounds; the injunction cannot give rise to an inference of intentional discrimination by the President, much less by the Alabama Legislature four years later. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 540-45 (N.D. Cal. 2020). To the extent that any of these events informed the Legislature's thinking at all, Plaintiffs have not alleged facts that could overcome the presumption of legislative good faith. The second *Arlington Heights* does not help Plaintiffs.

### D. Plaintiffs' Allegations Concerning Events Leading Up to the Act's Passage and the Contemporary Statements of Legislators Do Not Evince a Discriminatory Legislative Purpose (Factors 3 & 5).

In their discussion of events leading up to the Act's passage, Plaintiffs discuss various versions of various bills that the Alabama House and Senate considered in

2022 and 2023. Doc. 1 ¶¶ 165-70. Some of these bills would not have banned DEI programs in higher education. *Id.* ¶ 166. Some noted that "slavery and racism" are "deviations from … the founding principles of the United States." *Id.* ¶ 170. None "receive[d] meaningful consideration" by the Legislature. *Id.* ¶ 168. This history does not show a discriminatory purpose by the Legislature in 2024, particularly given that it is "largely unconnected to the passage of the actual law in question." *GBM*, 992 F.3d at 1324.

Nor do the isolated statements by two individual legislators—Senator Barfoot and Representative Oliver—and Governor Ivey that Plaintiffs highlight. Doc. 1 ¶¶ 75-81, 177-78. Plaintiffs allege that Representative Oliver claimed that DEI "in-doctrinate[s] students into a far-left political ideology" and that Senator Barfoot said that "DEI sounds inviting and sounds like something we should all get behind, but in fact those DEI offices around the state have been used to silo people by race, by color, by religion, ethnicity or national origin." *Id.* ¶ 79 (alteration in original; foot-notes omitted). Likewise, Plaintiffs allege that Governor Ivey said: "[M]y admin-istration has and will continue to value Alabama's rich diversity, however, I refuse to allow a few bad actors on college campuses—or wherever else for that matter—to go under the acronym of DEI, using taxpayer funds, to push their liberal political movement counter to what the majority of Alabamians believe." *Id.* ¶ 81.

Again, applying the presumption of legislative good faith, the most that can be said about these statements is that (1) Senator Barfoot was concerned that DEI discriminated *against* individuals based on race; and (2) Representative Oliver and Governor Ivey were concerned about the *political* ramifications of DEI. "[P]artisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). The statements do not imply animus.

More fundamentally, even if these statements could show an intent to discriminate, the isolated statements by just two legislators and the Governor cannot demonstrate "that the legislature as a whole was imbued with racial motives." *Id.* Plaintiff cannot "impute the discriminatory intent of one or a few decisionmakers to the entire group." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 836 (11th Cir. 2020); *see GBM*, 992 F.3d at 1324 (expressing "skepticism that the discriminatory intent could be ascertained from the statements of one legislator"). And without more, Plaintiffs cannot raise a plausible inference that the entire legislative body acted with an intent to discriminate against black individuals when it enacted SB 129. The third and fifth *Arlington Heights* factors weigh against Plaintiffs.

### E. Plaintiffs Have Not Identified Any Meaningful Procedural or Substantive Departures in the Legislative Process That Indicate Animus (Factor 4).

Plaintiffs allege that "[t]he Alabama Legislature enacted SB 129 through a rushed and atypical legislative process." Doc. 1 ¶ 182. They claim that (1) the bill

was posted on the Alabama Legislative website the day before the first hearing, (2) that it passed quickly through the Senate, (3) that a House Committee hearing took place on a Tuesday rather than a Wednesday, and (4) that "legislation in Alabama normally takes at least two months two become law," whereas "it took less than a month for the Legislature to introduce SB 129 and enact it into law." *Id.* ¶¶ 183-89. Assuming these allegations are true, so what? The most "obvious" reason the Legislature would act quickly to pass a bill is that the bill was a priority; "purposeful, invidious discrimination … is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (quotation omitted). That is particularly true here in light of the presumption of legislative good faith.

Plaintiffs' other piece of evidence is that, "[u]pon information and belief, SB 129 marks the first time that the Alabama Legislature has regulated what is taught in public universities" rather than allowing the Alabama Commission on Higher Education to handle the matter. Doc. 1 ¶¶ 190-91. Again: So what? Even if the allegation were true, it would show only that the Legislature cared about enacting a law to prevent race discrimination at *all* of the State's schools. It cannot raise a plausible inference of racial discrimination by the Legislature. The fourth *Arlington Heights* factor also weighs against Plaintiffs.

