IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASSANDRA SIMON, SYDNEY ) 
TESTMAN, MIGUEL LUNA, )
ISABELLA CAMPOS, DANA )
PATTON, RICHARD FORDING AND )
THE ALABAMA STATE )
CONFERENCE OF THE NAACP, )
)
    Plaintiffs, )
)
vs. )   Case No. 2:25-cv-00067-MHH
)
KAY IVEY in her official capacity as )
Governor of Alabama and President Ex- )
Officio of the University of Alabama )
Board of Trustees, SCOTT PHELPS in )
his official capacity as President Pro )
Tempore University of Alabama Board )
of Trustees, MIKE BROCK, KAREN )
BROOKS, MYLA E. CALHOUN, )
RONALD GRAY, JEFF GRONBERG, )
O.B. GRAYSON HALL, JR., )
BARBARA HUMPHREY, W. DAVIS )
MALONE III, EVELYN VANSANT )
MAULDIN, HARRIS MORRISSETTE, )
J. STEVEN ROY, KENNETH SIMON, )
MARIETTA URQUHART AND )
KENNETH VANDERVOORT in their )
official capacities as members of the )
University of Alabama Board of Trustees )
)
    Defendants.

**MEMORANDUM IN SUPPORT OF THE BOARD DEFENDANTS'
MOTION TO DISMISS**

In Count VI of the Complaint, Plaintiffs Simon, Testman, and Alabama NAACP allege they have been "harmed by intentional discrimination of SB 129 as implemented by the University of Alabama system" in violation of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1 ¶¶ 264-276).[1] Plaintiffs' claims, however, fail for the following reasons:

*First*, the Alabama NAACP does not have standing to pursue its equal protection claim.

*Second*, Plaintiffs' equal protection claim fails because it is based on alleged harms that do not arise from SB 129 or the University's implementation thereof.

*Third*, Plaintiffs' equal protection claim fails because Plaintiffs have not alleged that they are being treated differently than similarly situated persons.

I. **THE ALABAMA NAACP DOES NOT HAVE STANDING TO PURSUE AN EQUAL PROTECTION CLAIM AGAINST THE BOARD DEFENDANTS.**

As an initial matter, the Alabama State Conference of the NAACP ("Alabama NAACP") does not have standing to assert a claim on behalf of unnamed members. As the Board Defendants explained in their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. 26 at 26-27), to establish associational standing, an organization must "make specific allegations establishing that at least

---

[1] For Counts I-IV, the Board Defendants adopt and incorporate the arguments set forth in their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. 26) relating to Plaintiffs' First Amendment claims. For Count V, the Board Defendants adopt and incorporate the arguments set forth in Governor Ivey's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. 27) relating to Plaintiffs' Fourteenth Amendment vagueness claims.

one identified member ha[s] suffered or w[ill] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

In the Complaint, Alabama NAACP generally alleges that its "members include students at UA, all of whom have experienced direct and continued harm due to SB 129" Doc. 1 ¶ 7. The equal protection count specifically alleges that SB 129 "discriminates against Black students by limiting funding for Black student groups like the UA NAACP and eliminating on campus spaces for student organizations that were created to support Black students and faculty," *id.* ¶ 274. Nowhere in the Complaint does Alabama NAACP identify a member whom it specifically alleges has suffered or will suffer harm as a result of the University's alleged actions. Therefore, the Alabama NAACP lacks standing to pursue its equal protection claim.

## II.   PLAINTIFFS MISREPRESENT THE EFFECTS OF SB 129.

The whole premise of Plaintiffs' equal protection claim is flawed as it is based on alleged harms that do not result from SB 129 or the University's implementation thereof. (Doc. 1 ¶¶ 264-276). Plaintiffs' equal protection claim is based on the premise that "SB 129 explicitly targets concepts related to race, racism, and efforts to overcome racism" and that its "impact will bear more heavily on Black people, specifically Black students and Black educators, who are more likely to benefit from discussions on these topics." (Doc. 1 ¶ 273). Elsewhere in the Complaint, Plaintiffs

allege that SB 129 "censor[s]…instruction on race and gender inequalities in public university classes," *id.* at ¶ 202, and "curtail[s] academic scholarship on remedying the effects of racial discrimination," *id.* at ¶ 205.

SB 129 does no such thing. As it relates to the classroom, SB 129 states that professors may not "direct or compel" students "to personally affirm, adopt, or adhere" to one of eight "divisive concepts" defined in the statute, that professors may not require students to perform "course work that advocates for or requires assent to a divisive concept," "[c]ondition enrollment or attendance in a class…solely on the base or race or color," or "[p]enalize or discriminate against a student…for his or her refusal to support, believe, endorse, embrace, or otherwise assent to a divisive concept or diversity statement." Ala. Code § 41-1-91.

