FILED

2025 Apr-18  PM 06:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, AND THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br>                Plaintiffs, <br><br>    v. <br><br> KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore, University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees, <br><br>               Defendants. | Case No. 2:25-CV-00067-MHH |

# PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

*Introduction*...................................................................................................................... *1*

I.    *Legal Standard* ......................................................................................................... *3*

II.   *Plaintiffs Have Properly Alleged Standing to Bring Each Claim* ............................. *3*
      A.    Professors Simon, Patton, and Fording Have Standing. ................................... 5
      B.    Plaintiffs Luna, Campos, and Testman Have Standing. ................................. 10
      C.    Plaintiff Alabama NAACP Has Associational and Organizational Standing............. 14
            i.   Plaintiff Alabama NAACP Has Associational Standing............................... 14
            ii.  Plaintiff Alabama NAACP Has Organizational Standing............................. 16
      D.    Plaintiffs Simon, Testman, and Alabama NAACP Have Standing Under the Equal
            Protection Clause.......................................................................................... 17

III.  *Plaintiffs Have Alleged Sufficient Facts to Show Their Injuries Are Traceable to and*
      *Redressable by Governor Ivey.* ............................................................................ *17*

IV.   *Sovereign Immunity Does Not Bar Plaintiffs' Claims Against the Governor.* ................. *19*

V.    *The Complaint States a Claim for Violations of the First Amendment*............................ *20*
      A.    SB 129 Violates the First Amendment Rights of the Professor Plaintiffs.................... 20
            a.   The Context .................................................................................................. 24
            b.   State Interests .............................................................................................. 25
            c.   Academic Freedom ...................................................................................... 26
      B.    Student Plaintiff Miguel Luna Has Stated a First Amendment Claim........................ 28
      C.    Student Plaintiffs Luna, Campos, and Testman Have Stated First Amendment Claims
            with Respect to Student Organization Funding.......................................... 29
      D.    Plaintiff Alabama NAACP Has Stated First Amendment Claims with Respect to its
            Freedom of Association Claims. ................................................................. 30

VI.   *The Complaint Sufficiently Alleges that SB 129 Is Unconstitutionally Vague.* ................. *32*

VII.  *The Complaint States a Claim Under the Equal Protection Clause*................................ *37*
      A.    Plaintiffs Have Alleged Sufficient Facts About SB 129's Discriminatory Impact. ..... 39
      B.    Plaintiffs Have Alleged Sufficient Facts That SB 129's Discriminatory Impact Was
            Foreseeable. .............................................................................................. 42
      C.    Plaintiffs Have Alleged Sufficient Facts About SB 129's Historical Background. ..... 43
      E.    Plaintiffs Have Alleged Sufficient Facts About SB 129's Substantive Departures...... 45
      F.    Plaintiffs Have Alleged Sufficient Facts About the Availability of Less Discriminatory
            Alternatives. .............................................................................................. 46

VIII. *Defendants' Remaining Arguments Lack Merit*....................................................... *47*
      A.    Board Defendants' Claims About the Effects of SB 129 Are Premature.................... 47
      B.    Board Defendants Misunderstand and Misapply Equal Protection Doctrine. ............. 48

*Conclusion* ...................................................................................................................... *50*

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*,
  508 F.3d 94 (2d Cir. 2007)......................................................................... 31

*Arlington Heights. Thompson v. Sec'y of State for the State of Ala.*,
  65 F.4th 1288 (11th Cir. 2023). .................................................................. 50

*Arnett v. Kennedy*,
  416 U.S. 134 (1974).................................................................................. 35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................... 3, 40

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). ....... 12, 29

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
  529 U.S. 217 (2000)................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................... 13

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991)... ....................................................... passim

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006). .................................................................. 4

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).................................................................................. 51

*City of S. Miami v. Governor*,
  65 F.4th 631 (11th Cir. 2023). ................................................................... 20

*Deeb v. Saati*,
  No. 1:17-CV-21204-KMM (S.D. Fla. Nov. 8, 2017) ................................... 3

*Demers v. Austin*,
   746 F.3d 402 (9th Cir. 2014) ................................................................... 23

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ................................................................. 14

*Dream Defs. v. DeSantis*,
  553 F. Supp. 3d 1052 (N.D. Fla. 2021)................................................ passim

*Dream Defs. v. DeSantis*,
  57 F.4th 879 (11th Cir. 2023) ................................................................. 20

*E&T Realty v. Strickland*,
  830 F.2d 1107 (11th Cir. 1987) ............................................................... 50

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................. 16

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ............................................................... 16

*Fla. State Conf. of NAACP v. Lee*,
  566 F. Supp. 3d 1262 (N.D. Fla. 2021).................................................... 47

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)................................................................................. 21

*Garrett v. Matthews*,
  625 F.2d 658 (5th Cir. 1980) ................................................................... 35

*Gaston v. City of Leesburg*,
    No. 24-10276, 2025 WL 252437 (11th Cir. Jan. 21, 2025) ...................................... 50

*Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*,
    36 F.4th 1100 (11th Cir. 2022) ....................................................................................... 5

*Gerlich v. Leath*,
    152 F. Supp. 3d 1152 (S.D. Iowa 2016) ...................................................................... 13

*Glyhnn Env't Coal., Inc. v. Sea Island Acquisition, LLC*,
    26 F.4th 1235 (11th Cir. 2022) ....................................................................................... 4

*Greater Birmingham Ministries v. Sec'y of Ala.* ("GBM"),
    992 F.3d 1299 (11th Cir. 2021) .................................................................... 38, 39, 40, 51

*Griffin Indus., Inc. v. Irvin*,
    496 F.3d 1189 (11th Cir. 2007) .................................................................................... 50

*Grutter v. Bollinger*,
    539 U.S. 306, 329 (2003) ............................................................................................. 20

*Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*,
    922 F.2d 756 (11th Cir. 1991) ....................................................................................... 6

*Harrell v. The Fla. Bar*,
    608 F.3d 1241 (11th Cir. 2010) .................................................................................. 4, 5

*Heim v. Daniel*,
    81 F.4th 212 (2d Cir. 2023) ......................................................................................... 22

*Henry v. Att'y Gen., Ala.*,
    45 F.4th 1272 (11th Cir. 2022) ..................................................................................... 6

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................................................................... 33

*Hillis v. Stephen F. Austin State Univ.*,
    665 F.2d 547 (5th Cir. 1982) ....................................................................................... 28

*Honeyfund.com, Inc. v. DeSantis*,
    622 F. Supp. 3d 1159 (N.D. Fla. 2022) ............................................................ 34, 35, 36

*Hunt v. Amico Props., L.P.*,
    814 F.3d 1213 (11th Cir. 2016) .................................................................................... 40

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................................................. 14, 39

*I.L. v. Ala.*,
    739 F.3d 1273 (11th Cir. 2014) .................................................................................... 44

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236, 1253 (11th Cir. 2020) ......................................................................... 20

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) .................................................................................... 40

*Kahn v. Portfolio Recovery Assocs., LLC*,
    No. 8:10-CV-2399-T-26TGW, 2011 WL 223870 (M.D. Fla. Jan. 24, 2011) .............. 49

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ..................................................................................................... 27

*Kilborn v. Amiridis*,
    131 F.4th 550 (7th Cir. 2025) ...................................................................................... 23

*League of Women Voters of Fla., Inc v. Fla Sec'y of State*,
    66 F.4th 905 (2023) ...................................................................................................... 48

*Lewis v. City of St. Petersburg*,
  260 F.3d 1260 (11th Cir. 2001) ........................................................................... 49
*Lewis v. Governor of Ala.*,
  944 F.3d 1287 (11th Cir. 2019) ........................................................................... 20
*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................. 4
*Matal v. Tam*,
  582 U.S. 218 (2017) ........................................................................................... 23
*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................................. 23
*Merriweather v. Hartop*,
  992 F.3d 492 (2021) ........................................................................................... 23
*Mhany Mgmt., Inc. v. County of Nassau*,
  819 F.3d 581 (2d Cir. 2016) .............................................................................. 47
*N.C. State Conf. of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ................................................................... 39, 46, 47
*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ................................................................ 51
*O'Laughlin v. Palm Beach Cnty.*,
  30 F. 4th 1045 (11th Cir. 2002) ......................................................................... 35
*PBT Real Est., LLC v. Town of Palm Beach*,
  988 F.3d 1274 (11th Cir. 2021) ........................................................................... 3
*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  No. 4:22-CV-304-MW/MAF, 2022 WL 20099419 (N.D. Fla. Nov. 22, 2022) ........................ 5
*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  641 F. Supp. 3d 1218 (2022) ....................................................................... passim
*Pernell v. Fla. Bd. of Governors of State Univ.*,
  No. 22-13992-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023) ............................. 28
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 US 37 (1983) ............................................................................................... 31
*Piarowski v. Illinois Cmty. Coll. Dist.*,
  515, 759 F.2d 625 (7th Cir. 1985) ..................................................................... 28
*Pittman v. Cole*,
  267 F.3d 1269 (11th Cir. 2001) ......................................................................... 12
*Porter v. Bd. of Trustees of N.C. State Univ.*,
  72 F.4th 573 (4th Cir. 2023) .............................................................................. 22
*Red Door Asian Bistro v. City of Fort Lauderdale*,
  No. 22-11489, 2023 WL 5606088 (11th Cir. Aug. 30, 2023) ............................. 51
*Rogers v. Lodge*,
  458 U.S. 613 (1982) ........................................................................................... 44
*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ........................................................................... 22, 27, 30, 32
*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) ............................................................................................... 5
*San Filippo v. Bongiovanni*,
  961 F.2d 1125 (1992) ......................................................................................... 35

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................................ 34
*Scallet v. Rosenblum*,
  911 F. Supp. 999 (W.D. Va. 1996) ..................................................................... 27
*Schwarz v. City of Treasure Island*,
  544 F.3d 1201 (11th Cir. 2008) .......................................................................... 51
*Shaw v. Hunt*,
  517 U.S. 899 (1996).............................................................................................. 45
*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ............................................................... 26, 27, 29
*Stanley v. Georgia*,
  394 U.S. 557 (1969)....................................................................................... 11, 29
*Stout v. Jefferson Cty. Bd. of Educ.*,
  882 F.3d 988 (11th Cir. 2018) ............................................................................ 46
*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .............................................................................................. 4
*Sweezy v. State of N.H.*,
  354 U.S. 234 (1957)............................................................................................. 27
*Taylor v. Polhill*,
  964 F.3d 975 (11th Cir. 2020) ......................................................................... 4, 6
*Tracy P. v. Sarasota Cty.*,
  No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801 (M.D. Fla. Sep. 5, 2007)............................ 46
*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995)............................................................................................. 26
*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) .............................................................................. 47
*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
  535 U.S. 635 (2002).............................................................................................. 20
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...................................................................................... passim
*Washington v. Davis*,
  426 U.S. 229 (1976).............................................................................................. 39
*Widmar v. Vincent*,
  454 U.S. 263 (1981)....................................................................................... 31, 32

**Statutes**

SB 129 § 2(d), 2024 Reg. Sess. (Ala. 2024) ......................................................... passim

**Other Authorities**

*About the Agency*, The Ala. Comm'n on Higher Educ., https://www.ache.edu/index.php/about-the-agency/ (last visited Apr. 18, 2025)..................................................... 19
Jemma Stephenson, *Gov. Kay Ivey Signs Bill to Limit Public Funds for DEI, Use of 'Divisive Concepts' in Alabama*, Ala. Reflector (Mar. 20, 2024),
  https://alabamareflector.com/2024/03/20/gov-kay-ivey-signs-bill-to-limit-public-funds-for-dei-use-of-divisive-concepts-in-alabama/.................................................. 19

Shirin Faqiri, *Alabama Gov. Kay Ivey Signs Sweeping Law that Prohibits Diversity, Equity and Inclusion at Public Schools and Universities*, CNN (Mar. 20, 2024), https://amp.cnn.com/cnn/2024/03/19/us/alabama-bill-bans-dei-public-universities-reaj......... 19

*State Board of Education*, The Alabama Dep't of Educ., https://www.alabamaachieves.org/state-board-of-education/ (last visited Apr. 18, 2025)...................................................................... 19

**Introduction**

Plaintiffs Cassandra Simon, Sydney Testman, Miguel Luna, Isabella Campos, Dana Patton, Richard Fording, and the Alabama State Conference of the NAACP (collectively, "Plaintiffs"), commenced this action to challenge Senate Bill 129 ("SB 129") under the First and Fourteenth Amendments to the United States Constitution. SB 129 unconstitutionally restricts Plaintiffs' ability to learn, teach, and engage in public university classes and programs related to diverse viewpoints and topics. These topics include race, racism, sexism, homophobia, structural inequality, and social justice where certain viewpoints are disfavored by Alabama legislators. SB 129's vague restrictions broadly chill protected speech and enable arbitrary and discriminatory enforcement based on perceived association with Alabama's definition of "Diversity, Equity, and Inclusion" ("DEI") or "divisive concepts." Moreover, SB 129 is the crescendo of a series of legislative actions to stifle Black activism since the 2020 racial justice movement that took place across the country, including at the University of Alabama system. SB 129 constitutes race-based discrimination against Black students, Black professors, Black student groups, and programs and spaces associated with Black members of the University of Alabama system. Plaintiffs have suffered unconstitutional First and Fourteenth Amendment harms surrounding curriculum, student group funding, and campus space since the enactment of SB 129.

