# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> Plaintiffs, <br><br> vs. <br><br> KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART AND KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees <br><br> Defendants. | Case No. 2:25-cv-00067-RDP |

**THE BOARD DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiffs' claims are due to be dismissed as a matter of law for the following reasons:

- First, Alabama NAACP lacks organizational or associational standing.

- Second, *Bishop* requires dismissal of the First Amendment claim relating to classroom instruction.

- Third, *Rosenberger* requires dismissal of the First Amendment claim relating to student organizational funding.

- Fourth, Alabama NAACP's freedom of association claim fails because it has not alleged that it was barred from reserving space or registering events on campus.

- Finally, Plaintiffs' equal protection claim is due to be dismissed because they have not alleged that SB 129 has a discriminatory effect.

## I. ALABAMA NAACP LACKS STANDING TO PURSUE ITS CLAIMS AGAINST THE BOARD DEFENDANTS.[1]

Plaintiff, the Alabama State Conference of the NAACP, ("Alabama NAACP") claims it has established both organizational and associational standing. Alabama NAACP has failed to plead either sufficiently.

With regard to organizational standing, Alabama NAACP has not established standing based on its own alleged injuries. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) ("[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'"). Alabama NAACP does not allege it suffered a direct injury, but rather claims members of UA NAACP were injured separately through other organizations. (Doc. 1 at ¶ 25) ("Specifically, members of the UA NAACP have been denied access to university funding and

---

[1] Contrary to Plaintiffs' suggestions, standing challenges "cannot be waived or forfeited." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662-63 (2019). The primary focus of the Board Defendants' Motion to Dismiss is the merits of Plaintiffs' arguments; however, the Board Defendants adopt and incorporate the standing arguments advanced in Governor Ivey's Memorandum in Support of Her Motion to Dismiss (Doc. 32-1 at 9-26) and her Reply in Support thereof.

1

campus spaces for Black students, such as the Black Student Union."); *id.* at ¶ 130 ("BSU did not receive any funding from UA, harming UA NAACP members who are also members of UA's BSU."); *id.* ("LGBTQIA members of the UA NAACP are also harmed by the loss of UA support for LGBTQIA student spaces due to SB 129."); *id.* at ¶ 218 ("[S]tudent members of the UA NAACP, used the BSU office."); *id.* at ¶ 219 ("Members of the UA NAACP found community and support in the BSU…."); *id.* at ¶ 256 ("By determining the provision of physical spaces on campus to student organizations…such as BSU, BSFA, and SafeZone, Defendants violate the First Amendment rights of…student members who are also members of Plaintiff Alabama NAACP….").

Plaintiffs argue in response that "SB 129 threatens the UA NAACP's ability to receive University funding and use University space," (Doc. 43 at 16), and that "SB 129 poses a threat to the organization directly by potentially stripping the organization of its ability to put on programs using university funding and having dedicated university space for its members to gather," *id.* at 16-17. These arguments are not rooted in the Complaint, which does not allege that UA NAACP ever applied for, received, or was denied funding from the University, that the University ever dedicated an office specifically for UA NAACP, or that the University has engaged in any harmful conduct directed at UA NAACP directly, as opposed to one of its members or another group on campus. "Like an individual, an organization may not establish standing simply based on 'the intensity of the litigant's interest'…'no matter how longstanding the interest and no matter how qualified the organization.'" *FDA*, 602 U.S. at 394.

With regard to associational standing, Alabama NAACP has failed to meet the first prong of the three-part test:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

>organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). First, it failed to plead standing for at least one member, by name or pseudonym, who has suffered a direct and redressable injury. Rather, Alabama NAACP pleads alleged injuries to other student organizations. (Doc. 1 at ¶ 130 ("UA NAACP…has members who are part of the BSU."); *id.* at ¶ 218 (unidentified Alabama NAACP members "used the BSU office").

