FILED
2025 May-02  PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, and THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> v. <br><br> KAY IVEY, in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees; SCOTT PHELPS, in his official capacity as President Pro Tempore of the University of Alabama Board of Trustees; and MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART, AND KENNETH VANDERVOORT, in their official capacities as members of the University of Alabama Board of Trustees, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    No. 2:25-cv-00067-RDP |

**GOVERNOR IVEY'S REPLY IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 1

I.    This Court Lacks Jurisdiction To Hear Plaintiffs' Claims Against Governor Ivey In Her Official Capacity As Governor. ............................................... 1

    A.    Plaintiffs Have Not Pleaded Facts That Would Establish Standing. ................... 1

    B.    Governor Ivey Is Not a Proper Party in Her Official Capacity as Governor. ................................................................................. 5

II.    Plaintiffs' First Amendment Claims Should Be Dismissed Because They Challenge The Government's Regulation Of Its Own Speech. ................................. 7

    A.    Public University Professors Are Subject to the State's Curricular Choices in the Classroom. ........................................................ 8

    B.    Public University Students Are Subject to the State's Curricular Choices in the Classroom. ........................................................ 12

    C.    Public University Student Groups Promoting Divisive Concepts Do Not Have a First Amendment Right to Preferential Treatment. ................................ 12

III.    Plaintiffs' Vagueness Challenge Fails Because The Act Is Readily Understood ....... 14

IV.    Plaintiffs Have Not Alleged Facts That, If True, Would Show Intentional Discrimination ................................................................................ 16

CONCLUSION .......................................................................................................... 19

CERTIFICATE OF SERVICE .................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. S.C. State Conf. of the NAACP*,
  602 U.S. 1 (2024) ................................................................................................ 16

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  103 F.4th 765 (11th Cir. 2024) ............................................................................ 4

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) ............................................................................................ 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 17, 18

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
  529 U.S. 217 (2000) ............................................................................................ 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 3

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991) ....................................................... 9, 10, 11, 12

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ............................................................................................ 18

*D.N. by Jessica N. v. DeSantis*,
  -- F. Supp. 3d -- , No. 21-CV-61344, 2024 WL 5165857 (S.D. Fla. Dec. 19, 2024) ............... 16

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) .............................................................................. 11

*Ex parte Young*,
  209 U.S. 123 (1908) .......................................................................................... 6, 7

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .............................................................................................. 5

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ...................................................................................... 10, 12

*Garrett v. Matthews*,
  625 F.2d 658 (5th Cir. 1980) ............................................................................. 14

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
  992 F.3d 1299 (11th Cir. 2021) ............................................................. 17, 18, 19

*Heim v. Daniel*,
  81 F.4th 212 (2d Cir. 2023) ................................................................. 11

*Henry v. Att'y Gen., Ala.*,
  45 F.4th 1272 (11th Cir. 2022) ........................................................... 13

*Higginson v. Becerra*,
  363 F. Supp. 3d 1118 (S.D. Cal. 2019) ............................................... 16

*Hunt v. Washington State Apple Advertising Comm'n*,
  43 U.S. 333 (1977) ................................................................................ 4

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ............................................................................ 11

*Jean v. Nelson*,
  711 F.2d 1455 (11th Cir. 1983) ........................................................... 17

*Keyishian v. Board of Regents*,
  385 U.S. 589 (1967) ...................................................................... 11, 12

*Kilborn v. Amiridis*,
  131 F.4th 550 (7th Cir. 2025) ............................................................. 11

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,
  66 F.4th 905 (11th Cir. 2023) ............................................................. 19

*Lewis v. Bentley*,
  No. 2:16-CV-690-RDP, 2017 WL 432464 (N.D. Ala. Feb. 1, 2017) .................... 17

*Lewis v. Governor of Ala.*,
  944 F.3d 1287 (11th Cir. 2019) (en banc) .......................................... 17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 3

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................... 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ................................................................................ 12

*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968) ............................................................................ 11

*Porter v. Bd. of Trustees of N.C. State Univ.*,
  72 F.4th 573 (4th Cir. 2023) ............................................................... 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) .................................................................................... 8, 10, 12

*San Filippo v. Bongiovanni*,
    961 F.2d 1125 (3d Cir. 1992) ...................................................................... 14

*Stout v. Jefferson Cnty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) ..................................................................... 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)...................................................................................... 1, 8

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)....................................................................................... 4

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
    980 F.3d 821 (11th Cir. 2020) ..................................................................... 18

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    413 U.S. 548 (1973)...................................................................................... 15

*Urofsky v. Gilmore*,
    216 F.3d 401 (4th Cir. 2000) (en banc) ...................................................... 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)................................................................................ 17, 19

*Widmar v. Vincent*,
    454 U.S. 263 (1981)...................................................................................... 13

**Other Authorities**

67 C.J.S. *Officers* § 17 (Dec. 2024 Update)................................................... 6, 7

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*,
    17 SUFFOLK U.L. REV. 881 (1983) ................................................................. 5

