IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, AND THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br>Plaintiffs, <br><br>v. <br><br>KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore, University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees, <br><br>Defendants. | Case No.  2:25-CV-00067-MHH |

**PLAINTIFF ALABAMA NAACP'S SUPPLEMENTAL MEMORANDUM REGARDING ITS STANDING TO ASSERT THIS ACTION**

      Plaintiffs submit this supplemental memorandum in accordance with the Court's April 17, 2025 Order to address the Article III standing of the Alabama NAACP ("AL NAACP").  In short, the Alabama NAACP has both associational and organizational standing.

      Alabama NAACP has associational standing because its members, who are students at the University of Alabama ("UA"), were harmed when UA closed the Black Student Union ("BSU")

1

community space (a dedicated space focused on issues experienced by Black students at UA but open to all students) and Safe Zone Resources Center (a dedicated space focused on issues central to LGBTQIA+ students at UA but also open to all students) ("Safe Zone") as a direct result of SB 129. Members of Alabama NAACP's student chapter at UA (the "UA NAACP Chapter") used these spaces prior to its closure. As just one example, the President of the UA NAACP Chapter visited the BSU space multiple times per month prior to its closure where he was mentored and received advice from other UA students (including other members of the AL NAACP), and formed relationships with and recruited others who became senior officers of the UA NAACP Chapter. The interests of Alabama NAACP members and the resulting harm implicated by the closure of BSU space and Safe Zone are highly germane to Alabama NAACP's mission to support the advancement of Black students, including those attending higher education institutions like UA. Moreover, because this is a suit for injunctive relief, it is not necessary for the individual members to bring suit on their own behalf.

Alabama NAACP likewise meets the requirements for organizational standing because the organization itself has been directly harmed by SB 129. The closure of the BSU space harmed the UA NAACP Chapter because it lost a valuable source of recruitment of student members and leaders at UA. Moreover, given the vagueness of SB 129 and the actions of UA administrators to date with regard to other organizations, Alabama NAACP has a credible concern that the UA NAACP Chapter will be deemed a prohibited DEI program under SB 129. In addition, there is a real risk that programming put on by the UA NAACP Chapter will be prohibited as DEI programming or implicating "divisive concepts" under SB 129 and be deemed ineligible for university funding. These concerns of being deemed a prohibited DEI program or associated with a prohibited divisive concept have already impacted UA NAACP's programming. During the past

school year, fears about repercussions from SB 129 led the UA NAACP Chapter to move an event off campus. Moreover, the UA NAACP Chapter's faculty advisor expressed concern about attending the event due to the possibility it would be deemed to violate SB 129.

For all of these reasons, Alabama NAACP has standing.

## LEGAL STANDARD

Article III standing contains three elements. First, a plaintiff must: have suffered an injury in fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id*. at 560-61. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*. at 561.

There are two ways in which an organization such as the Alabama NAACP may demonstrate injury in fact. An organization may assert *associational standing* because its "members are injured." *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (citing *Button*, 371 U.S. at 428). In addition, the organization may assert *organizational standing* because it has itself incurred harm. *See NAACP v. Button,* 371 U.S. 415, 428 (1963).

In the Eleventh Circuit, when First Amendment rights are involved, courts apply the injury-in-fact requirement loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). "Thus, it is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance ..., the injury is self-censorship.'" *Id*. (citing *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th

3

Cir. 2001) (citation omitted)). The "direct penalization . . . of First Amendment Rights" is "*presumed* to cause irreparable injury." *Siegel v. LePore*, 234 F. 3d 1163, 1178 (11th Cir. 2000) (en banc) (per curiam) (emphasis added).

