FILED

2025 May-21  PM 07:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CASSANDRA SIMON, SYDNEY TESTMAN, )
MIGUEL LUNA, ISABELLA CAMPOS, )
DANA PATTON, RICHARD FORDING AND )
THE ALABAMA STATE CONFERENCE OF )
THE NAACP, )
)
      Plaintiffs, )
)
vs. )
)
KAY IVEY in her official capacity as ) Case No. 2:25-cv-00067-RDP
Governor of Alabama and President Ex-Officio )
of the University of Alabama Board of )
Trustees, SCOTT PHELPS in his official )
capacity as President Pro Tempore University )
of Alabama Board of Trustees, MIKE BROCK, )
KAREN BROOKS, MYLA E. CALHOUN, )
RONALD GRAY, JEFF GRONBERG, )
O.B. GRAYSON HALL, JR., BARBARA )
HUMPHREY, W. DAVIS MALONE III, )
EVELYN VANSANT MAULDIN, HARRIS )
MORRISSETTE, J. STEVEN ROY, )
KENNETH SIMON, MARIETTA )
URQUHART AND KENNETH )
VANDERVOORT in their official capacities as )
members of the University of Alabama Board )
of Trustees )
)
      Defendants. )
)

## JOINT REPORT OF THE PARTIES

Pursuant to this Court's April 17, 2025 Order (Doc. 40), the Parties submit the following

Joint Report setting forth their proposed findings of fact and conclusions of law. The Parties have

conferred and have determined that the Parties will be available for a two-day hearing beginning

June 25, 2025. Two of the Board Defendants' witnesses will be unavailable on those dates, and

the parties have agreed that those witnesses' testimony will be obtained by deposition prior to the hearing.

# TABLE OF CONTENTS

I.    THE PARTIES' PROPOSED STIPULATED FINDINGS OF FACT ......................................... 1

II.   THE PLAINTIFFS' PROPOSED FINDINGS OF FACT ......................................................... 19

III.  THE DEFENDANTS' PROPOSED FINDINGS OF FACT...................................................... 65

IV.   THE PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW .................................................. 70

V.    THE DEFENDANTS' PROPOSED CONCLUSIONS OF LAW ............................................... 93

I. **The Parties' Proposed Stipulated Findings of Fact**

1.      The Board of Trustees of The University of Alabama is comprised of three operating divisions: The University of Alabama ("UA"), The University of Alabama at Birmingham ("UAB"), and the University of Alabama in Huntsville ("UAH").

2.      Plaintiff Dr. Cassandra Simon is an associate professor of social work at UA.

3.      Plaintiff Dr. Dana Patton is a professor of political science at UA.

4.      Plaintiff Dr. Richard Fording is a professor of political science at UA.

5.      Plaintiff Sydney Testman is a student at UAB.

6.      Plaintiff Miguel Luna is a student at UAB.

7.      Plaintiff Alabama NAACP is the Alabama state conference of the NAACP, a national civil rights organization.

8.      Defendant Governor Kay Ivey is sued in her official capacity as the Governor of Alabama and in her official capacity as the President Ex-Officio of The Board.

9.      Defendants Scott Phelps, Mike Brock, Karen Brooks, Myla E. Calhoun, Ronald Gray, Jeff Gronberg, O.B. Grayson Hall, Jr., Barbara Humphrey, W. Davis Malone III, Evelyn VanSant Mauldin, Harris Morrissette, J. Steven Roy, Kenneth Simon, Marietta Urquhart,[1] and Kennth Vandervoort are sued in their official capacities as members of the Board.

10.     Alabama Senate Bill SB 129 ("SB 129") was introduced to the Senate Committee on County and Municipal Government on February 20, 2024.

---

[1] Defendant Urquhart no longer serves on the Board. Her seat was filled by Angus R. Cooper III.

11.    The bill was signed into law on March 19, 2024, and is codified as Alabama Code §§ 41-1-90 through 41-1-94. The law took effect on October 1, 2024.

12.    Plaintiffs filed this lawsuit on January 14, 2025. (Doc. 1).

13.    On January 30, 2025, Plaintiffs sought a preliminary injunction to enjoin Defendants from enforcing SB 129. (Doc. 12.) In support, Plaintiffs submitted declarations from Plaintiffs Simon, Luna, Testman, and the Alabama NAACP. (Docs. 12-3 through 12-7.) The plaintiffs sought preliminary relief for claims under the First Amendment and the Due Process Clause of the Fourteenth Amendment only; they did not seek relief under the Equal Protection Clause of the Fourteenth Amendment.

## The Professor Plaintiffs

### Dr. Cassandra Simon

14.    Professor Simon is an Associate Professor of Social Work, with tenure, at the University of Alabama ("UA") where she has taught since 2000.

15.    Professor Simon graduated from University of New Orleans with a B.S. in psychology in 1982.  She obtained a Master of Social Work from Louisiana State University in 1986, and a Ph.D. in Social Work from the University of Texas at Arlington in 1992.

16.    Professor Simon has over twenty-five years of professional experience in higher education and has research interests which include social justice, race relations, health disparities, community engagement, and human rights.

17.    Professor Simon has been published in multiple peer-reviewed academic journals, including the Journal of Ethnic and Cultural Diversity in Social Work, the Journal of Community Psychology, and the Journal of Social Work Education.

18.    Professor Simon teaches undergraduate and graduate courses in human behavior, family and child welfare, and social justice

19.    Dr. Simon taught a course titled "Anti-Oppression and Social Justice" at UA in the fall semester of 2024. (Doc. 56-1).

20.    The University of Alabama 2024-25 Course Catalog describes the *Anti-Oppression and Social Justice* course as follows: "This course examines issues related to the lived experiences of people based on age, culture, race, ethnicity, gender/gender identity/gender expression, sexual orientation, socioeconomic status/class, ability, religion/spirituality, and national origin.  It is designed to introduce the student to social, economic, and political systems of power that serve to oppress communities that have been minoritized." UA Course Catalog, https://catalog.ua.edu/search/?search=anti-oppression+and+social+justice.

21.    The dean of the School of Social Work at UA, Dr. Schnavia Hatcher, contacted Dr. Simon via email and instructed her to cancel the sit-in assignment. Specifically, she wrote: "Despite the way you've framed it, it is difficult to see how this exercise is not tied to the classroom or does not create a situation where students are being forced to assert a position and/or unwillingly take part in political activity. Similarly, the way this has been organized runs afoul of the Board's commitment to institutional neutrality." (Doc. 56-2 at p. 5 of 10).

22.    The email quoted the following language from Chapter 3.II.B of the UA Faculty Handbook: "It is the responsibility of faculty members to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including

termination. Examples of the types of behaviors that could warrant a range of disciplinary actions….” (Doc. 56-2 at p. 5 of 10).[2]

23.    Dr. Simon responded to Dean Hatcher, stating that she was “confused and concerned” about the decision and sought clarification on “how because it is tied to the classroom it is inappropriate or violates the new law and guidelines.” (Doc. 56-2 at p. 3-4 of 10). She asked Dean Hatcher to “identify the specific policy or policies with which I have overlooked or not complied and could result in disciplinary action.” *Id.*

24.    Dr. Jim Dalton, Executive Vice President and Provost at UA, replied to Dr. Simon, stating that the assignment can be viewed as “sponsoring a program that promotes DEI, tacitly requires a student’s assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept,” in violation of the law. (Doc. 56-2 at p. 3 of 10). He stated that Dr. Simon’s students “are more than welcome to independently— completely separate from any academic exercise—take advantage of the numerous opportunities the University provides to express themselves on campus, including their personal opposition to the new law,” and that Dr. Simon is “personally free to engage in political activity as a private citizen if done in a manner consistent with the terms of the Faculty Handbook and Board Rule 304,” but that “[s]uch political activity, however, has no place in the classroom and this standard predates the passage of SB129.” *Id.*

25.    Dr. Simon formally cancelled the advocacy portion of the assignment, but a group of students still gathered at Denny Chimes November 13, 2024 to protest SB 129. (Doc. 12-4 ¶¶ 33, 35); (Doc. 56-3 ¶ 8).

---

[2] A complete copy of the Faculty Handbook has been submitted as Doc. 56-7.

26.    Dr. Simon's students held a rescheduled sit-in protest. The protest was organized separate from Dr. Simon's course. (Doc. 12-4 ¶ 36); (Doc. 56-3 ¶ 9).

27.    The extracurricular sit-in took place on November 18, 2024.

28.    UA did not discipline Dr. Simon in relation to the student advocacy assignment. (Doc. 56-3 ¶ 10).

29.    Dr. Simon taught the same course, "Anti-Oppression and Social Justice," in the spring semester of 2025. (Doc. 56-3 ¶ 11).

30.    The Council on Social Work Education governs the accreditation of baccalaureate and master's social work programs in the United States.  CSWE's Commission on Accreditation evaluates programs according to the 2022 Educational and Policy Accreditation Standards ("EPAS"), which establishes thresholds for professional competence.  (Doc. 55-10).

31.    UA's School of Social Work is currently accredited by CSWE.

***Dr. Dana Patton***

32.    Plaintiff Dana Patton is a tenured Professor of Political Science at UA, where she has been teaching since 2011.

33.    Professor Patton's expertise and academic research focus on health policy, social policy, gender politics, leadership, and state politics and policy.  She has written numerous articles that have appeared in peer-reviewed publications, and she is presently on the editorial boards of Public Administration Review and World Medical & Health Policy.

34.    Professor Patton is also the Director of UA's Dr. Robert E. Witt University Fellows Program ("Witt Fellows Program").  The Witt Fellows Program "calls together a community of top scholars from diverse disciplines with a common goal: to directly apply their growing expertise towards the most pressing needs in our society.  Young leaders with a passion for service work

5

closely with one another and with masters of their fields to develop the mindsets and skillsets necessary to make a meaningful impact beyond the four walls of the classroom, sharing critical real-world experiences and coursework with tight-knit cohorts of mutual challenge and support."

35.    Fellows are selected through a highly competitive process to participate in the program, which seeks to prepare them for lives of leadership in and service to their community, state, nation, and world.  At the end of the program, students receive a minor in Social Innovation and Leadership.

36.    At UA Professor Patton teaches the following courses, among others: Understanding Poverty, Social Investment and the Role of Innovation, Systemic Change Through Social Entrepreneurship, and The Politics of Health Policy.

37.    Dr. Patton taught *Understanding Poverty* in the fall semester of 2024. (Doc. 56-3 ¶ 12); (Doc. 1 ¶ 140).

38.    She plans to teach it again in the Fall 2025 semester.

39.    UA did not discipline Dr. Patton based on the complaints it received relating to *Understanding Poverty* in fall 2024. (Doc. 56-3 ¶ 15).

40.    Professor Patton also teaches the course *Social Investment and the Role of Innovation*, which the Witt Fellows take in the spring semester following the Understanding Poverty course.  Professor Patton taught it in Spring 2025 and plans to teach it in Spring 2026.

41.    Dr. Patton taught a course titled *The Politics of Health Policy* at UA in the spring semester of 2025. (Doc. 56-3 ¶ 16); (Doc. 1 ¶ 98).

***Dr. Richard Fording***

42.    Plaintiff Dr. Richard Fording is a Professor in the Department of Political Science at the UA.

43.    Professor Fording previously served as UA's Chair of the Department of Political Science from 2011 to 2016 and served as the Marilyn Williams Elmore and John Durr Elmore Endowed Professor at UA from 2016 to 2021.  Professor Fording has been teaching at the University of Alabama for 14 years.  He has been a professor of political science for 29 years.

44.    Professor Fording's research specialties include American politics and public policy administration.  Professor Fording mainly teaches courses in the areas of the intersection among race, ethnicity, and politics.  His teaching emphasizes on how the politics of race and class affect the design of public policy, social welfare policies, and perpetuate race and class inequalities.

45.    Professor Fording has published several works related to the impact of race on public and social welfare policies, particularly in relation to the Temporary Assistance for Needy Families ("TANF") program.  These works include, among others, the journal articles entitled *Hate-Motivated Behavior: Impacts, Risk Factors, and A Call for Solutions*, *Race and the Local Politics of Punishment in the New World of Welfare*, and *Second-Order Devolution and the Implementation of TANF*.

46.    Professor Fording has authored several books regarding the intersection of race and social policies.  His publications include *Hard White: The Mainstreaming of Racism in American Politics* and *Race and the Politics of Welfare Reform*.  His research on race and social policy has won numerous international awards, including the Oliver Cromwell Cox Book Award by the Section on Racial and Ethnic Minorities (SREM) of the American Sociological Association, and most recently, the Aaron Wildavsky Enduring Contribution Award, from the Public Policy Section of the American Political Science Association for a book or article published in the last ten to twenty years that continues to influence the study of public policy.

47.     UA's Fall 2024 semester began on August 21, 2024.

48.     At the beginning of the semester, the UA College of Arts and Sciences held a legal training session for UA faculty.

49.     The training session included information about UA's compliance with SB 129, which would go into effect on October 1, 2024.

50.     The PowerPoint presentation included 103 slides, 4 of which discussed SB 129. UA titled the introductory slide "Alabama's Anti-DEI Law (aka SB 129 and Alabama Act 2024-34)."  It included a link to UA's published DEI guidance, located at https://deiguidance.ua.edu/. (Doc. 55-25, p. 95-98).

51.     UA administrators also provided disclaimer language for professors to add to their syllabi.  Professors were recommended to include this language on their syllabi.  The language read:

> All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting.  This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective scholarly lens designed to encourage critical thinking.  Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered 'divisive' under Alabama law, nor penalized for refusing to support or endorse such a concept.  All students are strongly encouraged to think independently and analytically about all material presented in class and may express their views in a time, place, and manner consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry and expressions.

52.     At the University of Alabama, Professor Fording teaches, among other courses, *The Politics of Poverty*, *Social Movements and U.S. Politics*, and *The Politics of Voting Rights.*

53.     Professor Fording has taught *The Politics of Poverty* course since 1996.  He has taught some variation of the course to undergraduate and graduate students since 2012.  Professor

Fording taught the course for the Masters of Public Administration program in the Spring 2024 semester.

54.    According to the UA 2024-2025 Undergraduate Catalog, *The Politics of Poverty* is a course offered in the Department of Political Science.  The description of the course is as follows: "In this course we will examine one of the most enduring social problems in the United States – poverty.  The course is divided into three sections.  In the first section, we will primarily focus on the conceptualization and measurement of poverty, as well as the demographic groups that are most likely to suffer from high poverty rates.  In the second part of the course, we will review in detail the major government programs aimed at alleviating poverty.  We will examine their historical development, their structure and the social science research on their effectiveness.  In the third section of the course we will review alternative explanations for poverty, focusing on the distinction between individual and structural explanations and how it influences public discourse and the politics of poverty.  As this is an upper level course that fulfills the university's writing requirement, there will be a significant amount of writing in this class.  Writing proficiency is required for a passing grade in this course.  A student who does not write with the skill normally required of an upper-division student will not earn a passing grade, no matter how well the student performs in other areas of the course." UA Course Catalog, https://catalog.ua.edu/search/?search=Politics+of+Poverty.

55.    In Fall 2024 and Spring 2025, Professor Fording taught the course *Social Movements and U.S. Politics*

56.    Professor Fording has been teaching *Social Movements and U.S. Politics* consistently throughout his tenure at UA.  He first taught the course at the University of Kentucky in 2008.  His plan is to continue teaching this course in the upcoming school year.

57.     According to the UA 2024-2025 Undergraduate Catalog, *Social Movements and U.S. Politics* is a course offered in the Department of Political Science.  The description of the course is as follows: "In this course we will examine the causes and consequences of social movements in U.S. politics.  Although social scientists have defined "social movements" in somewhat different ways, we will rely on a relatively simple definition that reflects the shared elements of all of the definitions found in the literature.  Social movements are collective, organized efforts of non-state actors to promote or resist change, that rely in whole or in part on unconventional political tactics.  Throughout U.S. history, it is difficult to identify major examples of policy change that were not spurred by social movement activity.  Yet, social movements remain the least studied form of political influence within the discipline of political science.  Therefore, much of the material from this course will draw from the fields of sociology and history, where the majority of the research on social movements can be found." UA Course Catalog, https://catalog.ua.edu/undergraduate/arts-sciences/political-science/courses/.

58.     Professor Fording included the disclaimer language on his Fall 2024 and Spring 2025 semester syllabi for *Social Movements and U.S. Politics*. (Doc. 55-31).

59.     Professor Fording also teaches the course *Politics of Voting Rights*.

60.     According to the syllabus, *Politics of Voting Rights* covers "the history of voting rights in the United States and the impact that election laws have had (and continue to have) on inequalities in voter participation and representation.  In Part 1 of the course, we review the history of voting rights in America, including an in-depth analysis of the political struggles that led to the enfranchisement of women through the 19th Amendment, and racial and language minorities through the Voting Rights Act of 1965.  We look closely at the major voting rights laws that evolved out of these struggles, focusing most of our attention on the Voting Rights Act (VRA) of

1965 and the subsequent evolution of voting rights law that has occurred through federal court decisions as well as revisions to the VRA made by Congress.  In part 2 of the course, we examine the impact of various election laws (including the VRA) on voter turnout, as well as their effects on both descriptive and substantive representation.  We will examine political science research on the effects of a variety of topics, including: the impact of state registration laws, various laws and practices that lead to vote dilution (e.g. single vs. multimember districts), racial gerrymandering, voter identification laws, felon disenfranchisement, various 'voter suppression' practices, the role of local election administration, and claims of voter fraud.  The course should be especially useful for students interested in careers in politics (especially voter mobilization), election administration, voting rights/civil rights legal advocacy, and more generally, students interested in democratic strategies to achieve social justice."  (Doc. 55-34).

### **The Student Plaintiffs**

*Sydney Testman*

61.     Sydney Testman is over 18 years of age and identifies as a Black woman.

62.     Testman is enrolled as a senior at the University of Alabama at Birmingham ("UAB").

63.     Testman is majoring in Political Science and pursuing a Master of Public Administration Degree.

64.     Testman has been involved in various capacities with the Social Justice Advocacy Council ("SJAC") since 2022.  She served as a first year representative on  SJAC from August 2022 to May 2023.  From August 2023 to May 2024, she served as the Finance Coordinator of SJAC.

65.     Additionally, as Finance Coordinator of SJAC, Testman received a $600 stipend from UAB. This $600 was separate from the $10,000 SJAC budget.

