Status **Active**  PolicyStat ID **16777367**

THE UNIVERSITY OF
**ALABAMA**®

| | |
|---|---|
| Origination | 10/13/2020 |
| Last Approved | 9/30/2024 |
| Effective | 9/30/2024 |
| Last Revised | 9/30/2024 |

Owner  James Dalton: Executive VP and Provost

Area  AA > Academic Affairs

Applicability  The University of Alabama - All

# Faculty Handbook

# Welcome

The purpose of the *Faculty Handbook* is to describe the administrative policies and procedures of the University of Alabama ("University") that affect faculty-rank employees in academic units. Reasonable efforts have been made to cover all important matters and to ensure that the contents are accurate; in the event that areas of policy have been omitted or are not stated clearly, or if ambiguities or inconsistencies are found to exist, decisions will be made by appropriate officials of the University.

The provisions of and policies referenced in the Employee Handbook (except for provisions and policies applicable only to non-exempt employees) apply to faculty members. Faculty members are responsible for reviewing and adhering to the Employee Handbook, the *Faculty Handbook,* and all applicable rules of The Board of Trustees of The University of Alabama. If, in applicable situations involving faculty-rank employees, a conflict exists between the language of the *Faculty Handbook* and the language of the Employee Handbook, the language of the *Faculty Handbook* will control and supersede the language of the Employee Handbook provided that interpretation is consistent with the University's custom and practice with applicable faculty status.

Faculty with rights and responsibilities under this *Faculty Handbook* are understood to be all persons who have full-time tenured, tenure-track, or renewable contract appointments. Part-time, temporary, emeritus, and adjunct faculty are understood to have responsibilities dictated by this *Faculty Handbook* (e.g. compliance with policies and upholding instructional standards), but do not have full rights as defined herein. Some faculty rights are exclusive to those holding a tenured or tenure-track position; these rights are noted in the appropriate sections.

The University reserves the right to amend or alter the conditions and terms contained in this *Faculty Handbook* as it deems necessary. The University will attempt to give notice of changes of information, policy, and procedure to faculty members and administrative personnel; inquiries as to whether the information contained herein is the current policy and procedure of the University should be made at the Office for Academic Affairs. Board of Trustees Rule 108 requires this statement appear in this *Faculty Handbook*:

*"Although the policies contained herein are intended to reflect current rules and policies of the University, users are cautioned that changes or additions may have become effective since the publication of this material. In the event of a conflict, current statements of Board policy contained in the Bylaws, Rules, official minutes, and other pronouncements of the Board or Chancellor, or superseding law, shall prevail."*

This *Faculty Handbook* will be reviewed annually. The revision process will include consultation with the Council of Deans and with the Faculty Senate. Suggestions for changes should be addressed to the Provost. Changes appropriately reviewed and approved by the Provost will become effective the following year on August 16. All changes will be made in compliance with Board of Trustees Rule 108.

**This current version of the *Faculty Handbook* was revised following the above process and became effective August 16, 2023, superseding all previous versions of the *Handbook*.**

James T. Dalton, Executive Vice President and Provost

# CHAPTER 1: MISSION OF THE UNIVERSITY

The University of Alabama will advance the intellectual and social condition of the people of the state, the nation and the world through the creation, translation and dissemination of knowledge with an emphasis on quality programs in the areas of teaching, research and service.

For information about the University's mission, vision, core values, and strategic goals see Mission and Objectives.

# I. Activities to Support the Mission

The University of Alabama's activities emerge from a broad range of research and creative activities, many of which are recognized for their contributions to the economic, technological, and cultural growth of the State of Alabama. Research and creative activity yields continuing stimulation for the instructional programs offered by the University's colleges and schools, which are supported by the University Libraries, a member of the Association of Research Libraries. At the undergraduate level, the University offers a broad range of baccalaureate programs in the arts and humanities, science and technology, pre-professional, and professional fields. A University-wide core curriculum provides a general education component as the keystone of every undergraduate program. Graduate programs, built on these undergraduate foundations, concentrate on the development of original scholarship, research, and creative activity. Professional programs, including the State's only public law school, prepare students with high levels of competence and for leadership roles. As one of the major residential campuses in the State, the University enhances the academic and personal growth of its students through its on-campus environment. Recognizing that education is a lifelong endeavor, the University offers an array of educational opportunities for non-traditional students.

The University's research, creative activities, and instructional programs form a foundation for extensive service activities, establishing a number of partnerships with business, non-profit organizations, and government through applications of new knowledge. These relationships often extend beyond the bounds of the State as the University assists developmental efforts at regional, national, and international levels.

# II. History of the University

The University opened its doors on April 18, 1831. See History of UA for the University's history.

# III. Administrative Organization

## A. Board of Trustees

The State constitution vests management and control of the University in The Board of Trustees of The University of Alabama. In 1969, the Board promulgated bylaws establishing The University of Alabama System with a Chancellor as chief executive officer. The System includes The University of Alabama, the University of Alabama at Birmingham, and the University of Alabama in Huntsville. Each University within the System is administered by a President who reports to The Board of Trustees through the Chancellor.

Current information about The Board of Trustees (including its members, officers, meetings, and committees) and Board meetings and minutes is available from The University of Alabama System.

# B. Office of the Chancellor

The bylaws of The Board of Trustees state that the Chancellor shall exercise such executive powers as are necessary for the governance of the University System and shall be the principal link between the Board's responsibility for policy and each President's responsibility for the individual campus. The authority and duties of the Chancellor are set forth in The Board of Trustees Bylaws.

# C. Office of the President

The President is the University's chief executive officer. The President, who reports to The Board of Trustees through the Chancellor, is the main representative of the University to the public and works closely with the Chancellor in dealing with state and federal agencies. It is the President's responsibility to provide educational and administrative leadership to the institution. The President's duties encompass all aspects of educational programs, external relations, personnel management, and financial management.

In carrying out the duties of the office, the President is assisted by the Chief Administrative Officer, who serves as a point of contact for key constituents, and works with the President and senior officers with institutional planning, policy development, and problem resolution, among other areas. The President is also assisted by the Provost and by vice presidents of the other major functional areas described below, by deans of the academic colleges, and by other administrative staff. More information about the President is available from the Office of the President.

# D. Provost and the Office for Academic Affairs (OAA)

The Provost, who also serves as the vice president for Academic Affairs, is the senior vice president and the chief academic officer for the University. The Provost plans, coordinates, directs, and facilitates the University's efforts in fulfilling its comprehensive mission in teaching, research, and service. Information about the Provost, the Office for Academic Affairs staff and affiliated units, and resources and reports from this office are available from the OAA.

# E. Research and Economic Development

The Office of the Vice President for Research and Economic Development offers a number of programs designed to build the research community on the campus of The University of Alabama. These activities include networking sessions to foster collaboration, funding research resources, internal funding opportunities, and professional development to enhance the ability of faculty, staff, and students to secure funding for research and other scholarly activities. Information about the office, research support, economic development, undergraduate research, and research development is available from Research and Economic Development.

# F. Division of Community Affairs

The Office of the Vice President of Community Affairs and this division's subsidiary units help the

University fulfill its mission to advance the intellectual and social condition of the people of Alabama through establishing quality programs that connect the University's mission of teaching, research, and service in ways that improve the quality of life for individuals and communities. More information about this division and its initiatives is available from the Division of Community Affairs.

## G. Division of Student Life

The Office of the Vice President for Student Life supervises departments that offer programs and services to support students and maximize their learning experiences. More information about this division and its departments and resources is available from the Division of Student Life.

## H. Division of Advancement

The vice president for Advancement oversees development activities, advancement services, planned giving, and the Alumni Association. More information about this division and its initiatives is available from the Division of Advancement.

## I. Division of Finance and Operations

The vice president for Finance and Operations has full responsibility for investment management, budgeting, financial accounting and reporting, human resources, auxiliary services, land management, business services, facilities and maintenance, construction, public safety, and risk management. More information about departments in this division is available from the Division of Finance and Operations.

## J. Division of Strategic Communications

The vice president of Strategic Communications oversees internal and external communications for the University and manages and promotes The University of Alabama brand worldwide. More information is available from the Division of Strategic Communications.

## K. Division of Opportunities, Connections, and Success

The Division of Opportunities, Connections and Success serves a leadership role in collaboration with other University efforts to support all students seeking educational access and academic achievement. Acknowledging that different groups may have different barriers to success in higher education and employment, this division supports opportunities for students and employees across campus, regardless of backgrounds. More information about these departments and initiatives is available from the Division of Opportunities, Connections, and Success.

## L. Academic Divisions of the University

The term "academic division" refers to any of the colleges and schools headed by a dean. The academic divisions have diverse roles, scopes, and organizations.

The chief administrative officer of an academic division is a dean. The dean, with assistance from

appropriate staff, receives and makes recommendations on curriculum, staffing, promotion, tenure, development, space, equipment, and all financial aspects of a division's operation.

If the term "college" is used independently in this *Faculty Handbook,* it refers to any academic division (a school or college) headed by a dean. If the term "school" is used, it refers to those schools headed by a dean, unless otherwise noted.

For more information, please see each of the academic divisions below.

Capstone College of Nursing
College of Arts and Sciences
College of Communication and Information Sciences
College of Community Health Sciences
College of Education
College of Engineering
College of Human Environmental Sciences
Culverhouse College of Business
Graduate School
Honors College
The University of Alabama School of Law
School of Social Work
University Libraries

## M. Departments and Areas

In those schools and colleges divided into academic and administrative units, the department or area is both an academic unit and an administrative unit. The chief administrative officer of the department is the departmental chairperson or head. In areas, the chief administrative officer is the area head. The chief administrative officer of a school within a college is the director.

## N. Faculty Members

An individual who holds an academic appointment, either full-time or part-time, and performs a combination of teaching, research, clinical, and/or service functions normally will have one of the faculty ranks described in Chapter 2. However, there are distinguished faculty titles, which can be awarded by The Board of Trustees. These distinguished faculty titles include professor emeritus, distinguished professor, endowed chair, and endowed professor.

# IV. Faculty Participation

Faculty governance is vital to the life of The University of Alabama.

The advice of faculty members concerning administrative leadership and academic programs is sought actively and systematically. Faculty and administrators are partners in the enterprise of education at The University of Alabama. Processes guiding all important decisions that shape the University's educational potential and that allocate its resources are the joint responsibility of faculty and administrators. (See generally Appendix A, "Policies and Guidelines for Faculty Participation in the Selection of Deans and Departmental Chairpersons and in the Review of their Leadership" and Appendix I, "Principles and Procedures

for Discontinuance or Merger of Academic Units".)

Faculty voting privileges concerning issues within academic units are determined by each individual school or college, except where specified within the *Faculty Handbook*. For example, membership on faculty committees that make recommendations on tenure is limited to persons holding tenured positions.

# A. Committees and Task Forces

The University maintains a number of University Standing Committees and appoints University Task Forces that deal with special matters not in the purview of a Standing Committee to assist the administration in reaching decisions and to ensure representation of appropriate segments of the University community. These Committees and Task Forces make recommendations on issues of concern to the University community, as well as work closely with the President and the Provost both to oversee the University's planning process and to help establish University budgetary priorities and allocations. The importance of their work is recognized by giving them access to all information relevant to their missions and by giving them timely written responses to their recommendations. These Committees and Task Forces make annual written reports, which are filed in the Provost's office and are available upon request.

The chairs and the faculty and staff membership of Standing Committees and, where appropriate, Task Forces are selected by the President from the nominees and alternates presented by the Committee on University Committees (with the exceptions noted below). Faculty and staff are invited each spring to indicate to the Committee on University Committees their preferences about service on University Committees. A listing of Standing Committees is available from the University's Standing Committees. Appointments to Standing Committees are announced in the spring semester, and such committees are expected to begin their work promptly at the beginning of each fall.

The Faculty Senate appoints one person to membership on each appropriate University Standing Committee and, normally, on each Task Force appointed by the President or the Provost.

The faculty membership of the Committee on University Committees constitutes a voting majority of the Committee and is selected by the President from a group of faculty recommended by the Faculty Senate. The Committee on University Committees annually elects co-chairs, one each from its faculty and staff membership.

When the President chooses not to accept a nomination or recommendation, the President contacts the chair of the Committee on University Committees or the President of the Faculty Senate, as appropriate, in order to reach agreement. If agreement cannot be reached, the President requests another nomination or recommendation.

Membership on appropriate Standing Committees rotates in order to involve different members of the University community in University governance. Normally, one-third of a committee's membership rotates off the Committee each year, and normally at least one year will intervene before a person can be reappointed to a Committee. Members are selected to reflect the broader campus community, unless the charge to a Committee or Task Force makes it impractical to do so. A faculty or staff member does not ordinarily serve on more than two University Committees or Task Forces at one time. A term of service for a Committee member usually will not exceed three consecutive years.

Academic divisional, departmental, or area Committees assist the institution by making

recommendations on aspects of divisional and departmental activities.

# B. Curriculum Matters

Normally, recommendations about curricular matters are initiated at the program level and are reviewed at appropriate administrative levels. Implementation of recommendations depends on the availability of resources.

1. **Graduate Curricula**
   The Graduate Council and the Dean of the Graduate School evaluate proposals for new graduate degree programs and recommend whether to seek approval for such programs. Contact information for current Graduate Council members and committees is available from the Graduate School.

2. **Undergraduate Core Curriculum**
   The undergraduate core curriculum is overseen by the Core Curriculum Oversight Committee (CCOC) in accordance with the Guidelines for the Core Curriculum Oversight Committee. Courses approved for the core curriculum are available from the Office of the University Registrar. More information about the committee structure as well as approval of core curriculum courses is available from the Office for Academic Affairs.

3. **Honors Courses**
   The Honors College is responsible for the review and approval of all Honors-designated courses. The procedures for obtaining Honors designation for a course are available from the Honors College.

# C. Faculty Senate

The Faculty Senate consists of faculty members elected from the various divisions. The Senate aids the University in making decisions on issues of policy, development, and operations by:

- Offering advice and suggestions on matters of general faculty concern; and
- Providing a channel for communication between the faculty and University officials.

The Faculty Senate's deliberations and recommendations should reflect the opinion of the faculty at large. Service in the Senate is a high honor, carrying with it responsibility to report to one's division about the Senate's activities, to solicit the opinion and advice of divisional colleagues on issues before the Senate, and to represent divisional colleagues in Senate debate and votes. All regular meetings of the Faculty Senate and of its committees are open to all who wish to attend.

The Faculty Senate appoints one person to membership on each appropriate University Standing Committee, and, normally, on each Task Force appointed by the President or the Provost.

The President of the Faculty Senate can request to meet with the Council of Deans (decided by the Provost) or to meet with the vice presidents (decided by the President) on specific occasions to discuss issues that are of mutual importance to the Faculty Senate and these groups and with the intent to streamline processes of input on these issues to the Provost/President.

Those matters the Faculty Senate or University Administration deem to be especially important, and are not specific to individual academic divisions, are referred to the faculty for a faculty-wide referendum.

The wording of such referenda will be determined by the Faculty Senate and Provost after consultation with other University officials or committees, as appropriate. Voting will be administered by the Office for Academic Affairs and generally will commence within six weeks following a decision by the Faculty Senate that a referendum is required. The Office for Academic Affairs will print, distribute, receive, and count ballots. Faculty will have a minimum of two weeks to submit ballots after they have been distributed. The Office for Academic Affairs should provide a written statement of voting results within two weeks after the deadline for submission of ballots. The voting process normally should be completed within 10 weeks following a decision by the Faculty Senate that a referendum is required.

Except as governed by other sections of the *Faculty Handbook*, for purposes of voting on referenda, "faculty" is defined to include all tenured, tenure-track, and renewable contract full- time faculty with the rank of instructor, assistant professor, associate professor, professor, or equivalent and whose administrative appointments do not exceed fifty percent of their total appointments. Visiting, adjunct, and emeriti faculty are not included in this definition. The Faculty Senate may elect, by a majority vote of the Senate, to modify the list of faculty eligible to vote on a particular referendum.

Except as governed by other sections of the *Faculty Handbook*, a question on a referendum will pass if it is approved (1) by a majority of the faculty who vote in the referendum and (2) by a majority of colleges and equivalent academic divisions (determined by a majority of their voting faculty) that participate in the referendum. The Faculty Senate may modify these rules as necessary in cases of referenda asking the faculty to choose between more than two options.

Faculty are entitled to vote only in the academic division in which they hold their primary appointment.

Matters specific to individual colleges or equivalent academic units and not affecting a broad cross-section of faculty outside of those academic units are not governed by these policies.

The constitution, bylaws, and other details of the Faculty Senate are available from the Faculty Senate.

# D. Research and Allied Organizations

The University of Alabama operates numerous centers, institutes, programs, services, bureaus, laboratories, consortia, offices, and clinics to provide a variety of services to students, University personnel, and others. Board of Trustees Rule 503 requires periodic reviews for formally approved centers and institutes. More information on the University's policy outlining the process for annual review of research and service centers/institutes and a list of Board-approved centers and institutes are available from the University of Alabama System.

# E. University Accreditations

Information on regional and specialized accreditation is available from the Office of Institutional Effectiveness.

# CHAPTER 2: FACULTY PERSONNEL POLICIES

## I. Introduction

The accomplishments and reputation of The University of Alabama depend on the quality of its faculty and the record of teaching, creative scholarship, and service/academic citizenship that the faculty generates. The success of the faculty in its scholarly activities ultimately determines the caliber of the University's academic programs.

Given the faculty's central importance to the University's educational mission and given the University's steadfast commitment to academic excellence, it is incumbent upon the University leadership to promote and support an academic climate in which the faculty can be successful. It is incumbent upon faculty members to be active, consistent, and energetic contributors to the University's academic programs. In particular:

### A. Teaching

All faculty members with teaching responsibilities are expected to be effective teachers, to demonstrate a level of teaching performance commensurate with their rank and experience, and to make substantive contributions to the overall instructional effectiveness of the academic programs in which they have assigned duties.

### B. Research

All tenured and probationary faculty members and renewable contract faculty members with research responsibilities are expected to engage in an ongoing program of research, publication, creative activity, and scholarly effort that is appropriate to their appointment, discipline, and fields of specialization.

### C. Service

All faculty members are expected to engage in responsible service/academic citizenship activities appropriate to their appointment, rank, length of service, and discipline. External service/academic citizenship activities are those that extend the influence and expertise of the faculty to areas and populations external to the University. These activities may include, but are not limited to, education beyond the classroom, research partnerships and collaboration, professional leadership, community engagement, clinical service and training, and public/community leadership and consultation. The intent is to extend the knowledge and skills of the University faculty to the public in a manner that is mutually beneficial and that contributes to the University's tripartite mission, which includes service. Furthermore, internal service/academic citizenship are defined to include service to students and to the institution through effective governance. There is no presumption that service/academic citizenship are alternatives to teaching and research. Flexibility in meeting the service/academic citizenship requirements of each department and division is critical, and consequently, individual responsibilities may vary from time to time.

All faculty are expected to behave collegially. Lack of collegiality is defined as the inability and/or

unwillingness to work cooperatively and civilly with colleagues and University administration. This includes, but is not limited to, engaging in extremely disrespectful and grossly offensive remarks aimed at colleagues and administrators. This standard is consistent with the AAUP Statement on Professional Ethics and should not violate the principles of academic freedom, as defined in this document.

From time to time, faculty members are assigned administrative duties beyond those required by responsible academic citizenship. In these cases, the extent of the faculty member's administrative efforts should be appropriately documented as part of their FTE. It is important to note that the expectations for retention, tenure, and promotion are not diminished by additional effort devoted to such administrative duties. An individual cannot earn tenure or promotion primarily by performing in an administrative capacity as a faculty member (even though such performance is always considered in the award of salary increases). It is the policy of The University of Alabama to require evidence of academic merit as demonstrated by the individual's academic credentials, record of scholarly achievements, service, and instructional skills, before awarding tenure or promotion in academic rank.

In recognition of the extreme importance to the University of the academic credentials, academic achievements, and potential academic contributions of its faculty members, the University has established a set of criteria and standards to be observed in appointing new faculty, in promoting faculty members to higher academic rank, and in awarding tenure. These criteria and standards apply throughout the University except insofar as a department or academic division formally establishes higher or more detailed requirements and these receive appropriate administrative approval. All departments and academic divisions are encouraged to amplify the University criteria and standards for appointment, promotion, and tenure with more explicit and specific criteria that apply to their discipline or profession. These amplifications must in no way diminish or conflict with the University criteria and standards. Divisional supplements must be approved by the Provost, department supplements must be approved by the academic dean and by the Provost. Copies of the current criteria, standards, and procedures for each unit and the University should be kept current and made available to faculty members at the time of initial appointment (start date for employment as a faculty member). Continuing faculty members should be notified of any changes.

In cases of tenure and promotion from assistant professor to associate professor, the departmental/college requirements at the time of the individual's initial appointment shall govern unless the faculty member chooses to be reviewed according to the updated requirements. In cases of promotion from associate professor to professor, requirements in effect at the time the individual applies for promotion shall govern. If and when requirements for promotion from associate professor to professor are changed, the new requirements will come into effect three years after the date of approval.

Some colleges or schools are divided into departments, while others have subdivisions called areas or programs. In what follows, the appropriate substitutions should be made for the words "chairperson" and "department," when applicable.

# II. Criteria and Standards for Appointments

Appointments to the faculty of The University of Alabama are based on the personnel requirements of the University's academic programs and on the goal of achieving and maintaining excellence in its teaching, research, and service/academic citizenship activities. Recruiting for faculty positions is conducted according to the University's Affirmative Action Plan and other approved administrative procedures established in the various administrative and academic units. It is a policy of the University to involve faculty, students, and

others as may be appropriate in the review of candidates for positions of academic and administrative leadership (see Appendix A).

Faculty appointments fall in three broad categories: tenured/tenure-track, renewable contract and temporary. In the tenured/tenure-track category, those who have not been awarded tenure are considered probationary. Probationary faculty are employed with the understanding that performance that meets expectations (as defined by departmental, college, and university criteria) during a probationary period may result in the award of tenure. Employment as a renewable contract or temporary faculty member conveys no right or expectation of continued employment beyond the period specified in the letter of appointment.

The University of Alabama has the following ranks for faculty members: instructor, senior instructor, principal senior instructor, professor of practice,  assistant professor, associate professor, and professor. Eligibility for promotion is limited to full-time and part-time regular faculty members at the rank of instructor, senior instructor, assistant professor, or associate professor. Titles for temporary appointments may be prefixed by the words Adjunct or Visiting.

Candidates for appointment to the rank of associate professor or professor in an academic area of specialization are expected to possess an appropriate terminal degree. Candidates for appointment to the rank of assistant professor normally are expected to have completed requirements for an appropriate terminal degree (see additional information below on timelines for completion of the terminal degree if not completed at time of appointment).

# A. Instructor

A candidate for appointment to the rank of instructor must have an appropriate record of educational achievement, typically possessing a graduate degree or relevant experience or both and must have the potential to be an effective teacher. All instructors are expected to demonstrate a high level of performance in the classroom, to contribute to instructional effectiveness in assigned courses, and to engage in service/academic citizenship. Instructors may hold temporary or renewable contract appointments, but they cannot be classified as tenured/tenure track. Instructors cannot be promoted to any rank other than senior instructor and principal senior instructor. They cannot be appointed to any professor rank (a tenured/tenure-track or renewable contract position) without having been selected through an open search.

# B. Tenured/Tenure-Track Professor Ranks

1. **Tenured/Tenure-Track Assistant Professor**
   Appointment to the position of tenured/tenure-track assistant professor is based on educational achievement and/or related professional experience and potential for outstanding instructional effectiveness and scholarly contributions appropriate to the discipline and field of specialization. The candidate normally should have completed a doctoral program or other terminal academic program appropriate to the discipline. There should be substantial evidence to indicate that the individual has the capabilities and competencies required for successful performance of all anticipated professional responsibilities.

   An individual who has not completed requirements for a terminal degree may be offered an appointment as assistant professor. If the offer of appointment is made contingent upon completion of requirements for the degree, but the appointee fails to meet this contingency by

the effective date of employment, the individual will be assigned the rank of instructor, and a revised appointment letter should be issued that specifies a period of time during which the individual is expected to complete requirements for the degree. If no period of time is specified, the period in rank as an instructor cannot exceed one academic year. Failure to complete all degree requirements will serve as cause for non-retention. If a decision is made to retain the individual, a new appointment at the rank of assistant professor will be offered as soon as requirements specified in the appointment letter are met.

For tenure-track assistant professors, the mandatory tenure decision time for an individual who completes degree requirements after the effective date of employment may, by mutual agreement, be as late as the sixth academic year after the academic year during which requirements for the terminal degree are satisfied, even if this results in a probationary period of more than six years; the terms of any such agreement shall be specified in a new letter of appointment issued at the time degree requirements are met.

All tenure-track/tenured assistant professors are expected to maintain a good level of performance in the classroom and/or other appropriate instructional settings; to contribute to the overall instructional effectiveness of the academic programs in which they have assigned duties; to engage in an ongoing program of research, publication, creative activity, or scholarly efforts appropriate to their disciplines and fields of specialization; and to engage in service/academic citizenship appropriate to their areas and expertise.

2. **Tenured/Tenure-Track Associate Professor**
   Appointment to the position of tenured/tenure-track associate professor is based upon a candidate's instructional effectiveness and record of scholarly contributions appropriate to the candidate's discipline and field of specialization; however, candidates who have no prior record at the rank of assistant professor may be appointed at the rank of associate professor provided they possess a combination of educational achievement, typically possessing a terminal degree, and professional contributions that give them the capabilities and competencies required for successful performance at the associate professor rank and also the professional stature commensurate with that rank.

   All faculty members who hold the rank of associate professor are expected to approach a standard of outstanding performance in the classroom and/or other appropriate instructional settings; to make a strong contribution to the overall instructional quality of the academic programs in which they have assigned duties; to engage in an ongoing and substantive program of research, publication, creative activity, or scholarly efforts appropriate to their disciplines and fields of specialization; and to engage in service/academic citizenship appropriate to their areas and expertise.

3. **Tenured/Tenure-Track Professor**
   Appointment to the position of tenured/tenure-track professor is based upon a candidate's instructional effectiveness and record of scholarly contributions appropriate to their discipline and field of specialization; however, candidates who have no prior record at the rank of associate professor may be appointed at the rank of professor provided they possess a combination of educational achievement, typically possessing a terminal degree, and professional contributions that give them the capabilities and competencies required for successful performance at the rank of professor and also the professional stature commensurate with that rank.

   All faculty members who hold the rank of professor are expected to contribute to the leadership of academic programs; to maintain an outstanding level of effectiveness in the classroom and/or

other appropriate instructional settings; to make a strong contribution to overall instructional quality; to engage in an ongoing and substantive program of research, publication, creative activity, or scholarly efforts appropriate to their disciplines and fields of specialization; and to engage in service/academic citizenship appropriate to their areas and expertise.

# C. Renewable Contract Professor Ranks

Renewable contract professorial appointments are made in the areas listed below.

1. **Renewable Contract Assistant Professor**
   Appointment to the position of renewable contract assistant professor is based on educational achievement, related professional experience or clinical practice, and potential for outstanding instructional effectiveness and/or scholarly contributions appropriate to a candidate's disciplines and fields of specialization. Renewable contract assistant professor titles will include one of three descriptors that specify the primary nature of the appointment: Teaching, Research, or Clinical. The candidate normally should have completed a doctoral program or other terminal academic program appropriate to the discipline. There should be substantial evidence to indicate that the individual has the capabilities and competencies required for successful performance of all  professional responsibilities, as articulated in the letter of appointment.

   An individual who has not completed requirements for a terminal degree may be offered an appointment as assistant professor. If the offer of appointment is made contingent upon completion of requirements for the degree but the appointee fails to meet this contingency by the effective date of employment, the individual will be assigned the rank of instructor, and a revised appointment letter should be issued that specifies a period of time during which the individual is expected to complete requirements for the degree. If no period of time is specified, the period in rank as an instructor cannot exceed one academic year. Failure to complete all degree requirements will serve as cause for non-retention at the end of the academic year. If a decision is made to retain the individual, a new appointment at the rank of assistant professor will be offered as soon as requirements specified to hold the rank of assistant professor are met.

   Depending on their specific appointment (Teaching, Research, or Clinical Assistant Professor) renewable contract faculty are expected to 1) maintain a good level of performance in the classroom and/or other appropriate instructional settings and to contribute to the overall instructional effectiveness of the academic programs in which they have assigned duties; 2) engage in an ongoing program of research, publication, creative activity, or scholarly efforts; and/ or 3) conduct clinical practice appropriate to their disciplines and fields of specialization. In addition, all renewable contract assistant professors are expected to engage in service/academic citizenship appropriate to one's area and expertise. The relative weight of each area of activity should be specified in letters of appointment or other college-level documentation. Any changes in this relative weight, agreed upon by the dean, department chair, and faculty member, should be documented in an addendum to the offer letter.

2. **Renewable Contract Associate Professor**
   Appointment to the position of renewable contract associate professor is based upon a candidate's instructional effectiveness, record of scholarly contributions, and/or clinical practice appropriate to the discipline and field of specialization; however, candidates who have no prior record at the rank of assistant professor may be appointed at the rank of associate professor provided they possess a combination of educational achievement, typically possessing a terminal degree, and professional contributions that give them the capabilities and competencies

required for successful performance at the associate professor rank and also the professional stature commensurate with that rank, as articulated in the letter of appointment. Renewable contract associate professor titles will include one of three descriptors that specify the primary nature of the appointment: Teaching, Research, or Clinical.

Depending on their specific appointment (Teaching, Research, or Clinical Associate Professor), renewable contract faculty are expected to 1) approach a standard of outstanding performance in the classroom and/or other appropriate instructional settings and make a strong contribution to the overall instructional quality of the academic programs in which they have assigned duties; 2) to engage in an ongoing and substantive program of research, publication, creative activity, scholarly efforts; and/or 3) conduct clinical practice appropriate to their disciplines and fields of specialization. In addition, all renewable contract associate professors are expected to engage in service/academic citizenship appropriate to their areas and expertise. The relative weight of each area of activity should be specified in letters of appointment or other college-level documentation. Any changes in this relative weight, agreed upon by the dean, department chair, and faculty member, should be documented in an addendum to the offer letter.

3. **Renewable Contract Professor**
Appointment to the position of renewable contract professor is based upon a candidate's instructional effectiveness, record of scholarly contributions, and/or clinical practice appropriate to the discipline and field of specialization; however, candidates who have no prior record at the rank of associate professor may be appointed at the rank of professor provided they possess educational achievement, typically possessing a terminal degree, or professional contributions that give them the capabilities and competencies required for successful performance at the rank of professor and also the professional stature commensurate with that rank, as articulated in the letter of appointment. Renewable contract professor titles will include one of three descriptors that specify the primary nature of the appointment: Teaching, Research, or Clinical.

Depending on their specific appointment (Teaching, Research, or Clinical Professor), renewable contract faculty are expected to 1) contribute to the leadership of academic programs, maintain an outstanding level of effectiveness in the classroom and/or other appropriate instructional settings, and make a strong contribution to overall instructional quality; 2) engage in an ongoing and substantive program of research, publication, creative activity, scholarly efforts; and/or 3) conduct clinical practice appropriate to their disciplines and fields of specialization. In addition, all renewable contract associate professors are expected to engage in service/academic citizenship appropriate to their areas and expertise. The relative weight of each area of activity should be specified in letters of appointment or other college-level documentation.  Any changes in this relative weight, agreed upon by the dean, department chair, and faculty member, should be documented in an addendum to the offer letter.

4. **Professor of Practice**
A professor of practice appointment is typically reserved for persons who have accumulated significant experience and have established a record of distinction in their profession in the private or public sector, outside of academia. These will be people at the pinnacle of their careers who are moving into a new or continuing career path at the University.  Professors of practice should be able to provide effective, practice-oriented teaching, research, or clinical expertise in areas that supplement and enhance the efforts provided by other members of the faculty. Professors of practice will be evaluated on the specific duties stipulated in their letters of appointment. Professors of practice appointments are only offered at the full professor rank and do not have a promotion path.

Academic units with accreditation requirements that mandate deviations from the renewable-contract professor appointment, retention, and promotion policies contained in this *Faculty Handbook* should request that the Provost approve an alternate policy for that division. In those cases, the approved alternate appointment, retention, and promotion policies must be made public for all faculty members in the affected unit to review and consult.

# D. Endowed Chairs and Professorships

Endowed chairs and professorships enhance the quality of programs in higher education through both the recognition and contributions of the chair holders and professors. The positions are among the highest and most prestigious appointments in academia, and they honor significant scholarly or creative achievement and academic excellence. Distinguished scholars who hold these positions make significant contributions to the research and teaching missions of the University. Moreover, they increase the visibility of the University and aid in attracting additional high-quality faculty, superior students, and external resources for research, instruction, and service. In cases where the endowed chair or professor is being considered for appointment with tenure, normal procedures for awarding tenure are followed in addition to the process outlined herein.

Board of Trustees Rule 508 ("Establishment of Academic Chairs, Professorships, and Endowed Lectureships and the Designation of Holders of Academic Chairs and Professorships") sets forth guidelines the University must follow for 1) obtaining approval of a new academic chair, endowed professorship, or endowed lectureship; 2) designating a holder of an academic chair or endowed professorship; 3) short-term appointments to endowed chairs, and 4) appointments to professorships. A professorship, academic chair, or endowed lectureship may not be officially recognized until first approved by The Board of Trustees.

The Board of Trustees allows the University to appoint endowed chairs with short-term appointments of less than 12 months. These must be made with prior approval by the Chancellor, following the procedures in Board of Trustees Rule 508. An annual report is presented to The Board of Trustees on the short-term appointments to endowed chairs for that academic year. Procedures described below do not apply to short-term appointments, but are applicable to appointments that exceed one year and may include tenure or some other long-term commitments by the University.

1. **General Criteria for Appointments for Endowed Chairs and Professorships**
   Criteria for appointments to endowed chairs and professorships must reflect the highest ideals of academic excellence and scholarly or creative achievement. While all appointments to these positions are made by The University of Alabama Board of Trustees, procedures for recruitment must be consistent with the University's Affirmative Action Plan, stipulations of the endowment, and other administrative procedures established in the various academic units. Involvement of the faculty, students, and others, as may be appropriate, is essential in the review and recommendation of candidates for endowed chairs and professorships.

   In addition to criteria set forth in Board of Trustees Rule 508, the following general criteria will be used in the review and recommendation of candidates for endowed chairs and professorships:

   - Convincing evidence of outstanding teaching performance and effectiveness;
   - An outstanding record of productive research, publication, creative activity, and scholarly achievement appropriate to the discipline and fields of specialization;

- Evidence of a continuing record of exemplary service/academic citizenship appropriate to the discipline or profession; and
- Evidence of achievement of a professional status at the national or international level that will enhance the stature of the University's faculty.

With respect to these criteria, each successful candidate should present a record sufficiently consistent in quantity and/or quality to warrant the expectation of continued performance and contributions at an outstanding level. Generally, specific qualifications required for particular endowed chairs or professorships will be based on these criteria. Position announcements will include specific qualifications, and these qualifications and those set forth in Board of Trustees Rule 508 will be employed by the search committee in the review and recommendation of candidates.

2. **Procedures for Recruitment of Candidates for Endowed Chairs**
   Procedures for recruitment and recommendation of candidates for endowed chairs will conform to Board of Trustees Rule 508, the Affirmative Action Plan of the University, and all prevailing federal and state regulatory requirements as well as stipulations of the endowment. While The University of Alabama Board of Trustees makes all appointments to endowed chairs, recommendations to the Board will be made only after considering 1) the evaluations and advice of the faculty of the department, school, or college, 2) consultation from outside peer reviewers, who may include but are not limited to those suggested by the candidates, and 3) the advice of a search committee, as described below:

   a. When a new endowed chair is established or when a vacancy occurs, the dean shall meet with the faculty of the academic unit before deciding on the nature of the search and the size and composition of a search committee. Faculty members from the academic unit will be appointed by the dean and will constitute a majority of the search committee. Other members of the search committee will be appointed by the dean in consultation with the Provost. Usually, the Provost will appoint a staff member from the Office for Academic Affairs to serve as a non-voting member on the search committee and to provide liaison and logistical support. Giving due regard to advice and concerns expressed by the faculty, the dean will designate a faculty member appointed from the academic unit to chair the search committee.

   b. The search committee, working in cooperation with the dean and the Office for Academic Affairs and with appropriate participation from constituent groups, shall announce and advertise the position in a manner appropriate to the nature of the search, and coordinate the review and evaluation of candidates for the position. The committee shall solicit, encourage, and provide for faculty participation and the participation of other constituent groups. In order to maintain confidentiality for the initial group of applicants, their application material will be made available only to members of the search committee. The members of the search committee will keep confidential the identities of the candidates in the initial candidate pool. The committee will provide the dean a list of candidates they assess to be acceptable to be invited to campus for interview. From that list, the dean will select final candidates. Interviews scheduled should allow for discussions with the President, the Provost, deans, chairpersons, search committee members, faculty, and, where appropriate to the nature of the search, with students, alumni, and others, including the Chancellor or designated representatives. Following these interviews, and other information gathering procedures appropriate to the nature of the search, every reasonable effort should be

made to obtain the views of the faculty in the academic unit and appropriately interested constituent groups. The advice of the faculty may be determined by individual written evaluations, by an expression of faculty sentiment at a called faculty meeting, or by such other means as the search committee may consider appropriate. General support of the faculty in the academic unit normally will be necessary for further consideration of a candidate. In cases where the appointment includes the award of tenure, action by the tenured faculty in accordance with normal procedures in the academic unit is necessary before the dean makes a recommendation to the Provost and President.

c.  It shall be the responsibility of the search committee to submit to the dean both a summary of evaluations and advice received from the faculty on each person interviewed and the search committee's own evaluation of whether each candidate is acceptable or unacceptable. The dean should also receive and review outside peer reviews for candidates for endowed chair positions. The dean recommends a candidate to the Provost and President who, in turn, recommend the candidate to the Chancellor and The University of Alabama Board of Trustees. In the event the search committee and dean do not find a successful candidate for presentation to the Provost and President, the search process normally shall be continued until a candidate acceptable to the search committee, the dean, and the faculty is successfully recruited. Except in extraordinary circumstances, the Provost and President shall recommend to the Board the appointment of an endowed chair from those candidates who have general faculty support. If it should become necessary to reopen the search, the dean and the search committee may confer to establish further direction; if it appears desirable, a new search committee may be formed.

