FILED
2025 Jul-23  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART AND KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 2:25-cv-00067-RDP |
| Defendants. | ) ) |

## THE BOARD DEFENDANTS' POST-HEARING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................2

    A.    The Professor Plaintiffs.........................................................2

    B.    The Student Plaintiffs ........................................................11

    C.    Alabama NAACP.................................................................18

    D.    Report on Meeting to Confer Regarding Institutional Neutrality ...................19

ARGUMENT ........................................................................................................20

  I.    THE PROFESSOR PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL ...............................20

    A.    The Professor Plaintiffs lack standing ............................................20

    B.    The speech at issue is government speech and is not protected under the First Amendment ..................................................25

    C.    Even if the speech at issue is not government speech, the balancing test set forth in *Bishop* undoubtedly favors the University's right to control the content of its courses ..................................................28

  II.    THE STUDENT PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL...................................32

    A.    The Student Plaintiffs lack standing ..................................................32

    B.    The Student Plaintiffs have not stated claims under *Rosenberger* .................35

  III.    ALABAMA NAACP'S FIRST AMENDMENT CLAIMS FAIL ............................................39

    A.    Alabama NAACP lacks standing.....................................................39

    B.    Alabama NAACP has not stated a claim under *Widmar* or *Healy* .................41

  IV.    THE PLAINTIFFS' FOURTEENTH AMENDMENT VAGUENESS CLAIMS FAIL ....................43

    A.    The Plaintiffs lack standing to bring a vagueness claim................................43

    B.    SB 129 is not unconstitutionally vague ..........................................45

CONCLUSION ...................................................................................................51

Since the initial round of briefing, the Parties have developed an evidentiary record through the submission of exhibits and through witness testimony. The evidence demonstrates Plaintiffs have not established the elements required to obtain the extraordinary and drastic remedy of preliminary injunctive relief. The Court should deny Plaintiffs' Motion for Preliminary Injunction for the following reasons:

*First*, the Professor Plaintiffs do not have standing to pursue their First Amendment claims. Even if they did, the Professor Plaintiffs are not likely to succeed on the merits of their claims because their classroom speech is government speech, which is not protected by the First Amendment. In the alternative, the balancing test set forth in *Bishop* undoubtedly weighs in favor of the University's right to control the content of its courses.

*Second*, the Student Plaintiffs do not have standing to pursue their First Amendment claims. Even if they did, Ms. Testman's and Mr. Luna's claims relating to USGA funding fail because SJAC and Esperanza chose not to apply for funding. Similarly, Ms. Testman's claim regarding SJAC's loss of departmental funding fails because those funds are university speech. Finally, Mr. Luna's claim regarding his "right to receive" his professors' classroom speech fails because his professors' classroom speech is not protected by the First Amendment.

*Third*, Alabama NAACP does not have organizational or associational standing to pursue its freedom of association claim. Even if it did, Alabama NAACP is not likely to succeed on the merits of its claim because neither UA NAACP nor any other student group has been denied access to campus spaces.

*Fourth*, none of the Plaintiffs have standing to pursue their Fourteenth Amendment vagueness claims. Even if they did, SB 129 is not unconstitutionally vague because an ordinary person using ordinary common sense would be notified upon reading the Act that certain conduct

puts them at risk of discharge, and because the Act does not encourage inconsistent, arbitrary, or discriminatory enforcement.

## FACTUAL BACKGROUND

**A.    The Professor Plaintiffs.**

        i.    <u>Dr. Simon</u>

Dr. Cassandra Simon is a tenured associate professor of social work at the University of Alabama ("UA"). (Doc. 58 at p. 2, ¶ 14). In the fall semester of 2024, Dr. Simon taught a course titled *Anti-Oppression and Social Justice*. (Doc. 58 at p. 3, ¶ 19). As part of this course, Dr. Simon assigned a class project that she described as an "advocacy project," based on a social issue selected by the collective decision of the students in the class. (Evid. Hrg., Vol. I at 136:14-21). The fall 2024 course syllabus described the project as follows:

> Students will be given an opportunity to come up with their own class project. If students are not able to come up with their own assignment they will have to do a project come up with by the professor. In the past students have been required to participate in an ongoing university project on addressing racial history on the University of Alabama's campus and/or the history of protests on campus

(Defendants' Ex. 3, at p. 4). The class project was a graded component of Dr. Simon's course. *Id.* The syllabus did not present an option for students to opt out of the advocacy project selected by their classmates, but Dr. Simon testified that she told students "they are to come and talk to [her]" if they do not wish to participate in the project. (Evid. Hrg., Vol. I. at 139:12-19). According to Dr. Simon, no student has ever asked to opt out of the class project. *Id.* at 168:13-169:25.

Dr. Simon's class chose to organize a sit-in protest in opposition to SB 129. (Doc. 12-4 ¶ 28); (Evid. Hrg., Vol. I at 140:15-17). *See also* (Doc 12-4 ¶ 24) (describing the event as a "sit-in to protest SB 129"); (Doc. 12-1 at p. 12) (describing the project as "a protest of SB 129"); (Doc. 31 at p. 7) (describing the project as a "protest").

On November 13, 2024, the morning of the scheduled sit-in, Dr. Schnavia Hatcher, the

Dean of UA's School of Social Work, sent Dr. Simon an email instructing her to cancel the sit-in

assignment. (Evid. Hrg., Vol. I at 142:4-7). Specifically, Dean Hatcher wrote:

> Despite the way you've framed it, it is difficult to see how this
> exercise is not tied to the classroom or does not create a situation
> where students are being forced to assert a position and/or
> unwillingly take part in political activity. Similarly, the way this has
> been organized runs afoul of the Board's commitment to
> institutional neutrality.[1]

(Doc. 58 at p. 3, ¶ 21); (Defendants' Ex. 4 at p. 4). Dean Hatcher made clear that Dr. Simon's

students were welcome to protest SB 129 on campus outside of class time, and that Dr. Simon was

welcome to do the same in her capacity as a private citizen. (Defendants' Ex. 4 at p. 4). The end

of the email contained an excerpt from the UA Faculty Handbook: "It is the responsibility of

faculty members to recognize failure to comply with specific policies and procedures could lead

to progressive disciplinary actions up to and including termination." (Doc. 58 at p. 3-4, ¶ 22);

(Defendants' Ex. 4 at p. 4). *See also* (Defendants' Ex. 13 at p. 50).

Dr. Simon responded to Dean Hatcher, stating that she was "confused and concerned"

about the decision to cancel the protest and seeking clarification on "how because it is tied to the

---

[1] In September 2024, The Board of Trustees of the University of Alabama (the "Board") adopted a resolution titled "Recognizing Commitment to Institutional Neutrality and Freedom of Speech and Expression." (Defs' Ex. 8). The resolution states, in pertinent part:

> [T]o safeguard the freedom of speech and expression for members of the System
> community, the System itself must remain neutral on political and social issues
> unless the issue directly affects any aspect of the System's core operations. Taking
> institutional positions on an issue or making statements about it risks alienating
> members of the System community and destroying the intellectually independent
> environment upon which the System thrives. It is for the Board to decide what
> issues directly affect aspects of the System's core operations, so members of the
> System community exercising their First Amendment rights should make clear
> they do not speak on behalf of the System, its component divisions, or any
> administrative unit within the System.

(Defendants' Ex. 8 at p. 2).

classroom it is inappropriate or violates the new law and guidelines." (Doc. 58 at p. 4, ¶ 23); (Defendants' Ex. 4 at p. 2-3).

Dr. Jim Dalton, Executive Vice President and Provost at UA, replied to Dr. Simon, stating that the protest assignment could be viewed as "sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept," and that having a class protest in opposition to SB 219 is "contrary to UA's commitment to institutional neutrality." (Defendants' Ex. 4 at p. 2); (Doc. 58 at p. 4, ¶ 24). Provost Dalton also made clear to Dr. Simon that her students were free to protest SB 129 on their own, and that Dr. Simon herself was free to do so in her personal capacity. (Defendants' Ex. 4 at p. 2).

Dr. Simon formally cancelled the sit-in assignment, but a group of students still gathered at Denny Chimes on November 13, 2024 to protest SB 129. (Doc. 58 at p. 4, ¶ 25). Dr. Simon's students later held a rescheduled sit-in protest unrelated to Dr. Simon's course that occurred on November 18, 2024. (Doc. 58 at p. 5, ¶¶ 26-27); (Evid. Hrg., Vol. I at 152:23-154:1). UA did not discipline Dr. Simon in relation to the sit-in assignment. (Doc. 58 at p. 5, ¶ 28) (Evid. Hrg., Vol. I at 184:15-20). Dr. Simon taught *Anti-Oppression and Social Justice* again in the spring semester of 2025. (Doc. 58 at p. 5, ¶ 29).

Dr. Simon testified during her direct examination that the cancellation of the sit-in protest could violate social work accreditation standards and jeopardize the school of social work's accreditation. (Evid. Hrg., Vol. I at 149:9-151:6). However, during her cross-examination, she agreed "wholeheartedly" that the social work accreditation standards do *not* require Dr. Simon to require her students to participate in a sit-in protest as part of a graded assignment. *Id.* at 183:5-9; 183:23-184:9.

Aside from the protest assignment, Dr. Simon claims she is concerned that some of the readings she assigns may violate SB 129 because they could be considered "course work that advocates for a divisive concept" under Section 2, Subsection 3 of SB 129. (Evid. Hrg., Vol. I at 159:14-160:4). Yet, she testified that she does not assign coursework that advocates for any of SB 129's "divisive concepts." *Id.* at 161:3-5. She also testified that she does not compel or direct her students to affirm, adopt, or adhere to any of the divisive concepts listed in the Act, and that "no credible educator" would do so. *Id.* at 160:14-23.

The University has never told Dr. Simon that she must change her course materials to comply with SB 129. *Id.* at 192:3-11. Other than cancelling the sit-in, the University has never objected to any portion of her *Anti-Oppression and Social Justice* course. *Id.* at 192:12-14

ii.    Dr. Patton

Dr. Dana Patton is a tenured professor of political science at UA and serves as the director of the prestigious Dr. Robert E. Witt University Fellows Program (the "Fellows Program"). (Doc. 58 at p. 5, ¶¶ 32, 34). She teaches courses titled *Understanding Poverty*, *Social Investment and the Role of Innovation, Systemic Change Through Social Entrepreneurship*, and *The Politics of Health Policy*. *Id.* at p. 6, ¶ 36. Dr. Patton taught *Understanding Poverty* during the fall 2024 semester. *Id.* at p. 6, ¶ 37.

In October 2024, UA was made aware of a complaint involving Dr. Patton's *Understanding Poverty* course. (Dalton Dep. at 24:20-25:4) (Evid. Hrg., Vol. I at 28:22-29:1). The complaint relayed several student concerns, including that "everything is presented from a liberal standpoint and must be accepted as fact," and that some students felt "unable to express their viewpoints in the classroom or in class assignments." (Plaintiffs' Ex. 25 at p. 2-4); (Dalton Dep. at 25:7-17).

