# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING AND THE ALABAMA STATE CONFERENCE OF THE NAACP,<br><br>    Plaintiffs,<br><br>vs.<br><br>KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART AND KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees<br><br>    Defendants. | Case No. 2:25-cv-00067-RDP |

**PROPOSED STIPULATION**

On July 14, 2025, the Parties met and conferred regarding a resolution passed by The Board of Trustees of The University of Alabama (the "Board") titled "Recognizing Commitment to Institutional Neutrality and Freedom of Speech and Expression." The resolution was received as Defendants' Exhibit 8 during the June 25, 2025 evidentiary hearing. During the meet and confer, the Parties discussed the Board's position regarding what role, if any, the institutional neutrality

1

policy played in guiding the Board's decisions on matters relating to this lawsuit, particularly the decision to close certain offices and programs at the University of Alabama ("UA") and the University of Alabama at Birmingham ("UAB"). As discussed during the meet and confer, the Board has drafted a proposed stipulation in an attempt to clarify its positions regarding the closure of certain offices and programs at UA and UAB. The Board Defendants are prepared to stipulate as follows:

1. The Board's position is that regardless of whether SB 129 is unconstitutional, the following actions taken by the Board were and continue to be appropriate and warranted under federal law and university policy:

 (a) The closure of UAB's Office of Diversity, Equity, and Inclusion;

 (b) The closure of UAB's Student Multicultural and Diversity Programs office;

 (c) The closure of UA's Division of Diversity, Equity and Inclusion;

 (d) The closure of the Black Student Union office in the UA Student Center;

 (e) The closure of the Safe Zone office in the UA Student Center.

2. The Board's position is that these decisions involved multiple considerations in addition to the Board's concerns about SB 129. For instance, the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), raised concerns that the offices and programs listed above could lead to Equal Protection issues in the future. Although the *SFFA* decision was focused on race-based admissions programs, its reasoning can easily be extrapolated to affect other aspects of university administration. *See, e.g.*, *SFFA*, 600 U.S. at 231 ("[Each] student must be treated based on his or her experiences as an individual—not on the basis of race. Many universities have for too long done just the opposite."); *id.* at 208 ("Distinctions between citizens solely because of their ancestry

are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

3. It is not the Board's position that any of its offices or programs were violating the Fourteenth Amendment under *SFFA* at the time of their closure. Rather, the Board was concerned that, due to the uncertainty created by *SFFA*, certain offices and programs at the Board's institutions could be at risk of violating federal law in the future. In other words, these decisions were proactive.

4. It is the Board's position that today there is even greater cause for concern that the offices and programs listed in Paragraph 1 would risk violating federal law in the future if they were reopened or reinstated. The executive branch has made abundantly clear that it interprets *SFFA* broadly to encompass diversity, equity, and inclusion programs at public universities, and that the Administration is intent on rooting out anything that could be conceived as a race-based preference. For example:

    (a) On February 14, 2025, the Department of Education's Office for Civil Rights published a "Dear Colleague" letter, informing educational institutions of the Department's interpretation of Title VI of the Civil Rights Act, the Equal Protection Clause of the United States Constitution, and other federal law following the *SFFA* decision.[1] The letter stated that *SFFA*'s holding "applies more broadly" than admissions, and that "[f]ederal law…prohibits covered entities from using race in decisions pertaining to…all…aspects of student, academic, and campus life." *Id.* at 2. The letter specifically states that "DEI programs…frequently preference certain racial groups" and "stigmatize students who belong to particular racial groups," and that "the Department will vigorously enforce the law" under its interpretation of *SFFA*. *Id.* at 3.[2]

---

[1] *"Dear Colleague" Letter*, U.S. DEP'T OF EDUC. (Feb. 14, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing.

[2] On April 24, 2025, a federal district court entered a preliminary injunction enjoining the Department from enforcing or implementing the "Dear Colleague" letter. *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874, at *101 (D.N.H. Apr. 24, 2025). However, the fact that the Department has temporarily halted enforcement of the letter does not mean that the Department's view of the law has changed or that it will not pursue enforcement under a similar or identical interpretation of federal law in the future.

(b) On January 21, 2025, President Trump issued Executive Order 14,173, titled "Ending Illegal Discrimination and Restoring Merit Based Opportunity."[3] The Order states that "institutions of higher education have adopted and actively use…race-based and sex-based preferences under the guise of [DEI] that can violate the civil rights laws of this Nation," and orders "all agencies to enforce…civil-rights laws and to combat illegal private-sector DEI presences, mandates, policies, programs, and activities." *Id.* at 8,633.[4]

(c) On April 23, 2025 President Trump issued Executive Order 14,279, titled "Reforming Accreditation to Strengthen Higher Education."[5] The Order declares that accreditation standards requiring law schools and medical schools to undertake DEI initiatives are "discriminatory" and "blatantly violate the Supreme Court's decision in [*SFFA*]." *Id.* at 17,529. The Order instructs the Attorney General and Secretary of Education to "investigate and take appropriate action" against accrediting agencies who impose such requirements. *Id.* at 17,530.(d) UAB is currently being investigated by the Department of Education's Office for Civil Rights for allegedly awarding race-based scholarships in violation of Title VI.[6]

5. While the full impact of *SFFA* and these executive orders remains uncertain, several universities have either done away with or significantly curtailed their DEI initiatives (including: The University of Florida, The University of Texas at Austin, Texas A&M University, The University of North Carolina, The University of Oklahoma, and many others).[7] In the private sector, there have been a number of lawsuits challenging race-based preferences. Law firms

---

[3] Exec. Order No. 14,173, 90 Fed. Reg. 8,633 (Jan. 21, 2025).

