FILED
2025 Jul-23 PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, ISABELLA CAMPOS, DANA PATTON, RICHARD FORDING, AND THE ALABAMA STATE CONFERENCE OF THE NAACP, | Case No.  2:25-CV-00067-RDP |
| Plaintiffs, |  |
| v. |  |
| KAY IVEY in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees, SCOTT PHELPS in his official capacity as President Pro Tempore, University of Alabama Board of Trustees, MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART and KENNETH VANDERVOORT in their official capacities as members of the University of Alabama Board of Trustees, |  |
| Defendants. |  |

# PLAINTIFFS' POST-HEARING MEMORANDUM IN SUPPORT OF THEIR REQUEST FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ..................................................................................................................... 3

   I.   The Plaintiffs Have Alleged Standing to Bring First Amendment Claims. ....................... 3

     A.   The Professor Plaintiffs Have Standing. ........................................................... 3

     B.   Student Plaintiff Miguel Luna Has Standing to Bring His First Amendment Right to Receive Claim. ............................................................................................... 7

     C.   Plaintiffs' Harms Are Traceable and Redressable by Governor Ivey. ............................ 8

   II.   The Professor Plaintiffs Are Likely to Succeed on Their First Amendment Claims. .......... 9

     A.   Legal Standards ............................................................................................. 9

     B.   SB 129 Is A Viewpoint-Based Restriction of Professors' Right to Free Speech and Academic Freedom in Violation of the First Amendment. ....................................... 17

     C.   Defendants' Representations of Their Interpretations of SB 129 Directly Contradict the Language of the Statute and Do Not Immunize SB 129 from Its Unconstitutionality. ........ 24

     D.   SB 129's "Safe Harbor" Provisions in Section 4 Do Not Cure the Statute's Constitutional Infirmities. ............................................................................... 25

   III.   Student Plaintiffs Testman, Luna, and the UA NAACP Have Demonstrated a Likelihood of Success on the Merits for Their Student Funding and Student Space Claims. ... 28

     A.   The Student Plaintiffs Have Standing. ............................................................. 28

     B.   UAB's Viewpoint Discriminatory Restrictions on Funding of Student Organizations and Use of University Space Violate the First Amendment. .................................... 35

     C.   UA's Closure of the BSU and Safe Zone Spaces Violated the First Amendment. ........ 38

     D.   SB 129's Prohibitions on Student Funding and Student Space Allocation Are Unconstitutionally Vague. ............................................................................... 40

   IV.   Defendants' Remaining Arguments Are Irrelevant and Lack Merit. ............................. 42

CONCLUSION ................................................................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. All. For Equal Rights v. Fearless Fund Mgmt.*,
    LLC, 103 F.4th 765 (11th Cir. 2024) ...................................................................33

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
    No. CV SAG-25-628, 2025 WL 1191844 (D. Md. Apr. 24, 2025) ........................47

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
    39 F.4th 95 (3d Cir. 2022) ...................................................................................16

*Ashton v. Kentucky*,
    384 U.S. 195 (1966) ........................................................................................25, 40

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) (plurality opinion) ...............................................................8

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
    529 U.S. 217 (2000) ............................................................................................10

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ............................................................................................13

*Bishop v. Aronov*,
    926 F.2d 1066 (11th Cir. 1991) ................................................................. *passim*

*Bonner v. City of Prichard*,
    661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) .................................................10

*Brown v. Chi. Bd. of Educ.*,
    824 F.3d 713 (7th Cir. 2016) ...............................................................................12

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
    451 F.3d 1257 (11th Cir. 2006) .............................................................................3

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ............................................................................................24

*Cochran v. City of Atlanta, Ga.*,
    289 F. Supp. 3d 1276 (N.D. Ga. 2017) ...............................................................15

*Construction Industry Ass'n of Sonoma County v. City of Petaluma*,
    522 F.2d 897 (9th Cir. 1975), *cert. denied*, 424 U.S. 934 (1976) .......................34

*Crue v. Aiken*,
    370 F.3d 668 (7th Cir. 2004) ...................................................................15

*Davis v. Phenix City*,
    296 F. App'x 759 (11th Cir. 2008) (*per curiam*) ......................................16

*Davis v. Phenix City, Alabama*,
    No. CIVA 3:06CV544 WHA, 2008 WL 401349 (M.D. Ala. Feb. 12, 2008) .........................16

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) ...................................................................11

*In re Dinnan*,
    661 F.2d 426 (5th Cir. 1981) ...................................................................10

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) ...................................................................13

*Fla. Democratic Party v. Hood*,
    342 F.Supp.2d 1073 (N.D. Fla. 2004) ......................................................34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
    528 U.S. 167 (2000) ..........................................................................34, 37

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .................................................................11, 12, 14

*Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration*
    *& Elections*,
    36 F.4th 1100 (11th Cir. 2022) .................................................................6

*Gerlich v. Leath*,
    152 F. Supp. 3d 1152 (S.D. Iowa 2016), *aff'd*, 847 F.3d 1005 (8th Cir. 2017) ......................29

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ...............................................................................12

*Gutierrez v. Saenz*,
    145 S. Ct. 2258 (2025) ...........................................................................47

*Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*,
    922 F.2d 756 (11th Cir. 1991) ...................................................................3

*Harrell v. The Fla. Bar*,
    608 F.3d 1241 (11th Cir. 2010) .................................................................3

*Healy v. James*,
    408 U.S. 169 (1972) ...............................................................................39

*Heim v. Daniel*,
  81 F.4th 212 (2d Cir. 2023) ...................................................................................12

*Henry v. Att'y Gen..*,
  45 F.4th 1272 (11th Cir. 2022) ................................................................................3

*Hill v. Colorado*,
  530 U.S. 703 (2000)................................................................................................26

*Hillis v. Stephen F. Austin State Univ.*,
  665 F.2d 547 (5th Cir. 1982) ..................................................................................11

*HM Florida-ORL, LLC v. Governor of Florida*,
  137 F.4th 1207 (11th Cir. 2025) .......................................................................24, 25

*Honeyfund.com, Inc. v. DeSantis*
  622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v.*
  *Governor*, 94 F.4th 1272 (11th Cir. 2024)...........................................23, 26, 27, 28

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977)................................................................................................31

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018)................................................................................................15

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967)........................................................................................9, 10, 26

*Kilborn v. Amiridis*,
  131 F.4th 550 (7th Cir. 2025) ...........................................................................11, 12

*Local 8027 v. Edelblut*,
  2024 WL 2722254 (D.N.H. 2024)......................................................................23, 28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..................................................................................................3

*Matal v. Tam*,
  582 U.S. 218 (2017)................................................................................................13

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
  474 F.3d 477 (7th Cir. 2007) ............................................................................12, 13

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ..................................................................................12

*Moonin v. Tice*,
  868 F.3d 853 (9th Cir. 2017) ..................................................................................15

*NAACP v. U.S. Dep't of Educ.*,
No. 25-CV-1120 (DLF) (D.D.C. Apr. 24, 2025) .................................................................. 47

*Nat'l Educ. Ass'n v. United States Dep't of Educ.*,
No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ......................................... 47

*Nat'l Urban League v. Trump*,
No. 25-CV-471-TJK, 2025 WL 1275613 (D.D.C. 2025) ...................................................... 46

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
641 F. Supp. 3d 1218 (N.D. Fla. 2022) .......................................................................... *passim*

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*,
391 U.S. 563 (1968) ................................................................................................ 14, 15, 16

*Porter v. Bd. of Trs. of N.C. State Univ.*,
72 F.4th 573 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) ....................................... 11

*Reno v. ACLU*,
521 U.S. 844 (1997) .......................................................................................................... 25

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ..................................................................................................... *passim*

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ............................................................................................................. 6

*Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*,
508 F. Supp.3d 521 (N.D. Cal. 2020) .............................................................................. 23

*Smith v. Goguen*,
415 U.S. 566 (1974) .......................................................................................................... 23

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ..................................................................................... 9, 30

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ........................................................................................... 37

*Stanley v. Georgia*,
394 U.S. 557 (1969) ........................................................................................................... 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*
*(SFFA)*,
600 U.S. 181 (2023) .................................................................................................... 45, 46

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ......................................................................................................... 3, 7

*Sweezy v. State of N.H. by Wyman*,
    354 U.S. 234 (1957)................................................................................10

*Taylor v. Polhill*,
    964 F.3d 975 (11th Cir. 2020) ..................................................................3

*Tenn. Educ. Ass'n v. Reynolds*,
    732 F. Supp.3d 783 (M.D. Tenn. 2024)..........................................23, 28

*Texas v. Johnson*,
    491 U.S. 397 (1989)..................................................................................9

*United States v. Nat'l Treas. Emp's Union*,
    513 U.S. 454 (1995)................................................................14, 15, 16

*Widmar v. Vincent*,
    454 U.S. 263 (1981)................................................................13, 38, 39

*Wolfe v. Barnhart*,
    446 F.3d 1096 (10th Cir. 2006) ..............................................................15

*Wollschlaeger v. Governor of Florida*,
    848 F.3d 1293 (11th Cir. 2017) ......................................................24, 26

*Wood v. Florida Department of Education*,
    No. 24-11239, 2025 WL 1819099 (11th Cir. July 2, 2025)........12, 14, 16

*Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*,
    89 F.4th 1337 (11th Cir.), *cert. denied*, 145 S. Ct. 161 (2024)................23

## Statutes

Ala. Code § 41-1-91(1).........................................................................40

Ala. Code § 41-1-93(1).........................................................................41

## Other Authorities

Act of July 14, 2023, Sess. L. 2023-102, S. 195, Gen. Assemb. of N.C.,
    https://www.ncleg.gov/Sessions/2023/Bills/Senate/PDF/S195v4.pdf. (*An Act
    to Make Various Changes to the Laws Concerning the University of North
    Carolina*)................................................................................................44

Ala. Const. art. XIV, § 264 .....................................................................8

*AMEXCAN Soft Skills Panel*, , Univ. of N.C.,
    https://heellife.unc.edu/event/11200329 (last visited July 16, 2025) ......45

Bd. of Trustees, Univ. of Ala. Sys., *Resolution Recognizing Commitment to Institutional Neutrality and Freedom of Speech and Expression & Bd. Rule 304: Institutional Neutrality and Political Activities of System Personnel* (Sept. 5, 2024), https://www.uab.edu/reporter/in-the-know/board-codifies-institutional-neutrality ........................................................................................... 43

*Black Student Union*, Student Union at La. State Univ., https://lsubsuprteam.wixsite.com/bsuatlsu (last visited July 16, 2025) ................................. 44

*Events*, La. State Univ., LSU TigerLink, https://tigerlink.lsu.edu/events?group_ids=61258&show=past (last visited July 16, 2025) .......................................................................................................................... 44

Exec. Order No. 14,173, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ...................................................... 46

Exec. Order No. 14,279, 90 Fed. Reg. 17,529 (Apr. 23, 2025) .................................................... 46

*Fund Your Initiative*, La. State Univ., https://www.lsu.edu/sg/impact/funding.php? (last visited July 16, 2025) .............................. 44

John Owen et al., *Univ. Statement on Institutional Statements,* Institutional Statements Comm., Univ. of Va. (Aug. 12, 2024), https://www.virginia.edu/institutional-statements/ ................................................................ 44

*Latinx Student Center*, Student Affairs, Univ. of Va., https://studentaffairs.virginia.edu/subsite/multicultural/centers/latinx-student-center (last visited July 16, 2025) .............................................................................. 44

*Mission & Philosophy*, Off of Afr. Am. Affairs, Univ. of Va., https://oaaa.virginia.edu/ (last visited July 16, 2025) ............................................................ 44

*Queer/Trans Student of Color Resources*, Student Affairs, Univ. of Va., https://studentaffairs.virginia.edu/subsite/lgbtq/resources/qtbipoc (last visited July 16, 2025) .......................................................................................................................... 44

*Rep Your Flag: Multicultural Festival*, Univ. of N. Carolina Student Org., Univ. of N.C. https://heellife.unc.edu/event/10698505 (last visited July 16, 2025) ......................... 44

*Sponsor*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/sponsor (last visited July 23, 2025) .......................................................................................................................... 40

*Supervisors,* Bd. of Supervisors, La. State Univ. & Agric. & Mech. Coll. (Oct. 10, 2024), https://www.lsu.edu/bos/docs/agendas/2024/2024-10-10-agenda.pdf ......................... 44

## PRELIMINARY STATEMENT

The evidence introduced at the two-day Preliminary Injunction hearing proves that Senate Bill 129 ("SB 129") not only threatens, but has already resulted in, viewpoint discrimination in violation of the First Amendment.  Indeed, Defendants concede that SB 129 discriminates based on viewpoint.  The statute itself prohibits "course work that advocates for" any of eight enumerated "divisive concepts," but allows course work that advocates against those same topics.  Defendants argue that this is perfectly permissible because the Professor Plaintiffs are essentially mouthpieces of Alabama under the "government speech" doctrine and, in any event, that the "safe harbor" provisions of SB 129 render any fear of enforcement on the Professor Plaintiffs' part as unreasonable.  Not so.  As we describe below, the "government speech" doctrine does not apply in the university setting, as every circuit court that has considered the issue has concluded.  Further, the safe harbor provision permitting the teaching of divisive concepts "in an objective manner and without endorsement" is so vague as to render SB 129 meaningless and thus, unconstitutional, as several courts have concluded about similar statutes.