**F.    The Act Accomplishes the State's Compelling Interests In a Way Plaintiffs' Proposed Alternatives Would Not (Factor 8).**

Plaintiffs devote exactly one sentence to the final *Arlington Heights* factor: They allege that "any legitimate purpose behind SB 129 could be achieved through less discriminatory means, such as enforcement of existing anti-discrimination laws and/or the normal procedures regulating higher education, which encompasses the pedagogical expertise of trained educators rather than favored viewpoints of political actors in the Alabama Legislature." Doc. 1 ¶ 276.  This is insufficient.

First, "the fact that 'the Alabama [L]egislature did not include the alternative option[s] that Plaintiffs would have preferred' is not evidence of discriminatory intent." *League of Women Voters*, 66 F.4th at 940 (alteration omitted; remaining alterations in original) (quoting *GBM*, 992 F.3d at 1327). "The legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it." *Id.*

Second, that the Legislature favored enacting *additional* antidiscrimination provisions rather than relying on "existing anti-discrimination laws" shows only that the Legislature thought the existing protections were insufficient—not that the additional protections were somehow enacted with a discriminatory purpose. Plaintiffs do not even try to show that the Legislature's belief was so irrational that it could be explained only by animus.

Third, nothing in the Constitution requires State Legislatures to defer to the "pedagogical expertise of trained educators" to allow professors to compel students to believe "[t]hat individuals should be discriminated against or adversely treated because of their race." Act § 1(2)(b). "Indeed, if our history has taught us anything, it has taught us to beware of elites bearing racial theories." *Students for Fair Admissions*, 600 U.S. at 268 (Thomas, J., concurring) (quotation omitted). "In part for this reason, the Fourteenth Amendment outlaws government-sanctioned racial discrimination of all types," no matter what the "trained educators" say. *Id.* The State's interest in complying with this constitutional mandate is compelling, and Plaintiffs offer nothing that would allow the State to meet that interest another way. The last *Arlington Heights* factor weighs decisively against Plaintiffs.

* * *

"Overall, the *Arlington Heights* [factors] are meant to assist this Court in determining whether racially discriminatory intent existed when the Alabama [L]egislature passed" SB 129 in March 2024.  *GBM*, 992 F.3d at 1327. "After examining all of the *Arlington Heights* factors, it is clear that Plaintiffs have failed to" allege facts that, if true, could "prove that the law was enacted with discriminatory intent." *Id.* That being the case, the Court should dismiss Count Six of Plaintiffs' Complaint.

## CONCLUSION

Even assuming the truth of the facts Plaintiffs allege, Plaintiffs cannot meet their burden of establishing this Court's jurisdiction to hear their claims against Governor Ivey. Nor can they state a claim upon which relief can be granted. Alabama's law is constitutional, protecting students from discrimination that sorts students by race and compels assent to racial concepts at odds with the State's curricular choices and our Constitution's promise of equality under the law. The law is easily understood, and to the extent there is doubt on that score, it certainly can—and therefore must—be interpreted in a manner that comports with the Constitution. And Plaintiffs have failed to allege facts that could show that the State's law *prohibiting* race-based discrimination in Alabama's education system was enacted because of a secret intent to discriminate against black individuals. The Court should dismiss Plaintiffs' Complaint against Governor Ivey in her official Capacity as Governor.

Date: March 25, 2025                    Respectfully submitted,

                                        Steve Marshall
                                          *Attorney General*

                                        James W. Davis (ASB-4063-I58J)
                                          *Deputy Attorney General*

                                        s/ A. Barrett Bowdre
                                        A. Barrett Bowdre (ASB-2087-K29V)
                                          *Principal Deputy Solicitor General*

                                        George Muirhead (ASB-7345-K00L)
                                          *Assistant Solicitor General*

                                        OFFICE OF THE ATTORNEY GENERAL
                                        STATE OF ALABAMA
                                        501 Washington Avenue
                                        Post Office Box 300152
                                        Montgomery, Alabama 36130-0152
                                        Telephone: (334) 242-7300
                                        Facsimile: (334) 353-8400
                                        Jim.Davis@AlabamaAG.gov
                                        Barrett.Bowdre@AlabamaAG.gov
                                        George.Muirhead@AlabamaAG.gov

                                        *Counsel for Defendant Kay Ivey in her*
                                        *official capacity as Governor of Alabama*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on March 25, 2025, which will serve all counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendant Kay Ivey in her*
*official capacity as Governor of Alabama*