None of these provisions prohibit "instruction on race and gender inequalities in public university classes," *see* Doc. 1 ¶ 202, "curtail academic scholarship on remedying the effects of racial discrimination," *id.* at ¶ 205, or ban "discussions" of "concepts related to race, racism, and efforts to overcome racism," *id.* at ¶ 273. Rather than prohibiting *discussion*, SB 129 prohibits professors from *advocating* certain concepts during class time, including "[t]hat any race…is inherently superior or inferior," "[t]hat individuals should be discriminated against or adversely treated because of their race…," "[t]hat the moral character of an individual is determined

4

by his or her race…," "[t]hat, by virtue of an individual's race…the individual is inherently racist…," and so on. Ala. Code § 41-1-90(2).

Under SB 129 students are free to discuss these topics, debate these topics, and engage in coursework relating to these topics. It only prohibits assignments that *advocate* for these concepts or require students to *assent* to them. This is for the benefit of all students. While a professor indeed may not, during class time, require their students to operate under the assumption that the white students in the class are "inherently racist" by virtue of their skin color, the same professor is also barred from requiring students to operate under the assumption that non-white students "should be discriminated against or adversely treated because of their race." Ala. Code § 41-1-90(2).

The entire premise of Plaintiffs' equal protection claims—to the extent they are based on what can and cannot be taught in the classroom—is based on a reading of SB 129 that is not supported by its plain language, as the statute cannot reasonably be interpreted as barring "discussions" on "concepts related to race, racism, and efforts to overcome racism," or "censoring instruction…on race." This is a non-starter, because the statute does not authorize the injuries that Plaintiffs complain of.

And even if it did, Plaintiffs' equal protection claims against the Board Defendants still fail because they have not alleged that the University has treated them any differently than their similarly situated peers.

5

## III. PLAINTIFFS HAVE NOT ALLEGED THAT SB 129 HAS A DISCRIMINATORY EFFECT.

Section 1 of the Fourteenth Amendment to the United States Constitution provides that "No State shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992). To state a claim for equal protection, a plaintiff must allege "both an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). Plaintiffs cite *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), in which the Supreme Court set forth five factors for courts to consider when evaluating disparate impact claims, and *Greater Birmingham Ministries v. Secretary of State for Alabama*, 992 F.3d 1299 (11th Cir. 2021), in which the Eleventh Circuit recognized three additional factors to consider. (Doc. 1 ¶¶ 267-272).

Under the *Arlington Heights* test, a plaintiff must allege that the "State's 'decision or act had a discriminatory purpose *and* effect.'" *Greater Birmingham*, 992 F.3d at 1321 (emphasis added); *id.* ("If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail."). When engaging in *Arlington*

6

*Heights Analysis*, the first step is "determining whether the challenged law has a discriminatory *impact* and 'whether it bears more heavily on one race than another.'" *Id.* at 1321 (emphasis added). From there, courts look to the other *Arlington Heights* factors to determine "whether racially discriminatory *intent* existed." *Id.* (emphasis added). Here, Plaintiffs' Complaint does not make this crucial first showing.

Plaintiffs declare throughout the Complaint that SB 129 "disproportionately harms Black members of Alabama's public university communities." (Doc. 1 ¶ 208); *id.* at ¶ 210 ("SB 129[]…disproportionately impacts Black students."); *id.* at ¶ 216 ("SB 129[]…disproportionately impacts Black students…."). However, the Complaint contains no allegations that Black students and faculty have been treated differently, or are at risk of being treated differently, from their similarly situated peers due to the University's enforcement of SB 129.

The lack of disparate impact is best demonstrated by Plaintiffs' own Complaint. Here, Plaintiffs—two of whom identify as white, two of whom identify as black, and two of whom identify as Latino/Latina—allege that the Board Defendants have violated their rights by limiting classroom discussions relating to race and racial justice and by restricting funding to organizations that serve members of various identity groups. These are the same alleged injuries that form the basis of Dr. Simon, Ms. Testman, and the Alabama NAACP's equal protection claims. It defies logic for Plaintiffs, on one hand, to argue that the University's actions have

harmed *all* Plaintiffs—a racially diverse group of individuals—while, on the other hand, arguing that the very same conduct somehow impacts only the black Plaintiffs.