Defendants' motions to dismiss should be denied. Each Plaintiff has pleaded detailed facts that establish Article III standing. The Professor Plaintiffs teach subject matter that falls squarely within SB 129's ambit, and, as detailed in the Complaint, they all fear discipline, including termination, for violating SB 129. Although Defendants contend that their fear is unfounded, as detailed in the Complaint, two of the Professors Plaintiffs have already been threatened with

discipline after being accused of violating SB 129. The harm is actual and real, flows directly from the legislation being challenged, and is redressable.

The Student Plaintiffs likewise have sufficiently pleaded standing. As detailed in the Complaint, they are leaders in student organizations that have lost funding as a direct result of SB 129. Indeed, university administrators have informed them that their organizations cannot receive funding for anything associated with SB 129's "divisive concepts." In addition, one of the student plaintiffs, Miguel Luna, has standing for the additional reason that he has been deprived of the First Amendment-protected right to receive information when his professors censor viewpoints as a result of SB 129. And Plaintiff Alabama NAACP has standing because members of its student chapter at the University of Alabama ("UA") were harmed when, as a direct result of SB 129, the university closed spaces and terminated funding for certain organizations serving Black and/or LGBTQ+ students. The Governor readily admits that she is a proper defendant as President Ex-Officio of the UA Board of Trustees but argues that she cannot be sued as Governor, notwithstanding her statutory enforcement authority and multiple statements *as Governor* of her intention to enforce SB 129. As such, her argument that she could be sued as trustee but not Governor lacks merit.

Finally, Plaintiffs state a claim for all of the counts in the Complaint. The right of university professors to teach, and students to learn, free of government viewpoint discrimination is well established. The fact that the professor plaintiffs teach at a state university does not eviscerate their First Amendment rights, and the federal circuit courts of appeal have consistently held that classroom and scholarly speech of state university professors is not "government speech." Multiple federal courts evaluating statutes similar to SB 129 have held that the statutes violate the First Amendment and are also unconstitutionally vague pursuant to the Fourteenth Amendment. Finally,

the allegations in the Complaint show that SB 129 was enacted with a discriminatory purpose and has a discriminatory impact on Black professors, students, and members of the Alabama NAACP.

## I.    Legal Standard

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Id.* The court must accept the alleged facts and "draw all reasonable inferences in the plaintiff's favor." *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1286 (11th Cir. 2021) (citation omitted). Conclusory arguments that ignore the allegations in the complaint do not support dismissal. *See Deeb v. Saati*, No. 1:17-CV-21204-KMM, 2017 WL 8890872, at *1 (S.D. Fla. Nov. 8, 2017).

## II.    Plaintiffs Have Properly Alleged Standing to Bring Each Claim.

The Plaintiffs have standing as professors, students, and student organizations at the UA and Alabama Birmingham ("UAB") campuses. The Professor Plaintiffs have suffered from censorship of their teaching due to broad prohibitions and conflicting and vague directives about what they can and cannot teach in the classroom. At the same time, a Student Plaintiff is unable to receive certain information in his university education and are uncertain as to the breadth of this restriction. The Student Plaintiffs have also suffered from the recission of university funding for student groups like the Social Justice Advocacy Council ("SJAC"), the denial of opportunity for funding for student groups like Esperanza at UAB, and the abolition of the Black Student Union ("BSU") and Safe Zone offices for Black and/or LGBTQIA students at UA. Finally, Equal

Protection Plaintiffs have standing to allege claims of race-based intentional discrimination against Black Professors and Black students.

Standing is established where Plaintiffs demonstrate (i) an "injury-in-fact" (ii) fairly traceable to the defendants' challenged action (iii) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To survive a motion to dismiss, a complaint need only "clearly allege[] facts demonstrating each element" of the standing requirement. *Glyhnn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022). Moreover, "general factual allegations of injury can suffice, so long as the complaint "plausibly and clearly allege[s] a concrete injury." *Id.*

When First Amendment rights are involved, courts apply the injury-in-fact requirement loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). "When a plaintiff has stated that he intends to engage in a specific course of conduct arguably affected with a constitutional interest, . . . he does not have to expose himself to enforcement to be able to challenge the law." *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020) (quotation marks and citation omitted). Particularly where a law is challenged as vague, as it is here, Plaintiffs are not required to "confess that [they] will in fact violate that law"—because the law itself provides no clear definition of what would constitute a violation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *cf. CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269-70 (11th Cir. 2006). With the sole exception of Governor Ivey in her capacity as Governor, Defendants do not dispute that Plaintiffs are subject to SB 129, or that their injuries are traceable to SB 129 and would be remedied by the relief sought in this action. Doc. 32-1, p. 24.

Defendants' argument that Plaintiffs must establish standing "plaintiff by plaintiff, claim

by claim, and challenged provision by challenged provision," Doc. 32-1, p. 10, is simply not the law. First, the standing requirement is satisfied as long as a single Plaintiff has standing. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006); *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113-14 (11th Cir. 2022). Second, although Plaintiffs must demonstrate standing for each provision they are actually challenging, Plaintiffs need only show at this stage that the challenged provisions "at least arguably" forbid their desired expression. *See Harrell*, 608 F.3d at 1260. They have amply done so here, as the complaint alleges plausible violations of their constitutional rights and how each of the challenged provisions "at least arguably" forbid their constitutionally protected expression. *Id*.

### A. Professors Simon, Patton, and Fording Have Standing.

Professors Simon, Patton, and Fording bring this suit because SB 129 threatens their First Amendment right to engage in speech free from government-imposed viewpoint discrimination. The Professor Plaintiffs allege detailed facts that, taken as true, demonstrate that SB 129 has chilled their speech by inhibiting their ability to teach their university-approved courses, and that they are self-censoring due to that chilling effect. Doc. 1, ¶¶ 17-19, 92-108, 148-49. As such, the Professor Plaintiffs have standing, and Defendants' motions to dismiss should be denied. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22-CV-304-MW/MAF, 2022 WL 20099419, at *1 (N.D. Fla. Nov. 22, 2022) (concluding that professors' allegations of intending to teach, or self-censoring from teaching prohibited course content had established standing.).

Contrary to Defendants' argument that the Professor Plaintiffs have not demonstrated "objective harm or a threat of specific future harm," Doc. 32-1, p. 10-11 (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)), the Professor Plaintiffs have described countless instances of both. Indeed, UA administrators have already threatened both professors Simon and Patton with discipline for

perceived noncompliance with SB 129. Doc. 1, ¶ 8. Moreover, the law does not require that Professor Plaintiffs wait for a specific threat of enforcement or actual termination to have standing. Instead, the First Amendment harm occurs when a speaker, based on a credible fear of enforcement, is reasonably motivated to self-censor or risk possible discipline or termination. *See, e.g.*, *Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1288 (11th Cir. 2022); *Taylor*, 964 F.3d at 980; *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991).

### i.     Professor Simon

Professor Simon alleges detailed facts about her actual injury from SB 129. She is in the constitutionally untenable position of having to self-censor or risk enforcement. This risk remains real, as Professor Simon continues to teach the subject matter that places her in peril. The Complaint alleges that Professor Simon currently teaches, and has taught for many years, a UA-approved course titled *Anti-Oppression and Social Justice*. Doc. 1, ¶ 17. In this class, Professor Simon teaches about structural racism, racial inequalities, and the existence of implicit bias. *Id.* ¶ 95. Teaching students about the existence of implicit bias is central to Professor Simon educating the next generation of social workers: "Plaintiff Dr. Simon believes that to train culturally competent and effective future social workers, her students must learn about diverse communities and evidence-based research regarding implicit bias." *Id.* ¶ 96. In addition, Professor Simon teaches about "White privilege" and advocates for "the concept that historical discrimination has a significant impact on communities of color and LGBTQIA communities and needs to be considered when serving those populations." *Id.* ¶¶ 93, 135.

The detailed factual allegations about Professor Simon, taken as true as they must be, establish that she runs the real risk of being deemed to "advocate" in support of or "compel assent" to SB 129's "divisive concepts." Her teaching and advocacy regarding implicit bias risks violating

SB 129 §§ 2(d),[1] 2(g),[2] and 2(f)[3]. In addition, her teaching regarding institutional racism and sexism risks violating SB 129 §§ 2(g), 2(f), 2(e)[4], 2(b)[5]. Professor Simon's teaching and advocacy regarding the impacts of historic discrimination on minority communities risk violating SB 129 §§ 2(h)[6] and 2(f). Further, Professor Simon shows the award-winning documentary *Eyes on the Prize* to generate discussions about the Civil Rights Movement.[7] *Id.* ¶ 94. The lectures about the film risk violating SB 129 §§ 2(g), 2(f), and 2(e). And her teachings about how racial and gender bias impact commonly understood notions of "fairness" and "meritocracy" risk violating several SB 129 provisions, including §§ 2(e), 2(f), 2(g), and 2(b).

Furthermore, the Complaint alleges that UA has already threatened enforcement action against Professor Simon. Specifically, as part of her *Anti-Oppression and Social Justice* course, Professor Simon's students (but not Professor Simon) select a group advocacy project. *Id.* ¶¶ 135-36. During the fall 2024 semester, Professor Simon's students selected, as their project, a protest against SB 129. *Id.* ¶¶ 135-36. The day before the scheduled protest, UA administrators insisted that Professor Simon tell her students to cancel the protest. *Id.* ¶¶ 137. UA's Provost informed

---

[1] SB 129 § 2(d), 2024 Reg. Sess. (Ala. 2024) ("That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.").

[2] SB 129 § 2(g) ("That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.").

[3] SB 129 § 2(f) ("That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.").

[4] SB 129 § 2(e) ("That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin.").

[5] SB 129 § 2(b) ("That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.").

[6] SB 129 § 2(h) ("That meritocracy or traits such as a hard work ethic are racist or sexist.").

[7] The Governor suggests it is unreasonable to believe that merely showing an episode of *Eyes on the Prize* could violate SB 129. It is not the mere showing of the film that potentially violates SB 129, but rather the lecture and associated discussion in connection with the topics covered by the documentary.

Professor Simon that the student-selected and student-organized protest violated SB 129 because "it can be viewed as . . . tacitly requir[ing] a student's assent to a divisive concept." *Id*. ¶ 137. The UA administration threatened Professor Simon with discipline, including termination, if the protest was not cancelled. *Id*. ¶ 136. Professor Simon felt compelled to comply with the request. *Id*.

Defendants' argument that Professor Simon and the other Professor Plaintiffs have nothing to worry about because SB 129 "expressly protects" "discussion" of the divisive concepts, *see* Doc. 32-1, p. 15, is misleading, incomplete, and inaccurate. For a discussion of divisive topics to comply with SB 129, professors must not advocate for the subject matter, must conduct the discussions in a manner that the State deems both objective and historically accurate, and, according to the Governor, must not engage in any interpretation of the course material. *See* Doc. 32-1, p. 45. These conditions, even if one could possibly understand their meaning, hamstring the professors to preclude any meaningful discussion on topics that could potentially implicate the divisive concepts. For example, a university professor cannot possibly teach without interpreting historical events and social phenomena—that is what professors do. *See Heim v. Daniel*, 81 F.4th 212, 226–27 (2d Cir. 2023) ([P]rofessors at public universities are paid – if perhaps not exclusively, then predominantly – to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines."). Moreover, UA's threat of enforcement against Professor Simon (and Professor Patton, *see infra*) belie the Governor's argument that the Professor Plaintiffs may teach divisive concepts without concern.

### ii.  Professor Patton

Professor Patton, too, has already faced threats of discipline after UA Administrators informed her that they had received an SB 129 complaint about her course, *Understanding Poverty*. Doc. 1, ¶ 140.