The Supreme Court and the Eleventh Circuit have made clear that an associational standing cannot be based on an organization's self-descriptions of its own membership. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations" are required "to make specific allegations establishing that at least one identified member had suffered or would suffer harm."); *Ga. Republican Party*, 888 F.3d at 1203 ("We cannot accept an organization's 'self-descriptions of [its] membership . . . . regardless of whether it is challenged.'" (quoting *Summers*, 555 U.S. at 499)). Alabama NAACP has not established associational standing because it has not identified a single member—by name or otherwise—who has suffered or will suffer harm due to SB 129 or the Board's implementation thereof.

Alabama NAACP has also failed to establish that its members' alleged injuries would be redressed by a court order against the University. Again, Alabama NAACP's claims are based on injuries to its members, who claim they are no longer able to use the office space that was formerly occupied by groups like BSU and SafeZone. (Doc. 1 at ¶ 25) ("Specifically, members of the UA NAACP have been denied access to university funding and campus spaces for Black students, such as the Black Student Union."). An order enjoining SB 129 or requiring the University to re-dedicate office space to BSU and SafeZone would not redress Alabama NAACP's alleged injuries because BSU and SafeZone—neither of which are parties to this lawsuit—would not be bound by

3

the order and could choose not to allow UA NAACP members to use their offices in the same ways as before, or they could simply decide to use their office space for entirely different purposes than before. In other words, the UA NAACP members would have to rely on the acts of third parties, rather than the Court's order, to redress their alleged injuries. This "contravenes the 'settled principle[]' that 'it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (emphasis omitted). *See also Baughcum v. Jackson*, 92 F.4th 1024, 1033 (11th Cir. 2024) ("An injury must be traceable to the defendant and redressable by a court order against the defendant, not a third party."). Any persuasive effect that a judicial order against the University might have upon organizations like BSU and SafeZone to restore the previous status quo "cannot suffice to establish redressability" because those organizations are not parties to this lawsuit. *Jacobson*, 974 F.3d at 1254. Alabama NAACP therefore cannot establish redressability.

Because Alabama NAACP has failed to establish organizational or associational standing, its claims are due to be dismissed.

II. ***BISHOP*** **REQUIRES DISMISSAL OF THE FIRST AMENDMENT CLAIMS RELATING TO CLASSROOM CURRICULUM, INSTRUCTION, OR ASSIGNMENTS.**

After ignoring the binding precedent of *Bishop v. Aronov*, 926 F.2d 1066, 1076 (1991), in their Motion for Preliminary Injunction, Plaintiffs, after some encouragement from this Court, finally addressed *Bishop*, but assert that its facts "are readily distinguishable from the present case." Yet, a review of *Bishop* demonstrates that it is directly on point, which is exactly why Plaintiffs did not even mention it in their initial briefing.

In *Bishop*, the Eleventh Circuit laid out a balancing test between a university's right to control its own speech[2] and a "strong predilection" for academic freedom[3] that could be resolved based on the context of the speech.

> As a place of schooling with a teaching mission, we consider the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time. Tangential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university.

*Id*. at 1074. The most important consideration is whether the activity was in a context that "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id*. at 1073. On one end of the spectrum, a professor is free to "hold his particular views; express them, on his own time, far and wide and to whomever will listen; or write and publish, no doubt authoritatively, on them; nor could [a university] so prohibit him." *Id.* at 1076. Such a context does not bear an imprint of a university's sanction. On the other end of the spectrum, a university is free to control the content of its own courses, which clearly "gives the appearance of endorsement by the university." *Id*. at 1074.

In *Bishop,* the Court "simply concluded that the University as an employer and educator" has the right to control the content and viewpoints expressed by professors "in the classroom and like settings." *Id*. at 1077. The holding was simple because the context was "the university classroom during specific in-class time and the visage of the classroom as part of a university

---

[2] The First Amendment does not protect the speech of University employees when they are speaking on the University's behalf. *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) ("When the government exercises the right to speak for itself, it can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." (cleaned up)); *Rosenberger*, 515 U.S. at 833 ("When the University determines the content of the education it provides, it is the University speaking.").