Brief of Plaintiffs-Appellees Fla. State Conference of Branches and Youth Units of the
    NAACP, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
    No. 22-11143, 2022 WL 3369252 (11th Cir. 2022) ................................... 19

*Ex Officio*, BLACK'S LAW DICTIONARY (12th ed. 2024)..................................... 6

J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"*
    99 YALE L.J. 251 (1989)............................................................................... 12

Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*,
    91 U. CHI. L. REV. 1539 (2024) .................................................................... 4

Opinion of the Justices 64,
  13 So. 2d 674 (Ala. 1943) ................................................................................. 7

*Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024) ....................................... 15

Wright & Miller, 13A FED. PRAC. & PROC. JURIS. § 3531.9.5 (3d ed.) .................... 4

**Rules**

Fed. R. Civ. P. (12)(b)(6) ................................................................................... 1, 18

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 1

**Constitutional Provisions**

Ala. Const. Art. V, § 130 (2022) ............................................................................ 6

Ala. Const. Art. XIV, § 264 (2022) ........................................................................ 6

## INTRODUCTION

"Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). Alabama agrees. That is why the State enacted a law forbidding public schools from sorting students "based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation," and prohibiting public school teachers and professors from requiring students to personally affirm "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior," among seven other concepts. Act § 1(2)(a), (3).

Plaintiffs disagree. They wish to teach or be taught the eight racial concepts Alabama considers odious, and they demand preferential treatment for race-based affinity groups. They also allege that Alabama's Act is unconstitutionally vague and that the State's antidiscrimination statute was enacted with the secret purpose of harming black individuals. As Governor Ivey explained in her motion to dismiss, these claims fail and should be dismissed under Rules 12(b)(1) and (12)(b)(6). Plaintiffs have failed to allege sufficient facts to establish standing, abrogate Governor Ivey's sovereign immunity, or state a claim under the First or Fourteenth Amendments. *See* Doc. 32-1. Plaintiffs' response simply confirms that dismissal is necessary.

## ARGUMENT

### I. This Court Lacks Jurisdiction To Hear Plaintiffs' Claims Against Governor Ivey In Her Official Capacity As Governor.

#### A. Plaintiffs Have Not Pleaded Facts That Would Establish Standing.

Plaintiffs acknowledge that they must demonstrate that at least one plaintiff has standing to challenge each provision of the Act. Plfs' Resp., Doc. 43 at 12 ("Resp.").[1] Because they fail to do that, at least some of Plaintiffs' claims must be dismissed for lack of standing.

---

[1] Citations are to the pagination in the ECF header.

Start with the professors. No professor plaintiff alleges that she wishes to "[d]irect or compel a student … to personally affirm, adopt, or adhere to" *any* divisive concept. Act § 2(2). As a result, no professor—and no plaintiff—has standing to challenge Section 2(2) of the Act. Similarly, no professor plaintiff alleges that she wishes to "advocate[] for or require[] assent to" the divisive concept "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior of inferior." *See* Act § 2(3), 1(2)(a). The professors claim that their work could "arguably" implicate every other concept, but not this one. *See* Resp. 13-17. That is understandable given the subject matter, but it means Plaintiffs cannot challenge this provision of the Act.

As for the provisions of the Act they do mention, the plaintiff professors resort to vague claims that they teach "about structural racism," or "about the existence of implicit bias." Resp. 13. But the Act makes clear that professors can teach "about" whatever subject they like. Act § 4(3)(b). What they cannot do is "[d]irect or compel" students to "personally affirm, adopt, or adhere to a divisive concept," or "[r]equire" students to participate in a class "that advocates for or requires assent to a divisive concept." *Id.* § 2(2), (3). If the professor plaintiffs really wish to use their positions of influence at a public university to advocate for or compel assent to the idea "[t]hat individuals should be discriminated against or adversely treated because of their race," *id.* § 1(2)(b), they should say so. Since they haven't, they lack standing to challenge these provisions of the Act.

The students fare no better. As Governor Ivey pointed out in her motion to dismiss, it makes no sense for Luna to claim injury by relying on a course syllabus *assuring* students that they will not "be required to assent or agree with any concept considered 'divisive' under Alabama law." Doc. 32-1 at 28. Luna double downs, asserting without explanation that he "fears that these disclaimers and warnings 'indicate that professors are being encouraged to avoid controversial

topics.'" Resp. 18. Perhaps if the syllabus said the opposite—that students *would be* required to agree with certain concepts—one could see the connection. As it is, Luna has not shown that his fear is plausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Luna and Campos also claim injury based on their fears that their student group, Esperanza, will not be eligible for funding from UAB. As Governor Ivey explained (Doc. 32-1 at 30), the problem is that Luna and Campos do not allege that they ever asked for funding and were denied, or even that they have concrete plans to seek funding. Plaintiffs respond: "Once again, the Governor is wrong. Luna expressly alleges in the Complaint that Esperanza cannot fulfill its mission without programming and associated funding." Resp. 19. That is a non sequitur. It remains true that Plaintiffs have not alleged that Luna or Campos or anyone else has asked UAB for funding for Esperanza. Plaintiffs now claim it would be "futile" to do so (20), but that simply confirms that Plaintiffs' fears are "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Under these circumstances, Plaintiffs cannot plausibly allege futility until they make *some* effort to receive funding.