## ARGUMENT

**I.      Plaintiff Alabama NAACP has Associational Standing.**

An organization such as Plaintiff Alabama NAACP satisfies the requirements of associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1316 (11th Cir. 2021) (applying the three-factored *Hunt* test in holding that the Alabama NAACP has the right to assert standing on behalf of members impacted by challenged voter ID laws). All three elements are satisfied in this case,

### A.      *Members of Plaintiff Alabama NAACP Have Suffered Harm as a Direct Result of SB 129 That is Redressable by This Lawsuit.*

Members of the Plaintiff Alabama NACCP's UA Chapter suffered harm (and thus incurred an injury in fact) when the University of Alabama closed the BSU space and Safe Zone for purportedly violating SB 129. Prior to these closures, student members of the UA NAACP Chapter used both the BSU space and Safe Zone. The mission of the BSU applied at the BSU space was:

> . . . to establish and innovate relationship opportunities and experiences for minority students at the University of Alabama. We also serve as a liaison between the minority student body and administration in efforts to uphold the values stated in the Capstone Creed. We serve our members by providing community service opportunities, mentoring relationships within BSU, and providing outlets for expression and discussion. We strive to address the issues that affect our community on campus, locally, and internationally.

> Our goal is to provide a safe and welcoming environment for all students who wish to be a part of it.

*Black Student Union*, The Source, https://mysource.ua.edu/organization/uabsu (last visited May 21, 2025).

Prior to the closure of the BSU space, UA NAACP Chapter President Ja'Kobe Bibbs, a rising junior at the University of Alabama, visited the BSU space multiple times per month to socialize, form community, and strengthen friendships with—and receive mentorship from—other UA students in the BSU space.  Plaintiffs' Proposed Findings of Fact, Plaintiff Alabama NAACP [hereinafter Alabama NAACP Findings].  During his freshman year, Mr. Bibbs attended the BSU space in connection with his participation in the Freshman Liaison Program, a subcommittee of BSU.  *Id.*  That program taught Mr. Bibbs various leadership skills, how to become active on campus, and how to find a community with other Black students at UA.  *Id.*  In addition, Mr. Bibbs received guidance from other students at the BSU space about how to further his relationship with an alumni mentor.  *Id.*  He also was counseled, encouraged, and assisted by fellow students at the BSU space in applying to the Blackburn Institute at UA, a premier community and engagement organization that promotes young leaders across UA to better the State of Alabama through leadership development and civic engagement programs.  *Id.*

Mr. Bibbs was not the only member of the UA NAACP Chapter to frequent the BSU space. Other members of the UA NAACP Chapter also regularly visited the BSU space.  For example, Member #1 of the UA NAACP Chapter is the Event Coordinator of the UA NAACP Chapter.  *Id.* She is a junior at UA, majoring in Philosophy on a jurisprudence track and minoring in Sociology & Educational Policy and Reform.  *Id.*  Prior to its closure, Member #1 regularly visited the BSU space, where she regularly interacted with Mr. Bibbs and others.  *Id.*  As part of these interactions

and networking, Mr. Bibbs recruited Member #1 to serve on the Executive Board of the UA NAACP Chapter as the Event Coordinator. *Id.* Prior to the closure of the BSU space, Mr. Bibbs also built relationships with two other students who became UA NAACP Chapter members and served on the UA NAACP Chapter's Executive Board. *Id.*

When the University of Alabama closed the BSU space for purportedly violating SB 129, Mr. Bibbs and the other UA NAACP Chapter members lost all of the above benefits that they had previously received from visiting the BSU space on campus, including mentorship, networking, gathering to respond to current events, and socializing. *Id.* Had the BSU space not been closed as a result of SB 129, Mr. Bibbs and other UA NAACP Chapter members would have continued to use the space to build relationships and further participation and membership in the UA NAACP Chapter. *Id.*

Had the BSU space not been closed as a result of SB 129, the BSU space would have served as a place for UA NAACP Chapter members to engage in issues central to the UA NAACP Chapter's mission. *Id.* One example of the UA NAACP Chapter's injury from the closure of the BSU space is when, in late 2024, many Black UA students, including members of the UA NAACP Chapter, received threatening text messages informing Black students they were to be sent to plantations to spend the rest of their lives in slavery. *Id.* Because the BSU space had been closed, the UA NAACP Chapter members and other Black students did not have a dedicated space where they could gather to discuss, process, and receive support about these racially hostile texts. *Id.*

In addition, prior to its closure, UA students gathered at the BSU space to discuss elections and the impact of elections on Black communities, an issue that is central to the UA NAACP Chapter's mission. Due to the closure of the BSU space, UA NAACP Chapter members and other students were no longer able to use the space for this purpose. *Id.*

Members of the UA NAACP Chapter were similarly harmed when the University of Alabama closed the Safe Zone for purportedly violating SB 129. The Safe Zone "promotes equity and inclusion for LGBTQIA+ individuals at The University of Alabama. The Center provides educational outreach, community support and crisis intervention resources for LGBTQIA+ members of The University of Alabama community and their allies." *Alabama Safe Zone*, Alabama LGBTQIA+, www.alabamaSafe Zone.com/archiveszrc (last visited May 21, 2025).