66.     Testman is currently the Executive Vice President of the Undergraduate Student Government Association ("USGA"). She has served in this capacity since August 2024.

67.     Previously, Testman served in the freshman forum of the USGA from August 2022 to May 2023. Testman served as a USGA senator from August 2023 to May 2024. Testman has been involved in USGA every year she has been at UAB.

**Miguel Luna**

68.     Plaintiff Miguel Luna is enrolled as a senior at the University of Alabama at Burmingham. He identifies as a Gay Latino man.

69.     Luna is a Political Science and History Major.

70.     Luna is a co-founder of Esperanza, a student group for Latine students at UAB. (Doc. 55-43). Esperanza's mission is to be "a networking organization designed for Hispanic/Latine students. Professional development, mentorship, and community are important aspects addressed where students will have the opportunity to learn more about how to successfully progress within their career goals. Support and encouragement are provided to ensure students are receiving resources necessary for completion of their degree and understanding of their goals to maximize their potential."

71.     In Fall 2024, Luna enrolled in the course Politics and Race in America. According to the UAB Course Catalog, this course covers: "Politics and Race in America is an advanced level course about racial politics in the United States. This course focuses on tensions between separatism and assimilation, electoral politics and protest politics, and cooperation and competition among underrepresented groups in America. The goals of the course are for you to (a) grasp the

complex dynamics of racial stratification in America and the role of politics in contributing to these dynamics and (b) pinpoint the similarities and differences of the agendas and strategies adopted by underrepresented groups, but to indicate the interaction between "racial" politics and American politics as a whole.  The study of race in America provides a window into the soul of America; by learning about race in America, we learn enduring lessons about the foundations, institutions, participation, and policy in American government.  After completing this course, you will be able to understand the race in America and be able to develop your own analyses about race in America."   UAB Department of Political Science and Public Administration, https://catalog.uab.edu/undergraduate/collegeofartsciences/politicalscienceandpublicadministration/politicalscienceandpublicadministration.pdf.

72.    In Fall 2024, Luna enrolled in Human Rights.  According to the syllabus, the class covered "key concepts and controversies in the study of human rights" as well as "the role that political actors—governments, institutions, and non-governmental institutions—have in protecting and/or abusing these rights." (Doc. 55-40).

73.    In Luna's Human Rights course, the professor added the following disclaimer on the course syllabus: "Note on Academic Freedom: All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting.  This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective, scholarly lens designed to encourage critical thinking.  Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered "divisive" under Alabama law, nor penalized for refusing to support or endorse such a concept.  All students are strongly encouraged to think independently and analytically about all material presented in

13

class and may express their views in a time, place, and manner, consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry, and expressions." (Doc. 55-40).

74.     In Spring 2025, Luna was enrolled in a course entitled Environmental Politics. According to the syllabus, Environmental Politics has the following course description and objectives: "We are surrounded by controversies and threats related to our environment, ranging from the worldwide (climate change) to the local (toxic sites in North Birmingham and infamous "poop trains" of 2018 and 2022). Politically, environmental issues occupy an interesting space that includes a complex array of actors, including multiple federal, state and local agencies, courts and corporations, as well as a broad array of nonprofit organizations and advocacy groups. This course will (a) introduce you to some of the main actors and organizations that affect environmental policies as well as (b) examine some of the primary issues related to our environment, including energy policy, natural resources, environmental protection and environmental justice." (Doc. 55-39).

75.     Luna's Environmental Politics professor added the following disclaimer to the course syllabus: "Note on Academic Freedom: All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting. This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective, scholarly lens designed to encourage critical thinking. Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered "divisive" under Alabama law, nor penalized for refusing to support or endorse such a concept. All students are strongly encouraged to think independently and analytically about all material presented in

class and may express their views in a time, place, and manner, consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry, and expressions." (Doc. 55-39).

***Student Organization Funding***

76.    UAB uses two separate mechanisms to allocate funding to student organizations operating on campus. (Doc. 26-1 ¶¶ 4-8).

77.    Every semester RSOs are allowed to apply for funding from USGA to support student programs and events for the following semester.  To receive funds, the RSO must submit an application to USGA that lists the events they would like supported, ranked by importance, and a line item budget for each event showing how the funds will be used.

78.    USGA's funding allocations for RSOs are made a semester in advance. For example, funding allocations for the fall semester are made during the preceding spring semester. (Doc. 56-6 ¶ 5).

79.    The USGA mission is as follows: "USGA aims to represent the undergraduate student body by advocating for student interests and empowering the student voice.  We provide opportunities to influence both their academic and social experiences at UAB.  In order to accomplish our mission, USGA leaders work closely with faculty and administration to propel both short- and long-term student goals.  In addition to policy work, USGA works on services, programs, and funds distribution to student organizations in order to develop and foster a more collaborative UAB community."

80.    Social Justice Advocacy Council ("SJAC") is a student organization at UAB whose mission is "to celebrate diversity of identity, broaden cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about social justice and identity

related issues, and promote intercultural interactions between all communities of people at UAB."
(Doc. 12-6 ¶ 5).

81.    As a UFO, SJAC received its funding directly from the Department of Student
Affairs.

82.    SJAC would distribute some of its funds to other student groups to support their
programming and events on campus. (Doc. 12-5 ¶ 22).

83.    When SJAC was a UFO, it distributed some of its funds to Esperanza. (Doc. 12-5
¶ 22).

84.    Esperanza also received funds directly from UAB's former Office of Diversity,
Equity, and Inclusion. (Doc. 12-5 ¶ 18).

**The Alabama NAACP**

85.    Plaintiff Alabama NAACP is the Alabama state conference of the National
Association for the Advancement of Colored People, Inc.  It was founded in 1913 by faculty, staff,
and local residents associated with Talladega College in Talladega, Alabama and is the oldest and
one of the most significant civil rights organizations in Alabama.

86.    Bernard Simelton has served as the President of the Alabama NAACP since 2009
and was elected to the NAACP National Board of Directors in February 2018.

87.    The Alabama NAACP has a student chapter at the University of Alabama—the
University of Alabama Chapter of the National Association for the Advancement of Colored
People (the "UA NAACP Chapter").  The UA NAACP Chapter is a branch of Plaintiff Alabama
NAACP.

88.    The UA NAACP Chapter currently has approximately 45 members.

16

89.    As stated in the UA NAACP Chapter's constitution, its purpose is to "improve the political, educational, social and economic status of minority groups; to eliminate racial prejudice; to eliminate discriminatory acts of injustice; to keep the public aware of the adverse effects of racial discrimination; and to take all lawful action to secure its elimination . . . ."

90.    The UA NAACP Chapter hosts programs, classes, trainings, seminars, and other events which are open to individuals of all racial backgrounds but often focus on issues pertaining to Black individuals.

91.    Among other things, the UA NAACP Chapter operates a "speakers bureau" that arranges for on-campus speakers to come to UA.

92.    BSU formerly had a dedicated office space in the middle of the UA Student Center. (Doc. 1 ¶ 131).

93.    Safe Zone, a program that provided programming and resources for LGBTQIA+ students, also had a dedicated office space in the Student Center. (Doc. 1 ¶ 131).

94.    Safe Zone does not limit participation in its programming to LGBTQIA+ individuals or its membership to only LGBTQIA+ students.

95.    In the fall semester of 2024, UA closed the BSU and Safe Zone office spaces in the Student Center. The BSU office was converted into a food pantry, and the Safe Zone office became the Student Leadership Lounge. (Doc. 1 ¶ 131); (Doc. 56-3 ¶ 21). Neither BSU not Safe Zone are parties to this lawsuit.

### Governor Ivey

96.    The University of Alabama Board, which includes Governor Ivey as President Ex-Officio, is given broad authority over management and control over University of Alabama

17

System, including authority to govern students, and matters associated with termination and discipline of professors.

97.     In a statement accompanying the signing of SB 129, Governor Ivey stated: "We have already taken action to prevent this in our K-12 classrooms, and I am pleased to sign SB 129, to protect our college campuses."

98.     In a statement about SB 129, Governor Ivey stated: "My administration has and will continue to value Alabama's rich diversity, however, I refuse to allow a few bad actors on college campuses – or wherever else for that matter – to go under the acronym of DEI, using taxpayer funds, to push their liberal political movement counter to what the majority of Alabamians believe."

99.     Governor Ivey serves as the President of the Alabama State Board of Education.

## II.    THE PLAINTIFFS' PROPOSED FINDINGS OF FACT

### The Professor Plaintiffs

*Professor Cassandra Simon*

**Background**

1.    Professor Simon has received numerous awards during her tenure at UA for her teaching, service, and community engagement activities.  She was the inaugural recipient of the Buford Peace Award, which recognizes faculty members who are professionally and personally active in causes that promote justice and peace.  In 2006, she became the first Black UA faculty member to receive the Premier Morris Mayer Award. This is an annual award that recognizes one faculty member who demonstrates leadership, integrity, and service.  In 2013, she was awarded the Autherine Lucy Foster Award, which is given annually to a faculty member who has made a commitment to service to students of color.

**Professor Simon's Curriculum and SB 129's Harms to Professor Simon**

2.    All of Professor Simon's courses involve conversations, readings, or other exercises about the concepts of racial and gender superiority, unconscious bias, privilege, and oppression.

3.    For example, Professor Simon's coursework incorporates assignments that require her students to reflect on and journal about "justice, inequity, discrimination, humanitarianism, oppression, etc." (Doc. 55-1).

4.    Professor Simon's coursework also requires her students to grapple with concepts related to racial identity, gender identity, sexual orientation, the concept of privilege and anti-racism.  (Doc. 55-3; Doc. 55-4; Doc. 55-5; Doc. 55-6; Doc. 55.7; Doc. 55-8; Doc. 55-9; Doc. 55-12; Doc. 55-13; Doc. 55-14; Doc. 55-15; Doc. 55-16; Doc. 55-17).

5.      Professor Simon teaches a course entitled *Anti-Oppression and Social Justice.*  The Course description provides: "This course examines issues related to the oppression of people on the basis of their gender, ethnicity, race, culture, sexual orientation, physical or mental ability, age, religion, and national origin.  It is designed to introduce the student to a range of issues of oppression and social and economic injustice pertinent to the field of social welfare and to the profession of social work.  This course has the University Core Curriculum 'W' designation. Writing proficiency is required for a passing grade in this course."  (Doc. 55-2).

6.      The course objectives entail that students should leave the class with the ability to: "A. Demonstrate awareness, understanding, and appreciation of cultural and social diversity.  B. Discuss the social, psychological, historical, political, and economic factors that influence oppressed populations.  C. Discuss the interrelated concepts of race, class, and gender as social constructs that perpetuate systems of hierarchy in a society.  D. Demonstrate understanding of the concepts of oppression and privilege---specifically how poverty, racism, sexism, ageism, heterosexism, gender-based discrimination, legal bias, and bias against individuals based on their religion affect population subgroups in their social functioning.  E. Articulate the role, values, and responsibility of the social work profession in relation to oppressed populations including people of color, women, and gay and lesbian persons." (Doc. 55-2).

7.      UA offered the course before Professor Simon arrived in 2000 and she has continued to teach the course each academic year for the past 24 years.  The course is a junior-level course that sophomores may take and is required for both the Social Work and Social Welfare majors. It focuses on issues related to the oppression of people on the basis of their race, gender identity, ethnicity, culture, sexual orientation, and/or other characteristics and the responsibility of social workers to work to counter discriminatory and oppressive conditions.

8.      Professor Simon's *Anti-Oppression and Social Justice course* covers topics including, but not limited to, White privilege, implicit bias, structural racism, mental health disparities, homophobia, racism, sexism, and systemic oppression of minority communities.

9.      In *Anti-Oppression and Social Justice*, she teaches about how race- and gender-based stereotypes can exacerbate health disparities.  For example, Black queer people face unique barriers to receiving HIV care and treatment that relate to historical lack of access to high quality medical care.

10.     Professor Simon's instruction in the *Anti-Oppression and Social Justice* course is rooted in the understanding that racism and sexism are deeply embedded in American society.  She endeavors to train future social workers about how the impact of systemic racism on their future clients cannot be divorced from their professional mission.

11.     With Professor Simon's field of social work, there is longstanding consensus that an individual's social, political, and economic advancement is deeply affected by institutional racism and sexism rather than solely based on the individual traits, such as their talent or abilities. She teaches her students about how commonly understood notions of "meritocracy" and "fairness" often ignore the ways in which racial and gender bias impact an individual's life and health outcomes.  She assigns course materials on this topic, including course materials that discuss how life and health outcomes are often influenced by racial and gender bias.  As someone who trains future social workers, she believes it is important to provide her students with information that will enable them to conduct effective interventions in the lives of their clients and that factors in systemic racism and sexism and how social inequality impacts the life trajectory of minority communities.

12.    Professor Simon also teaches about implicit bias in Anti-Oppression and Social Justice.  She explains to her students that implicit bias is well-documented, and she assigns readings about the existence of implicit bias.  In addition, she has her students complete the Harvard Implicit Association Test, which "measures the strength of associations between concepts (e.g., Black people, gay people) and evaluations (e.g., good, bad) or stereotypes (e.g., athletic, clumsy)."  The main purpose of the test is to "educate about implicit bias" and to "raise awareness and encourage self-reflection."  Although she does not assign a letter grade for the assignment or review their test results, the purpose of this assignment is to help my students understand how implicit bias operates and what impacts it may have.

13.    Professor Simon has shown her students episodes from the award-winning documentary, *Eyes on the Prize*, and incorporates the documentary into class discussions.  She has seen their shock and dismay to learn about the civil rights history of the United States.  She also shows, and incorporates in class discussions, the documentary film *Slavery by Another Name*, which challenges the belief that American slavery ended with the Emancipation Proclamation and tells how thousands of African Americans were pulled back into forced labor with force and brutality.  Even though her courses do not explicitly assign blame or guilt to any individual students, it is not uncommon for some students to react with feelings of guilt after watching these films.

14.    Professor Simon believes that SB 129's definition of "divisive concepts" puts her at risk of violating the law by teaching her students that structural racism and sexism exist, and the many ways they impact Black individuals and other minorities.  Specifically, she is concerned that teaching and assigning course materials that address the existence of implicit basis and White privilege, and the fact that American society is not a colorblind meritocracy, might violate SB 129.

22

15.     Professor Simon has already been threatened with discipline under SB 129, including termination, because of her Anti-Oppression and Social Justice course.

16.     Every year students in Professor Simon's *Anti-Oppression and Social Justice* course are given the opportunity to complete a project as outlined in the syllabus: "Class Project - (200 points): Students will be given an opportunity to come up with their own class project.  If students are not able to come up with their own assignment they will have to do a project that the professor has come up with (this has never happened).  Portfolio will and group binder will be included in this grade.  **For your projects, there is no political indoctrination**, as students develop and choose what campaigns to work on.  Furthermore, my role is to offer guidance about strategy and tactics, university policy, and to help students consider the variety of options available, with the students deciding on how to best move forward." (Doc. 55-2).

17.     The project allows students to address a social issue of their choosing.  In addition to choosing the social issue, students also choose the manner in which they approach their chosen topic.  The students who chose to participate in the project pick their topic collectively and work as a group to plan and complete the advocacy portion of the project. Professor Simon's involvement in the project is limited to ensuring that students are complying with university policies.  Professor Simon has taught this class since she arrived at UA in 2000 and has always included an advocacy component, including projects including student-led organizing and protests of issues of their choosing.  Prior to the passage of SB 129, University administrators never raised concerns with the course.

18.     Throughout the first few weeks of the course, Professor Simon assists students with narrowing down their social issue topic based on their passions and interests.  On the day that students choose their project topic, Professor Simon provides students with guidelines for topic

selection before leaving the classroom to give the students an opportunity to choose their topic without her supervision or influence. The students inform Professor Simon when they have chosen their social issue and invite Professor Simon back into the class. Any student who feels uncomfortable with the chosen topic or does not want to participate in the project is given the opportunity to complete an alternative assignment.

19.     In the Fall 2024 semester, students chose SB 129 as their social issue. As Professor Simon has done in the past, she left the room when it was time for students to choose their topic. The students informed Professor Simon that, through their project, they hoped not only to voice their opposition to SB 129 but also to receive information from the university about how students' needs would be accommodated in the wake of SB 129. Professor Simon's students also shared with her that they wanted an opportunity to gather information from other students about how they had been affected by SB 129. Ultimately, the students decided to fulfill the advocacy component of the project by organizing a sit-in on November 13, 2024. The sit-in would have taken place on campus in an area that has held similar events before without issue.

20.     The day before the sit-in was scheduled to take place, on November 12, 2024, Professor Simon received an email from the Dean of the UA School of Social Work, Schnavia Smith Hatcher. Dean Hatcher informed Professor Simon that she had seen a flyer promoting the sit-in and asked Professor Simon to ensure that the students had complied with university policy regarding the reservation of event space for the sit-in. Professor Simon responded to Dean Hatcher's email, letting her know that the students had submitted a grounds permit form and were informed by a university employee that they did not need approval to use campus grounds for the sit-in. (Doc. 55-11).

21.    After exchanging a few messages with Dean Hatcher regarding the expected turnout for the event, she asked if Professor Simon would be cancelling a class session or mandating participation in the sit-in for the course, noting that this could be a concern if issues were to arise regarding the sit-in. Professor Simon responded that she would not be cancelling class, as the sit-in was not scheduled during a regular course session, and explained that students were not required to participate in the sit-in.  Professor Simon also provided information about the project selection process. (Doc. 55-11).

22.    The next morning, November 13, 2024, the day of the scheduled-sit in, Dean Hatcher emailed Professor Simon, informing her that Dean Hatcher and Provost James Dalton had concluded that the sit-in may violate SB 129 and should be cancelled immediately.  Specifically, Dean Hatcher shared her opinion that the sit-in was "tied to the classroom" and therefore may be considered to be forcing a student to "assent to a position and/or unwillingly take part in political activity."  Dean Hatcher also noted UA's policies regarding timely event approvals and cited Chapter 3.II.B of the Faculty Handbook, which states "[i]t is the responsibility of faculty members to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including termination."  (Doc. 55-11).