3.  **Procedures for Recruitment of Candidates for Endowed Professorships**
Procedures for the recruitment of endowed professorships generally will follow those for the recruitment of endowed chairs. Procedures will conform to Board of Trustees Rule 508, the Affirmative Action Plan of the University, and all prevailing federal and state regulatory requirements as well as the stipulations of the endowment. While the Board of Trustees of The University of Alabama makes all appointments to endowed professorships, recommendations to the Board will be made only after considering 1) the evaluations and advice of the faculty of the department, school, or college and 2) the advice of a search committee. Exceptions to the recruitment procedures for endowed chairs may occur under the circumstances described below. In some cases, income from the corpus for an endowed professorship may not be sufficient to justify a national or international search to fill a new or vacant position. In these cases, the dean may organize an internal search for candidates from within the department, school, or college. The dean will meet with faculty in the academic unit to determine the size and composition of the search committee. Faculty members from the academic unit will be appointed by the dean and will constitute a majority of the search committee. Other members may be appointed to the committee by the dean in consultation with the Provost. The dean may choose to chair the committee or may designate a faculty member appointed from the academic unit to chair the search committee. The responsibilities of the search committee and the procedures for recommendation of the candidate are similar to those for recruitment and recommendation of an endowed chair.

4.  **Terms of Appointment for Endowed Chairs and Professorships**
Terms of appointment for endowed chairs and professorships are for five academic years unless an alternate term is specified in the initial letter of appointment to the endowed position. Individuals can be reappointed to these positions after the initial term. Evaluation and

reappointment procedures are determined by each academic division and must be consistent with any stipulations contained in the memorandum of agreement establishing the endowed position. Deans of the academic unit in which the endowed positions are held make the final decision on reappointment for endowed professorships, while the dean recommends reappointment of endowed chairs to the Provost, who holds the final decision.

**Note:** Those with appointment letters written prior to the Fall 2019 *Faculty Handbook* revision and silent on the term of appointment must undergo re-appointment review no later than 2023- 2024.

# E. Distinguished Professorships

Distinguished Professorships enhance the quality of programs in higher education through both the recognition and contributions of the professors. The Distinguished Research Professor positions recognize extraordinary, internationally recognized scholarly attainment in an individual field. The Distinguished Teaching Professor positions recognize extraordinary achievements within and outside the classroom in teaching and training in an individual field. By the nature of their appointment, these distinguished scholars and teachers make special contributions to the research, creative activity, and teaching missions of the home department, school, or college, and University. Moreover, they increase the visibility of the University and aid in attracting additional high-quality faculty, superior students, and external resources for research, instruction, and service. Appointments are expected to most often be made for an indefinite period; however, instances may exist where a limited term, with or without the possibility of renewal, is desirable.

While The Board of Trustees of The University of Alabama makes all appointments to Distinguished Professorships, recommendations to the Board will be made by the President of the University and/or Provost only after considering the criteria in Board of Trustees Rule 508, and the additional requirements described below.

- Candidates are limited to faculty members with the rank of full professor at The University of Alabama.
- The number of Distinguished Research Professorships will not exceed 5 percent of the number of faculty members with the rank of full professor at the University. The number of Distinguished Teaching Professorships will not exceed 5 percent of the number of faculty members with the rank of full professor at the University.
- Nominations for Distinguished Professorships arise from the home college of the candidate. Nomination packets are to be forwarded by the respective dean to the Provost.
- Nomination packets for Distinguished Research Professorships will consist of a) a letter from the dean describing the extraordinary attainments in the field by the candidate (three pages or less), b) a curriculum vitae limited to five pages, c) reprints of the most significant publications or examples of creative activity (maximum of six), and d) external letters from up to three outstanding scholars in the field who either (1) hold appointments at R1 universities or (2) have appointments at other types of universities but have demonstrably exceptional records of scholarship. These scholars are to be "arms-length" from the candidate. Former advisors, co-authors/co-editors, research collaborators, and former colleagues are excluded. The preponderance of letters should be from scholars of distinguished rank, named chairs, or similar titled professorships. When this is not possible or feasible, an explanation should be provided.
- Nomination packets for Distinguished Teaching Professorships will consist of a) a letter from the

dean describing the extraordinary attainments in the field by the candidate (three pages or less), b) a curriculum vitae limited to five pages, c) reprints of the most significant publications or examples of creative activity (maximum of six) if applicable, d) letters from up to three faculty members of the University, and e) letters from up to three former students describing the influence of the candidate on their lives and careers.

# F. Temporary Ranks

Eligibility for appointment to a temporary rank normally requires professional preparation and experience comparable to that required for a regular faculty appointment at that academic rank. Temporary faculty members must have preparation and experience appropriate to the duties to be assigned.

Temporary appointees may be assigned to teach courses, conduct research, direct students, assist with research projects of students, direct field work of students, or provide consultation on research or instructional projects. Temporary appointments are for a predetermined period of time and convey no right or expectation of employment beyond the period specified in the letter of appointment. Temporary appointees are not eligible for promotion in rank but may apply for any other temporary faculty position, including upgraded positions they have previously held.

The recommendation to accord temporary full-time or part-time faculty appointments begins at the program level and is forwarded to the academic dean. Deans may make temporary part-time and full-time faculty appointments after receiving approval from the Provost.

The compensation for temporary appointees will depend on the type of service rendered and the rank of appointment. Unless authorized by the Provost, compensation for temporary appointees will not exceed the rates approved for regular members of the faculty.

# G. Joint Appointments

Occasionally, reasons may exist for appointing a faculty member to more than one department or area. Recommendations and authorization for joint appointments follow the same policies and procedures that apply to appointments to individual departments or areas. Before approving a joint appointment, the Provost will ensure that there is agreement between and among all the authorities involved. This agreement shall include rank in each department or area and procedures for considering tenure and promotion and for assigning duties and compensation. Faculty members with split or joint appointments must have one unit (typically a department) designated as their primary home unit. This is noted in their letter of appointment.

The faculty member on a joint appointment normally participates in formal votes on tenure and promotion only in the primary department or unit as designated in their appointment letter. However, faculty having joint appointments may participate in formal votes in both departments or units if permitted by the policies of the non-primary department. They may only vote for a given candidate in their primary unit, if the candidate also holds a joint appointment. For university-wide or college-wide votes, those on joint appointments can only vote once.

# H. Adjunct and Visiting Scholar/Professor Appointments

Faculty members in performance of their duties at The University of Alabama may have collaborations with a faculty member(s) at other institutions where their joint activity would be enhanced if the faculty member(s) at the other institution could perform some activities at The University of Alabama. When these activities require the use of an office or other facilities or equipment at The University of Alabama, a temporary, formal affiliation with the University, such as an adjunct or visiting appointment at the rank of instructor or assistant professor, associate professor, or professor, may be required.

1. **Adjunct Faculty Appointments**
   Adjunct faculty appointments are normally made for a fixed period of at least one calendar year, may be renewed, and normally do not include salary from the University. The privileges associated with the adjunct position at The University should be clearly stated in the letter of appointment. Procedures for appointing and renewing adjunct faculty status are determined by the individual colleges.

2. **Visiting Faculty Appointments**
   Visiting faculty appointments are normally made for a period of less than one calendar year and normally do not include salary from the University. Visiting professor status must be sought by submitting the Office for Academic Affairs Visiting Scholar Form. Note that there are additional requirements for visiting full-time faculty appointments that involve a contract with the home institution as outlined in Section XIV.

# I. Non-Faculty Research Appointments

Various research contracts, grants, and projects depend in part on the services of personnel whose primary commitment is to research rather than to a combination of teaching, research, and service appropriate for faculty status. Consequently, the University has established a category of research positions that are non-tenure-earning, non-faculty positions. The duration of appointments in these positions will be limited by the duration of the contracts, grants, and projects that fund the positions. While these positions are not faculty rank and therefore have no faculty rights under the *Faculty Handbook*, persons holding research positions have responsibilities dictated in this *Faculty Handbook* and are expected to abide by all applicable University policies.

# III. Terms of Appointment and Reappointment for Renewable Contract Faculty

## A. Initial Appointments for Renewable Contract Faculty

Initial appointments for renewable contract faculty are normally made for a period of three years, but appointments can range from one to six years. Initial appointments may be made at the ranks of instructor, assistant professor, associate professor, or professor, contingent upon qualifications, demonstrated expertise, and experience.

Unlike the appointments of tenured faculty, renewable contract appointments are term appointments that, by definition, are not tenure-earning and do not convey any right or expectation of continued employment after the time specified. Continuation throughout the term of the appointment is contingent on satisfactorily meeting the departmental and college performance standards (in accordance with the annual reviews defined below) and compliance with the *Faculty Handbook*, the Employee Handbook, and general University policies applicable to all employees. Additionally, continuation to the end of the appointment is dependent upon the needs and available funding within the academic division. The University reserves the right to terminate employment immediately if, in the judgment of the department chair, dean, and Provost, such action is warranted. Examples of types of behavior that could result in the University exercising this right are listed in Chapter 3 ("Compliance with Laws, University Policies, and Professional Licensure Standards of Conduct").

Consistent with appointments for tenure-track positions, an individual who has not completed requirements for a terminal degree may be offered an appointment as an assistant professor contingent upon completion of requirements for the degree. If the appointee fails to meet this contingency by the effective date of employment, the individual will be assigned the rank of instructor, and a revised appointment letter will be issued that specifies a period of time during which the individual is expected to complete requirements for the degree. If no period of time is specified, the period in rank as an instructor cannot exceed one academic year. Failure to complete all degree requirements will serve as cause for non-retention at the end of the academic year. Written notification to the faculty member by April 15 of the decision to impose this contingency constitutes notice that the individual's employment at the University terminates at the end of the academic year unless all degree requirements are met by the specified date; however, the dean may set a later termination date.

# B. Reappointment for Renewable Contract Faculty

1. **Renewable Contract Professor Ranks (Including Professor of Practice)**
   When a renewable contract faculty member holding a professor rank is being considered for reappointment after an initial contract term or for any subsequent reappointment to a term at the same rank (for example, in year three of a three-year appointment), this process normally begins with the departmental faculty evaluation committee communicating its reappointment evaluation results to the department chair, who recommends either reappointment or non-reappointment to the dean. The dean will make the final decision regarding whether to renew the contract.

   Notification of the decision to reappoint or not to reappoint a faculty member will be made in writing to the candidate and shall provide the reason for not being reappointed. Notification shall be made in a timely fashion and no later than April 15; however, failure to meet this deadline will not result in automatic re-appointment. At no time will contract renewal be deemed de facto tenure.

   Reappointment of renewable contract professor rank faculty depends on annually documented meritorious teaching, research, or clinical performance; satisfactory service to the department and/or college; compliance with policies referenced in the *Faculty Handbook*, Employee Handbook, and general University policies applicable to all employees; continued departmental need; and continued availability of funding, as determined by the dean. The final decision and notification of reappointment or non-reappointment will be made by the dean or the dean's designee.

2. **Instructors**

When an instructor is being considered for reappointment at the end of the specified contract term, academic units may initiate a committee review, in which the committee will communicate its evaluation results to the department chair, who in turn recommends either reappointment or non-reappointment to the dean. Reappointment depends on annually documented meritorious teaching, research, or clinical performance; satisfactory service to the department and/or college; compliance with policies referenced in the *Faculty Handbook*, Employee Handbook, and general University policies applicable to all employees; continued departmental need; and continued availability of funding, as determined by the dean or the dean's designee. The final decision and notification of reappointment or non-reappointment will be made by the dean or the dean's designee.

Notification of the decision to reappoint or not to reappoint a faculty member will be made in writing to the candidate and shall provide the reason for not being reappointed. Notification shall be made in a timely fashion and no later than April 15; however, failure to meet this deadline will not result in automatic re-appointment. At no time will contract renewal be deemed de facto tenure.

# IV. Criteria and Standards for Promotion

Promotion is open only to regular, full-time and part-time faculty, and not to temporary faculty.

## A. Promotion for Tenured/Tenure-Track Professor Ranks

A faculty member usually completes at least five years in rank before being considered for promotion from assistant professor to associate professor and at least four years in rank before being considered for promotion from associate professor to professor; consequently, candidates normally do not apply before their sixth year for promotion to associate professor and before their fifth year in rank for promotion to professor. Faculty members whose academic credentials and performance are outstanding, or who have held academic appointments at their present rank at other institutions, may be considered for promotion sooner.

1. **Promotion from Assistant Professor to Associate Professor**

To merit promotion to the rank of associate professor, candidates must possess a strong record of performance at the assistant professor rank. Decisions to promote an assistant professor to the rank of associate professor are based upon: 1) the caliber of the faculty member's teaching effectiveness and overall contribution to the quality of the instructional programs; and 2) the caliber of the faculty member's record of research, publication, creative activity, and scholarly efforts in the discipline and field of specialization. These two areas of performance are co-equal in importance and are predominant in the evaluation of candidates for promotion from assistant to associate professor.

To meet the criteria and standards of performance for promotion to associate professor, a candidate's record of academic performance and accomplishments must satisfy the following requirements.

a. A successful candidate must present convincing evidence of good instructional

performance and effectiveness; each candidate's record must be judged sufficient in quality to demonstrate continuing and substantial progress toward an outstanding level of performance.

Documentation of a candidate's instructional performance should include at least the following:

- Evidence of effective performance by the candidate in the classroom and/or other instructional settings and evidence of the degree of the candidate's commitment to instructional excellence, including judgments by members of the departmental promotion committee and the departmental chairperson.

- Student opinions regarding the candidate's instructional performance.

- Any available evidence that the candidate has made contributions (beyond those included in responsible service/academic citizenship) to improving the quality of the instructional programs in the academic area. Such contributions may include improving the presentation of course materials, developing effective instructional aids, developing new courses or programs, strengthening the content of existing courses, preparing useful and current course syllabi, participating effectively in the supervision of research efforts of graduate students, assisting in student recruitment and career placement, performing meritoriously in adult and professional continuing education programs, providing curricular or instructional leadership, and obtaining or participating significantly in grants and contracts that enhance the University's instructional efforts.

b. A successful candidate must present a strong, continuing record of productive research, publication, creative activity, and scholarly achievement appropriate to the discipline and field of specialization. This record must be sufficient in both quantity and quality to demonstrate substantial progress toward an outstanding level of performance.

Candidates have many ways to establish a strong, continuing record of productive research, publication, creative activity, and scholarly achievement; however, each successful candidate is expected to have published a number of substantial articles in recognized refereed journals in the discipline (or the equivalent in the case of candidates whose disciplines are in the creative, visual, or performing arts). In evaluating the totality of a candidate's record, consideration is given to all appropriate types of original scholarship, creative effort, and professional activity relevant to the candidate's discipline. The weight placed on each scholarly and professional activity necessarily varies according to the contribution it makes to the discipline and to the professional stature of the candidate. The following are examples of the types of scholarly and professional contributions that are considered:

- Articles published in refereed journals in the candidate's discipline;

- Books and book-length research monographs;

- Invited or juried or reviewed exhibitions, presentations, or performances;

- Chapters in books and edited collections of readings;

- Research reports submitted in connection with research grants or contracts;

- Participation in research contract or grant activities;

- Patents;

- Entrepreneurial activity related to the candidate's discipline;

- Papers published in the proceedings of meetings of professional associations;

- Articles in non-refereed periodicals;

- Papers presented at professional meetings;

- Appointment as a referee, as a member of an editorial board, or as an editor of a scholarly academic or professional journal;

- Any other types of scholarly publications and creative efforts that contribute to the candidate's fields of specialization; and

- Important professional activities that contribute materially to the individual's professional stature and to the University's mission.

In appraising the quantity and quality of a candidate's scholarly and creative contributions to the discipline, emphasis is placed upon: 1) whether the amount of publications, externally funded research, and/or creative activities (as is applicable to the discipline) is commensurate with what should be expected of someone applying for the rank of associate professor; 2) evidence as to the substantive and consistent nature of the candidate's scholarly or creative efforts; 3) the quality of the refereed journals in which manuscripts have been published (or the quality of the invited or juried or reviewed exhibitions, presentations, or performances); 4) the caliber of the publications in which the candidate's works (other than refereed journal articles) have appeared; 5) their documented contribution to each co-authored or multi-authored publication; 6) any evidence of the impact that the candidate's works have had on the discipline or of the extent to which the candidate's publications have been recognized or cited by others; 7) the emerging professional stature of the candidate; 8) the quality of any invitations to consult or lecture; and 9) the quality of any participation by the candidate in research contract or grant activities.

c. Each successful candidate must show evidence of a continuing record of service/ academic citizenship appropriate to the candidate's area and expertise, as defined at the departmental and divisional levels. These activities could include, but are not limited to: Work on departmental-, college-, and university-level committees and projects; mentoring students, advising student groups, and otherwise supporting students; providing service and education to external groups in a variety of forms; supporting underrepresented and/or underserved students and/or communities; engaging in partnerships with target groups on enterprises aimed at problem-solving; working to advance the profession, including by serving on editorial boards; serving in leadership roles at the state, national, regional, and/or international levels; providing expert testimony on matters of professional expertise; serving as invited or elected members of boards, panels, and commissions; community engagement; clinical service and training; and enhancing the visibility and mission of the University by work outside the classroom. The university values all of these service activities as meaningful contributions to the promotion process.

The absence of a continuing record of service/academic citizenship on the candidate's part detracts from what otherwise may be a strong set of qualifications for promotion. Similarly, a pattern of continual lack of collegiality will be a factor in promotion decisions.

    d.   Only in extraordinary circumstances should tenure-track Assistant Professors be assigned significant administrative duties. While meritorious performance in an administrative capacity contributes to a candidate's case for promotion, the standards for promotion in the areas of instruction and research or creative activities are not diminished by additional effort devoted to administrative-related duties. Promotion to the rank of associate professor is awarded principally on the basis of academic merit, as evidenced by a candidate's academic credentials, teaching effectiveness, instructional contributions, and record of research, publication, creative activity, and scholarly achievement.

   2.  **Promotion from Associate Professor to Professor**
To merit promotion to the rank of professor, candidates must possess a strong record of performance at the rank of associate professor. Decisions to promote an associate professor to the rank of professor are based upon: 1) the caliber of the faculty member's teaching effectiveness and overall contribution to the quality of the instructional programs; and 2) the caliber of the faculty member's record of research, publication, creative activity, and scholarly efforts in the discipline and field of specialization. These two areas of performance are co-equal in importance and are predominant in the evaluation of candidates for promotion from associate professor to professor.

To meet the criteria and standards of performance for promotion to professor, a candidate's record of academic performance and accomplishments must satisfy the following requirements.

    a.   A successful candidate must present convincing evidence of outstanding instructional performance and effectiveness; each candidate's record should be judged sufficiently consistent in quality to warrant the expectation of continued performance at this level.

       Documentation that a candidate's instructional performance is outstanding and consistent in quality should include at least the following:

        •  Evidence of effective performance by the candidate in the classroom and/or other instructional settings and evidence of the degree of the candidate's commitment to instructional excellence, including judgments by members of the departmental promotion committee and the departmental chairperson.

        •  Student opinions regarding the candidate's instructional performance.

        •  Any available evidence that the candidate has made substantial contributions (beyond those included in responsible service/academic citizenship) to improving the quality of the instructional programs in the academic area. Such contributions may include improving the presentation of course materials, developing effective instructional aids, developing new courses or programs, strengthening the content of existing courses, preparing useful and current course syllabi, participating effectively in the supervision of research efforts of graduate students, assisting in student recruitment and career placement, performing meritoriously in adult and professional continuing education programs, providing curricular or instructional leadership, and obtaining or participating significantly in grants and contracts

that enhance the University's instructional efforts.

b. A successful candidate must present an outstanding record of productive research, publication, creative activity, and scholarly achievement appropriate to the discipline and field of specialization; this record should be sufficiently consistent in both quantity and quality to warrant the expectation of continued performance at this level.

Although many ways exist for a candidate to establish an outstanding, continuing record of productive research, publication, creative activity, and scholarly achievement, each successful candidate is expected to have published a number of substantial articles in recognized refereed journals in the discipline (or the equivalent in the case of candidates whose disciplines are in the creative, visual, or performing arts). In evaluating the totality of a candidate's record, consideration is given to all appropriate types of original scholarship, creative effort, and professional activity relevant to the candidate's discipline. The weight placed on each scholarly and professional activity necessarily varies according to the contribution it makes to the discipline and to the professional stature of the candidate. The following are examples of the types of scholarly and professional contributions that are considered:

- Articles published in refereed journals in the candidate's discipline;

- Books and book-length research monographs;

- Invited or juried or reviewed exhibitions, presentations, or performances;

- Chapters in books and edited collections of readings;

- Research reports submitted in connection with research grants or contracts;

- Participation in research contract or grant activities;

- Patents;

- Entrepreneurial activity related to the candidate's discipline;

- Papers published in the proceedings of meetings of professional associations;

- Articles in non-refereed periodicals;

- Papers presented at professional meetings;

- Appointment as a referee, as a member of an editorial board, or as an editor of a scholarly academic or professional journal;

- Any other types of scholarly publications and creative efforts that contribute to the candidate's fields of specialization; and

- Important professional activities that contribute materially to the individual's professional stature and to the University's mission.

In appraising the quantity and quality of a candidate's scholarly and creative contributions to the discipline, emphasis is placed upon: 1) whether the amount of publications, externally funded research, and/or creative activities (as is applicable to the discipline) is commensurate with what should be expected of someone applying for the rank of professor; 2) evidence as to the substantive and consistent nature of the candidate's scholarly or creative efforts; 3) the quality of the refereed journals in which manuscripts have been published (or the quality of invited or juried or reviewed

exhibitions, presentations, or performances); 4) the caliber of the publications in which the candidate's works (other than refereed journal articles) have appeared; 5) their documented contribution to each co-authored or multi-authored publication; 6) evidence of the impact that the candidate's works have had on the discipline and of the extent to which the candidate's publications have been recognized or cited by others; 7) the professional stature of the candidate; 8) the quality of any invitations to consult or lecture; and 9) the quality of any participation by the candidate in research contract or grant activities.

c.  Each successful candidate must show evidence of a continuing record of service/ academic citizenship appropriate to the candidate's area and expertise, as defined at the departmental and divisional levels. These activities could include, but are not limited to, work on departmental-, college-, and university-level committees and projects; mentoring students, advising student groups, and otherwise supporting students; providing service and education to external groups in a variety of forms; supporting underrepresented and/or underserved students and/or communities; engaging in partnerships with target groups on enterprises aimed at problem-solving; working to advance the profession by serving on editorial boards; serving in leadership roles at the state, national, regional, and/or international levels; providing expert testimony on matters of professional expertise; serving as invited or elected members of boards, panels, and commissions; community engagement; clinical service and training; and enhancing the visibility and mission of the University by work outside the classroom. The university values all of these activities as meaningful contributions to the promotion process.

The absence of a continuing record of service/academic citizenship on the candidate's part detracts from what otherwise may be a strong set of qualifications for promotion. Similarly, a pattern of continual lack of collegiality will be a factor in promotion decisions.

Only in extraordinary circumstances should Associate Professors be assigned significant administrative duties at the level of department chair or higher. While meritorious performance in an administrative capacity contributes to a candidate's case for promotion, the standards for promotion in the areas of instruction and research or creative activities are not diminished by additional effort devoted to administrative-related duties. Promotion to the rank of professor is awarded principally on the basis of academic merit, as evidenced by a candidate's academic credentials, teaching effectiveness, instructional contributions, and record of research, publication, creative activity, and scholarly achievement.

# B. Promotion for Renewable Contract Professor Ranks

Departments, schools, and colleges will create a committee or committees to work in conjunction with the chair or dean to evaluate renewable contract faculty for promotion. Committees for promotion to a given rank will consist of faculty who possess that rank or a higher rank. In cases in which there are fewer than three department members who are eligible to serve on the evaluation committee, the dean will appoint additional members with interests related to the faculty member's discipline from other departments. However, if possible, the chair of the committee should be a member of the candidate's home department.

The promotion process for renewable contract faculty follows the departmental, college, and dean-level timeline for tenure-track faculty. The dossier for promotion will be forwarded to the department chair by October 1 in the year of application. The permissible recommendations at each stage are to grant promotion or deny promotion. The candidate for promotion may terminate the review process at any stage by requesting the dossier be withdrawn from consideration.

Promotions for renewable contract faculty members holding professor ranks require submission of a dossier. The dossier will include a current curriculum vitae; evidence of effective teaching, research, or clinical practice from a variety of sources; evidence of service at the department, school, college, University, and/or professional levels; a statement of professional activities; and documentation of other relevant activities. Some departments may require that external letters evaluating the candidate's professional performance or research be included in the dossier. It is expected that the documentation of outcomes and student learning will generate substantial data for evaluation of teaching/clinical competency.

The departmental evaluation committee will review promotion applications and provide a written recommendation to the department chair. In those academic divisions without departmental structures, a divisional committee is used. The evaluation committee reviewing renewable faculty cases for promotion will base its written recommendation on the contents of the dossier as well as on job descriptions as stated in appointment letters, department, school, or college criteria for promotion as approved by the dean's office, annual evaluations by departmental committee (if utilized), and the annual chair/dean evaluations. The committee's written recommendation must include the actual vote totals for and against (noting all votes cast). In cases where the vote was not unanimous, the written recommendation must attempt to identify the grounds for dissent so that the votes can be appropriately contextualized as the dossier proceeds through the review. Abstentions are strongly discouraged. Recusals are permitted when conflicts of interest exist; however, the faculty member should provide an explanation to the committee chair. The department chair then writes an independent recommendation and forwards that, along with the committee recommendation and the dossier, to the dean, who may utilize a divisional evaluation committee (if applicable).

The dean's recommendation, along with the full dossier, will normally be received by the Provost by February 1. The Provost, together with designated persons, reviews each dossier and recommendations from the committee(s), chair, and dean and makes the ultimate decision on promotion. The decision of the Provost will generally be forwarded to the candidate, dean, and departmental chairperson between March 15 and April 15; however, failure to meet this deadline by the Provost will not result in an automatic promotion for the candidate. As with tenure and tenure-track decisions for promotion, final authority for promotion lies with the Provost.

Renewable contract assistant professors normally do not apply before their sixth year for promotion to associate professor and before their fifth year in rank for promotion to professor. On rare occasions, exceptional candidates may warrant early promotion consideration.

Promotion for renewable contract professors will be based on the same criteria as for tenured and tenure-track professors with two differences:

- The relative weight of performance in teaching, research, and/or clinical practice will be based on the distribution documented in the letter of appointment or any later addendum. If the relative weight of any area is 0%, that area of performance will not be considered for evaluation for

promotion.

- Because the nature of clinical appointments varies across colleges and departments, units with clinical assistant, associate, and full professors will be required to develop specific criteria for promotion for the clinical component of such appointments.

Candidates whose promotion applications are not successful may apply again for promotion in future years. These candidates should be provided with clear guidance regarding the professional development steps needed to reach promotion in the future.

## C. Promotion from Renewable Contract Instructor to Renewable Contract Senior Instructor or Renewable Contract Principal Senior Instructor

Following their sixth year of service, instructors who are reappointed for a seventh year will be promoted to senior instructor, effective August 16 of their seventh year of service. After additional six years of services, they will be promoted to principal senior instructor, effective August 16 of their thirteenth year of service. Deans are responsible for notifying the faculty member and the Office for Academic Affairs of any upcoming promotion for the following academic year no later than May 15.

# V. Criteria and Standards for Awarding Tenure to Probationary Faculty

The decision to award tenure to a probationary faculty member is an affirmative act based upon an individual's performance, accomplishments, and potential for ongoing contribution to the University's academic programs and teaching, research, and service/academic citizenship missions.

## A. Criteria and Standards

To merit the award of tenure, a probationary faculty member must satisfy the following criteria and standards of performance.

1. A successful candidate must present convincing evidence of good instructional performance and effectiveness; each candidate's record must be judged sufficient in quality to demonstrate continuing and substantial progress toward an outstanding level of performance.

   Documentation of a candidate's instructional performance should include at least the following:

   - Evidence of effective performance by the candidate in the classroom and/or other instructional settings and evidence of the degree of the candidate's commitment to instructional excellence, including judgments by members of the departmental tenure committee and the departmental chairperson.

   - Student opinions regarding the candidate's instructional performance.

   - Any available evidence that the candidate has made contributions (beyond those included in responsible service/academic citizenship) to improving the quality of the instructional programs in the academic area. Such contributions may include improving the presentation of course materials, developing effective instructional aids, developing new courses or programs, strengthening the content of existing courses, preparing

useful and current course syllabi, participating effectively in the supervision of research efforts of graduate students, assisting in student recruitment and career placement, performing meritoriously in adult and professional continuing education programs, providing distinguished curricular or instructional leadership, and obtaining or participating effectively in grants and contracts that enhance the University's instructional efforts.

2.  A successful candidate must present a strong, continuing record of productive research, publication, creative activity, and scholarly achievement appropriate to the discipline and field of specialization; this record must be sufficient in both quantity and quality to demonstrate substantial progress toward an outstanding level of performance. Although many ways exist for a candidate to establish a strong, continuing record of productive research, publication, creative activity, and scholarly achievement, each successful candidate is expected to have published a number of substantial articles in recognized refereed journals in the discipline (or the equivalent in the case of candidates whose disciplines are in the creative, visual, or performing arts). In evaluating the totality of a candidate's record, consideration is given to all appropriate types of original scholarship, creative effort, and professional activity relevant to the candidate's discipline. The weight placed on each scholarly and professional activity necessarily varies according to the contribution it makes to the discipline and to the professional stature of the candidate.

The following are examples of the types of scholarly and professional contributions that are considered:

- Articles published in refereed journals in the candidate's discipline;

- Books and book-length research monographs;

- Invited or juried or reviewed exhibitions, presentations, or performances;

- Chapters in books and edited collections of readings;

- Research reports submitted in connection with research grants or contracts;

- Participation in research contract or grant activities;

- Patents;

- Entrepreneurial activity related to the candidate's discipline;

- Papers published in the proceedings of meetings of professional associations;

- Articles in non-refereed periodicals;

- Papers presented at professional meetings;

- Appointment as a referee, as a member of an editorial board, or as an editor of a scholarly academic or professional journal;

- Any other types of scholarly publications and creative efforts that contribute to the candidate's fields of specialization; and

- Important professional activities that contribute materially to the individual's professional stature and to the University's mission.

In appraising the quantity and quality of a candidate's scholarly and creative contributions to the discipline, emphasis is placed upon: 1) whether the amount of publications, externally funded research, and/or creative activities (as applicable to the discipline) is commensurate with what should be expected of someone applying for tenure; 2) evidence as to the substantive and

consistent nature of the candidate's scholarly or creative efforts; 3) the quality of the refereed journals in which manuscripts have been published (or the quality of invited or juried or reviewed exhibitions, presentations, or performances); 4) the caliber of the publications in which the candidate's works (other than refereed journal articles) have appeared; 5) their documented contribution to each co-authored or multi-authored publication; 6) any evidence of the impact that the candidate's works have had on the discipline and of the extent to which the candidate's publications have been recognized or cited by others; 7) the emerging professional stature of the candidate; 8) the quality of any invitations to consult or lecture; and 9) the quality of any participation by the candidate in research contract or grant activities.

3. Each successful candidate must show evidence of a continuing record of responsible service/ academic citizenship appropriate to the candidate's area, as defined at the departmental and divisional levels. These activities could include, but are not limited to, work on departmental, college, and university committees and projects; mentoring students, advising student groups, and otherwise supporting students; providing service and education to external groups in a variety of forms; supporting underrepresented and/or underserved students and/or communities; engaging in partnerships with target groups on enterprises aimed at problem-solving; working to advance the profession by serving on editorial boards; serving in leadership roles at the state, national, regional, and/or international levels; providing expert testimony on matters of professional expertise; serving as invited or elected members of boards, panels, and commissions; community engagement; clinical service and training; and enhancing the visibility and mission of the University by work outside the classroom. The university values all of these service activities as meaningful contributions to the tenure process.

The absence of a continuing record of service/academic citizenship on the candidate's part detracts from what otherwise may be a strong set of qualifications for tenure. Similarly, a pattern of continual lack of collegiality will be a factor in tenure decisions.

4. Each successful candidate must have made substantial progress toward achieving a professional status that will enhance the stature of the University's faculty and must be judged to have the potential to make a continuing contribution to the University's mission in teaching, research, and service/academic citizenship.

When a tenure-track candidate in their mandatory tenure review year applies for tenure and for promotion from assistant to associate professor in the same review cycle, the Provost will issue one consistent outcome – to grant tenure and promotion or to deny both.

## B. Duration of Probationary Status

The appointment letter for a probationary faculty member must specify the last academic year during which a tenure decision can be made (the mandatory tenure decision time). This mandatory tenure decision time is the academic year preceding the last full academic year of the probationary period. The start date of the probationary period for a faculty member whose appointment begins after the beginning of the academic year may be the beginning of that academic year or the beginning of the next academic year. This date must be stipulated in the offer letter and approved by the dean and the faculty member.

The probationary period includes all full-time service at a faculty rank after earning an appropriate terminal degree and may include full-time service prior to receiving a terminal degree. However, time spent in appointments prior to beginning a probationary appointment at the University may be

excluded. The decision as to whether to count time spent in prior appointments or service prior to receiving an appropriate terminal degree will result from negotiations between the individual and the dean, with concurrence by the Provost, and will be reflected in the mandatory tenure decision time specified in the appointment letter conferring probationary faculty status. Factors to be considered in the decision concerning credit for prior appointments include the extent to which the appointment permitted normal professional progress and the possibility that moving to the University can be expected initially to cause some delay in normal professional progress. If a person holding a probationary faculty appointment at the University participates in a faculty exchange, takes leave for no more than six months, or takes leave for scholarly purposes, the time spent on exchange or leave will count as part of that person's probationary period unless the individual and the Provost agree in writing to an exception to this provision at the time the exchange or leave is approved. The total period of full-time service in a probationary status normally will not exceed seven years at the University, with a final tenure decision made during the sixth year. The probationary period will normally not be less than four years at the University, with a final tenure decision made during the third year. Faculty members appointed at advanced ranks may have shorter probationary periods, as specified in their original appointment letters.

Normally, candidates do not apply for tenure until the year before their probationary period ends. Faculty members whose academic credentials and performance are outstanding may be considered for tenure sooner. Candidates must satisfy all criteria for tenure regardless of the timeframe.

At any time preceding August 16 of the mandatory year for tenure decision, a probationary faculty member may request an extension of the probationary period. An extension, if granted, normally will not be for more than one year. Application for extension must be made by the probationary faculty member through the department chair to the dean of the college. A positive response to the application must be approved by the Provost.

Upon the birth or adoption of a child, a faculty member holding a tenure-track appointment will, upon written notice, be granted a one-year extension of the date on which the probationary period would end. Only one such extension is allowed per faculty member. A written notice to exercise this option must be provided to the department chair, the dean, and the Provost, preferably within six months but no later than 12 months after birth or adoption. Further, regardless of the date of birth or adoption, this notice must be given no later than the December 15 prior to the October 1 on which the original mandatory tenure application was to be made. During this extension, the retention process continues, with the probationary candidate receiving normal feedback from the department about job performance.

A faculty member who requests and receives an extension of their probationary period, and later decides to decline that extension and return to their original mandatory year will not be penalized and will not be considered to be applying for early tenure. They must notify their chair by August 16 of their original mandatory year if they choose to decline their extension. A faculty member who begins the tenure application process according to their original mandatory tenure review by submitting their dossier by the deadline, gives up the right to the extension of their probationary period. They cannot subsequently revert back to the extended probationary period they were granted.

## C. Initial Appointment with Tenure

It is the policy of The University of Alabama not to award tenure at the time of initial appointment to faculty rank. Exceptions may be made at the ranks of associate professor and professor, provided candidates have a record of substantial experience and accomplishments and provided they possess the professional stature and abilities to merit the award of tenure without a probationary period for evaluation. In making a decision to award tenure at the time of initial appointment, the candidate's record and credentials are examined from the standpoint of: 1) teaching experience and evidence of instructional effectiveness; 2) quantity and quality of research, publication, creative activity, and scholarly achievements; 3) professional stature in the discipline; and 4) potential for making an ongoing contribution to the University's mission in teaching, research, and service/academic citizenship.

# VI. Composition of Faculty Committees for Appointments and Reviews

Membership on departmental and divisional faculty committees that make recommendations concerning faculty appointments, promotion, progress reviews, and tenure is limited to persons holding a regular full-time faculty appointment as assistant professor, associate professor, or professor. Those holding the rank of instructor, senior instructor, and principal senior instructor may participate in faculty hiring, reviews, and retention processes for instructors if the academic division permits such participation. Additionally, only tenured faculty members may serve on committees for tenure and progress reviews, and departmental committees for promotion to a given academic rank must consist of people who possess that rank or a higher rank. These restrictions on eligibility apply in all departments and divisions. Usually, the departmental committees that make recommendations concerning promotion, progress reviews, and tenure consist of all persons eligible to serve, but (subject to the eligibility requirements given above) the full faculty of each department establishes its own specific criteria and processes concerning the composition, formation, and operation of these departmental committees. Likewise, the full faculty of each division establishes its own specific criteria and processes concerning the composition, formation, and operation of these divisional committees.

Departmental chairpersons, deans, and faculty members currently serving in the Office for Academic Affairs or the President's Office who may have a separate role in recommending retention, tenure, and promotion do not serve on the departmental or divisional committees making such recommendations.

In cases where there are fewer than three department members who are eligible to serve on one of the personnel committees, the dean, after consultation with the members eligible to serve, will appoint additional members to the committee from other departments with related interests. The committee chairperson must be a member of the candidate's department, if any member of that department is eligible to serve.

All committee discussions and votes are confidential. Confidentiality protects and ensures honest, thorough, and robust discussion of the merits of each candidate. All those involved in appointment, promotion, progress review, and tenure recommendations will keep candidate applications and related personnel documentation, as well as committee discussions and deliberations, confidential.

# VII. Preparation of Dossiers; Subsequent

# Additions

A dossier serves as a basis for decisions regarding retention, tenure, and/or promotion. The primary responsibility for preparing a dossier to be considered by a faculty committee on retention, promotion, progress review, or tenure rests with the candidate, but the departmental chairperson shall offer assistance. The dossier shall include all evidence and support material deemed by the candidate to be necessary for the review and shall include any material required by departmental and divisional policies as well as a clear description of any special duties stated in the initial or subsequent appointment letter(s). Dossiers are required to be prepared as follows:

- By tenure-track faculty for retention annually and during the mandatory tenure decision year;
- By any faculty at the rank of assistant or associate professor when seeking promotion; and
- By renewable-contract faculty at any rank during the terminal year of their appointment, if they are seeking and the dean is considering them for reappointment. Divisions and units may require additional dossier review for renewable contract faculty.

No material submitted by a candidate shall be removed from the dossier prior to a final decision regarding the candidate's retention, tenure, and/or promotion in that year's review.