UA investigated the complaint, beginning with a Zoom meeting between Dr. Patton and two administrators, Dr. Luoheng Han and Dean Tiffany Sippial, on the morning of October 16, 2024. (Dalton Dep. at 27:3-14) (Evid. Hrg., Vol. I at 37:16-23). After the meeting, Dr. Han asked Dr. Patton to prepare a memorandum summarizing what was discussed during the meeting. (Evid. Hrg., Vol. I at 37:24-38:5). The memorandum explained, among other things, that Dr. Patton's lectures "draw from research findings published in peer-reviewed academic journals," and that "if student comments are one sided, I ask if anyone has a different perspective…to add to the discussion. If a student does not offer alternate views, I do." (Plaintiffs' Ex. 27 at p. 1). Dr. Patton's memorandum also states: "I have never in this class, or in any class I've taught in over twenty years, directed or compelled students to affirm, adopt, adhere to, or assent to a 'divisive concept.'" *Id.*

On October 17, Dr. Han sent Dr. Patton an email asking her to "consider revising [her] statement" to address a list of nine line-items, including "how [she] 'consciously avoid[s]' compelling assent," "[a]ny additional information that [she] shared with students…to clarify [her] position on open discussion," and "[a]ny classroom methodologies that [she] might be using to avoid 'self-censoring' by students." (Plaintiffs' Ex. 28 at 1); (Dalton Dep. at 27:19-21); (Evid. Hrg., Vol. I at 40:3-41:10). Provost Dalton testified that he wanted this additional information to help him craft a response to the complainant and "defend Dr. Patton in terms of her ability to teach what she was on poverty in the classroom." (Dalton Dep. at 27:19-28:13).

Dr. Patton met numerous times with Dr. Lesley Reid, the Associate Provost for Academic Affairs, to discuss her responses to these additional requests. (Evid. Hrg., Vol. I at 44:8-18; 45:13-46:5). On October 25, Dr. Patton sent Dr. Reid an email stating she was "unable to respond" to the request for additional information because she had "serious concerns that the requested

information infringes on [her] academic freedom." (Defendants' Ex. 9 at p. 5). Dr. Reid responded to these concerns, explaining to Dr. Patton that her input "allows the University to respond by centering the faculty member as the expert in pedagogy and their specific discipline," and that any written statement she provided "would be for [the Provost's] use in responding to the inquiry, not something that would be provided to anyone externally, including the person making the complaint or any of your students." *Id.* at p. 4.[2]

Dr. Patton and Dr. Reid met again on November 6 to discuss her response to the information requests. (Evid. Hrg., Vol. I at 50:21-22; 51:13-21). Dr. Patton testified that she and Dr. Reid "went through everything bit by bit," and that Dr. Reid got Dr. Patton's position on each allegation contained in the complaint. *Id.* at 117:3-6; *id.* at 118:8-12 ("Yes, I was given the opportunity to give my side of the story to Dr. Reid."). In lieu of a more detailed statement drafted by Dr. Patton, Dr. Reid prepared a memorandum for Dr. Dalton summarizing her discussions with Dr. Patton. (Defendants' Ex. 11); (Dalton Dep. at 80:15-18).

Provost Dalton closed the investigation, concluding that Dr. Patton's teaching and coursework had not violated any UA policies. (Dalton Dep. at 80:18-22). UA did not discipline Dr. Patton based on its investigation of the complaint. (Doc. 58 at p. 6, ¶ 39); (Dalton Dep. at 30:1-3); (Evid. Hrg., Vol. I at 63:25-64:7). No one from the University ever told Dr. Patton that she had violated SB 129 or that she needed to change any of her courses. (Evid. Hrg., Vol. I at 109:24-110:3; 112:12-18; 118:19-21). Dr. Patton agrees that the University has an obligation to investigate student complaints, and "absolutely" agrees that the University had an obligation to investigate the

---

[2] Provost Dalton also testified that his "intention in reaching out to Dr. Patton…was to try to gather information from her to help respond to…the complainant with a narrative that says we have looked at this; she is presenting things in…an unbiased way which provides the opportunity for discussion and debate." (Dalton Dep. at 79:13-22).

complaints involving her *Understanding Poverty* course. (Evid. Hrg., Vol. I at 95:18-25; 96:4-97:13).

Aside from the investigation, Dr. Patton claims she has changed the content of some of her courses due to concerns about SB 129. *Id.* at 65:5-8. For example, she no longer requires her students to complete the Harvard Implicit Association Test, an online survey that attempts to identify participants' implicit associations. *Id.* at 65:10-67:16. No one from the University told her to make these changes. *Id.* at 109:24-110:3; 112:12-18. Dr. Patton chose to make these changes because she believes they will reduce the likelihood of student complaints in the future. *Id.* at 113:1-14 ("I have a fear, based on what happened to me, that there could be a complaint again. And so, yes, I am changing my courses for that reason."); *id.* at 69:9 ("I just want to avoid having more complaints."); *id.* at 119:2-5 ("I'm doing that out of self-protection.").

Dr. Patton agrees that it is inappropriate for a professor to require students to agree with their opinion in order to receive a successful grade. *Id.* at 86:7-18. She testified that she does not require students to assent to her views on any issue, and that she believes she teaches in an "objective" and "historically accurate" manner. *Id.* at 77:17-18; 78:17-19; 89:13-16; 105:21-25.

Dr. Patton plans to teach *Understanding Poverty* during the upcoming fall 2025 semester, and she remains the director of the Fellows Program. (Doc. 58 at p. 6, ¶¶ 37-38); (Dalton Dep. at 30:10-12); (Evid. Hrg., Vol. I at 118:22-119:1; 122:12-14).

### iii.    Dr. Fording

Dr. Richard Fording is an endowed Professor in the Department of Political Science at UA. (Doc. 58 at p. 6-7, ¶¶ 42-43). His courses include *The Politics of Poverty*, *Social Movements and U.S. Politics*, and *The Politics of Voting Rights*. (Doc. 58 at p. 8, ¶ 52).

At the beginning of the fall 2024 semester, Dr. Fording viewed a training session created for the UA College of Arts and Sciences. The training included a PowerPoint presentation, which contained four slides discussing SB 129.[3] (Doc. 58 at p. 8, ¶¶ 48-50) (Evid. Hrg., Vol. I at 198:15-202:13); (Plaintiffs' Ex. 36 at slides 95-98). The slides advised that SB 129 does *not* prohibit the discussion of divisive concepts if those topics "pertain to the topic of [the] course," and that professors can "require students to be familiar with these concepts and discuss them in class," so long as instruction is done in "an objective manner, without endorsement, and in a way that does not compel assent to the concept." (Plaintiffs' Ex. 36 at slide 97). A slide also recommended that professors "talk, don't test" about divisive concepts to avoid student complaints. *Id.* at slide 98. The slides also made it clear that "[i]f students…complain about the content you present in your course, as long as it pertains to the subject matter of the course and would be recognized in your discipline or by your colleagues as appropriate for the course, you are within the guidelines of your academic freedom." *Id.* at slide 93.

Dr. Fording claims these slides discouraged him from teaching certain course materials for fear of violating SB 129. (Evid. Hrg., Vol. I at 202:14-22); (Evid. Hrg., Vol. II at 297:3-9). Dr. Fording knows that Dr. Dorr is not a lawyer, and agrees that "talk, don't test" was a recommendation from Dr. Dorr rather than a mandatory requirement. (Evid. Hrg., Vol. II 283:20-284:6; 285:10-14). No one else from the University told Dr. Fording to "talk, don't test." *Id.* at 285:2-14.

UA has published official guidance for professors on its website titled "Resources and Recommendations for Handling Difficult Topics in an Academic Setting." (Defendants' Ex. 11).

---

[3] The slides were created by Dr. Lisa Dorr, a professor in the Department of History and the Resource Liaison for the College of Arts & Sciences. (Plaintiffs' Ex. 36, at slide 1). Dr. Dorr is not a lawyer. (Evid. Hrg., Vol. II at 283:20-284:6).

The guidance reads, in pertinent part: "[a]ssessment related to 'divisive concepts' or politically divisive issues should measure a student's understanding and/or critical analysis rather than their agreement with a particular viewpoint." (Defendants' Ex. 11 at 13). Dr. Fording agrees that this official guidance allows him to test on divisive concepts. (Evid. Hrg., Vol. II at 292:4-25).

In December 2024, Dr. Fording was forwarded an email from Provost Dalton regarding the cancellation of Dr. Simon's advocacy assignment. (Evid. Hrg., Vol. I at 213:20-215:22). The email stated:

> To your point, this may likely be viewed or experienced as UA interpreting the law too broadly on many occasions. I frankly would rather be in the position of having cautioned scores of faculty regarding potential violations than meting out a single sanction for confirmed violation.

(Plaintiffs' Ex. 41 at 1).

Dr. Fording claims that SB 129, and his perceptions regarding the University's enforcement of SB 129, caused him to stop teaching one of his courses, *The Politics of Poverty*, and to change the content of another one of his courses, *Social Movements and U.S. Politics*. (Evid. Hrg., Vol. I at 197:24-198:7; 217:7-22). These were Dr. Fording's decisions, as no one from the University told him to change either course. (Evid. Hrg., Vol. II at 237:6-10).

Dr. Fording also testified he is worried some of his assigned readings may violate SB 129. For example, Dr. Fording introduces his students to readings regarding the eugenics movement, including some historical readings written by proponents of the eugenics movement, as a way to introduce his students to the now-discredited arguments advanced by that movement. (Evid. Hrg., Vol. II at 257:23-259:8). He believes these readings could be construed as "advocating for" divisive concepts (a), (b), and (c) in violation of SB 129. *Id.*[4]

---

[4] At the evidentiary hearing on June 25, 2025, counsel for both the Board and Governor Ivey made clear that it is *not* the position of any Defendant that SB 129 prohibits professors from assigning readings in which the author advocates

Dr. Fording believes professors have a "responsibility" to teach in an objective manner, *id.* at 306:14-17, and testified that he does not compel his students to affirm, adopt, or adhere to any of SB 129's divisive concepts, *id.* at 265:13-16.

Dr. Fording does not allege he has been disciplined or threatened with discipline for violating SB 129, nor does he allege that UA has required him to change anything about his courses due to SB 129. (Evid. Hrg., Vol. II at 302:22-303:3). His primary concern seems to be that others could interpret his course work as advocating for divisive concepts and submit a complaint against him under their mistaken interpretation of SB 129. *Id.* at 307:6-309:21.

### B.    The Student Plaintiffs.

At UAB, a university funded organization ("UFO") is a student organization that is directly supported through a department or division of the University. (Defendants' Ex. 2 at p. 1). Each UFO's purpose "aligns with that of the department or division and is directly advised and financially supported by that unit." *Id.*; (Evid. Hrg., Vol. II at 316:5-12). Dr. Mary Wallace, the Assistant Vice President for Student Affairs at UAB, testified that each UFO is "embedded" in a department "to carry out a piece of that department's mission," (Wallace Dep. at 17:17-20), and that each UFO is a "part of the department" that funds it, *id.* at 18:14-19, 19:18-20:4, 21:9-11. UFOs are permitted to use UAB's official name and core logo in their branding materials. (Defendants' Ex. 2, at p. 3); (Wallace Dep. at 20:7-21:11).