[4] On February 21, 2025, a federal district court entered a preliminary injunction enjoining certain provisions of the Order. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025). On March 14, 2025, the Fourth Circuit granted the government's motion to stay the preliminary injunction pending appeal. *Order*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025). Another federal court has declined to enjoin the Order. *Nat'l Urb. League v. Trump, Civil Action* No. 25-471 (TJK), 2025 U.S. Dist. LEXIS 83732, at *3-4 (D.D.C. May 2, 2025).

[5] Exec. Order No. 14,279, 90 Fed. Reg. 17,529 (Apr. 23, 2025).

[6] Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any **program or activity** receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added).

[7] *See, e.g.*, Laura Spitalniak, *A Look at DEI Eliminations at Colleges Across the US*, HIGHER ED DIVE (Dec. 16, 2024), https://www.highereddive.com/news/dei-eliminations-cuts-offices-colleges-texas-florida-kentucky-alabama/727414/#:~:text=Florida%20State%20University%20also%20dismantled,t%20likely%20to%20let%20up. *See also* Erin Gretzinger et al., *Tracking Higher Ed's Dismantling of DEI*, CHRONICLE OF HIGHER ED. (updated June 20, 2025), https://www.chronicle.com/article/tracking-higher-eds-dismantling-of-dei.

4

Perkins Coie and Morrison & Foerster were both sued over their diversity fellowship programs, and both law firms responded by making their fellowships available to students of all races.[8] Likewise, in *American Alliance for Equal Rights v. Fearless Fund Management., LLC*, 103 F.4th 765, 779 (11th Cir. 2024), the 11th Circuit reversed the District Court and issued an injunction against an investment firm that held an entrepreneurship funding competition open only to businesses owned by black women because it violated Title VI. The Wisconsin State Bar recently settled a lawsuit alleging that its "diversity clerkship" program discriminated against students on the basis of race. As part of the settlement, the Bar modified its definition of "diversity" and agreed to make clear in any promotional materials for the clerkship that the program is available to all Wisconsin law students.[9] While not directly on point, these cases demonstrate that any sort of racial preference is viewed with suspicion after *SFFA*.

6.     In September 2024, the Board adopted its resolution on institutional neutrality. The resolution states, in part:

> Finally, to safeguard the freedom of speech and expression for members of the System community, the System itself must remain neutral on political and social issues unless the issue directly affects any aspect of the System's core operations. Taking institutional positions on an issue or making statements about it risks alienating members of the System community and destroying the intellectually independent environment upon which the System thrives. It is for the Board to decide what issues directly affect aspects of the System's core operations, so members of the System community exercising their First Amendment rights should make clear they do

---

[8] *See, e.g.*, Kathryn Rubio, *Biglaw Firm Changes Tack After Diversity Lawsuit*, ABOVE THE LAW (Oct. 6, 2023), https://abovethelaw.com/2023/10/perkins-coie-diversity-fellowship/; Kathryn Rubio, *Biglaw Caves: Morrison Foerster Changes Diversity Fellowship Criteria Following Lawsuit*, ABOVE THE LAW (Sept. 7, 2023), https://abovethelaw.com/2023/09/biglaw-caves-morrison-foerster-changes-diversity-fellowship-criteria-following-lawsuit/.

[9] Karen Sloan, *Wisconsin Bar Redefines "Diversity" to Settle Discrimination Lawsuit*, REUTERS (July 17, 2025), https://www.reuters.com/legal/government/wisconsin-bar-redefines-diversity-settle-discrimination-lawsuit-2025-07-17/; *State Bar Successfully Defends Leadership Academy and Leadership Summit*, STATE BAR OF WIS. (July 16, 2025), https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=31128&source=carousel.

5

    not speak on behalf of the System, its component divisions, or any administrative unit within the System.

(Defs' Ex. 8 at p. 2). It is not the Board's position that the institutional neutrality policy caused the Board to close the offices and programs listed in Paragraph 1. However, the Board's position is that, going forward, it must strive to adhere to its policy of institutional neutrality.[10]

    7.    The Board's position is that, in the current legal landscape, it would not be prudent to reopen or reinstate the offices and programs listed in Paragraph 1, even if SB 129 is deemed unconstitutional.

    Please let us know what, if anything, Plaintiffs are willing to stipulate to.

    */s/ Jay M. Ezelle*
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Samuel A. Cochran (ASB-1354-R84D)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
jezelle@starneslaw.com
cgresham@starneslaw.com
scochran@starneslaw.com

***Counsel for the Board Defendants***

---

[10] The Board has already done so. For example, Provost Jim Dalton cited the Board's institutional neutrality policy as one of the reasons why Dr. Simon could not require students to participate in a sit-in assignment protesting SB 129. (Defs' Ex. 4 at p. 2) (describing the assignment's "opposition to SB 129" as "a political position contrary to UA's commitment to institutional neutrality").

6