University administrators also have interpreted SB 129 to prohibit funding for student organizations that promote a divisive concept or are associated with a DEI Program.  They have broadly applied this prohibition to all cultural, political, and religious organizations (a reading that finds no support in the text of the statute).  This viewpoint-based prohibition violates the First Amendment as set forth in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).  In addition, the text of SB 129 concerning student funding is unconstitutionally vague, as evidenced by the University system's inconsistent and wildly broad interpretations.  Still further, University administrators violated the First Amendment by terminating the use of certain on-campus spaces based on alleged incompatibility with SB 129.  But the record evidence shows that

this enforcement of the statute was arbitrary (further confirming the statute's vagueness) as neither of the closed spaces promoted a divisive concept or constituted a DEI Program.

All of the Plaintiffs have also amply demonstrated standing. Professors Patton, Simon, and Fording testified at length about the threats of enforcement of SB 129 and the actual harm they faced—they self-censored courses to not risk discipline and/or continued to teach courses in a way that may risk discipline. Their injuries are far from theoretical or speculative. The same is true for the Student Plaintiffs. Plaintiff Miguel Luna's right to receive information is co-extensive with the Professors' claims. Plaintiff Luna has not received the information he would otherwise receive but for SB 129, in violation of the First Amendment, because of his professor's self-censorship to comply with the law's vague provisions. The organization founded by Luna, in which he serves as President, lost multiple sources of funding as a direct result of SB 129. Likewise, the organization led by Plaintiff Sydney Testman lost $10,000 in annual funding due to SB 129, which caused Testman to lose her position and a stipend. University administrators revoked the funding and status of other student organizations as well, in an effort to comply with SB 129. The Governor admitted this was harm giving rise to standing at the hearing. Members of the Alabama NAACP similarly suffered actual harm when the University of Alabama ("UA") closed the Black Student Union and Safe Zone spaces. UA closed these spaces because it was enforcing SB 129.

All of these actions by University administrators chilled speech and caused harm that is irreparable. SB 129 prohibits university professors from teaching certain disfavored viewpoints (but not favored viewpoints pertaining to the same subject matter) and has caused university administrators to stop funding student organizations after they already had created a "limited public forum" for those organizations. Thus, SB 129 has already caused irreparable harm and plaintiffs have demonstrated a substantial likelihood of success on the merits. Accordingly, this

Court should grant Plaintiffs' request for a preliminary injunction, enjoining enforcement of SB 129.

## ARGUMENT

### I. The Plaintiffs Have Alleged Standing to Bring First Amendment Claims.

To properly assert standing, Plaintiffs must demonstrate (i) an "injury-in-fact" (ii) fairly traceable to the defendants' challenged action (iii) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation omitted). Courts apply the injury-in-fact requirement loosely where First Amendment rights are implicated, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). When "a plaintiff has stated that he intends to engage in a specific course of conduct arguably affected with a constitutional interest, . . . he does not have to expose himself to enforcement to be able to challenge the law." *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020) (quotation marks and citations omitted). First Amendment harm occurs when a speaker, based on a *credible fear of enforcement*, is reasonably motivated to self-censor or risk possible discipline or termination. *See, e.g., Henry v. Att'y Gen..*, 45 F.4th 1272, 1288 (11th Cir. 2022); *Taylor*, 964 F.3d at 980; *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). Particularly where a law is challenged as vague, Plaintiffs are not required to "confess that [they] will in fact violate that law"—because the law itself provides no clear definition of what would constitute a violation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *cf. CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269-70 (11th Cir. 2006).

#### A. *The Professor Plaintiffs Have Standing.*

The evidentiary hearing generated ample evidence that the Professor Plaintiffs have a "credible fear of enforcement" from SB 129 and that they have engaged in self-censorship and/or

intend to engage in prohibited speech and risk discipline.  With respect to Professor Patton, her credible fear of enforcement is not hypothetical.  It stems from an anonymous complaint that UA received immediately after SB 129 went into effect on October 1, 2024 ("the Complaint").  The Complaint accused Professor Patton of "embed[ding] divisive concepts," in "violation of our divisive concepts legislation," with respect to the Witt Fellows Program that she directs and the *Understanding Poverty* course that she teaches.  The Complaint failed to identify which of the eight "divisive concepts" were purportedly "embedded" in the program or which provisions in SB 129 Professor Patton specifically violated.  Instead, it misquoted and mischaracterized Professor Patton's lectures and assigned books, and accused her of "producing engaged global citizens as opposed to patriotic Americans."  The Complaint exhorted UA to "correct" the program.  Prelim. Inj. Hr'g Tr. 30:6–35:13; Pls.' Ex. 25.

After Professor Patton provided the written response that UA requested, she was told to "revise" her statement and respond to nine points, including "[a]ny planned changes to the readings for future semesters."  Prelim. Inj. Hr'g Tr. at 40:10–4:25; Pls.' Ex. 28.  Associate Provost for Faculty Affairs Lesley Reid warned Professor Patton that if she did not respond to all nine points, Professor Patton could be terminated, even though Reid also conceded that this directive impinged on Professor Patton's academic freedom.  *Id.* at 42:2–43:1, 45:6–12.  Reid also told Professor Patton that no professor had ever been asked to respond to a complaint like this, but that a "very powerful person in Montgomery" was involved.  *Id.* at 48:7–19, 50:21–51:12.

In addition, Professor Patton was also threatened by an Alabama state legislator.  At a November 2024 UA football game, Representative Danny Garrett, the Chair of the Ways and Means Committee for Education in the Alabama state legislature, told Professor Patton that a "couple of legislators [] had asked him to take the [C]omplaint" to UA and that they were "not

4

going to let this go." *Id.* at 51:24–52:7, 54:2, 55:6–14, 56:15–23. When Professor Patton explained to him that she was not going to let the state legislature dictate what books she assigns in her courses because they were not qualified to do so, Representative Garrett responded that her argument was "not going to cut it," reminding her throughout their conversation that he controlled "the education budget." *Id.* at 56:2–23. In a text after the game, Representative Garrett warned Professor Patton to "address/resolve concerns and avoid potential major issues in the future," which Professor Patton took as a threat. *Id.* at 58:1-19, Pls;' Ex. 32.

Based on those threats of enforcement, Professor Patton has already self-censored out of fear of enforcement, including termination. She will no longer show the documentaries that were previously viewed by students in her *Understanding Poverty* course or use small group discussions to discuss the books in that course. Prelim. Inj. Hr'g Tr. 67:17–69:9. She stopped teaching certain race-related theories that she has long taught in her higher-level courses, and she will no longer administer, or discuss, the Harvard Bias Association Test in her courses, all in fear of being accused again of violating SB 129. *Id.* at 70:12–71:4, 65:5–66:1. She also stopped posting her lecture slides for students out of fear that they would misunderstand the bulleted content (without an accompanying lecture) and conclude that Professor Patton is "doing something wrong in class in violation of this law"—particularly with respect to charged issues like "structural racism." *Id.* at 69:22–71:11. Her trepidation about the term "structural racism" stems, in part, from a prior incident during a lecture she was giving on "infant mortality rates of African-American women" and its connection with "structural racism" and "racial discrimination," when a student interrupted her "midsentence" to ask Professor Patton: "Don't we have a new law, SB 129 that says you can't talk about divisive stuff anymore." *Id.* at 69:10–71:4.

5

The above facts certainly support standing for Professor Patton.  And although it is black-letter law that the standing requirement is satisfied as long as a single Plaintiff has standing, *see Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006); *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113–14 (11th Cir. 2022), the evidence amply supports standing independently for Professors Simon and Fording as well.

With respect to Professor Simon, her credible fear of enforcement is based on the threat she received from UA that the "advocacy project" her students chose to do as part of her *Anti-Oppression and Social Justice* course was in violation of SB 129, and if she refused to cancel the project, she could "be disciplined . . . and possibly lose [her] job." Prelim. Inj. Hr'g Tr. 147:2–5, 151:7–152:2; Pls.' Ex. 12.  As a result, she cancelled the advocacy project, which has been part of that course for over twenty years.  *Id.* at 136:19–137:1, 152:22–153:2.

Professor Fording has a credible fear of enforcement because he is in the same Political Science department as Professor Patton, is intimately familiar with the Complaint against her and how it was handled, and familiar with the threat against Professor Simon over her advocacy project.  *Id.* at 210:19–211:5. Professor Fording's fear is also grounded in his understanding of how broadly the University plans to enforce SB 129, and how it affects the courses he teaches. Among other courses, Professor Fording teaches essentially the same poverty course as Professor Patton (called *The Politics of Poverty* rather than *Understanding Poverty*) and uses the same course materials, including the materials cited in the Complaint against Professor Patton.  *Id.* at 211:23–212:13. In addition, Professor Fording was forwarded an email from Provost Dalton confirming that UA wanted to "take actions to prevent faculty" from breaking the law, and this broad enforcement of SB 129 "may likely be viewed or experienced as UA interpreting the law too broadly on many occasions."  Pls.' Ex. 41.  Provost Dalton explained he "would rather be in the

position of having cautioned scores of faculty regarding potential violations than meting out a single sanction for a confirmed violation."  Prelim. Inj. Hr'g Tr. 215:15–22; Pls.' Ex. 41.  Further, Professor Fording attended a mandatory Legal Training that broadly equated giving any tests or assignments related to a divisive concept as prohibited conduct, underscoring his reasonable fear of possible discipline.  *Id.* at 202:2–202:22; Pls.' Ex. 36.

Professor Fording's credible fear of enforcement caused him to self-censor by not teaching his *Politics of Poverty* class moving forward, and to eliminate certain discussions in his *Social Movements and U.S. Politics* course.  Prelim. Inj. Hr'g Tr. 236:1–14.  Professor Fording also intends to continue teaching certain concepts that arguably implicate SB 129's divisive concepts in his *Politics of Voting Rights and Social Movements* course, while risking discipline.  *Id.* at 244:16–245:5.