That Plaintiffs have taken their First Amendment claims, which are asserted on behalf of a racially diverse group of students and professors, and repackaged them as equal protection claims only affecting the black-identifying Plaintiffs paints a clear enough picture as to why Plaintiffs have not stated a plausible equal protection claim. For good measure, the Board Defendants address the substance of Plaintiffs' equal protection claims to further demonstrate why those claims would still fail even in the absence of Plaintiffs' contradictory pleading.

> **A. As alleged, SB 129's impact on course curriculum, and the University's alleged curricular and programming changes, apply equally to all students and faculty without regard to race**.

Plaintiffs allege that SB 129 imposes viewpoint restrictions in a way that disproportionately harms black students and professors. (Doc. 1 ¶ 200) ("SB 129 has been utilized to chill important speech in classroom discussions and in extracurricular activities."); *id.* at ¶ 205 ("any curtailment of academic scholarship on remedying the effects of racial discrimination harms not only Black students, but Black people all across Alabama."); *id.* at ¶ 207 ("SB 129 censors university programming, and causes curricular restrictions that disproportionately harm Black students."); *id.* at ¶ 273 ("the law's impact will bear more heavily on Black people, specifically Black students and Black educators.").

Plaintiffs do not allege that any provision of SB 129 facially discriminates against black students and professors, and instead rely on allegations about curricular and programming changes that the University has implemented on a campus-wide basis as evidence of SB 129's allegedly discriminatory impacts (again, without citing the provisions about whose implementation they complain). Upon review of these allegations, the Complaint does not describe any discriminatory treatment.

First, as discussed above, neither SB 129 nor the University's implementation of SB 129 prevent the teaching of "courses in gender studies and ethnic studies," "instruction on race or gender inequalities," "instruction on the histories of racism in America and present day social inequalities," or "academic scholarship on remedying the effects of racial discrimination." (Doc. 1 ¶¶ 201-205). SB 129 only prohibits "advocat[ing] for or requir[ing] assent to a divisive concept." Plaintiffs do not explain how being denied the ability to advocate (or hear advocacy) for the position that "individuals should be discriminated against . . . because of their race," or that a "race . . . is inherently superior or inferior," specifically discriminates against black students and educators.

Even assuming SB 129 prohibits instruction on racial inequities (it does not), Plaintiffs' claims still fail, as the Complaint relies on unacceptable assumptions about race and education to argue that the alleged curricular and programming changes harm black students and professors in particular. For example, Plaintiffs

9

allege that "the censorship of instruction on race and gender inequalities in public university classes has a profound impact on academic engagement and outcomes for Black students in those classes," (Doc. 1 ¶ 202), and that because professors are no longer able to "espouse viewpoints on certain topics related to race and racism…Black students are deprived of the opportunity to learn about the ways in which racial discrimination affects them," *id.* at ¶¶ 203-204. These allegations do not involve any claim that black students were treated differently from other students and depict curricular changes that apply across the board to all students without regard to race. These allegations assume that black students, by virtue of their skin color, are harmed by the alleged curricular changes more than students of other races, but they do not explain how the alleged "censorship of instruction on race and gender inequalities" and restrictions on professors' ability to "espouse viewpoints on certain topics related to race and racism" could possibly deprive black students of an "opportunity to learn" in a way that does not equally impact students of other races.

Similarly, they allege that "Dr. Simon had to cancel a class project involving a student led diversity, equity, and inclusion advocacy event," and that "[t]his harms Black students in particular who are training to be future social workers." *Id.* at ¶ 206. Again, Plaintiffs do not allege that the black students in Dr. Simon's class were treated differently, nor do they explain how cancelling an assignment affects an aspiring black social worker any more than it would affect an aspiring social worker

of another race. Plaintiffs instead rely on the precarious assumption that coursework related to diversity benefits black students "in particular," because of their race.

The Complaint then points to the UA Student Government Association's "Diversity Passport" program, which Plaintiffs claim "benefitted Black students by requiring all students on campus to attend events themed around diversity and cultural awareness" by creating a point system to receive priority seating at football games. *Id.* at ¶ 207. The program was replaced by the "Capstone Wellness Explorer," which Plaintiffs characterize as allowing students "to accrue points from other programs that do not…expose students to diversity or cultural awareness." *Id.* Plaintiffs complain that the new program "do[es] not similarly benefit Black students." *Id.* Again, no allegation that black students were treated differently, no explanation of how the introduction of the Capstone Wellness Explorer program affects black students in a way that does not affect students of other races, and an assumption that diversity-related programming benefits black students in particular because of their race.