> University officials . . . told Plaintiff Dr. Patton that a current student complained about being asked to discuss White privilege after the law went into effect . . . . University officials also told her that students had complained about the alleged 'liberal' viewpoint expressed through her assigned course materials, the nature of class discussions on racism and bigotry, and her instruction on topics such as the American Dream and the redistribution of wealth.

*Id.* ¶ 142. UA administrators then requested Professor Patton to provide extensive information about her class, including course materials, instruction procedures, and "clarif[ication]" of her "position on open discussion"; if she refused to answer these questions, she was told that she could receive progressive discipline or termination. *See* Doc. 1, ¶ 143. Although the UA Administrators did not identify the divisive concepts implicated by her views expressed in this course, the topics implicate SB 129 §§ 2(c)[8], 2(d), 2(e), 2(f), 2(g), and 2(h).

As a result of these events, Professor Patton has self-censored by removing certain materials from her courses that she fears may risk violating SB 129. Doc. 1, ¶ 98. Professor Patton's self-censorship is the exact "chilling effect" that the First Amendment seeks to avoid.

Notwithstanding this self-censorship, Professor Patton remains concerned that she will continue to be accused of violating SB 129. In *Understanding Poverty*, Professor Patton teaches that race-based, forced labor continued well beyond the Civil War and into the twentieth century. *Id*. ¶ 101-02. She shows her students the documentary *Slavery by Another Name*: "Many of her students were not aware of convict leasing as a practice and expressed shock and disappointment about the practice in general and Alabama's role in facilitating convict leasing throughout the state." *Id*. ¶ 101. Professor Patton fears that discussion of this topic runs the risk of being deemed advocating in support of divisive concepts SB 129 §§ 2(d), 2(e), 2(f), and 2(g). Further, Professor Patton teaches *Social Investment and the Role of Innovation*, which includes a two-week service

---

[8] SB 129 § 2(c) ("That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.").

trip to Marion, Alabama, which explores poverty and race relations, and "the discrimination and racial violence that Black Marion residents faced at the hands of White government officials and community members." *Id*. ¶ 103. She fears the discussions spurred by these trips may be viewed as espousing the prohibited viewpoints of SB 129 §§ 2(c), 2(e), and 2(f).

### iii.    Professor Fording

Professor Fording alleges that, in response to SB 129, he also engaged in self-censorship. Doc. 1, ¶ 19, 105-08, 155. Due to SB 129, Professor Fording decided not to teach the course *Politics of Poverty*, which addresses implicit bias and structural racism, but he alleges he would have taught the course in Spring 2025 if SB 129 did not exist. *Id*. ¶ 155; *see also id.* ¶¶ 152, 107-18. Professor Fording provides multiple examples of his instruction that are arguably proscribed by SB 129. Doc. 1, ¶ 105-108. For example, in his *Politics and Voting Rights* course, Professor Fording teaches that "structural forces such as racial prejudice and racial gerrymandering inhibit political mobilization, and that these barriers then influence the policies and programs that the government supports and implements." *Id*. ¶ 105. This teaching likely implicates SB 129 §§ 2(d), 2(e), 2(f), 2(g), and 2(h).

Professor Fording's fears of enforcement and his resulting self-censorship are credible and reasonable in light of SB 129's restrictions on subject matter that is routinely covered in his courses, as well as SB 129's lack of clear enforcement mechanisms. Professor Fording was aware of the complaint and threat of discipline against Professor Patton for her teaching of similar subject matter, which confirms the reasonableness of his concerns. *Id*. ¶ 153.

### B.  Plaintiffs Luna, Campos, and Testman Have Standing.

The Student Plaintiffs have standing for multiple reasons, including loss of the right to receive information from their professors, loss of university funding for their student

organizations, and the risk that student organizations will be deemed prohibited DEI programs.

### i.    Miguel Luna

Miguel Luna, a junior studying political science and history at UAB, has standing to challenge SB 129 because it impacts his right to receive information from his professors—a right co-extensive with his professor's First Amendment right to speech free from viewpoint discrimination. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.,* 641 F. Supp. 3d 1218, 1265 (N.D. Fla. 2022); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Luna's fear about SB 129's censorship on his professors is not mere speculation, as Defendants claim. Luna has alleged that, in two different classes, including one he is currently taking, his professors have posted SB 129 disclaimers on their course materials, and one professor even issued a verbal warning related to SB 129—causing Luna to fear that SB 129 would impact the viewpoints he gets access to in class. Doc. 1, ¶ 110-11. Luna fears that these disclaimers and warnings "indicate that professors are being encouraged to avoid controversial topics" to prevent SB 129-related complaints. *Id.* ¶ 110. Additionally, Luna alleges that he observed a shift in one professor's approach to various discussions, noting that his discussion of human rights abuses in Alabama prisons was timid. *Id.* ¶ 113. These allegations provide sufficient specificity about the threat of a First Amendment violation to be non-speculative, establishing standing. *See Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (concluding plaintiff's alleged "inability to receive speech from a willing speaker" was sufficient injury to confer standing). Defendants' argument that Luna must allege exactly what the professor desired to express—but did not because of SB 129—is far beyond what is required by the law. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).

In addition, Luna has standing as the President and founder of Esperanza, a student group

that provides support for Latine[9] students at UAB to improve their retention rates. Doc. 1, ¶ 124-

25.

> UAB administrators informed Plaintiffs Luna and Campos that pursuant to UAB's
> interpretation of SB 129, Esperanza cannot receive any future funding from UAB should
> an event or initiative focus on a 'divisive concept'. Without funding, Esperanza cannot
> fulfill its mission of serving as a resource for Latine students and enriching their academic,
> personal, and professional development.

*Id.* ¶ 125. Luna was also a member of SJAC.[10] Doc. 1, ¶ 121. Following the passage of SB 129,

however, UAB terminated SJAC's status as a University Funded Organization ("UFO"); SJAC

has therefore been defunded and demoted, and can no longer provide funding to student groups,

like Esperanza and others, or host internal programming. *Id.* ¶¶ 20, 120-23.[11]

Thus, Luna, as President and founder of Esperanza and as a member of SJAC, has suffered

actual, tangible harm by losing a past funding source and being informed by UAB that the

organization cannot receive future funding for programming associated with divisive concepts.

The Governor argues that Luna has not asserted that Esperanza desires to put on programming

associated with divisive concepts and has not actually applied for such funding. Doc. 32-1, p. 19.

Once again, the Governor is wrong. Luna expressly alleges in the Complaint that Esperanza

cannot fulfill its mission without programming and associated funding prohibited by SB 129.

Moreover, given that UAB already told Luna that it will not fund Esperanza programming

---

[9] The term Latine means "of, relating to, or marked by" Latin American heritage.

[10] SJAC's mission "is to celebrate diversity of identity, broaden cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about identity related issues, and promote intercultural interactions between all communities of people at UAB." Doc. 1, ¶ 121.

[11] Defendants argue that Luna and Campos do not have standing to challenge SJAC's loss of funding because they are not currently members of the organization, Doc. 32-1, p. 18, but Luna and Campos are not bringing suit for injury incurred by SJAC. Rather, as the co-founders of Esperanza, Luna and Campos were directly harmed when SB 129 caused groups like Esperanza to lose its funding from groups such as SJAC as SJAC could no longer provide funding to events associated with allegedly divisive concepts like the ones Esperanza sought to host.

associated with divisive concepts, Doc. 1, ¶ 125, it is futile for Esperanza to apply.[12] In sum, the detailed facts alleged in the Complaint are more than sufficient to establish plausibility under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### ii.    Isabella Campos

Isabella Campos is a senior at UAB majoring in political science. She is a co-founder of Esperanza, together with Luna. She also was previously a member of SJAC prior to the group's defunding and demotion by UAB administrators. As a leader of Esperanza and former member of SJAC, she has standing for the same reasons as Luna.

### iii.    Sydney Testman

Sydney Testman is a junior at UAB majoring in political science. Prior to the passage of SB 129, Testman served as the finance coordinator for SJAC. Doc. 1, ¶ 20. As a result of SB 129, the finance coordinator position was eliminated, and thus Testman lost her position. *Id.* Testman also lost her ability to participate in SJAC programming and the programming of organizations funded by SJAC. As a result, Testman, like Luna and Campos, was injured by SB 129. *See Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1165-66 (S.D. Iowa 2016), *aff'd*, 847 F.3d 1005 (8th Cir. 2017), *and aff'd*, 861 F.3d 697 (8th Cir. 2017) (finding individual students had standing to bring claims alleging harms against organization because they were personally injured). Defendants argue that Testman does not have standing because she is no longer a member of SJAC. Doc. 32-1, p. 18; Doc. 33-1, p. 15-16. That argument does not hold water. Testman lost her position with SJAC *because of* SB 129, which prompted the university to take away SJAC's university funding and eliminate Testman's finance coordinator position. Doc. 1, ¶¶ 20, 122. Defendants cannot strip

---

[12] To the extent that the Defendants dispute the allegations of Luna, or any Student Plaintiffs, regarding their communications with UAB administrators, resolution of this dispute is inappropriate at the Motion to Dismiss stage.

SJAC of funding, make Testman's position defunct, and then use Testman's lack of a position in the defunded organization to argue that she lacks standing.

### C. Plaintiff Alabama NAACP Has Associational and Organizational Standing.

#### i.    Plaintiff Alabama NAACP Has Associational Standing.

An organization has associational standing where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As Defendants admit, an organizational plaintiff need not identify members by name to establish associational standing. Doc. 32-1, p. 20; *see also Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999). Here, Plaintiff NAACP State Conference of Alabama and in particular, their University of Alabama Chapter ("UA NAACP") has alleged facts that satisfy all the elements for associational standing.

The Alabama NAACP has a student chapter at UA comprised of approximately forty-five members. Doc. 1, ¶ 25. The civil rights interests that the UA NAACP seeks to protect as a Plaintiff are germane, indeed central, to its purpose. Specifically, the Student Chapter is committed to "ensur[ing] a society in which all individuals have equal rights without discrimination based on race." Doc. 1, ¶ 24-25.

Prior to the passage of SB 129, the Complaint alleges that members of the UA NAACP used dedicated space provided to, and participated in programming organized by, the UA Black Student Union and Safe Zone (organizations and spaces focused on the needs of LGTBQIA+ students at UA). Doc. 1, ¶ 131. Following SB 129's enactment, UA closed the BSU and Safe Zone spaces, finding that they violated SB 129. *Id.* Due to the closure of

the BSU and Safe Zone spaces, members of the UA NAACP lost access to the programing and

space previously provided by BSU and Safe Zone, and thus suffered—and continue to suffer—

harm as a result of SB 129. Doc. 1, ¶¶ 129-31, 208-09, 256.

The Complaint alleges the following detailed facts, among others, concerning injury

to UA NAACP members who are also members of UA's BSU:

> Before SB 129 went into effect, the BSU received at least $20,000 per year in funding from
> UA. After SB 129 went into effect, the BSU did not receive any funding from UA, harming
> UA NAACP members who are also members of UA's BSU.

*Id*. ¶ 130. The Complaint likewise includes allegations about the harm to Student Chapter

members when the BSU and Safe Zone lost their dedicated spaces on UA's campus:

> [S]everal UA student groups serving Black and LGBTQIA students had their offices in the
> UA campus student center closed by the UA administration. For example, the UA BSU
> office, a space in the student center that had supported Black students since at least 2017,
> was transformed into a food pantry. SafeZone, which was granted space in the UA student
> center in 2013 to support LGBTQIA students, was converted into the Student Leadership
> Lounge due to SB 129. UA explicitly cited SB 129 as the reason for the closure of these
> student offices. . . . Black students, including student members of the UA NAACP, used the
> BSU office to socialize, organize campus events for the Black community, and connect with
> one another. The BSU office was a central location for Black student life on UA's campus,
> and closing it left a void that Black students have found difficult to fill.

*Id*. ¶¶ 131, 218.

Defendants argue that the UA NAACP does not claim "that those other organizations

[BSA and Safe Zone] are prohibited from reserving space on campus to meet, that they have tried

to reserve space and been denied the opportunity, or even that they have plans to reserve meeting

space in the future." Doc. 32-1, p. 21. This argument misconstrues the UA NAACP's argument.

The UA NAACP is not arguing that the BSU and Safe Zone can never reserve a room for a one-

off event. Rather, what has been lost is (i) a dedicated space where individuals (including

members of the UA NAACP) congregate and associate on a regular basis, and (ii) programming

focused on the Black community and the LGBTQIA+ community at UA. As discussed below,

-15-

this loss was the direct result of SB 129.