[3] The Eleventh Circuit made clear that while academic freedom is an "adjunct of the free speech rights of the First Amendment," *id.* at 1075, there is "not…support to conclude that academic freedom is an independent First Amendment right" and courts should not "supplant [their] discretion for that of the University," *id.*

5

course in an after-class meeting." *Id*. at 1074. Although the Eleventh Circuit recognized that there are "abundant cases which acclaim academic freedom," those cases' "pronouncements about academic freedom…cannot be extrapolated to deny schools command of their own courses," *Id.* at 1075. In the context of a classroom, "Federal judges should not be ersatz deans or educators." *Id*. at 1075.

The same simple conclusion applies here because the context is the same: the classroom. *See* Doc. 1 ¶ 9 ("the law's chilling effect on classroom discussions"); ¶ 77 ("the classroom should be a place of 'affirmation and healing.'"); at 36 ("SB 129's Impact on Professors' Classroom Teaching"); ¶ 87 ("in order to curtail certain classroom discussions"); ¶ 92 ("SB 129's impact on her classroom instruction"); ¶ 110 ("professors may decrease or eliminate discussions of race and racial justice in the classroom due to SB 129"); ¶ 144 ("the manner in which she facilitated classroom discussions and the political content of her course materials"); ¶ 200 ("SB 129 has been utilized to chill important speech in classroom discussions"); ¶ 231 ("Plaintiff Professors are forced to modify their reading lists, exclude instruction and classroom discussion on certain subject matters").

In fact, with regard to the allegations against the University, the Complaint presents a context where "the University's interest is most obvious."[4] *Bishop,* 926 F.2d at 1074. Plaintiffs argue that the University should have ignored student complaints about coercion in the classroom or compelled participation in a demonstration against SB 129. Doc. 1, ¶¶ 137, 140, 142. Because the context of the allegations against the University involves the classroom, and in particular student complaints of coercion in the classroom, the ruling in *Bishop* applies equally here.

---

[4] "The University's interest is most obvious when student complaints suggest apparent coercion—even when not intended by the professor." *Bishop,* 926 F.2d at 1074.

6

Plaintiffs argue three things in *Bishop* make it distinguishable from this case: (1) the speech was religious, (2) the speech was irrelevant to the curriculum, and (3) the university's restraint was viewpoint neutral. (*See* Doc. 43 at 26)("In *Bishop*, the university sought to impose a viewpoint neutral restraint on all religious content that was unrelated to the course, regardless of the viewpoint."); *id.* at 24 ("A university's attempt to stop a professor from inserting irrelevant religious views into a secular class is distinct from the restrictions that SB 129 imposes on professors seeking to present course material and viewpoints that are pertinent to their assigned subject matter."). Plaintiffs strike out on all three.

First, the Eleventh Circuit repeatedly stated that its holding in *Bishop* was based in the balance of free speech rights of professors versus universities, not religious speech:

> As we have noted, the religious facets of this case cloud its true countenance. We are not persuaded that, even in the remotest sense, Dr. Bishop's rights of free exercise or worship as those concepts are comprehended in constitutional parlance are implicated. He has made no true suggestion, much less demonstration, that any proscribed conduct of his impedes the practice of his religion. . . . Furthermore, the University's restrictions of him are not directed at his efforts to practice religion, per se, but rather are directed at his practice of teaching. If either Dr. Bishop's or the University's conduct truly went to the exercise of religion by Dr. Bishop, no doubt the Establishment Clause would resolve the case. As it is before us, we see no free exercise question.

*Bishop*, 926 F.2d at 1077. *See also id.* at 1072 ("Though the religion clauses are implicated because of the indisputably religious character of Dr. Bishop's remarks, the primary analysis that must be made here ascends from the cases that discuss the free speech rights of public teachers."). Thus, there is no basis in *Bishop* to support Plaintiffs' argument that it should be limited solely to religious speech.

Second, Plaintiffs' assertion that *Bishop* is distinguishable because Dr. Bishop's religious beliefs "were irrelevant" to his physiology course is a misreading of the case. (Doc. 43 at 24). Dr.