The Alabama NAACP suffers from the same problem when it tries to claim organizational standing. Nowhere does the NAACP allege that it has been denied any funding request, that it has concrete plans to apply for funding, or even that the university has threatened it with loss of funding. The most the NAACP can say is that "SB 129 poses a threat to the organization directly by potentially stripping the organization of its ability to put on programs using university funding and having dedicated university space for its members to gather." Resp. 23-24. It is hard to get more conjectural or hypothetical than that, particularly when Plaintiffs' only mention of "dedicated university space" concerns *other organizations* not involved in this litigation.

The NAACP's claim of associational standing also fails. To "borrow" a member's standing, an organization must show that at least one member has standing to sue in his own right. *See* Wright & Miller, 13A FED. PRAC. & PROC. JURIS. § 3531.9.5 (3d ed.). The organization does not have to identify the member "by name," but it must allege sufficient facts showing "'that at least one identified member had suffered or would suffer harm.'" *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). But which member of the NAACP has suffered harm, and how? Plaintiffs' Complaint does not say. Instead, it simply alleges that some (unidentified) NAACP members also happen to be members of *other* organizations that suffered harm. That is not enough.

Indeed, even if these vague allegations could give those members a right to sue—or give the other organizations a right to sue on behalf of *their* members—the NAACP fails to connect its members' harm via their membership in other organizations to its own mission. But any harm the group seeks to remedy must be "germane to the organization's purpose." *Hunt v. Washington State Apple Advertising Comm'n*, 43 U.S. 333, 343 (1977). "For example, a group devoted to preventing racism may assert associational standing based on racial discrimination experienced by one of its members." Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*, 91 U. CHI. L. REV. 1539, 1561 (2024) (footnote omitted). "In contrast, a random assault on a member unrelated to race would not provide a basis for associational standing." *Id.* at 1561-62.

Plaintiffs' theory is akin to a random assault on one of the NAACP's members. Plaintiffs assert that the NAACP "is committed to 'ensur[ing] a society in which all individuals have equal rights without discrimination based on race.'" Resp. 21 (quoting Doc. 1 ¶¶ 24-25). The group's purported injury, though, is that a different organization, "SafeZone, which was granted space in the UA student center in 2013 to support LGBTQIA students, was converted into the Student

Leadership Lounge." *Id.* at 22 (quoting Doc. 1 ¶ 131). While the NAACP may very well happen to have LGBTQIA-identifying students who participated in SafeZone, Plaintiffs never connect the purported harm those students faced with the NAACP's mission of combating *racial* (not LGBTQIA) discrimination. The NAACP cannot claim standing based on random connections its members happen to have to an unrelated organization.

The NAACP's connection with the Black Student Union is at least in the right ballpark, but it also is too attenuated. The purpose of modern standing doctrine is to ensure that a plaintiff can "answer a basic question: 'What's it to you?'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U.L. REV. 881, 882 (1983)). This question is important for all three standing requirements: injury-in-fact, causation, and traceability. *See id.* at 379-85. But the NAACP's causation theory relies not on the State's regulation of it or its members, but on the State's regulation of a third party not before the Court—the Black Student Union—and the effects the regulation has on *that* organization's members, some of whom also happen to be members of the NAACP. While the NAACP may be able to represent the interests of its own members—a recognized form of third-party standing—Plaintiffs have not pointed to a case where an organization could represent the interests of *other* organizations its members happen belong to. The Constitution does not permit such third-party standing once removed. *E.g.*, *id.* at 385 (rejecting standing arguments of "plaintiffs doctors and medical associations" who were "unregulated parties" but sought "to challenge FDA's regulation *of others*").

## B. Governor Ivey Is Not a Proper Party in Her Official Capacity as Governor.

Plaintiffs' claims against Governor Ivey should be dismissed for another reason: Governor Ivey does not enforce the Act in her capacity as Governor. And *as Governor*, she has not caused any of the purported harms Plaintiffs complain of, nor could she remedy them. Plaintiffs thus lack

standing to sue her, and the doctrine of *Ex parte Young* does not strip her of sovereign immunity. *See* Doc. 32-1 at 35-38.

Plaintiffs respond with two arguments. First, they claim that they "alleged sufficient facts that the Governor's duties in each capacity"—as Governor and as President Ex-Officio of the UA Board of Trustees—are "inseparably blended" because, in essence, Governor Ivey serves as the President Ex-Officio only because she is Governor. Resp. 25. That is indeed what "ex officio" means. *See Ex Officio*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("By virtue or because of an office."). And the Alabama Constitution indeed requires the Governor to serve as "ex officio president" of the UA Board of Trustees. Ala. Const. Art. XIV, § 264 (2022). That is the point. The general rule, unrebutted by Plaintiffs, is that "where a public officer is declared by law by virtue of the office to be also, ex officio, the incumbent of another public office, the two offices are distinct and separate." 67 C.J.S. *Officers* § 17 (Dec. 2024 Update). The *exception* to this rule is when "the duties of each capacity are of the same general nature and inseparably blended in the law which creates and defines the undisputed office." *Id.* In that case, "the officer holds the one office" rather than two. *Id.*