Prior to closure, UA NAACP members spent time in the Safe Zone. For example, a UA NAACP member, who is a sophomore majoring in International Studies and minoring in Chinese and International Business (Member #2), attended the Safe Zone prior to its closure. Alabama NAACP Findings. When the Safe Zone was closed, UA NAACP Chapter members lost access to the various community building, educational resources, and crisis intervention support it had provided. *Id.*

The harms suffered by the UA NAACP Chapter members are redressable by this lawsuit. The defendant Board of Trustee members have broad authority and control over the affairs of the University of Alabama. *See* Board Manual Article I ("The entire management and control over . . . The University of Alabama System shall be completely and absolutely vested in The Board of Trustees . . . ."); *see also* Board Manual at 82 (authority over "matters of termination, discipline and grievances" for tenured professors); Board Manual at 75 (authority to govern students). Moreover, the Governor serves as a voting member and President of the Board of Trustees. *See* Ala. Const. art. XIV, § 264. Thus, the Court may order the reversal of UA's decision to close the BSU space and Safe Zone on the grounds that such action pursuant to SB 129 violates the First Amendment freedom of association.

B.     *The Other Requirements for Associational Standing are Satisfied.*

Plaintiff Alabama NAACP's UA Chapter likewise meets the other requirements for associational standing. The mission of the UA NAACP Chapter is highly germane to the interests that Plaintiff Alabama NAACP seeks to protect in this case. The mission of the UA NAACP Chapter is to "improve the political, educational, social and economic status of minority groups; to eliminate racial prejudice; to eliminate discriminatory acts of injustice; to keep the public aware of the adverse effects of racial discrimination; and to take all lawful action to secure its elimination . . . ." Alabama NAACP Findings. The instant lawsuit seeks to address the closure of two different spaces used by UA NAACP Chapter members—the BSU space and Safe Zone—that had been central to the educational, professional, and social growth of Black and LGBTQIA+ students at the University of Alabama while also providing important services to them. The UA NAACP Chapter has brought this suit to address the discriminatory closures of the on-campus BSU space and Safe Zone. *See, e.g.*, *Am. All. For Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024) (finding that Plaintiff in a case alleging racial and gender discrimination has satisfied the second *Hunt* factor because the organization "seeks racial equality for its members, an interest germane to its purpose").

Lastly, the claims asserted and relief requested in this lawsuit do not require participation of the individual UA NAACP Chapter members. Plaintiff seeks (i) a declaration finding that the closure of the BSU space and Safe Zone violated the First Amendment and (ii) an injunction enjoining enforcement of SB 129 against the BSU space and Safe Zone. Individualized proof, such as in a case for damages, is not required. *See Id.* (finding Plaintiff satisfied the third *Hunt* factor because "neither the civil-rights claim it asserts nor the preliminary injunction it seeks necessitates individual proof or requires the individual members' participation").

8

II. **Plaintiff Alabama NAACP has Organizational Standing.**

To demonstrate that an organization has standing to sue in its own right, the organization must demonstrate that is satisfies the three *Lujan* factors: 1) an injury in fact has occurred; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury is not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560-61. There are multiple injuries the Alabama NAACP has incurred as a result of SB 129 and Defendants' enforcement of SB 129. First, the closure of the BSU space harmed the UA NAACP Chapter because it lost a valuable source of recruitment of members and leaders. Second, given the vagueness of SB 129 and the actions of UA administrators, to date, with regard to other organizations, Alabama NAACP has a reasonable and credible concern that the UA NAACP Chapter will be deemed a prohibited DEI program under SB 129. In addition, there is a real risk that programming put on by the UA NAACP Chapter will be prohibited as DEI programming or as implicating "divisive concepts" under SB 129 and thus deemed be ineligible for university funding. Each of these injuries would alone be sufficient to confer organizational standing.