23.    In Professor Simon's response to Dean Hatcher's message, Professor Simon expressed her confusion regarding the mandate to cancel the sit-in.  First, because Dean Hatcher did not cite any specific university policies that may have governed the sit-in, Professor Simon asked her to identify the specific policies or procedures that may have been violated. Second, because Dean Hatcher's message referenced the alleged "political" nature of the scheduled sit-in, Professor Simon asked for clarification regarding how an event concerning a topic chosen by

students, at which students would discuss how the chosen topic had impacted them, could be considered a "political" activity.  (Doc. 55-11).

24.    Professor Simon expressed her concern about academic freedom given the university's response.  Professor Simon also shared that she would inform her students that the sit-in would no longer be part of their grade.

25.    After receiving Dean Hatcher's message, Professor Simon informed her students that she had been told by the university that they must cancel the sit-in, and her students said they were both afraid of getting in trouble and fearful that Professor Simon would be fired.

26.    After Professor Simon's students cancelled the sit-in, Provost Dalton responded to Professor Simon's message and stated that the sit-in could be considered a violation of SB 129 by "sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept, and/or other portions of the law." (Doc. 55-11).

27.    Provost Dalton also indicated that the students may continue with the sit-in as long as Professor Simon informed them that the gathering was not related to the course or their grade. (Doc. 55-11).  However, the students had already informed others that the sit-in had been cancelled by the time Professor Simon received Provost Dalton's message.

28.    The students held a rescheduled sit-in, not associated with Professor Simon's course, and received UA approval.

29.    Professor Simon's will continue to teach *Anti-Oppression and Social Justice* again this fall and her students will once again select a class project. She is concerned that selection of a project related to a "divisive concept" will again be considered a violation of SB 129.

30.     Faculty with the UA School of Social Work, including Professor Simon, are concerned about the impact of SB 129 on the department's accreditation status.  Professor Simon has expressed this concern to UA administration and noted that School of Social Work instructors had previously been told by university administrators that SB 129 would not impact their teaching because of the need to comply with Social Work accreditation standards.

31.     The second social work competency standard included in EPAS recognizes the role of the social work profession in advancing racial, social, and economic justice. Specifically, EPAS notes that the role of social workers includes "critically evaluat[ing] the distribution of power and privilege in society in order to promote social, racial, economic, and environmental justice" and "advocat[ing] for . . . strategies to eliminate oppressive structural barriers to ensure that social resources, rights, and responsibilities are distributed equitably."  (Doc. 55-10).

32.     EPAS's third social work competency standard asserts that social workers must recognize the various ways in which oppression and privilege impact human experiences and shape life outcomes.  Specifically, the EPAS states that social workers should understand "the pervasive impact of White supremacy and privilege," "the societal and historical roots of social and racial injustices" and "the forms and mechanisms of oppression and discrimination."  (Doc. 55-10).

33.     When questioned about how SB 129 would impact their ability to instruct students in a manner consistent with the field's accreditation standards, the UA administration originally told instructors that SB 129 would not affect their classrooms due to CSWE's accreditation standards.  Following the bill's passage, UA created a webpage with information about compliance with SB 129, which states: "SB129 specifically does not apply to actions taken in furtherance of satisfying any accreditation standard or requirement." However, UA's actions in connection with Professors Simon's Anti-Oppression and Social Justice course are inconsistent with this statement.

34.    To competently and responsibly fulfill duties as a social work professor, Professor Simon must teach her students about past patterns of discrimination and how they are contributing to current disparities in health, employment, generational wealth, and other life outcomes. Students pursuing careers in social work must be aware of and understand these patterns to effectively engage in practice with diverse groups of people.

35.    Professor Simon is still unsure how to teach in a way that complies with the accreditation standards in her field without running afoul of SB 129.

***Professor Dana Patton***

**Professor Patton's Courses**

36.    Understanding Poverty is the first course that students take in the Witt Fellows Program.  It is intended to provide incoming freshmen with a strong understanding of poverty and the historical reasons and the enduring legacy of inequities in our society.  The syllabus for the course explains that the course "build[s] from a survey of the conceptualization and measurement of poverty, as well as the demographic groups that are most likely to suffer from high poverty rates. We will review alternative explanations for poverty, focusing on the distinction between individual and structural explanations and how this distinction influences public discourse and the politics of poverty." (Doc. 55-18).

37.    Professor Patton assigns five books in her *Understanding Poverty* course:

  a.  Not a Crime to be Poor: The Criminalization of Poverty in America

  b.  Poverty, by America

  c.  Promises I Can Keep: Why Poor Women Put Motherhood Before Marriage

  d.  Evicted: Poverty and Profit in the American City

  e.  The Left Behind: Decline and Rage in Small-Town America.

28

38.    The assigned readings in the course are designed to provide context and a comprehensive understanding of poverty, including the history of poverty, relevant factors common to poverty, and the personal experiences of those living in poverty.  The books provide information about government programs utilized to address poverty, such as temporary assistance for needy families, supplemental nutrition assistance program, employment insurance, and social security.  The readings discuss why poverty is persistent in the United States, and why these programs have been successful in reducing poverty.  Because of the history and enduring legacy of racism, sexism, and other inequities in our country, it is impossible for Professor Patton's students to understand poverty without understanding these inequities.  For example, students explore how when groups of people, like Black Americans, have been historically denied access to education, safe places to live, and employment opportunities, it becomes exceptionally difficult for families to thrive and build economic stability.

39.    The book *Not a Crime to be Poor: The Criminalization of Poverty in America*, for example, explores the current system of "modern peonage."  The book discusses how modern, escalating fees, bail, and racially motivated police activity keep people in an interconnected system of poverty and jail, and how this disproportionally affects people of color. The book was awarded "Special Recognition" by the 2018 Robert F. Kennedy Book & was a Journalism Awards Finalist for the American Bar Association's 2018 Silver Gavel Book Award.

40.    *Poverty, by America* uses history, research, and original reporting to illustrate the ways affluent Americans knowingly and subconsciously sanction and perpetuate poverty. The book encourages a critical self-analysis of the ways in which the reader is a participant in the system of poverty.  Communities of poverty are explored, as are societal structures and systems that perpetuate poverty.  Race and racial social structures are extensively discussed in the book.

29

41.     In the book, *Promises I Can Keep: Why Poor Women Put Motherhood Before Marriage*, the authors chronicle five years of research living with and speaking in-depth with 162 low-income single mothers in impoverished neighborhoods in Philadelphia with high teen pregnancy rates.  The book explores the cycle of poverty and its generational implications through the experiences of these young mothers.  Using extensive research, the book challenges common stereotypes of women who have children at an early age, such as that they are immoral or are using the children to take advantage of the social welfare system.  Class discussions center around social science explanations for poverty in the United States, and particularly the way systemic racial prejudice and discrimination have created inequalities in our society.

42.     The Pulitzer Prize-winning book *Evicted: Poverty and Profit in the American City* chronicles a sociologist who follows eight families in Milwaukee to explore the housing crisis in the United States.  The book discusses the history of racially discriminatory housing policies like redlining that denied mortgages and financial services to Black American families dating back to the 1920s.  The book analyzes government eviction policies and how a disproportionate number of Black and Latino families experience difficulty in securing housing and dealing with the trauma of eviction.  The book spurs conversations in the class about the policies that should be utilized to try to alleviate the housing crisis, and how the policies have to take into account the previous and current inequities that affect marginalized racial minorities.

43.     The book *The Left Behind: Decline and Rage in Small-Town America* draws on more than a decade of research and hundreds of interviews to explain the perceptions of those in America's small towns, farms, and rural communities, including people of color, with respect to their own feelings of marginalization and disconnection from decisionmakers in Washington, D.C. and urban America.  The book emphasizes the role of a "moral community" and preservation of a

particular way of life that many rural Americans believe is no longer valued and is under siege by Washington due to immigrant population growth in rural areas, urban areas favored over rural for government investment, and minorities receiving favorable treatment from the government.

44.    Students in *Understanding Poverty* also learn how race-based forced labor continued well beyond the Civil War and into the 20th Century.  To illustrate, Professor Patton shows her students the documentary *Slavery by Another Name*.  After the Civil War and the official end of slavery, Southern states continued to lease incarcerated populations, many of whom were Black, to private railways, mines, and large plantations to work with no pay and in dangerous and deadly work conditions.  The film spurs conversations in the classroom about how these historically racially discriminatory practices have contributed to inequities in our society.  Many of Professor Patton's students learn for the first time about convict leasing and typically express shock, disappointment, and guilt about the practice in general and Alabama's role in facilitating the practice.

45.    Professor Patton has always used small in-class group discussions in her *Understanding Poverty* class in connection with the books and other reading materials.  She poses questions to the small groups to discuss to maximize understanding and analysis of those materials.

46.    For example, in discussing the book *Evicted: Poverty and Profit in the American City*, Professor Patton asked the small groups in the class to consider the following question:

47.    Tenants in eviction court were generally poor, and almost all of them (92 percent) had missed rent payment.  The majority spent at least half their income on rent.  One-third devoted at least 80 percent to it." . . . "As usual, the courtroom was full of black women.  In a typical month, 3 in 4 people in Milwaukee eviction court were black. Of those, 3 in 4 were women.  Discuss." Professor Patton's UFE 101 Small Group Discussion Questions. October 1, 2024. (Doc. 55-19).

48.     The discussion question typically leads to students in small groups exploring the historical racially discriminatory practices that have led to inequities in housing and lopsided rates of eviction for Black residents, the societal institutions that perpetuate such practices, and who has benefitted from those practices and institutions.

49.     Professor Patton teaches her students that one cannot fully understand poverty in the United States without understanding the role of racism, sexism, and other inequalities. Professor Patton expects her students to discuss difficult topics in her *Understanding Poverty* class, including race and racism, and students experience a variety of feelings during these discussions, including guilt.  That is why in her *Understanding Poverty* syllabus, she explains: "You may feel hesitant or anxious about weighing in on some topics due to fear of being misunderstood.  This is normal, but we must push through these feelings and engage in thoughtful and respectful discussions on difficult topics."  (Doc. 55-18).

50.     The *Social Investment and the Role of Innovation* course that Professor Patton teaches provides "hands-on experience of assessing needs, and designing projects to intervene in systemic poverty in direct partnership with community leaders in the Black Belt region of Alabama."  The course culminates in a two-week service trip (the Black Belt Experience) in May to Marion, Alabama, in which students explore poverty and race relations in Marion, including discrimination and racial violence that some Black Marion residents have experienced.  The goal of the service trip is for the students to work with community centers in Marion, like schools, nursing homes, community health non-profits, and others, to create and execute an action plan based on asset-based community development to assist the community.

51.     In addition, students visit Civil Rights sites in Alabama such as Selma, as well as the Legacy Sites in Montgomery, and hear from speakers who share their own experiences from

the Civil Rights movement, including on the Selma Bridge. The class requires the students to understand the concepts taught in *Understanding Poverty*, such as how and why historically racially discriminatory policies have led to the systemic poverty that persists in Marion today. Before they engage in outreach with impoverished communities, the students must have an understanding of the underpinnings of poverty in these communities and what the perspectives are of those within the communities.

52.    Professor Patton also teaches *The Politics of Health Policy*, which "examines health policy at all levels of government, with particular focus on the interdependence of the national, state, and local governments to provide health services." Racial inequity is also discussed in this course because understanding health policy as it pertains to and affects different races and ethnicities is critical to a comprehensive understanding of health policy for Professor Patton's students. For example, Professor Patton examines the relationship across infant mortality rates, education, and race in the United States. The research shows that infants of White and Asian mothers in the United States have mortality rates comparable to peer countries, but infants of Black mothers fare much worse, regardless of income and education level. Professor Patton discusses reasons for this disparity with her class, including disproportionate stresses that Black mothers face and what societal institutions contribute to those stresses.

53.    In *The Politics of Health Policy*, Professor Patton has also previously taught the "fundamental cause" and "social construction of target populations" theories, which are research-based theories that encourage critical thinking about implicit bias and perceptions of those living in poverty.

54.    The "fundamental cause" theory explores racism as a fundamental cause of health inequity. Professor Patton discusses the association health outcomes have had with racism. In

that connection, she explores the role of slavery, the KKK, Jim Crow laws, legal and overt discrimination in housing and education, and unequal resources in education due to how public education has been funded.  Professor Patton explores with her students whether health inequalities cannot be eradicated by "addressing intervening mechanisms, because enduring inequalities in knowledge, money, power, prestige, and beneficial social connections ensure that mechanisms are reliably replaced."

55.    In an in-class exercise exploring the "fundamental cause" theory, Professor Patton asks students to "map the root cause" of a disease or injury by identifying the factors contributing to the disease or injury, then finding the "root cause" of those contributing factors.  The root cause, in some cases, is race.

56.    Under the "social construction of target populations" theory, public policy is influenced by the perceptions and stereotypes of certain groups.  The theory ultimately seeks to address why some groups participate more than others in democracy and how that impacts policy decisions, such as the lack of universal health insurance coverage in the United States and the refusal of most states in the Deep South to adopt Medicaid expansion under the Affordable Care Act.

57.    Professor Patton also teaches the course, *Systemic Change Through Social Entrepreneurship*.  The course description explains that the "course expand[s] on the students' understanding of systemic change.  Students will examine theories of systemic change through highlighted successes of change agents who have effected change in their systems of influence. Throughout the semester, students will develop their own plan for enacting change in their system of choice, while also exploring ideas of ethical leadership, emotional resiliency, and creativity." Although a new professor will be teaching the course in the fall, he has not taught the course

previously and Professor Patton, as Director of the Witt Fellows Program, will be working with him on the content of the course.

**SB 129 and the Threat of Discipline Against Professor Patton**

58.    On October 8, 2024, a week after SB 129 went into effect, Tiffany Sippial, Dean of the Honors College at UA, informed Professor Patton that the University had received a complaint from students about her *Understanding Poverty* course.  UA administrators subsequently informed Professor Patton that both the course and the Witt Fellows Program she leads were the subjects of the complaint, which accused both of possibly violating the new "divisive concept legislation" insofar as "the program feels anti-American" and "seems to have a focus on systematic racism, supporting anti racism, correcting social injustice and producing engaged global citizens (as opposed to patriotic Americans)."  The complaint argued that "it is critical that this program is corrected next semester."  (Doc. 55-20).

59.    Professor Patton was asked to draft a memo to respond to the complaint that could be passed on to UA counsel.  On October 16, 2024, Professor Patton addressed a memo to Associate Professor Han and Dean Sippial, explaining that her lectures in the *Understanding Poverty* course:

   a.   "[A]re based on data from sources such as the US Census Bureau, Bureau of Labor Statistics, Department of Health & Human Services, among others.  In addition, lectures draw from research findings published in peer-reviewed academic journals. Questions are posed to the class to prompt discussion.  If student comments are one sided, I ask if anyone has a different perspective or view to add to the discussion. If a student does not offer alternative views, I do."

   b.   "I have never in this class, or in any class I've taught in over twenty years, directed or compelled students to affirm, adopt, adhere to, or asset to a "divisive concept." (Doc. 55-21).

60.     The next day Professor Patton was asked to "revis[e] her statement" and address an admittedly "lengthy list" of follow-up questions, including the following:

    a.   How does Professor Patton "`consciously avoid' compelling assent"?

    b.   Did Professor Patton plan to make "changes to the readings for future semesters"?

    c.   How does Professor Patton "[a]ddress the allegation that the readings are political"? (Doc. 55-22).

61.    When Professor Patton objected to responding to these questions, UA administrators explained to her that the person behind the complaints about her course was very powerful, which she later understood to refer to someone from the Alabama state legislature. Lesley Reid, Associate Provost for Faculty Affairs at UA, informed Professor Patton that a faculty member had never before been asked to write a response to such questions and Professor Patton would not have been asked to respond if the person behind it was not so powerful.

62.    Associate Provost Reid also informed Professor Patton that if Professor Patton did not respond to the additional follow-up questions she might be subject to "progressive discipline," including termination.

63.    Professor Patton later learned that two Alabama legislators had been critical of her *Understanding Poverty* class and the Witt Fellows Program. At a UA football game on November 16, 2024, state representative Danny Garrett approached Professor Patton and told her that there were people in the legislature "very upset" about her stewardship of the Witt Fellows Program and the content of the *Understanding Poverty* course, and reminded her several times that he "controls the budget" relating to UA and the Witt Fellows Program. He specifically mentioned Alabama state representative Susan DuBose was "not going to let it go" regarding her displeasure with Professor Patton's lectures and book selection in the *Understanding Poverty* course.

**How SB 129 Has Impacted Professor Patton's Coursework**

64.    As a direct result of the complaint and threats of discipline, Professor Patton has changed her courses.

65.     Specifically, Professor Patton previously taught her students about the well-documented phenomena of implicit bias, whereby people have unconscious attitudes about specific social groups, such as Blacks or women. Prior to the passage of SB 129, Professor Patton had her students take the Harvard Implicit Association Test in her *The Politics of Health Policy* and *Systemic Change Through Social Entrepreneurship* courses as a tool to demonstrate how implicit associations function and to discuss how implicit bias impacts perceptions of those in poverty. Professor Patton asked her students to identify their implicit biases through this test as a way to understand the associations they and others make regarding, amongst other things, gender and race. She also led classroom discussions about implicit bias in her *Understanding Poverty* class.

66.     Following the passage of SB 129, Professor Patton no longer has the students take the Harvard Implicit Association Test as part of her classes and plans to no longer discuss this test in her *Understanding Poverty* class, for fear that doing so will be deemed to violate SB 129. Professor Patton is concerned that discussion leading students to consider the implicit biases they may have about the poor and race could be accused of running afoul of SB 129, particularly the "divisive concept" that an individual is "inherently racist, sexist, or oppressive, whether consciously or unconsciously."

67.     Professor Patton has also already removed her PowerPoint lectures on the "fundamental cause" and "the social construction of target population" theories from her *Politics of Health Policy* course. She fears that any discussion of these theories, which involve exploration of systemic racism as a contributing factor to health disparities and how stereotypes impact policy decisions, will implicate SB 129. In fact, in a recent classroom discussion about how racism

impacts infant mortality rates in her *Politics of Health Policy* course, a student asked Professor Patton whether she was violating SB 129 by discussing the topic.

68.    Professor Patton is worried that her lectures and assigned readings in the above-referenced courses—which she has used without complaint for years – and related classroom discussions will lead to further complaints and threats by UA administrators in light of SB 129. Readings in assigned texts, as described above, contain personal narratives of diverse individuals living in poverty and directly involve race and concerns about systemic racism as a contributor to poverty.