For tenured/tenure-track faculty, the dossier of a candidate for promotion or tenure must include at least three external evaluations of the candidate's scholarly and creative contributions to their discipline submitted by scholars who either (1) hold appointments at R1 universities or (2) have appointments at other types of universities but have demonstrably exceptional records of scholarship. For renewable contract faculty in professor ranks, the dossier of a candidate for promotion may require external evaluations, as determined by the academic division's rules. The candidate suggests in a timely fashion the names of several experts in the candidate's field who might provide external evaluations. For tenured/tenure-track faculty, the departmental chairperson must secure at least one of the required three external letters from experts suggested by the candidate. In seeking objective reviews of a candidate's research record, an "arm's-length" policy is critical in selecting reviewers. External reviewers should not be assistant professors, nor the candidate's terminal degree advisor(s), nor individuals with whom the candidate has collaborated on publication, externally funded research, or creative works. Exceptions should be documented and rare. These evaluative statements shall be sent to the departmental chairperson, who must put them in the dossier. External reviews must have been written within the past two years to be included in a dossier, unless otherwise noted by a college-specific policy approved by the Provost. All external letters received by the time of the review by the departmental committee must be included. Letters received after this time will not be considered. Efforts should be made to protect the identity of the external evaluators. Additionally, access to external review letters should be limited to appropriate faculty and administrators involved in the review process.

## A. Dossiers for Retention and Reappointment of Renewable Contract Faculty

Dossiers for renewable contract faculty for retention and reappointment at the same rank are prepared according to guidelines established by the academic division. Procedures for reappointment for renewable contract faculty are described elsewhere in Chapter 2. Instructors must prepare dossiers for retention (if required by the academic unit) and reappointment. The candidate submits a dossier to the departmental chairperson (or appropriate administrative official in divisions without departments),

who may add information the departmental chairperson/administrative official considers relevant. In the event information is added, the departmental chairperson/administrative official informs the candidate, who has the opportunity to add explanatory or rebuttal material. No dossier is required for promotion to senior instructor, as that promotion is automatic in the seventh year in rank as instructor.

## B. Dossiers for Tenure and Promotion

Dossiers for promotion to associate professor and professor (including renewable contract faculty) and for tenure are due October 1 unless, with the approval of the Provost, a division selects a different date. The candidate submits a dossier to the departmental chairperson (or appropriate administrative official in divisions without departments), who may add information the departmental chairperson/ administrative official considers relevant. In the event information is added, the departmental chairperson/administrative official informs the candidate, who has the opportunity to add explanatory or rebuttal material. The dossier is then transmitted by the departmental chairperson/administrative official to the departmental faculty committee.

Generally, no new evidence is added to the dossier after it has been transmitted to the departmental committee. In extremely unusual circumstances, when new evidence becomes available that seems to the dean to be significant, the dean may reconvene the departmental and divisional committees and ask these committees and the departmental chairperson to assess the new evidence.

Dossiers generally are reviewed by one or more faculty committees, the departmental chairperson (or appropriate administrative official in divisions without departments), the dean, and the Provost. The reviews of faculty committees, the departmental chairperson, and the dean each result in written recommendations that are attached to the dossier and are considered at subsequent stages of the review process. Each such recommendation shall include a discussion of the evidence in the dossier concerning whether the candidate's performance satisfies the pertinent set of criteria and standards.

The candidate is given a copy of each such recommendation and has an opportunity to supply an explanatory or rebuttal statement. Any such statement by the candidate becomes a part of the dossier and is reviewed by the departmental/divisional committee or departmental chairperson/dean whose recommendation elicited the candidate's response. Following this review, the candidate is informed in writing of the results, and a copy is included in the dossier. The dossier is then forwarded for review at the next stage.

Those performing the review at each stage shall have access to the complete dossier of the candidate and to copies of the formal written recommendations made at each prior stage of the review. In addition, they shall rely on their professional judgment in making evaluations and recommendations. Since the dossiers contain confidential and sensitive material, access to them shall be limited to persons formally involved in the review process.

Any material in the dossier submitted by the candidate that is not retained in the digital evaluation platform shall be returned to the candidate at the end of the review process.

# VIII. Progress Reviews of Probationary Faculty

It is University policy to conduct a review of each untenured faculty member's performance and dossier during each year prior to mandatory tenure decision time, beginning in their second year. A primary purpose

of this review is to identify current strengths and weaknesses in the faculty member's performance and to make suggestions for improvement; however, this review also leads to a decision concerning retention.

The review process within a division consists of evaluations of the dossier by a single faculty committee, by the departmental chair, area head, or program director, if the division has such administrative subunits, and by the dean. The faculty committee normally will be a departmental, area, or program committee, if the division has administrative subunits; otherwise, it will be a divisional committee. Probationary faculty members are provided with an opportunity to submit a response or rebuttal to the evaluation submitted at each stage of the process, up until the final review by the dean or Provost (as applicable). The opportunity must be provided prior to the dossier being submitted for the next level of review.

The faculty committee reviews the record of each probationary faculty member who has not reached mandatory tenure decision time and recommends whether to continue the person's appointment. The committee's recommendation must include a discussion of evidence in the dossier showing the person's progress toward meeting the criteria and standards for tenure. The recommendation also includes any suggestions for improvement that the committee considers appropriate.

The next stage of the review process consists of an independent recommendation by the departmental chairperson (or by the dean in divisions without administrative subunits) based on a review of the dossier and of the recommendation of the faculty committee. The departmental chairperson's recommendation includes a discussion of evidence in the dossier showing the person's progress toward tenure and may include any suggestions for improvement that the chairperson considers appropriate.

The dossier, together with recommendations from the departmental committee and the departmental chairperson, is transmitted to the dean. Except in cases where there is an automatic review by the Provost, a review by the dean is the last step in the annual progress review of probationary faculty members. The dean notifies the departmental chairperson and the faculty member of the decision and may include suggestions for improvement.

Review by the Provost is automatic in two cases: 1) whenever the dean decides the probationary faculty member's appointment should not be continued; and 2) in the review process that occurs two years before mandatory tenure decision time. In these cases, the dean makes a recommendation that is forwarded to the Provost for the final decision. If the dean recommends the appointment not be continued, the faculty member may submit a letter of rebuttal to the dean, who can respond in writing but must include the letter of rebuttal and any response in the dossier. The Provost notifies the dean, the departmental chairperson, and the faculty member of the Provost's decision. If the decision is that the faculty member is not to be retained, then the faculty member is no longer eligible to apply for promotion or tenure.

If a probationary faculty member has not completed requirements for an appropriate terminal degree, the dean may decide retention of the faculty member shall be contingent upon completion of all degree requirements by a specific date (which can be no earlier than the date specified in the faculty member's letter of appointment). Written notification to the faculty member by March 1 of the decision to impose this contingency constitutes notice that the individual's employment at the University terminates at the end of the academic year unless all degree requirements are met by the specified date; however, the dean may set a later termination date.

If the decision not to retain the faculty member is made during the third or subsequent years, the faculty member's appointment will not terminate until the end of the following academic year. A decision not to

retain a probationary faculty member in their second year must be transmitted in writing to the faculty member by December 15 of the second year, otherwise, the faculty member may remain on the faculty for an additional year.

Reviews during the second year should occur no later than October, with recommendations reaching the dean by November 1. Reviews during the third and later years should be conducted early enough to ensure the faculty member is notified of the decision prior to May 15. Exceptions to these timelines may be made under the provisions of the "Termination and Severance" section.

# IX. Procedures for Making Tenure Recommendations

Recommendations concerning tenure usually begin at the departmental level. However, in divisions that have no administrative subunits, recommendations will be initiated at the divisional level. Each department has a tenure committee consisting of tenured faculty members. It is the responsibility of each candidate for tenure to prepare a dossier to be considered by the committee and to submit the dossier to the departmental chairperson (or the dean in divisions that have no administrative subunits) by October 1. The dossier shall include all of the written recommendations and the prior letters of retention resulting from the previous progress reviews described elsewhere in this document. Individual divisions and departments may require the inclusion of special forms or material. A dossier must be submitted in the academic year in which a tenure decision is mandatory.

The appointment letter of each probationary faculty member sets the maximum duration of the probationary period by specifying the academic year in which a tenure decision must be made (the mandatory tenure decision time). The faculty member will be considered for tenure prior to mandatory tenure decision time if earlier consideration is guaranteed in the appointment letter or if the faculty member requests early consideration. In cases of early consideration for tenure, the recommendation can be to award tenure, to deny tenure, or to defer a decision on tenure; the faculty member can terminate the review process at any stage by asking that the dossier be withdrawn from consideration. The only possible recommendations at mandatory tenure decision time are to award tenure or to deny tenure; the faculty member can terminate the review process only by resigning.

The candidate is given a copy of each recommendation made at the departmental or divisional level and has an opportunity to supply a written explanatory or rebuttal statement. Any such statement by the candidate becomes a part of the dossier and is reviewed by the departmental/ divisional committee or departmental chairperson/dean whose recommendation elicited the candidate's response. Following this review, the candidate is informed in writing of the results, and a copy is included in the dossier. The dossier is then forwarded for review at the next stage.

## A. Departmental Tenure Recommendations

The departmental tenure committee evaluates the dossier of each candidate, applying the criteria and standards for tenure given in the *Faculty Handbook,* together with any additional criteria and standards imposed by the department or division. The committee, with members relying on their professional experience as faculty, makes a written recommendation concerning tenure that includes substantive discussion comparing the candidate's performance, as shown in the dossier (including the external evaluations), to each of the criteria and standards for tenure. The committee's written

recommendation must include the actual vote totals for and against (noting all votes cast). In cases where the vote was not unanimous, the written recommendation must attempt to identify the grounds for dissent so the votes can be appropriately contextualized as the dossier proceeds through the review. Abstentions are strongly discouraged in early tenure reviews and not permitted in the mandatory tenure review. Recusals are permitted when conflicts of interest exist; however, the faculty member should provide an explanation to the committee chair and shall not participate in the committee discussion.

The next stage of the review process consists of an independent written recommendation by the departmental chairperson based on a review of the dossier (including external evaluations) and of the recommendation of the departmental tenure committee. The chairperson's recommendation includes an independent evaluation of whether the dossier shows that the candidate has met each of the criteria and standards for tenure. The chairperson then transmits the dossier, including all recommendations, to the dean.

## B. Divisional Tenure Recommendations

Each division has a tenure committee consisting of tenured faculty members to review dossiers and recommendations submitted to the dean by departmental chairpersons. This committee makes an independent evaluation of each dossier, with the members relying on their professional experience as faculty, and makes a written recommendation that includes the committee's assessment of whether the dossier (including external evaluations) contains convincing evidence that all applicable criteria and standards for tenure have been met. The committee's written recommendation must include the actual vote totals for and against tenure (noting all votes cast). In cases where the vote was not unanimous, the written recommendation must attempt to identify the grounds for dissent so that the votes can be appropriately contextualized as the dossier proceeds through the review. Abstentions are strongly discouraged in early tenure reviews and not permitted in the mandatory tenure review. Recusals are permitted when conflicts of interest exist; however, the faculty member should provide an explanation to the committee chair and shall not participate in the committee discussion.

The next review is conducted by the dean, who makes an independent written recommendation after considering the dossier (including external evaluations) and all the preceding recommendations. The dean's recommendation concerning tenure includes an assessment of the individual's potential for making a continuing contribution toward meeting the University's academic needs and thus may be based in part upon knowledge of budgetary constraints, projected enrollment patterns, and needs of the program or discipline. By February 1, the dean transmits the complete dossier, including the dean's recommendation, to the Provost.

## C. University Tenure Decision

The Provost, together with designated persons, reviews each dossier and all preceding recommendations. Following this review, a written recommendation from the Provost goes to the President, who makes the final decision, unless the President has delegated this decision-making authority to the Provost.

The Provost sends the faculty member written notice of the final tenure decision and provides copies to the departmental chairperson and dean. Formal written notice from the Provost is the only way in

which tenure is awarded.

Notification of the award of tenure normally occurs between March 15 and April 15. In the case of denial of tenure, the Provost must notify the individual before the end of the academic year. Notification of denial of tenure constitutes notice that the individual's appointment at the University terminates at the end of the next academic year.

# X. Procedures for Making Promotion Recommendations for Professorial Rank Faculty

Professorial ranks eligible for promotion are assistant professor and associate professor. University criteria for each rank are described in Chapter 2, Section IV: Criteria and Standards for Promotion. Divisions and departments may require additional criteria to augment the University criteria for promotion, so long as they neither diminish nor conflict with the University standards.

The process to be followed in applying for promotion, and in considering applications for promotion, is similar to that for tenure. Each department has a promotion committee for each rank, and there is a divisional promotion committee.

Each candidate for promotion is responsible for preparing a dossier to be considered by the appropriate departmental promotion committee. As these dossiers are designed to support an application for promotion rather than for tenure, material such as progress reviews may not be needed. Individual divisions and departments may require the inclusion of special forms or materials.

The candidate submits the completed dossier to the departmental chairperson by October 1. The chairperson, if necessary, places additional information in the dossier and then transmits the dossier to the chairperson of the departmental promotion committee. Thereafter, the stages in the review process, including all written notifications of recommendations and opportunities for rebuttal, are exactly the same as for tenure, with the exception of votes of abstention, which are discouraged but allowed. The permissible recommendations at each stage are to grant promotion or deny promotion. The candidate for promotion can terminate the review process at any stage by requesting that the dossier be withdrawn from consideration.

Completed promotion dossiers reach the Office for Academic Affairs by February 1. The Provost, together with designated persons, reviews each dossier and all preceding recommendations. Following this review, a written recommendation from the Provost goes to the President, who makes the final decision, unless the President has delegated this decision-making authority to the Provost.

The Provost sends the faculty member written notice of the final promotion decision and provides copies to the departmental chairperson and dean. Formal written notice from the Provost is the only way in which promotion is awarded. Notification of the decision to award promotion normally occurs between March 15 and April 15.

# XI. Graduate Faculty Appointments

The purpose of the graduate faculty of The University of Alabama is to set standards for graduate work and to provide graduate instruction. It is the responsibility of the graduate faculty in each division to elect its representative(s) to the Graduate Council, which acts for the faculty in matters relating to graduate work. The dean of each academic division has the responsibility of nominating members to serve on the graduate

faculty. The procedures for selecting graduate faculty and the subsequent rights and responsibilities are determined by the Graduate Council, as the duly elected representative body of the graduate faculty, subject to the approval of the Dean of the Graduate School and the Provost. Those criteria are published in the Graduate Catalog.

# XII. Policy and Guidelines on Faculty Evaluations

All full-time, regular faculty members are subject to annual evaluations, since decisions must be made about matters such as salary increases and the assignment of time and support for research, teaching, service, and administration. The criteria and standards used in these evaluations shall be similar to those used in reviews for tenure and promotion, except that these continuing reviews shall concentrate on the question of whether the individual has maintained or improved the level of performance that justified hiring, earlier promotions, and/or tenure. The following procedures are designed to ensure that all evaluations are based on factual information, that the faculty member has a timely opportunity to discuss any evaluations, that a written record will be available in case the faculty member chooses to contest an evaluation, and that faculty be involved in the development of any performance improvement plan.

1. Each faculty member shall submit a written activities report for the year just completed to the departmental chairperson (or appropriate supervisory official in non-departmentalized units) during the spring semester.

2. The department chairperson (or appropriate supervisory official) shall provide a written annual performance assessment comparing that faculty member's performance to the criteria and standards described above and making recommendations for improvement prior to the next evaluation. The annual performance assessment should be provided to the faculty member before the final performance assessment and salary recommendations are provided to the Office of Academic Affairs.

3. Each faculty member shall have an opportunity to provide feedback (including meeting privately with the departmental chairperson or appropriate supervisory official, if desired) about the activities report, the annual performance assessment, and the type of duties to be assigned during the next year. This opportunity shall occur before the final annual performance evaluation is submitted and salary recommendations are made to the Office for Academic Affairs. It is the responsibility of the departmental chairperson to notify the faculty member of the appropriate period for such a meeting.

4. A written performance improvement plan will be instituted for any faculty member who repeatedly falls below expectations in any area of responsibility, for at least two years in a row or longer depending on the standards and expectations in the field of study. The goal of the plan will be to facilitate improvement in performance to a level that meets college/school and/or departmental expectations. The performance improvement plan, consisting of corrective actions and expected outcomes, will be developed by the department chair and respective faculty member, in consultation with the dean. The corrective actions in the plan are not exclusive to, but may include professional development, training, coaching, or redistribution of workload. The plan must be signed by the faculty member, department chair, and dean. Performance improvement plans may not include any actions that are considered either minor discipline or severe sanctions under the Faculty Handbook progressive discipline policy.

5. Faculty who do not meet the expectations of the performance improvement plan may be considered for progressive disciplinary action as defined in the Faculty Handbook. Progressive disciplinary actions taken in any circumstance will be the responsibility of the department chair

and dean, with the consultation of and approval of the Office of Academic Affairs.

# XIII. Resignations

Acceptance of a full-time faculty appointment is a commitment for the scheduled academic year. When circumstances do not permit the completion of such a commitment, the University may agree to an earlier resignation with a written notice. A faculty member planning to resign shall give written notice to the departmental chairperson or area head as early as possible. A faculty member who resigns forfeits all rights of tenure and rank.

A faculty member who, without the permission of the department chair, dean, or Provost, fails to report to work for a period of time exceeding 30 calendar days or fails to return to work after the expiration of an approved absence shall be deemed to have constructively tendered a resignation. In such a case, the employee may be terminated by the University without initiating the termination for cause process. This does not apply, however, if the faculty member has been approved for additional leave (such as Family Medical Leave – see Employee Handbook – or medical leave for faculty as provided in Chapter 4) or an exception is necessitated under the Americans with Disabilities Act or Section 504 of the Rehabilitation Act or other state or federal law. A faculty member with a qualifying disability should refer to the Employee Handbook on how to request a reasonable accommodation.

# XIV. Termination and Severance

In accordance with Board of Trustees Rule 301, the definition of tenure at The University of Alabama recognizes that tenure is an "affirmative commitment by the Board of Trustees to a faculty member, generally offered after a probationary period of employment, of a right to continuing employment except upon dismissal for cause, retirement, resignation, bona fide financial exigency of the institution or division in which tenure is held, or major curtailment or formal discontinuance of a program or department of instruction."

Otherwise, tenure may be revoked only for adequate cause. "Adequate cause" for revoking tenure must be directly and substantially related to performance of academic duties and responsibilities or to fitness to perform academic duties and responsibilities.

## A. Adequate Cause to Revoke Tenure or to Terminate Before the End of an Employment Term

Adequate cause to revoke tenure and to dismiss a tenured faculty member or to terminate a probationary or renewable contract faculty member before the end of the employment term specified by the *Faculty Handbook* or by the appointment letter between the University and the faculty member is established when the faculty member engages in behaviors such as the following (this list is not exhaustive):

- Consistent failure to maintain standards of sound scholarship and/or competent teaching;
- Willful failure to discharge fundamental obligations as a teacher, colleague, and member of the wider community of scholars;
- Gross neglect of established University obligations appropriate to the appointment;
- A pattern of continual failure to comply with the policies of the Board, the University, the college or the department, or to carry out specific assignments, when such policies or assignments are

reasonable;

- A serious violation of or pattern of continual failure to comply with one or more of the faculty behavioral obligations set forth in The Code of Conduct/Standards of Behavior section of the *Faculty Handbook*, including willful disregard of accepted standards of professional conduct (AAUP Statement of Professional Ethics);
- A serious violation of or pattern of continual failure to comply with one or more policies, including but not limited to the Title IX and Sexual Misconduct Policy; Harassment Policy; Equal Opportunity, Non-Discrimination, and Affirmative Action Policy Statement; Consensual Romantic Relationships Policy; Child Abuse Reporting Policy; Code of Ethical Conduct, Scientific Misconduct, Conflict of Interest Financial Disclosure in Research and Other Sponsored Programs Policy;
- Falsification of academic credentials or information on one's employment application or other information concerning qualifications for a promotion or a position;
- Dishonesty (fraudulent research, plagiarism, theft or misuse of University property);
- Physical or mental incapacitation (when the faculty member no longer can perform the essential functions of the job, with or without reasonable accommodation); Improper use of narcotics or intoxicants that substantially impairs the faculty member's fulfillment of departmental and/or University duties and responsibilities;
- Conviction of a serious criminal offense or of any serious crime involving immoral or unethical conduct;
- Misrepresentation of criminal history background information; and
- Conviction of a crime substantially related to the duties and responsibilities associated with teaching, research, or service, or that impedes professional capacities as a teacher, advisor, or researcher/scholar.

When a faculty member does not dispute either the facts or the adequacy of the cause, the faculty member may resign immediately or receive immediate termination. When dispute exists on the facts or on their adequacy, the procedures outlined in the Mediation and Grievance System will be followed (see Appendix B).

## B. Financial Exigency and Termination of Tenured Faculty

The University accepts the obligation of showing that the needs based on financial reasons or major curtailment of a program or department are genuine. Pursuant to Board of Trustees Rule 301, The University of Alabama must submit decisions of financial exigency or program discontinuance to the Chancellor and the Board for approval.

Policies governing the merger and discontinuation of academic units are described in Appendix I. It is understood that merging and discontinuation of units could result in the termination of all regular faculty (appointment with tenure, probationary, or renewable contract before the end of a specified term).

In addition to adequate cause and merger/discontinuation of a unit, tenured faculty also can be terminated as the result of a bona fide financial exigency. This is defined as a significant decline in financial resources that is brought about by decline in institutional enrollment or by other actions or

events that compel a reduction in the University's current operating budget. Financial exigency also can include financial strain in an academic unit that makes it unable to fulfill, for the foreseeable future, its teaching and research missions unless it reduces its financial obligations to tenured faculty.

If the President believes that a bona fide financial exigency exists or is predictable, and if the resolution of the financial emergency could involve the termination of tenured faculty members, then the President shall inform the President of the Faculty Senate of the nature and extent of the financial emergency and shall request that the Provost develop a plan to accommodate academic and research portions of the financial emergency. The Provost must consider input from the deans, administrators, and tenured faculty in the affected units. The plan will be submitted to the Merger or Discontinuance of Academic Units Committee for review and recommendations. Based on this input, the President will submit a final recommendation to The Board of Trustees in accord with Board of Trustees Rule 301.The appointment of a tenured faculty member shall not be terminated in favor of retaining a faculty member without tenure in the same academic unit unless this would result in an extreme distortion of that academic unit. Before terminating tenured faculty, efforts will be made to place affected tenured faculty members in suitable available positions within the University. If a reasonable period of retraining of an affected faculty member would qualify that member for another available position at the University, then reasonable and appropriate institutional resources shall be considered. No tenured faculty member shall be terminated within less than 12 months from the date of The Board of Trustees' approval of the University's decision of financial exigency. The University shall give reasonable assistance in the identification and facilitation of other employment opportunities.

## C. Notice of Termination

1. **Tenured/Tenure-Track Faculty**
   A faculty member in a tenured position normally shall receive written notice of the termination date at least one calendar year in advance, unless the adequate cause includes acts of moral turpitude (as defined in Chapter 3, Section II.B.) or actions that could be reasonably construed as job abandonment or constructive tendering of a resignation such as failing to perform assigned duties for 30 calendar days without being on approved leave.

   Employment of a probationary faculty member (tenure-track) may end pursuant to a decision by the Provost to non-retain. Notification dates of a decision to non-retain are set forth elsewhere in this document.

2. **Renewable Contract and Temporary Faculty**

   Employment of a full-time renewable contract faculty member generally ends at the specified time in the appointment letter. Notification of the decision to reappoint or not to reappoint a renewable contract faculty member should be made in writing to the candidate in a timely fashion, and no later than April 15 of the terminal year specified in the appointment letter; however, failure to meet this deadline will not result in automatic re-appointment. At no time will contract renewal be deemed de facto tenure.

   Cases where the dean determines that the renewable contract faculty member's appointment will not be continued to the contract end date must be reviewed and approved by the Provost. If the Provost finds it necessary to terminate the employment of a full-time renewable contract faculty member before the end of their contract, that faculty member would be entitled to request a

review by the Tribunal (see Appendix B).

Those faculty holding any temporary appointment or those holding part-time renewable contract appointments are not entitled to advance notice of termination and/or non-renewal.

## D. Leave with Pay Pending Tribunal Review

If the faculty member's continued performance of duties poses a significant risk of harm to persons or property as determined in the sole discretion of the Provost, the faculty member may be relieved of duties and suspended with pay during the pendency of any mediation and grievance process as described in Appendix B. If a faculty member is relieved of duty in accordance with these procedures and is subsequently reinstated, all mentions of the leave of absence with pay will be removed from personnel files. This section does not apply to a decision by a department chair or dean to not assign a faculty member a particular course or courses in a particular semester. Those routine decisions are not offenses that can be grieved and are left to the sole discretion of the department chair or dean.

# XV. Appointment, Evaluation, and Replacement of Administrators

Administrators do not have tenure in office; tenure as a faculty member is a separate right. Final authority over the selection and retention of university-level administrators at the vice president level rests with the President. The President may delegate final authority for academic administrative appointments, including deans and associate provosts, to the Provost. Primary authority for the selection and retention of associate deans, assistant deans, and departmental chairpersons rests with the academic dean.

Appendix A describes procedures to be followed in selecting and evaluating departmental chairpersons and deans.

# XVI. Conversion from Administrative to Faculty Status

This policy concerns the return to full-time faculty status of faculty members holding administrative positions at or above the department chair/head level. The policy defines "academic-year salary," the phasing out of any administrative stipend (defined as any additional pay related to the administrative work above the 12-month base salary), and a leave program in lieu of "sabbatical leave" designed to facilitate the resumption of the duties associated with full- time faculty status. Loss of an administrative appointment cannot be subject of a grievance. This policy does not apply to administrators in the College of Community Health Sciences who are dually appointed by the CHSF.

## A. Academic-Year Salary

The summer salary of an administrator is defined as 30% of that individual's academic-year salary. An administrator's salary may also include an additional amount designated as an administrative stipend. The academic-year salary of those with 12-month appointments is defined as:

Nine-month academic-year salary = (12-month salary minus administrative stipend) divided by 1.3

# B. Awarding Administrative Leave and Phasing Out Administrative Stipends

The primary purpose of administrative leave is to provide the administrator with a compensated period of time for the study and research necessary to resume a full-time faculty role. Administrators taking advantage of this leave normally are expected to serve at least one academic year as a full-time faculty member after their administrative leave is completed.

Unless otherwise stipulated in an offer letter, administrators returning to full-time faculty status are eligible for a phasing out of their administrative stipend (if applicable) and to administrative leave as follows:

**Category A** is those with 10 or more years of continuous administrative service. They receive two semesters of paid administrative leave that must be taken within the first year after leaving their administrative role. Those with designated administrative stipends receive one-half of the administrative stipend in the first year and one-quarter in the second year after leaving their administrative role.

**Category B** is those with a least five but less than 10 years of continuous administrative service. They receive one semester and one summer of paid administrative leave, both of which must be taken in the first year after leaving their administrative role. Those with designated administrative stipends receive one-half of the administrative stipend in the first year after leaving their administrative role.

**Category C** is those with administrative service of more than one but less than five years of continuous administrative service. They may receive one semester or one summer of administrative leave, at the discretion of the Dean. If granted, such leave must be taken in the first year after leaving their administrative role.

# C. Other Conditions

1. **Date of Conversion**
   The date of conversion from administrative to faculty status is subject to negotiation, but normally will be the first working day after the end of the administrative appointment and will be no later than the following August 16. Administrative stipends begin to be phased out as soon as the administrative appointment ends. Similarly, administrative leave typically begins as soon as the administrative appointment ends. For example, an administrator who steps down January 1 and had more than five years of administrative service typically would take administrative leave in the spring and summer semesters at the 12-month salary, but then would be converted to nine-month faculty status , and 9-month academic year salary, on August 16, when the administrator returns from leave. If that same administrator steps down August 16, the conversion to nine-month appointment would take place immediately, and the administrator could take compensated leave either in the Fall or Spring semester that academic year and receive compensated summer leave (equal to 30 percent of the nine-month base) the following summer.

2. **Salary During Administrative Leaves**
   Salary during administrative leave will be one-half of the 9-month salary for each semester of fall and/or spring leave and 30 percent of the 9-month salary for summer-semester leave. Any variation from this policy must be approved in writing by the Provost before the leave begins.

3. **Accrued Leave**
   Administrators opting to take administrative leave under this policy are expected to utilize all of their accrued annual leave prior to beginning their administrative leave; any annual leave not taken by the time of conversion is lost. Administrators who opt not to take administrative leave may be entitled to a payout of up to 30 days of their accrued annual leave, consistent with University employment policies and with approval by the dean (if applicable) and Provost.

# XVII. Faculty Participation in Selection of Vice Presidents

The President ensures faculty participation in the selection of vice presidents by appointing faculty members to each search committee.

# CHAPTER 3: FACULTY CONDUCT AND COMPENSATION

## I. Academic Freedom

The academic freedom of the faculty is indispensable to the University in fulfilling its obligations to students, the community, and the State. The University endorses the statement on academic freedom as expressed in the American Association of University Professors' statement, Academic Freedom and Tenure, 1940 Statement of Principles and explained in its 1970 Interpretive Comments:

- Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition.
- Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights to the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.

Faculty members are entitled to full freedom in research and publication. However, publication of research results may be subject to requirements of individual research contracts and patent and copyright limitations. Faculty members are free to present relevant material in the classroom without prior censorship, but are expected to meet the highest standards of professional integrity.

Any faculty member may speak freely as a private citizen, but should make clear the views stated represent personal opinions and do not necessarily represent the position of the institution. In expressing opinions in public, faculty members should realize that the public may judge the teaching profession, as well as the University, on the basis of statements made by individual faculty members.

The University of Alabama is committed to providing and promoting an atmosphere in which employees can realize their maximum potential in the workplace and students can engage fully in the learning process. Toward this end, all members of the University community (including faculty, staff, and students) must understand that harassment based upon one's protected status as identified in the University's Equal Opportunity and Non-Discrimination Policy will not be tolerated, and that they are required to abide Harassment Policy, Title IX and Sexual Misconduct Policy, and Consensual Romantic Relationships Policy. The University will take appropriate action to prevent, correct, and, where warranted, discipline behavior that violates these and other related policies.

## II. Code of Conduct/Standards of Behavior

All faculty, at any rank, are required to review and adhere to the conduct standards referenced in the sections below and in various University policies. Failure to do so may subject the faculty member to progressive discipline and/or sanctions, up to and including suspension, non-renewal of contract, non-retention, dismissal, and/or revocation of tenure.

# A. AAUP Statement on Professional Ethics

The University of Alabama expects high ethical standards of all personnel. In particular, the University endorses the principles set forth in the Statement on Professional Ethics by the American Association of University Professors (2009). All faculty are required to review and adhere to these principles.

As noted in the section above on Academic Freedom, the University attaches great value to freedom of speech and open debate, but it also attaches great importance to the principles of civility and respect that govern an academic community. Indeed, the Statement on Professional Ethics requires that faculty members show due respect for the opinions of others in the exchange of criticism and ideas, strive to be objective in their professional judgment of colleagues, and not discriminate against or harass colleagues. Consequently faculty are required to act collegially, with civility and respect toward one another and toward all members of the University community.

Faculty are also required by the Statement of Professional Ethics to demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. They should avoid any exploitation, harassment, or discriminatory treatment of students, and should acknowledge significant academic or scholarly assistance from them.

# B. Compliance with Laws, University Policies, and Professional Licensure Standards of Conduct

In the continuing effort to maintain an effective and safe work/study environment and to comply with relevant federal and state laws, The University of Alabama has adopted a variety of policies governing faculty, staff, and student behavior. These policies were established to ensure acceptable standards of behavior and the display of professionalism as applicable to teaching, research, and institutional service.

All faculty members of The University of Alabama are expected to comply with applicable federal, state, and local laws as well as the policies of The University of Alabama. Those faculty members who are members of an occupation or profession that has established standards of conduct/ethics (including, but not limited to, licensure, registration, certification, or accreditation) shall be expected to conduct the affairs of the University and their professions according to the standards of conduct/ethics applicable to such occupations or professions.

While it is the responsibility of The University of Alabama's administration to maintain current and fair policies and procedures and to appropriately communicate current information about policies and procedures to appropriate University employees, it is the responsibility of faculty members to be aware of such policies and procedures and to comply with them. Faculty shall comply with applicable policies and procedures as referenced in the *Faculty Handbook*, in the Employee Handbook, in the Human Resources Policy Manual, on the University's Policies website, and on other official University websites. Examples of some of the policies or Employee Handbook provisions all faculty are required to comply with include, but are not limited to, the following:

- Code of Ethical Conduct (including anti-retaliation provision and policies referenced within)
- Title IX and Sexual Misconduct Policy
- Harassment Policy

- Child Abuse Reporting Policy and Procedures
- Hazing Policy
- Equal Opportunity and Non-Discrimination Policy
- Consensual Romantic Relationships Policy
- Drug-Free Campus and Workplace Policy
- Approved Alcohol Venue Policy
- Confidentiality of Student Records Policy
- HIPAA Privacy and Security Policies
- Dangerous Weapons & Firearms Policy
- Self-Disclosure of Criminal Conviction Reporting Process
- Nepotism Policy
- Computer & Network Use Guidelines
- Indebtedness and Collection Policy
- Solicitation Policy
- Purchasing Policy
- Spending and Travel Policy
- Board of Trustees Rule 304, Political Activities of University Personnel
- Research, Contracts, and Grants Policies including but not limited to:
    - Conflict of Interest/Financial Disclosure in Sponsored Programs
    - Health and Safety of Human Participants
    - Scientific Misconduct
    - Data Ownership and Retention
    - Effort Reporting Policies and Procedures
    - Federal Whistleblower Protections
    - Animal Subjects Procedures
    - Export Controls Policy
    - Biological Safety Manual
    - Radiation Safety Manual

It is the responsibility of faculty to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including termination. Examples of the types of behaviors that could warrant a range of disciplinary actions include, but are not limited to, the following:

- Repeated refusal to complete University-mandated training;
- Falsification of information on an employment application or other information concerning qualifications for a position or promotion;
- A pattern of unfair or abusive treatment of students;
- Consistently substandard performance or academic incompetence;
- Refusal to participate in a performance improvement plan;

- Incompetence, neglect, or dishonesty in performance of duties;
- Excessive absenteeism;
- A pattern of insubordination or failure to carry out reasonable, job-related duties appropriately assigned by a supervisor;
- A violation of state ethics laws or other University policy, including, but not limited to, appropriating state or student equipment, time, or resources for personal use or gain; fraudulent research or plagiarism; theft of University property; using course materials developed by the faculty member or their family members without appropriate approval from the college or department's textbook selection committee; or other unethical conduct;
- Violation of the University's Equal Opportunity, Non-Discrimination, and Affirmative Action Policy Statement, Title IX and Sexual Misconduct Policy, Harassment Policy, or Consensual Romantic Relationships Policy, including retaliating against someone who complains or participates in an investigation of any such matter;
- Committing a serious criminal offense, a felony, or a crime involving immoral or unethical conduct;
- Acts involving moral turpitude, as defined by Alabama HB 282 (2017) Definition of Moral Turpitude Act.
- Participating in acts of violence or making threats of violence;
- Illegal possession of a drug or controlled substance, or improper use of narcotics or intoxicants that substantially impairs the faculty member's fulfillment of departmental and/or University duties and responsibilities or serious or repeated violations of the University's Drug-Free Workplace Policy;
- A serious or repeated violation of one or more of the faculty behavioral obligations set forth in the Code of Conduct/Standards of Behavior section of the *Faculty Handbook*;
- Acts identified in the Standards of Behavior section of the Employee Handbook; or
- Any other behavior or condition that significantly affects a faculty member's fitness to carry out professional responsibilities.

# III. Progressive Discipline

When a faculty member's performance or conduct is not in keeping with the standards expected of an employee of The University of Alabama, the department chair or other appropriate administrative officer has the responsibility to investigate the situation and administer corrective action, if needed. Faculty members are subject to corrective action for a continued pattern of substandard performance or for violation of Board or University rules, regulations, or policies; departmental or college policies; or federal, state, or local laws or regulations.

The concept of progressive discipline acknowledges that a faculty member may have demonstrated a continued pattern of substandard performance or violated rules, laws, or policies or otherwise engaged in misconduct that, while serious, does not justify dismissal and/or loss of tenure. Activities of a faculty member that fall outside the scope of employment shall constitute misconduct only if such activities adversely affect the legitimate interests of the University. Examples of such conduct include, but are not limited to: 1) conduct, professional or personal, involving moral turpitude; and 2) actions that result in preventing other members of the University community from fulfilling their responsibilities or that create a clear and present danger to members of the University community.

Sanctions are disciplinary actions imposed on an individual that may include corrective action or punishment. Sanctions may extend from mild to severe and from informal to formal. Requiring a faculty

member to complete a performance improvement plan; participate in online or in-person training on a policy, rule, regulation, or law to remediate a potential deficiency in understanding of appropriate behaviors or courses of action is generally not considered a punitive sanction, but rather is considered an educational responsibility.

In cases of an employment offense or misconduct, a range of sanctions short of dismissal is generally available. The range of sanctions from minor to severe constitutes progressive discipline. Appropriate sanctions may include, but are not limited to, the lists below. These sanctions do not appear in hierarchical order.

## A. Minor Discipline

- Oral or written reprimand or warning
- Reassignment to other duties (including removal from future teaching or research or ineligibility to apply for or receive research funds)
- Removal from extracurricular activities, committee assignments, or administrative assignments Restriction on travel abroad or domestic travel
- Loss of travel or research funds
- Loss of privileges of rank
- Reassignment of workspace
- Placement of a faculty member under the direct supervision of a specified administrator with a specific plan for remediation and for a specific period of time
- Transfer or reassignment
- Loss of summer teaching employment for those on less than 12-month contracts
- Restitution
- Fines or penalties
- Loss of merit raises
- Loss of eligibility for promotion for a stated period of time

## B. Severe Sanctions

- Revocation of tenure and/or dismissal of a tenured faculty member for adequate cause
- Dismissal of a tenure-track (probationary) faculty member for adequate cause, before the end of the term specified by the *Faculty Handbook*
- Dismissal of a renewable contract faculty member before the end of the term specified in a contract or appointment letter between the University and the faculty member
- Suspension, with or without pay, of a faculty member from service for a stated period
- Reduction of a faculty member's rank (demotion)
- Reduction of an academic year salary before the end of that academic year

A first offense may warrant the most extreme penalty and loss of employment or tenure. Any sanctions imposed must be selected to meet the severity, frequency, and/or flagrant nature of the infraction. In some instances, the faculty member may be placed on leave with or without pay until final action is taken.