A registered student organization ("RSO") is a student-created and student-led organization that is *not* directly supported by a department or division of the University. (Defendants' Ex. 2 at p. 1). RSOs are not permitted to use UAB's official name and core logo in

---

for a divisive concept. (Evid. Hrg., Vol. I at 155:12-156:15). Counsel for the Board stated that "[t]he University's position is that professors, using their academic freedom and their judgment as professors, are absolutely entitled to assign course material that may have different opinions on divisive topics." *Id.* at 155:23-156:1.

their branding materials. (Wallace Dep. at 14:5-7). Unlike UFOs, RSOs do not automatically receive funding from a department or division of the university each semester. Instead, RSOs can apply each semester for a budget allocation from the Undergraduate Student Government Association ("USGA") at UAB.

All properly registered RSOs are permitted to submit a budget request to USGA each semester. (Wallace Dep. at 16:6-11). The requirements and procedures for registering an organization and submitting a budget request are contained in the Student Organization Handbook, which is publicly accessible on UAB's website. (Defendants' Ex. 1, at p. 5-12, 44-51). USGA's division of finance, led by a student-elected VP of Finance, evaluates each RSO's budget request and determines how much will be allocated to each RSO that applies for funding. (Wallace Dep. at 15:16-21). The USGA budget allocation process occurs a semester in advance. (Doc. 58 at p. 15 ¶ 78).

Following the enactment of SB 129, UAB created a webpage titled "Guidance for Compliance with Federal Law and SB 129." (Plaintiffs' Ex. 2 to Wallace Depo.). This page provided guidance to UAB students, faculty, and staff for compliance with recent changes to state and federal law, including the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) and SB 129. *Id.* The guidance advised that student organizations "may host DEI programs or discussions that involve 'divisive concepts,' provided that no state funds are used to sponsor any such program." *Id.* at p. 4.

In August 2024, Dr. Wallace informed student members of USGA that, based on UAB's guidance, state funding could not be used for programming associated with "divisive concepts." (Wallace Dep. at p. 75:5-12). However, beginning in the fall 2024 semester, UAB has used private funds from the UAB Educational Foundation, rather than state dollars, to fund USGA's budget

allocations to certain cultural, political, and religious RSOs at UAB. (Doc. 58 at p.67, ¶ 15); (Wallace Dep. at 99:23-100:21; 102:11-22). This change was implemented to ensure that all RSOs could continue to receive funding from USGA without risking a potential violation of SB 129. (Wallace Dep. at 24:7-19; 78:13-16). Members of USGA, rather than UAB administrators, determined each semester whether each RSO's budget allocation would be paid using state funds or Educational Foundation dollars. (Wallace Dep. at p. 117:16-22; 104:4-10; 107:8-16). Under this system, all RSOs were able to apply for and receive funding from USGA. (Wallace Dep. at 24:13-25:1); (Evid. Hrg., Vol. II at 327:22-25).

On June 20, 2025, UAB updated its "Guidance for Compliance with Federal Law and SB 129" webpage. (Defendants' Ex. 14). The updated guidance no longer advises that state funds cannot be used to sponsor DEI programs or events relating to divisive concepts. *Id.* Going forward, budget allocations for all RSOs will be paid from a single funding source.

i.    SJAC

Social Justice Advocacy Council ("SJAC") is an RSO at UAB whose mission is "to celebrate diversity of identity, broaden cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about social justice and identity-related issues, and promote intercultural interactions between all communities of people at UAB." (Doc. 58 at p. 15-16, ¶ 80). SJAC used to be a UFO. As a UFO, it received funds directly from the Student Multicultural and Diversity Programs ("SMDP") office. (Wallace Dep. at p. 38:3-11). Each year, SJAC would allocate a portion of its funds to an "affiliate board" comprised of student organizations "that had a social justice mission." (Wallace Dep. at p. 23:2-7); (Evid. Hrg., Vol. II at 314:16-17). SJAC's allocations to the affiliate board were subject to the approval of, and were disbursed by, the SMDP office. (Wallace Dep. at p. 33:19-34:9).

In the summer of 2024, UAB closed the SMDP office, ending SJAC's source of direct funding. (Wallace Dep. at p. 38:3-20).[5] Following the closure of SMDP, UAB administrators advised the student leaders of SJAC that SJAC would not operate as a UFO going forward, and that they should register SJAC as an RSO if they wanted it to continue as a student organization. (Wallace Dep. at p. 56:3-57:12).

SJAC began operating as an RSO during the fall 2024 semester. Because the USGA budget allocations for the fall semester had already been made during the preceding spring semester, SJAC did not participate in the normal USGA budget process for that semester. (Wallace Dep. at p. 63:14-23). USGA has a process where newly registered RSOs are able to obtain a small amount of funding after the budget deadline has passed. (Def. Ex. 1, at p. 51); (Wallace Dep. at p. 63:5-13; 64:7-18). SJAC did not seek this post-deadline funding from USGA. (Evid. Hrg., Vol. II at 328:4-13).

SJAC had the opportunity to submit budget requests to USGA for the spring 2025 and fall 2025 semesters, but it did not do so. (Wallace Dep. at p. 25:22-26:15). Neither of the Student Plaintiffs are currently members of SJAC. (Evid. Hrg., Vol. II at 329:5-8; 387:6-7).

ii. <u>Sydney Testman</u>

Sydney Testman is a rising senior at UAB. (Doc. 58 at p.11, ¶ 62). For the 2023-2024 academic year, she served as SJAC's finance coordinator. (Doc. 58 at p.11, ¶ 64); (Evid. Hrg., Vol. II at 314:22-25). In this position, Ms. Testman was involved with processing funding requests submitted by SJAC's affiliate organizations. (Evid. Hrg., Vol. II at 315:3-6). Ms. Testman testified that, following SJAC's transition to an RSO, her role as finance coordinator was "terminated"

---

[5] Dr. Wallace testified that prior to SB 129, UAB was already planning to change SJAC's funding model, and that funding for SJAC's affiliate board would have been cut "regardless of SB 129" in order to centralize student organization funding through USGA and prevent RSOs from "double dipping" by receiving funds from both SJAC and USGA. (Wallace Dep. at p. 23:7-22).

because her "whole role was funding student organizations and [SJAC] no longer had the funds to do that." (Evid. Hrg., Vol. II at 319:13-20).[6] Contrarily, she testified that she was given "the option to either create an entirely new role and kind of fit into the new SJAC or they could release me from SJAC." *Id.* at 320:18-20. She apparently chose non-membership, as she later testified that she is no longer a member of SJAC. *Id.* at 329:5-8.

For the 2023-2024 academic year, Ms. Testman received a $600 stipend from SMDP for her work as financial coordinator of SJAC. (Evid. Hrg., Vol. II at 314:22-25; 315:17-22); (Wallace Dep. at p. 66:7-11). Following the closure of SMDP and SJAC's transition to an RSO, this stipend was not available for the 2024-2025 academic year. (Evid. Hrg., Vol. II at 319:13-20); (Wallace Dep. at p. 66:12-67:2).

Ms. Testman has also held positions on USGA each year she has attended UAB. She is currently the Executive Vice President of USGA. (Doc. 58 at p.12, ¶ 66-67). As a member of USGA, she knew that UAB had obtained funds from the Educational Foundation, and that all RSOs, including SJAC, were eligible to receive budget allocations from USGA for the spring 2025 and fall 2025 semesters. (Evid. Hrg., Vol. II at 328:15-329:4). *See also* (Wallace Dep. at p. 25:4-21).

### iii.  Esperanza

Esperanza is an RSO at UAB whose mission, among other things, is to be "a networking organization designed for Hispanic/Latine students." (Doc. 58 at p. 12, ¶ 70). Esperanza was one of SJAC's "affiliate organizations," and it received funding allocations from SJAC when SJAC was still a UFO. (Doc. 58 at p. 16, ¶ 83). Esperanza has also received funding in the past from

---

[6] Again, Dr. Wallace testified that funding for SJAC's "affiliate board" would have been cut "regardless of SB 129." (Wallace Dep. at p. 23:7-22). If true, this means that Testman's position as Finance Coordinator—which primarily involved processing budget allocations to SJAC's affiliate organizations—also would have been terminated regardless of SB 129.

UAB's Office of Diversity, Equity, and Inclusion. (Doc. 58 at p. 16, ¶ 84). The Office of Diversity, Equity, and Inclusion has since closed. (Wallace Dep. at p. 72:1-8).

Esperanza had the opportunity to submit budget requests to USGA for the fall 2024, spring 2025, and fall 2025 semesters, but chose not to do so. (Wallace Dep. at p. 26:23-27:11); (Evid. Hrg., Vol. II at 385:15-23). In fact, Esperanza has never applied for funding from USGA. (Evid. Hrg., Vol. II at 384:24-385:3).

       iv.   <u>Miguel Luna</u>

Miguel Luna is also a rising senior at UAB. (Doc. 58 at p. 12, ¶ 68). Mr. Luna co-founded Esperanza in 2023 and currently serves as its president. (Evid. Hrg., Vol. II at 348:1-6); (Doc. 58 at p.12, ¶ 70). He also served on USGA's executive council during the 2024-2025 academic year. (Evid. Hrg., Vol. II at 340:8-14).

Mr. Luna claims that Esperanza did not apply for USGA funding for the fall 2025 semester because he did not believe it would be "eligible for any type of funding." (Evid. Hrg., Vol. II at 359:22-360:7; 142:3-16). He further testified that his personal knowledge of the changes to USGA's funding practices led him to believe that Esperanza was not eligible for USGA funding. *Id.* at 364:15-365:1

Contrarily, Luna testified that he knew that other cultural affinity groups with similar missions and events to Esperanza, such as the Spanish and Latino Student Association, the Japanese Culture Club, the Pakistani Student Association, and the African Student Association, all received funding allocations from USGA, paid for using Educational Foundation dollars. *Id.* at 357:14-358:18; 385:4-14; 386:6-387:5; 387:21-388:8. When asked to explain why Esperanza did not apply for USGA funding when he knew that the Spanish and Latino Student Association had received a budget allocation, Luna responded:

> At the time, we didn't want to try to apply for any type of funding because we wanted our funding to be permanent and long-standing. We didn't want any type of temporary situation in relation to funding because we wanted our events to continue in the future and we didn't want to create new events every year. We wanted them to be long-lasting

*Id.* at 385:15-23. When asked, Luna confirmed that the decision not to pursue funding from USGA was his choice. *Id.* at 386:4-5.

Mr. Luna also raised concerns about some of his courses at UAB. In the fall 2024 semester, Luna enrolled in *Politics and Race in America* and *Human Rights*. (Doc. 58 at p. 12-13, ¶¶ 71-72). In spring 2025, he enrolled in *Environmental Politics*. *Id.* at p. 14, ¶ 74.

Mr. Luna claims he enrolled in *Politics and Race in America* "to understand racial stratification within the United States and how it is influenced by politics" and that "[h]e particularly wanted to learn from the Professor about how race influences political behavior." *Id.* at p. 63, ¶ 202. He claims his professor "did not engage in and did not lead class discussions among the students on topics related to the impact of systemic racism on the U.S government and its policies." *Id.* at p. 63, ¶ 203.