That the Professor Plaintiffs do not state they will violate the law by, for example, "direct[ing] or compel[ling] a student . . . to personally affirm, adopt, or adhere to a divisive concept" does not deprive the Professor Plaintiffs of standing, particularly when the law is vague.  *See Susan B. Anthony List*, 573 U.S. at 163.  As described *infra*, SB 129 is so vague (and UA has enforced it so broadly) that the Professors have no choice but to self-censor (and already have), or continue to speak and risk discipline, given prior threats of enforcement (by both UA and the Alabama State Legislature), UA's explicit statements that it would interpret the law broadly, and UA's "recommendation" to faculty not to test or give assignments involving the divisive concepts. Prelim. Inj. Hr'g Tr. 202:2–202:13; Pls.' Ex. 36.

**B.**     ***Student Plaintiff Miguel Luna Has Standing to Bring His First Amendment Right to Receive Claim.***

Plaintiff Student Miguel Luna's "right to receive" First Amendment claims are co-extensive with professors' First Amendment right to free speech and academic freedom.  It is "well

established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The right to receive information is an "inherent corollary" of the right of free speech, and students maintain this right in academic environments. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867–868 (1982) (plurality opinion). University students' First Amendment right to receive information is co-extensive with professors' First Amendment right to speech free from viewpoint discrimination. *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1243 (N.D. Fla. 2022).

By prohibiting public university professors from providing information related to certain "divisive concepts" during the course of instruction, SB 129 denies public university students the right to receive and learn from that information—information that would be available but for the law. The restrictions implemented by the University of Alabama system pursuant to the enforcement of SB 129 have infringed on Plaintiff Luna's First Amendment right to receive information. Luna testified about these impacts during the evidentiary hearing. Prelim. Inj. Hr'g Tr. 378:12–380:2.

### C.    *Plaintiffs' Harms Are Traceable and Redressable by Governor Ivey.*

The Governor argues that she should be dismissed in her capacity as Governor (as distinct from her capacity as Trustee). But no such artificial distinction exists—there is just one Governor and when she acts as a Trustee, she remains the Governor. The only reason that the Governor serves as a Trustee is because she is the Governor. Ala. Const. art. XIV, § 264. Accordingly, the Governor is properly sued both in her official capacity as a Trustee and in her official capacity as Governor.

## II.    **The Professor Plaintiffs Are Likely to Succeed on Their First Amendment Claims.**

### A.    ***Legal Standards***

The First Amendment's "bedrock principle" provides that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).   Consequently, viewpoint-based discrimination is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.  And "the dangers of viewpoint discrimination are heightened in the university setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)).  Laws that favor certain viewpoints over others undermine the role of the classroom as the "marketplace of ideas." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *Speech First, Inc.*, 32 F.4th at 1128 ("Colleges and universities serve as the founts of—and the testing grounds for—new ideas.").

The Eleventh Circuit's decision in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), is consistent with Supreme Court precedent disfavoring viewpoint-based regulations in higher education.   The *Bishop* court recognized the university's authority to "reasonably control the content of its curriculum." 926 F.2d at 1074.  The university's authority to set its own curriculum, however, does not include the authority to "impose its own orthodoxy of viewpoint about the content it allowed within the university classrooms." *Pernell*, 641 F. Supp. 3d at 1273.  The *Bishop* court noted that the university sought to impose a viewpoint neutral restriction on any religious content that a professor attempted to interject into the approved curriculum, regardless of the professors' viewpoint within that religious content.   926 F.2d at 1077–78 ("Should another professor express religious beliefs in the classroom, the University would likely produce a similar memo.").

SB 129 is not a viewpoint-neutral regulation on university curricular choices, but rather viewpoint discrimination on what a professor can teach in university-approved courses.  Here, the Professor Plaintiffs are not demanding that Defendants modify the approved university curriculum or accommodate requests for new course content.  Instead, Professor Plaintiffs challenge a law that restricts their ability to teach course material even though their courses and syllabi had been approved by the University.  Prelim. Inj. Hr'g Tr. 13:22–14:12; Prelim. Inj. Oral Arg. Tr. 23:5–23, 27:19–40:25.  SB 129 is a prophylactic ban on professors' ability to present "course work that advocates for" views with which legislators disagree and imposes unconstitutional viewpoint discrimination on university instructors throughout Alabama.

Furthermore, the Supreme Court has long recognized that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."  *Keyishian*, 385 U.S. at 603; *In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981)[1] ("Time after time the Supreme Court has upheld academic freedom in the face of government pressure.").  Although declining to recognize academic freedom as an independent right, the *Bishop* court recognized a "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment," as well as the "invaluable role academic freedom plays in our public schools, *particularly at the post-secondary level*." 926 F.2d at 1075 (emphasis added). This academic freedom interest belongs to both instructors and academic institutions.[2]  *Bishop*,

---

[1] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[2] The Supreme Court has never held that this academic freedom interest also belongs to state legislatures.  *See Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 238–39 (2000) (noting "wide protection for the academic freedom and autonomy that bars legislatures (and courts) from imposing conditions on the spectrum of subjects taught and viewpoints expressed in college teaching"); *see also Sweezy v. State of N.H. by Wyman*, 354 U.S.

926 F.2d at 1076 (recognizing professor plaintiff's "interest in academic freedom"); *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 553 (5th Cir. 1982) ("[Academic freedom's] roots have been found in the [F]irst [A]mendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method.").

The Defendants' view of *Bishop* misconstrues its holding to create a strict liability approach where every time a professor speaks in a classroom, their interest in academic freedom must yield to the university interest. This reading of *Bishop* relies on viewing in-class university instruction as government speech based on *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In *Garcetti*, the Supreme Court held that public employee speech is not protected if it is expressed pursuant to the employee's "official duties." *Id.* at 421. But the Court expressly reserved the question of whether the "official duties" framework developed in that case applied to "case[s] involving speech related to scholarship or teaching." *Id.* at 425. Significantly, **every** post-*Garcetti* circuit decision has declined to extend *Garcetti*'s holding to university level teaching and scholarship. *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) ("We decline the University officials' invitation to extend *Garcetti* to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so."); *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) ("As this Court has repeatedly recognized, the *Garcetti* rule does not extend to speech by public university faculty members, acting in their official capacity, that is 'related to scholarship or teaching.'"); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("We conclude that *Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties'

---

234, 250 (1957) ("To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.").

of a teacher and professor."); *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (concluding that Supreme Court precedent weighed in favor of ruling that First Amendment protections apply to university professors' classroom speech); *Heim v. Daniel*, 81 F.4th 212, 226 (2d Cir. 2023) (declining to extend *Garcetti* to apply the government speech doctrine to professor's academic scholarship).

The Eleventh Circuit's recent decision in *Wood v. Florida Department of Education*, No. 24-11239, 2025 WL 1819099 (11th Cir. July 2, 2025), does not apply *Garcetti* at the university level and ultimately is not controlling in this case. The *Wood* court emphasized that its decision "is a narrow one," limited to a K-12 teacher's use of pronouns. *Id.* at *2–3, *5. The Supreme Court has "long recognized" that "given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Consequently, the speech of university professors is governed by different legal standards than the speech of K-12 public school teachers. The context, nature, and applicability of SB 129 are distinguishable from the issues before the Eleventh Circuit in *Wood*.

Indeed, the *Wood* court's application of *Garcetti* should be limited to K-12 teachers and does not apply to professors in university settings. The *Wood* decision did not suggest that its reasoning extended to university professors' classroom instruction. In conducting its *Garcetti* analysis, the *Wood* court relied on several cases that contain explicit language limiting their holdings to the K-12 context.[3] *See, e.g.*, *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477,

---

[3] Notably, several of these courts have chosen to apply the *Garcetti* framework to the in-classroom speech of primary and secondary school teachers despite declining to do so in the higher education context. *Compare Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715–16 (7th Cir. 2016) (applying *Garcetti* in the "primary and secondary school context") *with Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) ("We decline the University officials' invitation to extend *Garcetti*

479 (7th Cir. 2007) (describing question before the court as "[w]hether teachers in primary and secondary schools have a constitutional right to determine what they say in class"); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010) (concluding that "the First Amendment does not protect primary and secondary school teachers' in-class curricular speech").

The Supreme Court has directed courts to "exercise great caution before extending our government-speech precedents" because the government-speech doctrine is "susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Furthermore, courts must consider additional factors when addressing the First Amendment rights of K-12 teachers that are inapplicable to university instruction. Because primary and secondary school children are minors, K-12 school administrators have the unique responsibility of acting "in *loco parentis*" to "protect children" from certain types of speech. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). In contrast, university students are adults, and "[t]he First Amendment guarantees wide freedom in matters of adult public discourse." *Id.* at 682; *see also Widmar v. Vincent*, 454 U.S. 263, 274 n. 14 (1981) (explaining that "[u]niversity students are . . . young adults" and "less impressionable than younger students"). Additionally, the compulsory nature of primary and secondary schools presents additional concerns regarding instructor speech that are not present in the higher education context. *See Mayer*, 474 F.3d at 479 ("Children who attend school because they must ought not be subject to teachers' idiosyncratic perspectives."). Given the Supreme Court's recognition of the special role of universities in facilitating the free exchange of ideas

---

to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so.").

among students and professors, there is no rationale for extending the *Garcetti* government speech principles to university instructors.

The reasoning in *Wood* is distinguishable not only because of its K-12 context but also because of the narrow reach of the statute involved. The *Wood* court described the statute at issue as governing "a narrow swath of expression" and having a "relatively limited sweep." 2025 WL 1819099 at *2, *3. In contrast, SB 129 implicates a wide range of topics and concepts that could be considered "divisive" under the statute, Pls.' Prelim. Inj. Br. at 10–11, ECF No. 12-1, which heightens the bill's chilling effect on protected speech. *United States v. Nat'l Treas. Emp's Union*, 513 U.S. 454, 468 (1995) [*NTEU*] (noting that a state faces a heavy burden to justify a broad restriction on expression of protected speech). Furthermore, the *Wood* court did not address whether the law at issue was viewpoint neutral. Here, the defendants concede that SB 129, by its own terms, imposes viewpoint discrimination. Prelim. Inj. Oral Arg. Tr. 122:4–124:20; Bd. Defs.' Resp. in Opp'n to Pls.' Mot. for Prelim. Inj. 4, ECF No. 26.; Resp. in Opp'n to Pls.' Mot. for Prelim. Inj. by Def. Kay Ivey, at 35, ECF No. 27. Finally, the speech at issue in *Wood* was not "scholarship or teaching," and therefore did not constitute the type of university professor speech that the Supreme Court identified as implicating "additional constitutional interests" in *Garcetti*. 547 U.S. at 425. Conversely, Professor Plaintiffs are solely challenging SB 129's application to their classroom instruction and materials. For all these reasons, the Eleventh Circuit's holding in *Wood* does not control in this case.

The Supreme Court developed an additional test for resolving First Amendment claims brought by public employees against their employer in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968). In *Pickering*, the Supreme Court considered a K-12 teacher's First Amendment claim arising from *out-of-school speech*. 391 U.S. at 564–67. The

*Pickering* court utilized a balancing approach for weighing the free speech rights of a government employee against the government's interest in workplace efficiency. *Id.* at 568–74. The *Bishop* court considered *Pickering* as one of many cases that was not "satisfactorily on point with this one to adopt as controlling." *Bishop*, 926 F.2d at 1074. Instead, the Eleventh Circuit "frame[d] [its] own analysis" rather than adopt *Pickering*, and that analysis is binding on this Court. Although Plaintiffs would prevail under either test, this Court should look at *Bishop* and not *Pickering* in conducting its balancing analysis.