The remainder of the Complaint is rife with similar assertions about race and education. (Doc. 1 ¶ 273) ("Black students are more likely to benefit academically from courses that include these topics, Black educators are more likely to engage in scholarship on these topics…."); *id.* at ¶ 221 ("Black professors are more likely than their White colleagues to engage their students in diversity related activities."); *id.*

11

at ¶ 224 ("Black faculty are also more likely to support Black students."); *id.* ("Black professors are more likely to engage with race-related issues through their work on committees."); *id.* at ¶ 223 ("Students of all races have higher expectations that courses focusing on race will be taught by faculty of color, and that is frequently the case."); *id.* at ¶ 208 ("SB 129's mandate to ban offices, programs, and staff in connection with public universities' diversity, equity, and inclusion efforts disproportionately harms Black members of Alabama's public university communities.").

The Supreme Court has repeatedly rejected these kinds of assertions as "offensive and demeaning" because they treat students and professors not as individuals but as a product of their race. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 911-12 (1995) (rejecting the "offensive and demeaning assumption" that individuals "of a particular race, because of their race, 'think alike [or] share the same political interests…'"); *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 219 (2023) (rejecting the "'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" (quoting *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003)); *id.* at 221 (universities should not further "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." (quoting *Miller*,

515 U.S. at 912)); *id.* at 220 (rejecting the "pernicious stereotype" that "a black student can usually bring something that a white person cannot offer," and "that race in itself 'says [something] about who you are.'"). In short, the Supreme Court unambiguously instructs public universities and courts to avoid treating students as though their opinions, beliefs, educational interests, and educational needs are predetermined based on their skin color.

Plaintiffs do not allege that the University's alleged curricular and programming changes have been implemented in ways that treat black students and faculty differently than students and faculty of other races. Their claims that the University's alleged actions harm black students "in particular" ring hollow because those assertions rely on the idea—which has been repeatedly rejected by the Supreme Court—that "minority students always (or even consistently) express some characteristic minority viewpoint on any issue," *Students for Fair Admissions*, 600 U.S. at 219, and that a curricular change that does not align with a "characteristic minority viewpoint" necessarily renders harm to all students of that race.

The Board recognizes that Plaintiffs are dissatisfied with curricular and programming changes made at the University, but dissatisfaction and disagreement are not grounds for an equal protection claim. As alleged, the University-wide changes to curriculum and programming apply to all students and faculty without

regard to race. Plaintiffs have not alleged discriminatory impact and, therefore, have not stated an equal protection claim that is plausible on its face.

    **B.    As alleged, SB 129's effect on student organization funding, and the availability of student organization funding at the University, apply equally to all students without regard to race.**

Plaintiffs also allege that SB 129 discriminates against black students by denying student organization funding to black-affiliated student organizations. (Doc. 1 ¶ 210) ("SB 129's curtailment on university funding for student organization disproportionately impacts Black students. Based on information and belief, all Black student organizations whose missions are dedicated to serving Black members of UAB and UA have lost funding due to SB 129."). Again, Plaintiffs do not allege that any provision of SB 129 facially discriminates against black students and instead allege that the University has implemented SB 129 in a discriminatory way.

Throughout the Complaint, Plaintiffs assert that various groups that provide support to black students were "defunded" or "lost funding." (Doc. 1 ¶ 210) ("all Black student organizations…have lost funding due to SB 129"); *id.* at ¶ 213 ("At UA, the BSU lost all funding from the university…."); *id.* at ¶ 118 ("Across UA and UAB, SB 129 caused the defunding of student groups that serve students of color, female students, and LGBTQIA students."). Without more, these allegations seem to suggest that these groups were denied the *opportunity* to receive student organization funding. A close reading of the Complaint, however, proves otherwise.

14

It all comes down to the distinction between University Funded Organizations ("UFOs") and Registered Student Organizations ("RSOs). The Complaint alleges that the University "automatically provides university funding" to UFOs, and that such funding "comes directly from the university," whereas RSOs "must apply to the Undergraduate Student Government Association ("USGA") each semester or secure an alternate source of funding, such as alumni donations." (Doc. 1 ¶ 119). In other words, RSOs must submit budget applications each semester to receive an allocation from USGA, while UFOs are hand-selected by the University to receive dedicated funds without going through the budget application process.