Defendants also contend that the harm suffered by members of the UA NAACP from the elimination of the BSU and Safe Zone spaces "would only have affected those (unidentified) students personally, not as members of the NAACP." *Id.* UA NAACP demonstrated that its student members suffered actual, concrete harm as the result of SB 129. That is all that is required. Defendants do not, and cannot, credibly argue that members suffering individual harm requires them to sue individually in this case, rather than through a membership-based organization representing their interests in its own lawsuit. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008).

### ii.    Plaintiff Alabama NAACP Has Organizational Standing.

The Supreme Court has consistently held that organizations have standing "to sue on their own behalf for injuries they have sustained." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024). The organization must only "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393-94. UA NAACP has alleged facts establishing all three prerequisites. SB 129 threatens the UA NAACP's ability to receive University funding and use University space because there is a credible and objectively reasonable threat it will be deemed a DEI program and/or that its members will be perceived as having viewpoints associated with SB 129's divisive concepts. *See* Doc. 1, ¶ 25. Although the Student Chapter does not limit membership, and events "are open to individuals of all racial backgrounds," they "may focus on issues pertaining to Black individuals." *Id*. ¶ 161. UA has already closed the BSU and Safe Zone, and rescinded BSU's funding. The impact of SB 129 on the UA NAACP is greater than the mere diversion of resources that has been found sufficient to establish organizational standing. Here, SB 129 poses a threat to the organization directly by

potentially stripping the organization of its ability to put on programs using university funding and having dedicated university space for its members to gather.

**D. Plaintiffs Simon, Testman, and Alabama NAACP Have Standing Under the Equal Protection Clause.**

To establish standing for constitutional claims, the operative question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' [as] to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260-61 (1977). A plaintiff is harmed when she is the direct target of the defendant's discrimination. *Id.* at 263. The injury may be indirect. *Id.* If there is at least a "substantial probability" that the court could provide relief, a plaintiff has standing. *Id.* at 264 (*quoting Warth v. Seldin,* 422 U.S. 490, 504 (1975)).

SB 129 explicitly targets certain concepts related to race, racism, and efforts to overcome racism. Doc. 1, ¶ 273. This is specifically applicable to Equal Protection Plaintiffs, as Black educators and students, who are engaged in coursework that relies heavily on personal experiences of racism and social injustices. The Professor Plaintiffs are censored in their teaching, their free speech threatened by "official action that is racially discriminatory." *Vill. of Arlington Heights,* 429 U.S. at 264. The Student Plaintiff and the Alabama NAACP are harmed by the loss of funding for Black student groups and the elimination of on-campus spaces for student organizations created to support Black students. Doc. 1, ¶ 274.

**III.    Plaintiffs Have Alleged Sufficient Facts to Show Their Injuries Are Traceable to and Redressable by Governor Ivey.**

Plaintiffs have shown that their injuries are fairly traceable to and redressable by Governor Ivey because she is the President Ex-Officio of the UA Board of Trustees and has statutory

enforcement authority over SB 129. Doc. 1, ¶¶ 27, 89-91. Defendants appear to concede that Governor Ivey can be sued in her capacity as President Ex-Officio of the University of Alabama Board of Trustees, arguing only that Plaintiffs allegedly lack standing to sue the Governor in her capacity as Governor. Doc. 32-1, p. 24-26. Defendants attempt to establish this fictional divide, but cite no authority supporting the proposition that the Governor can be dismissed from this lawsuit as Governor, but not as President Ex-Officio of the Board.

Even if these two roles were "separate offices," as Defendants argue, Plaintiffs have alleged sufficient facts that the Governor's duties in each capacity are inseparably blended. Governor Ivey—as President Ex-Officio of the Board—is explicitly given enforcement authority over SB 129. *See* Doc. 1, ¶¶ 27, 89; SB 129 § 3. The Governor's role as President Ex-Officio of the UA Board of Trustees is enshrined in the Alabama Constitution, and, as a voting member and President of the Board, she has authority to set policies governing University students and professors and to make enforcement decisions regarding SB 129. *See* Ala. Const. art. XIV, § 264.[13] Moreover, Governor Ivey's broad authority over education in Alabama is underscored by her position as the President of the State Board of Education, and her ability to appoint the state's Commission on Higher Education.[14]

Even if the Governor holds "separate offices," Governor Ivey's multiple public statements *as the Governor* expressing her intention to enforce SB 129 demonstrate that Plaintiffs' injuries

---

[13] The UA Board, including the Governor as President Ex-Officio, is given broad authority over University faculty and students. *See* Board Manual Article I ("The entire management and control over . . . The University of Alabama System shall be completely and absolutely vested in The Board of Trustees . . . .); *see also* Board Manual pg. 82 (authority over "matters of termination, discipline and grievances" for tenured professors); Board Manual pg. 75 (authority to govern students). Notably the Board Defendants do not make the argument that Board members do not have standing.

[14] *About the Agency*, The Ala. Comm'n on Higher Educ., https://www.ache.edu/index.php/about-the-agency/ (last visited Apr. 18, 2025); *State Board of Education*, The Alabama Dep't of Educ., https://www.alabamaachieves.org/state-board-of-education/ (last visited Apr. 18, 2025).

are traceable to and redressable by the Governor. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d

1052, 1080 (N.D. Fla. 2021) (finding that the Act giving the Governor power to enforce, as well

as his statements about having engaged in enforcement, were sufficient to establish standing). In

a statement regarding SB 129, Governor Ivey vowed to stop DEI supporters and proponents from

pursuing a "liberal political movement counter to what the majority of Alabamians believe." Doc.

1, ¶ 81. In another statement accompanying the signing of SB 129, Governor Ivey stated: "We

have already taken action to prevent this in our K-12 classrooms, and I am pleased to sign SB 129,

to protect our college campuses."[15] Where there is clear statutory enforcement authority and the

intent to enforce, traceability and redressability requirements are satisfied. *Dream Defs. v.

DeSantis*, 57 F.4th 879, 889 (11th Cir. 2023).[16]

## IV.    Sovereign Immunity Does Not Bar Plaintiffs' Claims Against the Governor.

Although the Eleventh Amendment ordinarily bars claims against the state in federal court,

*Ex parte Young* recognizes an exception where "[the] complaint alleges an ongoing violation of

federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub.

Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). Where the Governor has "some connection"

with the enforcement of the challenged statute, the Governor is a proper party. *Dream Defs. v.

Governor of the State of Fla.*, 57 F.4th at 889. Contrary to Defendants' assertions that Governor

---

[15] Shirin Faqiri, *Alabama Gov. Kay Ivey Signs Sweeping Law that Prohibits Diversity, Equity and Inclusion at Public Schools and Universities*, CNN (Mar. 20, 2024), https://amp.cnn.com/cnn/2024/03/19/us/alabama-bill-bans-dei-public-universities-reaj; *see also* Jemma Stephenson, *Gov. Kay Ivey Signs Bill to Limit Public Funds for DEI, Use of 'Divisive Concepts' in Alabama*, Ala. Reflector (Mar. 20, 2024), https://alabamareflector.com/2024/03/20/gov-kay-ivey-signs-bill-to-limit-public-funds-for-dei-use-of-divisive-concepts-in-alabama/.

[16] None of Defendants' cited cases involved the clear statutory enforcement authority and intent found here. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (Secretary of State had no control over the alleged improper printing of names on a ballot); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301-02 (11th Cir. 2019) (Attorney General had no enforcement capability to provide employees allegedly owed wages from employer); *City of S. Miami v. Governor*, 65 F.4th 631, 645 (11th Cir. 2023) (Governor had no ability to redress injuries stemming from actions of local law enforcement).

Ivey merely signed the bill into law, SB 129 expressly provides her with statutory authority to enforce the Act. SB 129 § 3. Moreover, she has publicly declared her intention to do so. Doc. 1, ¶ 81. Because she has both the authority and the intention to enforce SB 129, she is a proper defendant to claims for prospective injunctive relief, placing her squarely within the bounds of the *Ex parte Young* exception.

## V.    The Complaint States a Claim for Violations of the First Amendment.

The Supreme Court has consistently acknowledged that universities occupy a unique position within First Amendment jurisprudence. *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."). In contravention of this well-established precedent, Defendants argue that the First Amendment offers no protection for classroom instruction. Doc. 32-1, p. 27-28. This argument lacks merit.

### A.  SB 129 Violates the First Amendment Rights of the Professor Plaintiffs.

Defendants begin with the premise that public university professors have no First Amendment rights regarding their teaching because such teaching constitutes government speech—a contention that no federal appellate court has endorsed. *See id.* To the contrary, the Eleventh Circuit applies a balancing test for public university professors' speech in the classroom, and that balancing test weighs in favor of the Professor Plaintiffs' First Amendment rights. *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).

#### i.    Professor Plaintiffs' Speech Is Not Government Speech.

Defendants argue that, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Professor Plaintiffs' class instruction is not entitled to First Amendment protection because it constitutes

government speech. Doc. 32-1, p. 28-29. Defendants' reliance on *Garcetti* is misplaced. In *Garcetti*, the Supreme Court held that public employee speech is not protected if it is expressed pursuant to the employee's "official duties." *Garcetti*, 547 U.S. at 421. The court explicitly stated that "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425.

In fact, none of Defendants' cited cases hold that the government speech principles articulated in *Garcetti* are applicable to the classroom instruction of a university professor. Doc. 32-1, p. 28-35. In *Rosenberger*, which was decided over a decade before *Garcetti*, the Supreme Court noted that "the University's own speech" is "controlled by different principles" than the speech of "private persons whose speech it facilitates." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). Because that case involved university funding allocations to student organizations rather than curricular speech, the Court did not reach the issue of whether a professor's in-class instruction is equivalent to "the University's own speech." *See id.*; *see also Pernell*, 641 F. Supp. 3d at 1238 ("*Rosenberger* did not hold or even suggest that everything a professor utters in a university classroom is the university's speech."). In *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217 (2000), another pre-*Garcetti* student organization funding case, the Court noted in dicta that, if the case at issue had involved "speech by an instructor or a professor in the academic context," then "principles applicable to government speech would have to be considered." *Id.* at 235. But the Supreme Court explicitly considered those same government speech principles in *Garcetti* and declined to rule that they applied to university classroom instruction.

Notably, every Court of Appeals that considered this issue post-*Garcetti* has declined to

apply government speech principles to in-class instruction at the university level.[17] *See Heim*, 81 F.4th at 226 (declining to extend *Garcetti* to apply the government speech doctrine to professor's academic scholarship); *Porter v. Bd. of Trustees of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023) ("As this Court has repeatedly recognized, the Garcetti rule does not extend to speech by public university faculty members, acting in their official capacity, that is 'related to scholarship or teaching.'") (citations omitted); *Meriwether v. Hartop*, 992 F.3d 492, 504-05 (6th Cir. 2021) (concluding that Supreme Court precedent weighed in favor of ruling that First Amendment protections apply to university professors' classroom speech); *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) ("We decline the University officials' invitation to extend *Garcetti* to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so."); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("We conclude that *Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor.").

As the Sixth Circuit explained:

[O]ur court has rejected as "totally unpersuasive" "the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). And we have recognized that "a professor's rights to academic freedom and freedom of expression are paramount in the academic setting." *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001); *see Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188-89 (6th Cir. 1995).[1] Simply put, professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship. *See Hardy*,

---

[17] The cases cited by Defendants are inapposite. Both *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), and *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), did not involve education. The plaintiffs in *Lee v. York Cnty. School. Div.*, 484 F.3d 687 (4th Cir. 2007), and *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007), taught at secondary and elementary schools, not universities, which has more academic freedom. The Third Circuit opinion in *Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488 (3d Cir. 1998), predates *Garcetti* and expressly acknowledges its conflict with *Bishop*. *Id.* at 491. The unpublished, per curiam Eleventh Circuit decision cited by Defendants concerned a teacher's response on a cheerleader tryout questionnaire, submitted "pursuant to her duty as junior varsity cheerleader sponsor." *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 887 (11th Cir. 2006). The teacher's actions did not involve academic scholarship or instruction, so *Gilder-Lucas* provides no support for Defendants' argument that government speech principles should be applied to a university professor's in-class instruction.

260 F.3d at 680.

*Merriweather v. Hartop*, 992 F.3d 492, 505 (2021).

Importantly, the Supreme Court has directed courts to "exercise great caution before extending our government-speech precedents" because those precedents are "susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Defendants contend that the *Garcetti* academic carve-out cannot be reconciled with *Bishop*, but the *Garcetti* court recognized that "additional constitutional interests" are implicated when considering academic instruction. *Garcetti*, 547 U.S. at 425. This is consistent with *Bishop*'s holding that the balancing of university and professor interests is more appropriate for evaluating a professor's in-class speech than a bright-line rule that always resolves in the university's favor. "To the extent Defendants urge this Court to determine that university professors' in-class speech is always pure government speech, the weight of binding authority requires this Court to decline the invitation." *Pernell*, 641 F. Supp. 3d at 1241.