7

Bishop taught exercise physiology and "[s]ome of his references concerned his understanding of the creative force behind human physiology." *Bishop*, 926 F.2d at 1068. In addition, Dr. Bishop organized an after-class meeting for his students entitled "Evidences of God in Human Physiology," which "covered various aspects of the human body including the complexity of its design and operation, concluding that man was created by God and was not the by-product of evolution." *Id.* The University's memorandum to Dr. Bishop described his comments as "a 'Christian Perspective' of an academic topic." *Id.* at 1069. Likewise, the Eleventh Circuit described the speech as "certain personal (perhaps even professional) opinions about his work that happen to have a religious source." *Id*. at 1076. Dr. Bishop's opinions were not "irrelevant" to the topic of human physiology.

To demonstrate the weakness of Plaintiffs' attempt to distinguish *Bishop*, compare Plaintiffs' assertion to the actual text of *Bishop:*

| **Plaintiffs' Brief** | ***Bishop*** |
|---|---|
| In *Bishop*, the university sought only to prevent the professor from making assertions about his religious beliefs, which were irrelevant "vis-a-vis the subject matter of his [exercise physiology] courses." Id. at 1076. | Under the memo, the University seeks only to prevent Dr. Bishop from making assertions about his religious beliefs vis-a-vis the subject matter of his courses. |
| (Doc. 43 at 24). | *Bishop*, 926 F.2d at 1076. |

Plaintiffs cite a sentence in *Bishop* that says that Dr. Bishop was making assertions "vis-a-vis the subject matter of his courses," meaning "in relation to"[5] his courses, to claim the exact opposite: Plaintiffs' unsupportable assertion that the Eleventh Circuit held that Dr. Bishop's comments were irrelevant to the course. Plaintiffs fashion this argument from their desire to avoid *Bishop*, not the

---

[5] Webster's Third New International Dictionary at 2556. Vis-à-vis literally translates to face-to-face. It can be used to mean: "one that faces another," "in relation to: over against," and "in comparison with," but never irrelevant. *Id.*

8

actual holding of the case. *Bishop* never even uses the term "irrelevant," And repeatedly stated that the comments were directly related to the course.

Third, Plaintiffs' argument that *Bishop* involved "a viewpoint neutral restraint" misreads *Bishop* and misstates the law on viewpoint neutrality. Bishop never once used the term "viewpoint neutral." Rather, it said the University sought "to prevent him from presenting his religious viewpoint during instructional time." *Bishop*, 926 F.2d at 1077. Further, the Court held that Dr. Bishop's employment with the University could "give the impression that the University sponsors that viewpoint." *Id.* The Court also noted that the University's memo "exclude[d] Christian viewpoints alone because it is addressed to Dr. Bishop, who expressed them alone." *Id.*[6] Thus, *Bishop* allowed the university to control the content of its courses by restricting specific viewpoints.

As *Bishop* cannot be distinguished from this case, all First Amendment claims based on the content of the curriculum, instruction, or assignments in a classroom are due to be dismissed.

### III. THE STUDENT PLAINTIFFS HAVE NOT ALLEGED THAT THEIR ORGANIZATIONS WERE DENIED THE OPPORTUNITY TO RECEIVE STUDENT ORGANIZATION FUNDING.

The Student Plaintiffs' First Amendment claims arise from allegations regarding the allocation of student organizational funding. The Complaint only contains allegations that one student organization with Student Plaintiffs as members—Social Justice Advocacy Council ("SJAC")—applied to the University for and was denied funding.[7]  (Doc. 1 ¶¶ 121-124).

---

[6] Furthermore, Plaintiffs' assertion that a restraint on all religious viewpoints, as opposed to secular viewpoints, in the classroom is a content-based restriction rather than viewpoint-based restriction is wrong because such a restraint is based on "the specific motivating ideology or the opinion or perspective of the speaker" rather than religion as a subject-matter. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). *See also id.* at 831 ("It discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 393 (1993)).