Plaintiffs try to swallow the general rule by reasoning that any office held ex officio is, by virtue of being ex officio, necessarily "inseparably blended" with the primary office. *See* Resp. 25. That is not Alabama law. Instead, the State Constitution recognizes that the Governor may hold "other office[s]" as "provided in this Constitution." Ala. Const. Art. V, § 130 (2022). What "other office[s]" are "provided in this Constitution"? The offices that the Governor holds by virtue of being Governor, such as her office as President Ex-Officio of the UA Board of Trustees. "[T]he duties of the two capacities are separate and distinct so that the officer, while acting in one capacity, is governed by one law and, while acting in the other, is governed by a different and independent

6

law." 67 C.J.S. *Officers*, *supra*. No law directs Governor Ivey in her capacity as Governor to en-force the Act at UA, while the Act itself directs Governor Ivey in her capacity as President Ex Officio of the Board of Trustees to do so. Those distinct roles make the Governor's two offices "distinct and separate." *Cf.* Opinion of the Justices 64, 13 So. 2d 674, 677-78 (Ala. 1943) (explain-ing that a legislator's service on the War Emergency Council would constitute a separate office because the legislator would be "performing administrative acts wholly apart from that which he renders as a legislator"—even though he was eligible to serve on the Council only by virtue of his office as a legislator).

Plaintiffs' second argument is that "Governor's Ivey's multiple public statements *as the Governor* expressing her intention to enforce SB 129 demonstrate that Plaintiffs' injuries are trace-able to and redressable by the Governor," thereby "placing her squarely within the bounds of the *Ex parte Young* exception" to sovereign immunity. Resp. 25-27. But Plaintiffs themselves admit that these "public statements" are Governor Ivey's signing statements explaining why she signed SB 129 into law. *See* Doc. 1 ¶ 81; Resp. 26 n.15. Plaintiffs note that legislators offered similar statements, Doc. 1 ¶ 80, yet Plaintiffs did not sue them—likely because they also do not enforce the Act. And while Plaintiffs argue (at 26-27) that, "[c]ontrary to Defendants' assertions that Gov-ernor Ivey merely signed the bill into law, SB 129 expressly provides her with statutory authority to enforce the Act," a page earlier Plaintiffs explain what they mean by this: "Governor Ivey—*as president Ex-Officio of the Board*—is explicitly given enforcement authority over SB 129." Resp. 25 (emphasis added). Just so. Governor Ivey should be dismissed in her capacity as Governor.

## II. Plaintiffs' First Amendment Claims Should Be Dismissed Because They Challenge The Government's Regulation Of Its Own Speech.

The Court should also dismiss Plaintiffs' First Amendment claims for failure to state a claim under Rule 12(b)(6). Plaintiffs' theory is remarkable. They claim that professors at a state

university can compel students to affirm, as part of their coursework, that white students are inherently superior to black students, that Jewish students should be discriminated against, and that Germans are inherently racist—and that there is nothing the State can do about it. To be sure, Plaintiffs promise that universities "can prevent the teaching of wholly meritless views with the appropriate context and state interests." Resp. 35 n.24. But the promise simply begs the question: "wholly meritless views" according to whom? The professor, or the State? Here, the State has made its views known: It views as "wholly meritless" the idea "[t]hat individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin." Act § 1(2)(b). The professors disagree; for reasons unknown, they believe such discrimination has merit, and they wish to use their positions at a public university to compel their students to think so, too. Reneging on their promise, Plaintiffs say the professors win—and that the State is also powerless to stop its universities from preferentially funding race-based student organizations, which Plaintiffs argue must be treated better than other student groups.

The Constitution's promise is not so empty. It requires that States treat students equally, "without regard to any differences of race, of color, or of nationality." *Students for Fair Admissions, Inc.*, 600 U.S. at 230 (quotation omitted). And it allows "the government to regulate the content of what is or is not expressed when it is the speaker." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Those principles resolve this case. The Court should dismiss Plaintiffs' First Amendment claims for failure to state a claim upon which relief can be granted.

### A.    Public University Professors Are Subject to the State's Curricular Choices in the Classroom.

Contrary to Plaintiffs' theory, the First Amendment does not give professors veto power over their public employers when it comes to what they can teach in class. Just the opposite. When

a professor "and the University disagree about a matter of content in the course he teaches," "even to the extent that it represents [the professor's] professional opinion about his subject matter," "[t]he University must have the final say in such a dispute." *Bishop v. Aronov*, 926 F.2d 1066, 1076-77 (11th Cir. 1991). Again: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077.

After largely ignoring *Bishop* in their other briefing, Plaintiffs finally embrace *Bishop* as the proper test and abandon their argument that any regulation of a professor's speech in class is subject to strict scrutiny. *Compare* Doc. 12-1 at 8-10 *with* Resp. 27. And *Bishop* is indeed the simplest way for this Court to resolve the issue. But Plaintiffs' reading of *Bishop* is wrong.