  A. *Closure of the BSU Also Directly Injured the Alabama NAACP and Gives Rise to Organizational Standing.*

As explained above, UA NAACP Chapter President Ja'Kobe Bibbs formed relationships with three different individuals at the BSU space who he recruited to become members of the UA NAACP Chapter Executive Board. This includes the UA NAACP Chapter's current Events Coordinator. When the BSU space was closed, the UA NAACP Chapter lost a valuable source of recruitment of dues paying members and leaders, and thus was directly harmed by SB 129. *See, e.g.*, *Florida Democratic Party v. Hood*, 342 F.Supp.2d 1073, 1079 (N.D. Fla. 2004) ( "[A]n organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes."); *see also Construction Industry Ass'n of Sonoma County v.*

*City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975), *cert. denied*, 424 U.S. 934 (1976) (holding association of builders suffered injury in fact sufficient to confer standing where new construction rules resulted in lost dues paid by members).

### B. Alabama NAACP's Credible Fear of Violating SB 129 Gives Rise to Organizational Standing.

In addition, Alabama NAACP has organizational standing because it has a credible fear that it will be deemed a prohibited DEI program or associated with a divisive concept under SB 129.

SB 129 prohibits a "public institution of higher education" (like the University of Alabama) from "sponsor[ing] any diversity, equity, and inclusion program." Ala. Code § 41-1-91(1). "Diversity equity and inclusion program" is defined to include "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." § 41-1-90(3). Neither "program" nor "sponsor" is further defined in the statute. SB 129 goes on to prohibit "public institutions of higher education" from "expend[ing] funding … for the purpose of compelling assent to any divisive concept." § 41-1-91(8). The UA NAACP Chapter focuses on issues impacting Black individuals in Alabama, but its membership is open to all. Alabama NAACP Findings. In light of the closure of the BSU space and Safe Zone, both of which focused on issues pertinent to specific groups but did not restrict membership to those groups, the UA NAACP is reasonably concerned that it will be deemed a prohibited DEI program and lose access to university resources. *Id*.

The UA NAACP Chapter is likewise concerned that its programming, much of which focuses on issues of ongoing racial discrimination and other inequities, will be deemed prohibited

as DEI programing or as implicating "divisive concepts" under SB 129. The UA NAACP Chapter has hosted—and intends to host in the future—speakers addressing topics concerning racial gerrymandering and implicit bias, among others. *Id*.

Importantly, where, as here, First Amendment rights are involved, the Court must apply the injury-in-fact requirement of standing loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell*, 608 F.3d at 1254. "Thus, it is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance . . . the injury is self-censorship.'" *Id*. (citing *Pittman*, 267 F.3d at 1283 (citation omitted)). The *Harrell* case involved a Florida personal injury attorney who challenged rules regulating the way in which members of the Florida Bar can advertise their services. *Id*. at 1247-48. The plaintiff's case asserted that these rules, which included a prohibition on advertisements that "promise results" and a requirement that TV and radio ads be pre-screened for compliance, violated his First Amendment rights. *Id*. at 1255. The Eleventh Circuit overturned the District Court's dismissal on standing and ripeness grounds, instead finding that the plaintiff in *Harrell* had raised a justiciable vagueness challenge to the relevant rules. *Id*. at 1257-58. To reach this holding, the Court applied a three-factored test to evaluate whether *Harrell* alleged an injury-in-fact sufficient for standing. The Court required *Harrell* to establish: 1) that he seriously wished to advertise his services; 2) that such advertising would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and 3) there is at least a minimal probability that the rules will be enforced, if they are violated. *Id*. at 1254.

The *Harrell* test supports a finding that, as a result of the vague language in SB 129 and Defendants' enforcement thereof, the Alabama NAACP has been subject to an impermissible

11

"chilling effect" on its First Amendment right to freely associate on campus; a right that other student organizations at the University of Alabama are freely allowed. Taking the hosting of events as an example, under *Harrell*, the NAACP can establish injury-in-fact if it can show: 1) that it seriously wished to host certain events on the University of Alabama campus; 2) that such events would arguably be affected by SB 129, but SB 129 is at least arguably vague as it applies to these events; and 3) there is at least a minimal probability that the rules will be enforced if they are violated. The Alabama NAACP's claim meets this test.