69.    For that reason, Professor Patton no longer plans to show the documentary *Slavery by Another Name* about convict leasing in her *Understanding Poverty* course.  Professor Patton is concerned that the readings, documentaries, lectures, and classroom discussion about these topics may be viewed as endorsing particular perspectives about race and "advocat[ing] for" certain "divisive concepts."

70.    As careful as Professor Patton might be in her lectures, she has even less control over classroom discussions, which are common (and encouraged) in her classroom.  She is concerned that by attempting to navigate different views about sensitive subjects about race in her classroom, she could be accused of "advocat[ing] for" a particular divisive concept.  The classroom discussions often elicit differing opinions, surprise, disappointment, and disbelief amongst her students, particularly about issues tethered to race.  Professor Patton cannot predict nor can she control whether these conversations may make her students feel "a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin," in violation of SB 129.

71.     Because of that, Professor Patton no longer plans to use small group discussions to analyze the readings and discuss her assigned questions in the *Understanding Poverty* course. She fears that she cannot properly monitor these discussions to ensure that conversations among students do not implicate the divisive concepts in SB 129.

**Professor Richard Fording**

**Background**

72.     As a Professor of Political Science at UA, Professor Fording educates students on the social science surrounding governance, power, and politics. The concept that systemic and structural inequalities, particularly systemic and structural racial inequalities, exist in our society— beyond mere individual acts of discrimination—is a fundamental component of Professor Fording's scholarship and teaching.

**Enactment of SB 129 and the UA's Enforcement**

73.     At the beginning of the Fall 2024 semester, Professor Fording completed the UA College of Arts and SciencesUA legal training session by viewing a recorded version of the presentation online.

74.     UA stated in the presentation:

> What the law prohibits (for our purposes today) Instructors cannot:
>
> a.  Direct or compel a student, employee, or contractor to <u>personally affirm, adopt or adhere to a "divisive concept."</u>
>
> b.  Require students, employees, or contractors to share their personal view on a "divisive concept" outside of an academic setting where the teaching or discussion of the "divisive concept" is done in an objective manner, without endorsement, and in a way that does not compel assent to the concept.

75.     During the training, UA administrator Dr. Lisa Dorr told faculty members that the law enumerated eight "divisive concepts." Dr. Dorr stated that UA recommended that professors do not directly test on any material that could be considered a divisive concept or "include them

as specific criteria on other kinds of assignments (like papers)." Dr. Dorr advised that professors "[t]alk, don't test."

76.     UA warned testing on these topics could lead to student complaints, noting students would argue they were "graded down for their content related to a divisive concept. They would be arguing in effect that your grading criteria was compelling assent by your students."

77.     UA published guidance on what constitutes a "divisive concept" under SB 129 recites language from SB 129 itself. Specifically, the language under the heading "What is a 'divisive concept,'" merely recites the text of the law from SB 129.

78.     Following the training, Professor Fording believed several of the topics he discussed in his courses may be considered "divisive concepts." He believed SB 129 could impact his teachings and he did not understand UA's directive from the legal training session.

**Professor Fording's Courses and the Implications of SB 129**

79.     In Professor Fording's in *The Politics of Poverty* course, class discussions begin on conceptualizing and measuring poverty. The class studies social science explanations for poverty in the United States, with a focus on the distinction between individual and structural explanations of poverty. A key take-away from Professor Fording's course is the understanding that social science research shows that poverty is not an individual and moral failing, but rather a result of the various forms of discriminatory policies, especially systemic racial prejudice and discrimination, which have created poverty in our society. (Doc. 55-26; Doc. 55-35; Doc. 55-27).

80.     For example, Professor Fording's class discussions focus on the history of segregation and Jim Crow laws which discriminated against Black Americans in all areas of public life including access to education, safe housing, health care, marriage and cohabitation, and entrance to retail establishments. The course discusses how these policies were enforced by the

government through terror and violence against Black people, particularly in the Southern states. Class teachings include how the enduring effects of this segregation have contributed to poverty in today's society.

81.    Professor Fording also shows the Pulitzer Prize winning documentary film *Slavery by Another Name*, which discusses convict leasing and the exploitative labor practices in Southern states in the Post-Civil War period.  The class discussions cover how even though slavery officially ended at the end of the Civil War, these forms of exploitative labor practices were a continuation of slavery as another economic system that has caused enduring poverty amongst Black Americans.

82.    Professor Fording discusses redlining, a racially discriminatory practice dating from the 1920s, through which U.S Government homeownership programs systemically denied mortgages, insurance loans, and other financial services to certain geographic areas because of the residents' racial and ethnic identities.  The class discussions cover how redlining and other historical racially discriminatory housing and land ownership practices have contributed to present-day racial inequality and poverty.

83.    Professor Fording teaches about the history of the GI Bill, which was legislation enacted in 1944 to provide veterans returning from service during World War II with access to various benefits to assist with achieving social and economic stability. Professor Fording teaches that the sweeping legislation helped create a booming middle class, but the benefits of the GI Bill were largely denied to African American war veterans.  The class discussions cover how the denial of GI Bill benefits to African American veterans has contributed to the income disparities between White and Black Americans.

41

84.    Assigned readings include the article "The Case for Reparations" by Ta-Nehisi Coates, which discusses redlining, housing discrimination, and other issues of systemic racism that have led to economic disparities between White and Black Americans.  The article makes an argument for pursuing policies that seek to redistribute wealth and resources to Black Americans and other communities that have been historically marginalized.

85.    Professor Fording also teaches about implicit bias and has his students complete the Harvard Implicit Association Test.  This test is broadly utilized to measure a person's subconscious attitudes and beliefs about people of particular races or other identities.  He has used the test to show his students that most everyone holds implicit biases—*i.e.*, positive or negative stereotypes about others based on race, gender, or other group characteristics.  The test shows that most everyone holds these biases, which are difficult to control because they are a product of a person's socialization.  Students have, at times, expressed discomfort after taking the test and discovering their own biases.  The test has also sparked important classroom conversations about how students can recognize and combat racial prejudice in their personal and professional lives.

86.    While implicit bias is a widely discussed phenomenon in social science, Professor Fording believes that, due to SB 129, he can no longer discuss "implicit bias" in his courses because a student's discomfort may lead to a complaint that he is advocating for, directing, or compelling certain students to adhere to a "divisive concept."

87.    After teaching his students about the causes for poverty, Professor Fording's *Politics of Poverty* course focuses on the various social programs and policies designed to prevent or alleviate poverty and whether these programs have been effective.  Professor Fording teaches about how policy making and attitudes surrounding programs designed to alleviate poverty are linked to racial attitudes and racial hierarchies in society.

88.     For example, Professor Fording covers the history of anti-poverty policies and welfare, including Supplemental Security Income, Temporary Assistance for Needy Families, and the Supplemental Nutrition Assistance Program.  Professor Fording teaches about the public discourse around poverty and how racial prejudice and discrimination contributes to harmful welfare policies. He teaches about social science data that shows how, despite the broad economic benefits of these programs throughout communities, states continue to decrease spending for these programs.  Professor Fording discusses research and literature documents showing that a strong predictor of attitudes towards welfare spending is a belief in the racial stereotype that Black Americans are "lazy" and have less work ethic than White Americans.  A product of this stereotype is decreased welfare generosity in any state in which there is a higher percentage of welfare recipients who are Black in that state.  (Doc. 55-28).

89.     Professor Fording has not taught the *Politics of Poverty* course since SB 129 came into effect—for the first time since 1996.  Professor Fording would teach the course but for his fear of violating SB 129.  He does not believe he can teach the course in compliance that the instructional standards of his academic field, without violating SB 129.

90.     Professor Fording believes it is impossible to effectively teach his class and comply with UA's guidance regarding SB 129.  For example, Politics of Poverty fulfills the university's writing requirement and 90% of the class grade is based on written assignments, while 10% is based on class participation.  He cannot ascertain whether his students have accomplished the course's learning objectives without requiring writing assignments which may implicate at least one of the divisive concepts.

91.     For example, one of the questions on his final exam for *Politics of Poverty* states, in part, "Throughout this course, we have found that race is inextricably linked to poverty itself . .

43

. How and why does race continue to be so important in understanding poverty in the United States? If you were asked to offer two policy recommendations to reduce the black-white poverty gap over the next two decades, what you would recommend?" (Doc. 55-29).

92.    Professor Fording also tests on the following question: "Provide one example of how historical racial discrimination impacts poverty and inequality today."

93.    Professor Fording's fear of violating SB 129 through teaching his *Politics of Poverty* course is informed by his awareness that Plaintiff Professor Dana Patton was accused of violating SB 129 through her instruction and course materials in her *Understanding Poverty* course.  Professor Fording developed the *Understanding Poverty* course in 2013 and taught the course from 2013 to 2017.  The course contents and discussions in Professor Patton's course have significant overlap with Professor Fording's *Politics of Poverty* course.  The course materials that were the basis of the complaint against Professor Patton are included in Professor Fording's *Politics of Poverty* course.

94.    During the Fall 2024 semester, UA administrators warned Plaintiff Professor Cassandra Simon that one of her class assignments, a sit-in in protest of SB 129, could violate SB 129.  Although she ultimately canceled the assignment, but Professor Fording was aware of her communications with UA about the assignment and the threat of enforcement against Professor Simon because of it.

95.    Following the assignment cancellation, the student newspaper, Crimson White, wrote an article detailing the incident, which Professor Fording read.  Zoe Bernstein, *"We are Silenced": University Cancels SB129 Sit-in on Day of Event* (Nov. 28, 2024) https://thecrimsonwhite.com/117987/news/we-are-silenced-university-cancels-sb129-sit-in-on-day-of-event/.

96.    Professor Fording received an email forwarded to him from a fellow faculty member on December 5, 2024, which included an email exchange between the faculty member and Provost James Dalton.  In response to an expressed concern about SB 129 and the cancellation of Professor Simon's class assignment, Provost James Dalton wrote that UA administration must "comply with the law" and in doing so, "this may likely be viewed or experienced as UA interpreting [SB 129] too broadly on many occasions."  Thus, Professor Fording believed UA would broadly interpret SB 129 and broadly enforce it regarding classroom instruction.  (Doc. 55-30).

97.    As part of the *Social Movements and U.S. Politics* course, Professor Fording teaches various social movements in the United States from various ideologies.  Professor Fording's syllabus, from his Spring 2025 class, states "Although we will examine a broad range of social movements to illustrate the concepts and theories introduced in this class, due to the centrality of race in American politics, we will spend a considerable amount of time studying the various movements for racial justice and the counter-movements that they spawned over the last 50 years."

98.    Professor Fording believes that though the material may be difficult, it is important for him to teach this material about social movements honestly so students can understand how these movements have affected contemporary U.S. politics, recognize these social movements when they appear in mainstream media, and connect these social movements to other concepts in social science.

99.    Since the passage of SB 129, Professor Fording is no longer discussing the Black Lives Matter movement in class, has decreased his coverage of the Black power movement, and has eliminated excerpts from a book about the white nationalist movement. (Doc. 55-32).

100.    Professor Fording has shortened his discussion about the white nationalist movement in his class, compared to classes that he taught in prior years.  The portion of his class about white nationalism goes in-depth into the beliefs of white supremacist groups that the world is hierarchical, and that members of the Aryan, or European, race are more highly developed and evolutionarily superior to others.  The course materials also include visuals and teachings for the Klu Klux Klan, Neo-Nazis, and Skinheads that depict hate speech and support violent actions taken against members of the non-white race.  Professor Fording is careful to provide an advance warning to the class that these extreme theories and images will be discussed, but he is still concerned that this course material may be considered a "divisive concept." (Doc. 55-33).

101.    Professor Fording has eliminated his discussion of the Black Lives Matter movement, which covered the movement's ideologies and how the existence and growing awareness of systemic racism has contributed to the growth of the social movement.

102.    Professor Fording assigns the students to pick a "protest song" to play during class and analyze as a class presentation.  Some students have chosen songs associated with the Black Lives Matter movement, such as *Alright* by Kendrick Lamar, or songs highlighting systemic racial violence in America perpetuated against Black Americans, such as *This is America* by Childish Gambino.  Before SB 129, Professor Fording often engaged in robust discussions with students about their presentations to discuss the various social movements or protests in their song choices. After SB 129, Professor Fording no longer facilitates discussions during student presentations for fear of violating SB 129.

103.    Professor Fording has been teaching the *Politics of Voting Rights* for five years.  He last taught the course in Fall 2024.  He will likely teach this class again in the Spring 2026 semester.

He does not plan to change any materials in this course, but believes he risks being subject to potential discipline under SB 129.

104.    In *Politics of Voting Rights*, Professor Fording discusses and cites social science research that shows how the historical and systematic suppression of Black citizens' ability to vote has had a significant impact on present voting rights.  The discussion also covers the Voting Rights Act and how state and local governments have subverted that legislation to continue suppressing Black voters.  Professor Fording discusses research demonstrating that structural forces such as racial prejudice and racial gerrymandering inhibit political mobilization, and that these barriers then influence the policies and programs that the government supports and implements.  The course teaches how these historically discriminatory voting policies contribute to voter suppression today, as evidenced in the recent *Allen v. Milligan* case challenging racial gerrymandering in Alabama.  These conclusions are widely accepted as accurate within his discipline.

105.    One of the assigned readings include *Uncounted: The Crisis of Voter Suppression in America*.  The book explores the history of voter suppression in the United States, particularly as it relates to race, poverty, and African American voters in the South.

106.    Professor Fording plans to continue teaching *Politics of Voting Rights* as he has in the past though fears he may be disciplined under SB 129.

## Plaintiff Alabama NAACP

**Background**

107.    Since its founding, the Alabama NAACP has been a leading advocate for political, legal, and civil rights of Black Alabamians.

108.    The Alabama NAACP's mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate

discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. Its membership is open to all races.

109.    The Alabama NAACP has thousands of members in branches across the state, including college chapters with members who are students at public universities including the University of Alabama ("UA").

110.    All members of the UA NAACP Chapter are students at UA.

**Harm to UA NAACP Chapter Members From SB 129**

111.    Members of the UA NAACP Chapter were harmed when, as a direct result of SB 129, the UA administration closed the Black Student Union ("BSU") office.

112.    UA Administrators closed the BSU office purportedly because it violated SB 129. AL NAACP Exhibit A (Maven Navarro, *University removes dedicated offices for Black Student Union, Safe Zone*, The Crimson White (Aug. 22, 2024), https://thecrimsonwhite.com/115369/top-stories/university-removes-dedicated-offices-for-black-student-union-safe-zone/.)

113.    The BSU's mission is "to establish and innovate relationship opportunities and experiences for minority students at the University of Alabama.  We also serve as a liaison between the minority student body and administration in efforts to uphold the values stated in the Capstone Creed.  We serve our members by providing community service opportunities, mentoring relationships within BSU, and providing outlets for expression and discussion.   We strive to address the issues that affect our community on campus, locally, and internationally. Our goal is to provide a safe and welcoming environment for all students who wish to be a part of it."  *Black Student Union*, The Source, https://mysource.ua.edu/organization/uabsu (last visited May 9, 2025).

114.    Use of the BSU space was open to students of all races, although its programming focused on the needs of UA's Black students.

115.    Prior to the passage of SB 129, members of the UA NAACP Chapter used the BSU space and participated in its programming.

116.    UA NAACP Chapter President Ja'Kobe Bibbs, a rising Junior at the University of Alabama majoring in Political Science and African American Studies, attended the BSU multiple times per month prior to its closure to socialize, form community, strengthen friendships, and receive mentorship.

117.    For example, Mr. Bibbs attended the BSU in connection with his participation in the Freshman Liaison Program, a subcommittee of BSU.  That program taught Mr. Bibbs various leadership skills, how to become active on campus, and how to find a community centered around the Black student experience. Mr. Bibbs received guidance from other students at the BSU as to how to further his relationship with an alumni mentor.  He also was counseled, encouraged, and assisted by fellow students at the BSU in applying to the Blackburn Institute at UA, a premier community and engagement organization that promotes young leaders across UA to better the State through leadership development and civic engagement programs.

118.    Mr. Bibbs also built networking skills at the BSU.  Mr. Bibbs used the BSU office to develop his social skills, especially after being isolated during some of his time in high school due to COVID.  Using the BSU office, Mr. Bibbs was able to make new friends, get out of his comfort zone, and connect with both underclassmen and upperclassman who freely shared advice as Black students at UA.

119.    Other members of the UA NAACP Chapter also regularly attended the BSU.  For example, Member #1 is the Event Coordinator of the UA NAACP Chapter.  She is a junior at UA

majoring in Philosophy on a jurisprudence track and minoring in Sociology & Educational Policy and Reform.  Member #1 regularly attended the BSU prior to its closure.

120.    Mr. Bibbs regularly interacted with Member #1 at the BSU.  As part of these interactions and networking, he recruited her to serve on the Executive Board of the UA NAACP Chapter as the Event Coordinator.

121.    Mr. Bibbs also formed relationships with two other individuals at the BSU who he recruited to serve on the UA NAACP Chapter Executive Board during the 2024-2025 school year. This included Member #2, the 2024-2025 Vice-President of the UA NAACP Chapter, who recently graduated UA with a degree in Psychology on a pre-med track and a minor in International Studies, as well as Member #3, the Public Relations & Social Media Chair for the UA NAACP, who recently graduated from UA with a degree in News Media and a minor in Political Science.

122.    After the UA closed the BSU space, Mr. Bibbs and the other members of the UA NAACP Chapter lost the use of the space and thus lost access to mentorship, networking, gathering to respond to current events, and socializing that they previously had, described above.

123.    Had the BSU not been closed as a result of SB 129, Mr. Bibbs would have continued to use the space to build relationships and further participation and membership in the UA NAACP Chapter.

124.    Had the BSU not been closed as a result of SB 129, the BSU would have served as a place for UA NAACP Chapter members to engage in issues central to the UA NAACP Chapter's mission.  As one non-exhaustive example of the loss experienced by the closure of the BSU, in late 2024, many Black UA students, including members of the UA NAACP Chapter, received threatening text messages informing Black students they were to be sent to plantations to spend the rest of their lives in slavery.

125.    Because the BSU had been closed, the UA NAACP Chapter members and other Black students did not have a dedicated space where they could gather to discuss, process, and receive support in regard to these racially hostile texts.

126.    In addition, students gathered at the BSU to discuss elections and the impact of elections on Black communities, an issue that is central to the UA NAACP Chapter's mission. Due to the closure of the BSU, UA NAACP Chapter members and other students were no longer able to use the space for this purpose.