In matters where the dean and the Provost concur that a faculty member's continued performance of faculty duties poses a significant risk of harm to persons or property, the faculty member may be relieved of any or all duties and/or placed on leave with pay during the pendency of the mediation and grievance process.

In all faculty discipline, the University bears the burden of proof that adequate cause exists; it will be satisfied by a preponderance-of-evidence standard. The faculty member's record should be considered as a whole when contemplating imposition of disciplinary action.

# IV. Workload Assignments and Removal from the Classroom

An academic administrator's responsibilities include assigning workload and duties. These assignments may be adjusted from time to time, and normally such adjustments are not considered disciplinary actions.

If an academic administrator determines that a faculty member with rights under the *Faculty Handbook* must be relieved of all or part of the currently assigned teaching responsibilities after classes have begun in a given term, the administrator must promptly provide reasons for this action to the faculty member in writing. This action, if it does not result in a loss of pay, cannot be grieved and, therefore, the faculty member has no right to mediation. However, the faculty member can ask for a review from the dean and Provost simultaneously.

# V. Participation in Political Activities

Board of Trustees Rule 304 governs the rights and obligations of University personnel who seek or hold public office. The Rule recognizes the civil and political rights and responsibilities of University personnel and encourages them to fulfill their responsibilities as private citizens. The Rule prohibits the use, or appearance of use, of the University name or resources in support of a political campaign or organization and imposes two limitations on University personnel who expect to retain their connection with the University while holding public office. These limitations are:

- The office held must not result in a conflict of interest with University responsibilities and duties; and
- The duties of the office must not interfere with the person's performance of University responsibilities and duties.

The Rule provides for the possibility of leave of absence without pay, subject to prior approval by the Chancellor, when there is a conflict of interest or when interference with the performance of University duties exists. Refer to Board of Trustees Rule 304 for the complete statement of policy and to the Employee Handbook section on Running for Public Office & Political Activities.

# VI. Policy on Contributions

The University cooperates with the United Way of West Alabama by sponsoring a University-wide solicitation campaign for the United Way Fund. Otherwise, as noted in the Employee Handbook solicitation section, solicitations on UA premises are prohibited. For more information, refer to the HR Policy Manual on the HR website for the complete Solicitation Policy.

# VII. Mediation and Grievance System

The University of Alabama has a Mediation and Grievance System that provides a mechanism to process grievances of members of the faculty and proposed severe sanctions against faculty members. Appendix B contains the full statement of policies and procedures for the Mediation and Grievance System.

# VIII. Faculty Workloads and Assignments

## A. Workload and Full-Time Equivalent

A full-time workload (one full-time equivalency or FTE) for a University of Alabama faculty member is twelve credits of teaching per semester combined with the other duties required by good service/academic citizenship. This normally translates into four, three-credit courses (0.20 FTE each) per semester, with the remaining 0.20 devoted to service. Remotely located faculty who have teaching responsibilities exclusively online (with no service/academic citizenship or other responsibilities) may be assigned up to five courses per semester only if stipulated in a letter of appointment. Negotiations between the chairperson and the faculty member can result in replacing part of the teaching component with time assigned to research, clinical, or other activities that contribute to the mission of the University. For tenure-track/tenured faculty, teaching loads generally are reduced to allow for research. These variable teaching assignments are approved by the dean and, depending on the nature of the assignment, by the Provost. Faculty workloads are revisited annually to be responsive to needs of the units and the faculty members' productivity and success in assigned areas. Faculty members on a reduced teaching component may have their teaching load increased incrementally by their dean, in consultation with the department chair, as applicable, if their research or other activities fail to meet the negotiated expectations. For example, a faculty member teaching two courses a semester who is consistently not performing to standards in research may have course load increased by one course per semester for the first year and then to the full twelve credits of teaching per semester in subsequent years. Faculty members consistently not performing to negotiated expectations in any area are also subject to progressive disciplinary action.

## B. University Convocations

Faculty members are encouraged to participate in the commencement exercises in appropriate academic regalia, which can be borrowed or rented through the Faculty Senate Regalia Loan Program. Faculty members are encouraged to attend other University convocations, such as the President's meetings with the University faculty, which take place periodically throughout the year.

# IX. External Activities and Supplemental Compensation Policy

Faculty of the University of Alabama often provide leadership and share their expertise with the private sector, government, and society in general. Participation in such external activities, both compensated and uncompensated, can support the University's missions of teaching, research, and service and are encouraged within the limits set forth below and in related University policies, especially the Disclosure of External Activity by Faculty and Other Research Grant and Contract Eligible Employees Policy.

Reporting of all professional external activities, as defined below, is an integral part of establishing performance expectations between a faculty member and the appropriate administrative officer. Such reporting is also necessary to manage potential matters relating to Conflicts of Interest (COI) and Conflicts of Commitment (COC), especially those involving grant or contract eligible faculty.

Faculty must report any proposed external activity at least two weeks in advance using the process set forth in the Disclosure of External Activity by Faculty and Other Research Grant and Contract Eligible Employees Policy. If the external activity is for compensation, faculty members must obtain prior approval from the appropriate administrative officers of the University before undertaking it. Responsibility for adhering to the provisions and spirit of this compensation policy is one of the professional obligations a faculty member assumes when accepting employment at the University. Any questions concerning the policy should be discussed with the appropriate administrative officer before beginning an external activity.

## A. Definitions

"**Faculty,**" as used in this policy, refers to those with full-time appointments at any faculty rank, including academic deans and other administrators. Faculty includes faculty members on sabbatical leave, or other types of professional leave.

"**External Activity**" is any activity other than Primary Responsibilities or Secondary Responsibilities that an employee may engage in that, (1) is based upon professional knowledge, experience and abilities of the employee that relate to their UA employment, and (2) is performed for any public or private entity other than UA. When completing the external activity the employee may or may not receive compensation. External Activities most often include, but are not limited to, appointments and consulting for any public or private entity other than UA. For faculty, External Activities include those activities occurring (1) during the appointment period of faculty (9-month or 12-month), (2) during the allotted "supplemental compensation days," and (3) during the time the faculty is not under academic-year appointment (e.g., summer months).

"**Primary Responsibilities**" are the teaching, research, service, administrative duties, and other appropriate duties officially assigned by The University of Alabama to the employee.

"**Secondary Responsibilities**" are well-recognized professional activities or affiliations traditionally undertaken by employees outside of immediate UA employment context but where the employee legally and professionally represents UA. Secondary Responsibilities may or may not entail the receipt of honoraria, remuneration, or the reimbursement of expenses. Secondary Responsibilities are not considered External Activities, and employees engaging in Secondary Responsibilities do not have to report these activities, compensated or not. Some examples of Secondary Responsibilities include, but are not limited to, the following: Membership in and service to professional associations and learned societies; membership on professional or scientific review or advisory panels; presentation of lectures, papers, concerts, or exhibits; participation in seminars and conferences; reviewing or editing scholarly publications and books; service to national or international associations, foundations, or on governing boards closely aligned with or related to faculty work; work or service required to maintain credentials or board certifications related to the University faculty position, etc.

"**Honoraria**" refer to any payments given for professional or voluntary services that are rendered nominally without charge or invoice, and any payment in recognition of these services typically forbids a price to be set.

**"Conflict of Commitment"** is any activity that interferes with the Primary Responsibilities or Secondary Responsibilities of the employee of The University of Alabama.

**"Conflict of Interest"** is addressed in Board Rule 106.2. All university employees must acknowledge and appropriately manage conflicts of interest. "University community members should be loyal to our missions and institutions, appropriately objective and impartial in exercising their duties and discretion, and follow applicable ethical standards. University community members must not use public offices or resources for private or other improper gain, or otherwise act under an improper conflict-of-interest related to their duties."

**"Supplemental Compensation"** refers to any payment, deferred payment, equity, or deferred equity, or in-kind incentives provided in exchange for the expectation that the employee will perform work or services for the benefit of the external payer. It may be internal compensation from the University or external compensation from an entity other than the University. Compensation does not include standard Honoraria.

**"Academic-Year Appointment"** normally covers the nine-month period beginning on August 16 and ending on May 15. A 12-month appointment normally begins August 16 and concludes on the following August 15.

**"Appropriate Administrative Officer"** refers to that individual who determines the faculty member's conditions of employment. The appropriate administrative officer for a faculty member normally is the dean of the school or college or division director. Reports and requests for approval from faculty members will be transmitted to the dean or director by the appropriate departmental chairperson and will include the chairperson's recommendation. If the faculty member is a dean, vice president, or other executive, the appropriate administrative officer is the person to whom the individual reports.

## B. External Supplemental Compensation

Although external activities only need to be reported, external activities for which a faculty member receives compensation must be approved by the appropriate administrative officer.

1. **Approval for External Supplemental Compensation**
   Each faculty member at the University is expected not only to be an effective teacher and to maintain an ongoing program of research and scholarly effort, but also to exercise responsible service/academic citizenship. This typically includes advising students, serving as faculty advisor to student organizations, actively participating in professional associations, and engaging in other University activities where faculty participation is normal. Because supplemental compensation activity may infringe on these responsibilities, the faculty member is required to seek and receive prior written approval from the dean or the dean's designated representative for any such activity through the approval process set forth in the Policy for the Disclosure of External Activity By Faculty and Other Research Grant and Contract Eligible Employees. Deans, on their part, will respond with approval (or disapproval) promptly and normally will respond within five working days of receiving the request. If the proposed externally compensated activity is not approved, the dean will give the faculty member written notice of reasons for disapproving. Factors to be considered by the dean when deciding whether to approve supplemental compensation activities may include possible conflicts of interest, the amount of time the activity will require, and the appropriateness of arrangements to meet the faculty member's responsibilities.

2. **Limitations on Supplemental Compensation Leave**

   a. Faculty members on academic-year appointments may have no more than 39 supplemental compensation days (excluding weekends and holidays) during any academic year.

   b. Faculty on 12-month appointments must make arrangements with the appropriate administrative officer in order to receive supplemental compensation. Their maximum number of supplemental compensation days is 28 (excluding holidays, weekends, and annual leave) in any 12-month appointment period.

   c. Faculty members with a full-time, interim-term assignment may not exceed three days of supplemental compensation during that period. Faculty members with a full- time summer assignment may not exceed five days of supplemental compensation in any summer term.

   d. Deans of academic units that have unique needs to provide continuity of service to a community on a set schedule (e.g. patient care, clinical supervision, professional services) may reduce the number of allowed faculty supplemental compensation days with written approval from the Provost, provided the approved alternate policy is consistently applied to all similarly situated faculty in that unit.

   e. Faculty members shall not undertake compensated activities that will in any way: 1) conflict with the lawful interests and goals of The University of Alabama; or 2) impinge on their primary responsibilities to The University of Alabama. In the case of externally compensated activities, faculty members shall not: 1) make use of property or personnel of The University of Alabama for the purpose of obtaining compensation from sources external to the University, except when such use is permitted by law and is a normal part of the individual's professional academic activities; or 2) use or permit the use of the name of The University of Alabama in a way that would suggest that the activity is sponsored or endorsed by the University, without prior authorization of the President.

# C. Internal Supplemental Compensation

Each faculty member of the University must have prior written approval for all internal supplemental compensation activities.

1. Other than in exceptional circumstances, all teaching is done as a part of the assigned workload and without supplemental compensation. If teaching for internal supplemental compensation takes place, it is done over and above the assigned workload and normally is limited to one three-hour or four-hour course per semester.

2. Receipt of internal supplemental compensation for externally sponsored research and service activities is subject to the current policies and regulations of the external sponsor. The statements that follow describe some of these policies:

   • Internal supplemental compensation under sponsored programs (e.g., contracts and grants) is subject to University policy, except where the sponsor's policy is more restrictive.

   • Certain funding sources may require more specific documentation of both internal and external supplemental compensation activities; such conditions are specified in the terms of the agreement or sponsor policy. Any faculty member accepting such sponsorship is presumed to have accepted the conditions of the sponsoring agency. It

is the responsibility of the faculty member to provide any required documentation.

- Unless prior written approval is given by the sponsoring agency and the appropriate administrative officer, a faculty member cannot: 1) receive internal supplemental compensation on a project under the faculty member's direction; or 2) serve both on University-assigned time and receive internal supplemental compensation for the same work.

- If federal funds are used, supplemental compensation is only allowable in unusual cases where consultation is across departmental lines or involves separate or remote operations and the work performed by the faculty member is in addition to regular responsibilities. Charges for such work representing additional compensation are allowable provided that such consulting arrangements are specifically provided for in the federal award or approved in writing by the federal awarding agency. Further, compensation, including supplemental compensation, paid from federal funds will be at a rate not in excess of the individual's institutional base salary.

3. The remuneration for internal supplemental compensation activities depends upon negotiation between the faculty member and the agency in question. Usually, the daily rate for internal compensation will not exceed 1.5 percent of the academic-year salary or 1.15 percent of the 12-month salary, and the pay for teaching a supplemental course will be no more than that for teaching a comparable course during a summer term.

4. University faculty members who provide instruction or administrative support to classes, conferences, workshops, and seminars through the University of Alabama Online will, except for such activities funded through a grant or contract, receive internal supplemental compensation at rates determined by negotiation with the Office of Academic Affairs. These rates will be competitive to the extent that such rates are compatible with the projected revenue/cost of the program and with other relevant economic considerations.

# D. Conflict Provisions

The terms and conditions of any agreement between the University and external organizations, or between the University and particular employees, will prevail in the event of any conflict between that agreement and the provisions of this supplemental compensation policy.

# E. Appointments at Other Higher Education Institutions

A full-time University faculty member may not hold appointments in a faculty/academic role with any other institution of higher education without written approval from the Provost. Approval should be secured using the process set forth in the Disclosure of External Activity by Faculty and Other Research Grant and Contract Eligible Employees Policy. Note that there are additional requirements for faculty exchanges and visiting full-time faculty appointments outlined below.

# F. Discipline for Violations

An appropriate administrative officer who obtains information that a faculty member has violated these supplemental compensation standards will discuss the matter with the individual and may, with documented evidence, take any additional steps (including sanctions defined elsewhere) needed to

ensure compliance.

# X. Faculty Exchanges and Visiting Faculty Appointments

Faculty exchanges and visiting faculty appointments consist of arrangements by which a faculty member from The University of Alabama either exchanges duties for a stated period of time with a faculty member from another institution of higher education or takes a temporary full-time faculty appointment at another institution of higher education. In the case of faculty exchanges, the individual from the other institution must have credentials and competencies comparable to those of the individual from the University.

Typically, a faculty member of the University on a faculty exchange or who accepts a visiting faculty appointment remains on the payroll of the University for the period of the exchange and receives benefits as though continuing on assignment at the University. For faculty exchanges, professors from other institutions typically remain on the payrolls of their home institutions and receive benefits from those institutions. For visiting faculty appointments, the visiting university typically enters into a contract with UA to cover the faculty member's salary. Exchange or visiting professors from other institutions receive rights of usage of University facilities equivalent to those of regular faculty members.

A faculty member interested in arranging an exchange or visiting appointment should consult with, and receive prior authorization from, (1) the departmental chairperson or area head, (2) the dean of the division, and (3) the UA Office of Contract Management before beginning negotiations. Approval of the exchange or visiting appointment, and of the arrangements proposed, depends on recommendations from the departmental chairperson or area head and the dean of the division, but the final decision is made by the Provost. The procedural arrangements at the other institution must result in authorization of the exchange or visiting appointment by an appropriate official of that institution.

The University participates in a cooperative agreement for faculty exchange among certain Southern institutions and the Southern Regional Education Board. Faculty members wishing information about the institutions involved should contact the Dean of the Graduate School.

Time spent on a faculty exchange or a visiting faculty appointment is counted as University service for the purpose of considering tenure; it may be counted in determining eligibility for sabbatical leave, but prior approval for this arrangement must be obtained from the departmental chairperson or area head, the dean, and the Office for Academic Affairs.

# XI. Support for Research and Creative Activities

The University of Alabama encourages research activities by faculty members through several support programs for research.

## A. Departmental Support

1. **Reassigned Time**
   The University commits its resources to research or creative activities by providing time for faculty members to engage in research that is not sponsored by outside funding agencies and to seek external funding for their creative and scholarly pursuits. Initial decisions on time to be reassigned from teaching to research take place at the departmental level. Deans have final say

on any workload adjustments. The dean and the Provost receive regular reports on research productivity.

2. **Expenses for Faculty Professional Travel**
Subject to the availability of funds, the University may pay expenses of faculty members who participate in professional meetings as part of the meeting program. Prior arrangements for reimbursement for travel must be made with the UA official with budgetary authority over the funds. All faculty who travel on official University business are required to review and comply with all applicable University policies, including, but not limited to, UA's Spending and Travel Policy.

# B. Divisional Support

Indirect cost reimbursement on sponsored contracts and grants is allocated to provide general support to enhance research programs and activities in the divisions and departments.

The equivalent of 40 percent of the indirect costs reimbursement paid by contracts and grants is distributed to academic divisions, departments or areas, and principle investigators. One-half of these monies goes to the division, one-fourth to the department or area, and one-fourth to the principal investigator to be used for purposes other than salary for the investigators. Each division sets policies for the use of these divisional and departmental funds consistent with Spending and Travel Policy.

# C. University Support

The support services listed below are supplemented in various ways when financial resources are available.

1. **Research and Economic Development**
Research and Economic Development offers assistance to faculty members in pursuing external sponsorship for research, instruction, and service programs.

2. **Information Services**
The University provides computing, network, and Internet services to faculty, staff, students, and the campus. The Center of Instructional Technology provides hardware, software, training, emerging technology and accessibility services, and consulting services to faculty working on multimedia presentations, web pages, and classroom materials. Information on computing and network services and campus computing issues is available from the Office of Information Technology.

# D. Research Grants Committee

Research and Economic Development supports and coordinates awards recommended by the Research Grants Committee. This faculty committee recommends grants for specific research projects proposed by faculty members. Normally, these projects emphasize worthwhile research for which little outside money exists or for which initial support may lead to outside funding. The grants support needed research components such as compensation for research workers and clerical assistance, expenses for research-related travel, operating expenses, equipment expenses, and summer stipends.

# XII. Conflict of Interest

Senior administrators as defined in Board of Trustees Rule 106 shall disclose any potential conflict of interest as described in Board of Trustees Rule 106: "Ethics – Conflicts of Interest – Members of the Board of Trustees and Senior Administrators."

## A. Government-Sponsored Research

The University subscribes to and complies with the Joint Statement of the American Association of University Professors and the American Council on Education, "On Preventing Conflicts of Interest in Government-Sponsored Research at Universities" (see Appendix E).

The University has developed the Conflict of Interest Financial Disclosure in Research and Other Sponsored Programs Policy (see Appendix F). The policy applies to all sponsored programs as well as to University of Alabama intellectual property licensed to an entity in which a UA investigator owns any interest or serves as an employee, officer, or member of the Board of the Directors, regardless of the source of funding.

The University has also developed a Disclosure of External Activity by Faculty and Other Research Grant and Contract Eligible Employees Policy, which requires faculty and other employees to disclose to Research and Economic Development external activities that could serve as sources of potential Conflicts of Interest or Conflicts of Commitment and that must be disclosed so that the University may submit required certifications before a research grant or contract is submitted.

## B. Textbook Selection

The Code of Alabama, Section 36-25-5(a), 1995 (The Ethics Act), states "[n]o public official or public employee shall use or cause to be used his or her official position or office to obtain personal gain for himself or herself, or family member of the public employee or family member of the public official, or any business with which the person is associated unless the use and gain are otherwise specifically authorized by law." Amendments to the Alabama Ethics law passed by the 1986 Legislature place faculty of state-supported institutions of higher education within the purview of the conflict of interest standards set forth in the law. Advisory Opinion No. 1130 issued by the Alabama Ethics Commission on August 21, 1987, concluded that a faculty member "…who is also an author is not permitted to make the decision as to whether his or her publication will be used." The opinion approved a process by which "…the decision is made by either administrative officials of the institution or a textbook committee composed of other faculty members and administrative officials with the institution."

Each academic department or division is expected to have a textbook selection committee. In cases in which a faculty member desires to use textbook(s), laboratory manuals, computer software, or other instructional materials from which the faculty member or any person or business associated with the faculty member's family obtains direct financial gain, the faculty member shall submit this recommendation to the textbook selection committee at least three months prior to the beginning date of the semester in which the course(s) will be taught. The textbook selection committee is responsible for reviewing the recommendation, considering the appropriateness of the textbook(s) or other materials for the course, considering alternative textbooks or materials, and informing the faculty member and department chair or dean of its decision. Whenever possible, decisions should be made

at least two months in advance of the beginning date of the semester in which the course will be offered. Decisions on selection of textbooks or other materials authored by a faculty member, or from which the faculty member receives royalties, are effective for all semesters beginning in the subsequent 12 months, if the faculty member elects to continue using the textbook(s) or materials.

# XIII. Intellectual Property and Patent Procedures

New discoveries and inventions sometimes result from research activities at the University. The University's Policy on Intellectual Property establishes a mechanism consistent with Board of Trustees Rule 509. The purpose of this policy is to interpret intellectual property rights, and facilitate patent applications, the licensing of intellectual property, the equitable distribution of royalties or other financial returns, in order to provide uniformity in intellectual property matter and provide adequate reporting of intellectual property and patent activities.

The Intellectual Property Policy ensures faculty input on issues associated with intellectual property through the Intellectual Property Patent Committee (IPPC). The IPPC advises the Office of the Vice President for Research and Economic Development on patent applications, licensing of intellectual property, and new or revised policies and procedure associated with intellectual property matters. The committee includes a representative of the Faculty Senate, as well as faculty members selected by the Vice President for Research on the recommendation of divisional deans, associate deans for research, and the director of the Office for Innovation & Commercialization.

All faculty members and employees shall report any potentially patentable device, process, product, discovery, or invention at as early a stage of development as possible by completing a confidential Invention Disclosure Form, which, together with a copy of the procedures used in processing disclosures and patent applications, is available from the Office for Innovation & Commercialization

# XIV. Copyright Policy

The University of Alabama encourages the creation of copyrightable works by its faculty. Such works are an important contribution to the University's pedagogical, scholarly, and public service missions. The University's Copyright Policy establishes a mechanism, consistent with Board Rule 509 and Title 17 of the U.S. Code, to serve the public benefit and interest, to disseminate scholarly work produced by faculty and other employees, to determine and appraise all concerned parties of relative rights and equities, to facilitate the licensing of copyrighted works, the equitable distribution of royalties or other financial returns, to provide necessary uniformity in copyright matters, and to provide for adequate reporting of copyright activities.

# XV. Reproduction of Copyrighted Materials

Under Section 107 of the Copyright Act of 1976, the doctrine of "fair use" permits some reproduction of copyrighted works for educational purposes without the permission of the copyright owner. This doctrine of fair use is subject to limitations. Neither the statute nor judicial decisions, however, give specific practical guidance on what reproduction constitutes fair use. Faculty members seeking guidance for making decisions in this area may consult the document *Reproduction of Copyrighted Works by Educators and Librarians*, which is accessible from UA's Copyright Statement. Each faculty member is responsible for determining whether permission must be obtained before reproducing a copyrighted work. Duplication of computer software by University personnel is limited to only what is explicitly permitted by the software vendor.

# XVI. Academic Calendar and Compensation Periods

## A. Calendar

The academic year covers the nine-month period that begins on August 16 and ends on May 15. Academic terms normally include a fall semester ending in December and a spring semester ending in May. Interim terms fall between the end of the fall semester and the beginning of the spring semester, and between the end of the spring semester and the beginning of the summer term. Summer term consists of the full term (ten weeks) and can be divided into two five-week terms. The normal University holidays for employees are set forth in the Employee Handbook and are available from Human Resources.

The Academic Calendar is established annually by the Provost, in consultation with the Office of the University Registrar and the Faculty Senate leadership. The Calendar includes information about the drop-add periods and dates for paying fees and for deferred examinations. A final examination schedule is available from the Office of the University Registrar.

## B. Compensation Periods

Detailed information on faculty compensation can be found on the University of Alabama Human Resources website. The normal payment date is the last working day of each month. A new faculty appointee normally will receive a first payment on the last working day of the first calendar month of appointment; that payment will reflect the part of that month during which the faculty member was employed. The salary of part-time faculty members is paid in full during the months of appointment.

# XVII. Summer Session and Interim Program Compensation

Each academic unit attempts to meet student needs by offering appropriate courses during the summer and interim terms. However, these programs depend on the availability of funds, enrollment projections, actual student demand, and programmatic needs of departments and divisions. Despite these limitations, efforts should be made to distribute teaching opportunities equitably among departmental faculty members.

The salary for teaching a three-hour course will be the lesser of 85 percent of the in-state tuition paid by the student or 7.5 percent of the professor's academic-year (nine-month) base salary. A faculty member who wishes to teach a course with another faculty member should be advised that salary in this situation will be handled as Summer School salaries; that is, each professor will be paid a percentage of the salary that would be paid if the professor had taught the course alone. The percentage is dependent on the amount of the professor's involvement in the course. In no case should the total involvement of the professor be more than 100 percent. In no case shall compensation for teaching any three-hour course exceed 7.5 percent of a professor's academic- year base salary. For team-taught courses enrolling forty or more students, other compensation arrangements may be possible. These must be approved in advance by the Provost.

Each individual's teaching assignment during one of the two summer terms normally is limited to six semester hours. Each individual's teaching assignment during Interim terms normally is limited to three

semester hours.

# XVIII. Internal Degree Candidacy

Faculty who wish to take occasional graduate courses must register for these courses after admission to the Graduate School on the non-degree-seeking basis. To maintain University accountability, regular full-time faculty seeking admission as a degree-seeking graduate student must seek approval from their department chair and dean (which should not be unreasonably withheld), as well as the approvals required for other applicants to the same program.

# CHAPTER 4: FACULTY BENEFITS

## I. Retirement, Insurance, and Other Miscellaneous Employee Benefits and Services

The Benefits Office maintains current information concerning policies of all benefit programs. It is essential for new faculty members to arrange a conference with someone from the Benefits Office or attend a benefits session for new employees as soon as possible after the official employment start date. Some employee benefit decisions must be made during the first 30 days that one is on the University's payroll.

Unless otherwise noted in this chapter, faculty members have benefits as described in the current Benefits Guide for Faculty & Staff and as described in the Employee Handbook. See these pertinent sections, among others:

- Insurance Benefits
- Retirement Benefits
- Educational Benefit Program
- Action Card
- Employee Parking
- Employee Assistance Program (EAP)
- Faculty-Staff Clinic – The University Medical Center

## II. Leaves

Full-time faculty members (renewable contract, probationary, or tenured) may apply for leaves of absence, which, except for extended military leave, shall be for a period of one year or less. Faculty members normally must be employed at the University for one year to request these leaves. Unless otherwise noted here, faculty are entitled to all leaves afforded for their classification as defined in the Employee Handbook. Temporary faculty members with appointments for less than one calendar year typically are not granted leaves and are not eligible for leaves with compensation.

See these pertinent sections of the Employee Handbook, among others:

- Military Leave
- Jury Duty Witness Summons
- Suspension of Normal Campus Operations
- Bereavement Leave
- Voting
- Leave of Absence for Personal Reasons
- On-the-Job Injuries and Illnesses

Some leaves are unique to faculty members or operate differently for faculty who do not accrue annual or sick leave. These policies are as follows:

# A. Annual Leave and Sick Leave for 12-Month Faculty Members

Faculty members on 12-month appointments are eligible to accrue annual leave and sick leave. Policies that apply to University employees who accrue annual and sick leave generally apply to faculty members on 12-month appointments. Faculty in this category normally will abide by all policies related to the Leave Administration and Pay Policies and Practices as outlined in the Employee Handbook. Faculty on nine-month appointments do not accrue annual or sick leave and do not regularly report leave.

# B. Extended Sick Leave for Faculty

In the event of a personal illness, a faculty member may request sick leave for periods that may be as long as six months. To be eligible for extended sick leave for a personal illness, faculty members must have a qualifying serious health condition under the Family Medical Leave (FML) policy and work with the Benefits Office to request and be approved for FML, which can last for up to 12 weeks over a one-year period. Refer to Family and Medical Leave Policy for full details.

Faculty members who accrue both annual and sick leave must use their accrued time during this leave. If they exhaust their accrued leave, they can request leave with pay through their dean's office from the Office for Academic Affairs. While the leave provided under FML is guaranteed by law, leave with pay beyond what is accrued is not guaranteed and must be granted by the Office for Academic Affairs. All accrued leave must be exhausted before the Provost will consider such a request.

Faculty who do not accrue leave are guaranteed leave as provided by FML. For any portion of this leave to be granted with pay, however, a request must be submitted by the faculty member, through the dean's office, to the Provost for approval.

Faculty members whose personal illnesses prohibit them from returning to work and who have exhausted their approved FML may request additional leave from the Office for Academic Affairs or consult the Employee Handbook for more information on requesting leave as a reasonable accommodation under the Americans with Disabilities Act. For this request to be considered, faculty members normally will have been approved to receive FML and normally would have the support of their dean. These requests must be made in writing to the Office for Academic Affairs and should document the extenuating circumstances necessitating this extended sick leave. This additional leave will only be granted in extreme circumstances. Leave with pay is unlikely after the initial 12 weeks.

When a faculty member is approved for extended sick leave, the department chairperson or dean must arrange for colleagues to carry out the faculty member's obligations or must make other arrangements for fulfilling those obligations. In order to facilitate programmatic planning, a faculty member should notify the department chairperson or dean of the need for sick leave as far in advance of the anticipated leave period as possible.

# C. Parental Leave

Under the Paid Parental Leave Policy, the University provides up to four weeks of paid leave to employees who are the birth, adoptive, or foster parent of a newborn child, newly-adopted child, or

newly-fostered child. In addition, faculty may request that the Provost approve up to an additional eight weeks of paid parental leave. This leave is granted for the birth of a child, for prenatal care and incapacity related to pregnancy, for maternal recovery following the birth of a child, to provide time for initial bonding of the employee with the child, to prepare for adoption or foster placement, and/or for initial bonding with an adopted or foster child.

Parental leave must be requested through the FML process, and all approved paid leave runs concurrently with FML. Faculty members who accrue sick and annual leave are expected to use accrued time as paid time off, but they may be eligible for additional paid time off under the provisions above if they do not have a full eight weeks of leave at the time the leave begins.

Leave is granted during the actual time period necessary. It is not stored or added if birth occurs during the summer term, or winter or spring breaks. For example, if a baby is born June 1, a faculty member on a regular academic year appointment would not be eligible for paid leave. If the baby is born on August 1, the faculty member would be eligible for approximately six weeks of paid leave, because regular academic year appointments start on August 16. Colleges must work with eligible faculty members to provide eight weeks of paid leave provided the child is born, newly-adopted or newly-fostered during the academic year or close to the beginning of the academic year.

Department chairs and deans will work with faculty members to determine reasonable administrative, research, and service expectations during the portion of the semester in which the faculty member is not on leave. Except in extraordinary circumstances, and as approved by the Provost, no faculty member will be relieved of all teaching responsibilities for both the fall and spring semesters. Unless otherwise requested by a faculty member, no faculty member will have teaching, administrative, research, or service expectations increased in subsequent terms as a result of choosing to take parental leave.

To request parental leave, a faculty member should use the following steps:

1. As soon as possible, the faculty member should notify the department chair/dean of the due date and request assistance in planning a workload that accommodates the parental leave.

2. The department chair, in consultation with the faculty member, should propose a workload that accommodates the leave. The plan should make clear the expectations for the portion of the semester that the faculty member will not be on leave. Depending on when the child is due/adopted/expected to be placed, the faculty member may be able to teach courses typically taught during the semester. The assistance needed by the faculty member may be with grading at the end of the semester. The faculty member may benefit more from being relieved of research responsibilities or service responsibilities. A faculty member may be asked to pick up different responsibilities during the portion of the semester that the faculty member is available to work full time. For example, the faculty member may be asked to assist with responsibilities relating to program assessment plans or an upcoming accreditation visit.

3. This plan will be sent to the dean for review and commentary and then forwarded to the Provost for final approval. All faculty leaves must be approved by the Provost under the provisions in the *Faculty Handbook*.

4. Simultaneously, the faculty member should be following the FML approval process discussed above.

5. Faculty members and their supervisors must document leave time, and schools and colleges should initiate a conversion to unpaid status if the faculty member does not return to work at the

end of the approved paid leave period.

## D. Other FML-Covered Leave

Faculty members are eligible to apply through the Benefits Office for other qualifying FML events beyond personal illness and parental leave. Qualifying events include, but are not limited to, a serious health condition of an employee's spouse, dependent child, or parent, (see the Family and Medical Leave Policy). Request for this leave to be granted with pay should follow the same process as described above.

## E. Leave Associated with Distinguished Fellowships, Awards, and Grants

When University faculty members receive a distinguished fellowship, award, or grant intended to enable time away from their normal responsibilities at The University of Alabama, they may submit a request for leave through their department chair (if applicable) and dean, who shall forward the request to the Provost, who will make the final decision on leave. Faculty members who receive international awards should work with the Capstone International Center. It is the intent of The University of Alabama that faculty members receiving distinguished awards not be penalized for accepting them. Therefore, the following apply:

- Faculty members may apply to continue to receive their base University salary and benefits for the duration of the term of the award up to one year, with an additional one-year extension possible based on a written request approved by the department chair, dean, and the Provost. Leaves will not extend beyond two years.
- Any compensation provided by the awarding agency to pay for travel, housing, board, books, etc. while away from The University of Alabama shall normally be retained by the faculty member to offset costs of living temporarily in another location (if applicable).
- Any additional compensation provided by the awarding agency (for example, a monthly "teaching stipend" as defined in the Fulbright Award letter) shall also normally be retained by the faculty member.
- Recipients of leaves associated with distinguished fellowships, awards, and grants are expected to return to the service of The University of Alabama for at least one academic year after the completion the leave.
- Normally, leaves associated with distinguished awards will not be granted more often than once in four years.
- Faculty members are encouraged, but not required, to take such awards in conjunction with sabbatical leaves.
- The period spent on a leave associated with a distinguished award will not be counted toward the service period required to establish eligibility for a sabbatical leave.
- Documentation of the terms of the award, including details regarding compensation to be provided by the awarding agency, should be attached to the request.
- Department chairs and deans should explain in their memos to the Provost how they plan to cover the duties of the faculty member and costs associated with that coverage.

The University considers "Distinguished Fellowships, Awards, and Grants" to be those recognized as

such by the Association of American Universities, including those listed below. This list is not necessarily exhaustive; faculty receiving other important fellowships, awards, or grants may petition the Provost, through their dean, for consideration under this policy.

- Alexander von Humboldt Fellowships
- American Academy in Rome
- American Academy of Arts and Sciences
- American Antiquarian Society Fellowships
- American Council of Learned Societies Fellowships
- American Philosophical Society
- American School of Classical Studies in Athens Fellowships
- Field Medal
- Folger Library Postdoctoral Fellowships
- Ford Foundation Fellowships
- Fulbright Awards
- Huntington Library Research Fellowships
- John Simon Guggenheim Memorial Fellowships
- MacArthur Awards
- National Academy of Education
- National Endowment for the Humanities Fellowships
- Newberry Library Fellowships
- Nobel Prize
- Packard Fellowships
- Residency at the Center for Advanced Studies in the Visual Arts
- Residency at the Getty Center for Arts and Humanities
- Residency at the Institute for Advanced Study
- Residency at the National Humanities Center
- Residency at the Woodrow Wilson Center for Scholars
- Rockefeller Fellowships
- Searle Scholars
- Sloan Foundation Fellowships

## F. Voluntary Leave Without Pay

Tenured and probationary faculty members may request a voluntary leave of absence without pay. Typically, such leaves are granted for the purpose of further study, broader experience in the person's field, or in recognition of the faculty member's stature in the field. Normally, the faculty member should request leave of absence at least three months in advance of the beginning of the proposed leave period. The Provost decides whether to approve such leaves after considering recommendations from the chairperson and dean. Because granting a voluntary leave may interrupt the continuity of an

educational program, the availability of appropriate personnel and the importance of the individual's contribution to the smooth and orderly operation of the program will be among the factors considered in deciding whether to grant such leave. Time spent on a voluntary leave without pay is not counted when considering eligibility for a sabbatical leave unless prior agreement to count this time is recommended by the departmental chairperson and the dean and approved by the Provost. Approval will depend on the extent to which planned activities can be expected to enhance the applicant's professional stature, including the likelihood that research or scholarly publications will result. Time spent on a leave without pay does not accrue credit in the Teachers' Retirement System of Alabama.

## G. Effect of Leaves on Insurance Programs

When a faculty member has a leave of absence without pay, or temporarily goes off the payroll for other reasons, the faculty member must work with the Benefits Office for guidance about continuation of benefits during unpaid leave. Personnel of that office will provide information about the cost of continuation and will explain options available to the faculty member.

# III. Sabbatical Leaves

The University offers tenured faculty members opportunities to apply for sabbatical leaves to engage in activities designed for professional growth, development, and renewal. The goal of a sabbatical leave is to enhance the professional effectiveness of the faculty member and to enrich the academic climate of the University. A sabbatical leave provides an opportunity for professional growth through various kinds of activities. Examples include:

- Conducting research that leads to publication.
- Conducting research or study that leads to improving teaching, to a new area of teaching or research expertise, or to curriculum development.
- Engaging in activities to professionally revitalize or retrain the faculty member, such as association with distinguished persons in the field.

## A. Eligibility

A faculty member is eligible to receive a sabbatical leave after six academic years of full-time employment at The University of Alabama. A faculty member is eligible to receive a subsequent sabbatical leave after six academic years of full-time employment at The University of Alabama following completion of a sabbatical leave. A faculty member does not accumulate time to apply to sabbatical leave by additional full-time service beyond six years. For example, a faculty member who provides 12 years of continuous, full-time service is eligible to apply for only one sabbatical leave. When justified by the total period of service to the University, however, a subsequent leave may be approved during the fourth year after the preceding one. Under very special circumstances, if prior approval is recommended by the departmental chairperson or area head and dean and is granted by the Provost, a year spent on exchange, a visiting professorship, or a voluntary leave may count as service in determining eligibility for sabbatical leave.

As a general rule, no more than 20 percent of the faculty of any department should be on leave at any given time for sabbatical and voluntary leave (in the case of departments with fewer than five members, the limit is one person at any given time). Under extraordinary circumstances, individual

faculty members or departmental chairpersons may petition for exceptions to this policy; the petition will be reviewed by the academic dean and the Office for Academic Affairs before it is referred to the Provost for decision. Sabbatical leaves are an investment by the University in the future productivity of a faculty member. For that reason, recipients of sabbatical leaves are expected to return to the service of The University of Alabama for at least one academic year after the completion of such leaves. Applicants for sabbatical leave who would be able to render less than three years of service after return from sabbatical leave will be expected to offer particularly cogent reasons in support of their applications.