Luna claims he enrolled in *Human Rights* "to learn from his professor about human rights, and particularly to gain a better understanding of the persecution of racial and gender minorities and the state's role in facilitating these human rights violations." *Id.* at p. 63, ¶ 204. He claims that during class discussion, his professor "seemed wary of how he presented course materials to students, and did not provide instruction during or failed to lead class discussion on topics that could fall under SB 129." *Id.* at p. 63, ¶ 205. For example, Luna claimed the professor "remained silent and did not engage in classroom discussions about human rights violations experienced by incarcerated African Americans in the Alabama prison system." *Id.*

17

Luna claims he enrolled in the *Environmental Politics* course "to learn about environmental justice and environmental policymaking, and particularly how race, class, and gender may affect inequitable outcomes with regard to environmental health," but that his professor "did not engage in classroom discussion on topics such as the impacts of racism and government policy on environmental health." *Id.* at p. 63, ¶¶ 206-207.

**C.    Alabama NAACP.**

The Alabama State Conference of the NAACP ("Alabama NAACP") is the Alabama branch of the NAACP. (Doc. 58 at p. 16, ¶ 85). Alabama NAACP has a student chapter at the University of Alabama ("UA NAACP"). (Doc. 58 at p. 16, ¶ 87). Ja'Kobe Bibbs, a rising junior at UA, is currently the president of UA NAACP. (Evid. Hrg., Vol. II at 394:13-20).

Black Student Union ("BSU") is a registered student organization at UA. BSU used to have a dedicated office space in the middle of the UA student center. (Doc. 58 at p. 16 ¶ 92). Mr. Bibbs testified that the BSU office space was "given to the University of Alabama's African-American students." (Evid. Hrg., Vol. II at 428:6-23). Safe Zone, a program that provided programming and resources for LGBTQIA+ students at the University of Alabama, also had office space in the student center. (Doc. 58 at p. 16 ¶ 93).

During the fall 2024 semester, UA closed the BSU and Safe Zone office spaces in the student center. An article published in the Crimson White, the University of Alabama's student newspaper, contained the following statement from a University representative regarding the closures:

> In accordance with state and federal laws, no University program, space or benefit will contain impermissible restrictions, preferences or limitations related to race, color, religion, sex, ethnicity, national origin, sexual orientation or gender identity.

(Plaintiffs' Ex. 47 at 1). The BSU office was converted into a food pantry, and the Safe Zone office became the Student Leadership Lounge. (Doc. 1 ¶ 131); (Doc. 56-3 ¶ 21).

UA allows all student groups to reserve spaces on campus for meetings and events. (Dalton Dep. at 31:14-22); (Evid. Hrg., Vol. II at 420:13-16). Mr. Bibbs testified that UA has not prevented UA NAACP from reserving spaces on campus. (Evid. Hrg., Vol. II at 427:18-24). He also testified that UA NAACP has never applied for—nor has it been denied—funding from UA's Student Government Association. *Id.* at 427:14-17.

Mr. Bibbs testified that he visited the BSU office while it existed, but did not testify that he ever visited the Safe Zone office. *Id.* at 397:1-7. BSU, Safe Zone, and Mr. Bibbs are not parties to this lawsuit.

### D.    Report on Meeting to Confer Regarding Institutional Neutrality.

At the Court's direction, the Parties met and conferred regarding the impact of the University's policy on institutional neutrality on Plaintiffs' Motion for Preliminary Injunction. The Parties met twice and discussed entering a Stipulation about the Board's intended response in the event that SB 129 was found to be unconstitutional. The Board provided Plaintiffs with a Proposed Stipulation, attached hereto as <u>Exhibit A</u>, but Plaintiffs advised that they "disagree with the statements in the stipulation and thus cannot agree to it." The Board Defendants thus submit the Stipulation unilaterally as it accurately reflects the position of the Board of Trustees of the University of Alabama. [7]

---

[7] This unilateral Stipulation is offered consistent with the Court's orders and statements requiring the Parties to be candid about the positions they intend to take. *See* (Doc. 40) (requiring parties to meet and confer and file a joint report containing stipulated and proposed findings of fact and conclusions of law). *See also Drummond Co., Inc. v. Collingsworth,* No. 2:11-cv-3695-RDP, 2023 U.S. Dist. LEXIS 236139, at *2-3 (N.D. Ala. Nov. 30, 2023) ("Following the hearing, the court entered an order directing Drummond 'to provide a stipulation to Defendants regarding whether or not they claim financial harm or economic injury in this case and whether or not the 'public figure' inquiry is one that is relevant in this case.'").

## ARGUMENT

"A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Wood v. Fla. Dep't of Educ.*, No. 24-11239, 2025 U.S. App. LEXIS 16320, at *5 (11th Cir. July 2, 2025) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270-71 (11th Cir. 2020)). "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Id.* (quoting *Johnson & Johnson Vision Care, Inc.* v. *1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

Plaintiffs have moved the Court to preliminarily enjoin the enforcement of SB 129 in its entirety. The Motion is due to be denied because Plaintiffs lack standing and are not likely to succeed on the merits of their claims.[8]

## I.    THE PROFESSOR PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL.

### A.    The Professor Plaintiffs lack standing.

Injunctive relief "is a prospective remedy, intended to prevent future injuries." *Adler v. Duval Cnty, Sch, Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if [he] alleges, and ultimately proves, a real and immediate—as opposed to merely a conjectural or hypothetical—threat of future injury." *Williams v. Bd. of Reg. of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1302-1303 (11th Cir. 2007). "Plaintiffs bear the burden to establish standing, and at the preliminary-injunction stage, they must

---

[8] The Complaint asserts claims for violations of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1 at ¶¶ 264-276). These claims do not form the basis of Plaintiffs' Motion for Preliminary Injunction and therefore are not addressed in this brief. *See* (Doc. 12-1).

do so by coming forward with evidence demonstrating a substantial likelihood of establishing standing." *Computer v. Uthmeier*, No. 4:24cv438-MW/MAF, 2025 U.S. Dist. LEXIS 54359, at *3 (N.D. Fla. Mar. 13, 2025). To establish standing, a plaintiff must show (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. *HM Florida-Orl, LLC v. Governor of Fla.*, 137 F.4th 1207 (11th Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). While the Eleventh Circuit has recognized "'the injury requirement is most loosely applied . . . where first amendment rights are involved' . . . there must [still] be a substantial indication that the injury will occur and, if so, what shape that injury will take." *Elend v. Basham*, 471 F.3d 1199, 1210 (11th Cir. 2006) (quoting *Hallandale Professional Fire Fighters Local 2238 v. Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991)).

Here, the Professor Plaintiffs claim they have standing because they have self-censored to avoid potential enforcement of SB 129. "[S]elf-censorship establishes standing when 'the operation or enforcement' . . . of the government policy would cause a reasonable would-be speaker to 'self-censor.'" *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207 (11th Cir. 2025) (quoting *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022)). "A plaintiff bringing a pre-enforcement challenge to an enacted law must show it intends to 'engage in a course of conduct' that the Constitution arguably protects but a law prohibits or otherwise unconstitutionally burdens, and that 'a credible threat of prosecution' exists under that law." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The Professor Plaintiffs' claims fail to establish that they intend to engage in a course of conduct prohibited by SB 129 or that they face a credible threat of prosecution for their intended conduct under SB 129.

i.    The Professor Plaintiffs have not demonstrated an intent to engage in a course of conduct that violates SB 129.

None of the Professor Plaintiffs have demonstrated they intend to engage in any conduct that is even arguably prohibited by SB 129. Dr. Patton and Dr. Simon explicitly testified that they do not require assent to any of the divisive concepts listed in the Act. (Evid. Hrg., Vol. I at 77:17-18; 78:17-19; 89:13-16; 105:21-25). In fact, Dr. Simon testified that "no credible educator" would do so. *Id.* at 160:14-161:2. While Dr. Simon and Dr. Fording expressed concern that assigning readings that advocate for divisive concepts may violate SB 129, both the University and the Attorney General's office stated unequivocally that such assignments are not prohibited under their interpretations of SB 129. *Id.* at 155:15-156:15. To the extent this concern may have given Plaintiffs' standing, it has now been mooted. *HM Fla.-ORL, LLC*, 137 F.4th at 1207 ("[I]f those responsible for enforcing a challenged law say clearly and definitively that a would-be plaintiff's planned speech would not violate the law, the plaintiff may lack standing (or a lawsuit may be mooted).").

Moreover, the only divisive concept the Professor Plaintiffs identified that their teaching might implicate is concept (d), which provides that "by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." The Professors testified they were concerned their teaching on implicit bias could implicate this concept. The Professors' testimony, however, does not indicate that implicit biases are inherent to any race. In fact, Dr. Simon testified "A baby has no biases," and that implicit biases are developed over time based on the world in which we live. (Evid. Hrg., Vol. I at 134:23-135:11). Likewise, Dr. Fording testified that implicit bias is "a product of our socialization." (Evid. Hrg., Vol. II at 264:4-15). Again, the Professor Plaintiffs

cannot point to any portion of their planned speech that a reasonable person would believe violates SB 129.

Finally, Dr. Patton and Dr. Fording both testified that they teach in an objective manner. (Evid. Hrg., Vol. I at 77:17-18; 78:17-19; 89:13-16; 105:21-25; Evid. Hrg., Vol. II at 306:14-17). Dr. Fording even said it was a professor's responsibility to do so. Under Section 4(3)(b) of SB 129, "Nothing in [SB 129] . . . Prohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a large course of academic instruction . . . ." SB 129's safe-harbor, then, makes clear that the speech the Professor Plaintiffs wish to engage in does not arguably violate SB 129.

    ii.    <u>The Professor Plaintiffs have not demonstrated a credible threat of enforcement.</u>

As an initial matter, none of the Professor Plaintiffs have been disciplined under SB 129. In fact, the Professor Plaintiffs have presented no evidence that *anyone* has been disciplined under SB 129. Further, neither Dr. Fording nor Dr. Patton have had anyone at the University tell them their courses violate SB 129, even though they have both taught the classes at issue at the University for years and the University has the syllabi for their classes. (Evid. Hrg., Vol. II at 302:22-25); (Evid. Hrg., Vol. I at 109:24-110:3; 112:12-18).

The University's investigation of Dr. Patton's *Understanding Poverty* course cannot be considered "enforcement" because, as Dr. Patton admits, the University did not take any adverse action against her following its investigation. (Evid. Hrg., Vol. I at 63:25-64:7). To the contrary, the fact that no disciplinary action was taken shows there is *not* a credible threat of enforcement against Dr. Patton based on her *Understanding Poverty* course. It is patently unreasonable to conclude the University will investigate the same conduct in the future and reach a different conclusion.

Dr. Fording's purported credible threat of enforcement is even less compelling. He has never been told to change anything about his courses, and he has never even been investigated. (Evid. Hrg., Vol. II at 302:22-303:3). He merely testified he is aware of the investigation involving Dr. Simon, but he is also aware that the University took no action against Dr. Patton (Evid. Hrg., Vol. I at 210:15-23); (Evid. Hrg., Vol. II at p. 300:22-301:4). There is simply no credible threat of enforcement as to any of Dr. Patton's or Dr. Fording's future conduct.

Dr. Simon claims the University's response to the student-planned class protest shows a likelihood of enforcement, but that is simply wrong. First, it should be noted that the protest of SB 129 was not Dr. Simon's speech. Dr. Simon made it very clear that the SB 129 class protest was purely student led, and she even left the room while the students decided which project to pursue. Dr. Simon has not made it clear how this chilled *her* speech. (Evid. Hrg., Vol. I at 136:19-25, 140:17-19, 171:25-172:3) There is no evidence the University has ever told Dr. Simon that she cannot assign a class project in the future.