In any event, the Supreme Court later distinguished the "post hoc analysis of one employee's speech and its impact on that employee's public responsibilities" at issue in *Pickering* from "a wholesale deterrent to a broad category of expression by a massive number of potential speakers," and concluded that the government faces a heavier burden than the test articulated in *Pickering* for a "sweeping statutory impediment to speech" compared to an "isolated disciplinary action." *NTEU*, 513 U.S. at 467–68; *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018) (explaining that the government "must shoulder a . . . heav[ier] burden" and "is entitled to considerably less deference" than the standard *Pickering* framework for a "speech-restrictive law with widespread impact") (internal citations omitted). Courts within the Eleventh Circuit have concluded that the more stringent test the Court articulated in *NTEU*, rather than the traditional *Pickering* framework, applies to regulations that, like SB 129, forbid or suppress government employee speech before it occurs.[4] *See, e.g., Cochran v. City of*

---

[4] Several Courts of Appeal have also adopted this approach. *See, e.g., Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017) ("The government therefore must shoulder a heavier burden when it seeks to justify an ex ante speech restriction as opposed to an isolated disciplinary action.") (internal citation omitted); *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004) ("*Pickering* applies to speech which has already taken place, for which the public employer seeks to punish the speaker. *NTEU* applies when a prior restraint is placed on employee speech."); *Wolfe v. Barnhart*, 446 F.3d 1096, 1105 (10th Cir. 2006) ("A number of other circuits have concluded that the *NTEU* analysis

*Atlanta, Ga.*, 289 F. Supp. 3d 1276, 1294–99 (N.D. Ga. 2017) (applying *NTEU* rather than *Pickering* to plaintiffs' prior restraint claims); *Davis v. Phenix City, Alabama*, No. CIVA 3:06CV544 WHA, 2008 WL 401349, at *9–10 (M.D. Ala. Feb. 12, 2008). The Eleventh Circuit has affirmed one district court's conclusion that *NTEU*, rather than standard *Pickering* balancing, applies to prior restraints on speech. *Davis v. Phenix City*, 296 F. App'x 759, 761 (11th Cir. 2008) (*per curiam*).

Because SB 129 is a sweeping statutory prohibition that restricts the speech of thousands of university professors, a straightforward application of *Pickering* balancing is not appropriate. *See Pernell*, 641 F. Supp. 3d at 1272 (incorporating *NTEU* principles into *Bishop* balancing test); *see also Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 104 (3d Cir. 2022) (concluding *NTEU* rather than *Pickering* governed "a policy that prohibited or restrained future speech"). *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), rather than *Garcetti*, *Pickering*, or *Wood*, is the controlling authority for this case. The application of a bright-line rule that all university professor speech is government speech, and therefore does not receive First Amendment protection, contravenes the Eleventh Circuit's doctrinal guidance on this very issue. Adopting such a bright-line rule forecloses the possibility for the "case-by-case inquiry" into "the context[,]" "the [u]niversity's position as a public employer[,]" and "the strong predilection for academic freedom" that *Bishop* requires. 926 F.2d at 1074–75. The weight of binding authority therefore counsels against ruling that all university professor classroom speech is pure government speech. *Pernell*, 641 F. Supp. 3d at 1241. The balancing test the Eleventh Circuit developed in

---

applies to restrictions on employee speech that are imposed through such a generally applicable policy, rather than a post hoc case-by-case disciplinary process.").

*Bishop* weighs strongly in favor of granting the preliminary injunction on the Professor Plaintiffs' claims.  Pls.' Reply in Supp. of Mot. for Prelim. Inj. 18–25, ECF No. 31.

**B.**      ***SB 129 Is A Viewpoint-Based Restriction of Professors' Right to Free Speech and Academic Freedom in Violation of the First Amendment.***

As described above, Defendants concede that SB 129 discriminates based on viewpoint.  As a result, absent application of the "government speech" doctrine (which does not apply here) or *Bishop* balancing (which augurs in favor of Plaintiffs), that should end the First Amendment analysis.  Based on the evidence adduced at the two-day evidentiary hearing, however, we set forth below how the specific provisions of SB 129 discriminate based on viewpoint in violation of the First Amendment.

**i.**      ***Section 2(3) of SB 129 prohibits "course work" that "advocates for or requires assent to a divisive concept."***

Section 2(3) of SB 129 prohibits the university and/or it's professors from "require[ing] its students" to attend or participate in any . . . course work that advocates for or requires assent to a divisive concept."  Pls.' Ex. 34.  As demonstrated at the hearing, the term "course work" has a broad scope, and includes readings assigned for class, professors' lectures, guest speakers, projects, assignments, and tests.  Prelim. Inj. Hr'g Tr. 159:24–160:1; 225:9–15.  Under Section 2(3), even if a Professor is not herself "advocat[ing]" for a "divisive concept," the Professor nonetheless violates SB 129 if any reading or other "course work" that the Professor assigns does.  The evidentiary hearing revealed numerous examples of "course work" that "advocates for" various divisive concepts.

For example, the *Politics of Poverty* course includes course work on the "Structural Causes of Poverty – Racial Prejudice and Discrimination," which includes the assigned reading, *The Case for Reparations,* by Ta-Nehisi Coates.  *Id.* at 224:18–225:2; Pls.' Ex. 37.  That article sets forth the

case for reparations, which is arguably in direct violation of divisive concept (b) ("that individuals should be discriminated against or adversely treated because of their race . . ."). On the other hand, a reading that gives the opposing argument against reparations violates no divisive concept. A law that bans teaching in support of reparations, but allows teaching criticisms of reparations, is classic viewpoint discrimination.

Similarly, that same class also assigns course work about the "Eugenics Movement" so that students can understand how this movement contributed to (and continues to influence) poverty policy in the United States. Prelim. Inj. Hr'g Tr. 226:24–228:18; Pls.' Ex. 37. That course work includes readings about what the Eugenics Movement advocated for—namely, that certain races and genders are genetically inferior to others—in direct violation of divisive concepts (a) (that "any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior), (b) (that "individuals should be discriminated against or adversely treated because of their race, color . . . ."), and (c) (that "the moral character of an individual is determined by his race, color . . . ."). Prelim. Inj. Hr'g Tr. 257:23–258:22. Again, readings that reject the tenets of the Eugenics Movement do not violate any divisive concept.

Course work on the white nationalist and Black power movements in Professor Fording's *Social Movements and U.S. Politics* course implicate similar divisive concepts because they "advocate" for the inherent superiority or inferiority of race, whether individuals should be adversely treated based on race, and/or how race determines moral character. *Id.* at 258:23–261:12; Pls.' Ex. 42.

The course work in Professor Simon's *Anti-Oppression and Social Justice* course includes readings on "white privilege," "social class privilege," and "male privilege" that advocate for understanding the numerous privileges certain people may enjoy based on race, social class, and

18

gender, in violation of various divisive concepts, including divisive concept (h) ("[t]hat meritocracy or traits such as a hard work ethic are racist or sexist"). Prelim. Inj. Hr'g 157:7–22; Pls.' Ex. 10. Professor Fording further testified how his course work on structural racism, as it relates to the causes of poverty, implicates divisive concept (h) because this course work explains how certain people's structural advantages and disadvantages impact their social mobility, countering the belief that meritocracy is purely based on one's hard work. Prelim. Inj. Hr'g 262:16–263:9.[5]

Moreover, the Professors explained that they assign (or previously assigned) the Harvard Implicit Associations Test, which assesses and illustrates an individual's implicit biases. *Id.* at 65:19–66:1, 133:1–14, 231:18–232:15. By having the students engage in the test showing that implicit bias exists, the Professors can be seen as requiring "course work" that "advocates" for divisive concept (d) ("by virtue of an individual's race, color . . . the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously"). Beyond the course work assigned, the Professors explained that they teach the concept of implicit bias as a known and accepted social phenomenon. *Id.* at 65:19–66:1, 133:1–14, 231:18–232:15. By presenting research showing that implicit bias exists, the Professors themselves can be seen potentially as "advocating for" divisive concept (d).

---

[5] Beyond the specific examples marshalled at the evidentiary hearing, there are many other examples of course work that could implicate the divisive concepts. For example, if a course included reading material that advocated for affirmative action, that would clearly violate divisive concept (b) ("[t]hat individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin"). *See Pernell*, 641 F. Supp. 3d at 1233–1234 (concluding that the "poignant reflection" by Justice Sonia Sotomayor about her education would violate Florida's analogous statute to SB 129 because it "endorses affirmative action" in violation of that law's "divisive concepts").

The Professors also required students to watch the documentary *Slavery by Another Name*, which discusses the history of convict leasing. The documentary features a descendant of a white family, who built their wealth from the use of slavery and the leasing of Black convicts, expressing the shame and guilt she felt for the benefits her family received from the racially discriminatory practice. *Id.* at 17:23–18:4; 261:13–262:11. The documentary could be interpreted as "advocating for" the idea that White people should feel responsible, blame, or guilt on the basis of their race (divisive concepts (e), (f), and (g)).

As these examples illustrate, SB 129, and particularly Section 2(3), *literally* – without even resorting to any concepts of vagueness or overbroad enforcement—prohibits the use of readings, documentaries, lectures, or other course work that present potentially controversial historical events and ideas because that course work itself "advocates for" divisive concepts in violation of SB 129. And this is the reason why Defendants do not even attempt to defend Section 2(3), focusing all of their energy on Section 2(2) of SB 129, which as we describe below, is similarly problematic based on how it has been enforced.

> ### ii.    Section 2(2) of SB 129 prohibits "direct[ing] or compel[ling]" a student to "affirm, adopt, or adhere to a divisive concept."

Section 2(2) of SB 129 provides that the Professor Plaintiffs may not "direct or compel a student . . . to personally affirm, adopt, or adhere to a divisive concept." Pls.' Ex. 34. Although some Professors testified that they do not "direct or compel" students to "affirm, adopt, or adhere to a divisive concept" under a literal interpretation of those terms, the University's training and enforcement of this provision have far exceeded that literal interpretation, impinging on Professors' and Students' First Amendment rights.

The record is replete with evidence of the University's broad and inconsistent interpretation of prohibited conduct that falls under this "direct or compel" provision. The College of Arts and

Sciences presented a mandatory Legal Training that advised Professors to not test or require "assignments, like papers" on divisive concepts for fear that it would be considered "compelling assent" of students.  Prelim. Inj. Hr'g. Tr. 199:11–14, 202:2–13; Pls.' Ex. 36, slide 98.  Provost Dalton, in communicating with faculty, made it clear that he "work[ed] with the legal team every day" on complying with SB 129, and UA faculty may experience "UA interpreting the law too broadly on many occasions," potentially leading to cautioning "scores of faculty regarding potential violations."  Pls.' Ex. 41.  When asked what instruction in the classroom setting would constitute "compelling assent" from students, Provost Dalton confirmed that a "true/false" question on a test might run afoul of this provision of the law.  Dalton Dep. Tr. 46:5–22.  In addition, when Professor Simon asked how her proposed "advocacy project" for her class violated SB 129, Provost Dalton responded that it could be viewed as requiring "student[] assent" to some unidentified divisive concept.  Prelim. Inj. Hr'g Tr. 151:13–20; Pls.' Ex. 12 ("The issue at hand is that your class assignment, a component of their grade, can be viewed as: sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept, and/or other portions of the law.").