Thus, where Plaintiffs allege that students groups have been "defunded," what they are really alleging is that student groups which were formerly UFOs are now RSOs, which changes the source of funding for those organizations rather than denying them funding altogether. For example, Plaintiffs allege that Social Justice Advocacy Council ("SJAC") has been "defunded" and is "prohibited by SB 129 from receiving university funding." *Id.* at ¶¶ 21-22. Later in the Complaint, Plaintiffs explain that rather than being denied funding altogether, SJAC no longer receives funds *directly* from the University and is now an RSO, where it is able to submit funding requests to USGA each semester. *Id.* at ¶¶ 122; 119 ("UAB's student government association distributes about $170,000 in state funding to student groups every year, and about $53,000 of that funding goes to RSOs"). In addition, Plaintiffs

15

have not alleged that SJAC has ever submitted a funding request to USGA or that it has ever been denied funding after properly submitting a budget request. The only reasonable conclusion here is that the allegations of "defunding" only refer to funds that these organizations received from the University on a hand-selected basis when they were UFOs, and do not take into account RSO funding that is available from USGA.

Similarly, Plaintiffs allege that the "Black Student Awareness Committee ["BSAC"] was demoted from a UFO to an RSO." *Id.* at ¶ 211. As an RSO, BSAC is presumably able to receive funding from USGA. *Id.* at ¶ 119. Plaintiffs have not alleged that BSAC has ever submitted a funding request to USGA or been denied funding after doing so. The same is true for other student organizations referenced throughout the Complaint and, notably, Plaintiffs do not allege that the University has denied *any* student group of which they are members the opportunity to submit a funding application to USGA.

To the extent Plaintiffs claim their rights to equal protection were violated based on student organization funding, the essence of those claims is that certain organizations no longer receive funding directly from the University on a preferential basis and must now apply for a budget allocation from USGA like most other student organizations on campus are required to do. This is a far cry from an equal protection claim, as the Equal Protection Clause protects plaintiffs from being

16

treated *differently* than similarly situated persons because of their race. Here, Plaintiffs complain because their organizations are now being treated *the same* as most other student organizations on campus. Plaintiffs' equal protection claims relating to the transition of certain student groups from UFOs to RSOs do not allege discriminatory impact and, therefore, do not state an equal protection claim that is plausible on its face.

  **C.** **As alleged, SB 129's effect on the allocation of campus resources, and the University's room reservation policies, apply equally to all students without regard to race.**

Finally, Plaintiffs allege that SB 129 discriminates against black students by denying black-affiliated organizations access to campus spaces. (Doc. 1 ¶ 208) ("SB 129's mandate to ban offices…in connection with public universities' diversity, equity, and inclusion efforts disproportionately harms Black members of Alabama's public university communities."); *id.* at ¶ 209 ("At UA, the closure of spaces such as the BSU and SafeZone have harmed Black students, including Black LGBTQIA students."). They do not allege that any provision of SB 129 is facially discriminatory and instead rely on allegations that the University has implemented SB 129 in a way that discriminates against black students.

For instance, Plaintiffs allege that the University closed the Black Student Union ("BSU")'s office space, which was located "in the middle of the Student Center." (Doc. 1 ¶ 217); *id.* at ¶ 209 ("Black students no longer have a designated

17

location….").[2] The Student Center, and campus generally, has limited rooms and office space, and Plaintiffs have not alleged—nor could they—that the hundreds of student groups that are active on campus are each entitled to a permanent, dedicated office on campus, let alone in the middle of the Student Center. Nor have they alleged that BSU or any other student group has been barred from reserving space on campus to carry out their activities. Instead, they allege that BSU's former office space, which was given to it on a preferential basis to the exclusion of other student groups on campus, has been put to another use.

In other words, Plaintiffs complain that BSU longer *receives* certain benefits that other student organizations have *never* had access to. That is not grounds for an equal protection claim. To the extent Plaintiffs' equal protection claims are based on the closure of BSU and other organizations' office spaces, Plaintiffs have not alleged any actual discriminatory impact and, therefore, have not stated an equal protection claim that is plausible on its face.

## **CONLCUSION**

Plaintiffs' equal protection claim fails because Plaintiffs cannot show the "challenged law has a discriminatory impact" or that it "bears more heavily on one race than another." *Greater Birmingham*, 992 F.3d 1321. Instead, they have

---

[2] The space that formerly housed the BSU office now houses a food pantry that is open to all students on campus.

essentially alleged that their equal protection rights are being violated because the University is not treating them in a way that *benefits* them in comparison to their similarly situated peers. That is not an acceptable basis for an equal protection claim. For the reasons stated throughout this Memorandum, the Court should grant the Board Defendants' Motion to Dismiss and dismiss all claims against them.

Respectfully submitted this 25th day of March, 2025.

*/s/ Jay M. Ezelle*
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

**Counsel for the Board Defendants**