> ### ii.    The Professor Plaintiffs Have Alleged Sufficient Facts to State a Claim Under the First Amendment.

Defendants contend that, if *Garcetti* does not apply (and it does not), the Eleventh Circuit's decision in *Bishop*, 926 F.2d 1066, governs this action. Doc. 32-1, p. 30-31. The facts of *Bishop* are readily distinguishable from the present case, and application of *Bishop's* balancing test weighs in favor of denying Defendants' motions to dismiss.

To analyze a professor's First Amendment claim, the Eleventh Circuit developed a balancing test to evaluate "to what degree a school may control classroom instruction before touching the First Amendment rights of a teacher." *Bishop*, 926 F.2d at 1073. The *Bishop* court concluded that a "case-by-case inquiry" is required to determine "whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Id.* at 1074. This

fact-specific inquiry considers three factors:

> (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than the those of other persons," especially in light of "the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment."

*Id.* at 1074-75. Application of the test supports the validity of Plaintiffs' First Amendment claims.

### a.  The Context

In *Bishop*, the university sought only to prevent the professor from making assertions about his religious beliefs, which were irrelevant "vis-a-vis the subject matter of his [exercise physiology] courses." *Id.* at 1076. Here, Defendants do not argue that the Professor Plaintiffs attempted to interject any material that is outside the scope of their courses. The topics that are covered by SB 129's divisive concepts are directly related to their fields of study and are part of UA-approved courses. Professor Simon, for example, was threatened with discipline over a student-led project that was part of her approved curriculum. Doc. 1, ¶¶ 17, 92-93.[18] A university's attempt to stop a professor from inserting irrelevant religious views into a secular class is distinct from the restrictions that SB 129 imposes on professors seeking to present course material and viewpoints that are pertinent to their assigned subject matter. *See Pernell,* 641 F. Supp. 3d at 1271 ("*Bishop* might have had a different outcome had Dr. Bishop taught a religious studies class and instead offered his views regarding his own faith while instructing on Christianity.").

Defendants assert that *Bishop* gives universities the authority to discipline professors who

---

[18] The "optional class" class that drew university rebuke in *Bishop* is distinguishable from the final project Professor Simon assigned in her Anti-Oppression and Social Justice course. In *Bishop*, the professor hosted optional meetings to share his own "'Christian Perspective' of an academic topic" with his students. *Bishop*, 926 F.2d at 1069. Here, the students, rather than the professor, sought to share their views through a final project, so the fear of possible "coercion" in *Bishop* was not present in Professor Simon's course. *See id.* at 1074.

do not comply with their curriculum decisions, including through possible termination. Doc. 32-1, p. 29. SB 129 is not a regulation on university "curricular choices," as defendants describe, Doc. 32-1, p. 28, but rather viewpoint discrimination on what a professor can teach within university-approved courses. In addition, the university action that the plaintiff received in *Bishop* was a memo "proscrib[ing] particular conduct of Dr. Bishop so that he can know what the University does not want him to do." 926 F.2d at 1078. Here, due to the vagueness of the law, the Complaint describes how the Professor Plaintiffs are unsure what the university wants them to do and are therefore forced to choose between self-censoring and risking loss of their jobs. Doc. 1, ¶ 86. The serious consequences of violating the law, as well as the substantial chilling effect caused by those consequences, further distinguish this case from *Bishop*.

*Bishop* concerned a university memo reprimanding an individual professor based on specific concerns about irrelevant content being inserted into his course instruction. 926 F.2d at 1068-70. In contrast, SB 129 is a state-wide directive from the legislature that applies to every public educator in Alabama. Rather than redirect the conduct of an individual professor, SB 129 "chills potential speech before it happens," and the "widespread impact" of the legislation "gives rise to far more serious concerns than could any single supervisory decision." *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995).

**b. State Interests**

Viewpoint discrimination is presumed unconstitutional. *Rosenberger*, 515 U.S. at 829. "[T]he dangers of viewpoint discrimination are heightened in the university setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)). Due to SB 129's viewpoint-based restrictions, the state interests at stake in this case carry far less weight than those present in *Bishop*.

In *Bishop*, the university sought to impose a viewpoint neutral restraint on *all* religious content that was unrelated to the course, regardless of the viewpoint. 926 F.2d at 1077-78. By contrast, Defendants concede that SB 129 is a viewpoint-based restriction on professor speech.[19] Their extreme assertion that the university may engage in viewpoint discrimination by virtue of its position as a public employer contravenes established precedent that "the First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

Defendants argue that the constitutional harms of these viewpoint-based restrictions are outweighed by their interest in regulating course content and curriculum. But SB 129 does not prohibit particular curricula or courses; instead, it prohibits a variety of *concepts* associated with certain viewpoints. By "prohibiting only one perspective," SB 129 improperly "targets 'particular views taken by'" professors. *Speech First*, 32 F.4th at 1127 (quoting *Rosenberger*, 515 U.S. at 829). This censorship based on viewpoint has no pedagogical justification, but rather imposes the preferred viewpoints of state elected officials onto all Alabama public university professors. Defendants have presented no state interest sufficient to outweigh this presumptively unconstitutional restriction on professor speech.[20]

### c. <u>Academic Freedom</u>

---

[19] Doc. 32-1, p. 33 (explaining that SB 129 restricts the Professor Plaintiffs from "teach[ing] certain subjects and viewpoints related to race in her social work classes").

[20] Defendants suggest that the university's interest in avoiding an Establishment Clause violation was immaterial to the *Bishop* court's free speech analysis. Doc. 32-1, p. 33 n.8. On the contrary, the Eleventh Circuit indicated that the religious nature of the professor's commentary was germane to its consideration of the university's interest in regulating professors' in-class speech. *See Bishop*, 926 F.2d at 1076 ("The University's chief concern is that its courses be taught without personal *religious* bias unnecessarily infecting the teacher or the students.") (emphasis added); *see also Scallet v. Rosenblum*, 911 F. Supp. 999, 1011 n.13 (W.D. Va. 1996), *aff'd*, 106 F.3d 391 (4th Cir. 1997) (declining to apply *Bishop* "because the Establishment Clause concerns that lurked throughout the analysis in that case are wholly absent from the current case."). Here, Defendants have no state interest in avoiding potential religious coercion in the classroom.

Academic freedom is "a special concern of the First Amendment," *Keyishian*, 385 U.S. at 603, and serves as "an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1075. SB 129 threatens Plaintiff Professors' academic freedom and "impose[s] a[] strait jacket upon the intellectual leaders" at Alabama's public universities. *Sweezy v. State of N.H.*, 354 U.S. 234, 250 (1957). Defendants contend that, under *Bishop*, a university's decisions regarding curricular speech must always trump a professor's interest in academic freedom.[21] This contention conflicts with the Eleventh Circuit's recognition of "the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level." *Bishop*, 926 F.2d at 1075. And the Eleventh Circuit at least preliminarily rejected this argument by denying the defendants' motion for a stay on the preliminary injunction that was granted in favor of similarly situated plaintiffs in *Pernell*. *See Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992-J, 2023 WL 2543659, at *1 (11th Cir. Mar. 16, 2023) (declining to stay, pending appeal of preliminary injunction barring enforcement of divisive concepts law in university setting). Although *Bishop* noted that a "[u]niversity" has "final say" over "disagree[ments] about a matter of content," *Bishop*, 926 F.2d at 1076, that is inapposite here, where the disagreement is about specific viewpoints rather than general content,[22] and the institution seeking "final say" is the Alabama legislature rather than a

---

[21] By citing non-binding authority in support of the contention that academic freedom belongs primarily to universities rather than educators, Doc. 32-1, p. 32-33, the Governor ignores Eleventh Circuit precedent recognizing instructors' individual interest in academic freedom. *See Bishop*, 926 F.2d at 1076 (noting "Dr. Bishop's interest in academic freedom and free speech"). Multiple courts in other jurisdictions also have concluded that academic freedom is an interest that belongs solely to the instructor, or to both the university and the instructor in equal measure. *See Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 553 (5th Cir. 1982) (collecting cases) ("[Academic freedom's] roots have been found in the first amendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method."); *Piarowski v. Illinois Cmty. Coll. Dist.*, 515, 759 F.2d 625, 629 (7th Cir. 1985) ("[Academic freedom] is used to denote both the freedom of the academy to pursue its ends without interference from the government . . . and the freedom of the individual teacher . . . to pursue his ends without interference from the academy.").

[22] Despite Defendants' suggestions to the contrary, Plaintiff Professors are not demanding that Defendants modify the current university curriculum or accommodate requests for new course content. Instead, they claim that SB 129 restricts their ability to teach facts and discuss viewpoints that they have already incorporated into the

-27-

university.[23]

Although the state may have discretion regarding the subjects and subject matter taught at a public university, its ability to regulate the content of its courses does not support a prophylactic ban on professors' ability to espouse views with which legislators disagree.[24] *Pernell*, 641 F. Supp. 3d at 1277. The Alabama legislature's intrusion on both the university's administrative decision-making and professors' instructional choices impedes universities' "chief mission," which "is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

**B.  Student Plaintiff Miguel Luna Has Stated a First Amendment Claim.**

The Supreme Court has held that the First Amendment protects the right to speak as well as "the right to receive information and ideas." *Stanley*, 394 U.S. at 564. The right to receive information is an "inherent corollary" of the right of free speech. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 457 U.S. at 867 (plurality opinion) (citation omitted).

Defendants lack merit in asserting that, under *Bishop,* students cannot have a right to receive information in the classroom because professors have no right to send information about

---

curriculum throughout their long teaching careers, and are at substantial risk of self-censoring these facts and viewpoints due to SB 129's chilling effect. *See* Doc. 1, ¶ 86.

[23] Statements by SB 129's sponsors and supporters demonstrate that a primary goal of the law was to suppress viewpoints that the Alabama legislature deemed unfavorable. For example, after signing the bill, Governor Ivey indicated that SB 129 was part of a larger effort to censor a "liberal political movement" on college campuses. Doc. 1, ¶ 89 (quoting Ryan Quinn, *Alabama Governor Signs Bill Targeting DEI, 'Divisive Concepts'*, Insider Higher Ed (Mar. 22, 2024), https://www.insidehighered.com/news/quick-takes/2024/03/22/alabama-governor-oks-bill-targeting-dei-divisive-concepts).

[24] Contrary to Defendants' alarmist assertions, balancing a professor's interests against the university's interests, as the Eleventh Circuit directed in *Bishop*, would not leave universities powerless to address curricular speech that involved ahistorical views, such as Holocaust denial. Universities have viewpoint-neutral means of regulating professor conduct and, under *Bishop*'s balancing test, can prevent the teaching of wholly meritless views with the appropriate context and state interests. Indeed, in *Ali v. Woodbridge Twp. Sch. Dist.*, the case that the Governor cites in support of this assertion, the Third Circuit was not only silent as to whether the teacher's speech constituted government speech, it did not mention *Garcetti* at all. *See*, 957 F.3d 174 (3d Cir. 2020).

-28-

which the university disapproves. Doc. 32-1, p. 29. To the contrary, courts within the Eleventh Circuit have recognized that students have a right to receive information under *Bishop* and that the *Bishop* balancing test can be applied to the First Amendment claims of both professors and students. *Pernell*, 641 F. Supp. 3d at 1268. Plaintiff Luna is asserting his right to receive the information, ideas, and concepts that are available and that he would learn but for SB 129's restrictions and his professor's self-censorship. Luna reasonably fears this self-censorship because his professor has already demonstrated an intent to censor his own views. Luna is injured by the reasonable fear of his professor's self-censorship, and he has adequately alleged a First Amendment claim.

### C. Student Plaintiffs Luna, Campos, and Testman Have Stated First Amendment Claims with Respect to Student Organization Funding.

The loss of university funding for UFOs and Registered Student Organizations ("RSOs") pursuant to SB 129 also constitutes viewpoint discrimination under *Rosenberger*, which holds that once it "has opened a limited forum [,] . . . [t]he State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum," 515 U.S. at 829 (cleaned up). Luna, Campos, and Testman do not argue that their organizations should be given privileged positions on campus. Instead, Luna, Campos, and Testman contend that the allocation of funding based on the perceived viewpoints runs afoul of the First Amendment. Given that the university has created a limited forum, it is not reasonable to restrict funding for certain groups like SJAC and Esperanza based on perceptions that they are endorsing or supporting certain viewpoints like "divisive concepts" or constituting DEI programs.