[7] The Complaint also references Esperanza, a student organization that Plaintiffs Luna and Campos are members of, but does not allege that Esperanza ever applied for or received funds from the University or from USGA. The Complaint does allege that Esperanza was told that it could not receive funding directly from UAB. (Doc. 1 ¶ 25).

9

Specifically, Plaintiffs allege that SJAC was previously designated a University Funded Organization ("UFO"), (*id.* ¶ 121), which UAB has historically funded directly each year, (*id.* ¶ 119). For this current academic year, Plaintiffs allege SJAC was "demoted" to the status of a Registered Student Organization ("RSO"), which "must apply to the Undergraduate Student Government Association ("USGA") each semester or secure an alternate source of funding." (Doc. 1 ¶¶ 119, 122). Plaintiffs argue that being required to obtain funds from USGA, rather than directly from UAB, constitutes viewpoint discrimination because they were unreasonably excluded from a limited public forum. (Doc. 43 at 29). Plaintiffs are wrong.

Automatic funding from the administration that is directly awarded to a select few groups on preferential basis—i.e., the UFO funding formerly received by SJAC—is not a limited public forum. In terms of student organization funding, "when a university makes funds available to encourage student expression, the university creates a limited public forum." *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1549 (11th Cir. 1997). On the other hand, a UFO is effectively university speech in that it is speech that a University department has selected to promote through funding and, in the words of *Bishop*, by granting the imprimatur of the University. This stands in contrast to funding that is set aside for all student organizations to apply for—i.e. the RSO funds distributed by USGA—which is a limited public forum. *See, e.g.*, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (Student Activity Fund allocated by UVA's Student Council to registered student groups was a limited public forum).

Plaintiffs seek to avoid the distinction set forth in *Rosenberger* by arguing that "UFOs are similar to the 'CIOs' in *Rosenberger* because UFOs like SJAC are not controlled and directed by

---

Various other student groups are mentioned in the Complaint, but the Student Plaintiffs have not alleged they were members of those other groups.

10

the university." (Doc. 43 at 29). Yet, *Rosenberger* made clear that there was a distinction between a university "expend[ing] funds to encourage a diversity of views from private speakers"—which creates limited public forum—and a university "subsidiz[ing] transmittal of a message it favors"—which does not. *Id.* at 834.

> . . . when the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.

*Id.* Under Plaintiffs' view of *Rosenberger,* once a university enlists a student organization to convey university speech, it thereby loses the ability to stop that speech and is permanently required to continue to fund that student organization. Neither *Rosenberger* nor any Supreme Court or Eleventh Circuit case supports such an extreme position. Accordingly, the Student Plaintiffs' First Amendment claims relating to student organization funding are also due to be dismissed.

## IV. ALABAMA NAACP'S FREEDOM OF ASSOCIATION CLAIM FAILS BECAUSE IT HAS NOT ALLEGED THAT IT WAS BARRED FROM RESERVING SPACE OR REGISTERING EVENTS ON CAMPUS.

Plaintiffs' response with regard to Alabama NAACP's freedom of association claim demonstrates a similar misunderstanding of limited public forums. In, *Widmar v. Vincent*, the main case cited by Plaintiffs, a state university which "makes its facilities generally available for the activities of registered student groups" informed a registered religious group that "it could no longer meet in University buildings." *Widmar v. Vincent*, 454 U.S. 263, 264-65 (1981). The Supreme Court rightfully held that "[t]hrough its policy of accommodating their meetings, the University has created a forum generally open for use by student groups," and that "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id.* at 267-68.

11

Plaintiffs' claims are fundamentally different than the claims in *Widmar*. The Complaint alleges that UA's Black Student Union ("BSU") "lost their university-sponsored office…in the middle of the Student Center at UA," (Doc. 1 ¶ 217) and that UA's "SafeZone, which was granted space in the UA student center…was converted into the Student Leadership Lounge," (Doc. 1 ¶ 131). In other words, these groups no longer have their own dedicated office spaces in the center of campus. The Complaint does *not* allege that Alabama NAACP or any other group has ever been denied access or excluded from any space that is available to other student groups, or that they have been prevented from reserving rooms or registering events on campus. Rather than stating a First Amendment claim, Count IV bemoans the fact that BSU and SafeZone no longer have their own dedicated offices and must now share a limited public forum—i.e., university spaces that can be reserved by student organizations on a first-come, first-served basis—with other student organizations. Alabama NAACP's freedom of association claim is due to be dismissed.