The *Bishop* Court's first factor was "context: the university classroom during specific in-class time" and the "coercive effect upon students that a professor's speech inherently possesses." *Bishop*, 926 F.2d at 1074. Plaintiffs attempt to paint the context of *Bishop* as "[a] university's attempt to stop a professor from inserting irrelevant religious views into a secular class," Resp. 31, but this framing simply begs the question (again): relevant according to whom? The professor obviously thought his religious views *on physiology* were relevant to his physiology class, so that cannot be the distinction. *See* 926 F.2d at 1068-69. And for all the times Plaintiffs couch the professor's religious views as "irrelevant," it is notable that the Eleventh Circuit never framed the dispute that way. It instead recognized that the university simply did not want the professor teaching his religious views in class—relevant or not—and that, given "the visage of the classroom as part of a university course," the university, not the professor, got to make that decision. *Id.* at 1074.

The second factor in *Bishop* was "the University's position as a public employer which may reasonably restrict the speech rights of its employees more readily than those of other persons." *Id.* Plaintiffs use this second factor as a backdoor for their argument that the Act imposes

"viewpoint-based restrictions," which they note are "presumed unconstitutional." Resp. 32 (citing *Rosenberger*, 515 U.S. at 829). "In *Bishop*," Plaintiffs argue, "the university sought to impose a viewpoint neutral restraint on *all* religious content that was unrelated to the course, regardless of the viewpoint," whereas here, they say, "SB 129 is a viewpoint-based restriction on professor speech." *Id.* at 33. Lost on Plaintiffs is the irony that the case they cite to claim the mantle of viewpoint discrimination—*Rosenberger*—rejected this very distinction. "Religion may be a vast area of inquiry," the Court noted, "but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." 515 U.S. at 831. So it is the Supreme Court held that UVA's blanket ban on funding a student group's "religious content" (as Plaintiffs put it) was unconstitutional *viewpoint* discrimination. *Id.* at 832.

*Rosenberger* thus shows that the university in *Bishop* engaged in viewpoint discrimination when it prohibited the professor from sharing his religious views about physiology with his physiology class. But the *Bishop* Court was nonetheless right to hold that this viewpoint-based restriction was *not* "presumed unconstitutional." Why? Because the regulation concerned "the University's own speech, which is controlled by different principles." *Rosenberger*, 515 U.S. at 834. And "[w]here the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties," "principles applicable to government speech" should govern. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000). This is why the government-speech rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), so clearly applies in this context: The *Bishop* and *Rosenberger* Courts came very close to recognizing what *Garcetti* later held, which is that "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen" but "simply reflects the exercise of employer control over what the employer itself

has commissioned or created." 547 U.S. at 421-22 (citing *Rosenberger*, 515 U.S. at 833). Any

other reading cannot be reconciled with *Bishop* and *Rosenberger*.[2]

The third *Bishop* factor concerned "academic freedom," particularly the Supreme Court's

lofty rhetoric in cases like *Keyishian v. Board of Regents*, 385 U.S. 589 (1967). As the Eleventh

Circuit explained, "*Keyishian* dealt with that brand of regulation most offensive to a free society:

loyalty oaths," and the "Court's pronouncements about academic freedom in that context … cannot

be extrapolated to deny schools command of their own courses." 926 F.2d at 1075. Plaintiffs none-

theless rely heavily on this same language in *Keyishian* and similar cases. Resp. 27. But the Elev-

enth Circuit had good reason to discount these cases. As the en banc Fourth Circuit later explained,

"the Supreme Court has never set aside a state regulation on the basis that it infringed a First

Amendment right to academic freedom," nor "recognized that professors possess a First Amend-

ment right of academic freedom to determine for themselves the content of their courses and

---

[2] Plaintiffs cite a series of cases that they claim reject any application of "government speech principles to in-class instruction at the university level." Resp. 28-29. Even if that were true, Plaintiffs fail to mention that not one of the cases they cite adopted their novel proposal of back-dooring strict scrutiny into the analysis. They all applied a form of *Pickering* balancing—precisely the test the *Bishop* Court explained how to apply in this context. *See Bishop*, 926 F.2d at 1072 (discussing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). In any event, Plaintiffs' statement is not true—many of the cases they cite did *not* involve "in-class instruction"—and Plaintiffs neglect to report that many of the professors in these cases *lost*. *E.g.*, *Heim v. Daniel*, 81 F.4th 212, 234 (2d Cir. 2023) (rejecting professor's First Amendment claim that he was not hired because of the viewpoint expressed in his scholarship and holding that "de-cision-makers within a university must be permitted to consider the content of an aspiring faculty member's academic speech, and to make judgments informed by their own scholarly views, when making academic appointments"); *Por-ter v. Bd. of Trustees of N.C. State Univ.*, 72 F.4th 573 (4th Cir. 2023) (applying *Pickering* balancing to reject profes-sor's First Amendment retaliation claim for statements he made in department meeting and in an email to faculty); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) (applying *Pickering* to professor's First Amendment retaliation claim concerning a pamphlet he wrote and distributed with suggestions for restructuring his school). And the two cases Plaintiffs cite that do involve in-class speech are distinguishable. The Sixth Circuit's decision in *Meriwether v. Hartop* concerned a university that disciplined a professor for refusing to use a student's preferred pronouns in class. 992 F.3d 492 (6th Cir. 2021). The court thus relied on the Supreme Court's compelled-speech cases to hold that "the government 'may not compel affirmance of a believe with which the speaker disagrees.'" *Id.* at 503 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)). That is different from the State's *restrictions* on speech here. As for *Kilborn v. Amiridis*, the Seventh Circuit held that a professor's First Amendment retaliation claim survived a motion to dismiss where the professor alleged that the reasons the university gave for disciplining him were pretextual. 131 F.4th 550, 561-62 (7th Cir. 2025). To the extent the case suggests that universi-ties are powerless to stop their professors from using racial slurs in class, *see id.* 559-61, such dicta conflicts with *Bishop* and Supreme Court precedent.