As to the first factor, the UA NAACP Chapter "seriously wished" to host events that could be deemed "DEI programs" or to implicate "divisive concepts" at the University of Alabama campus. For example, speakers hosted by the UA NAACP Chapter on the UA campus often address barriers in society faced by Black individuals, including issues such as implicit bias and racial gerrymandering. Alabama NAACP Findings. That the UA NAACP Chapter "seriously wished" to host events regarding SB 129 on the UA campus is evidenced by the fact that the UA NAACP Chapter is still planning to try to host another event about SB 129 on campus, despite having had to move the last event that addressed this topic off campus. Alabama NAACP Findings.

Turning to the second *Harrell* factor, the UA NAACP Chapter's event discussing SB 129, which it felt compelled to hold off-campus, arguably would have been cancelled if it was scheduled to occur on campus because UA could arguably consider the event to be a "DEI program" and/or to invoke "divisive concepts." The event would, for example, potentially include debate about whether it is valuable to teach students the concepts of systemic racism, meritocracy, and implicit bias, implicating various of the "divisive concepts." *See* Ala. Code § 41-1-90(2)f. (stating the concept that "fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin"

12

is a divisive concept). An event hosted by Plaintiff Alabama NAACP, which voiced its opposition to SB 129 by filing this suit, is all the more likely to include discussion of the merit of teaching theories that implicate "divisive concepts." Whether SB 129, in fact, prohibits such an event from occurring on campus is not entirely clear. And that is precisely the kind of ambiguity the second *Harrell* factor is designed to protect against.

Finally, turning to the *Harrell* third prong, there is more than a minimal probability that SB 129 will be enforced against the UA NAACP Chapter. The fact that the University has not yet directly prohibited the UA NAACP Chapter or any of its events is not dispositive in this analysis. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (finding Plaintiffs are not required to "confess that [they] will in fact violate that law"—because the law itself provides no clear definition of what would constitute a violation); *cf. CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269-70 (11th Cir. 2006). Defendants have already shuttered campus spaces that were used to discuss diversity, equity, and inclusion topics and de-funded organizations that have diversity, equity, and inclusion missions despite the absence of any clear and explicit violation of the terms of SB 129. Thus, the UA NAACP Chapter acted reasonably by moving certain events off campus because it was reasonably possible that the organization or its members might have faced repercussions (or cancellation of the events) had they been held on campus. Indeed, the UA NAACP Chapter's faculty advisor felt she could not attend its off-campus event due to her own fears of repercussions under SB 129. Alabama NAACP Findings. The minimal probability of enforcement, as required by *Harrell*, is more than met.

Application of the *Harrell* test demonstrates that Plaintiff Alabama NAACP experienced a cognizable injury-in-fact, supporting its standing to sue. The "chilling effects" experienced by the Alabama NAACP are traceable to SB 129, and Defendants' actions to enforce SB 129 are

redressable by this court. Specifically, a ruling by this Court that SB 129 is unconstitutionally vague and in violation of the First Amendment—and, thus, unenforceable—would immediately thaw any chilling and allow the Alabama NAACP to host events at UA without fear, just as many other types of organizations with other kinds of missions can do now. As such, the Alabama NAACP has standing to sue in its own right on behalf to protect its own interest to preserve its First Amendment rights.

## CONCLUSION

For the foregoing reasons, Alabama NAACP has demonstrated they have both associational and organizational standing.

Dated: May 21, 2025

Respectfully submitted,

*/s/ Alison Mollman*
Alison Mollman
ASB-8397-A33C
ACLU of Alabama
PO Box 6179,
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

*/s/ Daniel A. Cantor*
Daniel A. Cantor*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW Washington, DC 20001-3743
(202) 942-5000

*/s/ Michael Rogoff*
Michael A. Rogoff*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684

*/s/ Antonio L. Ingram II*
Antonio L. Ingram II*
Mide Odunsi*
NAACP Legal Defense & Educational Fund, Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

*/s/ Carmen Lo*
Carmen Lo*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500 Palo Alto, CA 94306-3807
(650) 319-4500

*Admitted *pro hac vice*