127.    Members of the UA NAACP Chapter were further harmed when the UA administration closed Safe Zone. Safe Zone "promotes equity and inclusion for LGBTQIA+ individuals at The University of Alabama.  The Center provides educational outreach, community support and crisis intervention resources for LGBTQIA+ members of The University of Alabama community and their allies." *Alabama Safe Zone*, Alabama LGBTQ+, www.alabamasafezone.com/archiveszrc.

128.    UA asserted that it closed Safe Zone because it violated SB 129.  (Doc. 55-36).

129.    Prior to its closure, UA NAACP members spent time in the Safe Zone space.  For example, Member #2, a UA NAACP member who is a Sophomore majoring in International Studies and minoring in Chinese and International Business, attended Safe Zone prior to its closure.

130.    When Safe Zone was closed, UA NAACP Chapter members lost access to the space and the various community building, educational, and crisis intervention support it had provided.

**Harm to the UA NAACP Chapter From SB 129**

131.    As discussed above, when the BSU was closed as a result of SB 129, the UA NAACP Chapter lost a space that was important to efforts to recruit members and encourage participation in its leadership.

132.    The BSU was a space where Black students regularly engaged in issues highly relevant to the UA NAACP Chapter's mission, including combatting racism and other inequalities and assisting UA's Black  students in their educational endeavors.

133.    Plaintiff Alabama NAACP fears that its UA NAACP Chapter may be deemed a prohibited DEI Program under SB 129.  This fear stems from UA's closure of BSU and SafeZone, as well as the defunding of certain organizations focused on the needs of minority students.  None of these organizations restricted participation based on race, sex, or gender, yet they were deemed to violate SB 129.

134.    In addition, Plaintiff Alabama NAACP is concerned that its UA Chapter will be ineligible for funding because of the possibility that the types of events it has sponsored in the past and would like to sponsor in the future may be deemed to be associated with SB 129's divisive concepts.

135.    "Speakers bureau" speakers and UA NAACP Chapter members often discuss topics associated with racism.

136.    UA NAACP Chapter previously sponsored various speakers, such as Khadidah Stone, a well-established community organizer in the state of Alabama who visited campus to speak about the 2025 Alabama State Legislative session focusing on helping students understand how the legislature operates, as well as how to navigate and respond to recently passed or proposed legislation.

137.    The UA NAACP Chapter also hosted a Black Voters Matter event, Revision of Democracy Workshops, various political protests including speaking on the State Capital, and various speaking engagements with Senators and the youth of Alabama.  These speakers often address barriers in society faced by Black individuals, including issues such as implicit bias and racial gerrymandering.

138.    Fearing that it might be deemed to violate SB 129, the UA NAACP Chapter held an event concerning the issues arising from SB 129 itself off campus rather than on the UA campus. UA NAACP Chapter's advisor, a member of the UA faculty, was reluctant to attend out of fear of repercussions by UA administration enforcing SB 129.

139.    UA NAACP Chapter intends to put on several events that raise awareness about issues affecting both the state of Alabama and the quality of life for students at UA in the future that, but in light of UA's enforcement history to date, it fears that such programs could be found to violate SB 129.  These include collaborating with Alabama ACLU to discuss civil rights and civil liberties in the current climate, hosting another Black Voters Matter event, creating a joint event with the Center on Poverty Law and with the Greater Birmingham Ministry, participating in protests, and a follow up event concerning SB 129.

## The Student-Plaintiffs

### Student Sydney Testman

**The Social Justice Advocacy Council and SB 129's Harm to Testman**

140.    SJAC's objective is to celebrate diversity of identity, broaden cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about identity related issues, and promote intercultural interactions among all communities at UAB.  SJAC is an organization that provides a platform to empower marginalized communities

and identity based registered student organizations through engaging educational and inclusive events. UAB Organization Description, https://uab.campuslabs.com/engage/organization/uabsjac.

141.    A University Funded Organization ("UFO") is a student organization that receives dedicated funding from UAB.  The UFO uses this funding to fund activities by other student organizations, as well as to fund its own activities.

142.    SJAC was previously designated as a UFO and was supported by the Student Multicultural and Diversity Program ("SMDP").

143.    UFOs have specific budget allocations that Registered Student Organizations ("RSOs") do not.  To put on events, RSOs must secure funding from other sources at UAB or through external donations.  These sources of funding have to be sought for each particular event and are not guaranteed.

144.    SJAC was able to receive funding on an annual basis automatically without needing to apply for funding because of its classification as a UFO and not as an RSO.

145.    Typically, SJAC received $10,000 from the university in a bank account designated for UFO student organizations.  SJAC did not have to submit any requests to receive this funding. It was automatic and guaranteed year after year.

146.    SJAC utilized the $10,000 received from the university to host their own programming and also helped to fund other student groups on UAB's campus.

147.    SJAC was made up of two boards.  The Affiliates Board was composed of students who reviewed funding requests received from other student organizations on campus that wanted to use those funds for campus events that aligned with SJAC's mission.  The events were usually workshops, guest speakers or other social-justice related programming.  SJAC's Programming Board was composed of students who planned events hosted by SJAC.  Each of the two Boards

received roughly half of the total $10,000 funds received from UAB, although the exact amounts fluctuated depending on the organizations that requested funding from SJAC and SJAC's own programming in any given year.

148.    Testman served as the Finance Coordinator on the Affiliates Board of SJAC, and along with her student colleagues, reviewed funding requests and made decisions about which student groups would receive funding for social justice programming on campus.

149.    Testman reviewed funding applications from UAB student groups and distributed between $5,000 to $6,000 per year among these groups to support social justice programming on campus.

150.    The disbursement of funds to other groups depended on the type and volume of requests submitted to SJAC by other student groups.  Student groups could submit monthly requests to SJAC for funding—the full semester request by the student group did not have to be submitted at once.  The remaining funds were utilized by the SJAC Programs Board for SJAC programming.

151.    Prior to SB 129, Testman does not know of any instance in which UAB administrators directed which organizations SJAC could fund or overruled any funding decisions by students.

152.    Prior to SB 129, SJAC was completely student-organized.

153.    Before SB 129 went into effect, SJAC provided funding for a multitude of student-led events, including the Indian Cultural Association's Diwali event, the Spanish and Latino Association's Day of the Dead event, and a volleyball game hosted by the Korean Student Association.

154.    SJAC hosted events on its own as well.  SJAC hosted five key events each year. One example that usually took place early in the Fall semester is a spoken poetry event to raise funds to provide scholarships for students.  Another example is a conference that brings together different speakers and activists from across Alabama.

**After SB 129 Was Introduced In The Legislature But Before It Took Effect - Summer 2024**

155.    Each year, prior to the beginning of the academic year, all students involved with a UFO supported by the SMDP attended a retreat that consisted of leadership trainings and planning sessions for the academic year.  Attendance for these students at the retreat was mandatory.

156.    On April 10, 2024 via e-mail, Testman received a letter from Herbert Wilkerson, the Director of SMDP, stating "Due to the enactment of State Law 129, myself along with the team have made the decision to postpone the SMDP retreat."  (Doc. 55-44).

157.    On July 15, 2025, Testman received an email communication from Herbert Wilkerson stating "[i]t is with regret and optimism that I am announcing the cancellation of the SMDP retreat."  (Doc. 55-45).

158.    On August 5, 2025, Testman attended a virtual zoom meeting with Dr. Mary Wallace, then advisor of Undergraduate Student Government Association, Herbert Wilkerson, and other SJAC board members.

159.    Dr. Wallace and Mr. Wilkerson notified the SJAC members on the call that SJAC was being demoted to a Registered Student Organization ("RSO") because of SB 129.

160.    During this same call, Dr. Wallace and Mr. Wilkerson notified other UFOs supported by SMDP that they were being demoted and defunded. These organizations include Queer Peers, Black Male Excellency Network, and the Black Student Awareness Committee.

161.    Because SJAC was demoted to an RSO from a UFO, SJAC no longer automatically received funds from the University.

162.    Without funds from the University, SJAC's Affiliates Board was eliminated because there was no need for individuals to make decisions about which student organizations would receive SJAC funds because those funds were withdrawn.

163.    UAB officials told Testman that, because of SB 129, SJAC could not continue receiving state funding because SJAC may be connected to "divisive concepts" or fall under SB 129's definition of a "diversity, equity and inclusion program."

164.    As a direct result of SB 129, UAB eliminated Testman's Finance Coordinator position.  UAB also eliminated the $600 stipend she received as a result of her role.  Once Testman's position as Finance Coordinator was terminated, her role at SJAC ended.  SJAC does not have general membership positions.  In addition, following the loss of her stipend, Testman needed to direct her time and efforts to earning income to replace the lost stipend and meet her basic living expenses, like rent.

165.    After SJAC was demoted to an RSO and lost its funding as a UFO, SJAC was unable to put on its annual events in the same manner as prior years.  SJAC had to revise its mission statement and create a new bank account to receive any funds it might be able to get.  SJAC did not have the ability to apply for funds from the Undergraduate Student Government Association ("USGA") or other sources after it was demoted in Summer of 2024 because the deadline for requesting funds from USGA had passed in Spring of 2024.

166.    SJAC was unable to move forward with its annual spoken poetry event, which usually takes place in the Fall, because it had lost its funds after being demoted to an RSO.

57

167.    SJAC attempted to organize its annual conference with a significantly reduced budget that was funded by student's own money and small donations from local non-profit organizations.  As a result of the severely limited and unstable budget, the event was less attended than in prior years.

168.    Testman did not apply for funds from USGA for SJAC because she understood from Dr. Wallace that UAB believed SJAC was connected to a "divisive concept" or a "DEI" organization, so it would not receive state funding.

169.    SJAC's demotion and loss of funding as a result of SB 129 also prevented other student organizations which usually relied on funding from SJAC to receive funding for their events.  For example, SJAC had previously provided, but could no longer provide funding for the Indian Cultural Association's celebration of the Diwali holiday, the Spanish and Latino Student Association's celebration of the Day of the Dead, the Korean Student Association's volleyball game, and programming by Esperanza.

170.    Other UFOs also have been demoted to RSOs as a result of SB 129, including Queer Peers and the Black Student Awareness Committee.

171.    USGA does not have sufficient funds to sustain the organizations in the way they were pre-SB 129.

**The Undergraduate Student Government Association and Defunding of RSOs**

172.    After SB 129, USGA was one of the only remaining resources on UAB campus for RSOs to obtain UAB funding for their events.

173.    Every semester RSOs are allowed to apply for funding from USGA to support student programs and events for the following semester.  To receive funds, the RSO must submit

an application to USGA that lists the events they would like supported, ranked by importance, and a line-item budget for each event showing how the funds will be used.

174.    Every year, USGA is given $50,000 from UAB to allot to RSOs for their programming to disburse among RSOs.  The total funding requested by the various RSOs always far exceeds that amount.

175.    Prior to SB 129, to Testman's knowledge, every RSO that requested funding for events had at least one event approved.

176.    In her capacity as Executive Vice President, Testman was involved in discussions with her fellow USGA colleagues in Spring 2024 regarding how to allocate funds for RSO events for the academic year of 2024-2025.

177.    The USGA budget for Fall 2024 was finalized in Spring of 2024.  The budget was approved by Dr. Wallace in Spring 2024.  It was finalized after SB 129 was passed but beforeSB 129 went into effect.  The final budget did not exclude any requests for funding on the grounds that the requesting organization was a DEI program or that the requested event was associated with a divisive concept.

178.    After the budget for RSO programming was approved in the Spring of 2024, different student organizations contacted Testman and others serving on USGA about their budget requests for the 2024-2025 academic year and whether their budget would be impacted as a result of the legislation.

179.    Neither Testman nor others on USGA knew how to respond to these questions and remained uncertain about the budget that was finalized in the Spring of 2024.

180.    After SB 129 passed, on March 28, 2024, the SMDP office held a meeting titled "SMDP Meeting Tomorrow: SB 129."  This meeting was open to the student body.  The USGA

leadership team, with Testman, was present. Dr. John Jones, the Vice President of UAB Division of Student Affairs attended with Dr. Wallace.  After the meeting, USGA leadership, including Testman, approached Dr. Jones about a USGA specific meeting for how SB 129 would impact the student body, in the next week.  Dr. Jones stated he would attend the meeting but failed to attend.

181.    Testman, along with others, repeatedly attempted to schedule both in-person and zoom meetings with Dr. Jones.  On at least one occasion, he accepted a calendar invitation for a virtual meeting and yet again failed to attend.

182.    Dr. Jones did not respond to any emails or have any other contact with Testman or others in USGA leadership.

183.    At the first USGA meeting of the Fall 2024 semester, Testman, along with others serving on the USGA Executive Council, met in-person with Dr. Wallace for the first USGA meeting.

184.    During this meeting, Dr. Wallace directed the group that no organizations that had names or events related to "DEI" or "divisive concepts" could receive USGA funding.  Dr. Wallace stated that USGA funds came from school tuition and was state funding.  Dr. Wallace explained that no state funding could go to "DEI/divisive concepts" RSOs because of SB 129.

185.    Dr. Wallace explained that she fundraised over the summer from private sources and these "DEI/divisive concepts" organizations would receive private funds. Dr. Wallace began referring to these "DEI/divisive concepts" RSOs interchangeably as "private dollar organizations." The amount of funds raised from private donors was significantly less than what was originally allocated in the approved Spring 2024 budget.

60

186.    Since SB 129 has been in effect, there have been two additional USGA budget cycles where "DEI/divisive concept" RSOs have not received UA funding and instead received less in private dollars than allocated in the original budget finalized in Spring 2024.

***Student Miguel Luna***

**SB 129's Harmful Impact on Luna's Extracurricular Experience**

187.    Luna has served as the President of Esperanza since the group's founding in 2023. As the President of Esperanza Luna's role includes overseeing Esperanza's programming and funding operations and collaborating with other student organizations.

188.    Prior to the signing of SB 129 Esperanza relied heavily on funding from UAB's Office of Diversity, Equity, and Inclusion, which was closed after SB 129 was signed into law.  As a result, Esparanza lost its funding from the Office of Diversity, Equity, and Inclusion.

189.    Prior to the implementation of SB 129 Esperanza also received funding from the student organization Social Justice Advocacy Council ("SJAC"). As a direct result of SB 129, SJAC lost its status as a University Funded Organization and thus its ability to fund organizations such as Esperanza.

190.    This depletion of funding sources impacts Esperanza's ability to fulfill its mission and provide the programming, opportunities, and resources that the organization provided before SB 129 went into effect.

191.    Without these funding sources, Esperanza is unable to host events that it was interested in, such as a panel event for Latine pre-law students.

192.    The elimination of these funding sources also undermines Esperanza's ability to host events on topics such as Latine racial diversity, Spanish language skills, and navigating anti-Latine discrimination in the workplace.

193.    The lack of funding deprives Luna of the opportunity to network and associate with other Latine students and participate in programming focused on the Latine community.

194.    During the 2024-2025 school year Luna served as a member of the Undergraduate Student Government Association ("USGA") Executive Council.  Luna attended several Executive Council meetings with Mary Wallace, UAB's Assistant Vice President for Student Experience during the spring 2024 semester.

195.    On June 3, 2024, Luna sent Dr. Wallace and John Jones, UAB's Vice President of Student Affairs, an email asking for clarification regarding the operation of UAB's DEI programs in the wake of SB 129's passage.  (Doc 55-41).

196.    Luna never received a response.  On June 18, 2024 Luna sent a follow up email requesting an opportunity to "discuss the future of DEI at UAB."  (Doc. 55-42).

197.    Dr. Wallace and Dr. Jones never responded to Luna's questions.

198.    Luna attended a meeting with Dr. Wallace with other USGA leadership during the beginning of the Fall 2024 semester.  During this meeting, Dr. Wallace informed Luna that any organization related to "DEI" or a "divisive concept" could not receive university funding.

199.    Luna cannot determine from the text of SB 129 what programming and opportunities would be considered related to a divisive concept and therefore violative of SB 129.

200.    Luna also is concerned that Esperanza will be deemed a DEI program as defined by SB 129. While Esperanza membership is open to all UAB students regardless of race or ethnicity, its members are primarily Latine, and its stated focus is on issues of importance to Latine students. (Doc. 55-43).  Luna understands that other affinity-based organizations that are open to all students have been disbanded or lost funding due to SB 129.

201.    Having had both of his funding sources cut as a result of SB 129 and having been told by Dr. Wallace that USGA could not fund organizations associated with DEI and divisive concepts, Luna viewed applying for funds from USGA for Spring 2025 as futile.

**SB 129's Harmful Impact on Luna's Curriculum**

202.    Luna enrolled in *Politics and Race in America* to understand racial stratification within the United States and how it is influenced by politics.  He particularly wanted to learn from the Professor about how race influences political behavior.

203.    During class discussion in *Politics and Race in America*, Luna's professor did not engage in and did not lead class discussions among the students on topics related to the impact of systemic racism on the U.S government and its policies.

204.    Luna enrolled in *Human Rights* to learn from his professor about human rights, and particularly to gain a better understanding of the persecution of racial and gender minorities and the state's role in facilitating these human rights violations.

205.    During course discussions, Luna observed that his professor seemed wary of how he presented course materials to students, and did not provide instruction during or failed to lead class discussion on topics that could fall under SB 129.  For example, the professor remained silent and did not engage in classroom discussions about human rights violations experienced by incarcerated African Americans in the Alabama prison system.

206.    Luna enrolled in the *Environmental Politics* course to learn about environmental justice and environmental policymaking, and particularly how race, class, and gender may affect inequitable outcomes with regard to environmental health.

207.    In *Environmental Politics*, the professor did not engage in classroom discussion on topics such as the impacts of racism and government policy on environmental health.

**<u>Governor Ivey</u>**

208.    Section 3 of SB 129 provides that "[a]ll state agencies . . . including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who knowingly violates this act."

209.    Alabama Constitution Article XIV, § 264 states: "The state university shall be under the management and control of a board of trustees, which shall consist of . . . the governor, who shall be ex officio president of the board."

210.    Governor Ivey has the ability to appoint the 12-member board of Alabama's Commission on Higher Education.

III.    THE DEFENDANTS' PROPOSED FINDINGS OF FACT

*The Professor Plaintiffs*

1.      As part of the *Anti-Oppression and Social Justice* course, Dr. Simon assigned a class project. The course syllabus stated: "Students will be given an opportunity to come up with their own class project. If students are not able to come up with their own assignment they will have to do a project come up with by the professor. In the past students have been required to participate in an ongoing university project on addressing racial history on the University of Alabama's campus and/or the history of protests on campus." (Doc. 56-1 at p. 5 of 10).