## B. Term of Leave and Compensation

For individuals on a nine-month appointment, a sabbatical leave may consist of either a one- semester leave with full pay or two semesters with one-half pay. Faculty members on 12-month appointments may apply for a sabbatical leave of four and one-half months with full pay or of nine months with one-half pay. In some situations, however, departmental or divisional needs may permit only a one-semester or four-and-one-half-month leave. An applicant for a sabbatical leave should discuss the proposed time and duration of leave with the chairperson before submitting an application.

A sabbatical leave is approved for a specific period of time. An individual with an approved sabbatical leave who finds that it will be impossible to take the leave should notify his or her departmental chairperson or area head immediately. Any subsequent request for sabbatical leave will be treated as a new application and will be judged accordingly.

Faculty members on sabbatical leave have the same right to earn supplemental compensation as faculty members who are not on sabbatical leave. However, the purpose of sabbatical leave is professional development and not income augmentation. Thus, the amount the University will pay during a leave will be reduced by the amount that income from sabbatical-related sources (other than activities described as part of the proposed program of professional development), when added to the normal leave pay from the University, exceeds the person's regular salary plus reasonable expenses attributable to the approved plan of sabbatical activities. When the amount of income to be realized from sabbatical leave activities cannot be ascertained, the University will require an agreement to reimburse the University for any over payment.

## C. Application and Approval Process

Sabbatical leaves must be spent in planned programs related to the professional work of the recipient and designed to match the duration of the sabbatical leave. Applicants for sabbatical leaves are required to describe what they plan to do while on leave, where they plan to spend the leave, and how their plans relate to their professional development. The leave application must include appropriate plans for travel or residence away from campus whenever such travel or residence can be expected to afford opportunities for professional growth that are not available at the University.

Applications for sabbatical leave should be addressed to the administrative officer most immediately responsible for the applicant's area of operations and should be submitted online via the faculty activity reporting system by October 1. Applications must include the following: a detailed description of the project to be undertaken, reports from previous sabbatical leaves, and a current CV.

Department chairs shall transmit all applications, together with their recommendations, to their deans

by November 1. When approval is recommended, an explanation shall be furnished as to what arrangements are contemplated and what budgetary adjustments, if any, will be required to maintain the departmental program during the applicant's absence. After the departmental recommendation has been reviewed by the dean, the application, together with appropriate recommendations and remarks, will be forwarded to the Provost by December 1. Normally, the Provost's decision will be transmitted to the individual by February 1.

## D. Administration

As far as possible, divisional programs and schedules should be planned to enable faculty members to propose sabbatical leaves when eligible to apply. However, continuity of divisional programs may require leaves to be scheduled in other than a seventh year of service. A faculty member whose application for leave is refused solely because of needs of the department or academic division should be encouraged to submit an application for the following year; in such cases, efforts will be made to make leave possible.

The sabbatical leave program normally will be financed through departmental and divisional budgets. If adequate funds are not available within department/divisional budgets, deans may request funds through the regular budget allocation process.

## E. Reporting

The recipient of a sabbatical leave is expected to submit a report that describes in reasonable detail the extent to which achievements during the leave met the objectives stated in the approved plan for leave. This report is due no later than one month after the start of the spring or fall semester in which the faculty member returns from the sabbatical. This report should be forwarded through the same channels as the original application for leave.

## F. Effect on Retirement

A sabbatical leave that results in a reduction of regular pay will impact years of service as determined by the Teachers Retirement System of Alabama (TRS). Faculty members who take two semesters with one-half pay are generally credited by TRS as one-half year of service. Service for retirement is calculated independently by the TRS.

# CHAPTER 5: FACULTY INSTRUCTIONAL GUIDELINES

## I. Introduction

Faculty members at the University are expected to be experts in their disciplines, to be effective teachers, and to be accessible and helpful to their students. These general responsibilities are inherent in the student-faculty relationship and pertain to all who conduct classes at the University; meeting them requires the type of research and scholarship, teaching, and good service/academic citizenship that are emphasized in this *Faculty Handbook*.

Students are partners in the teaching-learning experience. Their active participation in class discussions and effective use of the faculty member's time during office hours can help the faculty member adjust to special needs of the class. Regular class attendance is essential.

Grades are an integral part of academic evaluation, and fairness in grading requires the detection and suppression of dishonesty in academic work. The University Policy on Academic Misconduct describes the process to be followed when misconduct appears to have occurred (see Appendix C.) The Academic Grievance Policy describes the process to be followed by students who believe they have been treated unfairly (see Appendix D).

The University of Alabama is committed to maintaining equal opportunities in education and employment. For more information, see the Equal Opportunity and Non-Discrimination Policy. It is incumbent upon faculty to provide a learning environment free from discrimination, harassment, and retaliation. Therefore, all faculty are required to adhere to the University's Title IX and Sexual Misconduct Policy, Harassment Policy, Consensual Romantic Relationships Policy, Guidelines for Pregnant and Parenting Students, OAA Guidelines for Religious Holiday Observance, the Office of Disability Services procedures, and other related policies and procedures.

## II. Advising, Office Hours and Registration

### A. Academic Advising

Faculty members are expected to be available to students to provide academic advice. Faculty members should be aware of curricular and degree requirements pertinent to their disciplines.

### B. Office Hours

All faculty members must offer at least two regularly scheduled in-person office hours per week during any academic term in which they are teaching or assigned advising responsibilities to answer questions from and to advise students. Individual colleges may require a greater number of office hours be offered. This requirement covers all faculty, including those who are teaching online courses and must offer regularly scheduled, live "virtual" office hours. Office hours may not be restricted to by-appointment only. However, faculty members are expected to schedule individual appointments as needed. The schedule of office hours must be included in all course syllabi. Faculty needing an ad hoc

exemption from holding office hours in-person may request and be granted such an exemption from their department chair.

## C. Registration

Faculty members may be required to assist in the registration process. Assignments of registration duties are made by departmental chairpersons and by academic deans or directors.

## D. Advising Student Organizations

Student organizations are an important part of the co-curricular activities of The University of Alabama. They can contribute to the personal development of students within the context of the University's teaching, research, and service missions. To the extent that they fulfill these missions, faculty are encouraged to support student organizations by serving as advisors, as guest speakers, and in other roles as appropriate. Faculty members serving as advisors to student organizations are campus security authorities under the Clery Act and are required to notify UAPD of any reports of crime they receive in their student organization advisor roles. More information is available from the University of Alabama Police Department.

## E. Tutoring

Persons on the payroll of the University may not tutor a student of the University for compensation if they have any direct connection with the course in which the student desires tutoring.

# III. Class Scheduling and Class Attendance

## A. Class Schedule

Normally, classes can be held only at the time and in the place specified in the schedule of classes. The only exceptions to this policy occur when the academic dean or designee approves a change in time and/or location and these changes are subsequently communicated to the appropriate offices.

## B. Faculty Class Attendance

Faculty members are expected to conduct their classes as scheduled. A faculty member normally must receive prior approval from the department chairperson before missing or rescheduling classes. The faculty member must arrange for a suitable substitute for missed classroom time and must receive approval for such arrangements from the department chairperson prior to enacting the substitute plans.

## C. Student Attendance

Students are expected to attend classes as scheduled. Attendance policies must be provided to each student at the beginning of the semester. These policies must allow for the possibility that students may experience difficulties beyond their control that can result in failure to attend class or failure to complete an assignment on time. Students who may miss class due to observance of religious holidays should refer to the OAA Guidelines for Religious Holidays Observances; those who could miss

class because of pregnancy-related issues should refer to the guidelines for Pregnant and Parenting Students; and those who might be absent due to issues related to a disability should refer to the Office of Disability Services.

# IV. Course Requirements and Textbooks

## A. Accurate Course Descriptions and Syllabi

Faculty members are required at the beginning of each course to provide their students with an accurate syllabus. Faculty are required to enter their syllabus for each course in the University's online syllabus management system. The University maintains this system to host and store official syllabi in a single, central location. The system also ensures consistency of syllabi forms and content across the curriculum. Some information is required to be included in all syllabi. Academic units can require additional information for their courses. More information is provided in the University's Syllabus Policy.

Students shall be given timely notice of any changes in the syllabus. Any special considerations (e.g., opportunities to earn extra credit) offered to a student shall be available to all students in the class.

The chairperson is responsible for guaranteeing faculty post course syllabi to the online syllabus management system and for monitoring the syllabi with regard to the above requirements.

## B. Textbooks

UA's Textbook/Course Materials Policy and regulations follow prescriptions of the Alabama state law enacted in 1993 and the Higher Education Opportunity Act (HEOA) of 2008. More information is available from the University Supply Store (Supe Store). To comply with these laws, The University of Alabama has an established policy that all textbook/course materials requests must be sent to the University Supply Store because of its University designation as the central distribution location. In addition to compliance with regulations, this policy ensures that the University will make available all of the necessary course materials for students.

Course materials information can be submitted through department offices or directly to the University Supply Store. The University Supply Store is required to make available all course materials and anthology/packet orders to established off-campus stores within 48 business hours of receipt. An efficient process has been developed to comply with the state mandate as well as with the HEOA for course materials information to be posted on the University course registration website.

Additionally, state ethics laws prohibit faculty members from using their position as University employees to obtain personal gain for themselves, for family members, or for any business with which the person is associated unless the use and gain are otherwise specifically authorized by law. No faculty member (or family members or associated businesses) who is an author of requested course materials may make the decision as to whether their course materials will be used; instead, University policy requires approval by a textbook selection committee. Individual academic units are responsible for developing procedures for selecting textbooks. (See Chapter 3, XII. B.)

## C. Distribution of Materials in Class Subject to

# Copyright Policy

Faculty are expected to abide by federal copyright laws. For scholarly research or teaching purposes, a single copy may be made of a chapter from a book; an article from a periodical or newspaper; a short story, short essay, or short poem; or a chart, graph, diagram, drawing, cartoon, or picture from a book, periodical, or newspaper.

The guidelines for multiple copying are more complex. Multiple copies may be made for classroom use, but the making of such copies must meet rigorous criteria. Each copy must include a notice of copyright. Under no circumstances may more than one copy per pupil be made. Multiple copies must also meet tests of brevity, spontaneity, and cumulative effect. (See Copyright Policy.)

## D. Academic Honor Code

All students in attendance at The University of Alabama are expected to be honorable and to observe standards of conduct appropriate to a community of scholars. The University of Alabama expects from its students a higher standard of conduct than the minimum required to avoid discipline. At the beginning of each semester and on examinations and projects, the professor, department, or division may require that each student sign the Academic Honor Pledge.

## E. Collection of Student Fees

The University of Alabama has established administrative procedures for approving and collecting student fees. The procedures preclude faculty from imposing student fees or collecting money from students for any reason.

# V. Assignments and Evaluations, Study Week, and Final Examinations

## A. Assignments and Evaluations

Faculty members are required to make appropriate assignments and to make periodic assessments of the progress of their students. Systematic evaluation of students' work is an important part of the teaching-learning process. Evaluations may take many forms and may vary in number and scope, depending on the objectives and purpose of the course. Faculty members must include in their syllabi information as to the nature and timing of major evaluations, including the final evaluation. Faculty members must give students timely information about the results of evaluations and must give students an opportunity to review their progress and to discuss their evaluations.

## B. Study Week

The week immediately preceding the final examination period each regular fall and spring semester is reserved as a time in which students may concentrate on completing course work and preparing for final examinations. Only laboratory examinations omitted from the Final Examination Schedule are permitted during Study Week. The University prohibits all other examinations and extended assignments during Study Week, except extended assignments in which students have been given

advance notice and sufficient time prior to Study Week to substantially complete the work. Routine assignments, including homework, readings, and quizzes are permissible.

## C. Final Examinations

While evaluation details are properly left to individual faculty members and their departments, it is the responsibility of each faculty member to conduct a final evaluation for each student in each course for which the faculty member is responsible. All didactic courses will be assumed to require a final evaluation unless a petition for variance is included as part of the course proposal or is granted prior to the start of the semester. It is the chairperson's responsibility, in consultation with the departmental faculty as necessary, to ensure that proper evaluations are conducted.

A time for each final examination or evaluation is available from the Registrar. Normally, final examinations can be held only at the assigned time. The only exceptions to this policy occur when the academic dean approves a change in time before the semester begins and students are informed of this decision at the beginning of the course; where time conflicts result from such a change, priority shall be given to examinations that comply with the Final Examination Schedule.

## D. Opportunities for Making up Examinations and Assignments

Students should be given the opportunity to hand in assignments and to make up work missed due to legitimate circumstances beyond the students' control. Methods for making up missed assignments may vary from course to course and from discipline to discipline, but normally should be the same from student to student within the same course. The appropriate method(s) used for each course must be stated in the course syllabus made available to each student at the start of the semester. Faculty members with students who may miss an exam or assignment for observance of a religious holiday should refer to the OAA Guidelines for Religious Holidays Observances, for pregnancy-related issues should refer to the guidelines and policies for Pregnant and Parenting Students, and for issues related to a disability should refer to the Office of Disability Services.

# VI. Records and Grades

## A. Class Records

Faculty members are expected to maintain grade records for all registered students. Faculty members may use systems of their choosing for keeping such records. The University expects each faculty member to leave all grade records with the department chairperson or dean at the end of employment at the University.

## B. Student Records

The University's policy on Confidentiality of Student Records is based on the statement of ethical principles of the American Association of Collegiate Registrars and Admissions Officers and in compliance with the requirements of the Family Educational Rights and Privacy Act of 1974, as amended (FERPA). Official student academic records are maintained in the Office of the University

Registrar. Divisional and departmental offices also maintain some student educational information useful in academic counseling and advising. Each academic/business unit is responsible for securing protected information in accordance with the GLBA Information Security Program Policy, University policy, FERPA, and other applicable laws. See the Office of the University Registrar's website on Privacy Guidelines (FERPA) for additional training.

Student educational information is accessible through an electronic student records system to authorized school officials with a legitimate educational need for the information. Faculty, administrators, and staff dealing with student records are expected to know the University's FERPA policy on Confidentiality of Student Records and to observe appropriate precautions when utilizing student information that is protected under FERPA (such as letters of recommendation, grade reports, protected information displayed on computer monitors, class rosters, etc.). In the event of an unauthorized disclosure of a student's personally identifiable and/or educational information, the unit administrator must promptly notify the dean, the University Registrar, and the Chief Information Security Officer and provide details of the extent of the breach. Refer to the Educational Records (FERPA) section of the University's Security Incident Response Plan.

In the absence of pending or potential litigation, faculty members should retain student records pursuant to the Record/Data Retention and Destruction Policy.

## C. Reporting Grades

Grades are reported online through the myBama web portal. Complete information on grade reporting is available from the University Registrar.

## D. Posting Grades

A faculty member who chooses to post grades must do so in a way that maintains student confidentiality as required by the Family Rights and Privacy Act of 1974. Grades cannot be posted by social security number or in a list that is in alphabetical order; rather, the faculty member or department must devise a unique code for each student and must ensure its confidentiality.

## E. Changing Grades

The assignment of course grades is a primary part of the academic responsibility of the faculty members to whom a course has been assigned. Changes in course grades are normally to be made only by such faculty member. Faculty members may change grades they have assigned only because of error in fact or error in judgment. The faculty within a department or discipline may, following procedures adopted by that faculty, authorize the change of course grades when they believe a faculty member has failed to discharge his or her academic duties in a responsible manner, where there is an uncorrected error, or where other factors of equity and professional judgment persuade the faculty to take such an extraordinary step.

University policy may authorize other grade changes, such as the W, N, and I grading rules or the Academic Bankruptcy provisions.

# VII. Student Opinion of Instruction

Students' opinions of teaching effectiveness play a major role in improving the quality of instruction in all academic divisions of the University. Therefore, faculty members are required to use the standard survey instrument selected by the University. This standard survey instrument, the Student Opinion of Instruction (SOI), is not intended to preclude the use of additional survey instruments by areas or departments or by individual faculty members. SOI is an online course evaluation system, replacing the traditional paper course evaluation system. SOI allows students to confidentially rate their University learning experiences, encouraging feedback about their courses and instructors. Reports of survey results are provided to University faculty and administrators after grades are submitted. Student ratings are very important in helping instructors improve their teaching and in helping the University evaluate courses and faculty. For more information, see the Office of Institutional Research and Assessment.

# APPENDIX A: SELECTION AND EVALUATION OF DEANS AND DEPARTMENT CHAIRPERSONS

## I. Basic Principles

Academic excellence is essential to the educational mission of The University of Alabama. Such excellence is achieved in an environment of mutual confidence, collegial participation, effective leadership, and strong academic programs. To foster that environment, it is University policy that faculty are expected to participate in the selection of deans and departmental chairpersons and that the advice of the faculty shall be actively and systematically sought concerning possible improvements in academic programs and in administrative leadership of academic divisions and departments. Throughout this Appendix, faculty shall be understood to consist of all persons who have a full-time tenure or tenure-track or renewable-contract appointment in the appropriate academic unit of the University.

The process by which the views of the faculty shall be sought is based on seven understandings:

1. Final authority over the selection and retention of deans and other academic administrators rests with the President and, at the President's direction, the Provost. Primary authority for the selection and retention of associate deans, assistant deans, and departmental chairpersons rests with the academic dean.

2. Normally, no person shall be appointed as a dean or a departmental chair who has not received a positive tenure recommendation from the relevant academic departmental tenure committee or (where the smallest relevant academic unit is the division) from the divisional tenure committee of The University of Alabama.

3. The evaluation and advice of the faculty shall be systematically obtained and considered prior to the appointment of deans and chairpersons.

4. Program direction, program quality, and the performance of deans and departmental chairpersons shall be evaluated annually, and an important consideration in this process shall be the feedback from the faculty.

5. It is the responsibility of the faculty to participate in reviews of programs and leadership and to provide reasons for their recommendations, which will be considered by the administration when making decisions. Faculty members who fail to participate fully in the leadership evaluation process, either by making no recommendation or by failing to give reasons for a recommendation, impair the administration's ability to make an appropriate decision.

6. Faculty participation in the evaluation of administrative performance shall be accomplished by providing the opportunity for yearly feedback.

7. Program direction and program quality shall be considered by higher administrators when considering faculty feedback of the leadership of academic administrators. Normally, the nature and timing of academic program reviews shall be left to the discretion of the higher administrators, but these reviews must be reasonably extensive and current and must involve opportunities for faculty members to express their views about the program.

8. In the following policies and procedures governing the selection and evaluation of deans of

instructional units and departmental chairpersons, there exists an intended degree of latitude and procedural flexibility to accommodate differences and preferences among academic divisions and departments. Each academic division and each department may adopt more specific formal procedures, provided that these procedures are consistent with the University policies and guidelines stated herein and provided that they are approved by the Provost and/or the academic dean, as may be appropriate.

Certain positions that carry the title of dean do not have faculty constituencies limited to a single division, such as dean of the Graduate School or dean of Continuing Studies. For these positions, it is necessary that the formal review process include campus-wide faculty participation and that the procedures stated herein be modified to accommodate such participation. Such modifications will be developed on a case-by-case basis by the Provost or other appropriate administrative officer, in consultation with appropriate faculty and administrative bodies, including the Council of Deans and the Steering Committee of the Faculty Senate. These modified procedures shall be implemented upon approval by the President.

# II. Policies and Guidelines for Selecting Deans

The Provost of The University of Alabama, acting through authority granted by the President of The University of Alabama, appoints deans. The process of searching for and appointing a dean will conform to the Affirmative Action Plan of the University and all prevailing federal and state regulatory requirements. In addition, appointments will be made only after considering: 1) the evaluations and advice of the faculty of the academic division; and 2) the advice of a search committee, as described below:

1. When a vacancy occurs, the Provost shall meet with the divisional faculty before deciding on the nature of the search and the size and composition of a representative search committee. Every division must have a written procedure for electing faculty to serve as members and alternates (at least three) to the search committee. The written procedure should designate a tenured faculty member to organize the election of faculty members to the search committee. Faculty members elected from the academic division will constitute a majority of the search committee. Secret ballot election by the divisional faculty, either acting as a whole or by departments according to procedures approved by the divisional faculty, shall determine the elected faculty membership on the search committee. Other members of the search committee will be appointed by the Provost. Should a faculty member have to step down for any reason, the Provost will appoint a replacement member from the list of alternates elected by the division. Usually, the Provost will appoint a staff member from the Office for Academic Affairs to serve as a non-voting member on the search committee and to provide liaison and logistical support. Giving due regard to advice and concerns expressed by the faculty, the Provost will designate one of the elected faculty members to chair the search committee.

2. The search committee, working in cooperation with the Provost and with appropriate participation from constituent groups, shall establish selection criteria, announce and advertise the position in a manner appropriate to the nature of the search, and coordinate the review and evaluation of candidates for the position. The committee shall solicit, encourage, and provide for faculty participation and the participation of other constituent groups. In order to ensure confidentiality for the initial group of applicants, their application material will be made available only to members of the search committee. The members of the search committee will keep confidential the identities of the candidates in the initial candidate pool. The committee will provide the Provost a list of candidates they assess to be acceptable to be invited to campus for interview. From that list, the Provost will select final candidates to interview.

3. Confidentiality is no longer protected for candidates who are chosen and agree to be finalists for campus presentations and interviews. Divisional faculty should have ample opportunity to review the credentials of those finalists selected for campus interviews by the Provost. Interviews scheduled for finalists should allow for discussions with the President, the Provost, deans, chairpersons, search committee members, faculty, and, as appropriate, with students, alumni, and others. Following these finalist interviews, and other information-gathering procedures appropriate to the nature of the search, every reasonable effort should be made to obtain the views of the divisional faculty and appropriately interested constituent groups. The advice of the divisional faculty may be determined by individual written evaluations, by an expression of faculty sentiment at a called faculty meeting, or by such other means as the search committee may consider appropriate. General support of the divisional faculty normally will be necessary for further consideration of a candidate.

4. The search committee shall submit to the Provost, a summary of evaluations and advice received from the divisional faculty on each finalist interviewed, as well as its own evaluation of whether each candidate is acceptable or unacceptable. In the event the Provost does not secure the appointment of a dean from the list of those candidates who have general faculty support, the search process normally shall be continued until a dean acceptable to the Provost and the faculty is successfully recruited. Except in extraordinary circumstances, the Provost shall select a dean from those candidates who have general faculty support. If it should become necessary to reopen the search, the Provost and the search committee may confer to establish further direction; if it appears desirable, a new search committee may be formed.

5. The Provost will make interim or acting dean appointments when necessary. Such appointments will be made only after considering any advice and concerns stated by the faculty. The Provost, as soon as is practicable, will organize a formal search to replace the interim or acting dean. Interim or acting appointees who have served for more than one year shall be subject to normal annual review of deans. After one year, the interim or acting appointee can be subject to review based on a written petition to the Provost by at least 25 percent of the total divisional faculty or upon a vote of one-third or more of the total divisional faculty.

# III. Policies and Guidelines for Leadership Evaluation of Deans

It is the policy of The University of Alabama that faculty members in each academic division shall have a yearly opportunity to provide feedback on the leadership of their division, normally a dean. This faculty feedback shall be an important component of the yearly evaluation of the divisional leadership by the Provost. A leadership evaluation shall be scheduled in each academic division at least once every five years, except that the Provost may vary the schedule by as much as one year if a change in the leadership of a division occurs or is anticipated, or if other circumstances arise in which it becomes desirable to do so.

# IV. Divisional Leadership Evaluations

## A. Evaluation by Faculty

The following policies and guidelines for obtaining the divisional faculty's advice on the division's leadership are to be employed:

1. Every year, an electronic survey will be distributed to faculty of the division providing them the

opportunity to give feedback on their divisional leadership. The survey instrument will consist of a series of questions in which participating faculty will assign a score and will be given an opportunity for discursive comments. The discursive comments allow faculty to state any reasons they have for believing that the divisional leadership has or has not helped the college or division make progress in meeting its mission and goals. The comments will be anonymous and will not be edited. The Provost and divisional leadership will receive the results of the electronic survey.

2. The electronic survey will be developed and reviewed at least once every five years by the ad-hoc committee appointed by the Provost consisting of members of the Academic Affairs Committee of the Faculty Senate and members of the Council of Deans. The Provost will approve the final form of the electronic survey.

3. In the fifth year, the electronic survey will contain the statement: "I recommend to the Provost to continue the current administrative leadership of the College." "Yes" or "no" will be solicited as the response.

4. Also in the fifth year, after the receipt of the electronic survey results, the Provost will meet with the full divisional faculty to solicit further faculty input and clarification of the survey results.

## B. Decision by the Provost

When the retention review occurs upon receiving results of the electronic survey, and after any other evaluations, discussions, and clarifications that the Provost considers necessary, the Provost will communicate the decision to those concerned, normally no later than one month following submission of the electronic survey.

## C. Early Divisional Leadership Evaluations

Upon a written petition to the Provost requesting an early evaluation, signed by at least 25 percent of the total faculty of the division, or upon a vote of one-third or more of the total divisional faculty requesting an early evaluation, an early evaluation of divisional leadership shall be initiated, except that:

1. Only one early evaluation may be called for during the interval between regularly scheduled divisional leadership evaluations; and

2. If an early evaluation results in the continued appointment of the dean, the Provost may schedule the next leadership evaluation to occur as late as five years after that early evaluation. No additional early evaluation can be called for before the date when a leadership evaluation would have occurred had there been no call for an early evaluation.

3.
   Early evaluations shall be conducted in the same way as regularly scheduled evaluations.

# V. Policies and Guidelines for Selecting Departmental Chairpersons

Departmental chairpersons are appointed by the dean of the academic division, subject to review and final approval by the Office for Academic Affairs and the President. The term "departmental chairperson" is defined and used throughout to mean the administrator of an academic unit within a division who reports

directly to the dean of the division. The term includes department heads, area heads or chairpersons, program heads or chairpersons, directors of schools within a college, and other such administrators of academic units. A similar interpretation should be placed on the use of the term "department."

The process of searching for and appointing departmental chairpersons will conform to the Affirmative Action Plan of the University and all prevailing federal and state regulatory requirements. In addition, appointments will be made only after considering: 1) the evaluations and advice of the faculty of the academic unit; and 2) the advice of a search committee, as described below.

When a vacancy occurs, the dean of the academic division shall meet with the departmental faculty before deciding on the nature of the search and the size and composition of a representative search committee. Committees of the whole may be appropriate in small academic units. Faculty members elected from the department will constitute a majority of the search committee. Secret ballot election by the departmental faculty shall determine the elected faculty membership on the search committee. The faculty of small departments may choose to elect additional faculty members from the division. Other members of the search committee will be appointed by the dean. Usually, the dean or a person from the dean's office will serve as a non-voting member on the search committee to provide liaison and logistical support. Giving due regard to the advice and concerns expressed by the faculty, the dean will designate one of the elected faculty members to chair the search committee.

1. The search committee, working in cooperation with the dean and with appropriate participation from constituent groups, shall establish selection criteria, announce and advertise the position in a manner appropriate to the nature of the search, and coordinate the review and evaluation of candidates for the position. Throughout the search process, the committee shall solicit and provide for faculty participation, and the participation of other constituent groups. In order to ensure confidentiality for the initial group of applicants, their application material will be made available only to members of the search committee. The members of the search committee will keep confidential the identities of the candidates in the initial candidate pool. The committee will provide the dean a list of candidates they assess to be acceptable to be invited to campus for interview. From that list, the dean will select final candidates.

2. Confidentiality is no longer protected for candidates who are chosen and agree to be finalists for campus presentations and interviews. Department faculty should have ample opportunity to review the credentials of those finalists selected for campus presentations by the dean in consultation with the search committee. Interviews scheduled for finalists should allow for discussions with the dean, the search committee members, individual faculty, and, as appropriate, students and others. Following these finalist interviews and other information-gathering procedures appropriate to the nature of the search, every reasonable effort should be made to obtain the views of the departmental faculty and appropriately interested constituent groups. The advice of the faculty may be determined by individual written evaluations, or by expression of faculty sentiment at a called faculty meeting, or by such other means as the search committee may consider appropriate. General support of the departmental faculty normally will be necessary for further consideration of a candidate.

3. The search committee shall submit to the dean a summary of evaluations and advice received from the departmental faculty on each finalist interviewed, as well as its own evaluation of whether each candidate is acceptable or unacceptable. I. In the event the dean does not secure the appointment of a chairperson from the list of candidates who have general faculty support, the search process normally shall be continued until a chairperson acceptable to the dean and the faculty is successfully recruited. Except in extraordinary circumstances, the dean shall select a

chairperson from those candidates who have general faculty support. If it should become necessary to reopen the search, the dean and the search committee should confer to establish further direction. If it appears desirable, a new search committee may be formed.

4. The dean may make interim or acting department chairperson appointments when necessary. Such appointments will be made only after considering any advice and concerns stated by the faculty. The dean, as soon as practicable, will organize a formal search to replace the interim or acting chairperson. Upon a written petition to the dean by at least 25 percent of the total departmental faculty or upon a vote of one-third or more of the total departmental faculty, acting or interim appointees who have served for more than one year shall be subject to review and the faculty's advice as to continuation.

# VI. Policies and Guidelines for Leadership Evaluation of Chairpersons

It is the policy of The University of Alabama that faculty members in each academic department shall have a yearly opportunity to provide feedback on the leadership of their department. This faculty feedback shall be an important component of the yearly evaluation of the departmental leadership by the dean. The dean, in consultation with the Office for Academic Affairs, will establish a schedule for the leadership evaluations of each department within the division. A leadership evaluation shall be scheduled in each academic department at least once every five years, except that the dean, in consultation with the Office for Academic Affairs, may vary the schedule by as much as one year if a change in the leadership of a department occurs or is anticipated or if other circumstances arise that make doing so desirable.

# VII. Departmental Leadership Evaluations

## A. Evaluation by Faculty

The following policies and guidelines for obtaining the departmental faculty's advice on the department's leadership are to be employed:

1. Every year, an electronic survey will be distributed to faculty of the department providing them the opportunity to give feedback on their chairperson. The survey instrument will consist of a series of questions in which participating faculty will assign a score and will be given an opportunity for discursive comments. The discursive comments allow faculty to state any reasons they have for believing that the departmental leadership has or has not helped the department make progress in meeting its mission and goals. The comments will be anonymous and will not be edited. The dean and the chairperson will receive the results of the electronic survey. In the fifth year, the electronic survey will contain the statement: "I recommend to the dean to continue the current administrative leadership of the Department." "Yes" or "No" will be solicited as the response.

2. The electronic survey will be developed and reviewed at least once every five years by an ad-hoc committee appointed by the Provost consisting of members of the Academic Affairs Committee of the Faculty Senate and members of the Council of Deans. The Provost will approve the final form of the electronic survey.

## B. Decision by the Dean

When the retention review occurs upon receiving results of the electronic survey, and after any other

evaluations, discussions, and clarifications that the dean considers necessary, the dean will communicate his or her decision to the chairperson normally no later than one month following submission of the electronic survey. The dean will meet, normally no later than two weeks after communication of the results to those concerned, to discuss the dean's decision. Then, if the faculty so chooses, it may inform the Provost and the President of its concerns regarding the dean's decision.

## C. Early Leadership Evaluations

Upon a written petition to the dean requesting an early evaluation, signed by at least 25 percent of the total faculty of the department or upon a vote of one-third or more of the total departmental faculty requesting an early evaluation, an early evaluation of departmental leadership shall be initiated except that:

- Only one early evaluation may be called for during the interval between regularly scheduled evaluations; and
- If an early evaluation results in the continued appointment of the department chairperson, the dean may schedule the next leadership evaluation to occur as late as five years after that early evaluation. No additional early evaluation can be called for before the date when a leadership evaluation would have occurred had there not been a call for an early evaluation.

Early evaluations shall be conducted in the same way as regularly scheduled evaluations.

# VIII. Implementation

Each academic division and department of the University may propose to the central administration the use of more specific guidelines and procedural details. As with any University policy, the provisions for faculty participation stated herein are subject to modification and change by the President whenever circumstances and experience warrant. However, any such changes will be discussed fully with the Faculty Senate (acting on behalf of the faculty), deans, and chairpersons prior to their approval by the President.

Normally, any person appointed as Provost will be expected to possess credentials commensurate with an appointment at a senior rank and in an appropriate academic discipline.

# APPENDIX B: GRIEVANCE AND MEDIATION SYSTEM

## I. General Principles and Purpose

The University of Alabama endeavors to promote the fair and equitable treatment of all members of the University community. The Grievance and Mediation System provides members of the faculty with a means of presenting grievances to other members of the faculty for evaluation, mediation, and in certain circumstances, recommendation of a resolution to the President. Because it is important that faculty members participate in their own governance and that of the University, the faculty maintains a central role in this mediation and grievance process. This faculty involvement, along with the process itself, is meant to help uphold the fundamental principles of academic rights, academic freedom, and contractual understanding. These procedures adhere to the principles of professional academic practices and are not considered to be judicial or legal in nature. They provide a standard administrative process that ensures that faculty grievances receive fair consideration.

## II. Scope of the Grievance and Mediation System

This policy applies to all persons who have full-time tenured, tenure-track, or renewable contract faculty appointments at The University of Alabama. It is applicable only to grievances regarding actions taken directly and specifically against the grievant or conduct directed specifically toward the grievant.

### A. Issues Subject to Review by the Grievance and Mediation Committee

Issues eligible for consideration by the Grievance and Mediation Committee are:

- Official disciplinary sanctions taken against a grievant;
- A violation of a written and duly approved departmental, divisional, or University policy, rule, or regulation, the violation of which has a substantial negative impact on the grievant as determined by the Grievance and Mediation Committee;
- Significant procedural improprieties in matters of regular retention reviews, tenure, or promotion that have a substantial negative impact on the grievant; or
- An improper and prejudicial action by an administrator or faculty committee that has a substantial negative impact on the grievant, if the Grievance and Mediation Committee determines that the issues raised by that action are sufficiently related to the concerns of an academic community.

### B. Issues Subject to Review by a Tribunal

Not all issues eligible for Grievance and Mediation Committee review may advance to a Tribunal. Review by a Tribunal is determined by the Grievance and Mediation Committee or by the nature of the sanction and is limited to:

- A review of severe sanctions, as specifically defined by the *Faculty Handbook*, imposed by an administrator on a grievant, if such review is requested by the grievant; or
- When the Grievance and Mediation Committee is unable to facilitate a resolution for cases accepted for mediation that involve:
  - Significant procedural improprieties in matters of retention, tenure or promotion; or
  - A blatant violation of a written and duly approved departmental, divisional, or University policy, rule, or regulation, which caused a substantial negative impact on the grievant and that is of concern to the entire academic community.

## C. Issues not Subject to Review

The following issues are not eligible for review by the Grievance and Mediation Committee or by a Tribunal:

- Decisions made by administrators in the ordinary course of their administrative duties, so long as they do not violate a written and duly approved departmental, divisional, or University policy, rule, or regulation. Such decisions include, but are not limited to, teaching assignments, single course assignments, teaching schedules (i.e. date/time of class), room assignments, administrative duties, classroom equipment, assigning office or lab space, allocating departmental travel funds, committee assignments, annual performance evaluations, setting hiring salaries, and awarding merit or equity raises.
- Loss of an administrative appointment. Faculty members serving in an administrative role (department chair, program director, dean, etc.) serve at the pleasure of the administration.
- Decisions made by administrators to remove opportunities from which faculty receive supplemental or extra pay for performing extra duties.
- Disputes regarding the professional qualifications or professional competence of a grievant. That responsibility is vested in the appropriate department, college, or school faculty; academic administrators; and external consultants, if applicable. In response to a claim of inadequate review, the role of the Grievance and Mediation Committee (or Tribunal, if applicable) shall be limited to inquiring whether the decision was a bona fide, conscientious exercise of professional academic judgment, using relevant standards of the institution.
- Grievances arising from retention, tenure, promotion, or contract renewal recommendations. In such cases, neither the Grievance and Mediation Committee nor the Tribunal shall substitute its judgment on the merits for that of the faculty, faculty committees, or administrators. The Tribunal will restrict its attention to claims that the procedures followed were not in accord with the *Faculty Handbook* and with any supplementary procedures adopted by the departmental and divisional faculties.
- Factual determinations by Title IX investigators, EEO investigators, or other University administrators appointed to investigate and/or make decisions regarding violations of the Title IX and Sexual Misconduct Policy; the Equal Opportunity and Non-Discrimination Policy; the Consensual Romantic Relationships Policy; and/or the Harassment Policy. Grievances that involve these policies should be reported to the appropriate channels as indicated in the relevant policy.

# III. Definitions

**"University"** means The University of Alabama in Tuscaloosa, Alabama.

**"Faculty"** or **"faculty Members"** means one or more persons with full-time tenured, tenure-track, or renewable contract appointments at the University. Except where otherwise clarified herein, "faculty" does not include part-time, temporary, visiting, or adjunct faculty members.

**"Administrators"** or **"Administrative Faculty"** are faculty members who hold administrative assignments at or above the level of departmental chairperson.

A **"Work Day"** is any day on which the University is in session, excluding weekends, University holidays, and the periods between the last day of final examinations in the spring semester and the first day of classes for the next fall semester.

A **"Work Week"** is five work days.

**"Severe Sanction"** is a type of serious discipline, defined in Chapter 3 of the *Faculty Handbook*, that has been imposed on a faculty member. Decisions made by administrators in the ordinary course of their administration (including but not limited to teaching assignments, single course assignments, teaching schedules, i.e. date/time of class, room assignments, administrative duties, classroom equipment, teacher recognition, assigning office or lab space, allocating departmental travel funds, committee assignments, annual performance evaluations, setting hiring salaries, awarding merit or equity raises, etc.) and minor discipline as defined in the Progressive Discipline section of the *Faculty Handbook* shall not be considered severe sanctions. In addition, non-renewal of an appointment or contract at the end of a contract period is not a severe sanction.

Examples of a severe sanction include cases in which an administrator:

- Revokes tenure and/or dismisses a tenured faculty member for presumed adequate cause;
- Dismisses a tenure-track (probationary) faculty member for presumed adequate cause, before the end of the term specified by the *Faculty Handbook;*
- Dismisses a renewable-contract faculty member before the end of the term specified in a contract or appointment letter between the University and the faculty member;
- Suspends, with or without pay, a faculty member from service for a stated period (this does not include paid administrative leave pending outcome of an investigation, mediation, or tribunal);
- Reduces a faculty member's rank (demotion); or
- Reduces an academic-year salary before the end of that academic year.

Definitions of other terms may appear in other sections of this document.

# IV. The Mediation and Tribunal Process

## A. Stage 1: Attempted Informal Administrative Resolution of Grievances (See Figure 1)

An informal resolution to a dispute is preferable to resorting to the formal mediation and grievance procedure. Therefore, a grievant is required to make reasonable and good faith efforts to resolve

disputes informally before availing themselves of the formal mediation and grievance process.