Regardless, Dr. Simon has not shown any credible threat of enforcement in the future. As Dr. Simon testified, the project "changes every semester depending on what the students choose," and she has been utilizing student led class projects "for over 20 years." (Evid. Hrg., Vol. I at 136:17-24). During all that time, there is no evidence Dr. Simon's students ever chose a protest similar to the SB 129 sit-in. In other words, there is no evidence of "a real and immediate—as opposed to merely a conjectural or hypothetical—threat of future injury." *Williams*, 477 F.3d at 1302-1303. "'[P]ast exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects' does not establish standing for future relief." *William Sweet v. Chief Just. of Fla. Sup. Court*, No. 23-13025, 2025 U.S. App. LEXIS 7018, at *9 (11th Cir. Mar. 26, 2025)) (quoting *JW v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018)).

Even assuming Dr. Simon faced a threat of future injury, an injunction against the enforcement of SB 129 would not redress her alleged injury. "Standing's redressability requirement mandates that it be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021). The University's reason for canceling the protest was not limited to SB 129. The University also informed Dr. Simon that the protest was "contrary to UA's commitment to institutional neutrality." (Defendants' Ex. 4 at p. 2). In addition, requiring students to participate in a protest as part of a graded assignment potentially implicates students' First Amendment rights by compelling their speech. As a result, enjoining SB 129 would not prevent the University from canceling a similar class-mandated protest in the future.

In sum, the Professor Plaintiffs lack standing to seek an injunction against the enforcement of SB 129.

## B.    The speech at issue is government speech and is not protected under the First Amendment.

The Professor Plaintiffs' First Amendment claims deal exclusively with speech made pursuant to their duties as university employees, as there is no evidence that the enforcement of SB 129 has had any effect on their ability to speak as private citizens. Their claims therefore implicate the two-step *Garcetti-Pickering* framework, which courts use to determine whether a public employee's speech is constitutionally protected:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on . . . her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public [based on the government's interests as an employer].

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006)).

The first step of the *Garcetti-Pickering* framework is comprised of two prongs. First, the Professor Plaintiffs must show that they are speaking (1) as private citizens—rather than as government employees—(2) about a matter of public concern. *Wood*, No. 24-11239, 2025 U.S. App. LEXIS 16320, at *6 (citing *Alves*, 804 F.3d at 1160). The first prong—whether the speech is made as a citizen or as a government employee—comes directly from *Garcetti*. 547 U.S. at 421-22. The "controlling factor" for this threshold question is whether the employee's speech is made "pursuant to his official duties." *Garcetti*, 547 U.S. at 421; *id.* ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). There is little question that when university professors instruct students on curricular matters, they do so "pursuant to their official duties" as university employees.

In *Wood v. Florida Department of Education*, the Eleventh Circuit recently confirmed that "[w]hen a public-school teacher addresses her students within the four walls of a classroom—whether orally or in writing—she is unquestionably acting 'pursuant to [her] official duties.'" No. 24-11239, 2025 U.S. App. LEXIS 16320, at *8 (11th Cir. July 2, 2025). While *Wood* dealt with a high school algebra teacher, not a university professor, there is no textual or historical basis for concluding that a college professor has greater first amendment rights than a high school teacher. And while *Garcetti* left the issue open, it only did so because the issue was not before the Court in that case. *Garcetti*, 547 U.S. at 425 ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.").

Simply put, there is no basis for concluding that university professors have special First Amendment rights above and beyond those enjoyed by other government employees. The Eleventh Circuit has directly held that there is no independent First Amendment right to academic freedom, *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991), so there is no basis in the law for an academic-freedom carveout to *Garcetti*. Further, as chronicled in *Urofsky v. Gilmore*, the idea that professors possess any sort of academic freedom did not take root in the United States until the late nineteenth and early twentieth centuries, post-dating the ratification of the First Amendment in 1791 and its incorporation against the states in 1868. 216 F.3d 401, 410-12. Thus, the idea that the "academic freedom of professors is not only a professional norm, but also a constitutional right," simply does not pass muster. *Id.* at 411. *See also id.* at 414 ("[T]he Court has never recognized that professors possess a First Amendment right of academic freedom to determine for themselves the content of their courses and scholarship, despite opportunities to do so.").

Accordingly, the government speech doctrine announced *Garcetti*, and followed in *Wood*, governs here. The speech at issue in this case could only be made in the Professor Plaintiffs' capacities as government employees because their course instruction and other curricular speech is necessarily made pursuant to their duties as government employees. Therefore, the Professor Plaintiffs' First Amendment claims fail the first prong of step one of the *Garcetti-Pickering* analysis.[9]

---

[9] The Board Defendants do not dispute that the speech at issue in this case is about matters of public concern. Thus, if the Court finds that the Professor Plaintiffs have met the first prong of step one, the Board agrees that it is appropriate to move directly to step two of the *Garcetti-Pickering* analysis.

**C.**      **Even if the speech at issue is not government speech, the balancing test set forth in *Bishop* undoubtedly favors the University's right to control the content of its courses.**

If the Court determines that the Professor Plaintiffs survive step one of the *Garcetti-Pickering* analysis, the Professor Plaintiffs must then demonstrate at step two that their "interest in speaking outweighs the state's interests in promoting the efficient delivery of public services." *Wood*, No. 24-11239, 2025 U.S. App. LEXIS 16320, at *6 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

The Eleventh Circuit has already placed its thumb on the scale for *Pickering* balancing when dealing with university professors' classroom speech. In *Bishop v. Aronov*, the Eleventh Circuit examined the First Amendment claims of a university professor who was ordered to stop injecting his religious viewpoints on physiology into his exercise physiology course and to stop hosting "optional" classes presenting a Christian perspective of physiology. 926 F. 2d 1066, 1068-70 (1991). In *Bishop*, the Eleventh Circuit employed a modified version of *Pickering* balancing to determine whether the University's restrictions on the professor's classroom speech were reasonable, weighing three factors: (1) the "context" of the speech; (2) the "university's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons"; and (3) the "strong predilection for academic freedom." *Id.* at 1072, 1074-75.[10] After balancing these factors, the Eleventh Circuit held that the University's restrictions did not infringe on the professors' free speech rights because the professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom." *Id.* at

---

[10] Although *Bishop* preceded *Garcetti*, the Eleventh Circuit foreshadowed *Garcetti* (and *Wood*) by recognizing that "*Pickering* only addresses out-of-school speech by teachers." 926 F. 2d at 1072. This observation—that *Pickering* does not govern claims regarding professors' in-class speech—is precisely why the *Bishop* court introduced its own modified version of *Pickering*. *See id.* ("[W]e take [*Pickering*] as our starting point because of the balancing it suggests. In and out of school, some balance must be reached.").

1076.[11] *Bishop*'s modified version of *Pickering* balancing weighs heavily in favor of the University in this case.

        i.    <u>Context</u>

The most important *Bishop* factor is the context of the speech at issue. *Id.* at 1074 ("First and foremost, we consider the context…."). The context in *Bishop* was "the university classroom during specific in-class time and the visage of the classroom as part of a university course in an after-class meeting." *Id.* The Court also considered "the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid," noting that "[t]he University's interest is most obvious when student complaints suggest apparent coercion— even when not intended by the professor." *Id.*

Here, the Professor Plaintiffs claim they are self-censoring their own classroom speech, that the University improperly cancelled an "optional" assignment, and that the University investigated complaints it received about a professor. Just like in *Bishop*, all of this speech arises in the context of the professors' course instruction. Additionally, the structure of Dr. Simon's advocacy assignment and the content of the complaints against Dr. Patton suggested "apparent coercion," which means the University's interest in controlling course content was even more "obvious." *Bishop*, 926 F. 2d 1074.

The "context" factor clearly weighs in favor of the University's ability to limit the Professor Plaintiffs' speech during instruction.

---

[11] In *Bishop*, he Eleventh Circuit "did not reach the question of establishment of religion." 926 F.2d 1078; *id.* at 1077 ("[T]he religious facets of this case cloud its true countenance."). Any attempt to distinguish *Bishop* from the present case based on Establishment concerns should be rejected.

ii.    The University's position as a public employer.

The second *Bishop* factor is "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than the those of other persons." *Id.* Specifically, universities have "authority to reasonably control the content of [their] curriculum, particularly that content imparted during class time," as well as authority "over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university." *Id.*

The university's interests outweigh professors' interests in disputes over curriculum. Indeed, the Eleventh Circuit made clear if "[professors] and the University disagree about a matter of content in the course[s] [the professors] teach[,] [t]he University must have the final say in such a dispute." *Bishop*, 926 F.2d at 1068. Plaintiffs' counsel agreed that the Professor Plaintiffs' claims are based on curricular speech only, so the second *Bishop* factor weighs strongly in favor of the University's interest in controlling its curriculum.

iii.    Predilection for Academic Freedom

For the third *Bishop* factor, courts are to consider "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075. This factor does not automatically skew in favor of plaintiffs claiming violations of academic freedom. It instead requires courts to recognize that "academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decision making by the academy itself." *Id.* at 1075 (quoting *Ala. Student Party v. Student Gov't Asso. of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989)). *See also Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (enumerating the "four essential freedoms" of a university: "to determine for itself on academic

grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.").

*Bishop* recognized that a balance must be struck between the academic freedom interests of the University, its students, and its professors. This is the "tightrope upon which the University [finds] itself perched." *Id.* at 1069. Because there is no independent right to academic freedom protected by the First Amendment, *Bishop* recognized that universities should be allowed to balance these competing interests as they see fit without judicial intervention. *Id.* at 1075 ("[W]e cannot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators."). That said, universities are incentivized to be mindful of their professors' interests in academic freedom, lest they decide to take their talents elsewhere. *Id.* at 1075 ("[T[he University will serve its own interests as well as those of its professors in pursuit of academic freedom….[Q]uality faculty members will be hard to attract and retain if they are to be shackled in much of what they do.").

The third *Bishop* factor therefore weighs heavily in favor of the University's ability to control its own curriculum and determine the appropriate balance between competing academic freedom interests at UA. *See id.* at 1076 ("In short, Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute."); *id.* at 1077 ("The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments.").

All three *Bishop* factors weigh in favor of the University. To the extent the Professor Plaintiffs have standing to bring their First Amendment claims, they are not likely to succeed on the merits of those claims because, under *Bishop*'s modified version of *Pickering* balancing, their

interests in academic freedom during class instruction are far outweighed by the University's interest in controlling its curriculum.

## II.    THE STUDENT PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL.

### A.    The Student Plaintiffs lack standing.

To establish standing, a plaintiff must show (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. *HM Florida-Orl, LLC*, 137 F.4th 1207 (quoting *Spokeo, Inc.*, 578 U.S. at 338). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if [he] alleges, and ultimately proves, a real and immediate—as opposed to merely a conjectural or hypothetical—threat of future injury." *Williams v. Bd. of Reg. of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1302-1303 (11th Cir. 2007). "'[P]ast exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects' does not establish standing for future relief." *William Sweet v. Chief Just. of Fla. Sup. Court*, No. 23-13025, 2025 U.S. App. LEXIS 7018, at *9 (11th Cir. Mar. 26, 2025) (quoting *JW v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018)). Neither Miguel Luna nor Sydney Testman can satisfy the basic standing requirements.