If testing or giving assignments on content related to divisive concepts is a potential violation of the "direct or compel" provision in SB 129, then Professors risk enforcement of SB 129 every day because "inherent in teaching is ensuring that [] students are learning, and there's no way" to assess their learning without "tests and assignments."  Prelim. Inj. Hr'g Tr. 202:14–22. For example, Professor Fording testified that the final exam in his *Politics of Poverty* course required his students to accept as historical fact that "race is inextricably linked to poverty itself" and to explain how race is related to the causes of poverty, and why it is important in understanding

21

poverty currently. *Id.* at 235:10–25. In testing and assigning papers about historical discrimination, and structural and institutional racism as it relates to causes of poverty, Professor Fording had concerns that these concepts implicated each of divisive concepts a, b, c, e, f, and g. *Id.* at 259:9–262:11 (explaining relation to each divisive concept); *Id.* at 264:21–267:7 (concerns regarding Section 2(2)). In class discussion, Professor Fording explained it is not unusual for students to feel uncomfortable or "inherently responsible" for structural racism and historical discrimination. *Id.* at 260:2–261:12. Although students are not asked to feel responsibility, "fault," or "a sense of guilt," Professors cannot control how these tests or assignments make their students feel. Nor can Professors control whether a student attributes those views to them, as students often do. *Id.* at 249:24–250:19.

UA's inconsistent and broad interpretation of "direct or compel" is one example of the vagueness issues plaguing SB 129, leading to increased and arbitrary enforcement, and further self-censorship by the Professors. Professors have no ability to determine what conduct may be prohibited under SB 129, being told instead that UA faculty would experience the law being interpreted "too broadly" and that any testing, assignment, or coursework regarding a divisive concept could run afoul of the law. It is precisely this vagueness that has invited complaints about possible violations of SB 129 simply because of the books assigned or views that teaching students to be "global citizens" is somehow a bad thing—in turn leading to extensive UA investigations and threats by state legislators—and has prompted questions from students about whether lectures on racial differences in infant mortality statistics violate SB 129. *Id.* at 70:12–71:14.

UA's inability to identify a single divisive concept that was implicated in either the alleged student complaints against Professor Patton or Professor Simon's advocacy project underscore the vagueness of the concepts covered by SB 129. Dalton Dep. Tr. 57:1–58:2, 60:11-–4; Prelim. Inj.

Hr'g Tr., 72:13–24, 152:12–18; Pls.' Ex. 12.  The University is not alone in its confusion, as every court that has considered similar divisive concepts has found them to be unconstitutionally vague. *Local 8027 v. Edelblut*, 2024 WL 2722254, at *17 (D.N.H. 2024) (finding concepts similar to SB 129's divisive concepts (a), (b), and (d) unconstitutionally vague); *Honeyfund.com, Inc. v. DeSantis* 622 F. Supp. 3d 1159, 1181–82 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) (finding concepts similar to SB 129 divisive concepts (c) unconstitutionally vague); *Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*, 508 F. Supp.3d 521, 543 (N.D. Cal. 2020) (finding concept similar to SB 129's divisive concept (d) unconstitutionally vague); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp.3d 783, 808 (M.D. Tenn. 2024) (denying motion to dismiss where plaintiffs asserted plausible theory that concepts making use of values-laden terms, and specifically concept similar to SB 129's divisive concept (h), were unconstitutionally vague).

Compounding the vagueness problem is the fact that the divisive concepts themselves include values-laden terms that discuss abstract principles where the meaning depends on political or social assumptions of the individual.  For example, words like "inherently," "superior," and "inferior," are not readily defined and vary depending on the characteristics being compared.  The concepts of "responsibility," "fault," or "guilt" are subjective feelings held by an individual. "Moral character," "racist," and "sexist" are hotly debated terms with no standard meaning.  Courts have recognized that terms like these unconstitutionally invite ambiguous enforcement.  *See Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807–09; *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1348 (11th Cir.), *cert. denied*, 145 S. Ct. 161 (2024) (holding that a law prohibiting advertisements that "primarily promote" "religious" materials failed "to provide any objective or workable standards"); *Smith v. Goguen*, 415 U.S. 566, 578 (1974) (holding

unconstitutional a law prohibiting a defendant from acting "contemptuously"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding unconstitutionally vague an ordinance that prohibited conduct "annoying" to others).  The Constitution does not allow for such vague regulations impinging on the First Amendment, especially when the penalties for running afoul of the regulations are discipline and termination.

### C. *Defendants' Representations of Their Interpretations of SB 129 Directly Contradict the Language of the Statute and Do Not Immunize SB 129 from Its Unconstitutionality.*

The Defendants' representations during the evidentiary hearing about how they intend to interpret and enforce SB 129, notwithstanding the language in the statute (and their own pre-hearing actions), do not rescue SB 129 from its constitutional infirmities.  *E.g.*, Tr. 153:12–156:15, 330:12–23, 332:3–10, 25.  The Eleventh Circuit has disallowed such representations in attempts to cure any potential constitutional infirmities related to vagueness.  For example, in *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017), a group of physicians lodged a vagueness challenge against Florida's Firearm Owners' Privacy Act, which dealt with doctor patient confidentiality and gun ownership.  In evaluating the potentially vague provisions, the Eleventh Circuit refused to take "the State at its word" and rely on "good faith" statements made by the individuals responsible for enforcing the statute to determine its constitutionality.  *Id.* at 1321 ("But we cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it.").

This is especially true when the State's interpretation "stands in stark contrast to the plain text of the statute."  *Id.* at 1322.  The Eleventh Circuit reaffirmed this principle as recently as this year, in *HM Florida-ORL, LLC v. Governor of Florida*, 137 F.4th 1207 (11th Cir. 2025).  There, a restaurant operator challenged a Florida law that prohibited exposing children to "adult live performances" as impermissibly overbroad.  *HM Florida-ORL*, LLC, 137 F.4th at 1207.  In

assessing whether the restaurant operator's self-censorship was reasonable, the Eleventh Circuit refused to consider trial statements made by the State classifying specific drag show concepts as permissible—when those statements did not clarify the boundaries of impermissible performances or commit to non-enforcement. *Id.* at 1218 ("It would defeat decades of First Amendment Jurisprudence to allow states to impose laws whose 'breadth and slipperiness' obfuscate their reach, then dodge lawsuits by saying plaintiffs are confused as to a law's scope.") (citing *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022)). The Eleventh Circuit emphasized that the state's "prior enforcement actions" further cast doubt on the state's post hoc rationalizations. *Id.* at 1218.

Defendants attempt to assert that there are self-contained limitations in SB 129, making it less sweeping of a statute than it is. Prelim. Inj. Hr'g Tr. 155:12–156:17, 189:3–190:16, 331:25–334:3. But, Defendants' reading of the statute is at odds with the actual plain text of the statute—the limitations Defendants are attempting to insert do not exist in the statute itself. This Court is required to reject this reading of SB 129 under binding Eleventh Circuit precedent.

### D.     *SB 129's "Safe Harbor" Provisions in Section 4 Do Not Cure the Statute's Constitutional Infirmities.*

The Supreme Court has held that vague laws implicating speech are particularly concerning. *See Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) ("When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer."); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (holding that a vague regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech"). Indeed, the Supreme Court has warned that, especially in academic contexts, "[t]he danger of [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform

teachers what is being proscribed." *Keyishian*, 385 U.S. at 604.  There are two independent reasons

why a statute may be void for vagueness.  "First, if it fails to provide people of ordinary intelligence

a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even

encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732

(2000); *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1319 (11th Cir. 2017) (*en banc*).[6] Pls.'

Mot. for Prelim. Inj., ECF No. 12; Pls.' Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21; Pls.'

Reply in Opp'n. to Defs.' Mot. to Dismiss, ECF No. 43.

Defendants argue that the safe harbor provisions in Section 4 of SB 129 enable Professors

to freely teach and discuss the divisive concepts without fear of running afoul of the law, however

that is incorrect.  First, the safe harbor provision allowing a professor to teach or discuss a divisive

concept "in an objective manner and without endorsement" highlights how SB 129 impermissibly

restricts speech based on viewpoint.  Per Defendants' reading, any classroom discussion *endorsing*

a divisive concept would violate SB 129 while *denouncing* that same concept would be permissible

under the law.  *See Honeyfund.com, Inc.*, 622 F. Supp. 3d at 1175; Prelim. Inj. Oral Arg. Tr. 129:6–

130:9.

Additionally, the phrase "objective manner and without endorsement" is so vague that it

does not properly provide sufficient guidance on what speech falls within the safe harbor.  As the

Professor Plaintiffs testified, the terms are in direct tension with one another.  A central role for

Professors, as experts in their field, is to present research in a field of study, and if supported by

the weight of evidence, affirmatively present the conclusion of that research as proven.  Prelim.

Inj. Hr'g Tr. 306:1–307:5.  According to SB 129, presenting the conclusion of research implicating

---

[6] All the reasons set forth in this brief regarding the vagueness of SB 129 also support
Plaintiffs' assertions that SB 129 is impermissibly vague in violation of the Fourteenth
Amendments' Due Process Clause.

a divisive concept would be an "endorsement" of the concept and run afoul of the law.  As Professor Fording explained about the tension of these terms:

> [S]o many of the questions related to divisive concepts involve questions that I would call empirical questions that are either based on what the historical facts are or what the social science research evidence says.  And so in -- many times, those questions are not -- you know, there's a clear answer based on the balance of the evidence. And so in presenting that objectively, therefore, I think I am endorsing an answer. I think that's kind of my job, and so sometimes I think those two things can be in conflict with one another.

*Id.* at 269:16–25.

Likewise, it is entirely unclear how Professor Patton can teach topics such as the statistics of poverty, welfare policy, racial disparities in health policy, or the lived experiences of people in poverty objectively, without "endorsing" a conclusion implicating a divisive concept.  *Id.* at 77:6–78:6. As Professor Patton testified:

> If I am teaching a course, out of all the documentaries to choose to teach, the theories out there, the lectures to give, the materials to pull, I think it's very reasonable to think that students will feel that I am endorsing what I am teaching them, that I stand behind what I am teaching them.

*Id.* at 77:9–14.

Professor Simon similarly cannot discern how to teach "objectively" within the context of social work that is highly dependent on individual perspectives.  *Id.* at 162:21–163:7. The safe harbor allowing for "teaching of topics or historical events in a historically accurate context" also provides no relief because many historical events may still be hotly debated, with competing views (each touting "facts") about what transpired and why.  Prelim. Inj. Hr'g Tr. 76:18–77:16, 268:19–270:18.

Further, any suggested dictionary definition for the term "objective" does not save the safe harbor provision from vagueness problems.  "[F]ew terms are as loaded and contested as 'objective.'"  *Honeyfund.com, Inc.*, 622 F. Supp. 3d at 1183.  "And many would suggest that it is

27

impossible to discuss a concept—or anything for that matter—'as perceived without distortion by personal feelings, prejudice, or interpretation.'" *Id.* "This is especially true when discussing concepts rooted in historical phenomena, like systemic racism, critical race theory, white privilege, and male privilege." *Id.* at 1183–84. Every court that has reviewed these terms has rejected them as unconstitutionally vague. *Id.* at 1184 (finding "objective manner without endorsement" vague); *Pernell*, 641 F. Supp. 3d at 1283–84 (same); *Tennessee Educ. Ass'n*, 732 F. Supp. 3d 783, 808–09 (finding the term "promoting" in a statute similar to SB 129 to be vague).

Finally, the scienter provision does not alleviate SB 129's vagueness concerns. First, courts have found similar statutes vague even with scienter requirements. *Local 8027 v. Edelblut*, 2024 WL 2722254, at *14-15 (D.N.H 2024); *Tennessee Educ. Ass'n*, 732 F.Supp.3d at 813 n.18; *see also Pernell*, 641 F.Supp.3d at 1285. Further, the scienter requirement does not alleviate concerns as it does not apply to the Student Plaintiffs' organizations and their loss of funding, or the Student NAACP chapter that lost designated space. The scienter requirement also does not help Professors who, based on what the University is telling them, cannot reasonably discern what acts would be in violation of SB 129, and Professors Simon and Patton already faced real enforcement despite the scienter requirement in the statute.