The Governor is incorrect in her contention that UFOs constitute university speech and are distinguishable from the "CIOs" in *Rosenberger*. Doc. 32-1, p. 37. UFOs are similar to the "CIOs" in *Rosenberger* because UFOs like SJAC are not controlled and directed by the university. SJAC

was a student-run organization and had an affiliates board, comprised of students who made dispositive decisions about how funding was allocated. Doc. 1, ¶ 121.

The ability to include the University's logo on a UFO or the presence of an advisor does not transform UFO speech into extensions of university speech. The Supreme Court has ruled that even a school mail system deeply emmeshed in the university may operate as a public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 US 37 (1983). Only student organizations—regardless of UFO or RSO status—that the Alabama legislature deemed unfavorable, like the organizations to which Testman, Campos and Luna belonged, lost funding and/or the ability to apply for funding. This amounts to favoritism, which "is not an acceptable principle for allocating resources in a limited public forum." *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 102 (2d Cir. 2007). Even under Defendants' interpretation of *Rosenberger,* where UFOs constitute government speech and RSOs are the only limited public forums at issue here, student Plaintiffs have stated a claim. The Complaint alleges that the university's viewpoint-based student funding restrictions applied to both RSOs and UFOs. Doc. 1, ¶ 120. This viewpoint-based bar on state funding is unconstitutional.

### D.  Plaintiff Alabama NAACP Has Stated First Amendment Claims with Respect to its Freedom of Association Claims.

Plaintiffs sufficiently alleged that Defendants violated the UA NAACP's freedom of association rights when it closed the physical spaces on campus associated with the BSUand Safe Zone due to content-based viewpoint discrimination. Doc. 1, ¶ 131-32. *Widmar v. Vincent*, 454 U.S. 263 (1981) governs this case. In *Widmar*, the Supreme Court explained that "[t]hrough its policy of accommodating their meetings, the University has created a forum generally open for use by student groups . . . . The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first

place." *Id.* at 267-68. The Supreme Court held that "having created a forum generally open to student groups, the University seeks to enforce a content-based exclusion of religious speech. Its exclusionary policy violates the fundamental principle that a state regulation of speech should be content-neutral, and the University is unable to justify this violation under applicable constitutional standards." *Id.* at 277. The applicable legal standard under *Widmar* is that any content-based exclusion needs to be "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* at 271.

Alabama does not have a compelling state interest in eliminating physical spaces for BSU and Safe Zone due to their perceived relation to SB 129's divisive concepts. Even if curtailing spaces related to divisive concepts were a compelling state interest, the University of Alabama did not narrowly tailor its actions to reach that end. Instead, it completely shut down BSU and Safe Zone to restrict the perceived divisive concept-related programming purported to occur in those spaces. Indeed, Defendants failed to permit UA NAACP members to even attempt to continue to use BSU or Safe Zone in compliance with SB 129. Instead, Defendants shut down the BSU space altogether and turned it into a food pantry, and the Safe Zone space was transformed into a student lounge. Doc. 1, ¶ 131. Similar to *Widmar*, this content-based discrimination violates Plaintiff UA NAACP First Amendment freedom of association rights.

Contrary to Defendants' arguments, the UA NAACP's claim is not based on entitlement to privileged access to physical space on campus. Instead, this claim is based on the impermissible motive behind the elimination of these spaces: content-based discrimination. Plaintiffs agree that the university could move BSU and Safe Zone to make room for a food pantry and office space for any number of reasons. Those reasons, however, cannot be a pretext for impermissible content-based discrimination because of SB 129.

Defendants contend that this claim should be evaluated under *Rosenberger*'s viewpoint discrimination standard. But Plaintiff UA NAACP's freedom of association claim easily passes muster under *Rosenberger*, which distinguished between content and impermissible viewpoint discrimination. *Rosenberger,* 515 U.S. at 829-30. The closing of the BSU and Safe Zone spaces constitute viewpoint discrimination because these were spaces dedicated to supporting and celebrating Black and/or LGBTQIA students on campus; they were run by students and involved only student speech. Doc. 1, ¶ 131-32. The closure of these physical spaces due to the anticipated viewpoints of the students who occupied them runs afoul of the First Amendment standard in *Rosenberger*. Given that the university created a limited forum, it is not reasonable to place viewpoint-based restrictions on certain student groups' spaces for being perceived as being associated with endorsing or supporting SB 129's divisive concepts.

## VI.    The Complaint Sufficiently Alleges that SB 129 Is Unconstitutionally Vague.

Plaintiffs adequately allege sufficient facts to establish that SB 129 is unconstitutionally vague in violation of the Fourteenth Amendment. A statute can be void for vagueness if "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc). Plaintiffs' complaint plausibly pleads both, namely, that a person of ordinary intelligence is unable to reasonably understand what conduct is prohibited by SB 129, s*ee* Doc. 1, at ¶ 86-108, and SB 129 provides no guidance or standards to determine what violates it, as shown by the confusing and arbitrary enforcement of university administrators. *See* Doc. 1, at ¶¶ 118-56, 161, 163-64.

Federal courts have enjoined enforcement of statutes with prohibitions nearly identical to

SB 129's "divisive concepts," as void for vagueness. In 2020, a federal court preliminary enjoined enforcement of President Trump's Executive Order 13950 as impermissibly vague because the plaintiffs could not discern whether they could conduct employee trainings on implicit bias without promoting the prohibited concept that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). SB 129 contains an identical divisive concept (Section (2)(d)), and Professors Simon, Fording, and Patton similarly cannot discern whether they can teach evidence-based research about implicit bias or utilize the widely accepted Harvard Implicit Association Test. *See* Doc. 1, ¶¶ 95, 107-08. Other "divisive concepts" listed in SB 129 are also riddled with vague terms such that it is impossible to determine what speech is prohibited. Doc. 1, ¶ 9, 133-64.

Regardless of the vagueness of each individual "divisive concept," the entirety of SB 129 is rendered vague by the provision allowing "teaching or discussion of any divisive concept in an *objective manner and without endorsement* . . . provided the institution and its employees *do not compel assent* to any divisive concept." SB 129 § 3(3)(b) (emphasis added). In considering a similar provision, the court in *Honeyfund* held that "few terms are as loaded and contested as 'objective,'" and that the lack of clarity between "objective discussion" and "endorsement" rendered the entire law unconstitutionally vague. *See Honeyfund.com, Inc. v. DeSantis* 622 F. Supp. 3d 1159, 1183-84 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024). Likewise, in *Pernell*, a federal district court found that the plaintiffs were likely to succeed on the merits of their claim that Florida's "Stop W.O.K.E. Act" was unconstitutionally vague, concluding that the provision allowing for "objective" instruction of the prohibited divisive concepts "without endorsement" rendered the statute impermissibly vague on its face. 641 F. Supp. 3d at 1281-86.

SB 129 fails to explain the difference between a discussion of the divisive concepts that would be deemed, on the one hand, "objective" and "without endorsement" and, on the other hand, a discussion "compel[ling] assent." Defendants assert that teaching a divisive concept "in an objective manner without endorsement" is easily understood because "it means discussing concepts 'without distortion by personal feelings, prejudice, or interpretations.'" Doc. 32-1, p. 45. It is untenable how UA professors could teach complex issues associated with structural racism, implicit bias, and other harms to historically marginalized communities without engaging in "interpretation" or otherwise running afoul of teaching a "divisive concept." *See e.g.* Doc. 1, ¶¶ 93-94, 98, 101-06. It is also unclear how to teach topics of racism or sexism as foundational truths rather than theories contemplated by academics without arguably "endorsing" or "compelling assent" to a divisive concept. Further, SB 129's apparent safe harbor that permits teaching "divisive concepts" in a "historically accurate" manner is also mired in vagueness, given that the histories concerning many of the concepts are subject to competing views and debate. Accordingly, the law fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" in violation of due process under the Fourteenth Amendment. *Honeyfund*, 622 F. Supp. 3d at 1184 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Defendants' remaining arguments that SB 129 is readily understood are unavailing.[25] SB 129's circular definitions cannot save the statute from its vagueness problems. The definition of a DEI Program is defined, in part, as anything "that otherwise violates this act." SB 129 § 2(3).

---

[25] Defendants' cited cases are factually and legally inapposite. *See O'Laughlin v. Palm Beach Cnty.*, 30 F. 4th 1045, 1055 (11th Cir. 2002) (considering restriction on firefighters' profane speech on social media); *Arnett v. Kennedy*, 416 U.S. 134, 162 (1974) (considering law allowing termination for "cause" of civil servant based on defamatory statements about coworkers); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (1992)(considering whether dismissal standards of a professor "for cause" was vague where Professor was terminated for exploiting visiting scholars from China into forced labor); *Garrett v. Matthews*, 625 F.2d 658, 660 (5th Cir. 1980) (reviewing faculty handbook's regulations on discipline).

Defining a term by other undefined and confusing terms in the act only further highlight SB 129's vagueness. Defendants then list prohibitions in Section 2 of the Act and declare that those provisions are easily understandable with no further explanation. Finding English words in a dictionary "does not magically extinguish vagueness concerns." *Honeyfund.com*, 622 F. Supp. 3d at 1181 (citation omitted), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024). To the extent that a "close case" would merit a presumption of validity of a statute, this is no close case. The existence of some clear language or proscribed conduct in a statute does not redeem the constitutional infirmities arising from its overall vagueness. *See Honeyfund.com*, 622 F. Supp. 3d at 1181 (declaring Florida law unconstitutionally vague when "[d]efendants may be right that some of the prohibited concepts are not vague. But some certainly are").

The existence of an alleged scienter requirement also does not sufficiently mitigate the statute's widespread vagueness. As an initial matter, a scienter requirement does not alleviate the risk that Student Plaintiffs' organizations and the UA NAACP will be deemed to be prohibited DEI Programs and the consequences flowing from that designation. Nor does it remedy the loss of funding suffered by the student organizations and the threats of discipline UA professors have already received despite SB 129's scienter requirement. Further, SB 129's statement that it should be interpreted to not violate the First Amendment cannot remedy the inability of a person of ordinary intelligence to determine what is proscribed. *See* Doc. 1, ¶ 104. It also does not resolve the likelihood of inconsistent or arbitrary enforcement; rather, it increases the risk.

SB 129's ambiguous language encourages inconsistent, arbitrary, and discriminatory enforcement, which further supports a finding of vagueness—a point that Defendants do not challenge. University students are confused about which student groups can be funded under SB 129 due to the lack of standards or criteria as to what might be considered a DEI program or

supportive of a "divisive concept." *See* Doc. 1, ¶¶ 118-32, 161, 163-64. Multiple student organizations at UA and UAB have arbitrarily lost state university funding and resources for their programs that support and celebrate the diverse members of their campuses. *Id.* This includes at least seven student organizations, including SJAC, the Black Student Awareness Committee, the Indian Student Association, the Spanish and Latino Association, and the Korean Student Association at UAB, as well as the BSU and the Safe Zone at UA. *See* Doc. 1, ¶ 123. Under the vague rubric of what SB 129 considers to be a "diversity, equity, and inclusion program" or a "divisive concept," the law invites discriminatory enforcement against organizations that support students of color and LGBTQIA students.

UA professors have received confusing and conflicting guidance about SB 129, indicating that administrators also do not know what SB 129 means or how to enforce it. *See* Doc. 1, ¶ 133-156. For example, UA published guidance[26] about SB 129 but that guidance fails to clarify the meaning of "divisive concepts," merely instructing professors to rely on their own individual interpretations. Additionally, UA offered training to professors, advising them to refrain from conducting tests or evaluations on "divisive concepts," *see* Doc. 1, ¶¶ 150-51, or directing them to avoid saying anything that could "be construed as an effort" to compel students to agree with "divisive concepts." Doc. 1, ¶¶ 90-91. None of this guidance provided clarity on how graded assessments can or cannot comply with SB 129, how a statement could be "construed" as a divisive concept, or how that determination would be made. These trainings have only caused further confusion.

Professor Simon was accused of purported violations of SB 129 due to a student-led class

---

[26] *Working Guidance for Compliance with Federal Law and Alabama Act 2024-34*, Univ. Ala., https://deiguidance.ua.edu/#faculty (last visited Jan. 29, 2025).

project that did not include any test or evaluation on any divisive concept. *See* Doc. 1, ¶ 136-37. Furthermore, although she received an initial notice that SB 129 would not impact how she could teach her curricula, *see* Doc. 1, ¶ 139, she was reprimanded later for teaching subject matter that neither specifically fell within the statutory definition of any "divisive concept" nor the statutory definition of a "DEI program." *See* Doc. 1, ¶ 136-37.