## V.   PLAINTIFFS' EQUAL PROTECTION CLAIM IS DUE TO BE DISMISSED BECAUSE THEY HAVE NOT ALLEGED THAT SB 129 HAS A DISCRIMINATORY EFFECT.

In their response, Plaintiffs concede that their equal protection claim does *not* allege that the University is "unequally administering a facially neutral statute," and thus argue that they are not required to show they were treated differently from similarly situated individuals. (Doc. 43 at 49). This concession is not clear from the face of the Complaint, which appears to contain an "as-applied" challenge regarding the University's alleged enforcement of SB 129 to Plaintiffs' detriment.  *See, e.g.*, (Doc. 1 ¶ 265) ("Specifically, Plaintiff Dr. Simon, Plaintiff Testman, and Plaintiff Alabama NAACP have been harmed by intentional discrimination of SB 129 as implemented by the University of Alabama system pursuant to enforcement of SB 129."). Indeed, Plaintiffs' Opposition Brief almost exclusively contains "as-applied" arguments. *See, e.g.* (Doc. 43 at 40) ("Professor Simon, a Black professor, has been one of the first faculty members targeted

by enforcement of SB 129 for her pedagogy and curriculum."); *id* at 40 ("[T]he UA NAACP and their Black members at UA experience disparate harm from SB 129 through the closure of the BSU's on-campus space."). However, the University readily accepts this concession, and Plaintiffs' equal protection claim should be dismissed to the extent it asserts an "as-applied" challenge rather than a facial challenge. *See, e.g., United States v. Brown*, 424 F. App'x 909, 911-12 (11th Cir. 2011) (finding "no merit" to plaintiff's "as applied equal protection claim" because he did not "compare himself to other [criminal] defendants";) *Maxi-Taxi of Fla., Inc. v. Lee Cty. Port Auth.,* 301 F. App'x 881, 884 (11th Cir. 2008) (finding that plaintiffs did not assert an "as applied" challenge because they "did not allege that [the defendant] unequally applied a facially neutral regulation"); *Oakes v. Collier Cty.*, 515 F. Supp. 3d 1202, 1213 (M.D. Fla. 2021) ("[A]s-applied challenge fails because [plaintiffs] do not point to any similarly situated individual who is treated different.").

Instead, Plaintiffs assert they are "challenging a facially neutral statute with a discriminatory effect, and *Arlington Heights* therefore governs the analysis of Plaintiffs' Equal Protection claims." (Doc. 43 at 49). It remains the case that to succeed on their equal protection claim under the *Arlington Heights* analysis, Plaintiffs must demonstrate that SB 129 has a discriminatory effect. *See Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect.").

Plaintiffs' claims of disparate impact (as opposed to as-applied injuries) rely on unacceptable assumptions about race in education to argue that certain curricular changes will necessarily harm black students and professors more than others. *See, e.g.* (Doc. 1 ¶ 273) ("Black students are more likely to benefit academically from courses that include these topics, Black

13

educators are more likely to engage in scholarship on these topics…."). These infirmities were addressed at length in the University's Motion to Dismiss. *See* (Doc. 33-1 at 8-14). *See also Miller v. Johnson*, 515 U.S. 900, 911-12 (1995) (rejecting the "offensive and demeaning assumption" that individuals "of a particular race, because of their race, 'think alike [or] share the same political interests…'").