scholarship." *Urofsky v. Gilmore*, 216 F.3d 401, 412, 414 (4th Cir. 2000) (en banc). The quotations Plaintiffs rely on are dicta, pure and simple.

And the dicta is not persuasive. The concept of "academic freedom" did not gain traction in the United States until the German model of higher education took hold in the late nineteenth century. *Id.* at 410-11. Before then, "academic freedom as we know it simply had no meaning." *Id.* at 410 (quoting J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 YALE L.J. 251, 253 (1989)). So "academic freedom" was not part of the original public meaning of the First Amendment, either in 1791 when the Amendment was ratified or in 1868 when it was incorporated to apply to the States. The *Keyishian* dicta is thus anachronistic and conflicts with the Supreme Court's instruction to apply the original meaning of constitutional provisions. *E.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022). This, too, is good reason to recognize that *Garcetti*'s rule applies in academia. While States are free to recognize some sort of academic freedom on their own, the First Amendment does not elevate university professors for special treatment over every other public employee. The professors' claims should be dismissed.

### B. Public University Students Are Subject to the State's Curricular Choices in the Classroom.

Plaintiff Luna's First Amendment claim in Count Two should be dismissed for similar reasons, even if Plaintiffs were right that the "*Bishop* balancing test can be applied to the First Amendment claims of both professors and students." Resp. 36. Luna simply does not have a First Amendment right to receive information the State does not wish to provide. *See* Doc. 32-1 at 46.

### C. Public University Student Groups Promoting Divisive Concepts Do Not Have a First Amendment Right to Preferential Treatment.

As Governor Ivey explained (Doc. 32-1 at 47-51), *Rosenberger* requires universities to treat organizations in a limited public forum equally, without regard to their viewpoints. The Act

does that. It prohibits state universities from directly sponsoring a DEI program, but allows universities to provide general funding to student organizations, no matter their viewpoint. Plaintiffs do not engage with this analysis. Resp. 36-37. They neither contend that the Governor has misread the Act nor argue that the Act would be unconstitutional if the Governor's interpretation is correct. The Court should thus "uphold [the] state statute against [Plaintiffs'] facial challenge." *Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1292 (11th Cir. 2022) (quotation omitted)).

As for the NAACP's claim that its right to associate was violated when UA converted office space that had been designated for the Black Student Union and SafeZone, Governor Ivey explained in her motion that "these claims fail because Plaintiffs have not shown that UA is operating a public forum of any kind in those spaces." Doc. 32-1 at 51. Plaintiffs have no response. *See* Resp. 37-39. That makes their invocation of *Widmar v. Vincent* inapposite. In that case, a university made "its facilities generally available for the activities of registered student groups," but "close[d] its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion." 454 U.S. 263, 265 (1981). That was unlawful.

Plaintiffs allege nothing of the sort here. According to Plaintiffs' Complaint, the Black Student Union and SafeZone were once given preferential treatment and provided dedicated office space. Now it seems that whatever kind of forum allowed for that treatment has closed, and UA makes "its facilities generally available" to all student organizations—including the NAACP, the Black Student Union, and SafeZone. Plaintiffs do not allege that the university "close[d] its facilities" to *any* student group on those terms. The First Amendment does not require UA to provide the Black Student Union and SafeZone with dedicated office space that other student groups do not receive. Plaintiffs have failed to state a claim upon which relief can be granted.