2.      The course syllabus did not present an option for students who didnot wish to participate in the protest to complete an alternative assignment. (Doc. 56-1 at p. 5 of 10).

3.      For their class project, Dr. Simon's students organized a sit-in protest in opposition to SB 129 that was scheduled for November 13, 2024. (Doc. 12-4 ¶ 28).

4.      UA was made aware of complaints about the assigned readings and discussions in Dr. Patton's *Understanding Poverty* course. (Doc. 56-3 ¶ 13); (Doc. 1 ¶ 140).

5.      UA investigated the complaints. As part of the investigation, administrators asked Dr. Patton for information about the course, including the content of course materials and her procedures for facilitating classroom discussion. (Doc. 56-3 ¶ 14); (Doc. 1 ¶ 143).

6.      Dr. Patton was not disciplined or threatened with discipline for teaching *The Politics of Health Policy* and *Social Investment and the Role of Innovation* at UA in the spring semester of 2025. (Doc. 56-3 ¶ 17)

7.      Dr. Fording was not disciplined or threatened with discipline for teaching *Social Movements and U.S. Politics* at UA in the spring semester of 2025. (Doc. 56-3 ¶ 19).

65

*Student Organization Funding at UAB*

8.     A Registered Student Organization ("RSO") is an organization that is formed, registered, and managed by students to "enhance the social, cultural, recreational, and educational functions of the University." (Doc. 56-4, p. 2 of 12).

9.     RSOs are autonomous organizations that are managed by their members without oversight from UAB. RSOs may not use UAB's full name, its logo, or its marks in their branding materials. *Id.* at p. 4-8 of 12.

10.     RSOs do not receive funding directly from a department or division of the University. Instead, they may apply for a funding allocation from UAB' Undergraduate Student Government Association ("USGA") each semester. To be eligible for a funding allocation from USGA, an RSO must (a) be registered with the University; (b) maintain an active bank account; and (c) maintain an active iSupplier account. (Doc. 56-5 at p. 50 of 75). Funding requests must be made during "budget request week," and members from each RSO that submits a budget request must appear for a scheduled budget hearing. *Id.*

11.     USGA funding is available to all RSOs that properly submit a funding request. (Doc. 26-1 ¶ 8); (Doc. 56-6 ¶ 4).

12.     A University Funded Organization ("UFO") "is a club or organization whose membership is composed of UAB students and is directly supported through a University department or division. The [UFO]'s purpose aligns with that of the department or division and is directly advised and financially supported by that unit." (Doc. 56-4 at p. 2 of 12).

13.     UFOs may use UAB's full official name and core logo in their branding materials. (Doc. 56-4 at p. 4-8 of 12.)

14.    USGA's student members determine the amount of funds that USGA allocates to each RSO.  (Doc. 26-1 ¶ 7).

15.    Following the enactment of SB 129, UAB began using private funds from the UAB Educational Foundation to pay for a portion of USGA's funding allocations. Specifically, private funds were used to pay for funding allocations that could potentially violate SB 129 if paid for using state funds. (Doc. 56-6 ¶ 6).

16.    The funding application process remains the same for all RSOs, and USGA makes its allocation decisions without regard to whether the allocations will be paid with state funds or private funds. (Doc. 56-6 ¶ 7). After USGA makes its allocation decisions, administrators examine each allocation and determine whether it will be paid with state funds or with private funds. (Doc. 56-6 ¶ 8). By using private funds, USGA is able to provide funding to all RSOs that properly submit funding requests without risking a violation of SB 129. (Doc. 56-6 ¶ 9).

17.    UAB plans to continue using private funds to fund RSOs through USGA for the foreseeable future and expects that it will continue to have sufficient private funds to fully fund organizations based on the planned budget allocations. (Doc. 56-6 ¶ 10).

18.    SJAC was formerly a UFO that was sponsored by UAB's Division of Student Affairs. (Doc. 26-1 ¶ 10).

19.    SJAC received funding and support directly from the Division of Student Affairs. (Doc. 26-1 ¶ 10).

20.    During the summer of 2024, SJAC was informed that it would no longer receive funding directly from the Division of Student Affairs and would be treated as an RSO going forward. (Doc. 56-6 ¶ 11).

21.     UAB was already considering removing the funding that SJAC was distributing to RSOs and centralizing all RSO funding requests through USGA to prevent RSOs from "double dipping" by receiving funds from both SJAC and USGA. (Doc. 56-6 ¶ 12)

22.     SJAC did not submit budget requests to USGA for the spring 2025 or fall 2025 semesters. (Doc. 26-1 ¶ 14); (Doc. 56-6 ¶ 14).

23.     SJAC remains an active student organization on campus, with several events throughout the year and a conference hosted in the spring semester each year. (Doc. 56-6 ¶ 15); (Doc. 26-1 ¶ 15).

24.     Esperanza is an RSO at UAB whose mission is to be a "networking organization designed for Hispanic/Latine students." It was co-founded by Plaintiff Luna. (Doc. 1 ¶ 124); (Doc. 12-5 ¶ 5).

25.     Esperanza did not submit budget requests to USGA for the spring 2025 or fall 2025 semesters. (Doc. 26-1 ¶ 14); (Doc. 56-6 ¶ 14).

26.     Esperanza remains an active student organization on campus, with events scheduled throughout the year. (Doc. 56-6 ¶ 15).

27.     All RSOs, including SJAC and Esperanza, had the opportunity to submit funding requests to USGA for the fall 2025 and spring 2025 semesters. (Doc. 26-1 ¶ 12); (Doc. 56-6 ¶ 13).

28.     No one from the UAB administration told any member of SJAC or Esperanza that their groups could not apply for a funding allocation from USGA. (Doc. 26-1 ¶ 13).

### *Dedicated Office Spaces*

29.     Black Student Union ("BSU") is a registered student organization at UA whose purpose is to represent the interest and concerns of Black students at the University of Alabama. (Doc. 56-7 at p. 2 of 11); (Doc. 12-7 ¶¶ 13-14).

30.    Most student organizations at UA do not have dedicated office spaces on campus. (Doc. 56-3 ¶ 22)

31.     UA allows all student groups to reserve meeting and event space in the Student Center and other campus facilities. (Doc. 56-3 ¶ 23).

32.    UA has not prevented BSU, Safe Zone, or Alabama NAACP from reserving space or hosting events on campus. (Doc. 56-3 ¶ 24).

IV.    **THE PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

<u>**PRELIMINARY INJUNCTION STANDARD**</u>

1.    A preliminary injunction is warranted under Federal Rule of Civil Procedure 65 if Plaintiffs show: "(1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).

**Plaintiffs are Likely to Succeed on the Merits of Their Claims**

2.    Plaintiffs are likely to succeed on the merits of their claims.

**Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Injury**

3.    "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

4.    The U.S. Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

5.    Moreover, "[i]t is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

6.     The "direct penalization . . . of First Amendment Rights" is "presumed to cause irreparable injury." *Siegel*, 234 F.3d at 1178 .

7.     Where the "existing status quo itself is causing . . . irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *18 (11th Cir. Apr. 15, 2022) (citation omitted).

8.     Because SB 129 violates Plaintiffs' First Amendment rights and monetary remedies cannot undo the harms of these violations, irreparable injury is presumed.

**The Balance of Equities Favors Granting a Preliminary Injunction**

9.     "The movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the [preliminary injunction]." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1241 (11th Cir. 2005) (Wilson, J., dissenting) (quoting *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir. 1981) (per curiam)).

10.     "The review 'require[s] a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief.'" *Schiavo,* 403 F.3d at 1241 (Wilson, J., dissenting) (quoting *Siegel*, 234 F.3d at 1178).

11.     Alabama has no legitimate interest in defending provisions that violate federal law. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

12.     Defendants do not risk any irreparable damage from a preliminary injunction. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute.").

71

**A Preliminary Injunction Would Serve the Public Interest**

13.    The Eleventh Circuit has established that "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

14.    In particular, this Circuit and the Supreme Court have recognized, "[n]owhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc. v. Cartwrigh*t, 32 F.4th 1110, 1128 (11th Cir. 2022); *see also Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

15.    A preliminary injunction enjoining SB 129 would serve the public interest because the constitutional rights of Plaintiffs facing government censorship of protected classroom speech, loss of student group funding, and termination of affinity spaces would be protected.

## PLAINTIFFS HAVE MET STANDING REQUIREMENTS

**Standing Requirements, Generally**

16.    Standing is established where Plaintiff demonstrates (i) an "injury-in-fact" (ii) fairly traceable to the defendants' challenged action (iii) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

17.    The "'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972) (citation omitted).

18.    In the Eleventh Circuit, when First Amendment rights are involved, courts apply the injury-in-fact requirement loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). "Thus, it is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising

her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance ..., the injury is self-censorship.'" *Id.* (citing *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (citation omitted)).

19.    "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 562 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

20.    In order to succeed on a preliminary injunction, a plaintiff must establish a substantial likelihood of irreparable injury sufficient to confer standing. *Siegel*, 234 F.3d at 1176.

21.    The "direct penalization . . . of First Amendment Rights" is "*presumed* to cause irreparable injury." *Siegel*, 234 F.3d at 1178 (emphasis added).

22.    "When a plaintiff has stated that he intends to engage in a specific course of conduct arguably affected with a constitutional interest . . . he does not have to expose himself to enforcement to be able to challenge the law." *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020) (cleaned up).

23.    Particularly where a law is challenged as vague, as it is here, Plaintiffs are not required to "confess that [they] will in fact violate that law"—because the law itself provides no clear definition of what would constitute a violation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *cf. CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269–70 (11th Cir. 2006).

24.    There are two ways in which an organization may demonstrate standing.  The organization may assert a right on its own behalf by, for example, averring that a statute at issue would curtail the organization's ability to engage in constitutionally protected activity. *See, e.g.*,

73

*NAACP v. Button,* 371 U.S. 415, 428 (1963) (hereinafter "Organizational Standing").  In addition, "an organization whose members are injured may represent those members in a proceeding for judicial review."  *Sierra Club*, 405 U.S. at 739 (citing *Button*, 371 U.S. at 428) (hereinafter "Associational Standing").

**Associational Standing of AL NAACP**

25.     The closure of the Black Student Union ("BSU") space at the University of Alabama ("UA") resulted in irreparable harm to Alabama NAACP UA Chapter member Ja'Kobe Bibbs and other unnamed members of the UA NAACP Chapter who used the BSU prior to its closure.

26.     The harm suffered by the Alabama NAACP UA Chapter members is fairly traceable to Defendants' actions in enforcing SB 129 and closing the BSU.

27.     The harm suffered by the Alabama NAACP UA Chapter members is redressable by the instant lawsuit and the requested declaratory and injunctive relief.

28.     Mr. Bibbs and other unnamed members of the Alabama NAACP have standing to sue Defendants related to the claims alleged in the Complaint.

29.     The mission of the Alabama NAACP is highly germane to the interests it seeks to protect in this case.

30.     The claims asserted and relief requested do not require participation of the individual UA NAACP Chapter members.

31.     Accordingly, the Alabama NAACP has associational standing to sue on behalf of its members, including Mr. Bibbs and the other unnamed members, to assert the rights of those members.

**Organizational Standing of AL NAACP**

32.    The closure of the BSU also resulted in irreparable harm to the Alabama NAACP UA Chapter as an organization.

33.    Injury to an organization's ability to generate membership and interest in the organization is an injury-in-fact that gives rise to standing.

34.    The UA NAACP Chapter has a reasonable fear that it will be deemed a prohibited DEI program pursuant to SB 129.

35.    The UA NAACP Chapter has a reasonable fear that its programming will be deemed to be associated with a prohibited divisive concept under SB 129.

36.    These reasonable fears and concerns about the enforcement of SB 129 have had a chilling effect on the UA NAACP Chapter's programming, leading the organization to move an event off campus.  In addition, the UA NAACP Chapter's faculty advisor has expressed hesitancy about attending certain events for fear of enforcement under SB 129.

37.    The harm to the Alabama NAACP as an organization is fairly traceable to Defendants' actions in enforcing SB 129.

38.    The harm to Alabama NAACP as an organization is redressable by this lawsuit and the requested relief.

39.    Accordingly, the Alabama NAACP has organizational standing.

**Professor Plaintiffs' Standing**

40.    Professors Simon, Patton, and Fording all have Article III standing.  They have suffered injury in fact as they (i) regularly engage in classroom speech protected by the First Amendment, (ii) have received threats of enforcement or reasonably fear enforcement for violating

75

SB 129, and (iii) are placed in the constitutionally untenable position of choosing between risking

enforcement or self-censorship.

41.    The harm suffered by the Professor Plaintiffs is directly traceable to Defendants

and is redressable by Defendants.

**Student Plaintiffs' Standing**

42.    Plaintiff Miguel Luna has suffered injury-in-fact because when his professors

self-censor, he has been deprived of the First Amendment right to receive information.  Plaintiff

Luna also suffered an injury-in-fact because as co-founder of Esperanza, an organization for

Latine students at the University of Alabama at Birmingham ("UAB"), he is not able to receive

university funding for certain events as a result of SB 129.

43.    Plaintiff Sydney Testman has suffered injury-in-fact because she has lost her

position, and its affiliated stipend, as Finance Coordinator for the Social Justice Advocacy Council

as a result of SB 129.

44.    The harm suffered by Luna and Testman is directly traceable to Defendants and is

redressable by Defendants.

**Standing to Sue Governor Kay Ivey and Lack of Sovereign Immunity**

45.    Plaintiffs' First Amendment and Fourteenth Amendment harms are traceable and

redressable by Governor Ivey because SB 129 gives the Governor clear statutory authority to

enforce the statute to the Governor as ex officio President of the UA Board of Trustees.  Governor

Ivey has also made multiple public statements regarding her intent to enforce the SB 129.

46.    Although the Eleventh Amendment ordinarily bars claims against the state in

federal court, Ex parte Young recognizes an exception where "[the] complaint alleges an ongoing

violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). Where the Governor has "some connection" with the enforcement of the challenged statute, the Governor is a proper party. *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th at 889.

47.    Aside from Governor Ivey merely signing SB 129 into law, SB 129 expressly provides her with statutory authority to enforce the Act. SB 129 § 3. Moreover, Governor Ivey has publicly declared her intention to enforce the Act. Because she has both the authority and the intention to enforce SB 129, she is a proper defendant to claims for prospective injunctive relief, placing her squarely within the bounds of the *Ex parte Young* exception.

## FIRST AMENDMENT – PROFESSORS' RIGHT TO SPEAK FREE FROM VIEWPOINT DISCRIMINATION AND STUDENTS' RIGHT TO RECEIVE

48.    "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.

49.    "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among view points within the subject matter. *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).

50.    Viewpoint-based restrictions are a subset of other content discrimination. *Rosenberger*, 515 U.S. at 829. "Government discrimination among viewpoints – or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker – is more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 163 (cleaned up).

51.    The Government may not regulate speech when the motivation behind that regulation is opinion or perspective about the speaker or the idea itself.  *Rosenberger*, 515 U.S. at 829. Viewpoint-based discrimination is one of the most "egregious form[s]" of First Amendment violations, and is "presumptively unconstitutional."  *Id.* at 829-830; *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004); *Moms for Liberty - Brevard Cnty. V. Brevard Pub. Schs.*, 118 F.4th 1324, 1332 (11th Cir. 2024).

52.    "[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment."  *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("[O]ur cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities.")  Consequently, university professors' and students' speech is entitled to First Amendment protection.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students.").

53.    Universities' "chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic."  *Speech First*, 32 F.4th at 1128.  Students cannot be prepared for civic and political participation if they are not "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'"  *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).

54.    "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).  The danger "is to speech from the chilling of individual thought and expression. That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition."  *Rosenberger*, 515 U.S. at 835.

55.    "Given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."  *Grutter*, 539 U.S. at 329.  Indeed, "[n]owhere is free speech more important than in our leading institutions of higher learning."  *Speech First*, 32 F.4th at 1128.

56.    In *Garcetti*, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  The Supreme Court expressly declined to "decide whether the [government speech] analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching."  *Id.* at 425.

57.    The Supreme Cout has never ruled that university professors' curricular speech is government speech, and every Circuit Court of Appeals that has decided this issue has declined to apply the *Garcetti* government speech doctrine to university professors' academic speech.  *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) ("We decline the University officials' invitation to extend Garcetti to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so."); *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) ("As this Court has repeatedly recognized, the *Garcetti* rule

does not extend to speech by public university faculty members, acting in their official capacity, that is 'related to scholarship or teaching.'"); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("We conclude that *Garcetti* does not—indeed, consistent with the First Amendment, cannot— apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor."); *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (concluding that Supreme Court precedent weighed in favor of ruling that First Amendment protections apply to university professors' classroom speech); *Heim v. Daniel*, 81 F.4th 212, 226 (2d Cir. 2023) (declining to extend *Garcetti* to apply the government speech doctrine to professors' academic scholarship).

58.    The First Amendment protects speech on UA and UAB campuses. Plaintiff-Professors Simon, Patton, and Fording's classroom instruction is entitled to First Amendment protection.

59.    Students have the First Amendment right to receive information as well as the right to disseminate ideas. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

60.    As a student at UAB enrolled in courses which may cover divisive concepts, Plaintiff Luna is entitled to receive uncensored viewpoints expressed within the classroom and as part of classroom instruction.

61.    In *Bishop*, the Eleventh Circuit formulated a balancing test for determining "to what degree a school may control classroom instruction before touching the First Amendment rights of a teacher." *Bishop v. Aronov*, 926 F.2d 1066, 1073 (11th Cir. 1991).

62.    The three *Bishop* factors are (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than the those of other persons," especially in light of "the University's authority to reasonably control

the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1074–75.

63.    "*Bishop* did *not* create a bright-line rule requiring that any conflict between a professor's speech and the State to always yield in the State's favor." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1268 (N.D. Fla. 2022). The *Bishop* balancing test demands a "case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Bishop*, 926 F.2d at 1074.

64.    Here, plaintiffs Simon, Fording, and Patton have demonstrated that the *Bishop* test weighs in their favor and they are therefore likely to succeed on the merits of their First Amendment claims. Consequently, Plaintiff Luna is also likely to succeed on the merits of his First Amendment claim.