In order to fulfill the requirement of attempted informal resolution, a grievant must attempt to resolve their problem first through verbal and written discussions through the appropriate academic administrative chain. This chain begins with their department chair and/or assistant/associate dean, and then their dean. A grievant who does not receive an acceptable decision within two work weeks after discussion with the appropriate administrator in the chain is entitled to initiate verbal and written discussions with the next-higher administrator.

The grievant may not submit a written complaint to the Grievance and Mediation Committee until they have attempted to resolve the issue informally at each administrative level up to and including their dean. The grievant may consult the Provost (or designee) if the dean has not provided an acceptable solution to the grievance, but is not required to do so.

The grievant is **strongly encouraged** to consult with a Faculty Ombudsperson or Informal Resolution Services at some stage in the informal resolution process.

## Stage 1: Required Administrative Resolution



**Required Administrative Steps**

Grievants are required to make a reasonable and good faith effort to resolve a grievance informally before submitting a written complaint to the Mediation Committee. To fulfill this requirement, the grievant must attempt to resolve the grievance through discussion with their Department Chair or Associate Dean and with their Dean. Grievants may also seek resolution from the Provost's designee.

**Additional Recommended Consultation Step**

Grievants are strongly encouraged to consult with a Faculty Ombudsperson or the Director of Informal Resolution Services before submitting a written complaint to the Mediation Committee. This consultation can occur at any point in Stage 1. If the grievant does not consult with one of these services, the Mediation Committee may require such consultation.

# B. Stage 2: Grievance and Mediation Committee Review of Complaint (See Figure 2)

1. **The Written Complaint as First Step in the Formal Grievance Process**
   Grievants who have been unable to resolve a grievance informally should submit a written complaint to the Grievance and Mediation Committee. The complaint must:

   • Describe in detail the nature of the grievance;

- Include a concise statement of the facts from which the grievance arose;
- Identify the initial date of the decision, action, or event that serves as the basis for the grievance;
- Describe how the grievance falls within the scope of permitted grievances set forth in this document;
- Identify against whom the grievance is directed (respondent);
- Summarize all attempts to informally resolve the dispute; and
- Describe the relief sought.

The grievant may provide any information deemed pertinent to the grievance. To the extent the Grievance and Mediation Committee creates complaint intake forms, the grievant must use those to submit the information identified above. All materials provided by the grievant will be shared with the respondent within one work week of being received by the Grievance and Mediation Committee.

2. **Time Limit within which to File a Written Complaint to Grievance and Mediation Committee**
   In order to be considered by the Grievance and Mediation Committee, the grievant must submit the written complaint within twelve work weeks of the time the grievant first knew or reasonably should have known about the matter or administrative decision that is the subject of the grievance. The time during which the grievant is seeking informal resolution is included in the twelve work-week time limit, however anytime when the grievance is under consideration by an ombudsperson, informal resolution services, or a university office or administrator is not.

3. **Decision to Accept or Dismiss Complaint**
   After receipt of the written complaint, the Grievance and Mediation Committee first determines if the complaint involves a grievable action (as defined in Section II). The Committee may conduct initial fact-finding, if necessary to make that determination. After deliberation and preliminary fact-finding, if necessary, the Committee will vote by simple majority to determine if the complaint involves a grievable action.

   If the vote determines the complaint involves a grievable action, the Committee initiates a formal fact-finding review. As part of the fact-finding review, the Grievance and Mediation Committee, acting either as a whole or through specifically designated members with, if appropriate, the assistance of the Faculty Liaison, may meet with the faculty grievant and/or with the respondent or others to clarify and ensure adequate factual support for the allegations presented.

   After completing fact-finding, the Committee will vote by simple majority to determine if:
   - The faculty grievant has made a sufficient good-faith effort to reach an informal resolution; **and**
   - Sufficient factual grounds exist, consistent with this policy, to support a grievance before the Grievance and Mediation Committee.

If there are multiple allegations made in the complaint, the Committee must determine whether each allegation meets the requirements listed above. The Committee may accept some allegations for mediation in a grievance and dismiss others. The Committee may require specific further attempts at informal resolution and/or require the parties to submit additional evidentiary support for their positions before making a final, official decision to accept or dismiss.

The committee will dismiss any complaint that alleges violations of the Title IX and Sexual Misconduct Policy; the Equal Opportunity and Non-Discrimination Policy; the Consensual Romantic Relationships Policy; and/or the Harassment Policy and refer the grievant to the appropriate channels as indicated in the relevant policy.

If the Committee decides to dismiss the complaint, written notice will be provided to the grievant and respondent(s). A decision to dismiss a complaint can be appealed to the Provost, who can overrule the Committee's decision and require that the Committee accept the complaint.

If the Committee decides to accept the complaint, it will promptly: (1) notify the grievant which aspects of the complaint have been accepted for review and resolution; (2) notify the respondent and provide a copy of the complaint and the Grievance and Mediation Committee's rationale for accepting the grievance; (3) request the respondent submit a required written response, in a timely manner, to all allegations made by the grievant; and (4) provide an opportunity for both parties to submit additional evidence to the Committee.



**Stage 2: Complaint Review**

# C. Stage 3: Resolution Through Formal Mediation (See

# Figure 3)

1. **Mediation Process**

   After a grievance has been officially accepted for action, the Grievance and Mediation Committee will provide the grievant and respondent(s) with the option of engaging in mediation to resolve the dispute.. The Committee will, in an informal process, attempt to facilitate a resolution by whatever techniques and procedures it deems most appropriate. This could include, but is not limited to, designation of an investigator (on or off the committee) to interview parties and witnesses and review documents or retention of an individual with dispute resolution expertise to assist the Grievance and Mediation Committee or the parties. The Grievance and Mediation Committee or members thereof or their designees may meet privately with either of the parties or with other informed persons to determine the evidence in support of or in defense of the allegations and to explore the possibility of finding a resolution upon which the parties can agree.

   Every effort will be made to maintain an atmosphere that encourages collegial resolution of the grievance. In particular, neither party may be represented or accompanied by an attorney as part of the mediation process, though the parties may consult with external counsel outside of the Grievance and Mediation Committee proceedings at their own expense. A grievant reserves the right to withdraw a grievance at any time. Unless withdrawn, the respondent must respond to a grievance accepted for action. If a settlement is agreed to by both parties, that settlement will be referred to the Provost for review with the intent of executing a binding agreement in the best interests of the parties and The University of Alabama. In those cases, the process is over and no further action shall be taken.

   The Grievance and Mediation Committee has the power to conclude a mediation without settlement in cases where either (1) one or both of the parties declines mediation or (2) it finds both parties have participated in good faith and that settlement is impossible or inappropriate. In those cases, the Grievance and Mediation Committee will detail its efforts to reach a resolution to the grievance in a memo to the Provost.

   The Provost may then close the grievance without action or make a final determination to resolve the grievance.

2. **Grievance and Mediation Committee's Referral of Eligible Matters to Tribunal**

   If a satisfactory resolution is not reached through the Grievance and Mediation Committee proceedings and the matter is eligible for review by a Tribunal, the Grievance and Mediation Committee shall confirm with the grievant that they wish to proceed to a tribunal review.

   If the eligible grievant wants to proceed to a tribunal review, the Grievance and Mediation Committee will prepare a confidential report for the Tribunal identifying the specific grounds upon which the Committee accepted the grievance and which of those actions would be eligible for review by a Tribunal. Both parties to the grievance may inspect that report, but may not make or otherwise obtain a copy of it.



## D. Stage 4: Resolution Through Tribunal (See Figure 4)

If a case has been referred to a Tribunal and the grievant wishes to proceed, the Grievance and Mediation Committee will help establish a Tribunal.

1. **Tribunal Procedure**
   The Tribunal will, in consultation with the parties, set a time for the hearing.
   Before setting a time for the hearing, the Tribunal will consult the parties and may, with or without the assistance of the faculty liaison, hold joint or separate pre-hearing meetings to simplify the issues, stipulate facts, provide for the exchange of documentary or other information, or achieve anything else that the Tribunal believes will be helpful to conduct a fair, effective, and expeditious hearing. The Tribunal, with the assistance of the faculty liaison, may also engage in any necessary investigation.

   At least 20 work days prior to the hearing, the grievant will supply the respondent and the Tribunal with a written statement of specific charges that sets forth the facts and issues that the grievant wishes the Tribunal to consider. This statement need not be identical to the original complaint presented to the Grievance and Mediation Committee, but it shall be limited to those issues that

are within the scope of the issues eligible for a Tribunal's review as determined by the Grievance and Mediation Committee. The respondent will supply the grievant and the Tribunal with a response to the charges no later than one work week prior to the hearing.

Each party, and the Tribunal if it so desires, may present witnesses and evidence at the hearing, subject to cross-examination. Character witnesses will generally not be allowed, but a character witness may be permitted at the discretion of the chairperson. The grievant and respondent must provide a list of potential hearing witnesses to the chairperson of the Tribunal at least four work days prior to the hearing. The chairperson will provide the witness list(s) to all relevant parties involved in the matter at least three work days prior to the hearing.

Based solely on the evidence in the hearing record, the Tribunal will make findings of fact concerning each allegation in the statement of charges, deciding whether the allegation has been established by a preponderance of the evidence.

When hearing a case which involves imposition of a severe sanction, the Tribunal will decide whether adequate cause for the proposed action has been established by a preponderance of the evidence in the record. If the Tribunal finds that adequate cause for the imposition of a severe sanction has been established, but believes that a less severe penalty would be more appropriate, it will so recommend, with supporting reasons.

If the Tribunal finds adequate cause for termination of employment, it also may report that the adequate cause involved either moral turpitude, as defined by Alabama HB 282 (2017) Definition of Moral Turpitude Act, or job abandonment/constructive resignation, as defined by the Faculty Handbook. In such cases, a tenured/tenure-track faculty member will not be provided notice of termination one-calendar year in advance, as would otherwise be allowed.

2. **Tribunal Hearing Rules**
   The hearing by the Tribunal is an administrative hearing, and the proceedings will be informal rather than those used in courts of law. The following rules govern the administration of a Tribunal hearing:

   - The Tribunal is not bound by legal rules of evidence. It may choose to admit any evidence that is of probative value subject to its determination of relevance and credibility.

   - The Tribunal may ask parties to produce evidence on specific issues, may question witnesses, or may produce its own evidence.

   - Each party will have the right to confront and cross-examine all witnesses.

   - If witnesses cannot or will not appear, but the Tribunal determines that the interest of justice requires admission of their statements, the Tribunal will identify the witnesses and disclose their statements.

   - Each party will have the right to rebut any evidence heard by the Tribunal.

   - Both parties have the option of retaining advisors/observers of their choices at their own expenses. An observer can be present at all proceedings except for deliberation.

   - Grievants are responsible for presenting their own case; and, therefore, advisors/observers have no right to speak or participate directly in any hearing before the Tribunal. An advisor/observer's failure to comply with these participation limitations may cause the advisor/observer to be removed from the proceeding.

- The Tribunal itself may request procedural legal advice from the University Office of Counsel.

- The proceedings are confidential, and no part of the proceedings shall be made public. The Tribunal may bar prospective witnesses from hearing the testimony of other witnesses.

- The University administration will cooperate with the Tribunal in securing witnesses and making available documentary and other evidence needed by the parties for the Tribunal.

- The Tribunal may grant adjournments of reasonable length to enable either party to investigate evidence if the Tribunal believes there is a valid claim of inequitable surprise.

- The burden of proof will be satisfied only by a preponderance of the evidence in the record considered as a whole. In case of severe sanction, the burden of proof rests on the administrator. In all other cases, the burden of proof rests on the grievant.

- A record of the hearing will be made by the Tribunal and provided to the President.

3. **Review and Final Decision by President**
The Tribunal will report its findings and recommendations to the University President. The parties will be given a copy of the Tribunal's report to the President. The parties have up until two work weeks after being provided the Tribunal's report to submit to the President any written arguments that are based on the evidence in the record. Untimely submissions and arguments based on evidence not within the record will not be considered by the President.

The President will review the hearing record and the Tribunal's report and recommendation and make a final decision. The Tribunal's recommendation is not binding upon the President.

Either the decision of the Tribunal will be sustained or the proceeding will be returned to the Tribunal with specific issues to be addressed. The Tribunal will then reconsider, taking into account the stated objections and receiving new evidence, if necessary. The Tribunal will once again report its findings and recommendations to the President.

The President will then make a final decision regarding what action needs to be taken only after study of the Tribunal's reconsideration. The President's decision is final and cannot be appealed.

**Stage 4: Resolution Through Tribunal**



# V. Description and Selection of the Grievance and Mediation Committee and Tribunal

The Faculty Grievance and Mediation Procedure involves three opportunities for faculty input into the resolution of faculty grievances: as the faculty liaison, as a member of the Grievance and Mediation Committee, or as a member of a Tribunal.

## A. Faculty Liaison

Annually, the Provost, with consultation of the President of the Faculty Senate, will select a senior tenured faculty member as faculty liaison who will act as a liaison between the grievant, the respondent, and the Grievance and Mediation Committee and/or Tribunals. The faculty liaison will also be responsible for supplying any support services or advice needed by the Grievance and Mediation Committee or Tribunals, including helping with investigations, arranging hearings, and establishing timetables and schedules that will result in fair and expeditious hearings. The faculty liaison also will be responsible for training the Grievance and Mediation Committee and Tribunals discussed below.

## B. Grievance and Mediation Committee

1. **Membership**
   The Grievance and Mediation Committee is composed of six tenured faculty members who are not administrators and two administrators. The six faculty members serve staggered, three-year terms such that two terms conclude on August 15 each year, and are elected by the Faculty Senate at its annual March meeting, to begin serving the next academic year. No more than one faculty representative may be from any one academic division. Faculty members completing a term on the committee are ineligible for re-election until two years have passed from completion of their respective terms. Any non-administrative faculty vacancy occurring on the committee may be filled on a temporary basis by a majority vote of the rest of the committee, but shall be filled for the full remainder of the term by the Faculty Senate.

   The President of the University or the President's designee chooses the two administrative members of the committee from among the administrators of the University who are tenured in one of the academic programs and who hold an administrative appointment in an academic area.

2. **Grievance and Mediation Committee Chair**
   At the start of the Fall semester, the Grievance and Mediation Committee selects its chairperson from among the non-administrative faculty members. The chairperson is responsible for coordinating and expediting the work of the committee, ensuring that grievances are resolved or, if eligible, submitted to a Tribunal generally within eight work weeks (excluding University closings and summer terms) from the time the grievances are received by the committee. If additional time is needed to effectuate a resolution, the Grievance and Mediation Committee may extend this time. In that instance, the Grievance and Mediation Committee should notify the parties of the extended time period and articulate a rational basis for the need for additional time.

3. **Grounds for Recusal/Disqualification of Grievance and Mediation Committee**
   Members of the Grievance and Mediation Committee shall disqualify/recuse themselves from participating in a particular grievance if they or reasonable persons would believe they cannot render an impartial decision because of personal affiliation and/or a conflict of interest. Members disqualifying themselves on one of these bases should seek to provide a written communication

to the chairperson to that effect within one work week of their receipt of information regarding their responsibility to disqualify/recuse themselves. The Grievance and Mediation Committee may decide a grievance with one less member; if multiple recusals occur, however, the Grievance and Mediation Committee shall elect a tenured faculty member to fill in on a temporary, case-specific basis until resolution of that grievance.

# C. Tribunal

Each Tribunal selected to hear eligible grievances and severe sanctions will consist of five tenured faculty members selected by the processes described below.

1. **Hearing Panel from which Tribunals Are Selected**
   When a Tribunal is needed to hear a matter and make a recommendation, the Provost's Office will prepare a list of all tenured faculty members eligible to serve on a Tribunal. To be eligible, a tenured faculty member must:

   - Be tenured.

   - Have worked at the University for at least three years.

   - Not be a member of the Grievance and Mediation Committee.

   - Not hold an administrative positions of department chair or higher.

   - Not be a member of the department, school, or college of the primary appointment of the grievant.

   The Provost, in conjunction with the President of the Faculty Senate, will use a random selection process to identify a panel of 11 tenured faculty members. The random selection process will consist of using a random number generator to select names from an ordered list of eligible faculty members who are not expected to be on leave during the academic year.

2. **Recusals of Hearing Panel for Tribunal**
   When a Tribunal must be convened for a particular eligible matter, the chair of the Grievance and Mediation Committee, with assistance from the Provost's Office and faculty liaison, will notify the 11-member Hearing Panel in a confidential communication of the salient issue(s) that will be presented to the Tribunal and of the identity of the grievant, respondent, and department and college involved. Hearing Panel members shall disqualify/recuse themselves from participating in a particular grievance hearing if they, or reasonable persons, would believe they cannot render an impartial decision because of personal affiliation and/or a conflict of interest. Hearing Panel members disqualifying themselves on one of these bases should provide written communication to the Grievance and Mediation Committee chairperson to that effect within one work week of their receipt of information regarding their responsibility to disqualify/recuse themselves.

   After giving Hearing Panel members an opportunity to recuse themselves, the Grievance and Mediation Committee chair will then provide the parties with a list of those who have not recused themselves. This list should contain at least nine names. Parties to the grievance may then object to the appointment of a Tribunal member by presenting a reason for objection to the Grievance and Mediation Committee chairperson, who will then decide whether to force recusal of any other Hearing Panel members.

3. **Selection of Tribunal**
   The Tribunal will consist of five members. Each party will have one work week after receipt of the

list of available Hearing Panel members in which to choose two persons from the list to serve on the Tribunal. The remaining member (or members, if the parties choose the same persons) will be selected in a meeting led by the faculty liaison with the two parties to the matter alternately striking a name from the list (with the grievant having the first strike) until the requisite five names remain.

If a Tribunal member retires or otherwise leaves the University during the course of a grievance, or if a Tribunal member is otherwise unable to continue, the remaining members of the Tribunal shall proceed. If Tribunal members have a compelling reason why, after the beginning of the dispute, they cannot proceed, the Tribunal will continue without them. If two Tribunal members cannot proceed, a new Tribunal will be chosen, and the formal hearing will recommence from the beginning.

4. **Tribunal Chairperson**
   The Tribunal will promptly elect its own chairperson from among the Tribunal members. The faculty liaison will work with the Tribunal chairperson and Grievance and Mediation Committee chairperson to effectuate a timely and effective transition to the Tribunal process.

# VI. Confidentiality of the Process and Document Retention

All Grievance and Mediation Committee and Tribunal proceedings involving faculty grievances will be kept confidential to the extent possible. Information will be shared only on a need-to-know basis. Every person involved in the mediation or tribunal process is expected to respect the confidentiality of the process, and every effort will be made to maintain an atmosphere that encourages collegial resolution of the problem. A breach of confidentiality by any party to mediation or tribunal, by a Grievance and Mediation Committee or Tribunal member, or a witness in a tribunal hearing may subject the individual to disciplinary action and resulting sanctions.

The chair of the Grievance and Mediation Committee or Tribunal shall maintain a file of all records related to each active mediation or matter before the Tribunal. At the close of a mediation or tribunal hearing, the respective chair shall direct committee or tribunal members to deposit all notes, emails, and everything related to the grievance in a confidential repository. Upon providing materials to the chair, all other documentation retained by the individuals should be destroyed. The chair shall organize the content of the confidential repository file, remove duplicate materials, and remove committee or tribunal access to the file. For mediations that advance to a tribunal, the Grievance and Mediation Committee Chair shall provide access to this file to the Tribunal Chair. At the conclusion of a tribunal, the Tribunal Chair will provide a copy of the file to the President, who decides the matter. Once the President decides on the matter, the President will return the file to the Tribunal Chair, who will then dispose of the file as stipulated below.

Unless subpoenaed by an agency or court with subpoena power or subject to production in discovery in litigation, efforts will be made to protect the release of Grievance and Mediation Committee or Tribunal files to third parties. If the matter was referred to the Tribunal from the Grievance and Mediation Committee, the Tribunal would have the original referral report, and a copy would be retained in the Grievance and Mediation Committee's file.

At the conclusion of a mediation or tribunal hearing, whether successful or not, the respective chair shall

deposit the paper and electronic file(s) in the University Archives, with access thereto limited to the President and Provost of the University and/or their designees. Unless the University's record-retention schedule notes otherwise or unless subject to a litigation hold, mediation and tribunal records shall be retained for three years after action taken on the matter and resolution of all claims. To the extent a resolution agreement is signed, that document shall be maintained by the Provost's office in a confidential file until two years after the grievant is no longer employed at the University.

# APPENDIX C: ACADEMIC MISCONDUCT DISCIPLINARY POLICY

## I. General Policy

All students in attendance at The University of Alabama are expected to abide by The Capstone Creed, in which students pledge, among other things, to pursue knowledge, act with fairness, integrity and respect, foster individual and civic responsibility, and strive for excellence in all that they do. All students are also required to adhere to the Academic Honor Pledge, and shall not, at any time, be involved with acts of academic misconduct, such as cheating, plagiarism, fabrication, or misrepresentation. Students are absolutely prohibited from engaging in academic misconduct as defined herein.

All students in attendance at The University of Alabama are expected to be honorable and observe standards of conduct appropriate to a community of scholars. The University of Alabama expects from its students a higher standard of conduct than the minimum required to avoid discipline. When enrolled at The University of Alabama, students are expected to abide by the Academic Honor pledge. Additionally, at the discretion of the course instructor, each student will be expected to sign an Honor Pledge.

The Academic Honor Pledge reads as follows: "*I promise or affirm that I will not at any time be involved with cheating, plagiarism, fabrication, or misrepresentation while enrolled as a student at The University of Alabama. I have read the Academic Honor Code, and I understand that violation of this code will subject me to charges under the Academic Misconduct Policy and result in penalties as severe as suspension or up to expulsion from the University.*

The University is committed to providing its students notice of academic misconduct charges and an opportunity to be heard prior to finding a student responsible and imposing a fair and equitable penalty. This Policy identifies types of academic misconduct and possible penalties and sets forth the process that will be followed when addressing accusations of academic misconduct. Except in divisions that have an alternate academic misconduct policy that has been approved by the Provost or except in instances in which a college is dealing with multiple students accused of academic misconduct in a course and the Provost has approved alternate procedures, academic misconduct cases shall be resolved as set forth below.

## II. Types of Academic Misconduct

Academic misconduct by students includes all acts of dishonesty in any academic-related matter and any knowing or intentional help, attempt to help, or conspiracy to help another student commit an act of academic dishonesty. Academic dishonesty includes, but is not limited to, each of the following acts when performed in any type of academic or academic-related matter, exercise, or activity:

- Cheating: using, attempting to use or assisting in the use of unauthorized materials, information, study aids, or computer-related information.
- Plagiarism: representing words, data, pictures, figures, works, ideas, computer programs or outputs, or any other work generated by someone else, as one's own.

◦ Self-Plagiarism: resubmitting your own previously submitted work without proper citation and permission from the current instructor to whom the original work is subsequently submitted.

- Fabrication: presenting as genuine any invented or falsified citation, data or material.
- Misrepresentation: falsifying, altering, or misstating the contents of documents or other materials related to academic matters, including schedules, prerequisites, and transcripts.

# III. Penalties for Academic Misconduct

## A. Range of Penalties

Penalties for academic misconduct can range from a reprimand to a penalty as severe as suspension or expulsion for egregious acts and/or multiple offenses.

1. **First Offense Penalties**
   For a student's first offense, typical penalties might include, but are not limited to, the student's grade on an assignment or test being lowered (even to a zero) or the student's grade being lowered in the course in which the misconduct occurred. If a student is accused of multiple acts of misconduct where the accusations have not been resolved at the college level (and are therefore not considered "second offenses" as defined below), penalties may be more severe than is typical in first offenses and may include a suspension. A suspension normally requires a minimum of one major semester (fall or spring).

2. **Second Offense Penalties**
   Second offense penalties presume that a first offense has been resolved (i.e., a college has made a finding of responsibility prior to the second academic misconduct act). A penalty of suspension is generally mandated for a finding of responsibility on second offenses. The length of the suspension for a second offense generally ranges from one major semester (fall or spring) to one academic year.

## B. Discretion in Imposing Penalties

Academic deans have the authority and discretion to impose a full range of penalties for both first and second offenses. Academic misconduct monitors are authorized to impose penalties up to but not including suspension and may impose penalties of suspension only if authority to do so has been delegated to them by their academic dean. In determining a penalty, the dean or misconduct monitor may take into consideration mitigating factors, such as a student's admission of academic misconduct in a timely fashion and/or other behavior consistent with acceptance of responsibility.

## C. Suspensions

In cases that involve suspension as a penalty, the college in which the misconduct occurred will place a hold on the student's record to prevent further enrollment, and the Office of the University Registrar will facilitate a drop of any existing future enrollment. The college in which the offense occurred should notify the student's home college of the length of the suspension at the time of suspension.

## D. Expulsions

For egregious acts and/or multiple offenses, a penalty of expulsion may be appropriate. A student permanently expelled is prohibited from reapplying to the University in the future or from earning a degree from any of its colleges or schools. If a disciplinary action results in a recommendation that expulsion is the appropriate sanction, then the matter shall be referred to the Office of Academic Affairs. The Provost and Vice President for Academic Affairs shall review the sanction and shall make the final decision to expel after consultation with the President of the University. Because a decision to expel a student is made after consultation with the President, **a student has no right to request a review of the sanction of expulsion.**

## E. Timing of Penalties Imposed

Penalties are not imposed until the time for filing an appeal has expired and no timely appeal was filed or after a decision on a timely appeal has been reached and no further appeals may be filed.

# IV. Resolution of Academic Misconduct by the Academic Misconduct Monitor

Each academic dean appoints an academic misconduct monitor (hereinafter "monitor") to resolve an accusation(s) of academic misconduct. The monitor must have had previous classroom experience as an instructor of record at the university level. The monitor is charged with taking reasonable steps to gather evidence regarding the accusation, notifying the student of the academic misconduct accusation, giving the student an opportunity to be heard, resolving the accusation and, where appropriate, imposing a fair and equitable penalty. The monitor may identify a designee to act on their behalf. In all cases, a designee must satisfy the qualifications and act with the authority of a monitor. This section generally describes the process the monitor will follow in resolving an academic misconduct accusation.

If there is a conflict of interest with the monitor handling and/or resolving the particular matter (i.e., the monitor is also the course instructor making the accusation of misconduct), the dean will either select a substitute academic misconduct monitor to follow the process below or may choose to escalate the matter to the dean for the initial meeting. In that instance, if the dean decides the matter pursuant to this section, then there will be no appeal to the dean's office; any appeal will be limited to the basis for an appeal to the Office for Academic Affairs discussed below.

## A. Responsibility of Course Instructor to Report Acts of Academic Misconduct

A course instructor or any other person(s) who has reasonable cause to believe a student has engaged in an act of academic misconduct shall report the matter in a timely manner to the monitor of the division within which the alleged misconduct occurred. In most cases, the monitor should receive the report within three weeks of the student's alleged act of misconduct. The instructor will take no other action in the matter until a final decision has been reached and time for any appeal exhausted. When suspected incidents of academic misconduct occur in settings other than an academic division, the matter will be reported to and processed through the divisional academic misconduct monitor where

oversight of the course occurs.

The course instructor should submit all evidence to the monitor for review. If any electronic device is confiscated by an instructor as part of the package of evidence presented to the monitor, the device will be returned promptly once pertinent information related to the accusation has been documented.

# B. Academic Misconduct Monitor's Response and Resolution

1. **Initial Responsibilities of Monitor**
   After a course instructor reports alleged academic misconduct by a student to the monitor, the monitor may discuss the circumstances involved with the course instructor and/or other appropriate person(s) and will review any pertinent materials in order to determine if a reasonable basis exists for believing that academic misconduct may have occurred. If the monitor concludes that there is a reasonable basis for believing an act of academic misconduct may have occurred, the monitor will determine if the matter is a second offense, will place appropriate holds, and will attempt to notify the student, in writing, of the accusation and of the student's need to promptly schedule a conference with the monitor to discuss next steps.

   a. Determining if an Accusation Represents a Second Offense
      Once the monitor concludes that a reasonable basis exists that an act of academic misconduct may have occurred, the monitor will determine if there are any prior academic misconduct findings for that student. If the student has previously been found responsible for academic misconduct, then the monitor will proceed with determining whether the student is responsible, but the monitor will not determine the penalty. Determination of the penalty for second offenses is reserved for the academic dean.

      For second offense cases that are in progress at the beginning of a semester, a student will be allowed to enroll and continue through completion of the semester, even if the penalty for the accusation is suspension. If an academic misconduct case is underway during a student's final semester, the awarding of the degree will depend upon the resolution of the case, and, if applicable, penalties imposed.

   b. Preventing Student from Dropping Course and Assigning Incomplete Grade
      Once the monitor concludes that a reasonable basis exists that an act of academic misconduct may have occurred, the monitor will promptly place a hold on the student's academic record, indicating the student cannot drop the course in which the alleged misconduct occurred. When such an accusation is made prior to the last day to withdraw from a class with a W grade, the student will not be allowed to drop the course in which the academic misconduct is alleged to have occurred until the misconduct resolution process is complete. If the student is found not responsible for the misconduct after the deadline to withdraw from the class with a W grade, the student will have five (5) business days from the date of the monitor's written notice to notify the monitor that they wish to drop that course. If the student is found responsible for misconduct by the monitor, the student will not be allowed to drop the course at any time.

      If the accusation of misconduct is made prior to the end of classes for the term, the

Office of the University Registrar will be notified to assign an "Incomplete" (I) grade so that the student may not withdraw from the term. If classes have ended for the term and the matter has not been finally resolved, the monitor will advise the instructor to assign the "Incomplete" (I) with the submission of final grades. The "Incomplete" (I) grade will be replaced with the student's earned grade (after application of any penalty imposed) once the proceedings set forth in this Policy are final.

c. Written Notification to the Student
The monitor will provide written notification to the student of the accusation of academic misconduct, identifying the type of academic misconduct that is alleged to have occurred and the course in which the alleged misconduct occurred. The notification will provide a link to this Policy, recommend that the student review this Policy, and require the student to promptly contact the monitor to schedule a conference with the monitor to discuss the allegations.

Anytime written notification to the student is required in this Policy, it generally will occur via the student's UA e-mail. A text may be sent to the student's personal cell phone advising that an email has been sent, or the student may be notified by other ways deemed appropriate by the University.

# C. When a Student Fails to Respond in a Timely Fashion to the Monitor's Request to Meet

1. **Monitor's Responsibility to Make a Timely Finding**
   If the student does not respond to the request to meet with the monitor within five (5) business days of the communication from the monitor, the monitor will send a second communication to the student. If the student fails to schedule a meeting with the monitor within five (5) business days from the date of the second communication, the monitor will proceed with reviewing the evidence and determining if a preponderance of evidence exists that a violation of this Policy occurred. The monitor will thereafter provide written notice to the student of their finding, with copies to the instructor and other involved parties. The monitor will also indicate in that written notification what, if any, penalty is being imposed.

   If the monitor makes a finding of responsibility and imposes a penalty as a result thereof, the student will have five (5) business days from the date of the monitor's notice to request a meeting with the monitor for further review. If the student fails to request a meeting with the monitor within this five (5) day period, the student will be deemed to have waived their opportunity to meet with the monitor and/or to present evidence to the monitor. At that point, the monitor's finding of responsibility will stand and the penalty will be imposed.

2. **Student's Limited Appeal to Set Aside Monitor's Finding**
   If a monitor makes a finding of responsibility against a student who has failed to meet with the monitor in a timely fashion and requests to do so, the student may seek to set aside the monitor's finding by appealing to the dean within five (5) business days of the penalty being imposed. However, the grounds upon which a student may bring an appeal in these circumstances are limited to mistake, inadvertence, or excusable neglect on the part of the student that caused the student to ignore or otherwise not respond to the monitor's communications. If the dean determines, in their discretion, that a preponderance of evidence exists that the student's failure to respond was due to mistake, inadvertence, or excusable neglect, then the dean may accept the case for appeal, and the matter will be resolved by the dean.

3. **Student's Conference with Monitor**
   The conference with the student and monitor can be held in person or electronically/virtually if the student or other involved parties are not available for an in-person meeting or if the monitor deems it appropriate. The monitor may invite the course instructor and/or other appropriate persons to join the conference. At the start of the conference, the student will be informed again of the accusation of academic misconduct, the type of academic misconduct that is alleged to have occurred, and the course in which the alleged misconduct occurred. The student will also be given a copy of this Policy and be asked to acknowledge receipt of the Policy.

   a. Student's Rights in Conference
      At the conference, the monitor will advise the student of the following:

      - The student is not required to make any statement regarding the matter under investigation.

      - The student may make a voluntary statement if they choose.

      - The student has a right to present any evidence, supporting witnesses, and other information to the monitor.

      - The student has a right to be advised and accompanied by any one person of the student's choosing. This adviser, who may be an attorney, may privately consult with and advise the student but may not question witnesses, make statements, or otherwise directly participate in the conference. Any fees charged by the adviser are the sole responsibility of the student. The monitor may remove or dismiss a support person/adviser who becomes disruptive or does not abide by the limitations on their participation. These limitations on an advisor accompanying a student to a conference with the monitor apply equally to advisors who accompany students to appeal meetings with the dean and with representatives from the Office for Academic Affairs.

      - Students admitted to the University are required to meet the provisions in the English Language Proficiency Policy and must understand and speak the English language sufficiently to participate in class discussions, write multiple-page essays, read and understand assigned textbooks and course materials and comprehend lectures. If a student requests an interpreter and appropriate University officials determine that a language interpreter is either required or in the best interests of the parties, then the University will select and schedule the language interpreter.

      - With the rights listed in bullets 3 and 4 above, the student is entitled to request a recess in the conference for one week, or more at the sole discretion of the monitor.

   b. Possible Findings After Student's Conference with the Monitor
      The monitor will preside over the conference with the student, and the provisions in paragraphs IV.B.3 a) 1) - 5) above apply during the conference. At the conference, the student will be informed of the following three possible findings:

      - **Dismissal**. The matter can be dismissed by the monitor if evidence is presented that leads the monitor to conclude that a preponderance of evidence does not exist that the student engaged in an act of academic misconduct. In that instance, the matter is concluded unless the course instructor files a timely appeal to the dean regarding the monitor's dismissal. A monitor may also dismiss and send a warning letter.

- **Admission of Responsibility**. The matter can be concluded by the monitor at the conference level and a penalty imposed if the student makes a voluntary written admission of engaging in an act of academic misconduct. In that instance, the matter is concluded unless either the course instructor or student files a timely appeal to the dean regarding the penalty imposed by the monitor.

- **Finding of Responsibility**. The matter can be concluded by the monitor at the conference level and a penalty imposed if the monitor concludes that a preponderance of the evidence indicates an act of academic misconduct occurred. In that instance, the matter is concluded unless the student files a timely appeal to the dean regarding the finding of responsibility and/or penalty or the course instructor files an appeal to the dean regarding the penalty imposed by the monitor.

4. **Written Notification of Finding by Monitor**
   The student will be given written notice of the monitor's finding and, if applicable, of the penalty(ies) to be imposed. Copies of this notice will also be sent to the instructor. The monitor may seek the advice of the course instructor prior to assigning a grade penalty. However, the monitor is not obligated to follow the instructor's recommendation, because a penalty is being assigned rather than an evaluation of academic work. If the course instructor does not approve the grade penalty recommendation, the course instructor has the option of filing an appeal to the academic dean (or dean's designee).

# V. Appeal to Academic Dean

The dean may identify a designee to act on their behalf. In all cases, a designee must satisfy the qualifications and act with the authority of the dean. In colleges in which a monitor may also serve as a dean's designee, the dean will ensure that the dean's designee handling the matter/appeal on behalf of the dean is never the monitor whose decision is being appealed or reviewed.

## A. Five Days to Appeal Monitor's Decision to Dean

A monitor's finding will be forwarded to the academic dean by the monitor if, within five (5) business days from the date of the written notification of the monitor's finding, either the student or the course instructor notifies the monitor and the dean that they wish to appeal the monitor's finding of responsibility and/or penalty, including dismissal.

## B. Decision of Dean & Notification of Decision

The dean may act alone or in conjunction with a standing divisional committee to review the appeal, but the dean shall make the appeal decision. The academic dean may confer with the course instructor, the student, the monitor and any other appropriate persons to discuss the matter in question. The dean may arrange an individual or group conference to discuss the matter or can act on the evidence already provided in the appeal documents by the course instructor, monitor and student. At the dean's discretion, conference(s) may be held in person or electronically/virtually.

Notice of the dean's appeal decision will include a statement of any changes to the monitor's decision and/or penalties imposed. This written notice will be sent to the student with copies to the instructor,

other involved parties (with a legitimate need to know and consistent with FERPA), and the monitor. If grade penalties are revised, the dean will notify the appropriate University officials, who will adjust the grade penalty when the decision is deemed final (i.e., when the appeal is concluded or time for appeal has run).

## C. Timeline for Appeal to Office of Academic Affairs

The student or the instructor may appeal the dean's decision to the Office for Academic Affairs if the appeal is filed within five (5) business days of the date of the dean's appeal decision. After five (5) business days, appeals are not accepted. If no appeal is filed, the decision of the dean is final, and the penalty, if any, is imposed.

# VI. Appeal to Office for Academic Affairs

The Provost may identify a designee to act on their behalf. In all cases, a designee must satisfy the qualifications and act with the authority of the Provost. Appeals to the Office for Academic Affairs may only be based on substantive grounds such as procedural errors, new evidence, or inconsistencies in penalties assigned. When an appeal is received by the Office for Academic Affairs, the Provost will review the appeal to ensure that these limited substantive grounds have been articulated. If the appeal meets the criteria or is unclear, the Provost may schedule a conference(s) with the student and other concerned parties to discuss the reasons for the appeal. If these meetings result in an agreeable solution to the matter, the appeal process will end.

If no such solution is reached, the Provost will make the decision on whether the appeal should be heard or denied. The appeal will not be granted unless there are substantive grounds, such as those noted above, to support the appeal. If the Provost denies the appeal, the appeal process will end. If the appeal is to be heard, the Provost will convene a panel to resolve the issues that remain.