### i.    Miguel Luna lacks standing.

Plaintiff Luna claims to have suffered an injury because SB 129 has impacted his right to receive information from his professors and because he has been injured by the University's funding decisions in his role as president of Esperanza. Neither of these claimed injuries confer the standing necessary for a preliminary injunction. First, Mr. Luna has not put forward any evidence that he has been deprived of his right to receive information from hiss professor. All he

alleges is that two of his professors added disclaimers to their course syllabi, and that they seemed timid while lecturing on certain topics.[12]

Mr. Luna has not identified any specific information that he has been unable to receive as a result of SB 129, and has provided nothing to support his assertion that his professors' speech was guided by concerns over SB 129 rather than pedagogical decisions not to discuss certain topics that Mr. Luna wanted to hear about. More importantly, for the preliminary injunction, he has not identified any information that he will not receive in his future classes because of SB 129. Mere "speculat[ion] about the decisions of third parties," is "no more than conjecture" and cannot "establish a likelihood of future injury." *Murthy v. Missouri*, 603 U.S. 43, 72 (2024). Nor can Mr. Luna rely on the unsupported allegations in the Compliant, as "a plaintiff at the preliminary injunction stage 'cannot rest on such mere allegations [as would be appropriate at the pleading stage].'" *League of Women Voters of Fla., Inc. v. Byrd*, No. 4:23cv216-MW/MAF, 2023 U.S. Dist. LEXIS 237881, at *11 (N.D. Fla. July 11, 2023) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 403 (2d Cir. 2011)). Mr. Luna simply has not put forward any evidence that he has been, or will be, deprived of his ability to receive any information as a result of SB 129.

Mr. Luna's funding claims are equally defective. For starters, Mr. Luna testified that Esperanza has never applied for USGA funding, and that it *chose* not to apply for USGA funding because it wanted more "long-standing" funding sources. (Evid. Hrg., Vol. II at 385:15-23, 386:4-5). Mr. Luna cannot claim that he has been injured because Esperanza did not receive funds that it never bothered applying for. More importantly, Mr. Luna cannot show a risk of future injury because the University has revised its guidance to remove any language prohibiting student groups from using state funds to host or sponsor DEI programs and programs involving discussion of

---

[12] Notably, the same disclaimer appeared on the syllabus for a class Luna was taking *before* SB 129 went into effect. (Evid. Hrg., Vol. II at 388:10-391:7); (Doc. 58 ¶¶ 72-73); (Doc. 55-40 at p. 4; *cf.* Doc. 70-24 at p. 3).

divisive concepts in the future. (Defendants' Ex. 14, p. 4; *cf.* Plaintiffs' Ex. 2 to Wallace Depo., p. 4). In other words, Esperanza is free to apply for USGA funding going forward and will not be denied state funds for hosting or promoting SB 129-related activities.

Mr. Luna's claims regarding the loss of funding from SJAC and UAB's Office of Diversity, Equity, and Inclusion (the "DEI Office") have redressability issues. First, enjoining SB 129 would not require UAB to reopen SMDP (the office that funded SJAC) or the DEI Office, so the requested injunction would not redress Luna's claims regarding the loss of funding from SJAC and the DEI Office.

Even if UAB reopened SMDP and SJAC transitioned back to a UFO, Luna's claimed injury would not be redressed unless SJAC decided to distribute a portion of its funds Esperanza like it did in the past. "[I]t must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (emphasis omitted). *See also Baughcum v. Jackson*, 92 F.4th 1024, 1033 (11th Cir. 2024) ("An injury must be traceable to the defendant and redressable by a court order against the defendant, not a third party."). Plaintiffs have presented no evidence that SJAC would fund Esperanza if reinstated. Consequently, Mr. Luna does not have standing to bring any of his claims.

ii.    <u>Sydney Testman lacks standing.</u>

Ms. Testman does not have standing to pursue an injunction relating to SJAC's future funding because she is no longer a member of SJAC. (Evid. Hrg., Vol. II at 329:5-8). While she claims her position as finance coordinator and her $600 stipend were terminated, she also testified that she was given the opportunity to serve SJAC in a different capacity and apparently declined

the offer. *Id.* at 320:18-20. Because Ms. Testman is no longer a member of SJAC, she will not suffer any injury if SJAC is denied funding in the future.

Even if Ms. Testman was still a member of SJAC, enjoining SB 129 would not redress her claimed injuries. As discussed above, enjoining SB 129 would not require UAB to reopen SMDP, so there is no guarantee that an injunction would result in SJAC receiving UFO funding from SMDP. Even if SJAC received UFO funding, there is no evidence that it would reinstate Ms. Testman to her previous role as finance coordinator or continue to pay her a $600 stipend. "'[P]ast exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects' does not establish standing for future relief." *William Sweet*, 2025 U.S. App. LEXIS 7018, at *9 (quoting *JW*, 904 F.3d at 1264).

Finally, as with Esperanza, SJAC remains free to seek USGA funding but has chosen not to. (Wallace Dep. at p. 25:22-26:15). Going forward, there is no question that SJAC's sponsorship of DEI programs or programs relating to divisive concepts will not prevent it from receiving USGA funding, as UAB has revised its guidance. (Defendants' Ex. 14, p. 4; *cf.* Plaintiffs' Ex. 2 to Wallace Depo., p. 4). Put simply, none of Mr. Testman's claimed injuries create standing for her requested injunction.

## B.      The Student Plaintiffs have not stated claims under *Rosenberger*.

The Student Plaintiffs allege that SJAC and Esperanza are unable to receive student organization funding from USGA due to UAB's enforcement of SB 129, and that this violates their First Amendment rights by denying them access to a limited public forum based on their viewpoints. (Doc. 12-1 at 14-18).

All Parties agree that *Rosenberger v. Rector & Visitors of the University of Virginia* is the leading Supreme Court case on student organization funding. That case involved a student

publication that was denied funding from University of Virginia's Student Activities Fund because of its religious viewpoint. 515 U.S. 819, 827 (1995). The student publication was a "Contracted Independent Organization" ("CIO") at the University of Virginia ("UVA"). CIO's at UVA are "independent of the University." *Id.* at 823-24. The Student Activities Fund at UVA exists "to support a broad range or extracurricular student activities," and is disbursed by UVA's Student Council. *Id.* at 824. In *Rosenberger*, the Student Council denied the student publication's funding request on the ground that the publication was a "religious activity." *Id.* at 827.

The Supreme Court held that, by denying funding based on the publication's religious viewpoint, UVA had engaged in viewpoint discrimination in violation of the students' First Amendment rights. *Id.* at 830-31. However, the Court also held that a university *can* impose viewpoint-based restrictions "when it is the speaker or when it enlists private entities to convey its own message." *Id.* at 833. *See also id.* ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."). That is because when a university "subsidize[s] transmittal of a message it favors," that expenditure of funds constitutes government speech subject to government regulation. *Id.* ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed.").

Neither of the Student Plaintiffs have stated a claim under *Rosenberger*.

i.    Sydney Testman / SJAC

Plaintiffs argue that SJAC's loss of direct funding from the SMDP office is analogous to the denial of funds to the student publication in *Rosenberger*. This analogy fails for several reasons. First, SJAC lost SMDP as a funding source because UAB closed the SMDP office, not because SMDP decided to discriminate against SJAC based on its viewpoint. (Wallace Dep. at 38:3-20).

However, even if SMDP *had* imposed viewpoint-based restrictions on its funding to SJAC, such restrictions would not violate Ms. Testman's free speech rights under *Rosenberger*.

In *Rosenberger*, the student publication, a CIO, was denied access to a pool of funds distributed by the Student Council to CIOs "to support a broad range of extracurricular student activities" and "to encourage a diversity of views from private speakers." 515 U.S. at 824, 833. In contrast, SJAC, as a UFO at UAB, received funds directly from the SMDP office because it was part of that department and because its purpose "align[ed] with that of the department." (Def. Ex. 2 at p. 1). *See also* (Wallace Dep. at 17:17-20) ("A [UFO] is an organization that is embedded in the department to carry out a piece of that department's mission."); *id.* at 35:8-16 ("SJAC…would have been part of the department, which made them part of the University."). Even Ms. Testman admitted that UFOs "receive money directly from the school and are created <u>as part of the University</u>." (Evid. Hrg., Vol. II at 316:5-12) (emphasis added).

Per *Rosenberger*, when SMDP provided funding to SJAC, it was "subsidiz[ing] transmittal of a message it favors" rather than "expend[ing] funds to encourage a diversity of views from private speakers." 515 U.S. at 834. Accordingly, SMDP was free to impose viewpoint-based restrictions on SJAC's funding. *See also id.* at 833 ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."); *id.* ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."). When UAB decided to close the SMDP office, SJAC's resulting loss of SMDP funding—including the funding for Ms. Testman's stipend—did not violate Ms. Testman's right to free speech because the University was controlling its *own* speech. *Id.* at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").

Following the closure of SMDP, UAB administrators advised SJAC to register as an RSO and to seek funding from USGA. (Wallace Dep. at 56:3-57:12). SJAC did not submit a funding application to USGA for the spring 2025 semester or the upcoming fall 2025 semester, despite Ms. Testman's knowledge that SJAC could have received a budget allocation from USGA that was paid for using Educational Foundation dollars. (Wallace Dep. at 25:22-26:15); (Evid. Hrg., Vol. II at 328:15-329:8).[13]

 USGA funding is the direct equivalent of the Student Activities Fund in *Rosenberger*, because it is distributed for the benefit of all RSOs. Ms. Testman's complaint is not that SJAC was denied access to USGA funding, but that it no longer receives funding directly from SMDP. In fact, Plaintiffs' entire argument seems to be that SJAC is entitled to a special source of funding and should not have to go through the same USGA budget allocation process that most other student organizations go through. This flips *Rosenberger* on its head. SJAC has not been denied a funding request, nor has anyone prevented it from submitting funding requests to USGA, so it has not suffered an injury similar to the student publication in *Rosenberger*. Ms. Testman is not likely to succeed on the merits of her First Amendment claim regarding SJAC.

        ii.    <u>Miguel Luna / Esperanza</u>

Miguel Luna claims he has been harmed because Esperanza, an RSO for which he currently serves as president, no longer receives a downstream funding disbursement from SJAC and is no

---

[13] Plaintiffs have repeatedly suggested that SJAC and Esperanza were denied the opportunity to receive funding from USGA. *See* (Doc. 12-1 at p. 17) ("UAB's denial of university funding to Esperanza, SJAC, and other student organizations…constitutes viewpoint-based discrimination."); (Doc. 58 at ¶ 92) ("UAB's denial of funding to SJAC….constitutes viewpoint-based discrimination."); *id.* at ¶ 93 ("UAB's allocation of university funding….constitutes viewpoint-based discrimination against Esperanza."). However, Testman and Luna's testimony shows that, in their capacities as members of USGA, they undoubtedly knew that all RSOs were eligible to receive funding from USGA—paid for using either state funds or Educational Foundation dollars—for the spring 2025 and fall 2025 semesters. (Evid. Hrg., Vol. II at 328:15-329:2); *id.* at 385:4-387:5. The Court should not accept the narrative that either Testman or Luna truly believed that SJAC and Esperanza's budget applications, if submitted, would have been denied because of SB 129, as the evidence shows they were fully aware that the opposite was true. *See id.* at 385:4-387:5 (listing various cultural affinity groups that Luna was aware received funding during the same period).

longer eligible for USGA funding. (Doc. 58 at p. 86, ¶ 93); (Doc. 12-1 at p. 16-17). Luna's claim regarding downstream funding from SJAC is not likely to succeed for the same reasons that Testman is not likely to succeed on her First Amendment claim regarding SJAC's loss of UFO funding. Luna's claim relating to Esperanza's eligibility for USGA funding also fails because his testimony reveals that he *knew* Esperanza could have received a budget allocation from USGA, (Evid. Hrg., Vol. II at 385:4-387:5), and that he *chose* not to apply because he views USGA funding unfavorably, *id.* at 385:15-386:5. There is no basis for Luna's First Amendment claim relating to Esperanza's funding.