III. **Student Plaintiffs Testman, Luna, and the UA NAACP Have Demonstrated a Likelihood of Success on the Merits for Their Student Funding and Student Space Claims.**

A. *The Student Plaintiffs Have Standing.*

i. *Plaintiff Testman*

Plaintiff Testman, who served as the finance coordinator and affiliates board member for the Student Justice Advocacy Council ("SJAC") at UAB, suffered direct harm as a result of SB

129.  The undisputed record establishes the following injuries caused by SB 129, each of which is independently sufficient to establish standing:

(i)  UAB administrators terminated SJAC's University Funded Organization ("UFO") status, and thus its $10,000 in annual funding from UAB, because they concluded that funding of SJAC violated SB 129.  Wallace Dep. Tr. 58:7–59:20; Tr. 316:22, 320:3–4.[7] Testman has standing to challenge this loss of funding because as a student leader of SJAC, she was harmed by UAB's actions.  *Gerlich v. Leath*, 152 F. Supp. 3d 1152 (S.D. Iowa 2016), *aff'd*, 847 F.3d 1005 (8th Cir. 2017).

(ii) When SJAC lost its UFO status, Testman lost her position as finance coordinator and a member of the affiliates board, as well as her $600 stipend.  Prelim. Inj. Hr'g Tr. 320:14-23; Wallace Dep. Tr. 66:7–67:2. Because SJAC no longer received funds to distribute to other student organizations, there was no longer a need for the affiliates board or a finance coordinator, which previously were responsible for distributing the funds.  Wallace Dep. Tr. 66:7–67:2.

(iii)  After demoting SJAC to a Registered Student Organization ("RSO"), UAB administrators told SJAC's student leaders that RSOs associated with a divisive concept or a DEI program were ineligible to receive State funding and pointed the student leaders to written guidance stating the same.  Wallace Dep. Tr.. at 58:1–59:5; Day 2 PI Hr'g Tr. 320:3. The Governor admitted at oral argument that Testman has standing.  Prelim. Inj. Oral Arg. Tr. at 136:9–11 ("I do think Miss Testman likely was injured from the loss of the $600 stipend.").

---

[7] The Trustees' argument that SJAC lost its funding because its sponsoring university office was closed omits a key fact, namely that the university office also was closed for alleged inconsistency with SB 129.  Wallace Dep. Tr. 38:16–42:17.

Various arguments to the contrary raised by the Defendants in their briefs are without merit. ***First***, the fact that Testman is no longer a member of SJAC cannot defeat standing because her positions within SJAC were terminated as a direct result of SB 129.[8]  Defendants cannot fault Testman for no longer being the SJAC finance coordinator or affiliate board member when the very law at issue caused her to lose these positions.  The harm suffered by Testman in losing these positions is not purely in the past because Testman wants to hold these positions again once the offending law is enjoined.  Supp. Decl. to Prelim. Inj. Reply at ¶ 7.

***Second***, the fact that UAB secured certain "private" funding from the UAB Educational Foundation during the 2024-25 school year does not defeat standing.  As an initial matter, UAB's policy of withholding State funds from certain student organizations based on their viewpoints is a direct First Amendment injury, regardless of whether other alternative funding is potentially available.  Established Supreme Court precedent prohibits public universities from engaging in viewpoint discrimination in making decisions about funding student organizations.  *See Rosenberger*, 515 U.S. at 819.  Moreover, it is undisputed that (a) alternative "private" funding has not been secured for the upcoming school year (Wallace Dep. Tr. 122:6–18) and (b) student organizations that received "private" funding during the last school year received less money than they were originally allocated prior to being cut off from State funding.  Prelim. Inj. Hr'g Tr. 326:4–16; Wallace Dep. Tr. 124:5–22.  For all of these reasons, the potential presence of alternative funding does not impact Testman's standing.

---

[8] Although UAB told Testman she could have a new title, this did not and could not remedy the injury caused by SB 129.  As Dr. Wallace admitted, the defunding of SJAC resulted in the termination of the affiliate board on which Testman had served, as well as her stipend for serving as SJAC's financial coordinator.

**Third**, standing is not impacted by the fact that SJAC has not applied for funding as an RSO for the upcoming school year.  It is undisputed that UAB administrators told SJAC student leaders that organizations associated with a divisive concept or DEI program could not receive State funding as an RSO.  Prelim. Inj. Hr'g Tr. 320:6–10, 320:24–321:11; Wallace Dep. Tr. 58:7–59:20.  And these same administrators had previously told SJAC that it was losing its State funding as a UFO because of its incompatibility with SB 129.  Prelim. Inj. Hr'g Tr. 320:3; Wallace Dep. Tr. 58:7–59:20.  Having expressly informed SJAC that it was ineligible for State funding and that the organization was at odds with SB 129, UAB cannot now seek to dismiss SJAC's claims on the grounds that it did not apply for the very funding it was told it was ineligible for.  As the Supreme Court has explained, a victim of discrimination need not engage in futile acts to establish standing: "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977).  Here, SJAC would have applied for RSO funding but for UAB's policy barring such funding to organizations associated with a divisive concept or a DEI program.  Prelim. Inj. Hr'g Tr. 321:9–11.

### ii. *Plaintiff Luna*

Like Testman, Plaintiff Luna, who is the founder and President of the student organization Esperanza, also suffered direct harm caused by SB 129 and thus has standing with respect to his student funding claims.  The undisputed evidence establishes the following, each of which is independently sufficient to establish standing:

(i) Esperanza lost funding when UAB administrators closed the Office of Diversity, Equity, and Inclusion, finding it incompatible with SB 129.  Prelim. Inj. Hr'g Tr. 351:12–352:2. This resulted in Esperanza losing funding for events such as its Hispanic Heritage Month

31

dinner and a panel concerning Hispanic students' experiences in higher education. *Id.* at 353:16–22, 355:7–12.

(ii) Prior to SB 129, Esperanza co-hosted events funded by SJAC. When SJAC lost its funding due to SB 129, such funding was no longer available for Esperanza events. *Id.* at 356:9–15.

(iii) As was the case with SJAC, UAB's policy of not providing State funding to RSOs associated with a divisive concept or a DEI program prevented Esperanza from receiving funding as an RSO. UAB administrators made this policy clear to Luna. *Id.* at 356:25–357:3; Wallace Dep. Tr. 75:5–12.

Defendants' arguments about Luna's standing fail for the same reasons as discussed above for Testman. Moreover, the record evidence refutes Defendants' contention that any harm to Luna is speculative. There is nothing speculative about losing access to three sources of funding.

### iii.    *UA NAACP Student Chapter Has Standing.*

The NAACP Student Chapter has both associational and organizational standing. With regard to associational standing, the undisputed evidence establishes that multiple members of the NAACP Student Chapter used the Black Student Union ("BSU") and Safe Zone spaces prior to their closure as a result of SB 129. For example, NAACP Student Chapter President Ja'Kobe Bibbs testified that he visited the BSU space approximately three times per week prior to its closure. Prelim. Inj. Hr'g Tr. 397:1–7. While there, he received important mentoring, recruited members and leaders for the NAACP Student Chapter, and formed other important relationships. *Id.* at 387:11–399:6. Mr. Bibbs also identified other NAACP Student Chapter members who used the BSU and Safe Zone spaces. *Id.*; *Id.* at 410:5–14. These members lost access to these spaces, and thus suffered direct harm, when the UA closed the BSU and Safe Zone spaces for purportedly violating SB 129.

In addition, the interests of the NAACP Student Chapter are highly germane to the interests being litigated in this matter. The NAACP Student Chapter has the "same mission as [their] parent organization, to improve the . . . economic, political, social, and educational rights of all people, and [they] continue to advance the civil rights of African Americans today." *Id.* at 395:1–5. The instant lawsuit seeks to address, among other things, the closure of two different spaces used by Student Chapter members—the BSU space and Safe Zone—that had been central to the educational, professional, and social growth of Black and LGBTQIA+ students at UA. *See, e.g.*, *Am. All. For Equal Rights v. Fearless Fund Mgmt.*, LLC, 103 F.4th 765, 771 (11th Cir. 2024) (finding that Plaintiff in a case alleging racial and gender discrimination has satisfied the second *Hunt* factor because the organization "seeks racial equality for its members, an interest germane to its purpose"). And there is no need for the members to sue individually. The relief sought here is an injunction, not individual damages. *See id.* (finding Plaintiff satisfied the third *Hunt* factor because "neither the civil-rights claim it asserts nor the preliminary injunction it seeks necessitates individual proof or requires the individual members' participation").

Contrary to Defendants' arguments, the NAACP Student Chapter is an appropriate associational plaintiff. It is suing for harm to its own members who used the BSU and Safe Zone spaces. Although the BSU and Safe Zone organizations would be appropriate additional plaintiffs if they so elected, they are not the exclusive entities entitled to bring suit because they are not the only entities or individuals that incurred harm from the challenged actions. Neither the BSU space nor the Safe Zone space was limited to members of those organizations. Prelim. Inj. Hr'g Tr. 396:23–25, 410:2–4. Rather, they were open to all students, including members of the NAACP Student Chapter. *Id.* NAACP Student Chapter members used the BSU and Safe Zone spaces, were harmed, and have cognizable claims. Moreover, the law does not require, as Defendants

incorrectly suggest, that the NAACP Student Chapter members attended the BSU and Safe Zone spaces in some formal capacity as NAACP members. Associational standing permits organizations with interests germane to those being litigated to bring suit on behalf of their members who were harmed in their individual capacities.[9] Indeed, that is the very purpose of associational standing.

With regard to organizational standing, SB 129 has caused the NAACP Student Chapter multiple harms. In light of UA's actions in closing the BSU and Safe Zone spaces, the NAACP Student Chapter has a credible concern that it, too, will be deemed to be at odds with SB 129. *Id.* at 415:11–416:13. These concerns led the NAACP Student Chapter to move an event about SB 129 off campus. *Id.* at 417:2–18. In addition, the NAACP Student Chapter suffered organizational harm when UA closed the BSU space, and the NAACP Student Chapter lost a valuable source of recruitment of dues paying members and leaders. *Id.* at 397:8–399:6; *see also Fla. Democratic Party v. Hood*, 342 F.Supp.2d 1073, 1079 (N.D. Fla. 2004) ("[A]n organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes.") (citation omitted); *Construction Industry Ass'n of Sonoma County v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975), *cert. denied*, 424 U.S. 934 (1976) (holding that association of builders suffered injury in fact sufficient to confer standing where new construction rules resulted in lost dues paid by members).

---

[9] For example, in *Friends of the Earth v. Laidlaw Environmental*, the Supreme Court found associational standing when members of an environmental group were harmed by discharges to a river because they lived near the point of discharge or desired to engage in recreation in the area. 528 U.S. 167, 183 (2000). They were not engaging in these activities in some capacity as members of the environmental group but rather in their individual capacity. *Id.*

**B.**    ***UAB's Viewpoint Discriminatory Restrictions on Funding of Student Organizations and Use of University Space Violate the First Amendment.***

Plaintiffs Luna and Testman are substantially likely to succeed on their First Amendment funding claims.  It is a cardinal principle of the First Amendment that "the government may not regulate speech based on . . . the message it conveys." *Rosenberger,* at 828.  In *Rosenberger*, the Supreme Court held that when a public university elects to fund student organizations, it creates a limited public forum and may not engage in viewpoint discrimination in deciding how to distribute the funding.  515 U.S. at 829.  UAB's restrictions on funding to both RSOs and UFOs based on their perceived association with a divisive concept violates *Rosenberger*.