Professor Patton was also notified by UA administration that her course, *Understanding Poverty*—which focuses on topics like systemic racism, supporting anti-racism, correcting social injustice, and producing engaged global citizens—may conflict with SB 129. *See* Doc. 1, ¶ 140-145. After receiving a student complaint concerning classroom discussions about topics such as White privilege, UA administrators requested Professor Patton to provide extensive information about her class, including course materials, instruction procedures, and "clarif[ication]" of her "position on open discussion." *See* Doc. 1, ¶ 143. The Senior Associate Provost warned Professor Patton that if she refused to answer these questions, she could receive progressive discipline or termination. *Id.* This arbitrary enforcement of SB 129 pressures UA professors to overcompensate their compliance with SB 129, thereby amplifying the chilling effect on their First Amendment rights.

**VII.    The Complaint States a Claim Under the Equal Protection Clause.**

Plaintiffs adequately allege sufficient facts that support the inference that the Alabama Legislature enacted SB 129 with a discriminatory purpose and that SB 129 has a discriminatory effect on Black professors and Black students. A law is unconstitutional under the Equal Protection Clause if "the State's decision or act had a discriminatory purpose and effect." *Greater Birmingham Ministries v. Sec'y of Ala.* ("GBM"), 992 F.3d 1299, 1321 (11th Cir. 2021) (internal marks omitted). "Determining whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266. The Eleventh Circuit relies on five factors recommended by the Supreme Court in *Arlington Heights*, along with three additional factors:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives."

*GBM*, 992 F. 3d at 1321-22.

Although these factors inform the discriminatory purpose inquiry, courts should not "miss[] the forest in carefully surveying the many trees" by focusing on each factor in isolation, or to the exclusion of other relevant evidence. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). These factors are non-exhaustive, and a Plaintiff is not required to prove the existence of each and every factor. *See GBM*, 992 F.3d at 1327. Rather, discriminatory purpose under *Arlington Heights* is determined "from the totality of the relevant facts," and courts must weigh the evidence as a whole. *Washington v. Davis*, 426 U.S. 229, 242 (1976). "The *Arlington Heights* factors require a fact intensive examination of the record." *GBM*, 992 F.3d at 1322 n.33.

As such, these claims are rarely dismissed at the pleading stage, where the record is not fully developed. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (noting legislature's motivation is a factual question); *Dream Defs.*, 553 F. Supp. 3d at 1094. Defendants ask the Court to ignore many of the allegations in the Complaint and draw different, less reasonable inferences based on Defendants' selective recitation of the facts. Doc. 32-1, p. 48-50; Doc. 33-1, p. 8-13. This is not the proper inquiry on a motion to dismiss. Instead, the Court must first accept the allegations in the Complaint as true, construe them in the light most favorable to Plaintiffs, and then draw all

reasonable inferences in Plaintiffs' favor to determine whether the claim is plausible on its face.[27] *See Hunt v. Amico Props., L.P.,* 814 F.3d 1213, 1221 (11th Cir. 2016); *Ashcroft*, 556 U.S. at 678-79. After examining all Plaintiffs' allegations, it is clear that Plaintiffs sufficiently state a claim of discriminatory purpose and effect, especially because the Complaint alleges facts that support each of the factors identified by Eleventh Circuit and the Supreme Court to guide the inquiry. *See GBM*, 992 F. 3d at 1321-22.

The discriminatory purpose need not be the "dominant or [even a] 'primary' one." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Rather, it need only be a motivating factor because "[r]arely can it be said that a legislature . . . operating under a broad mandate made a decision motivated solely by a single concern." *Id.* at 265. Additionally, Defendants' alternative motivations behind SB 129, such as preventing discrimination, are improper as rebuttal arguments, which should not be considered on a motion to dismiss. *See Jean v. Nelson*, 711 F.2d 1455, 1487 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). Accordingly, Defendants' motion to dismiss Plaintiffs' Equal Protection Clause claim should be denied.

### A. Plaintiffs Have Alleged Sufficient Facts About SB 129's Discriminatory Impact.

Plaintiffs allege sufficient evidence regarding SB 129's discriminatory impact to state a claim of intentional discrimination. The complaint clearly alleges that Black faculty are more likely to teach and research on topics related to race and racism, that Black faculty are more likely

---

[27] The presumption of legislative good faith is not dispositive, especially at the motion to dismiss stage. *See Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 863-67 (D. Ariz. 2022) (finding that presumption of legislative good faith did not defeat plaintiffs' discriminatory intent allegation at motion to dismiss stage). Nor should Defendants rely on *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024), for the proposition that the presumption of legislative good faith requires inferences in their favor at the motion to dismiss stage. In *Alexander* the U.S. Supreme Court applied the presumption of good faith to a full trial record, not a motion to dismiss. Moreover, *Alexander* did not reach the merits of the intentional discrimination count or engage in any *Arlington Heights* analysis but instead remanded that case back to the trial court.

to offer assignments related to race and racism, and teach courses related to race and racism, and that Black students receive tangible benefits from curriculum addressing issues of race and racism. Doc. 1, ¶¶ 220-21, 223, 201-02. Professor Simon, a Black professor, has been one of the first faculty members targeted by enforcement of SB 129 for her pedagogy and curriculum. *Id*. ¶ 17. SB 129's enforcement continues to have a disparate impact on Black professors like Professor Simon by restricting curriculum that represents her community, Black history, and contemporary topics related to Black identity. *Id*. ¶¶ 93-94. Moreover, UA's enforcement of SB 129 has a disparate effect on Black professors like Professor Simon and her Black students because it prevents her from supporting Black students, such as those who received racist texts message after the 2024 election, and recognizing Black trailblazers in her department. *Id*. ¶¶ 138, 158.

Regarding SB 129's disproportionate impact on Black students, Plaintiffs allege that Black students are more likely to enroll in and benefit from courses that cover topics that are implicated by SB 129's divisive concepts, such as race and gender studies. *Id*. ¶ 201-06. In addition, Plaintiffs allege that several student organizations, whose missions involved supporting and serving Black students, such as the Black Student Awareness Committee, lost university funding in the wake of SB 129. *Id*. ¶ 211. Moreover, the UA NAACP and their Black members at UA experience disparate harm from SB 129 through the closure of the BSU's on-campus space, the closure of the Capitol Room for the Black Faculty and Staff Association, and the ending of the DEI passport program— all of which are evidence of discriminatory impact. *Id*. ¶¶ 131, 207, 210-11, 217, . These physical spaces, organizations, and programs that were eliminated by UA pursuant to SB 129 were designed to benefit Black individuals by providing support and other services due to unfair disadvantages, reducing racial isolation, and breaking down barriers to opportunity. Thus, SB 129's enforcement

has caused Black Plaintiffs to experience disparate harm, providing evidence of discriminatory impact.

Plaintiffs' allegations of particularized facts about chilled speech, the discriminatory removal of spaces, and the disproportionate harm on Black instructors and students stemming from SB 129's suppression of race-related instruction and programming constitute sufficient pleading of discriminatory effect to survive a motion to dismiss. *Dream Defs.*, 553 F. Supp. 3d at 1094-95 (denying motion to dismiss, relying, in part, on allegations of how law enforcement selectively enforced laws designed to quell protests in a manner that disparately harmed Black protestors, as well as past data on disparities in criminal justice system). Contrary to Defendants' arguments, the fact that SB 129 also harms non-Black Plaintiffs does not dissipate the disproportionate harm of SB 129 on Black students and Black Professors. *Id.* ¶¶ 220-21, 223, 201-02, 17, 158, 138, 131, 217, 207. Indeed, the First Amendment harm suffered by the Professor Plaintiffs who are not Black stems from their scholarship and pedagogical choices to focus on topics designed to combat anti-Black racial inequities. *Id.* ¶¶ 18, 101, 103, 141-42, 152, 154.

Accepting Defendants' interpretation of Equal Protection doctrine leads to the absurd conclusion that an Equal Protection claim can only prevail if the law solely impacts people of a particular race. Doc. 32-1, p. 51; Doc. 33-1, p. 7. This view unreasonably raises an already high burden of proof for intentional discrimination claims and conflicts with long-standing Supreme Court precedent that a facially race-neutral statute can be struck down on Equal Protection grounds, even when the law applies to White individuals and the suit includes White plaintiffs. *See Hunter v. Underwood*, 471 U.S. 222, 226-32 (1985) (finding Equal Protection violation where provision in Alabama Constitution disenfranchised persons of all races convicted of crimes involving moral turpitude); *see, e.g., Dream Defs.*, 553 F. Supp. 3d at 1094-95 (denying motion to

dismiss and allowing the plaintiffs' Equal Protection Clause claim to proceed on behalf of Black protestors and Black-led organizations even though protest law applied broadly).

### B. Plaintiffs Have Alleged Sufficient Facts That SB 129's Discriminatory Impact Was Foreseeable.

Plaintiffs allege sufficient evidence regarding the foreseeability and knowledge of the discriminatory impact on Black professors and students. For example, Plaintiffs allege that Senator Will Barfoot, SB 129's sponsor, introduced SB 129 because of his concerns about public discourse around Black people and law enforcement. Doc. 1, ¶ 177. Plaintiffs also allege that Representative Ed Oliver stated that he supported SB 129 to address his concerns about Critical Race Theory. Doc. 1, ¶¶ 80, 178. Plaintiffs further allege that when "Senator Rodger Smitherman cautioned about the discriminatory impact of SB 129 on Black students, and the need for all to work to remedy the vestiges of slavery and Jim Crow in Alabama, Sen. Barfoot quipped: 'we are not responsible for that.'" *Id.* ¶ 197. These statements by SB 129 supporters demonstrate their knowledge about the foreseeable impact of SB 129 on Black people. *See Dream Defs.*, 553 F. Supp. 3d at 1094 (statement from bill's sponsor sufficient to deny motion to dismiss Equal Protection claim).

Despite Defendants' contentions, at the motion to dismiss stage this Court must accept as true the allegations regarding the impact on SB 129 on Historically Black Colleges and Universities, Doc. 1, ¶ 194, the harmful effects on Black Alabamians, *id.* ¶ 195, and the description of the bill as inherently racist by SB 129's opponents, *id.* ¶ 196. Moreover, Plaintiffs allegations that the Alabama Legislature was on notice because of similar lawsuits in Florida and Oklahoma provide additional evidence of foreseeability and knowledge, *id.* ¶ 73, regardless of the procedural posture of those cases at the time SB 129 was enacted. The plaintiffs in those cases raised intentional discrimination claims in their complaints, and those lawsuits challenged the same

divisive concepts that Alabama legislators enacted into law. As such, Plaintiffs' allegations easily support the inference that the Legislature had notice of SB 129's discriminatory impact on Black professors and students.

### C. Plaintiffs Have Alleged Sufficient Facts About SB 129's Historical Background.

Plaintiffs allege sufficient evidence about the historical background of SB 129 to support an inference of intentional discrimination. Defendants misrepresent these allegations, as limited to events occurring decades ago and wholly unconnected to SB 129. This misrepresentation aims to minimize the clear connection between the increased efforts to address anti-Black racism in response to the racial justice demonstrations of 2020 and the Alabama Legislature's racially motivated attempt to suppress those efforts through SB 129. Doc. 1, ¶¶ 63-73. The particular context of Alabama's history of systemic racism, the discrimination suffered by Black students in public education, and the statements about "Critical Race Theory," "Diversity, Equity, and Inclusion," and "wokeness" by Governor Ivey and Alabama state legislators all constitute relevant circumstantial evidence that the Court can and should consider under *Arlington Heights*. *See Rogers v. Lodge*, 458 U.S. 613, 625 (1982) ("“Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination . . . ."); *I.L. v. Ala.*, 739 F.3d 1273, 1286-87 (11th Cir. 2014) (noting that the district court properly considered plaintiff's historical context allegations, including those related to "Alabama's long-lived hostility to . . . funding public education of black children" and acknowledgement that "Alabama's 'racist past . . . cast long shadows'"); Doc. 1, ¶¶ 74-81. The allegations regarding the full historical context of SB 129, which the Court must accept as true, support sufficient pleading of discriminatory intent.[28]

---

[28] Supra, footnote 27.