Plaintiffs do not address these arguments in their response, other than suggesting that the Court must accept these prohibited assumptions on their face because they appear in the Complaint. (Doc. 43 at 39) ("The complaint clearly alleges that Black faculty are more likely to teach and research on topics related to race and racism, that Black faculty are more likely to offer assignments related to race and racism, and teach courses related to race and racism, and that Black students receive tangible benefits from curriculum addressing issues of race and racism."). *But see Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) ("[P]leadings that…are no more than conclusions, are not entitled to the assumption of truth.").

Even so, SB 129 does not prohibit the teaching of any of the concepts or classes identified in the Complaint. SB 129 only prohibits endorsing or requiring assent to the eight identified concepts. Nowhere does the Complaint explain how prohibiting endorsement or assent to the eight concepts bears more heavily on one race than another. Plaintiffs argue that Defendants do not credit their allegations about how SB 129 will be enforced. Defendants, however, are not required to accept as true Plaintiffs' interpretations of what SB 129 does or does not prohibit. *FI Real Est. Fund Two LP v. Donda, LLC*, No. 23-13742, 2024 U.S. App. LEXIS 32028, at *16 n.4 (11th Cir. Dec. 18, 2024) ("The district court was required to take the complaint's factual allegations as true but was not required to accept the complaint's legal conclusions and factual speculations."). Likewise, to the extent Plaintiffs rely on allegations that SB 129 may be improperly enforced in

14

the future, those "factual speculations," are not required to be accepted as true. *Id.* Plaintiffs also cannot rely on any allegation that SB 129 has been improperly applied, as they have limited their equal protection claim to a facial challenge. (Doc. 43 at p. 49).

In any event, Plaintiffs have not plausibly alleged that SB 129 will disproportionately affect black students and professors. For example, Plaintiffs argue in their response brief that the elimination of "spaces, organizations, and programs that…were designed to benefit Black individuals" causes disparate harm to the black Plaintiffs. (Doc. 43 at 40). This argument does not support a finding of discriminatory impact because it alleges that black students will no longer receive additional resources above and beyond what other students and professors receive, rather than alleging that black students will receive *fewer* or *different* resources than members of other races because of their race. This suggests equal treatment, not discriminatory treatment. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023) ("Eliminating racial discrimination means eliminating all of it.").

Plaintiffs mischaracterize the University as having argued that "an Equal Protection claim can only prevail if the law solely impacts people of a particular race." (Doc. 43 at 41). The University did not make that argument in its brief, and merely offered an observation that the black Plaintiffs' equal protection claims arise from the same alleged injuries as the other Plaintiffs' First Amendment claims, and that this is inconsistent with Plaintiffs' arguments that SB 129 disparately impacts black students and professors. (Doc. 33-1 at 7-8).

Plaintiffs have not adequately alleged that SB 129 will have a discriminatory effect on black students and professors because their allegations of discriminatory effect are either (a) based on unacceptable assumptions about race and education that have been rejected by the Supreme Court, (b) are not based on an actual discriminatory effect, or (c) could only be supportive of an

15

"as-applied" challenge, which Plaintiffs have abandoned. For these reasons, Plaintiffs cannot succeed on their equal protection claims, and those claims should be dismissed.[8]

## CONCLUSION

Plaintiffs have overplayed their hand and advanced claims and arguments that find no support in the Complaint or the relevant law. For the reasons stated above, as well as those reasons set forth in the University's Memorandum in Support of its Motion to Dismiss (Doc. 33-1), the Board Defendants respectfully request that this Court grant their Motion to Dismiss and dismiss all claims against them in this action.

Respectfully submitted this 2nd day of May, 2025.

/s/ Jay M. Ezelle
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

***Counsel for the Board Defendants***

---

[8] The analysis contained in this brief is limited to the "disparate impacts" and "discriminatory effects" of SB129. *See Greater Birmingham Ministries v. Sec'y of Ala.,* 992 F.3d 1299, 1321 (11th Cir. 2021) ("A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect."). The University adopts and incorporates the arguments contained in in Governor Ivey's Memorandum in Support of Her Motion to Dismiss (Doc. 33-1) and her reply in support thereof regarding the remaining *Arlington Heights* factors relating to discriminatory intent.