**III.    Plaintiffs' Vagueness Challenge Fails Because The Act Is Readily Understood.**

The Court should also dismiss Plaintiffs' vagueness challenge for the reasons Governor Ivey explained at length in her initial motion. Doc. 32-1 at 52-59. Plaintiffs relegate to a footnote their discussion of controlling caselaw from the Eleventh Circuit and the Supreme Court and rely instead on a non-binding district court decision from Florida. *See* Resp. 41-42.[3] Plaintiffs cannot evade binding precedent so easily. They assert without explanation that "Defendants' cited cases are factually and legally inapposite," Resp. 41 n.25, but the distinctions they highlight are irrelevant. Yes, *Arnett v. Kennedy* considered "a law allowing termination for 'cause' of civil servant based on defamatory statements about coworkers." Resp. 41 n.25 (citing 416 U.S. 134, 162 (1974)). But what matters is the Court's vagueness analysis: It held that "[t]he phrase 'such cause as will promote the efficiency of the service'" was *not* vague because it "makes it clear that in certain situations the discharge of a Government employee may be based on his speech." 416 U.S. at 160. Plaintiffs do not even try to explain why Alabama's law should be considered unconstitutionally vague if the standard in *Arnett* was not. They are equally mum about the other employment standards courts have upheld against vagueness challenges. *E.g., Garrett v. Matthews*, 625 F.2d 658, 660 (5th Cir. 1980) (rejecting claim by UA professor who argued that "the term 'adequate cause' [was] too vague to meet due process standards" for revoking tenure); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) (rejecting vagueness challenge to a provision requiring professors "to maintain 'standards of sound scholarship and competent teaching'").

Plaintiffs also fail to meaningfully engage with the text of the Act before they throw up their hands and declare the whole thing "vague." But as the Supreme Court put it in its seminal

---

[3] The case Plaintiffs rely on, *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), concerned a challenge to a Florida statute that governed private employers' conduct outside the education context; it has little bearing on this case, and the Eleventh Circuit's affirmance explicitly did not address or affirm the district court's vagueness analysis. *See* 94 F.4th 1272, 1283 n.6 (11th Cir. 2024).

*Letter Carriers* case (another case Plaintiffs ignore), while the Act's "prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973). The Act's "divisive concepts" are readily understood; the ordinary person knows what it means to suggest "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior," and they rightly find the idea reprehensible. Act § 1(2)(a). The Act's prohibitions are also readily understood; the ordinary person understands what words and phrases like "sponsor," "direct," "compel," "require," "advocates for," and "requires assent to" mean. Act § 2. That the Act incorporates and references other provisions does not make it "circular," as Plaintiffs suggest. Resp. 41 Most statutes work like that, and the ordinary person can easily apply the definitions in Section 1 to the list of prohibitions in Section 2.

The heart of Plaintiffs' argument seems to take issue with one of the Act's safe-harbor provisions in Section 4: "Nothing in this act … [p]rohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with the provisions of this act." Act § 4(3)(b). Plaintiffs claim that "the entirety of SB 129 is rendered vague by th[is] provision." Resp. 40. But Plaintiffs do not explain how a *safe harbor provision*, which simply "afford[s] protection from liability or penalty,"[4] can render the entire Act unconstitutionally vague. The provision exists to resolve any ambiguity in the liability provisions in Section 2. If those provisions are not already unconstitutionally vague (and they aren't), there is no reason to

---

[4] *Safe Harbor*, Black's Law Dictionary (12th ed. 2024).

think that a safe harbor provision could somehow *make* them vague. The safe harbor provision serves as a one-way release valve for alleviating liability, not imposing it. And regardless, even if that single provision were vague, the answer would be to enjoin enforcement of it, not the entire of the Act.

## IV.    Plaintiffs Have Not Alleged Facts That, If True, Would Show Intentional Discrimination.

Plaintiffs' last claim alleging intentional race-based discrimination under the Fourteenth Amendment's Equal Protection Clause should also be dismissed. *See* Doc. 32-1 at 59-74. At the outset, Plaintiffs all but ignore the presumption of legislative good faith, stating only that it is "not dispositive." Resp. 46 n.27. It's unclear what Plaintiffs mean by that, but if they mean that the presumption is not *always* dispositive, that's true enough. But if they mean that the presumption can *never* be dispositive, that's false, and they offer no law or reasoning to support that position.

Plaintiffs also argue that Defendants cannot rely on the Supreme Court's decision in *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024), because the Court there "applied the presumption of good faith to a full trial record, not a motion to dismiss." Resp. 46 n.27. Again, that's true enough, but irrelevant. Plaintiffs are careful not to say what they imply: that the presumption of legislative good faith therefore does not apply at the motion to dismiss stage and springs to life only late in litigation. Of course that's not true. *E.g.*, *D.N. by Jessica N. v. DeSantis*, -- F. Supp. 3d -- , No. 21-CV-61344, 2024 WL 5165857, at *10 (S.D. Fla. Dec. 19, 2024) (applying presumption of legislative good faith to dismiss intentional discrimination claim); *Higginson v. Becerra*, 363 F. Supp. 3d 1118, 1127 (S.D. Cal. 2019) (applying presumption to dismiss racial gerrymandering claim).

Plaintiffs also argue that intentional discrimination claims are "rarely dismissed at the pleading stage." Resp. 45. That may be, but it doesn't lower the pleading standards or indicate that

dismissal is inappropriate here. *Cf. Lewis v. Bentley*, No. 2:16-CV-690-RDP, 2017 WL 432464, at *11 (N.D. Ala. Feb. 1, 2017) (dismissing intentional discrimination claim under Rule 12(b)(6)), *aff'd sub nom. Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) (en banc). Nor are Plaintiffs correct that the Court must ignore obvious "alternative motivations behind SB 129, such as preventing discrimination." Resp. 46. As this Court explained in a similar context, "an equal protection claim is not plausible where there is an 'obvious alternative explanation' for the conduct other than intentional discrimination." *Lewis*, 2017 WL 432464, at *11; *see Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (discussing "obvious alternative explanation" in the context of the Rule 12(b)(6)). Plaintiffs' cited case does not change that standard. *See Jean v. Nelson*, 711 F.2d 1455, 1487 (11th Cir. 1983) (discussing standard for evaluating a "prima facie case" at trial by excluding evidence presented by the opposing party in rebuttal).