**Context**

65.    SB 129's viewpoint-based restrictions must be considered in the context of "the university classroom during specific in-class time." *Bishop*, 926 F.2d at 1074. "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180.

66.    The context of *Bishop* was a university memo directing an individual professor to refrain from "making assertions about his religious beliefs vis-a-vis the subject matter of his [exercise physiology] courses." *Bishop*, 926 F.2d at 1076.

67.    The context here is distinguishable from *Bishop* because the professor plaintiffs are not attempting to interject unsanctioned material into university-approved course content. Rather, the speech in this case is a core part of university-approved classes taught by the professors. Like

in *Pernell*, "Professor Plaintiffs are challenging a prohibition on expressing approval as to eight specific concepts" where the university "has already sanctioned these eight concepts as part of the curriculum." *Pernell*, 641 F. Supp. 3d at 1272.

68.     Additionally, the professor plaintiffs are challenging a state-wide ban on viewpoints deemed unfavorable by the Alabama legislature, not a narrow directive given to an individual professor.  "This prophylactic ban on university employees' speech affects potentially thousands of professors and serves as an ante hoc deterrent that 'chills potential speech before it happens,' and 'gives rise to far more serious concerns than could any single supervisory decision,' such as that in *Bishop*." *Pernell*, 641 F. Supp. 3d at 1271–72 (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995)).

69.     Furthermore, the university directive in *Bishop* was viewpoint neutral and applied to all religious content regardless of the substance of the professor's religious beliefs.  *Bishop*, 926 F.2d at 1077–78 ("Should another professor express religious beliefs in the classroom, the University would likely produce a similar memo.").  Here, Defendants have admitted that SB 129 constitutes a viewpoint-based restriction on certain ideas and beliefs.

**State interests**

70.     "[T]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

71.     Viewpoint discrimination is presumed unconstitutional, *Rosenberger*, 515 U.S. at 828, and "the dangers of viewpoint discrimination are heightened in the university setting." *Speech First*, 32 F.4th at 1127 n.6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)); *see also Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment) ("The danger of viewpoint discrimination is that the

government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing.").

72.    In *Bishop*, the university pursued its state interests in a viewpoint-neutral manner. *Bishop*, 926 F.2d at 1077–78 ("Should another professor express religious beliefs in the classroom, the University would likely produce a similar memo.").

73.    There is a distinction between "the State's valid exercise in prescribing a university's curriculum" and Defendants' "asserted interest in prohibiting educators from expressing certain viewpoints about the content of that curriculum." *Pernell*, 641 F. Supp. 3d at 1237. SB 129 is a regulation of the viewpoints that professors invoke during classroom instruction, not the content of the curriculum that professors are allowed to teach.

74.    Furthermore, the primary state interest underlying *Bishop* was the university's "chief concern" of ensuring that "its courses be taught without personal religious bias unnecessarily infecting the teacher or the students." *Bishop*, 926 F.2d at 1076.

75.    None of the religious coercion or Establishment Clause concerns that motivated the university's actions in *Bishop* are at issue here.

76.    The universities' positions as institutions of higher education are insufficient to justify a broad viewpoint-based restriction on subject-relevant curricular speech.

**Academic Freedom**

77.    There is a "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1075.

78.    Professors have an individual interest in academic freedom separate from the university's academic freedom interests. *See Bishop*, 926 F.2d at 1076 (noting "Dr. Bishop's

interest in academic freedom and free speech"); *Meriwether*, 992 F.3d at 504 (recognizing "professors' academic freedom"); *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 553 (5th Cir. 1982) (collecting cases) ("[Academic freedom's] roots have been found in the first amendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method."); *Piarowski v. Illinois Cmty. Coll. Dist. 515*, 759 F.2d 625, 629 (7th Cir. 1985) ("[Academic freedom] is used to denote both the freedom of the academy to pursue its ends without interference from the government . . . and the freedom of the individual teacher . . . to pursue his ends without interference from the academy.").

79.     The academic freedom interest in *Bishop* applied to academic institutions, not legislative bodies and therefore *Bishop*'s analysis should not apply to the Alabama Legislature's curriculum restrictions, *see Bishop*, 926 F.2d at 1075.

80.     The Alabama state legislature has no academic freedom interest in censoring classroom content.

81.     SB 129's viewpoint discrimination violates the First Amendment rights of the Professor Plaintiffs and Luna.

## **FIRST AMENDMENT - LOSS OF STUDENT FUNDING**

82.     Denial of official recognition of university and college student organizations burdens the First Amendment freedom of speech. *Healy*, 408 U.S. at 181. Failure to provide student organizations a space to gather, or otherwise participate in campus life fully by pursuing their stated purposes is not "insubstantial" when considering whether a First Amendment violation has occurred on a public university campus. *Id.* at 182. "[E]xtracurricular programs are, today, essential parts of the educational process." *Christian Legal Soc. Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 686 (2010).

83.    The First Amendment protects the speech of student groups within UA and UAB.

84.    "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

85.    "[T]he First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Christian Legal Soc.*, 561 U.S. at 667–68.

86.    "This will mean . . . that the taxpayers will occasionally be obligated to support not only the thought of which they approve, but also the thought they hate.  That is one of the fundamental premises of American Law."  *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 362 (8th Cir. 1988).

87.    When a university has "created a forum generally open for use by student groups" it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms."  *Widmar*, 454 U.S. at 267.  "[O]nce it has opened a limited forum . . . [t]he State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum" . . . nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829 (internal citation omitted).

88.    A limited public forum is established "by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *McDonough v. Garcia*, 116 F.4th 1319, 1328 (11th Cir. 2024) (quoting *Christian Legal Soc.*, 561 U.S. at 679 n.11 (2010)).

89.    UAB created a limited public forum by providing state university funding to its student organizations, both University Funded Organizations ("UFOs") and Registered Student Organizations ("RSOs").

90.     A "University may not discriminate based on the viewpoint of private persons whose speech it subsidizes." *Rosenberger*, 515 U.S. at 829 (internal citation omitted).

91.     "Favoritism of majority views is not an acceptable principle for allocating resources in a limited public forum." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 102 (2d Cir. 2007) (citing *Rosenberger*, 515 U.S. at 835). "A funding decision based on the speaker's viewpoint is impermissible irrespective of whether the harmed RSO had the same right as any other RSO to be 'considered' for funding." *Id.* at 101.

92.     UAB's denial of university funding to SJAC, based on whether the group may promote or espouse viewpoints disfavored by the Alabama Legislature, constitutes viewpoint-based discrimination against SJAC and Plaintiff Testman in violation of the First Amendment.

93.     Plaintiff Luna, as co-founder of Esperanza, an organization for Latine students at UAB, is not able to receive university funding for certain events that the group is interested in hosting because university officials informed him that UAB would deny funding to Esperanza for events deemed to be a "divisive concept" or related to "DEI." Esperanza also lost university funding for its events because it relied on SJAC, and also UAB's former Office of Diversity, Equity, and Inclusion, which was closed after SB 129 was signed into law, for event funding. UAB's allocation of university funding based on whether the group may promote or espouse viewpoints disfavored by the Alabama Legislature, constitutes viewpoint-based discrimination against Esperanza and Plaintiff Luna in violation of the First Amendment.

## FIRST AMENDMENT - STUDENTS' RIGHT OF ASSOCIATION

94.     The First Amendment protects the right of individuals to associate "to further their personal beliefs." *Healy*, 408 U.S. at 181. This right "has long been held to be implicit in the freedoms of speech, assembly, and petition." *Id.*

95.     "[O]ur cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."  *Widmar*, 454 U.S. at 268–69 (1981) (citing *Healy,* 408 U.S. at 180; then citing *Tinker*, 393 U.S. at 506; then citing S*helton v. Tucker*, 364 U.S. 479, 487 (1960)).

96.     As students at the University of Alabama, the members of the UA NAACP Chapter have a right to freely associate on the UA campus.

97.     The UA NAACP Chapter also has this right to freely associate on campus.  *See Button*, 371 U.S. at 428–29 ("We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit.").

98.     Impeding students' ability to meet on campus encroaches on the freedom of association.  *Healy,* 408 U.S. at 181 ("The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes.").

99.     Similar to the students in *Healy*, members of the UA NAACP Chapter were denied the right to freely associate when UA closed the physical spaces on campus associated with the BSU and Safe Zone based on the organizations purported connection to a divisive concept or a DEI program as defined by SB 129.

100.    The UA NAACP Chapter members' right to freedom of association was still violated, despite the fact that the members could meet in other campus locations.  *See Healy,* 408 U.S. at 182–83 (extending the right of freedom of association to student group even where students could meet unofficially on campus, meet off campus, and advertise off campus).

101.    That the UA NAACP Chapter members moved certain events off campus due to fear of violating SB 129 highlights SB 129's interference with the students' right to free association.

102.    In *Widmar*, the Supreme Court explained "[t]hrough its policy of accommodating [student group] meetings, the University has created a forum generally open for use by student groups." *Widmar*, 454 U.S. at 267.  Having created that forum, the University "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Id.*

103.    Indeed "a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985) (citing *Widmar*, 454 U.S. at 267 n.5).

104.    "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Widmar*, 454 U.S. at 267–68.

105.    The closure of the BSU and Safe Zone spaces as violating SB 129 constituted prohibited viewpoint discrimination.

106.    Fundamental constitutional principles hold "that a state regulation of speech should be content-neutral." *Widmar*, 454 U.S. at 277.  And the "applicable constitutional norms" hold that any content-based exclusion needs to be "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* at 271.

107.    Defendants do not have a compelling state interest in closing the BSU and Safe Zone spaces due to the perceived relation to SB 129's divisive concepts or SB 129's characterization of these organizations as prohibited DEI programs.

108.    "As a general rule" the government may not "selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others."  *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).

109.    Even if the state could assert a compelling interest, the means to achieve this interest were not narrowly tailored.

### FOURTEENTH AMENDMENT - VOID FOR VAGUENESS

110.    The Supreme Court has held that vague laws implicating speech are particularly concerning.  *See Ashton v. Kentucky*, 384 U.S. 195, 200 (1966); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (holding that a vague regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech").  Especially in education contexts, "[t]he danger of [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed."  *Keyishian*, 385 U.S. at 604.

111.    SB 129 is an impermissibly vague law regulating speech in the education context, which has caused a chilling effect at UAB, UA, and classrooms across Alabama.

112.    There are two independent reasons why a statute may be void for vagueness in violation of the due process clause of the Fourteenth Amendment.  "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc).

113.    Federal courts have enjoined enforcement of statutes with prohibitions nearly identical to SB 129's "divisive concepts," as void for vagueness.  In 2020, a federal court

preliminary enjoined enforcement of President Trump's Executive Order 13950 as impermissibly vague because the plaintiffs could not discern whether they could conduct employee trainings on implicit bias without promoting the prohibited concept that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." S*anta Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

114.    SB 129 contains an identical divisive concept (Section (2)(d)), and people of ordinary intelligence, including Professors Simon, Fording, and Patton, similarly cannot discern whether they can teach evidence-based research about topics such as implicit bias or utilize the widely accepted Harvard Implicit Association Test.

115.    The entirety of SB 129 is rendered vague because of the provision allowing "teaching or discussion of any divisive concept in an *objective* manner and *without endorsement* . . . provided the institution and its employees do not *compel assent* to any divisive concept." Ala. Code § 41-1-93(3b) (emphasis added).  Federal courts have enjoined enforcement of similar statutes as impermissibly vague.  For example, in *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1183–84 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024), the court held that the lack of clarity between "objective discussion" and "endorsement" rendered the entire law unconstitutionally vague.  Similarly, in *Pernell*, a federal district court found that the plaintiffs were likely to succeed on the merits of their claim that Florida's "Stop W.O.K.E. Act" was unconstitutionally vague, concluding that the provision allowing for "objective" instruction of the prohibited divisive concepts "without endorsement" rendered the statute impermissibly vague on its face.  *Pernell*, 641 F. Supp. 3d at 1281–86.

116.    A person of ordinary intelligence cannot determine how professors can teach complex issues associated with structural racism, implicit bias, or other harms to historically

marginalized communities in an "objective" matter. Further, it is impossible for the Plaintiff Professors to teach matters such as structural racism or implicit bias as widely accepted and substantiated by evidence (rather than simply as points of view advocated by academics) without arguably "endorsing" a divisive concept.

117. SB 129's safe harbor provision also allows for teaching "divisive concepts" in a "historically accurate" manner, but that too is sufficiently vague that a person of ordinary intelligence would not be able to discern what may be prohibited by the statute.

118. Even though words in SB 129 are defined by the statute, or can be found in the dictionary, that "does not magically extinguish vagueness concerns." *Honeyfund.com*, 622 F. Supp. 3d at 1181 (citation omitted). This is particularly true where terms in SB 129 are circular as evidenced by a "DEI Program" defined as, in part, anything "that otherwise violates this act." Ala. Code § 41-1-90(3).

119. SB 129's ambiguous language has encouraged inconsistent, arbitrary, and discriminatory enforcement, such as when Professor Simon was accused of purported violations of SB 129 due to a student-led and selected class project.

120. SB 129's ambiguous language also led to arbitrary threatened enforcement against Professor Patton when she was notified by UA administration that her course, *Understanding Poverty*—which focuses on topics like systemic racism, supporting anti-racism, correcting social injustice, and producing engaged global citizens—may conflict with SB 129 and threatened her with progressive discipline or termination if she refused to respond to extensive questioning about her class.

121.    SB 129's ambiguous language has led to arbitrary enforcement and loss of student funding and space for student groups that support students of color or LGBTQIA students, including SJAC and Esperanza at UAB, and BSU and Safe Zone at UA.

V.    THE DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

A.    **Plaintiffs Do Not Have Standing to Bring Their Claims.**

Plaintiffs "bear[] the burden of establishing" that this Court has jurisdiction to decide their claims. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To survive dismissal under Rule 12, Plaintiffs must therefore provide sufficient factual allegations in their Complaint showing that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* And because "[s]tanding is not dispensed in gross," they must do that "for each claim [they] seek[] to press," "for each form of relief that is sought," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up), and for each provision of the Act they seek to challenge, whether facially or as applied, *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006); *see Harrell v. The Florida Bar*, 603 F.3d 1241, 1254-55 (11th Cir. 2010).

In addition, while mere allegations can suffice to survive a motion to dismiss, "[a]t the preliminary injunction stage," a "plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). Plaintiffs cannot "rest on 'mere allegations,' but must instead point to factual evidence" establishing each element of standing as to each claim Plaintiffs bring for each provision of the Act they challenge. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

i.    **Alabama NAACP does not have organizational or associational standing to pursue its claims.**

Alabama NAACP has not established organizational standing based on its own injuries, and instead claims that members of its UA chapter were injured separately through their membership in other organizations. (Doc. 1 at ¶ 25) ("Specifically, members of the UA NAACP

have been denied access to university funding and campus spaces for Black students, such as the Black Student Union."); *id.* at ¶ 130 ("BSU did not receive any funding from UA, harming UA NAACP members who are also members of UA's BSU."); *id.* at ¶¶ 218, 219, 256; *see also* Doc. 12-7 ¶ 16. That is not enough to establish organizational standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 ("Like an individual, an organization may not establish standing simply based on 'the intensity of the litigant's interest'…'no matter how longstanding the interest and no matter how qualified the organization.'"). Nor has the Alabama NAACP alleged or shown that UA has threatened it with loss of funding or that it has applied for funding and been denied it.

Alabama NAACP has not established associational standing, either, because it has not identified at least one member, by name or by pseudonym, who has suffered a direct and redressable injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations" are required "to make specific allegations establishing that at least one identified member had suffered or would suffer harm."); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) ("We cannot accept an organization's 'self-descriptions of [its] membership . . . . regardless of whether it is challenged.'").

Alabama NAACP's claims are due to be dismissed, and its preliminary injunction motion denied, for lack of standing.

###### ii.    The remaining plaintiffs do not have standing to assert claims against Governor Ivey.

Governor Ivey also contends that the remaining plaintiffs lack standing because they have failed to allege or introduce evidence showing that they are harmed by each provision of the Act. To begin, the plaintiffs have not alleged, much less submitted evidence, regarding harm from many of the Act's provisions. No professor plaintiff, for instance, has alleged that she wishes to "[d]irect or compel a student … to personally affirm, adopt, or adhere to" *any* divisive concept. Ala. Code

94

§ 41-1-91(2). As a result, no professor—and no plaintiff—has standing to challenge Section 2(2) of the Act. Similarly, no professor plaintiff asserts that she wishes to "advocate[] for or require[] assent to" the divisive concept "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior of inferior." *Id.* § 41-1-91(3), 41-1-90(a). No plaintiff has standing to challenge these provisions, either.

As for the professor plaintiffs' request for a preliminary injunction, only Professor Simon submitted any evidence at all to support such a request when select Plaintiffs moved for a preliminary injunction. (Doc. 12-4.) Professors Patton and Fording thus necessary failed to "make a 'clear showing'" with "factual evidence" that they are "'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58. And while Professor Simon did submit a declaration, her declaration does not "sufficiently demonstrate[] an intent to take the action that she asserts is prohibited." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024). Instead, Professor Simon largely asserts that she wishes to lead "conversations, readings, or other exercises about the concepts of racial and gender superiority, unconscious bias, privilege, and oppression." Doc. 12-4 at ¶ 12. But the Act is clear that Professor Simon can teach "about" whatever subject she likes. *See* Ala. Code § 41-1-93(3). Any self-censorship by Professor Simon is not "reasonable." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

The student plaintiffs also lack standing. One plaintiff, Isabella Campos, is no longer a student at UAB and should thus be dismissed as a plaintiff because her claims are moot. And the other students' theory of harm based on loss of university funding is too speculative to establish standing, either to survive a motion to dismiss or to warrant preliminary injunctive relief. The student plaintiffs have not alleged that they have asked UAB for funding for their student organizations and been denied such funding. And to the extent that they fear that they may be

denied funding if they were to ask for it, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [is] require[d]." *Lujan*, 504 U.S. at 544.

### B.      Governor Ivey is Not a Proper Party in Her Official Capacity as Governor.

Governor Ivey also contends that she must be dismissed as a defendant because Plaintiffs lack standing to sue her in her official capacity as Governor of Alabama and she is entitled to sovereign immunity.