The panel will consist of a person designated by the Vice President for Student Life, a person designated by the Provost, one student (appointed by the President of the SGA), and one course instructor (appointed by the President of the Faculty Senate). Both the student and the course instructor designees will come from the division holding jurisdiction for resolving the alleged misconduct if it is possible to find such people who have no prior connection with the case. In cases involving graduate students, the faculty and student members of the appeals panel should hold graduate faculty or graduate student status, respectively. The person designated by the Provost will serve as hearing administrator and will coordinate and preside at all meetings conducted to resolve the academic misconduct appeal. The hearing by a panel is an administrative hearing, and the proceedings will be informal rather than those used in courts of law. The panel may admit any evidence that is of probative value in determining the issues, subject to the panel's judgment as to the relevance, credibility, and weight of the evidence. The panel may ask the parties to produce evidence on specific issues, may examine witnesses, and may call and examine its own witnesses. The party requesting the hearing may be accompanied and advised by any one person of the party's choosing. This adviser, who may be an attorney, may privately consult with and advise the client but may not question witnesses, make statements, or otherwise directly participate in the conference by discussing the alleged misconduct; only the client may participate in the hearing in this manner. Any fees charged by the adviser are the sole responsibility of the party who invited the adviser. The hearing administrator may remove or dismiss an adviser who becomes disruptive or who does not abide by the participation limits.

The panel will decide each of the issues raised in the appeal. The panel's decision will be final and will conclude the University's process. A decision contrary to the student's position must be supported by the votes of at least three of the four panel members. The panel will give written notice of its decision(s) to the student, the course instructor, the dean, and the Provost.

Written notice of the panel's decision to uphold the decision of the dean (or dean's designee) or to make changes to the findings and/or penalties will be provided to the student with copies to the instructor, dean, and other involved parties.

# VII. Records

Disciplinary sanctions, with the exception of University expulsion, shall not be made part of the student's permanent academic record (official transcript). Records documenting investigations and/or disciplinary actions taken against University students charged with academic misconduct shall be input into a centralized online software system and maintained for as long as required pursuant to the University's record retention schedule.

# APPENDIX D: UNIVERSITY-WIDE ACADEMIC GRIEVANCE PROCEDURES

## I. Academic Grievances

A student academic grievance is broadly defined as a student complaint regarding an academic action taken by instructional or administrative personnel at The University of Alabama. An academic grievance may be filed by a student against university personnel including instructional personnel, administrators, or staff members at the University. Examples of academic grievances include, but are not limited to, allegations of unfairness in grading, alleged violation of a written or oral agreement with a student (e.g. course requirements for graduation), and alleged inconsistent applications of existing policies. For a protest of a final course grade or other final comprehensive evaluations to be considered, the protest must be based upon one or more of the following grounds and upon allegation that the ground or grounds cited influenced the grade assignment to the student's detriment:

- Arithmetic or clerical error;
- Arbitrariness, possibly including discrimination based upon one's protected status as set forth in the University's Equal Opportunity and Non-Discrimination Policy; or
- Personal malice.

Grievances related to course grades normally should be filed during the semester in which the alleged action takes place, but such protest must be made not later than the last day of classes of the next succeeding regular semester. This grievance procedure is not available for cases in which a decision has been appealed and afforded a committee hearing, and the appeal has been denied.

Grievances related to course grades at The University of Alabama School of Law shall be resolved in accordance with the Law School's policies and procedures. Grievances related to course evaluations for medical students shall be resolved in accordance with The University of Alabama School of Medicine's policies.

A student must file a grievance in the academic department (academic department is a phrase that also refers to academic program or area, if these terms apply) of The University of Alabama in which the alleged action took place. Academic grievances shall be resolved by the department chair in the division where the grievance took place. Grievances concerning matters that are not within the jurisdiction of a particular academic division and grievances against the divisional academic dean must be resolved by the Provost or their designee. Grievances against the department chairperson must be resolved by the divisional academic dean. Appeals from the academic dean's decisions may also be made to the Provost.

In matters that involve both a misconduct issue and an academic grievance, the misconduct issues shall be addressed and resolved first. If issues still remain after the resolution of the misconduct issue and any related appeals, then the student has the option of filing an academic grievance, to address any issues that go beyond the misconduct issue.

# II. Resolution by Department Chairperson

Students who believe academic actions have unjustly affected them may file a grievance with the department chairperson. The facts and circumstances that are bases for the academic grievance should be presented to the department chairperson in written form.

Within 15 working days of the receipt of the grievance, the department chairperson will respond, starting with scheduling a conference with the student who has brought the grievance. During the conference (which may be held electronically), the department chairperson will reissue the student a copy of the University-wide Academic Grievance Procedures, ascertain the circumstances involved, and review any materials or circumstances pertinent to the grievance to determine if there seems to be a reasonable or sound basis for the academic grievance. If the chairperson decides there may be a reasonable or sound basis for the academic grievance, or if the student chooses to file the grievance, then the department chairperson will arrange conferences with the student and other person(s) involved. These meetings may be individual or joint conferences as deemed appropriate by the department chair.

Prior to these conferences, the other person(s) involved will be given a copy of the written grievance and will be reissued a copy of the University-wide Academic Grievance Procedures. Both the student and other person(s) will be informed that the purpose of conferences scheduled by the department chairperson is to attempt to resolve the issue informally. Both parties will be informed that they have the right to present any evidence, supporting witnesses, or any other relevant information during these conferences.

At the beginning of these conferences, the department chairperson will inform the student and other person(s) involved that the purpose of these meetings is to attempt to resolve the grievances informally. The department chairperson will act as intermediary between the student and other individual(s) with whom the student has a dispute. The department chair makes no formal resolution in the matter and should not take any action regarding a grade or any other final disposition. If a mutually satisfactory resolution can be reached, the academic grievance is resolved.

If a resolution cannot be reached informally between the student and other person(s) involved, the matter will be forwarded to the academic dean to be resolved.

# III. Resolution by Academic Dean

The dean may identify a designee to act on their behalf. The designee must have had previous classroom experience as an instructor of record at the university level. In all cases, a designee must satisfy the qualifications and act with the authority of the dean. In colleges in which a member of the dean's staff may have been involved in the matter at an earlier level, the dean will ensure that the dean's designee handling the matter on behalf of the dean is not the same person as the one who dealt with the matter earlier.

Any matter not resolved by the department chairperson's mediation will be resolved by the academic dean. Within 15 working days of receipt of the grievance, the dean will acknowledge the receipt and begin the resolution process. The dean may act alone or in conjunction with a standing divisional committee or an ad hoc committee appointed by the dean, but the dean will make the decision. The academic dean will arrange conferences with the faculty or staff member, student, and others, as may be appropriate, to discuss the

matter in question. The student and other person(s) involved will be given an opportunity to make a statement, present evidence, witnesses, or materials pertinent to the academic grievance. The student may be accompanied and advised by any one person the student chooses. This adviser, who may be an attorney, may privately consult with and advise the student, but may not question witnesses, make statements, or otherwise directly participate in the conference discussing the matter. Any fees charged by the adviser are the sole responsibility of the student. The dean or committee may remove or dismiss a support person/adviser who becomes disruptive or who does not abide by participation limits. The academic dean, after careful deliberation, will render a decision.

Notice of the dean's decision will be sent electronically to the student, with copies to the faculty or staff member and other involved parties. Either party may appeal the dean's decision to the Office for Academic Affairs if the appeal is filed within 5 working days of the mailing date of the dean's decision.

# IV. Appeal

The dean's decision may be appealed by either party to the Office for Academic Affairs within 5 working days of the mailing date of the dean's decision. Appeals must be based on substantive grounds such as procedural errors, new information, or inconsistencies in the application of policies.

The Provost may identify a designee to act on their behalf. The designee must have had previous classroom experience as an instructor of record at the university level. In all cases, a designee must satisfy the qualifications and act with the authority of the Provost.

When an appeal is received by the Office for Academic Affairs, an official from that office will respond within 15 working days. That official will schedule a conference(s) with the concerned parties to discuss the reasons for the appeal. If meetings with the concerned parties result in an agreeable solution to the matter, the appeals process will end. If no such solution is reached, the official from the Office for Academic Affairs will recommend to the Provost, giving reasons for the recommendation, whether the appeal should be heard or denied. If the Provost denies the appeal, the appeal process will end.

If the appeal is to be heard, the official from the Office for Academic Affairs will convene a panel to resolve the issues that remain. The panel will consist of a person designated by the Vice President for Student Affairs, a person designated by the Provost (not the official convening the panel), one student (appointed by the President of the SGA), and two faculty members (appointed by the President of the Faculty Senate); both the student and the faculty member will come from the division holding jurisdiction for resolving the academic grievance, if it is possible to find such people who have no prior connection with the case. In cases involving graduate students, the faculty and student members of the appeals panel should hold graduate faculty or graduate student status, respectively. The person designated by the Provost will serve as hearing administrator and will coordinate and preside at all meetings conducted to resolve the academic grievance appeal.

The hearing by a panel is an administrative hearing, and the proceedings will be informal rather than those used in courts of law. The panel may admit any evidence that is of probative value in determining the issues, subject to the panel's judgment as to the relevance, credibility, and weight of the evidence. The panel may ask the parties to produce evidence on specific issues, may examine witnesses, and may call and examine its

own witnesses. Either party may be represented at the hearing by a person of his or her choice. This adviser, who may be an attorney, may privately consult with and advise the student, but may not question witnesses, make statements, or otherwise directly participate in the conference by discussing the matter in question. Any fees charged by the adviser are the sole responsibility of the hiring party. The panel may remove or dismiss a support person/adviser who becomes disruptive or who does not abide by participation limits. If any party is accompanied by an attorney, then a representative from the Office of the University Counsel may be present.

The panel will decide each of the issues raised in the appeal. The panel's decision will be final and will conclude the process insofar as the University is concerned. A decision must be supported by the votes of at least three of the panel members. The panel will give written notice of its decision to the student, the faculty or staff member, the dean, and the Provost.

Records documenting investigations and/or decisions in the academic grievance cases shall be input into a centralized online software system and maintained for as long as required pursuant to the University's record retention schedule.

# APPENDIX E: POLICY ON CONFLICT OF INTEREST/FINANCIAL DISCLOSURE IN SPONSORED PROGRAMS

## I. Background

The University of Alabama (UA) realizes that actual or potential conflicts of interest may occur in the normal course of research and other sponsored activities. Consistent with the AAUP's 1965 statement *On Preventing Conflicts of Interest in Government Sponsored Research at Universities*, the University has developed this policy relating to conflicts of interest applicable to all UA investigators and the policy applies to all sponsored programs, including federal, state and local government; industry; or not-for-profit sponsors. The policy also covers UA intellectual property licensed to an entity in which a UA investigator owns an interest or serves as an employee, officer, or member of the board of directors, regardless of the source of funding. The policy is to be administered in conjunction with laws and policies setting forth standards of conduct, including Title 42 Code of Federal Regulations (CFR) Part 50, Subpart F; Title 45 CFR Part 94; the Ethics Act of the State of Alabama; and University of Alabama *Faculty Handbook*, Appendix E, On Preventing Conflicts of Interest in Government- Sponsored Research at Universities.

The U.S. Department of Health and Human Services/Public Health Service (PHS), which includes the National Institutes of Health and the National Science Foundation (NSF), have regulations promoting objectivity in research by requiring that a university applying for grants or cooperative agreements for research ensure that there is no reasonable expectation that the design, conduct, and reporting of the research to be funded pursuant to the application will be biased by any significant financial interest of the investigator or other personnel with decision-making capacity working on the research and that the research environment is one that promotes faithful attention to high ethical standards. In further support of this expectation, the federal government has issued agency-wide requirements (PHS and NSF) that policies and procedures regarding financial conflicts of interest be issued on research and other sponsored programs. Other federal agencies do not have specific requirements related to conflicts of interest; however, there is an expectation that universities develop policies and procedures that ensure objectivity when conducting research. The University has adopted this Policy on Conflict of Interest/Financial Disclosure in Research and Other Sponsored Programs (hereinafter referred to as "Policy on Conflict of Interest") to prevent or resolve, through management and/or mitigation, real or apparent conflicts that may exist in relation to sponsored activities undertaken by UA investigators through a sponsored agreement.

## II. Policy Statement Relating to Conflicts of Interest

It is the purpose of this policy to ensure no proposed, awarded, or ongoing UA research or sponsored program (hereinafter referred to collectively as "sponsored activities") shall be biased by significant financial interest, as defined below, or by a conflicting commitment of UA investigators responsible for the design, conduct, or reporting of that sponsored activity.

All UA faculty or staff who serve as principal investigators, co-principal investigators, project directors, co-project directors or in a decision-making capacity on a grant, contract, cooperative agreement or other sponsored agreement, who have significant financial interest with an entity will disclose that ownership to allow a review of potential conflicts of interest, conflicts of commitment, conflicts regarding employment, and/or use of graduate students in the company.

This policy also applies to any faculty, staff member, student, fellow, trainee, or other individual who, under the aegis of UA or pursuant to the review and approval of UA's Institutional Review Board for the Protection of Human Subjects (IRB), conducts research involving human subjects.

Prior to seeking UA approvals for submission of sponsored activities proposal or application, each investigator, as defined below, must have submitted to UA's director and research compliance officer, Office for Research Compliance, a UA Statement of Financial Interest form certifying the investigator has no conflict of interest or listing all significant financial interests of the investigator and the investigator's immediate family, as defined below. Each such financial disclosure statement must be updated during the course of the award either on an annual basis, or as new reportable significant financial interests are obtained.

The Office for Research Compliance will maintain confidential records of all: 1) investigator disclosures of significant financial interests (whether or not the interest was deemed a financial conflict of interest); and 2) reviews of investigator disclosures, including any actions taken regarding them. Records will be maintained for at least three years from the date of submission of final expenditure reports. In the case of faculty or staff ownership of a company, all financial disclosures and all actions taken with respect to each significant financial interest will be held for the life of the company plus a number of years as determined under the Records/Data Retention and Destruction Policy.

This policy establishes guidelines for the appropriate structuring of relationships with industry and other outside ventures to prevent conflict with previously established responsibilities to UA. Investigators are expected to disclose all significant financial interests related to their institutional responsibilities. Institutional responsibilities include activities such as research, research consultation, teaching, professional practice, institutional committee memberships, and service on panels such as institutional review boards or data and safety monitoring boards. It is not the intent of this policy to eliminate or prohibit all situations involving potential conflicts of interest. Rather, the policy is intended to enable investigators to recognize situations that may pose a conflict of interest, to provide processes for reporting these situations to UA's research compliance officer and for working with the Office for Research Compliance to manage these situations. This policy is intended to maintain the professional autonomy of researchers inherent in the self-regulation of sponsored activities.

In the event that an investigator participates in sponsored activity subject to this policy and the activity is being simultaneously supported by an organization that has a commercial interest in the outcome of the sponsored project, the sponsored activity supported by such organization must be provided through UA. Any direct compensation or payment to the investigator under that support must be disclosed, regardless of the amount. This policy will provide assurance to the investigators, UA, and, most importantly, the public, that relationships with industry and for-profit entities have been examined and will be conducted in a manner consistent with UA and public values.

UA believes that, with clear guidelines and principles and with appropriate supervision and monitoring, it is possible for interaction between industry and UA to take place in a manner that is consistent with the highest traditions of scientific research and in a way that energizes scientific creativity.

# III. Definitions

The "**University Conflict of Interest Committee (UCIC)**" serves as a resource with respect to matters involving conflicts of interest and the identification, management, mitigation, or elimination of specific conflicts of interest. The committee will also provide oversight for implementation of the Policy on Conflict of Interest and recommend to the Vice President for Research and Economic Development and Provost all future changes/ modifications to the policy.

"**Entity**" means any domestic or foreign, public or private, organization (excluding a federal agency) from which an investigator (and spouse and dependent children) receives remuneration or in which any person has an ownership or equity interest.

"**Immediate Family**" refers to the investigator's spouse and dependent children.

"**Investigator**" means the principal investigator or project director, or any other person, regardless of title or position, who is responsible for the design, conduct, or reporting of sponsored activities funded, or proposed for funding, by an external sponsor.

An investigator's "**Institutional Responsibilities**" are those conducted on behalf of the institution and as defined by the institution in its policy on conflict of interest, which may include, for example, activities such as research, research consultation, teaching, professional practice, institutional committee memberships, and service on panels such as institutional review boards or data and safety monitoring boards.

The "**Research Compliance Officer (RCO)**" directs the UA Office for Research Compliance and will report to the responsible University official (RUO) on all matters concerning this policy. The RCO will be the first point of contact for investigators on issues relating to conflict of interest and will perform the initial review of the statement of financial interest. The RCO will also coordinate the review of this statement with the University's Institutional Review Board for the Protection of Human Subjects. The RCO will process all paperwork related to conflict of interest disclosures and, if appropriate, conflict of interest management plans. The RCO is responsible for keeping the appropriate external funding agency informed if UA finds it is unable to satisfactorily manage an actual or potential conflict of interest for any activity in which that agency requires that it be notified.

"**Sponsored Activities**" means research, training and instructional projects involving funds, materials, or other compensation from external sources.

"**Research**" means a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge.

The "**Responsible University Official (RUO)**" will be the Vice President for Research and Economic

Development.

**"Significant Financial Interest"** means anything of actual or potential monetary value (such as remuneration or equity interests) that appears to be reasonably related to the investigator's institutional responsibilities. *Remuneration* includes salary or other payments for services (e.g., consulting, honoraria, paid authorship). *Equity interests* include stock, stock options, or other ownership interests. Significant financial interests include, but are not limited to:

- Remuneration received from a publicly traded entity in the last 12 months preceding disclosure **and** the value of any equity interest in the entity at the time of disclosure, if the aggregate value exceeds $5,000;

- Remuneration received from a non-publicly traded entity in the last 12 months preceding disclosure if the aggregate amount exceeds $5,000; **or** when the investigator (or the investigator's spouse or dependents) holds any equity interest;

- Intellectual property rights (e.g., patents, copyrights, licensing agreements, and royalties from such rights) upon receipt of income related to these; and

- Reimbursed or sponsored travel.

Significant financial interest does not include any of the following:

- Equity interest in a publicly traded entity that, when aggregated for an investigator and the investigator's immediate family, does not exceed $5,000 in value as determined through reference to public prices or other reasonable measures of fair market value. (NOTE: When the proposed project requires the use of human subjects and approval from the Institutional Review Board, these monetary thresholds do not apply. In such cases, the disclosure threshold is any amount above $0.);

- Salary, royalties, or other payments that, when aggregated for an investigator and the investigator's immediate family, are not expected to exceed $5,000 during the next 12-month period;

- Income from investment vehicles, such as mutual funds and retirement accounts, as long as the investigator does not directly control the investment decisions made in these vehicles;

- Salary or other remuneration received from UA, including salary received from external sources through sponsored agreements administered by UA;

- Standard royalties received for published scholarly work or other professional writings;

- Income from seminars, lectures, or teaching engagements, and service on advisory or review panels for federal, state, or local government agencies, institutions of higher education as defined at 20 U.S.C. 1001(a), academic teaching hospitals, medical centers, or research institutes that are affiliated with institutions of higher education;

- Income from services on advisory committees or review panels for governmental entities, public or non-profit entities;

- Travel that is reimbursed or sponsored by federal, state, or local government agencies, institutions of higher education as defined at 20 U.S.C. 1001(a), academic teaching hospitals, medical centers, or research institutes that are affiliated with institutions of higher education or reimbursed or sponsored by an entity where the combined monetary value is less than $5,000 for all categories. The University will determine if any travel requires further investigation, including determination or disclosure of the monetary value;

- Intellectual property rights assigned to UA and agreements to share in royalties related to such

rights.

**"Human Subject"** means a living individual about whom an investigator conducting research obtains data through intervention or interaction with the individual or obtains data through identifiable private information. If a potential conflict of interest exists and human subjects are involved in the research, the investigator will need to obtain the approval of UA's Institutional Review Board for the Protection of Human Subjects.

# IV. Conflicts of Interest

A potential or actual conflict of interest exists when an investigator or an investigator's immediate family member has a significant financial interest, as defined above, in an external funding source and that interest could directly and significantly affect decision-making in the design, conduct, or reporting of externally funded sponsored, educational, or service activities performed on behalf of the University.

# V. Procedures

1. All investigators must certify to the University's research compliance officer (RCO) knowledge of and compliance with UA's policy for promoting objectivity in sponsored activities by identifying, managing, and reducing or eliminating conflicts of interest as outlined herein (the statement of financial interest). This statement of financial interest form also requires similar information about members of the investigator's immediate family. Statements must include detailed supplemental information if an investigator marks any "yes" box on the form.

2. Investigators must disclose to the RCO on an annual and ad hoc basis new situations in which significant financial interests are obtained and that may raise questions of conflicts of interest as soon as such situations develop.

3. The RCO will review the statement of financial interest to determine whether a potential for a conflict of interest exists. A potential conflict of interest exists when the RCO reasonably determines that a significant financial interest could affect the design, conduct, or reporting of the sponsored activities in question. If it is determined that no conflict exists, the RCO will sign the statement, seek and obtain the signature of the responsible University official (RUO), and notify the Office for Sponsored Programs. If the RCO determines there may be a potential for a conflict of interest covered by this policy, the RCO will forward this determination, along with the submitted materials, to the RUO.

4. Should the RUO agree that the situation represents a potential for a conflict of interest and recommend development of a conflict-of-interest management plan, the RCO shall work with the investigator to develop the plan to manage, reduce, or eliminate the actual or potential conflict of interest. The plan will then be submitted to the University Conflict of Interest Committee (UCIC). The UCIC may recommend approval of the plan as developed or may recommend modification of the plan.

5. Examples of conditions or restrictions that might be part of the plan to manage, reduce, or eliminate actual or potential conflicts of interest include:
   - Public disclosure of significant financial interests;
   - Monitoring of the sponsored activity by independent reviewers;
   - Modification of the sponsored activity plan;
   - Disqualification from participation in all or a portion of the sponsored activity in question;
   - Divestiture of significant financial interests;

- Severance of relationships that create actual or potential conflicts.

6. The plan will then be forwarded by the UCIC to the RUO. The RUO may approve the proposed plan or may return the plan to the UCIC with suggested modifications. Once a plan approved by the UCIC and the RUO is developed, the research compliance officer will work with the investigator on the implementation and management of the plan.

7. If the management recommendation involves divestiture of financial interests or severance of relationships that create actual or potential conflicts, the RUO will confer with the Provost. The Provost has the authority to require the divestiture of significant financial interests and/or the severance of relationships that create actual or potential conflicts.

8. Prior to expenditure of any funds under an externally funded or sponsored activity, the Office for Research Compliance will conduct a review of disclosures of all senior/key personnel as described above and develop and implement a management plan in each case where a conflict exists.

9. If an investigator is new to the project or an existing investigator discloses a new significant financial interest during the course of the ongoing project, the RCO shall within 60 days: conduct a review of the disclosure as outlined above and (b) develop and implement, on at least an interim basis, a management plan if a conflict exists. If necessary, additional interim measures may be implemented prior to completion of the review.

# VI. Appeals

Should an investigator wish to appeal a decision made by the University Conflict of Interest Committee (UCIC), the investigator may present the appeal to the responsible University official (RUO). The RUO will confer with the Provost. In such cases, the Provost shall review all the materials relating to the action in question and shall discuss the findings/decisions with the investigator, chair of the UCIC, and RUO. After review, the Provost shall make a final decision as to the action. All decisions by the Provost of an appeal under this policy are final.

# VII. Investigator Responsibilities

University of Alabama investigators involved in sponsored activities shall be responsible for:

- Reading, understanding, and following this policy;

- Completion of the required FCOI training at least every four years or when the UA Policy on Conflict of Interest is revised and affects the investigators' requirements;

- Disclosing financial interests to the research compliance officer (RCO) by completing, signing, and submitting the statement of financial interest on or before a specified date or before submission of the grant/contract application as follows:

  - **HHS/PHS and NSF.** The disclosure should be filed prior to submission of the grant or contract proposal/application.

  - **All other sponsored activities.** The disclosure should be filed upon the notice of award and prior to expenditure of funds.

- Updating the statement with the RCO annually so that the statement on file is current and accurate at all times when an award is pending or in force;

- Updating the statement with the RCO as changes occur (within 30 days of discovering or acquiring a new or increased financial interest) so that the statement on file is current and accurate at all

times when an award is pending or in force;

· To the extent possible, ensuring that funded sponsored activities carried out through sub-grantees, contractors, or collaborators complies with UA's Policy on Conflict of Interest or that these entities provide assurance of compliance with all federal regulations and state law.

# VIII. Reporting

For externally funded or sponsored activities, the University must report any conflicting interest to the funding agency prior to expending any funds, and any interest identified as conflicting subsequent to the initial report must be reported within 60 days of that identification, as required. Further, the University agrees to make conflict of interest information available, upon request, to any external funding agency potentially or actually affected by this information. If it is determined that an investigator has biased externally funded or sponsored activities, the University will promptly notify the funding agency of the corrective action taken or to be taken. In the case where a project to evaluate a drug, medical device, or treatment was conducted by an investigator with a conflict that was not disclosed or managed, the University will require the investigator to disclose the conflict in each public presentation of the results of the sponsored activity.

For PHS-funded research/sponsored activities, the University will provide to the PHS awarding component an annual FCOI report that addresses the status of the FCOI and any changes to the management plan for the duration of the project period (including extensions, with or without funds). The report will specify whether the FCOI is still being managed or explain why it no longer exists.

Information on an identified Financial Conflict of Interest (FCOI) reported by the institution to the funding agency will include:

· Grant/contract project number;

· Project director/principal investigator (PD/PI) or contact PD/PI;

· Name of investigator with the FCOI;

· Name of the entity with which the investigator has an FCOI;

· Nature of the FCOI (e.g., equity, consulting fees, travel reimbursement, honoraria);

· Value of the financial interest ($0-4,999; $5,000-9,999; $10,000-19,999; amounts between $20,000-$100,000 by increments of $20,000; amounts above $100,000 by increments of $50,000, or statement that a value cannot be readily determined);

· A description of how the financial interest relates to the research/sponsored activity and the basis for the institution's determination that the financial interest conflicts with such activity;

· A description of key elements of the institution's management plan, including: (a) role and principal duties of the investigator in the research/sponsored activity; (b) conditions of the management plan; (c) how the management plan is designed to safeguard objectivity in the research/sponsored activity; (d) confirmation of the investigator's agreement to the plan; (e) how the management plan will be monitored to ensure compliance; and (f) other information as needed.

Whenever an FCOI is not identified or managed in a timely manner due to nondisclosure by the investigator, lack of institutional review or management of the FCOI, or failure by the investigator to comply with a management plan, the University is required, within 120 days of the noncompliance, to conduct a retrospective review of the investigator's activities and the externally funded research/sponsored activity. The institution will maintain documentation of the following elements from its review: (a) project number; (b)

project title; (c) project director/principal investigator or contact PD/PI; (d) name of investigator with the FCOI; (e) reason for the retrospective review; (f) detailed methodology used for the retrospective review, such as methodology of the review process, composition of the review panel, and documents reviewed; (g) findings of the review; and (h) conclusions of the review. Only in cases where bias is found, the institution will be required to notify the funding agency promptly and submit a report to the agency. The report will address the impact of the bias on the sponsored project and the actions the institution has taken, or will take, to eliminate or mitigate the effect of the bias.

# IX. Enforcement

UA anticipates that its investigators will comply fully and in a timely manner with this policy. Instances of deliberate breach, including: (i) failure to submit the required statement of financial interest or updates thereof; (ii) failure to provide additional information requested by the research compliance officer (RCO), University Conflict of Interest Committee (UCIC), or the Office for Research; (iii) knowingly filing an incomplete, erroneous, or misleading statement; (iv) knowingly violating applicable laws or UA policies or procedures; or (v) failure to comply with prescribed conditions or restrictions that have been imposed pursuant to this policy, may subject the investigator to disciplinary action under UA policies or procedures. Such action could result in a formal reprimand, non-renewal of appointment, termination of appointment for good cause, or any other enforcement action mandated by a funding agency.

The University shall, within 120 days of the University's determination of non-compliance, complete a retrospective review of the investigator's activities and the sponsored project to determine if there was bias in the design, conduct, or reporting of such sponsored activity. The University will document the retrospective review.

# X. Conflict of Interest Committee

## A. Composition of the University Conflict of Interest Committee.

The University Conflict of Interest Committee (UCIC) shall consist of four faculty members appointed by the Provost/Vice President for Academic Affairs, who are experienced with the administration of federal grants and contracts; the associate deans for research in the College of Arts and Sciences, College of Community Health Sciences, College of Commerce and Business Administration, and College of Engineering; and a representative of the Faculty Senate. The research compliance officer and a member of the University's Office of Counsel will serve as liaison (non-voting) members. The chair of the committee will be appointed by the Provost/Vice President for Academic Affairs from the faculty representatives on the committee. The appointed members of the committee shall serve three-year, staggered terms.

## B. Responsibilities of the University Conflict of Interest Committee.

The UCIC serves as a resource with respect to matters involving conflicts of interest and the identification, management, mitigation or elimination of specific conflicts of interest. The committee

will work with the investigators and research compliance officer to resolve potential or apparent conflicts of interest by implementing reasonable controls that are commensurate with the potential for conflict. The committee also will provide oversight for implementation of the Policy on Conflict of Interest and recommend to the Vice President for Research and Economic Development and Provost all future changes/modifications to the policy.

# XI. Use of Human Subjects

Any faculty, staff, student, fellow, trainee, administrator, volunteer, or other individual who, under the aegis of UA or pursuant to the review and approval of UA's Institutional Review Board for the Protection of Human Subjects (IRB), conducts research involving human subjects must complete and submit a statement of financial interest for review by the research compliance officer. The statement must be updated as circumstances of the investigator or the investigator's spouse or dependent children change.

# XII. Subrecipient Institutions

UA will incorporate, as part of a written agreement, terms that establish whether the UA Policy on Conflict of Interest or that of the subrecipient will apply to subrecipient investigators and include time periods to meet disclosure and/or financial conflict of interest reporting requirements. Subrecipient institutions that rely on their financial conflict of interest policies must report identified financial conflict of interests to UA within 30 days of identification of the conflict of interest to provide sufficient time for UA to report the financial conflict of interest to the funding agency to meet reporting obligations.

# XIII. Public Accessibility

Information concerning identified financial conflicts of interests held by investigators will be made publicly accessible by a written response from the Office for Research Compliance to any requestor within five business days of a request.

# XIV. Training Requirements

Each investigator must complete training prior to engaging in sponsored activity related to any funded grant or contract at least every four years and immediately under the designated circumstances:

- Institutional FCOI policies change in a manner that affects investigator requirements;
- An investigator is new to an institution;
- An institution finds an investigator non-compliant with the institution's FCOI policy or management plan.

# APPENDIX F: POLICY ON ACADEMIC MISCONDUCT IN SCHOLARLY ACTIVITIES

# I. Introduction

## A. General Policy

The University of Alabama (UA or University) has developed these policies and procedures for responding to allegations of misconduct in research and scholarship based on the U.S. Department of Health and Human Services, 42 CFR Parts 50 and 93, Public Health Service Policies on Research Misconduct; Final Rules, May 17, 2005.

The University of Alabama strives to create a research climate that promotes faithful adherence to high ethical standards in the conduct of research and scholarship without inhibiting the productivity and creativity of persons involved in research and/or scholarship. Misconduct or fraud in research or scholarship is an offense that damages not only the reputation of those involved, but also that of the institution and the entire educational community.

## B. Scope

This policy and the associated procedures apply to all UA employees and any person paid by, under the control of, or affiliated with UA at the time the alleged misconduct occurred. Such individuals include, but are not limited to, officials, tenured and untenured faculty, teaching and support staff, researchers, research coordinators, technicians, postdoctoral and other fellows, students, volunteers, and agents engaged in research or scholarship. It also applies to any research, research-training, or research-related grant, contract, cooperative agreement, or other sponsored project, and all scholarship activities.

The policy and associated procedures will be followed when the Research/Scholarship Integrity Officer (RSIO) receives an allegation of possible misconduct in research or scholarship. Particular circumstances in an individual case may dictate variation from the normal procedure. Any change from normal procedures must ensure fair treatment to the subject of the inquiry or investigation. The Provost and Vice President for Research and Economic Development must approve in advance any significant deviation from these policies and procedures.

Should the requirements of a granting agency be different from those of this policy, the granting agency's requirements shall be considered a part of this policy and incorporated in the investigation of possible misconduct involving a grant from the agency. The RSIO shall ensure that the University complies with the requirements of each granting agency, including requirements that the University report to the agency concerning allegations and/or findings of misconduct.

This policy does not apply to UA students accused of academic misconduct. The Academic Misconduct Disciplinary Policy is Appendix C in the *Faculty Handbook*.

# II. Definitions

**"Allegation"** means any written or oral statement or other indication of possible misconduct in research or scholarship made to an institutional official.

**"Assessment"** means a determination by the RSIO whether the allegation falls within the definition of misconduct in research and scholarship and whether it is sufficiently timely, credible, and specific so that potential evidence of misconduct may be identified. An inquiry must be conducted if these criteria are met.

**"Complainant"** means a person who, in good faith, makes an allegation of misconduct in research or scholarship.

**"Evidence"** means any document, tangible item, or testimony offered or obtained during a misconduct-in-research-or-scholarship proceeding that tends to prove or disprove the existence of an alleged fact.

**"Fabrication"** is making up data or results and recording or reporting them without a basis in fact.

**"Falsification"** is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

**"Good Faith,"** as applied to a complainant or witness, means having a belief in the truth of one's allegation or testimony that a reasonable person in the complainant or witness's position could have based on the information known to the complainant or witness at the time. An allegation of research or scholarly misconduct or cooperation with a research or scholarly misconduct proceeding is not in good faith if made or done with knowing or reckless disregard for information that would negate the allegation or testimony. Good faith, as applied to panel members, means cooperating with the research or scholarship misconduct proceeding by carrying out the duties assigned impartially for the purpose of helping UA meet its responsibilities. Panel members do not act in good faith if their acts or omissions on the panel are dishonest or influenced by unresolved personal, professional, or financial conflicts of interest with those involved in the research or scholarship misconduct proceeding.

**"Inquiry"** means preliminary information-gathering and fact-finding to determine whether an allegation of misconduct in research or scholarship warrants an investigation.

**"Inquiry Panel"** is a panel appointed by the Vice President for Research and Economic Development to determine whether an allegation of misconduct in research or scholarship warrants an investigation. Inquiry Panel members must be subject matter experts who are free from bias and have no real or apparent conflicts of interest either with the parties involved or the subject matter. Consequently, these individuals should be free of professional, financial, personal, or other substantial ties to the accused and the complainant. Panel members may be external to the University if necessary to meet these requirements.

**"Investigation"** means the formal examination and evaluation of all relevant facts to determine if misconduct in research or scholarship has occurred and, if so, to determine the responsible person and to assess its extent, gravity, and actual and potential consequences.

**"Investigation Panel"** is a panel of faculty and administrators appointed by the Provost with sufficient expertise to conduct the investigation. Investigation Panel members must be subject matter experts who are free from bias and have no real or apparent conflicts of interest either with the parties involved or the subject matter. Consequently, these individuals should be free of professional, financial, personal, or other substantial ties to the accused and the complainant. Panel members may be external to the University if necessary to meet these requirements.

**"Misconduct in Research or Scholarship"** means intentional, knowing, or reckless fabrication, falsification, or plagiarism in proposing, performing, reviewing, or reporting research or scholarship. Misconduct in research or scholarship does not include honest error or differences of opinion.

**"Office of Research Integrity or ORI"** means the office to which the secretary of Health and Human Services (HHS) has delegated responsibility for addressing research integrity and misconduct issues relating to Public Health Service supported activities.

**"Plagiarism"** is the appropriation of another person's ideas, processes, results, or words without giving credit appropriate to the context and discipline.

**"Research or Scholarship Record"** means the record of data or results that embody the facts resulting from scientific inquiry, such as any data, document, computer file, or any other written or non-written account or object that reasonably may be expected to provide evidence or information regarding the proposed, conducted, or reported research or scholarship that constitutes the subject of an allegation of misconduct in research or scholarship. A research or scholarship record includes, but is not limited to, grant or contract applications, whether funded or non-funded; grant or contract progress and other reports; laboratory notebooks; documents; publications; notes; correspondence; videos; photographs; X-ray film; slides; biological materials; computer files and printouts; manuscripts and publications; equipment use logs; laboratory procurement records; animal facility records; human and animal subject protocols; consent forms; medical charts; and patient research files.

**"Respondent"** means the person against whom an allegation of misconduct in research or scholarship is directed or the person whose actions are the subject of an inquiry or investigation. There can be more than one respondent in any inquiry or investigation.

# III. Rights and Responsibilities

## A. Vice President for Research and Economic Development

The Vice President for Research and Economic Development will consult with the RSIO to determine whether to initially convene an Inquiry Panel. The Vice President for Research and Economic Development will receive all draft and final reports issued by the inquiry or investigation panels. The Vice President for Research and Economic Development will appoint members to serve on an Inquiry Panel if necessary. After receiving the report of an Inquiry Panel, the Vice President for Research and Economic Development will decide if an Investigation Panel should be appointed and shall appoint members to serve on an Investigation Panel if necessary. Should the Vice President for Research and

Economic Development have a conflict of interest, the Provost will appoint another senior academic administrator to take on these functions.

# B. Provost

The Provost will receive final reports issued by investigation panels and make the final determinations on whether to accept the investigation report, its findings, and/or the recommended administrative actions. If necessary, the RSIO and Vice President for Research and Economic Development will consult with the Provost regarding the appointment of an Investigation Panel.

# C. Research/Scholarship Integrity Officer (RSIO)

The University research compliance officer will serve as the research/scholarship integrity officer who will have primary responsibility for implementation of the procedures set forth in this document. Should the position of University research compliance officer be vacant at the time of an allegation, an acting research/scholarship integrity officer shall be appointed. Neither the Vice President for Research and Economic Development nor the Provost may serve as research/scholarship integrity officer.

The RSIO will receive any allegations of research misconduct. In consultation with the Vice President of Research and Economic Development, and the appropriate dean or director (if necessary), the RSIO will determine whether to initially convene an inquiry panel.

The RSIO will assist the inquiry and investigation panels and all institutional personnel in complying with these procedures and with applicable standards imposed by the University, the government or external funding sources. The RSIO is also responsible for maintaining files of all documents and evidence and for the confidentiality and the security of the files. The RSIO will report to the Vice President for Research and Economic Development or the Provost the status of an inquiry or investigation. This person also will report, if applicable, to ORI or other federal agencies, as appropriate, and in accordance with applicable federal regulations, and keep ORI or other federal agencies, if applicable, apprised of any developments during the course of the inquiry or investigation that may affect current or potential funding or other federal funding for the individual(s) under investigation or that is needed to ensure appropriate use of federal funds and otherwise protect the public interest. The RSIO will work with the Vice President for Research and Economic Development to ensure that confidentiality is maintained to the extent possible under the circumstances of each inquiry or investigation.

Should the RSIO have a conflict of interest in a case, the Vice President for Research and Economic Development will appoint an alternate RSIO.