Luna also claims that SB 129's "chill on speech" infringes upon his First Amendment right to receive information, based on his perception that his professors "did not engage" with certain topics as much as he would have liked them to during class. (Doc. 12-1 at 12-14). This claim fails because Luna's "right to receive information is reciprocal to [his professors'] right to speak." *Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015); *see also Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them."). Given that under *Garcetti*, *Wood*, and *Bishop*, a university professor does not suffer a First Amendment injury when the university exercises its discretion to determine what is taught in the classroom, students similarly do not suffer First Amendment injuries when their professors abide by the university's curricular decisions.

## III.    ALABAMA NAACP'S FIRST AMENDMENT CLAIMS FAIL.

### A.    Alabama NAACP lacks standing.

Alabama NAACP does not have associational or organizational standing. Its associational standing argument hinges on its members' loss of access to the BSU and Safe Zone office spaces. This argument, however, fails on redressability grounds, as the decision to close these offices involved other considerations in addition to SB 129, including recent developments in federal law.

The University made this clear when it announced that the offices were being closed "[i]n accordance with state and federal laws[.]" (Plaintiffs' Ex. 47) (emphasis added). *See also* (Plaintiffs' Ex. 2 to Wallace Depo. at p. 1) ("Guidance for Compliance with Federal Law and SB 129) (emphasis added). Notably, the Supreme Court's 2023 decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), created concerns that the BSU and Safe Zone offices could lead to Equal Protection claims in the future. This is demonstrated by the University's "Working Guidance," which lists the *SFFA* decision as one of the grounds for issuing the guidance. (Plaintiffs' Ex. 2 to Wallace Depo., at p. 1). Although *SFFA* was focused on race-based admissions programs, its reasoning can easily be extrapolated to affect other aspects of university administration. *See, e.g.*, *SFFA*, 600 U.S. at 231 ("[Each] student must be treated based on his or her experiences as an individual—not on the basis of race. Many universities have for too long done just the opposite."); *id.* at 208 ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

Simply put, enjoining SB 129 would not assuage the Board's federal law concerns. In fact, the Board's concerns have intensified since the fall 2024 semester, as the executive branch has made clear that it intends to interpret *SFFA* broadly to prohibit all forms of race-based preferences in all aspects of public university administration, including diversity, equity, and inclusion programming.[14] Due to the increased scrutiny towards DEI programming at public universities,

---

[14] *See, e.g.*, "*Dear Colleague*" *Letter*, U.S. DEP'T OF EDUC. (Feb. 14, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing. On April 24, 2025, a federal district court entered a preliminary injunction enjoining the Department of Education from enforcing or implementing the "Dear Colleague" letter. *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874, at *101 (D.N.H. Apr. 24, 2025). The fact that the Department has temporarily halted enforcement of the letter does not mean that the Department's view of the law has changed or that it will not pursue enforcement under a similar or identical interpretation in the future. *See also Ending*

the Board does not believe it would be prudent to reopen the BSU and Safe Zone offices if SB 129 is enjoined.[15] As a result, Plaintiffs' requested injunction would not redress Alabama NAACP's claimed associational injury, and Alabama NAACP lacks associational standing.

Alabama NAACP argues it has organizational standing because the closure of the BSU office has created a chilling effect on its activities. Plaintiffs have presented no evidence showing that Alabama NAACP hosted events in the BSU office or had any formalized relationship with BSU. The closure of another organization's office space is otherwise too remote to confer organizational standing on Alabama NAACP. Further, Alabama NAACP's witness, Ja'Kobe Bibbs, testified that the UA chapter of Alabama NAACP has *never* been prevented from reserving any spaces on campus. (Evid. Hrg., Vol. II at 427:18-24). Mr. Bibbs also testified that UA NAACP has not been denied funding since the implementation of SB 129. *Id.* at 427:14-17. Alabama NAACP clearly lacks organizational standing because its claimed injuries are "conjectural [and] hypothetical," rather than "real and immediate." *Williams*, 477 F.3d at 1302-03.

### B.    Alabama NAACP has not stated a claim under *Widmar* or *Healy*.

Plaintiffs allege that the closure of the Black Student Union and Safe Zone offices in the UA student center violated Alabama NAACP and its members' rights to freedom of association. (Doc. 12-1 at p. 14-18). The cases Plaintiffs rely on, *Widmar v. Vincent* and *Healy v. James*, do

---

*Illegal Discrimination and Restoring Merit Based Opportunity*, Exec. Order No. 14,173, 90 Fed. Reg. 8,633 (Jan. 21, 2025). On February 21, 2025, a federal district court entered a preliminary injunction enjoining certain provisions of this Executive Order. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025). On March 14, 2025, the Fourth Circuit granted the government's motion to stay the preliminary injunction pending appeal. *Order*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025). Another federal court has declined to enjoin the Order. *Nat'l Urb. League v. Trump, Civil Action* No. 25-471 (TJK), 2025 U.S. Dist. LEXIS 83732, at *3-4 (D.D.C. May 2, 2025).

[15] After meeting and conferring with the Plaintiffs, the Board proposed to stipulate to its positions regarding these federal law concerns and the reopening of the BSU and Safe Zone offices. (Exhibit A). Plaintiffs advised that they "disagree with the statements in the stipulation and thus cannot agree to it." However, they have not offered any evidence that the Board *would* reopen the BSU and Safe Zone offices if SB 129 were to be deemed unconstitutional.

not support Alabama NAACP's claim. *Widmar* involved a student organization that was prohibited from meeting in university buildings because of its religious viewpoint, despite the fact that the university "routinely provide[d] University facilities for the meetings of registered organizations."454 U.S. 263, 264-65 (1981). In *Healy*, a university denied a student organization's request for official recognition based on its philosophy, which in turn barred the organization "from using campus facilities for holding meetings." 408 U.S. 169, 174-76 (1972).

This case is readily distinguishable from *Widmar* and *Healy* because Alabama NAACP has not alleged that it has been denied official recognition or that its members have been prevented from meeting on campus.[16] Instead, Alabama NAACP's chief complaint is that the rooms that formerly housed the BSU and Safe Zone offices have been put to new uses, and that its members must now participate in the same room reservation system that other student organizations on campus must use to schedule meetings and events on campus. (Evid. Hrg., Vol. II at 406:7-407:2, 423:10-14).

Plaintiffs' argument is hampered by the simple, undisputed fact that most other student organizations at UA do not have dedicated offices in the student center, while *all* student organizations on campus—including UA NAACP and BSU—are permitted to reserve meeting and event space in the Student Center and other campus facilities. (Doc. 56-3 at ¶¶ 22-23). Providing BSU and Safe Zone the same access to campus facilities as other student organizations is not discriminatory, nor does it impede their members' freedom to associate. The Eleventh Circuit has described the freedom to associate as "the exercise of one's right to choose one's associates." *Little v. Palm Beach Cty.*, 30 F.4th 1045, 1053 (11th Cir. 2022) (quoting *Bd. of Dirs. of Rotary Int'l v.*

---

[16] When asked whether UA NAACP had "ever been denied access to a room," Mr. Bibbs, the current president of UA NAACP, responded: "I have heard of no occasion where any student organizations have been denied from a room." (Evid. Hrg., Vol. II at 427:18-24).

*Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)). Alabama NAACP has presented no evidence that its members have been denied this right.

A ruling for the Plaintiffs would have drastic consequences on the University's ability to control its property and resources. The Supreme Court has held that universities have the "right…to make academic judgments as to how best to allocate scarce resources," and that when the University appropriates its resources "to promote a particular policy of its own[,] it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833. An injunction ordering UA to reinstate the BSU and Safe Zone offices would require UA to shutter the food pantry and Student Leadership Lounge, stripping UA of its ability to determine how its limited spaces on campus are used, contrary to *Rosenberger*.

The University agrees that it may not prevent student groups from reserving space on campus based on their viewpoint. (Doc. 26 at p. 28). That is simply not what happened here. Alabama NAACP is not likely to succeed on the merits of its First Amendment claim relating to the closure of the BSU and Safe Zone offices at UA.

## IV. THE PLAINTIFFS' FOURTEENTH AMENDMENT VAGUENESS CLAIMS FAIL.

### A. The Plaintiffs lack standing to bring a vagueness claim.

None of the Plaintiffs have standing to pursue a vagueness claim against the Board, starting with the Professor Plaintiffs. To establish an injury-in-fact for self-censorship based on a statute's vagueness, a plaintiff must show "(1) he seriously wishes to [speak]; (2) such [speech] would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him[;] and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *HM Fla.-ORL, LLC v. Governor of Fla*., 137 F.4th 1207 (11th Cir. 2025) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010)). These requirements are quite similar to the standing requirements for self-censorship under the First Amendment, which require a plaintiff to show (1)

they intend to engage in a course of conduct that the Constitution arguably protects but the law prohibits, and (2) a credible threat of enforcement. *Id.*

As previously shown with respect to their First Amendment claims, the Professor Plaintiffs have not demonstrated an intent to engage in speech affected by SB 129, nor do they  face a credible threat of enforcement. *See supra* pp. 20-25. The same facts demonstrate that the Professor Plaintiffs do not "seriously wish" to engage in speech that is "arguably affected by the rules," nor have they shown there is even a "minimal probability that the rules will be enforced" to punish their intended speech. *See id.*

Because the Student Plaintiffs and the Alabama NAACP have not alleged self-censorship, they must show the following to have standing for their vagueness claims: "(1) [they have] suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the rules; and (3) a favorable judgment is likely to redress the injury." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010). This analysis is similar to the standing analysis for the Student Plaintiffs' and Alabama NAACP's First Amendment claims.

The Student Plaintiffs do not have standing to pursue their vagueness claims because, as explained previously, they have not alleged actual or imminent injuries that would be redressed by enjoining SB 129. *Supra* pp. 32-35. Similarly, Alabama NAACP does not have associational standing because an injunction would not redress its claimed associational injury, and it does not have organizational standing because it has not alleged an actual or imminent injury to the organization itself. *Supra* pp. 39-41. Further, the Student Plaintiffs and Alabama NAACP lack standing based on the simple fact that SB 129's prohibitions are not enforceable against them, as they are neither employees nor contractors of a public institution of higher education. SB 129 § 3 ("[P]ublic institutions of higher education…may discipline or terminate the employment of any

**employee** or **contractor** who knowingly violates the act.") (emphasis added). Because the Student Plaintiffs and Alabama NAACP are not subject to punishment under the statute, any vagueness contained within SB 129 does not implicate their due process rights.

### B. SB 129 is not unconstitutionally vague.

A law or regulation is void for vagueness "if its prohibitions are not clearly defined." *Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *Little v. Palm Beach Cty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)). "Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (quoting *Bongiovanni*, 961 F.2d at 1136).