**i.**    ***UAB Enforced SB 129 To Prohibit Funding to Certain Organizations in Violation of Rosenberger.***

UAB interpreted SB 129 to prohibit use of State funding for student organization events deemed to promote a divisive concept or be associated with a DEI program.  This prohibition applied to both RSOs and UFOs.  For example, UAB's written guidance stated:  "UAB is unable to provide state funds to the registered student organization to be used for a specific 'DEI program' or event that promotes 'divisive concepts.'"  Wallace Dep. Pls.' Ex. 2 at 9.  UAB's Dr. Wallace explained that decisions about which RSOs would receive state funding were made based on whether the RSO was deemed to be associated with a divisive concept:

> Q. (BY MR. CANTOR:)  Right.  So there were some RSOs that would continue to receive state funds?
> A. There were some.
> Q. And there were other RSOs that would no longer receive state funds?
> A. Correct.
> Q. And whether or not an organization would continue to receive state funds, that was based on whether it was determined to be associated with one of SB129's divisive concepts?
> A. Based on the publicly available guidance about state funding, yes.

Wallace Dep. Tr. 76:13–77:3.

35

UAB likewise terminated SJAC's UFO status because it believed that SJAC was associated with one or more divisive concepts and thus at odds with SB 129:

> Q. So you are saying it is likely at this July meeting that you would have shared with the student leadership guidance from the University about SB129 in explaining to the students why they were no longer going to be a UFO, correct?
> A. Right. And we would have tied that to state funding versus any other kind of funding.
> Q. What do you mean by that?
> A. So university-funded organizations were state-funded organizations.
> Q. Okay. And so you had a concern that continuing to fund SJAC as a UFO, and use state funding for SJAC, that that would potentially violate SB129?
> MR. EZELLE: Object to the form.
> Q. (BY MR. CANTOR:) You can go ahead.
> A. That it would potentially violate, yes.
> Q. And why were you concerned that SJAC's mission or activities would potentially violate SB129?
> MR. EZELLE: Object to the form.
> A. Again, I can't point to a specific program, but there were elements of the mission of both SMDP and then associated with SJAC that could have programmatic elements that could potentially violate SB129.

Wallace Dep. Tr. 58:14–59:20.

Refusing to fund student organizations based on the viewpoints of those organizations violates the First Amendment. As the Supreme Court explained in *Rosenberger*, a public university is not required to provide funding to student organizations in the first instance. But once it elects to do so, it creates a limited public forum and may not discriminate based on viewpoint. *Rosenberger*, 515 U.S. at 833. Yet, UAB adopted a written policy that prohibited funding to certain student organizations with viewpoints disfavored by SB 129. Likewise, it stripped SJAC of its UFO status for the same reason.

UAB has now removed its discriminatory policy regarding student funding from its web site. This voluntary retraction of an illegal policy in the middle of litigation does not moot the issue. A case is not moot where a party voluntarily complies with the law after commencement of

litigation. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 190 (2000) (describing that unlawful conduct is "capable of repetition, yet evading review"). A voluntary act by a defendant to change course and no longer engage in a challenged practice "does not deprive a federal court of its power to determine the legality of that practice." *Id.* at 189 (citation omitted). A party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur." *Id.* (cleaned up).

Although voluntary changes by a government organization of a legislative nature are given some "solicitude," changes that are non-legislative, discretionary, and easily reversible do not receive a presumption of genuineness. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019). That is the case here. The change in policy occurred in the middle of litigation, was not legislative in nature, was entirely discretionary, and was not announced until the evidentiary hearing. Defendants continue to vigorously defend the constitutionality of SB 129. Taken together with the timing of the policy change, UAB has not put forth any evidence to satisfy its burden that voluntary cessation makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189.

Defendants offer no substantive defense of UAB's illegal policy regarding viewpoint-based prohibitions on State funding of student organizations. With regard to the demotion of SJAC and the associated loss of funding, Defendants attempt to distinguish *Rosenberger*, arguing that, as a UFO, SJAC's speech was actually the speech of the University and thus not subject to First Amendment protection. But this argument is refuted by the evidentiary record. For example, Sydney Testman testified that SJAC student members made their own decisions as to what programming they would put on and how they would allocate funds to other student organizations. Prelim. Inj. Hr'g Tr. 315:7–16. Dr. Wallace confirmed that this was the case. She could not

identify a single instance in which UAB made decisions regarding SJAC programming or what organizations would be funded by SJAC. Wallace Dep. Tr. 33:8–12, 35:17–36:20. Moreover, the fact that SJAC was funding the speech of other student organizations further confirms that its actions were not the speech of the University.

The record demonstrates that UAB created a limited public forum as per *Rosenberger* when UAB allowed some organizations to achieve UFO status. Pre-SB 129, organizations like SJAC, Black Male Excellence Network, Queer Peers, and Black Student Awareness Committee, along with others, were allowed UFO status. Post-SB 129, however, UAB engaged in prohibited viewpoint discrimination by terminating the UFO status of certain organizations such as SJAC, Queer Peers, and Black Student Awareness Committee because UAB determined them to be associated with divisive concepts. In other instances, UAB required certain UFOs that it deemed to violate SB 129 to change their mission and/or their name. *E.g.*, Wallace Dep. Tr. 59:16–20, 132:11–21, 53:6–54:4; Prelim. Inj. Hr'g Tr. 320:6–10; 320:24–321:11. But other UFOs whose viewpoints were not deemed to be associated with a disfavored viewpoint under SB 129 were left unaffected. UAB continues to fund UFOs today, and thus continues to facilitate a limited public forum from which SJAC and certain other organizations have been excluded based on their viewpoints. Prelim. Inj. Oral Arg. Tr. 152:2–18.

### C.    *UA's Closure of the BSU and Safe Zone Spaces Violated the First Amendment.*

It is undisputed that UA closed the BSU and Safe Zone spaces because it determined that they violated SB 129. Pls.' Ex. 47. In *Widmar*, the Supreme Court held that a public university may not discriminate in granting access to space on a university campus on the basis of content without demonstrating a compelling interest in doing so: "Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and

exclusions under applicable constitutional norms." *Windmar*, 454 U.S. at 267. Here, UA created a limited public forum by providing space to the BSU and Safe Zone, among other organizations. Indeed, the fact that it provided the space to these very organizations for years confirms that there is in fact no compelling interest in denying these organizations space. The reason that UA closed the spaces is because their use was deemed to be at odds with the viewpoints disfavored by SB 129. Pls.' Ex. 47. That is not a compelling interest. Rather, it is improper viewpoint discrimination.

Defendants' argument that BSU and Safe Zone had received some sort of extraordinary privilege by being allotted campus space, and therefore are not entitled to First Amendment protection, entirely misses the fundamental constitutional point. UA was not required to give any organization dedicated space. But once it elected to do so, it created a limited public forum and was prohibited from making decisions about which organizations get the space based on their presumed association with disfavored viewpoints. *See Widmar*, 454 U.S. at 277; *see also Rosenberger*, 515 U.S. at 828–29.

Defendants further contend that the NAACP Student Chapter did not suffer First Amendment harms because its members still have the ability to meet in other campus spaces. Once again, Defendants are wrong. The issue is not whether the NAACP Student Chapter can reserve a room on an *ad hoc* basis. The Constitution does not require a complete exile from campus in order to give rise to a freedom of association violation. *See Healy v. James*, 408 U.S. 169, 182–83 (1972) (extending the right of freedom of association to student group even where students could meet unofficially on campus, meet off campus, and advertise off campus). Rather, the constitutional problem is that UA created a limited public forum for dedicated space, and then terminated the BSU and Safe Zone spaces based on the presumed viewpoints of the organizations.

39

**D.**      **SB 129's Prohibitions on Student Funding and Student Space Allocation Are Unconstitutionally Vague.**

SB 129 is unconstitutionally vague with regard to its provisions concerning student funding because (i) a person of reasonable intelligence cannot determine what is and is not prohibited and (ii) it has been arbitrarily enforced.  The Supreme Court has held that vague laws implicating speech are particularly concerning.  *Ashton*, 384 U.S. at 200.

As an initial matter, the text of SB 129 is vague.  Section 2(1) of SB 129 provides that it is a violation of the statute to "[s]ponsor any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs." Ala. Code § 41-1-91(1).  Because the definition of a DEI program includes any program or event that "otherwise violates this act," SB 129 1(3), a program or event that promotes a divisive concept would also constitute a prohibited DEI program.  The Cambridge Dictionary defines "sponsor" to mean "(of a business or other organization) to pay for someone to do something or for something to      happen."      *Sponsor*,      Cambridge      Dictionary, https://dictionary.cambridge.org/us/dictionary/english/sponsor (last visited July 23, 2025).  Thus, one reading of SB 129 2(1) is that public universities are prohibited from providing funding for student organization events or programs that promote a disfavored divisive concept.  Indeed, this is how UAB (and UA)[10] interpreted SB 129 as reflected in their written guidance. Defs.' Ex. 14. This reading of SB 129 is reinforced by Section 4(1) of SB 129, which provides that nothing in the Act "[p]revents student, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, ***provided that***

---

[10] Like UAB, UA also published written guidance interpreting SB 129 to prohibit state funding of student organizations associated with a divisive concept or a DEI program.  And like UAB, UA recently removed this policy from its website.

***no state funds are used to sponsor these programs***.”  Ala. Code § 41-1-93(1) (emphasis added)

There would be no reason to carve out the use of State funding from the safe harbor unless the

initial prohibition in Section 2(1) regarding sponsorship prohibited the use of State funding and

the drafters did not intend to permit such funding in the safe harbor.

Not only did UAB interpret SB 129 to prohibit the use of State funding for student

organization programs and events associated with a divisive concept or DEI program, it also

interpreted the scope of this prohibition incredibly broadly.  Specifically, Dr. Wallace testified that

UAB applied the prohibition to any student organization deemed to a be “cultural, political, or

religious organization” a set of categories not found in SB 129’s definition of an impermissible

DEI program.  Wallace Dep. Tr. 99:23–100:8.  Thus, UAB did not provide state funding to the

Indian Cultural Association, as well as First Love (a Christian student group).  Prelim. Inj. Hr’g

Tr. 326:13–16.  It is not possible for a person of ordinary intelligence to look at the language of

SB 129 and extrapolate that the restriction on State funding applies to all “cultural, political or

religious” organizations or what it means to be such an organization.  Moreover, such an

interpretation is arbitrary in light of the actual text of SB 129 which never mentions those as

prohibited categories.  This is yet further evidence of the statute’s vagueness.

Although the above text of SB 129 suggests a prohibition on State funding of student events

or programs that promote a divisive concept, UAB has now removed its prohibition on State

funding from its web site, and counsel for UAB stated at the hearing that “[t]he University . . . [is]

no longer mak[ing] a distinction about state funding for use by [RSOs] . . . . Going forward under

this new guidance, all of the RSOs will be treated identical[sic], and so going back to the old

process . . . because we do not think that there is any prohibition in SB 129 or any of the federal

laws . . . in allowing a [RSO] to engage in DEI activities or to discuss divisive concepts.”  Prelim.

Inj. Hr'g Tr. 332:7–333:20.  This change of position demonstrates that even UAB does not know what is and is not prohibited by SB 129.  In addition, the Governor points to the last clause of Section 2(8) of SB 129 as permitting the funding of student organizations associated with a divisive concept.  Resp. in Opp'n  to Pl's Mot. for Prelim. Inj. by Def. Kay Ivey, at 14, ECF. No. 27.  But it is not at all clear how to read this section, nor how to reconcile it with Section 2(1) and Section 4(1).