-43-

**D. Plaintiffs Have Alleged Sufficient Facts About the Sequence of Events and the Contemporary Statements and Actions of Key Legislators.**

Plaintiffs allege sufficient evidence regarding the sequence of events and contemporary statements of key legislators. Those allegations include the Alabama Legislature's advancement of multiple bills, in sessions leading up to the passage of SB 129, that banned divisive concepts to censor certain discussions about racism and the history of Black Americans, including a bill to ban teaching that "slavery and racism are anything other than deviations from . . . the founding principles of the United States." Doc. 1, ¶¶ 165-69. These allegations are sufficient to demonstrate that SB 129 is the culmination of a sequence of legislative attempts to prohibit certain discussions about race and racism involving Black Alabamians. Defendants' contention that these prior bills are unconnected to SB 129 are belied by the inclusion of SB 129's divisive concepts in these previous legislative attempts, establishing evidence of a clear throughline. *Id.* ¶¶ 165-69.

Defendants are incorrect in asserting that key statements by Senator Barfoot, Representative Oliver, and Governor Ivey do not demonstrate discriminatory intent.[29] Doc. 32-1, p. 59. These statements show an intent to curtail speech about "DEI" "Critical Race Theory," and "systemic racism," revealing SB 129's "actual purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996); *Dream Defs.*, 553 F.Supp.3d at 1094-95; *see* ¶¶ 78, 79, 80, 178, 177, 197. All of the subject matter and topics that were targeted by the legislators and Governor Ivey concern efforts to address ongoing and systemic inequalities suffered by Black people in the United States—efforts that benefit Black people. Thus, the prohibitions against these particular topics specifically aim to likewise prohibit efforts to address ongoing and systemic inequalities, to the detriment, disadvantage, and harm to Black people, in particular.

---

[29]*Id.*

Defendants argue that even if these statements demonstrate discriminatory intent, they cannot be imputed to the whole legislature. Doc. 32-1, p. 60. But the motivations of SB 129's proponents were then ratified by the legislature, which understood SB 129's purpose to suppress disfavored viewpoints about race and racism, as relevant to Black Americans, and to cut state resources and physical spaces from Black students and faculty. *See Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1007 (11th Cir. 2018); *Tracy P. v. Sarasota Cty.*, No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801, at *6 (M.D. Fla. Sep. 5, 2007) ("Government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others."). Thus, the allegations regarding the sequence of events leading up to SB 129 and the statements by key legislators, which the Court must accept as true, sufficiently support a pleading of discriminatory intent.

### E.  Plaintiffs Have Alleged Sufficient Facts About SB 129's Substantive Departures.

Plaintiffs allege sufficient evidence regarding the procedural and substantive departures leading up to the passage of SB 129.[30] Plaintiffs alleged that the legislative process to enact SB 129 was procedurally rushed, lacked transparency, and prevented meaningful engagement from legislative opponents, experts, or members of the public. Doc. 1, ¶¶ 182-89, 192. Contrary to Defendants' contention of "so, what?," Doc. 32-1, p. 61, similar rushed and truncated legislative debate has been found to support an inference of discriminatory intent. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016) (noting the previous legislative process of a revised bill to provide evidence of discriminatory intent when "the process for the 'full bill; was, to say the very least, abrupt"); *see also Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 607-08 (2d Cir. 2016) (finding "oddness and abruptness" of timing of city ordinance supported

---

[30]*Supra*, footnote 27.

-45-

race-based animus); *Dream Defs. v. DeSantis,* 553 F. Supp. 3d 1052, 1095 (N.D. Fla. 2021) (holding allegations that there were substantive and procedural departures in a Florida bill's passage, including the legislature's rushed timeline for consideration, support the assertion that the bill had a discriminatory purpose); *see also Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1295 (N.D. Fla. 2021) (explaining that allegations that the Florida legislature "passed SB 90 in a short flurry of activity that allowed for essentially no public input and barely any legislative input" were sufficient in denial of motion to dismiss).

Plaintiffs allege that SB 129 is the first law that Alabama has enacted to regulate what is taught in higher education through the Legislature instead of the Alabama Commission on Higher Education. Doc. 1, ¶¶ 190-91. This kind of substantive departure supports an inference of discrimination, especially where, as here, the legislature enacts a law that addresses a non-existent problem. *See McCrory*, 831 F.3d at 235-37; *Veasey v. Abbott*, 830 F.3d 216, 238-39 (5th Cir. 2016). The allegations regarding the procedural and substantive departures of SB 129, which the Court must accept as true, sufficiently support a pleading of discriminatory intent.

### F.  Plaintiffs Have Alleged Sufficient Facts About the Availability of Less Discriminatory Alternatives.

Plaintiffs alleged sufficient evidence regarding the availability of less discriminatory alternatives in the Complaint:

> Plaintiffs allege "any concerns about discrimination against students on campus could have been addressed through existing anti-discrimination law. In addition, any concerns about what university students were learning could have been addressed by the Alabama Commission on Higher Education instead of the Alabama Legislature so that any curricular changes would be focused on pedagogy versus the preferences of the legislature.

Doc. 1, ¶ 181. Citing *League of Women Voters of Fla., Inc v. Fla Sec'y of State*, 66 F.4th 905, 942 (2023), Defendants argue that Defendants are not required to utilize the alternative options suggested by Plaintiffs. Doc. 32-1, p. 62. *League of Women Voters* is distinguishable, however,

because the court in that case was presented with the legitimate goal of preventing voter fraud. Although Defendants assert that SB 129's goal was to prevent discrimination, Doc. 32-1, p. 21-22, the actual record demonstrates that the law's stated goal was to prevent alleged indoctrination and ban the promotion of certain ideological concepts. Doc. 1, ¶¶ 75, 79-81, 178. The legislative record fails to support the contention that SB 129's proponents enacted it to combat discrimination. Doc. 1, ¶¶ 75, 79-81, 178. Unlike *League of Women Voters*, the pursuit of ideological censorship runs afoul of the First Amendment and thus is not a legitimate goal, especially when it disparately harms Black Alabama professors and students.

Given the lack of evidence in the legislative record that SB 129 was meant to address discrimination experienced by students and professors, the pedagogical issues pertaining to SB 129's impact on students and educators become even more acute and require the guidance of educational experts, who could have provided available and less discriminatory alternatives. Thus, the allegations regarding less discriminatory alternatives of SB 129, which the Court must accept as true, sufficiently support a pleading of discriminatory intent.

## VIII.    Defendants' Remaining Arguments Lack Merit.

### A.    Board Defendants' Claims About the Effects of SB 129 Are Premature.

Board Defendants' arguments regarding the "effects" of SB 129 are inappropriate at this stage. Doc. 33-1, p. 3-5. As noted above, when considering a motion to dismiss, the Court's analysis is "limited to the allegations in the complaint construed in the light most favorable to the plaintiff." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1264 (11th Cir. 2001). "On a motion to dismiss, the Court may not engage any resolving factual disputes." *Kahn v. Portfolio Recovery Assocs., LLC*, No. 8:10-CV-2399-T-26TGW, 2011 WL 223870, at *1 (M.D. Fla. Jan. 24, 2011). Board Defendants ignore this standard and ask this Court to resolve the factual disputes in their

favor. Specifically, the Board Defendants assert that any allegations regarding the "discussion" of race-related concepts are insufficient to support Plaintiffs' Equal Protection claims because SB 129 will only be enforced against professors who are "advocating" for these topics rather than discussing them. Doc. 33-1, p. 4-5. But this assertion simply amounts to a denial of Plaintiffs' allegations, which the Court must accept as true.[31]

Board Defendants ignore these allegations and insist that Plaintiffs' Equal Protection claims are grounded solely on the content of classroom discussions. Doc. 33-1, p. 5. But, taking but one example showing otherwise, UA leadership told Professor Simon that utilizing university resources to provide extracurricular support to Black students who received racist text messages after the 2024 election could violate SB 129. *See* Doc. 1, ¶ 138, 225. Plaintiffs clearly allege that SB 129 could be enforced outside the context of classroom discussions, and Plaintiffs' Equal Protection claims likewise apply to conduct that extends beyond classroom discussions.

**B. Board Defendants Misunderstand and Misapply Equal Protection Doctrine.**

Board Defendants acknowledge Plaintiffs' allegations that SB 129 will disproportionately impact Black students and faculty, *see* Doc. 33-1, p. 7 but claim that these allegations are insufficient to plead a discriminatory effect. Many of the Board Defendants' arguments are premised on the misapplication of Equal Protection Clause doctrine.

The Eleventh Circuit has recognized "three broad categories" of Equal Protection claims. *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). The first category applies to "a claim that a statute discriminates on its face." *Id.* "In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate

---

[31] The Board Defendants' assertions regarding the effects of SB 129 also demonstrate the vagueness of the law, as their description of the scope of SB 129 enforcement contradicts the guidance Alabama universities have provided to faculty and students. *Supra* Section VI.

state goal." *Id.* The second category involves claims that "neutral application of a facially neutral statute has a disparate impact." *Id.* at 1112 n.5 (citations omitted). This "traditional Equal Protection analysis" is governed by the multi-factor test developed in *Arlington Heights*. *Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288, 1322 (11th Cir. 2023). The third category encompasses a claim that "defendants are unequally administering a facially neutral statute." *E&T Realty*, 830 F.2d at 1112 n.5. For claims involving the unequal administration of a statute,[32] the plaintiff must "allege[] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007).

Board Defendants assert that the Plaintiffs have not sufficiently alleged discriminatory effect because they have not alleged "Black students and faculty have been treated differently, or are at risk of being treated differently, from their similarly situated peers." Doc. 33-1, p. at 7. Plaintiffs do not presently claim that SB 129 is being selectively enforced against them or that Defendants are administering SB 129 unequally. Instead, Plaintiffs are challenging a facially neutral statute with a discriminatory effect, and *Arlington Heights* therefore governs the analysis of Plaintiffs' Equal Protection claims. Comparison of similarly situated peers is not an element of the *Arlington Heights* analysis. *See GBM*, 992 F.3d at 1321-28; *Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023 WL 5606088, at *7 (11th Cir. Aug. 30, 2023) ("[P]roof of a similarly situated comparator is not necessary for [plaintiff] to establish the core elements of an equal-protection claim: (1) a discriminatory motive; and (2) a discriminatory effect."); *Schwarz v.*

---

[32] These claims are sometimes referred to as "class of one" or "selective enforcement" claims. *See Gaston v. City of Leesburg*, No. 24-10276, 2025 WL 252437, at *3 (11th Cir. Jan. 21, 2025).

*City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008) (noting that Equal Protection clause analysis may differ for selective enforcement claims).[33]

Board Defendants also argue that SB 129 cannot be considered discriminatory because it "applies equally to all students and faculty without regard to race." Doc. 33-1, p. 8. Specifically, Board Defendants repeatedly assert that Plaintiffs' allegations are deficient because they have not stated how certain provisions of SB 129 "specifically discriminates" against Black students and educators. *Id.* at 9. This argument flies in the face of "decades" of Supreme Court precedent establishing that "facially neutral laws may run afoul of the Equal Protection Clause if they are enacted or enforced with a discriminatory intent." *GBM*, 992 F.3d at 1343. Plaintiffs allege both that SB 129 was enacted with a discriminatory purpose and that Black faculty and students are and will be disproportionately harmed by SB 129's enforcement. *See* Doc. 1, ¶¶ 265, 273-74. Even if SB 129 *applies* equally to all members of a campus community, the racially disparate *effects* of the law support Plaintiffs' Equal Protection claims. *Vill. of Arlington Heights*, 429 U.S. at 264(noting that "[d]isproportionate impact is not irrelevant" to Equal Protection analysis); *Dream Defs.*, 553 F. Supp. 3d at 1094 (recounting plaintiffs' allegations regarding the disparate harm of the law on Black protestors and Black-led organizations).

### Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

---

[33] In support of their argument defendants cite to *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) and *Nordlinger v. Hahn*, 505 U.S. 1 (1992), neither of which involved racial discrimination claims nor included consideration of the *Arlington Heights* factors. Challenges to facially neutral laws brought under the Equal Protection Clause of the Fourteenth Amendment must be analyzed using the multi-factor test set forth by the Supreme Court in *Arlington Heights*, and these two cases are therefore inapposite.

Dated: April 18, 2025

/s/ Alison Mollman
Alison Mollman (8397-A33C)
Laurel Hattix (4592-E20I)
ACLU of Alabama
PO Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

/s/ Daniel A. Cantor
Daniel A. Cantor*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
(202) 942-5000

/s/ Michael Rogoff
Michael A. Rogoff*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684

Respectfully submitted,

/s/ Antonio L. Ingram II
Antonio L. Ingram II*
Mide Odunsi*
NAACP Legal Defense & Educational Fund,
Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

/s/ Carmen Lo
Carmen Lo*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 18, 2025, the foregoing motion was filed electronically and will be sent electronically to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.


/s/*Alison Mollman*
Alison Mollman
ACLU of Alabama