As for Plaintiffs' allegations concerning the *Arlington Heights* factors, Governor Ivey will not rehash her arguments from her initial motion, which Plaintiffs have not rebutted. *See* Doc. 32-1 at 62-74. A few responses will suffice.

First, Plaintiffs mischaracterize the Governor's argument concerning disparate impact and claim that, under the Governor's view, "an Equal Protection claim can only prevail if the law solely impacts people of a particular race." Resp. 48. As the Governor explained (at 63), that is not her argument. Rather, the point is simply that Plaintiffs must allege facts that, if true, would show that the Act "bears more heavily on one race than another." *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1321 (11th Cir. 2021) (quotation omitted). Plaintiffs' claim that "the First Amendment harm suffered by the Professor Plaintiffs who are not Black stem from their scholarship and pedagogical choices to focus on topics designed to combat anti-Black racial inequities" cannot help them in this regard. Resp. 48.

Second, Plaintiffs entirely ignore the presumption of legislative good faith in their discussion of the foreseeability of the Act's impact, the events leading up the Act's passage, and the Act's historical background. Resp. 49-52. And they apply obvious misinterpretations of benign statements by two individual legislators and Governor Ivey to impute the motives of the entire legislature—precisely what the Supreme Court and the Eleventh Circuit have instructed litigants *not* to do. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 836 (11th Cir. 2020); *GBM*, 992 F.3d at 1324. Plaintiffs excuse their failure to follow this caselaw by claiming (at 52) that "the motivations of SB 129's proponents were then ratified by the legislature," but Plaintiffs provide no citation for this conclusory allegation, and they have alleged no facts in their Complaint that, if true, could lead to such a conclusion. And the sole Eleventh Circuit case they cite involved a board of education with five members, not a legislative body with 105 members. *See Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 998 (11th Cir. 2018).

Third, Plaintiffs argue that the Court must "accept as true" their interpretation of the legislative process leading to the Act's enactment, "especially where, as here, the legislature enacts a law that addresses a non-existent problem." Resp. 53. This reasoning (again) not only ignores the presumption of legislative good faith but runs headlong into the Supreme Court's instruction to consider the "obvious alternative explanation" when reviewing a Complaint under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 682. In *Iqbal* itself, the Supreme Court rejected at the pleading stage a plaintiff's interpretation of events as evidence of "purposeful, invidious discrimination" and credited instead the "obvious alternative explanation" for the arrests the plaintiff complained of. *Id.* Governor Ivey repeatedly pointed this out (Doc. 32-1 at 68, 72), but Plaintiffs never engage.

Fourth, Plaintiffs try but fail to distinguish the Eleventh Circuit's teaching about the final *Arlington Heights* factor: the "availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1327 (quotation omitted). As the Governor explained (Doc. 32-1 at 73), the Eleventh Circuit in *League of Women Voters of Florida, Inc. v. Florida Secretary of State* held that "the fact that 'the [Florida] [L]egislature did not include the alternative option[s] that Plaintiffs would have preferred' is not evidence of discriminatory intent." 66 F.4th 905, 940 (11th Cir. 2023) (alterations in original) (quoting *GBM*, 992 F.3d at 1327). Plaintiffs reason that "*League of Women Voters* is distinguishable, however, because the court in that case was presented with the legitimate goal of preventing voter fraud." Resp. 53-54. True enough, but that is not how the plaintiffs in that case characterized the legislature's aim: They claimed that Florida's rejection of the plaintiffs' proposed alternatives showed that the legislature's actual goal was not preventing voter fraud but "discriminating against Black voters." *See* Brief of Plaintiffs-Appellees Fla. State Conference of Branches and Youth Units of the NAACP, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, No. 22-11143, 2022 WL 3369252, at *14 (11th Cir. 2022). Plaintiffs are right to read *League of Women Voters* as crediting the legislature's legitimate goals, but that reading dooms their claims here. *See* Doc. 32-1 at 73-74.

## CONCLUSION

For these reasons and those given in Governor Ivey's initial memorandum, the Court should dismiss Plaintiffs' Complaint against Governor Ivey in her official Capacity as Governor.

Date: May 2, 2025                          Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

George Muirhead (ASB-7345-K00L)
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
George.Muirhead@AlabamaAG.gov

*Counsel for Defendant Kay Ivey in her official capacity as Governor of Alabama*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on May 2, 2025, which will serve all counsel of record.

<div style="margin-left:40%">

s/ A. Barrett Bowdre

A. Barrett Bowdre

*Counsel for Defendant Kay Ivey in her official capacity as Governor of Alabama*

</div>