First, Plaintiffs have not alleged facts or demonstrated with evidence that their purported injuries are "fairly traceable to" any challenged action of Governor Ivey in her official capacity as Governor. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Nor have they shown that a decision in their favor would "significantly increase the likelihood that [they] would obtain relief that directly redresses the injury" and that it is "the effect of the court's judgment *on the defendant*—not an absent third party—that" does so. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up and emphasis altered). Simply put, Governor Ivey in her capacity as Governor does not enforce the Act; the Act makes no mention of her office. And though she serves as ex officio president of the UA Board of Trustees—and is sued separately in that capacity—that is a separate office with separate and distinct duties.

The general rule is that "where a public officer is declared by law by virtue of the office to be also, ex officio, the incumbent of another public office, the two offices are distinct and separate." 67 C.J.S. *Officers* § 17 (Dec. 2024 Update). That is why the Alabama Constitution speaks of "other office[s]" the Governor may hold as "provided in th[e] Constitution." Ala. Const., Art. V, § 130 (2022). Those "other office[s]" include the constitutional requirement that the

Governor serve as "ex officio president" of the Board of Trustees of the University of Alabama system. *See* Ala. Const. Art. XIV, § 264 (2022).

When the Governor acts as president ex officio, she "is governed by one law," and when she acts as Governor, she is "governed by a different and independent law." 67 C.J.S. *Officers* § 17, *supra.* As *Governor*, she does not appoint members to the Board of Trustees. *See* Ala. Const. Art. XIV, § 264; Ala. Code § 16-47-30. And as *Governor*, any indirect authority she has related to the Board is insufficient to establish that she has caused or could remedy any of Plaintiffs' purported injuries—regardless of her responsibilities under the "different and independent law" governing her office as president ex officio. *Cf. City of S. Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023) (rejecting argument that "the governor's ability to suspend officials for cause" could "establish[] traceability"). "[T]he two offices are as independent of each other as if occupied by different persons, in that the duties of the two offices … are separate and distinct and are governed … by different laws." *State ex rel. Hennepin Cnty. v. Brandt*, 31 N.W.2d 5, 7 (Minn. 1948). Plaintiffs lack standing to sue the Governor in her office *as Governor*.

For similar reasons, Plaintiffs' claims against Governor Ivey fail because the Governor is entitled to sovereign immunity. The most Plaintiffs say in their Complaint about the Governor in her capacity as Governor is that she "signed SB 129 into law." Doc. 1 ¶ 27. It is apparently for that reason that "Plaintiffs bring claims against Governor Ivey in her official capacity … as Governor." *Id.* But this allegation runs headlong into the Governor's sovereign immunity: "Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law." *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003). Likewise, where a state officer has no "responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate," making that officer entitled to sovereign immunity. *Summit Med. Assocs., P.C. v.*

97

*Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999); *see Women's Emergency Network*, 323 F.3d at 949-50 ("Where the enforcement of a statute is the responsibility of parties other than the governor …, the governor's general executive power is insufficient to confer jurisdiction.").

Thus, whether for lack of standing or the Governor's sovereign immunity, Governor Ivey is entitled to be dismissed in her official capacity as Governor of Alabama.

### C.   *Bishop v. Aronov* Forecloses the Professor Plaintiffs' First Amendment Claims.

In, *Bishop v. Aronov*, the Eleventh Circuit examined the First Amendment claims of a university professor who was ordered to stop injecting his religious viewpoints on physiology into his exercise physiology course and to stop hosting optional classes presenting a Christian perspective of physiology. 926 F. 2d 1066, 1068-70 (1991). The Court considered (1) the context of the speech ("the university classroom during specific in-class time and the visage of the classroom as part of a university course in an after class meeting"); (2) the "university's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons"; and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1074-75.

The Court ruled in favor of the university, holding that, in the context of the classroom during specific in-class time, "[t]he University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077. *See also id.* at 1076 ("In short, Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute."). The Eleventh Circuit reasoned that while there are "abundant cases which acclaim academic freedom…[t]he Court's pronouncements about academic freedom…cannot be extrapolated to deny schools command of their own courses." *Id.* at 1075. *See also id.* ("Though we are mindful of the invaluable role academic freedom plays in

98

our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right. And, in any event, we cannot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators.").

As is evident from the Eleventh Circuit's holding, the first two factors—the context of a public classroom taught by an employee of the university—outweigh any concerns regarding a professor's purported right to "academic freedom." That makes sense for at least two reasons. First, because the university was regulating the professor's viewpoint, seemingly the only way the university could evade strict scrutiny is if the government-speech rule applied. As the Supreme Court later held, discussion or teaching from a religious perspective is necessarily a "viewpoint" that is ordinarily protected by the First Amendment against restrictions. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831-33 (1995). The exception is when the viewpoint restriction concerns "the University's own speech, which is controlled by different principles." *Id.* at 834. As applied in *Bishop*, those "different principles" are that when public employees speak "pursuant to their official duties," their speech is not protected by the First Amendment. *Garcetti v. Ceballos* 547 U.S. 410, 421 (2006); *see id.* at 421-22 (speech "that owes its existence to a public employee's professional responsibilities" is government speech, and restrictions on such speech do "not infringe any liberties the employee might have enjoyed as a private citizen"). While the Supreme Court in *Garcetti* did not expressly hold that this rule applied to the university setting, *see id.* at 425, it didn't have to. No other rule explains the outcome of *Bishop* as simply as the government-speech rule does.

Second, the *Bishop* court was also right to find that "academic freedom" is not "an independent First Amendment right." 926 F.2d 1075. As the en banc Fourth Circuit later

explained, "the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom," nor "recognized that professors possess a First Amendment right of academic freedom to determine for themselves the content of their courses and scholarship." *Urofsky v. Gilmore*, 216 F.3d 401, 412, 414 (4th Cir. 2000) (en banc). Indeed, the concept of "academic freedom" for professors did not gain traction in the United States until the German model of higher education took hold in the late nineteenth century. *Id.* at 410-11. Before then, "academic freedom as we know it simply had no meaning." *Id.* at 410 (quoting J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 YALE L.J. 251, 253 (1989)). So "academic freedom" for professors was not part of the original public meaning of the First Amendment, either in 1791 when the Amendment was ratified or in 1868 when it was incorporated to apply to the States. Thus, while States are free to recognize some sort of academic freedom for professors on their own, the First Amendment does not elevate university professors for special treatment over every other public employee.

The Professor Plaintiffs' First Amendment claims arise in the same context as *Bishop*: the classroom. The only First Amendment injuries they have alleged are (i) that SB-129 imposes viewpoint-based curricular restrictions that may require them to alter their course instruction and assignments, (ii) that UA required Dr. Simon to cancel a coercive assignment, and (iii) that UA investigated student complaints against Dr. Patton. Their claims assume that "[a]ll instructors on college campuses have the First Amendment right to speak free from viewpoint-based restrictions" during instructional time. (Doc. 1 at ¶ 228). *Bishop* rejected this assumption and held that universities have the right to control the content of their courses, and that, during instructional time, professors do not have a First Amendment right to inject personal or professional opinions that are outside the university's chosen curriculum. *Bishop*, 926 F.2d at 1075-77. Accordingly, the

Professor Plaintiffs' First Amendment claims are due to be dismissed, and their motion for a preliminary injunction should be denied.

> **i.    Plaintiff Luna's First Amendment Claim Based on His Right to Receive Information Is Also Foreclosed by *Bishop*.**

Plaintiff Luna alleges that SB 129 infringes on his First Amendment right to hear his professors' opinions "uninhibited by state-imposed and sanctioned viewpoint-based restrictions" during class time. (Doc. 1 ¶ 244). Because Luna's professors do not have a First Amendment right to inject their personal or professional opinions and viewpoints during class time that are contrary to the University's chosen curriculum, Luna does not have a First Amendment right to hear those opinions and viewpoints during class time. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them.").

> **D.    The Student Plaintiffs' First Amendment Claims Relating to Student Organization Funding Fail.**

In *Rosenberger v. Rector & Visitors of the Univ. of Va.*, the University of Virginia's Student Council denied a student publication's funding request for the sole reason that the paper promoted a religious viewpoint. 515 U.S. 819, 822-23 (1995). The student group was a "Contracted Independent Organization" ("CIO"), a status that was available to all student groups who met certain requirements, and the Student Council denied funds from the "Student Activities Fund," a pool of funds established "to support a broad range of extracurricular student activities that 'are related to the educational purpose of the University.'" *Id.* at 824.

The Supreme Court held that the denial of funding violated the plaintiffs' First Amendment rights because the Student Activities Fund was created "to encourage a diversity of views from private speakers," *id.* at 834, and that, "[h]aving offered to pay the third-party contractors on behalf

of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints," *id.* at 835. The Court made clear, however, that "the University's own speech…is controlled by different principles," *id.* at 834, and that there is a distinction between "expend[ing] funds to encourage a diversity of views from private speakers" and "subsidiz[ing] transmittal of a message it favors." *Id.* at 834. *See also id.* at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."). The "distinction between the University's own favored message and the private speech of students" was "evident" in *Rosenberger* because "[t]he University had taken steps to ensure the distinction in the agreement each CIO must sign," *id.* at 834-835, which included a statement that the benefits and opportunities afforded to CIOs "should not be misinterpreted as meaning that…the University approves of the organizations' goals or activities," *id.* at 824.

Here, the Student Plaintiffs claim that their First Amendment rights were violated because SJAC—and, by extension, Esperanza—no longer receive funding directly from a university division or department and instead must apply for funding allocations from USGA. (Doc. 1 ¶¶ 119, 122). SJAC formerly received funding from the Divison of Student Affairs because its "purpose align[ed] with that of the department or division." (Doc. 56-4 at p. 2 of 12). In other words, Student Affairs exercised its discretion to provide funding to SJAC because its goals and activities aligned with the division's purpose. Student Affairs necessarily has the same discretion to discontinue such funding. *See Rosenberger*, 515 U.S. at 834 ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.").

The Student Plaintiffs complain that SJAC was "demoted" to an RSO, and that SJAC and Esperanza must now apply for funds through the USGA budget application process, which is how

most student organizations on campus receive funding from the University. These funds are analogous to the Student Activities Fund in *Rosenberger*, because they are allocated for the benefit of all RSOs that properly submit a budget application. The Student Plaintiffs have not alleged that either organization has taken the steps required to become eligible to receive RSO funding, that they have applied for RSO funding, or that their applications for RSO funding have been denied based on their promotion of certain viewpoints. Because the student groups at issue are treated just as *Rosenberger* demands—on equal footing with other student organizations, no matter their viewpoint—the Student Plaintiffs' First Amendment claims fail, and their motion for preliminary injunction should be denied.

### E.    Alabama NAACP's Freedom of Association Claim Fails.

In, *Widmar v. Vincent*, a state university which "makes its facilities generally available for the activities of registered student groups" informed a registered religious group that "it could no longer meet in University buildings." *Widmar v. Vincent*, 454 U.S. 263, 264-65 (1981). The Supreme Court held that "[t]hrough its policy of accommodating their meetings, the University has created a forum generally open for use by student groups," and that "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id.* at 267-68.

Alabama NAACP's claims are fundamentally different than the claims in *Widmar*. The Complaint alleges that UA's Black Student Union ("BSU") "lost their university-sponsored office…in the middle of the Student Center at UA," (Doc. 1 ¶ 217) and that UA's "SafeZone, which was granted space in the UA student center…was converted into the Student Leadership Lounge," (Doc. 1 ¶ 131). In other words, BSU and Safe Zone no longer have their own dedicated office spaces. The Complaint does not allege that Alabama NAACP or any other group has been

denied access to spaces that are available to other student groups on campus, that they have been prevented from reserving rooms or registering events on campus, or that they have been denied access to any forum that is generally open for use by student groups. Alabama NAACP's freedom of association claim is therefore due to be dismissed, and its motion for preliminary injunction should be denied.

### F.    Plaintiffs' Vagueness Claim is Due to Be Dismissed Because SB 129 is Readily Understood.

Plaintiffs' vagueness challenge also fails. "In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)). Provisions regulating such conduct are "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (quoting *Bongiovanni*, 961 F.2d at 1136).

This is not a stringent standard. The Supreme Court in *Arnett v. Kennedy* rejected a public employee's argument that an employment provision "authorizing removal or suspension without pay 'for such cause as will promote the efficiency of the service'" was "vague and overbroad." 416 U.S. 134, 156 (1974). The former Fifth Circuit in *Garrett v. Matthews* rejected a claim by a UA professor who argued that "the term 'adequate cause' [was] too vague to meet due process standards" for revoking tenure. 625 F.2d 658, 660 (5th Cir. 1980). And the *Bongiovanni* court—relied on by the Eleventh Circuit in *O'Laughlin*—rejected a vagueness challenge to a provision requiring professors "to maintain 'standards of sound scholarship and competent teaching.'" 961 F.2d at 1137.

104

Under these standards, Alabama's law is not vague. It clearly defines its terms and states in everyday English the acts that are prohibited. *See* Ala. Code § 41-1-90. "To the extent that any vagueness concerns still linger, they are mitigated by two additional characteristics": " (1) scienter requirements that must be satisfied …, and (2) a safe harbor option." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 27 (D.C. Cir. 2009); Ala. Code § 41-1-92(3) ("knowingly" scienter requirement); *id.* § 41-1-93 (safe harbor provisions); *see Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."). The Act also requires that "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall remain subject to relevant policies established by the institution," further alleviating vagueness concerns. Ala. Code § 41-1-92(1); *see U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973). And if any ambiguity remains after all that, the Act itself instructs how to resolve it: by construing its provisions in a way that does not "inhibit or violate the First Amendment rights of any student or employee." Ala. Code § 41-1-93(9); *see Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493 (1983) ("Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality."). While there are always "limitations in the English language with respect to being both specific and manageably brief," and the Act's "prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Letter Carriers*, 413 U.S. at 578-79.

Indeed, even where a heightened vagueness standard applies, "[t]he strong presumptive validity that attaches to" legislation means "that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within

their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). "Close cases can be imagined under virtually any statute," but "the mere fact that close cases can be envisioned" does not "render[] a statute vague," even where First Amendment speech rights are involved. *United States v. Williams*, 553 U.S. 285, 305-06 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. Accordingly, "[t]o succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'" *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)). If there is conduct that is clearly proscribed by the statute, the statute is not vague.

That is the case here. To take just a couple of examples, a professor who requires his students to assent to the concept that "White people are inherently superior to Black people" has clearly violated the Act. *See* Ala. Code §§ 41-9-91(3), 41-9-90(2)(a). So has a professor who compels her students to personally affirm that all Germans are inherently responsible for actions committed in the past by the Nazis. *See id.* §§ 41-9-91(3), 41-9-90(2)(e). Other clear examples abound. That being so, Plaintiffs cannot complain about any "close cases" they can conjure.

Nor do Plaintiffs' arguments about individual terms in the Act get them closer. Plaintiffs complain, for instance, about the word "objective," claiming that "no reasonable person can determine" what "objective" means in the context of the Act. Doc. 1 ¶ 9. But "objective" is not a difficult concept for reasonable people, much less college professors, to understand. It's the difference between the news page and the editorial page of the paper. The safe harbor provision that contains the term makes that clear: "Nothing in this act … [p]rohibits … the teaching or

discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept." Ala. Code § 41-1-93(3)(b).

More fundamentally, Plaintiffs' objections primarily concern terms like "objective" and "without endorsement" in the Act's safe-harbor provisions. *See* Doc. 1 ¶¶ 9, 146. But a safe harbor simply "afford[s] protection from liability or penalty." *Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024). Its purpose is not to define the world of prohibited conduct (though it can certainly clarify that world, which is why courts recognize that such provisions resolve ambiguity). And here, it is Section 2 of the Act that lists what conduct is prohibited. Under that section, a state university may not:

- "Sponsor" a DEI program;

- "Direct or compel a student … to personally affirm, adopt, or adhere to a divisive concept";

- "Require" students "to attend or participate" in "course work that advocates for or requires assent to a divisive concept";

- "Require a student …to share his or her personal point of view on any divisive concept outside of an academic setting";

- "Require" students "to participate, as part of any required curriculum … in an activity that involves lobbying … related to divisive concept";

- "Penalize or discriminate against a student … on the basis of his or her refusal to support, believe, endorse embrace, confess, or otherwise assent to a divisive concept or diversity statement";

- "Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color";

- "Authorize or expend funding … for the purpose of compelling assent to any divisive concept."

Act§ 2(1)-(8). Each of these provisions gives a reasonable person notice of what conduct is prohibited by the Act. Plaintiffs cannot show that *each and every* one of these prohibitions is so unintelligible that the Act is unconstitutionally vague in its entirety.

Last, Plaintiffs say the Act's definition of a "diversity, equity, and inclusion" program makes the Act vague and unenforceable. Doc. 1 ¶ 212. But the definition is clear: A DEI program is "[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this act." Ala. Code § 41-1-90(3). The "term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order." *Id.* As with the rest of the Act, the terms in the definition are readily understood, and the only possibly unclear term—"based on"—is one that is regularly used to denote something akin to proximate cause. *E.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-58 (1993) (explaining that "based upon" "calls for something more than a mere connection with, or relation to"); *Glob. Marine Expl., Inc. v. Republic of France*, 33 F.4th 1312, 1324 (11th Cir. 2022).

For these reasons, Plaintiffs' vagueness challenge should be dismissed for failure to state a claim upon which relief can be granted, and their motion for a preliminary injunction should be denied.

Dated: May 21, 2025

Respectfully Submitted,

*/s/ Jay M. Ezelle*
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
      jezelle@starneslaw.com
      cgresham@starneslaw.com
      scochran@starneslaw.com

*Counsel for the Board Defendants*

*/s/ Alison Mollman*
Alison Mollman
ASB-8397-A33C
ACLU of Alabama
PO Box 6179,
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

*/s/ Antonio L. Ingram II*
Antonio L. Ingram II*
Mide Odunsi*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

*/s/ Daniel A. Cantor*
Daniel A. Cantor*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW Washington, DC
20001-3743
(202) 942-5000

*Admitted *pro hac vice*

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

George Muirhead (ASB-7345-K00L)
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
George.Muirhead@AlabamaAG.gov

*Counsel for Defendant Kay Ivey in her
official capacity as Governor of Alabama*

*/s/ Carmen Lo*
Carmen Lo*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500 Palo Alto,
CA 94306-3807
(650) 319-4500

*/s/ Michael Rogoff*
Michael A. Rogoff*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684