# D. Complainant

The complainant is responsible for making allegations in good faith, maintaining confidentiality, and cooperating with an inquiry or investigation. The complainant will have an opportunity to be interviewed by the Investigation Panel, to be protected from retaliation, and to be informed of the outcome of the investigation. Also, if the RSIO has determined the complainant may be able to provide

additional pertinent information on any portions of the draft report, these portions may be given to the complainant for comment.

## E. Respondent

The respondent will be informed of the allegations when an inquiry or investigation is opened and will be notified in writing of the final determinations and resulting actions. The respondent also will have the opportunity to be interviewed by and to present evidence to the Investigation Panel, to review the draft inquiry and investigation reports, and to submit written comments during the designated time period. Any comments will be attached to the respective reports.

The respondent is responsible for maintaining confidentiality and cooperating with the conduct of an inquiry or investigation. If the respondent is found not to have committed misconduct in research or scholarship, the respondent has the right to receive reasonable institutional assistance in restoring the individual's professional reputation.

# IV. General Policies and Principles

## A. Responsibility to Report Misconduct in Research or Scholarship

It is the responsibility of all employees or individuals associated with the University to report in writing or orally any observed, suspected, or apparent misconduct in research or scholarship to the RSIO or (a) their department chair or unit head, or (b) the dean of the college or school in which their department or unit is located, who must immediately report the allegation to the RSIO. Alternatively, complainants may report through the University of Alabama System ethics process, which will then be reported to the RSIO.

If an individual is unsure whether an incident falls within the definition of misconduct in research or scholarship, this person may contact the RSIO to discuss the suspected misconduct informally. If the circumstances described by the individual do not meet the definition of misconduct in research or scholarship, the RSIO may refer the individual or allegation to other offices or officials with responsibility for resolving the problem. At any time, an employee may have discussions and consultations about concerns of possible misconduct with a department chair, unit head, dean, RSIO, Vice President for Research and Economic Development, or the Provost and will be counseled about appropriate procedures for reporting allegations. All University officials are under a duty to report alleged misconduct to the RSIO and to maintain confidentiality.

## B. Evidentiary Standards

The following evidentiary standards apply to findings made under this policy:

- Misconduct in research or scholarship shall be proven by a preponderance of the evidence.
- UA has the burden of proof for making a finding of research or scholarship misconduct. The destruction, absence of, or respondent's failure to provide research or scholarship records adequately documenting the questioned research or scholarship is evidence of misconduct in

research or scholarship when UA establishes by the preponderance of the evidence that: 1) the respondent intentionally, knowingly, or recklessly had research or scholarship records and destroyed them; or 2) the respondent had the opportunity to maintain the records but did not do so; or 3) the respondent maintained the records and failed to produce them in a timely manner; and 4) the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community.

- The respondent has the burden of going forward with and the burden of proving, by a preponderance of the evidence, any and all affirmative defenses raised. In determining whether UA has carried the burden of proof imposed by this policy, the panels shall give due consideration to admissible, credible evidence of honest error or difference of opinion presented by the respondent.

- The respondent has the burden of going forward with and proving by a preponderance of the evidence any mitigating factors that are relevant to a decision to impose administrative actions following a misconduct proceeding.

## C. Protecting the Complainant, Witnesses, and Panel Members

Individuals who bring allegations of misconduct and those who participate in inquiries or investigations as witnesses or panel members will not be retaliated against in the terms and conditions of their employment or other status at the institution. The RSIO will review instances of alleged retaliation for appropriate action. Employees should immediately report any alleged or apparent retaliation to the Vice President for Research and Economic Development.

To the extent possible under the circumstances of each inquiry or investigation, UA will protect the privacy of those who, in good faith, report misconduct. For example, if the complainant requests anonymity, UA will make an effort to honor the request during the allegation assessment or inquiry within applicable policies and regulations and state and local laws, if any. The complainant will be advised that if the matter is referred to an Inquiry Panel or Investigation Panel and the complainant's testimony is required, anonymity may no longer be guaranteed. The University will undertake diligent efforts to protect the positions and reputations of those persons who, in good faith, make allegations.

If a complainant chooses to bring legal counsel to an interview or meeting on the case the complainant must provide the RSIO with a minimum of five calendar days' notice so that the University's counsel may also be present. Legal counsel may not examine witnesses or otherwise participate in the inquiry or investigation fact-finding process.

## D. Protecting the Respondent

Inquiries and investigations will be conducted in a manner that will ensure fair treatment to the respondent(s) in the inquiry or investigation and confidentiality to the extent possible without compromising public health and safety or a thorough inquiry or investigation. The respondent may continue research activities throughout the inquiry and investigation phases, except in those cases where federal or other governmental policies prevent continuation.

A respondent may consult with legal counsel or a non-lawyer personal adviser (who is not a principal or witness in the case) to seek advice and may bring the counsel or personal adviser to interviews or

meetings on the case. Legal counsel may not examine witnesses or otherwise participate in the inquiry or investigation fact-finding process. If a respondent chooses to bring legal counsel or a personal advisor to an interview or meeting with the Inquiry Panel or Investigation Panel, the respondent must provide the RSIO with a minimum of five (5) calendar days' notice so that the University's counsel may be present.

## E. Cooperation with Inquiries and Investigations

UA faculty, staff, and students will cooperate with the RSIO, Vice President for Research and Economic Development, Provost, and other institutional officials in the review of allegations and the conduct of inquiries and investigations. UA faculty, staff, and students have an obligation to provide to the RSIO, Inquiry Panel, Investigation Panel, or other institutional officials relevant evidence, including documents and other information pertaining to the research or scholarship record and relating to the misconduct allegations.

# V. Assessment of Allegations

Upon receiving an allegation of misconduct in research or scholarship, the RSIO will, in consultation with the Vice President for Research and Economic Development, and the appropriate dean or equivalent administrator (if necessary), immediately assess the allegation and funding sources to determine whether the allegation falls within the definition of misconduct in research or scholarship and whether it is sufficiently timely, credible, and specific so that potential evidence of misconduct may be identified and ultimately reported to the appropriate federal/funding source requirements. An inquiry must be conducted if these criteria are met.

The assessment period should be brief, preferably concluded within a week. In conducting the assessment, the RSIO need not interview the complainant, respondent, or other witnesses, or gather data beyond any that may have been submitted with the allegation, except as necessary to determine whether the allegation is sufficiently credible and specific so that potential evidence of research misconduct may be identified. If no inquiry is required, the RSIO will document the allegation and outcome and notify the appropriate parties.

# VI. Conducting the Inquiry

## A. Initiation of the Inquiry Process

Following the assessment, if the RSIO, in consultation with the Vice President for Research and Economic Development, and the appropriate dean or equivalent administrator (if necessary), determines the allegation falls within the definition of misconduct in research or scholarship and is sufficiently credible and specific so that potential evidence of misconduct in research or scholarship may be identified, the RSIO will initiate the inquiry process. In initiating the inquiry, the RSIO should identify as clearly as possible the original allegation and any related issues that should be evaluated.

## B. Purpose of the Inquiry Process

The purpose of the inquiry is to make a preliminary evaluation of the available evidence to determine whether there is sufficient evidence of possible misconduct to warrant an investigation. Such a determination does not require a full review of all relevant evidence. The purpose of the inquiry is not

to reach a final conclusion about whether misconduct definitely occurred or who was responsible. The Inquiry Panel will proceed as stipulated in this document. The findings of the inquiry must be set forth in an inquiry report.

If additional information becomes available that substantially changes the subject matter of the inquiry or would suggest additional respondents, the Inquiry Panel will notify the RSIO, who, in consultation with the Vice President for Research and Economic Development, will determine the appropriate course of action.

## C. Appointment of the Inquiry Panel

The Vice President for Research and Economic Development, in consultation with the appropriate dean or dean's designee and other institutional officials as appropriate, will appoint an Inquiry Panel within 15 calendar days of the initiation of the inquiry. The Inquiry Panel should consist of a minimum of three individuals, all of whom do not have real or apparent unresolved conflicts of interest in the case, are unbiased, and have the necessary expertise to evaluate the evidence and issues related to the allegation(s), to interview the principals and key witnesses, and to conduct the inquiry. These individuals may be scientists, subject matter experts, administrators, lawyers, or other qualified persons. At least a majority of the panel members shall be from within the institution. The Vice President for Research and Economic Development will select one member to serve as chair of the Inquiry Panel. The RSIO shall facilitate the activities of the Inquiry Panel.

## D. Notice to Respondent

The RSIO will make a reasonable effort to locate the respondent using the last addresses reported by the respondent, personnel and retirement records, and publicly available database records. The RSIO will notify the respondent in writing of the allegations and the composition of panel membership at least seven calendar days before the inquiry begins. The respondent may submit, within five calendar days of transmittal of notification, a written objection to panel composition, based on alleged bias or conflict of interest, to the RSIO. The Vice President for Research and Economic Development will determine whether to replace the challenged member with a qualified substitute.

## E. Sequestration of the Research Records

At the time of or before beginning an inquiry, the RSIO will take all reasonable and practical steps to obtain custody of all research records and evidence needed to conduct the research or scholarship misconduct proceeding, inventory the records and evidence, and sequester them in a secure manner, except that where the research records or evidence encompass scientific instruments shared by a number of users. In the latter case, custody may be limited to copies of the data or evidence on such instruments, so long as those copies are substantially equivalent to the evidentiary value of the instruments. However, in the case of allegations involving federal funding, records will be sequestered in accordance with federal agency policies and procedures. The respondent will be provided with copies of all research records sequestered as part of the process or will be provided with supervised access to sequestered records for which copies cannot be made.

## F. Charge to the Inquiry Panel and the First Meeting

The RSIO will prepare a charge for the Inquiry Panel that describes the allegations and any related issues identified during the allegation assessment. The charge will state that the purpose of the inquiry is not to determine whether misconduct definitely occurred or who was responsible, but rather to make a preliminary evaluation of the evidence in order to determine whether there is sufficient evidence of possible misconduct to warrant an investigation.

At the Inquiry Panel's first meeting, the RSIO will review the charge with the panel, discuss the allegations, any related issues, and the appropriate procedures for conducting the inquiry, assist the panel with organizing plans for the inquiry, and answer any questions raised by the panel.

## G. Inquiry Process

The Inquiry Panel will examine relevant research and/or scholarship records and related materials. Since the purpose of an inquiry is to conduct an initial review of the evidence to determine whether to conduct an investigation, an inquiry does not require a full review of all the evidence related to the allegation. The Inquiry Panel may interview the complainant, respondent, and/or key witnesses, but this is not required as part of the inquiry.

An Inquiry Panel's purpose is to decide if an allegation warrants an investigation. An investigation is warranted if there is:

- A reasonable basis for concluding that the allegation falls within the definition of research or scholarship misconduct; and
- Preliminary information-gathering and preliminary fact-finding from inquiry indicates that the allegation may have substance.

# VII. The Inquiry Report

## A. Elements of the Inquiry Report

A written inquiry report must be prepared by the Inquiry Panel that includes, but is not limited to, the following information:

- The name and position of the respondent;
- A description of the allegations of research or scholarship misconduct;
- A description of federal support (if applicable), including grant numbers, grant applications, contracts, and publications listing federal support;
- The basis for recommending that the alleged(s) warrant an investigation or do not warrant an investigation; and,
- Any comments on the report by the respondent or the complainant.

This report shall be prepared by the Inquiry Panel chair and submitted by the Inquiry Panel chair to the RSIO, who will forward the report to the Vice President for Research and Economic Development.

## B. Comments on the Draft Report by the Respondent

The RSIO will provide the respondent with a copy of the draft inquiry report for comment. Notification for comments will be sent by the RSIO to the respondent in writing. If the notification is by certified mail and the certified mail is returned to the RSIO as undeliverable, but was mailed to the address identified, this will be noted, and the process will continue. Within 15 calendar days of confirmed receipt of the draft report, the respondent will provide written comments, if any, to the RSIO, who will forward them to the Inquiry Panel. Any comments the respondent submits on the draft report will become part of the final inquiry report and record. Based on the comments, the Inquiry Panel may revise the report as appropriate. Failure of the Respondent to return comments within 15 calendar days will constitute their waiver of the right to comment.

In distributing the draft report, the RSIO will inform the respondent of the confidentiality under which the draft report is made available and may establish reasonable conditions to ensure such confidentiality. For example, the RSIO may request the respondent sign a confidentiality statement or come to the RSIO's office to review the report.

## C. Final Report, Inquiry Decision and Notification

The RSIO will transmit the final report to the Vice President for Research and Economic Development on behalf of the Inquiry Panel. The Vice President for Research and Economic Development will review the report and make the determination of whether findings from the inquiry provide sufficient evidence of possible misconduct to justify conducting an investigation. The inquiry is formally completed when the Vice President for Research and Economic Development makes this determination, which should be made within five calendar days of receipt of the report. Any extension of this period will be based on good cause and recorded in the inquiry file.

The RSIO will notify in writing the respondent, the complainant, and all appropriate institutional officials of the decision. For PHS-funded research, if the inquiry finds an investigation is warranted, the RSIO will notify the ORI within 30 calendar days of such finding and provide a copy of the inquiry report.

## D. Time Limit for Completing the Inquiry Report

The Inquiry Panel will complete the inquiry and submit its report in writing to the RSIO no more than 60 calendar days following the initiation of the Inquiry Panel, unless the Vice President for Research and Economic Development approves an extension for good cause. If the Vice President for Research and Economic Development approves an extension, the reason for the extension will be entered into the records of the case and the report. The respondent and complainant also will be notified of the extension.

## E. Record Retention

All documentation and records of the inquiry, regardless of outcome, must be kept for at least seven years after the termination of the inquiry. Such documentation and records must be available to ORI, as appropriate, and must be kept sufficiently detailed to permit a later assessment, by ORI or another legal entity, of the reasons why UA chose to conduct or not to conduct an investigation.

# VIII. Conducting the Investigation

## A. Initiation and Purpose of the Investigation

After determination is made that an investigation is warranted, the RSIO will initiate the investigation process, which must begin within 30 calendar days. The purpose of the investigation is to explore in detail the allegations, to examine the evidence in depth, and to determine specifically whether misconduct has been committed, by whom, and to what extent. The findings of the investigation will be set forth in a report. A finding of misconduct in research or scholarship requires that:

- There be a significant departure from accepted practices of the relevant research community;
- The misconduct was committed intentionally, or knowingly, or recklessly; and
- The allegation has been proven by a preponderance of the evidence.

## B. Appointment of the Investigation Panel

The Vice President for Research and Economic Development may appoint the Inquiry Panel as the Investigation Panel or may appoint a new panel for the purpose of conducting the investigation. The Investigation Panel will be appointed and meet within 30 calendar days of the completion of the inquiry. The Investigation Panel should consist of at least three individuals, all of whom do not have real or apparent unresolved conflicts of interest and have the necessary expertise to evaluate the evidence and issues related to the allegations, to interview the principals and key witnesses, and to conduct the investigation. Individuals appointed to the Investigation Panel may be scientists, administrators, subject matter experts, lawyers, or other qualified persons. At least a majority of the panel members shall be from within the institution. The Vice President for Research and Economic Development will select one member to serve as chair of the Investigation Panel. The RSIO shall facilitate the activities of the Investigation Panel.

## C. Notice to Respondent

The RSIO will notify the respondent in writing of the allegations and the composition of panel membership. Such notification will be within a reasonable amount of time after determining that an investigation is warranted, but before the investigation begins. The respondent may submit to the RSIO within five calendar days of transmittal of notification, a written objection to panel appointees on the basis of bias or conflict of interest. The Vice President for Research and Economic Development will determine whether to replace the challenged member with a qualified substitute.

## D. Sequestration of the Research Records

To the extent the RSIO has not already done so at the allegation or inquiry stages, the RSIO will immediately sequester research and/or scholarship records and evidence needed to conduct the research and/or scholarship proceeding, inventory the records and evidence, and sequester them in a secure manner, except that where the research records or evidence encompass scientific instruments shared by a number of users. In the latter case, custody may be limited to copies of the data or evidence, so long as those copies are substantially equivalent to the evidentiary value of the originals. Whenever possible, UA must take custody of the records:

- Before or at the time it notifies the respondent; and,
- Whenever additional items become known or relevant to the investigation

The respondent will be provided with copies of all research records sequestered as part of the process or will be provided with supervised access to sequestered records for which copies cannot be made.

# E. Charge to the Panel and the First Meeting

The RSIO will define the subject matter of the investigation in a written charge to the panel that describes the allegations and related issues identified during the inquiry, defines the misconduct the respondent is alleged to have committed, and identifies the name of the respondent. The charge will state that the panel is to evaluate the evidence and testimony of the respondent, complainant, and key witnesses to assess whether, based on a preponderance of the evidence, misconduct in research or scholarship occurred and, if so, to what extent, who was responsible, and its seriousness. The charge of the Investigation Panel will also be to recommend, if the respondent(s) is found to have committed misconduct in research or scholarship, a course of institutional administrative action the University should follow. The Panel is to convey their findings and recommended administrative actions in a final investigation report to the Provost.

At the Investigation Panel's first meeting, the RSIO will review the charge with the panel, discuss the allegations, any related issues, and the appropriate procedures for conducting the investigation, assist the panel with organizing plans for the investigation, and answer any questions raised by the panel.

During the investigation, if additional information becomes available that substantially changes the subject matter of the investigation or would suggest additional respondents, the panel will notify the RSIO, who will consult with the Vice President for Research and Economic Development to determine the appropriate course of action.

# F. Investigation Process

The investigation will involve examination of all documentation including, but not necessarily limited to, relevant research records, computer files, proposals, manuscripts, publications, correspondence, memoranda, and notes of telephone calls. Whenever possible, the panel should interview the complainant(s), the respondents(s), and other individuals who might have information regarding aspects of the allegations. All interviews will be recorded or transcribed. Recordings or transcripts of the interviews should be provided to the interviewed party for comment or revision, and included as part of the investigatory file. The Investigation Panel will evaluate the evidence and testimony of the respondent, complainant, and key witnesses to determine whether, based on a preponderance of the evidence, misconduct in research and/or scholarship has occurred and, if so, to what extent, who was responsible, and its seriousness.

The Investigation Panel will use diligent efforts to ensure that the investigation is thorough and sufficiently documented and includes examination of all research records and evidence to reach a decision on the merits of the allegations. The Investigation Panel will take reasonable steps to ensure an impartial and unbiased investigation, to the maximum extent practicable and shall pursue diligently all significant issues and leads relevant to the investigation and will continue the investigation to completion.

# G. Time for Completing Investigation

The Investigation Panel shall complete the investigation within 120 calendar days of beginning it, including conducting the investigation, preparing the report of findings, providing the draft report for comment, finalizing the report, and in the case of PHS-funded research submitting the final report to ORI. If the panel is unable to complete the investigation in 120 days, the panel chair will ask the Provost for an extension. If the investigation involves PHS funding, the RSIO will send a request to ORI asking for an extension.

# IX. The Investigation Report

## A. Elements of the Investigation Report

The investigation report must be in writing and include the following:

- A description of the nature of the allegations;
- A description of the specific allegations of misconduct in research or scholarship for consideration in the investigation;
- A description, if federal funds are involved, of the research or scholarship activity under which funding was received, including any grant numbers, grant applications, contracts, and publications listing federal government support. (If PHS funding is involved, the report must list any current support or known applications or proposals for support that the respondent has pending with PHS and identify PHS support and non-PHS support.);
- Identification and summary of the research or scholarship records and evidence reviewed and/or evidence taken into custody but not reviewed;
- A statement of findings that lists each separate allegation of misconduct in research or scholarship identified during the investigation and that provides a finding as to whether misconduct in research or scholarship did or did not occur, and if it did:
    - Identify whether the research misconduct was falsification, fabrication, and/or plagiarism and/or if it was intentional, knowing and/or in reckless disregard;
    - Summarize the facts and the analysis that support the conclusion and consider the merits of any reasonable explanation by the respondent;
    - Include comments made by the respondent and complainant on draft investigation reports;
    - Identify the specific PHS support (if applicable);
    - Identify whether any publications need correction or retraction;
    - Identify the person(s) responsible for the misconduct; and,
    - Recommend actions to be taken by the Provost.

## B. Comments on the Draft Report

The RSIO will provide the respondent with a copy of the draft investigation report for comment and, concurrently, a copy of, or supervised access to, the evidence on which the report is based. Comments of the respondent on the draft report, if any, must be submitted in writing within 30 calendar days of the date the draft investigation report was confirmed to be received in writing by the respondent. If the

notification is by certified mail and the certified mail is returned to the RSIO as undeliverable but was mailed to the last address known by the University of the respondent, this will be noted, and the process will continue. The RSIO will forward the respondent's comments, if any, to the Investigation panel. Based on the comments, the Investigation panel may revise the report as appropriate. Any comments provided by the respondent must be included and considered in the final report. Failure of the respondent to return comments within 30 calendar days will constitute their waiver of the right to comment.

The RSIO may provide the complainant with either a copy of the draft investigation report or relevant portions of the report, as determined by the panel. If the panel chooses to seek comments of the complainant on the draft report or relevant portions of it, the complainant will be asked to submit comments in writing within 30 calendar days of the date the draft investigation report or relevant portions were confirmed to be received  by the complainant. If the draft report is sent by certified mail and the certified mail is returned to the RSIO as undeliverable but was mailed to the last address known by the University of the complainant, this will be noted and the process will continue. The RSIO will forward the complainant's comments, if any, to the Investigation panel. Failure of the complainant to return comments within 30 calendar days will constitute a waiver of the opportunity to comment.

In distributing the draft report or relevant portions to the respondent or complainant, the RSIO will inform the recipients of the confidentiality under which the draft report is made available and may establish reasonable conditions to ensure such confidentiality. For example, the RSIO may request the recipient sign a confidentiality statement or to come to the RSIO's office to review the report.

# C. Transmittal of the Final Investigation Report

The Investigation Panel will prepare and transmit the final report, with attachments, including the respondent's or, if applicable, the complainant's comments, to the Provost through the RSIO.

# D. Acceptance of Final Report

The Provost will make the final determination as whether to accept the investigation report, its findings, and the recommended institutional administrative actions outlined, but not limited to, those in this document. If a decision is rendered that is different from that of the Investigation Panel, the Provost will explain in writing the basis for rendering the decision. This explanation will be transmitted to the RSIO, Vice President for Research and Economic Development, Investigation Panel and respondent. If appropriate, the explanation will be transmitted, along with the report, to the appropriate federal agency. The Provost's explanation should be consistent with the University's definition of misconduct in research and scholarship, UA's policies and procedures, and the evidence reviewed and analyzed by the Investigation Panel. The Provost may also return the report to the Investigation Panel with a request for further fact-finding or analysis. The Provost's determination, together with the Investigation Panel's report, constitutes the final investigation report.

When a final decision on the case has been reached by the Provost, the RSIO will notify both the respondent and the complainant in writing. In addition, the RSIO, in consultation with the Provost and the Vice President for Research and Economic Development, will determine whether law enforcement agencies, professional societies, professional licensing boards, editors of journals in which reports may have been published, collaborators of the respondent in the work, or other relevant parties should

be notified of the outcome of the case. The RSIO is responsible for ensuring compliance with all notification requirements of funding or sponsoring agencies.

# X. Special Requirements for Reporting to the Federal Government

## A. Reporting Requirements

Federal Policy on Research Misconduct and Public Health Service (PHS) Policies on Research Misconduct, 42 CFR Parts 50 and 93 requires that federal agencies and research institutions share responsibility for the research process and work together in identifying and reporting research misconduct related to PHS grants and contracts.

It is in cooperation with federal policy that UA implements the following requirements when federal funds are involved in the misconduct inquiry or investigation.

If PHS funding is involved, UA will follow the U.S. Department of Health and Human Services, 42 CFR Parts 50 and 93, Public Health Service Policies on Research Misconduct (final rules, May 17, 2005). UA's decision to initiate an investigation must be reported in writing to ORI, on or before the date the investigation begins. At a minimum, the notification should include the name of the person(s) against whom the allegations have been made, the general nature of the allegation as it relates to the PHS definition of scientific misconduct, and the PHS applications or grant number(s) involved.

ORI must also be notified of the final outcome of the investigation and must be provided with the following:

- A copy of the investigation report, including all attachments and any appeals;
- Information concerning the final institutional action, including whether UA found misconduct and if so, who committed the misconduct;
- A statement of whether UA accepts the finding of the Investigation Panel;
- Institutional administrative actions that describe any pending or completed administrative actions against the respondent; and
- Explanation of any significant variations from the provisions of the institutional policies and procedures.

If federal agencies are involved that do not follow PHS policy and procedures, the misconduct will be reported in accordance with the sponsoring agency's printed policies and procedures. If required by a federal agency, the RSIO shall notify a federal agency of the results of inquiries or investigations.

## B. Termination and Extension of PHS-related Inquiry or Investigation

If UA plans to terminate an inquiry or investigation for any reason without completing all relevant requirements of the PHS regulations, the RSIO will submit a report of the planned termination to ORI, including a description of the reasons for the proposed termination.

If the institution determines that it will not be able to complete the investigation within 120 calendar days, the RSIO will submit to ORI a written request for an extension that explains the delay, reports on the progress to date, and describes other necessary steps to be taken. If the request is granted, the RSIO will file periodic progress reports as requested by the ORI.

## C. Working with ORI

When PHS funding or applications for funding are involved and an admission of misconduct in research is made, the RSIO will contact ORI for consultation and advice. Normally, the individual making the admission will be asked to sign a statement attesting to the occurrence and extent of misconduct. When the case involves PHS funds, the institution cannot accept an admission of scientific misconduct as a basis for closing a case or not undertaking an investigation without prior approval from ORI.

The RSIO will notify ORI at any stage of the inquiry or investigation if:

- The health or safety of the public is at risk, including an immediate need to protect animal or human subjects;
- PHS resources or interests are threatened;
- Research activities should be suspended;
- Federal action is needed to protect the interests of the person(s) making the allegations or of the individual(s) who is the subject of the allegations as well as their co-investigators and associates, if any, and others involved in the misconduct proceedings;
- It is probable that the alleged incident is going to be reported publicly;
- The research community or public should be informed; or
- There is a reasonable indication of possible violations of civil or criminal law. In this instance, the institution must inform ORI within 24 hours of obtaining that information.

# XI. Institutional Administrative Actions

UA will take appropriate administrative actions against individuals when an allegation of misconduct in research or scholarship has been substantiated. If the Provost determines that the alleged misconduct is substantiated by the findings, the Provost will decide the appropriate actions to be taken. The actions may include, but are not limited to, the following:

- Withdrawal or correction of all pending or published abstracts and papers emanating from the research or scholarship where misconduct was found;
- Removal of the responsible person from the particular project;
- Letter of reprimand;
- Probation;
- Suspension;
- Salary reduction;
- Initiation of steps leading to possible rank reduction;
- Termination of employment; and/or

• Restitution of funds, as appropriate.

# XII. Other Considerations

## A. Termination of Institutional Employment or Resignation Prior to Completing Inquiry or Investigation

The termination of the respondent's institutional employment, by resignation or otherwise, before or after an allegation of possible misconduct in research or scholarship has been reported, will not preclude or terminate the misconduct inquiry or investigation.

If the respondent, without admitting to the misconduct, elects to resign prior to the initiation of an inquiry, but after an allegation has been reported, or during an inquiry or investigation, the inquiry or investigation will proceed. If the respondent refuses to participate in the process after resignation, the panel will use its best efforts to reach a conclusion concerning the allegations, noting in its report the respondent's failure to cooperate and the effect of this non-cooperation on the panel's review of evidence.

## B. Restoration of the Respondent's Reputation

If UA finds no misconduct occurred, the Vice President for Research and Economic Development will undertake, after consulting with the respondent, reasonable efforts to restore the respondent's reputation. If the case involves PHS funding ORI must concur with UA that no misconduct has occurred before reasonable efforts to restore the respondent's reputation can take place. Depending on the particular circumstances, the Vice President for Research and Economic Development may notify those individuals aware of or involved in the investigation of the final outcome, publicizing the final outcome in forums in which the allegation of misconduct was previously publicized, or removing all reference to the misconduct allegation from the respondent's personnel file. Any institutional actions to restore the respondent's reputation must first be approved by the Provost.

## C. Protection of the Complainant, Witnesses, and Panel Members

The Vice President for Research and Economic Development will undertake reasonable efforts to protect the positions and reputations of good faith complainants, witnesses, and panel members and protect them from retaliation. Upon completion of an investigation, the Provost will determine what steps, if any, are needed to restore the position or reputation of the complainant, witnesses, and panel members. The Vice President for Research and Economic Development is responsible for implementing any steps the Provost approves. The RSIO also will take appropriate steps during the inquiry and investigation to prevent any retaliation against the complainant, witnesses, and panel members.

## D. Allegations Not Made in Good Faith

Based on the reports of the inquiry and/or investigative panels, the Provost will determine whether the complainant's allegations of misconduct in research or scholarship were made in good faith. If an allegation was not made in good faith, the Provost will determine the institutional administrative action(s) to be taken against the complainant. Possible administrative actions that may be taken against a complainant shown not to have acted in good faith include:

- Letter of reprimand;
- Probation;
- Suspension;
- Salary reduction;
- Initiation of steps leading to possible rank reduction; and/or
- Termination of employment.

# XIII. Record Retention

After completion of the inquiry or investigation and all ensuing related actions, the RSIO will prepare a complete file, including the records of the inquiry and investigation (if an investigation was conducted) and copies of all documents and other materials furnished to the RSIO or panels. Research and scholarship misconduct records will be kept in a secure manner for seven years after completion of the proceeding or if PHS funding is involved, seven years after completion of the proceeding or the completion of any PHS proceeding involving the research misconduct allegation, whichever is later.

# APPENDIX G: PRINCIPLES AND PROCEDURES FOR MERGER OR DISCONTINUANCE OF ACADEMIC UNITS

## I. Principles

The University's mission in teaching, research, and service includes providing a liberal education as well as advancing and disseminating highly specialized knowledge. However, to allocate its resources effectively, the University must from time to time merge or discontinue academic units (e.g., colleges, institutes, departments, programs) when they are no longer central to the institution's mission or when these units can be maintained only by using funds essential for units whose continuance is deemed more critical to the University's mission.

The Board of Trustees of The University of Alabama has responsibility for approval of the University's mission, role, and scope, and for the degree programs offered by the University. The Board delegates to the President responsibility for administration of the University and its programs of instruction, research, and service. Decisions to merge or discontinue academic units are the responsibility of the President. The President will seek the advice of administrators and faculty within the University in considering such decisions and will ensure that all faculty and staff who might be affected by merger or discontinuance of programs are consulted and that the decision will consider the needs of current students. The President will notify the Chancellor before a final decision is made, in accordance with Board Rule 503. The President will base decisions to merge or discontinue an academic unit essentially on educational considerations that reflect long-range judgment that the overall educational mission of the University will be enhanced by the merger or discontinuance.

## II. Procedures

A standing committee called the University Committee on the Merger or Discontinuance of Academic Units (referred to hereafter as the committee) will represent the faculty as a whole in cases where merger or discontinuance could result in termination of a faculty appointment (i.e., termination of an appointment with tenure or a probationary or special appointment before the end of the specified time). The specified time for notification of termination of appointments for probationary faculty shall conform to requirements for notification of non-retention in the *Faculty Handbook*. Persons who have special appointments, or appointments that are neither tenured nor tenure-track, are reviewed annually; continuation of such appointments depends on a record of satisfactory performance and on a continuing need for the services performed.

The committee's function will be to determine whether merger or discontinuance of an academic unit would benefit the educational mission of the University as a whole. This determination will be based essentially on educational considerations similar to those that affect the President's decision and the recommendations by deans and the Provost. Examples of factors that may be considered include program viability (based on demand for a program and the potential for growth) and the need to avoid duplication (or to effect economies in management or to strengthen related programs). An academic unit's record of excellence will

be a consideration in decisions regarding merger or discontinuation, but will not be the decisive factor.

The committee shall consist of nine tenured faculty members who are not members of the University Mediation Committee, with three members elected by the Faculty Senate, three elected by the Graduate Council, and three elected by the Council of Deans. The three persons elected by each group will serve staggered three-year terms, with a new member elected each fall semester for a term to begin at the start of the following spring semester. The initial committee will begin to serve when elected, rather than at the start of the following spring semester, and the terms of members will be extended accordingly. Each group shall assign terms of one, two, and three years to the three persons it elects to the initial committee. The initial Committee will meet as soon as possible to elect its chairperson. No person elected by a group shall be a member of that group at the time of the election, and the Council of Deans shall not elect any person who is a current member of the Council of Assistant and Associate Deans. No two of the three serving members elected by a group shall be faculty members of the same college or school (other than the Graduate School). Members completing a term on the committee are not eligible for reelection until two years have passed. The committee elects its own chairperson from among its members at the start of each spring semester.

When the dean, after consultation with the Provost and any other appropriate deans or department chairs, believes it necessary to consider a merger or discontinuance of an academic unit, the dean shall proceed as follows:

1. The dean shall convene a meeting of the appropriate faculty. At this meeting, the dean shall explain the reasons for considering a merger or discontinuance and propose the terms and conditions of any changes in faculty status resulting from the proposed merger or discontinuance, such as termination of faculty positions, reassignment of faculty, modification in research or teaching assignments, changes in reporting channels, or retraining that would be provided to facilitate continued employment of faculty. The dean shall ask the faculty to introduce any information in support of continuation of the academic unit or to suggest alternatives. This information may be conveyed to the dean orally or in writing, individually or in groups, and must be received within a reasonable period of time following the meeting (normally two weeks). In addition, any faculty member with tenure who believes that reassignment or modifications in research or teaching assignments is tantamount to termination of their appointment with the University shall inform the dean in writing, providing reasons for the faculty member's concern, within a reasonable period of time (normally two weeks).

2. If, after a reasonable period following the meeting with the unit in question (normally two weeks), the dean decides to continue considering the proposed merger or discontinuance, the dean shall convene a second meeting of the appropriate faculty and convey to them a summary of whatever information has been assembled and the alternatives suggested. For those tenured faculty members who indicated to the dean in writing that they believe their reassignments or other modifications in faculty assignments are tantamount to termination of their appointment with the University, the dean shall provide a written statement explaining plans for continued employment in a faculty position within the University. Those tenured faculty members not satisfied by the dean's written statement of explanation shall indicate their concerns to the dean in writing, requesting that the merger or discontinuance be reviewed by the committee; such a request will be dealt with as described in Item 4 below. The dean shall allow a reasonable period following this second meeting for the faculty to respond to any information or alternatives discussed in the meeting and to respond to the written statement of explanation (normally two weeks).

3. If the dean decides to continue considering the proposed merger or discontinuance, the dean shall

convey the reasons for considering a merger or discontinuance, along with a summary of all responses received, to the Council of Deans, the Faculty Senate, and, in cases that might affect graduate programs, the Graduate Council. A copy of the summary conveyed by the dean will be available to the faculty in the office of the academic unit under consideration. Such notification is to provide opportunity to identify consequences that may have been overlooked or elicit suggestions for alternatives. The dean shall allow a reasonable period (normally 30 days during the fall and spring semester) for these groups to respond.

4. If, after receiving any responses from the groups in Item 3 above, the dean decides to proceed with consideration of the merger or discontinuance, and no faculty appointments are to be terminated, then the dean shall proceed directly to Item 5. However, when the proposed merger or discontinuance includes termination of tenured faculty appointments of probationary or special appointments without appropriate notification, or in cases where tenured faculty have requested a review as in Item 2 above, the dean shall forward a summary of the information gathered to the University Committee on the Merger or Discontinuance of Academic Units, requesting the committee determine whether the merger or discontinuance is based essentially on educational considerations. The committee shall have a summary of all data gathered and shall have access to the original materials from which the summary has been compiled. The committee is free to gather other materials at its discretion; it may seek advice from knowledgeable parties on campus or elsewhere. Normally, the committee should complete its work within 30 days, but it may extend this period in difficult cases. The committee will convey its report to the dean.

5. If the dean, after receiving information and recommendations from all groups, decides to proceed with the merger or discontinuance, the dean shall submit a recommendation to the Provost. This recommendation will include all information and advice regarding the proposed merger or discontinuance that has been offered by individuals or groups including, when appropriate, the report of the committee. The dean's recommendation will include proposed provisions to allow students already enrolled to complete their degree requirements.

6. The Provost is responsible for reviewing the recommendation for merger or discontinuance from the dean, and for ensuring that all steps in these procedures have been followed. The Provost may ask for additional information or clarification concerning items included in the dean's recommendation and may seek advice from knowledgeable parties on campus or elsewhere. The Provost will make a recommendation to the President.

7. The President, after studying the recommendation from the Provost and obtaining any additional information, clarification, or advice that the President thinks necessary, will make the decision whether to merge or discontinue academic units. If the President decides to merge or discontinue units, provisions shall be made to allow students already enrolled to complete their degree requirements. Every effort will be given to finding continued employment at the University for administrative, technical, or clerical staff members whose jobs might be lost.

8. In cases where the merger or discontinuance above is a merger or discontinuance of colleges or schools, the Provost will perform the duties assigned to the dean in this document, and the first recommendation shall be made to the President rather than to the Provost.

# III. Additional Considerations

The University shall make every reasonable effort to provide other suitable positions for faculty members whose appointments are lost due to a decision to merge or discontinue a unit. Probationary faculty members whose appointments are lost due to a decision to merge or discontinue a unit may have their appointments terminated with appropriate notification as defined in Chapter 2, VII. If placement in another position at the

University for a tenured faculty member would be facilitated by a reasonable period of training, financial and other essential support for such training will be proffered. If no position is available within the University, with or without reasonable retraining, the tenured faculty member's appointment may be terminated. Notice of termination to faculty members will be provided consistent with policies published in this *Faculty Handbook*.

If the University is unable to provide suitable employment for a tenured faculty member who is displaced by the merger or discontinuance of academic units, the University shall provide at least one year of notice, or at least one academic year of severance pay. In determining the date of severance and the amount of severance pay, the University will consider the faculty member's service to the University and will be mindful of the interests of the faculty members who are approaching eligibility for vesture in the retirement system or eligibility for retirement.

Any tenured faculty member whose appointment is terminated because of merger or discontinuance of a unit, or who believes changes in assignments are tantamount to termination of appointment, and who questions whether the University followed the policy described in this document, is entitled to appeal to the University Mediation Committee. The hearing will be limited to questions as to whether the University has followed policy described in this document; the decision to merge or discontinue the unit shall not be at issue.

## Approval Signatures

| Step Description | Approver | Date |
| --- | --- | --- |
| Division | Lesley Reid: Associate Provost | 9/30/2024 |
| Workflow Review | Policy Management: Policy Manager [JC] | 9/30/2024 |

## Applicability

College of Community Health Sciences, The University of Alabama - Public, The University of Alabama - Secured