In their briefing, the only "divisive concepts" identified in Plaintiffs' vagueness arguments are concepts (a) and (d). (Doc. 12-1 at p. 20); (Doc. 58 at p. 90, ¶ 114). Divisive concept (a) is "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior."[17] SB 129 § (1)(2)(a). Despite Plaintiffs' claim that this concept is "mired in obscurity," (Doc. 12-1 at p. 20), a person of ordinary intelligence knows what divisive concept (a) means: that a particular race, color, religion, sex, ethnicity, or national origin is innately better or worse than other races, colors, religions, sexes, ethnicities, or national origins. Plaintiffs argue that the law does not clarify "what is prohibited beyond literally espousing…'White People are superior to

---

[17] "Inherent" is defined as "involved in the constitution or essential character of something **:** belonging by nature or habit **:** intrinsic." *Inherent*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/inherent.

Black people.'" *Id.* Perhaps unintentionally, Plaintiffs' example demonstrates that they *do* in fact understand the kind of statement would that implicate divisive concept (a).

The professors' testimony also demonstrates that divisive concept (a) is readily understood. Dr. Simon testified that she does not direct or compel students to affirm, adopt, or adhere to divisive concept (a) and that she does not assign any coursework that advocates for that concept. (Evid. Hrg., Vol. I at 154:15-22). Dr. Fording's testimony demonstrates a thorough understanding of divisive concept (a), as he testified that, while some social scientists have published papers in support of divisive concept (a), he "do[es] not endorse" that research and "dismiss[es] it," and "would agree that no one I know in the University of Alabama endorses that idea." *Id.* at p. 204:14-206:7.

Divisive concept (d) is "[t]hat, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." SB 129 § 1(2)(d). Again, a person of ordinary intelligence surely knows what divisive concept (d) means: that a person's race, color, religion, sex, ethnicity, or national origin determines whether they are—knowingly or unknowingly—racist, sexist, or oppressive.

Plaintiffs argue that people of ordinary intelligence, "including Professors Simon, Fording, and Patton," cannot discern whether concept (d) allows them to "teach…about topics such as implicit bias." (Doc. 58 at p. 90, ¶ 114). Contrarily, the professors' testimony shows they fully comprehend concept (d). For example, while Dr. Patton initially testified she thinks the Harvard Implicit Association Test implicates divisive concept (d), (Evid. Hrg., Vol. I at 119:6-10), she later agreed that "nothing in the Harvard Implicit Association Test says that someone is inherently racist," "sexist," or "oppressive." *Id.* at 121:7-14. Similarly, Dr. Fording initially testified that he

would "probably get pretty close to endorsing" divisive concept (d), but when asked whether he "would endorse that…by virtue of an individual's race, they are inherently racist," he answered "no, I would never say that or endorse that specifically." (Evid. Hrg., Vol. II at p. 307:6-24).

Plaintiffs also argue SB 129's definition of "Diversity, Equity, and Inclusion Program," and specifically the words "or otherwise violates this act," are impermissibly vague. (Doc. 12-1 at p. 22); (Doc. 31 at p. 32); (Doc. 58 at p. 91, ¶ 118). This language itself is not vague, as it simply refers to the Act's other prohibitions, none of which are unconstitutionally vague.

Plaintiffs did not argue in any of their briefing that the prohibitions contained in Section 2 of SB 129 are unconstitutionally vague. During witness testimony, Dr. Fording raised concerns about Section 2(3), which provides that a university may not "[r]equire its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept." He testified that the terms "course work"[18] and "advocates for"[19] could be construed as prohibiting him from assigning readings that "expose students to perspectives that support divisive concepts."[20] (Evid. Hrg., Vol. II at 267:16-268:8).

Counsel for the University confirmed that it is "absolutely not" the University's position that SB 129 prohibits professors from assigning reading material in which another speaker advocates for a divisive concept. (Evid. Hrg., Vol. I at 155:12-21). Instead, the University's

---

[18] "Coursework" is defined as "work that is assigned or performed as part of a course of study." *Coursework*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/coursework.

[19] "Advocate" is defined as "to support or argue for (a cause, policy, etc.) **:** to plead in favor of." *Advocate*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/advocate.

[20] Dr. Simon also raised concerns about this prohibition, but later testified that she does not "assign coursework that may advocate for any [divisive concept]," demonstrating her understanding of Section 2(3). (Evid. Hrg., Vol. I at 159:14-161:5).

position is that professors are permitted to assign course materials with varying opinions on divisive concepts, and that the safe harbor contained in Section 4(3)(b) of the Act[21] gives professors latitude to teach about divisive concepts without violating the Act. *Id.* at 155:23-156:12.

The remainder of Plaintiffs' vagueness concerns arise from language contained in the Act's safe harbor provisions, starting with Section 4(3)(b), which allows teachers to discuss divisive concepts "in an objective manner and without endorsement," provided that they do not "compel assent" to any divisive concept. (Doc. 58 at p. 90-91, ¶ 116); (Doc. 31 at p. 32). As a preliminary matter, a law is only void for vagueness "if its <u>prohibitions</u> are not clearly defined," *Keister*, 29 F.4th 1239, 1258 (emphasis added). Safe harbors do not define the world of prohibited conduct, so it is unclear whether safe harbors can be unconstitutionally vague. Even if they can be, the terms "objective," "without endorsement," and "compel assent" do not render SB 129 unconstitutionally vague.

A person of ordinary intelligence certainly knows what it means to be objective.[22] The meaning of the word "objective" in this context can be "ascertained fairly by reference to judicial decisions, common law, dictionaries," and the word's "common and generally accepted meaning." *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006). For example, American juries are frequently asked to "step back and look at things objectively." *See United States v. Davis*, No. 2:21cr101-MHT, 2022 U.S. Dist. LEXIS 224276, at *6 (M.D. Ala. Dec. 13, 2022). The professors' testimony demonstrates that they know what it means to teach in an objective manner, as Dr. Patton

---

[21] Under the safe harbor, universities are not prohibited "from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with the provisions of this act." SB 129 § 4(3)(b).

[22] "Objective" is defined as "expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudices, or interpretations." *Objective,* MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/objective.

testified that she believes she "teaches the facts objectively," (Evid. Hrg., Vol. I at 77:17-18), and Dr. Fording testified he believes professors have a "responsibility" to teach in an objective manner, (Evid. Hrg., Vol. II at 306:14-17).

Plaintiffs also claim they are unsure whether they can present evidence on matters such as implicit bias without "endorsing"[23] or "compelling assent to"[24] a divisive concept. (Doc. 58 at p. 90-91, ¶ 116). This claim is similarly unconvincing, as person of ordinary intelligence would understand the difference between presenting evidence of implicit bias and endorsing the idea that, "by virtue of an individual's race…the individual is inherently racist." SB 129 § 1(2)(d). Dr. Fording's testimony shows that he understands this difference, as he testified that, although he teaches about implicit bias, he does not *endorse* divisive concept (d). (Evid. Hrg., Vol. II at 306:18-307:24). Similarly, Dr. Patton testified that she does not "require students to assent" to her view on "any issue." (Evid. Hrg., Vol. I at 89:8-16).

Plaintiffs also take issue with the safe harbor contained in Section 4(4) of the Act, which shields teachers from liability when teaching "topics or historical events in a historically accurate context." (Doc. 58 at p. 91, ¶ 117); (Doc. 12-1 at p. 22); (Doc. 31 at p. 32). They argue the term "historically accurate" is vague because historical topics are often "subject to vigorous debate." (Doc. 31 at p. 32). While it is true that historical topics may be viewed through competing analytical lenses, the common meaning of the term "historically accurate"—i.e. reflecting an accurate representation of historical facts—would surely notify an "ordinary person[] using

---

[23] "Endorse" is defined as "to express support or approval of publicly and definitely." *Endorse*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/endorse.

[24] "Compel" is defined as "to cause to do or occur by overwhelming pressure." *Compel*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/compel.

"Assent" is defined as "an act of agreeing to something especially after thoughtful consideration **:** an act of assenting **:** acquiescence, agreement." *Assent*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/assent.

ordinary common sense" of the type of conduct that would "put them at risk of discharge"—i.e., teaching in a manner that does not accurately represent historical facts. *See Little*, 30 F.4th at 1055.

Plaintiffs also argue that SB 129 "encourages inconsistent, arbitrary, and discriminatory enforcement." (Doc. 12-1 at p. 22). They cite the cancellation of Dr. Simon's advocacy assignment, the investigation regarding Dr. Patton, and the closure of BSU and Safe Zone as evidence of "arbitrary…enforcement." (Doc. 58 ¶¶ 119-121). However, *none* of these instances actually involved enforcement of SB 129. The only enforcement provision in the statute is Section 3, which reads: "All…public institutions of higher education…may **discipline** or **terminate** the employment of any **employee or contractor** who knowingly violates this act." (emphasis added). Dr. Simon and Dr. Patton were not disciplined or terminated, so the act was never enforced against them. Testman, Luna, and Alabama NAACP are not employees or contractors of the Board, so the act *cannot* be enforced against them. Furthermore, Subsection 1 of the enforcement provision, which requires that "[a]ny disciplinary action or termination of an employee of higher education shall remain subject to relevant policies established by the institution," means that any violations of SB 129 are handled through the University's own disciplinary procedures, which exist to *protect* university employees from inconsistent, arbitrary, and discriminatory enforcement. SB 129 § 3(1); *see Joel v. City of Orlando*, 232 F.3d 1353, 1360 (11th Cir. 2000) ("Nor does the ordinance encourage arbitrary and discriminatory enforcement. The police officers charged with enforce[ement]….must also hew to the guidelines set forth in the [city ordinance book]," and "[t]hose guidelines substantially decrease the likelihood that [the ordinance] will be subject to arbitrary and discriminatory enforcement."). *See also* (Defendants' Ex. 5) (containing faculty discipline and grievance procedures).

Finally, any residual vagueness concerns are alleviated by the scienter requirement in SB 129's enforcement provision. SB 129 § 3 ("[I]nstitutions of higher education…may discipline or terminate the employment of any employee…who <u>knowingly violates</u> this act….") (emphasis added); *see Jones v. Governor of Fla.*, 975 F.3d 1016, 1047 (11th Cir. 2020) ("[L]aws that are 'in some respects uncertain' may be upheld against a vagueness challenge if they contain a scienter requirement." (quoting *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995))); *Hill v. Colo.*, 530 U.S. 703, 732 (2000) (holding that vagueness concerns were "ameliorated by" a statute's "scienter requirement").

In sum, each of the challenged provisions is clear enough that an ordinary person using ordinary common sense would be on notice of what conduct puts them at risk of discharge, and the Act does not encourage inconsistent, arbitrary, or discriminatory enforcement because Universities are required to handle alleged violations pursuant to their own adjudicative procedures. Plaintiffs have not shown they are substantially likely to succeed on the merits of their Fourteenth Amendment vagueness claims relating to SB 129.

## <u>CONCLUSION</u>

Board Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction because the evidence demonstrates that Plaintiffs do not have standing and are not likely to succeed on the merits of any of their claims.

Respectfully submitted this 23rd day of July, 2025.

/s/ Jay M. Ezelle
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

**Counsel for the Board Defendants**