The vagueness of SB 129 is further demonstrated by UA's arbitrary enforcement in closing the BSU and Safe Zone spaces.  To violate SB129, these spaces must either constitute a DEI program or be associated with a divisive concept.  The undisputed record evidence establishes, however, that both the BSU and Safe Zone spaces were open to all students and thus would not meet the definition of a DEI program.  Prelim. Inj. Hr'g Tr. 396:23–25, 410:2–4.  And it is inconceivable how either of the spaces could be shown to promote a divisive concept, and no one has remotely suggested this is the case.  Nonetheless, UA closed these spaces on the grounds that they violated SB 129, highlighting the arbitrary enforcement and UA's inability to interpret the statute.

## IV.    **Defendants' Remaining Arguments Are Irrelevant and Lack Merit.**

In defense of their actions, Defendants reference the Alabama university system's "institutional neutrality" policy, as well as certain 2025 federal Executive Orders and other administrative documents and the Supreme Court's decision regarding affirmative action in university admissions.  None have any bearing on the question of SB 129's constitutionality.

Regarding institutional neutrality, the University of Alabama System Board of Trustees adopted a policy after SB 129's passage that is inapplicable to the claims at issue.  Less than a month before SB 129 was set to go into effect and nearly six months after it was signed into law, the Board of Trustees Rule 304 "Institutional Neutrality and Political Activities of System

Personnel" ("Institutional Neutrality Policy[11]") went into effect.  Rule 304(2) guides the university to "remain neutral on political and social issues unless the issue directly affects any aspects of the System's core operations," to protect "First Amendment rights of free speech and free expression." Sections 304(3), (4), and (5) then discuss usage of campus resources for political activity, political activities, and procedure for personnel seeking political office.  Sections (3) and (5) discuss concepts such as procedures for "use of any System resources" with regards to a "political candidate, campaign or organization," and prohibit System personnel from running for public office if "such activities could or would result in a conflict of interest or interfere with the employee's carrying out his or her responsibilities."  Section (4) requires System personnel to make clear that "they are acting in a private and individual capacity" when engaging in any political activity, presumably regarding a political candidate, campaign, or organization as discussed in Sections (3) and (5).

The policy is directed toward regulating political campaigns and partisan issues.  The policy contains no explicit or implicit mention of in-class course instruction, allocation of state funding to student groups, or dedication of campus space.  Even if the policy were applicable to this case, the policy further affirms the constitutional First Amendment duty to avoid viewpoint discrimination and properly regulate speech in a content-neutral manner.  Indeed, 304(2) states "the Board may reasonably regulate the time, place and manner of expression in a viewpoint-neutral manner to ensure those rights are protected and that expression does not disrupt the ordinary activities of the System."  This language does not provide justification for the choices of

---

[11] Bd. of Trustees, Univ. of Ala. Sys., *Resolution Recognizing Commitment to Institutional Neutrality and Freedom of Speech and Expression & Bd. Rule 304:  Institutional Neutrality and Political Activities of System Personnel* (Sept. 5, 2024), https://www.uab.edu/reporter/in-the-know/board-codifies-institutional-neutrality.

the Board of Trustees in implementing SB 129 and the Institutional Neutrality Policy cannot be used as a shield for SB 129 enforcement.

Confirming that the "institutional neutrality" policy is not a defense to SB 129's illegal viewpoint discrimination, other southern public universities have adopted institutional neutrality policies and still provide support to minority students. For example, the University of Virginia has an institutional neutrality policy[12] and still maintains centers to support Black students[13], Latinx students[14], and LGBTQ students[15]. Additionally, Louisiana State University has adopted an institutional neutrality policy[16] and still provides funding for student groups associated with race,[17] including a Black Student Union.[18] In a similar fashion, the University of North Carolina system has adopted an institutional neutrality[19] policy and still provides state funding to Black[20] and

---

[12] John Owen et al., *Univ. Statement on Institutional Statements,* Institutional Statements Comm., Univ. of Va., (Aug. 12, 2024), https://www.virginia.edu/institutional-statements/.

[13] *Mission & Philosophy*, Off of Afr. Am. Affairs, Univ. of Va., https://oaaa.virginia.edu/ (last visited July 16, 2025).

[14] *Latinx Student Center*, Student Affairs, Univ. of Va., https://studentaffairs.virginia.edu/subsite/multicultural/centers/latinx-student-center (last visited July 16, 2025).

[15] *Queer/Trans Student of Color Resources*, Student Affairs, Univ. of Va., https://studentaffairs.virginia.edu/subsite/lgbtq/resources/qtbipoc (last visited July 16, 2025).

[16] *Resolution of the Board of Supervisors,* Bd. of Supervisors, La. State Univ. & Agric. & Mech. Coll. (Oct. 10, 2024), https://www.lsu.edu/bos/docs/agendas/2024/2024-10-10-agenda.pdf.

[17] *Fund Your Initiative*, La. State Univ., https://www.lsu.edu/sg/impact/funding.php? (last visited July 16, 2025).

[18] *Black Student Union*, Student Union at La. State Univ., https://lsubsuprteam.wixsite.com/bsuatlsu (last visited July 16, 2025); *Events*, , La. State Univ., LSU TigerLink, https://tigerlink.lsu.edu/events?group_ids=61258&show=past (last visited July 16, 2025).

[19] Act of July 14, 2023, Sess. L. 2023-102, S. 195, Gen. Assemb. of N.C., https://www.ncleg.gov/Sessions/2023/Bills/Senate/PDF/S195v4.pdf. (*An Act to Make Various Changes to the Laws Concerning the University of North Carolina*).

[20] *Rep Your Flag: Multicultural Festival*, Univ. of N. Carolina Student Org., Univ. of N.C. https://heellife.unc.edu/event/10698505 (last visited July 16, 2025).

Latinx[21] student groups.  The University of Alabama's position on denying state funding to groups associated with race, gender or sexual orientation is inconsistent with the implementation of institutional neutrality at public colleges and universities throughout the south.

Additionally, this Court should reject Defendant Governor Kay Ivey's suggestion that Alabama's "refusal to directly sponsor programs where attendance is based on an individual's race" is in adherence with the Supreme Court's ruling in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, 600 U.S. 181, 213, 230 (2023).  Resp. in Opp'n to Pls' Mot. for Prelim. Inj. By Def. Kay Ivey at 4-5, ECF No. 27.  The instant case is distinguishable from *SFFA* in several ways.  The holding of *SFFA* does not apply here.  The Supreme Court clearly stated that *SFFA* is applicable only to race-conscious admissions in higher education, not in curricular or extracurricular contexts such as the classroom and student groups.  *SFFA*, 600 U.S. 181, 213, 230.  This case does not implicate race conscious admission policies or any programs or activities that exclude individuals on the basis of race, ethnicity, sex, or national origin.  *Id.* at 221–225.  However, even if this Court adopts Defendant Governor's broad reading of *SFFA*, the policies and spaces at issue in this matter are still permissible.  Attendance in SJAC, Esperanza, BSU, and Safe Zone was not based on race or any other identity, and none of the groups or spaces conferred any benefits to individuals *exclusively* on the basis of race.  Prelim. Inj. Hr'g Tr. 314:18–21, 349:23–25, 396:23–25, 410:2–4.  The actions of legislators and University administrators pursuant to SB 129 were not an attempt to remove access to funding or student space because certain racial groups on campus were receiving a benefit exclusively based on their race.  Instead, the legislators

---

[21] *AMEXCAN at UNC*, Univ. of N.C., ,  https://heellife.unc.edu/organization/amexcan (last visited July 16, 2025); *AMEXCAN Soft Skills Panel,* , Univ. of N.C., https://heellife.unc.edu/event/11200329 (last visited July 16, 2025).

and University administrators took and continue to take actions that constitute viewpoint discrimination against certain views disfavored by the Alabama state legislature. Even though the state may perceive these viewpoints to be stereotypically related to certain racial demographics, none of the student groups whose funding was withheld or campus spaces dismantled under SB 129 *excluded* students on the basis of their race.

Further, the Executive Orders entitled "Ending Illegal Discrimination and Restoring Merit Based Opportunity[22]" and the Executive Order entitled "Reforming Accreditation to Strengthen Higher Education[23]" (both of which post-date Defendants actions in this case) are inapplicable. These Executive Orders restrict unlawful race-based and sex-based preferences that promote exclusion on the basis of race. *Nat'l Urban League v. Trump*, No. 25-CV-471-TJK, 2025 WL 1275613, at *20 n.9 (D.D.C. 2025) (distinguishing scope of executive order guidance to differentiate between "'policies that discriminate, exclude, or divide individuals based on race or sex' on the one hand, and 'observances' that 'celebrate diversity' and 'promote awareness without engaging in exclusion or discrimination' on the other."). University administrators and Plaintiffs Testman, Luna, and the Alabama NAACP have explained that all of the student groups denied funding pursuant to SB 129 and all of the spaces dismantled pursuant to SB 129 were open to all students regardless of race, ethnicity, and national origin or any other restrictions. Prelim. Inj. Hr'g Tr. 314:18–21, 349:23–25, 396:23–25, 410:2–4. There were no race-conscious organizations or spaces similar to preferential admissions regime in *SFFA*, nor did these groups and spaces discriminate, exclude, or divide students based on their race.

---

[22] Exec. Order No. 14,173, 90 Fed. Reg. 8,633 (Jan. 21, 2025).
[23] Exec. Order No. 14,279, 90 Fed. Reg. 17,529 (Apr. 23, 2025).

Finally, during the post-hearing meet and confer, counsel for the Trustees invoked the Department of Education's 2025 Dear Colleague Letter. The Dear Colleague Letter and associated Frequently Asked Questions document, however, are currently enjoined in three separate federal cases. *See Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *9 (D.N.H. Apr. 24, 2025) (preliminarily enjoining enforcement of the Dear Colleague Letter, FAQ Document, END DEI Portal, and Certification Requirement against plaintiffs, their members, and "any entity that employs, contracts with, or works with one or more plaintiffs or one or more of plaintiffs' members"); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 1191844, at *24 (D. Md. Apr. 24, 2025) (granting a universal stay of the Dear Colleague Letter as "likely procedurally and substantively defective," and rejecting request to limit relief to the named plaintiffs); Order at 2, *NAACP v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF) (D.D.C. Apr. 24, 2025), ECF No. 31 (enjoining enforcement of the Certification Requirement against "any entity or individual" due to unconstitutional vagueness).

To the extent Defendants are taking the position that their actions might be justified under some other law, this would not shield their actions taken pursuant to SB 129's unconstitutional provisions. The Supreme Court has recently made clear that standing is not defeated simply because a state actor claims it would "find another reason" to reach the same result. *See Gutierrez v. Saenz*, 145 S. Ct. 2258, 2268 (2025). As the Court explained, whether the government "might eventually find another reason […] to deny a prisoner's request for DNA testing does not vitiate his standing to argue that the cited reasons violated his rights under the Due Process Clause." *Id.* This principle applies equally here: the mere possibility of a separate legal justification does not deprive Plaintiffs of standing to challenge SB 129 as unconstitutional.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for preliminary injunction.


Dated:  July 23, 2025

Respectfully submitted,


*/s/ Alison Mollman*
Alison Mollman
ASB-8397-A33C
ACLU of Alabama
PO Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org

*/s/ Daniel A. Cantor*
Daniel A. Cantor*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW Washington, DC 20001-3743
(202) 942-5000


*/s/ Michael Rogoff*
 Michael A. Rogoff*
 Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7684

*/s/ Antonio L. Ingram II*
Antonio L. Ingram II*
Mide Odunsi*
Loreal Hawk*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300


*/s/ Carmen Lo*
Carmen Lo*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500 Palo Alto, CA 94306-3807
(650) 319-4500


*Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 23, 2025, the foregoing memorandum was filed electronically and will be sent electronically to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Alison Mollman*
Alison Mollman
ACLU of Alabama
