FILED

2025 Jul-23  PM 10:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA SIMON, SYDNEY TESTMAN, MIGUEL LUNA, DANA PATTON, RICHARD FORDING, and THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> v. <br><br> KAY IVEY, in her official capacity as Governor of Alabama and President Ex-Officio of the University of Alabama Board of Trustees; SCOTT PHELPS, in his official capacity as President Pro Tempore of the University of Alabama Board of Trustees; and MIKE BROCK, KAREN BROOKS, MYLA E. CALHOUN, RONALD GRAY, JEFF GRONBERG, O.B. GRAYSON HALL, JR., BARBARA HUMPHREY, W. DAVIS MALONE III, EVELYN VANSANT MAULDIN, HARRIS MORRISSETTE, J. STEVEN ROY, KENNETH SIMON, MARIETTA URQUHART, AND KENNETH VANDERVOORT, in their official capacities as members of the University of Alabama Board of Trustees, <br><br> *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 2:25-cv-00067-RDP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## GOVERNOR IVEY'S POSTHEARING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.     Plaintiffs Largely Failed To Demonstrate Any Harm From The Act And Failed
       Entirely To Show A Likelihood Of Imminent Irreparable Harm. ............................... 3

       A.     The Professor Plaintiffs Fear Meritless Student Complaints, Not
              Unlawful Enforcement of the Act..................................................................... 4

       B.     Plaintiff Luna Did Not Show That the Act Is Causing His Professors To
              Self-Censor. ..................................................................................................... 12

       C.     Plaintiff Testman Showed Injury But Not A Likelihood of Irreparable
              Harm. ............................................................................................................... 13

       D.     The NAACP Cannot Invoke Third-Party Standing Once Removed to
              Challenge Harms to Other Groups................................................................... 13

II.    Plaintiffs Failed To Make a "Clear Showing" That Governor Ivey Is a Proper
       Party in Her Official Capacity as Governor............................................................... 15

III.   Plaintiffs Did Not Establish A Likelihood Of Success On The Merits. .................... 17

       A.     Public University Professors Are State Employees Subject to the State's
              Regulation of Its Own Speech in the Classroom. ............................................ 17

       B.     Plaintiffs Failed to Establish a Likelihood of Success On Their Other
              Claims. ............................................................................................................. 28

IV.    The Other Preliminary Injunction Factors Weigh Against Plaintiffs. ....................... 29

CONCLUSION...................................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Pastides*,
   900 F.3d 160 (4th Cir. 2018) ................................................................... 11

*Arnett v. Kennedy*,
   416 U.S. 134 (1974)................................................................................... 29

*Bishop v. Aronov*,
   926 F.2d 1066 (11th Cir. 1991) ................................ 16, 20, 21, 22, 23, 27

*Boring v. Buncombe Cnty. Bd. of Educ.*,
   136 F.3d 364 (4th Cir. 1998) (en banc) ................................................... 27

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
   451 F.3d 1257 (11th Cir. 2006) ................................................................. 3

*Cate v. Oldham*,
   707 F.2d 1176 (11th Cir. 1983) ............................................................... 13

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   596 U.S. 61 (2022).................................................................................... 24

*Connick v. Myers*,
   461 U.S. 138 (1983)................................................................... 18, 20, 27

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)............................................................................... 3, 31

*Friends of the Earth v. Laidlaw*,
   528 U.S. 167 (2000) ................................................................................. 14

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)................................................... 17, 19, 20, 21, 23, 27

*Garrett v. Matthews*,
   615 F.2d 658 (5th Cir. 1980) ................................................................... 29

*Henry v. Att'y Gen. of Ala.*,
   45 F.4th 1272 (11th Cir. 2022) ................................................................ 28

*HM Fla.-ORL, LLC v. Governor of Fla.*,
   137 F.4th 1207 (11th Cir. 2025) ................................................................ 6

*Hunt v. Washington State Apple Advertising Comm'n*,
   43 U.S. 333 (1977).................................................................................... 14

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967)........................................................................................ 23, 30

*Laird v. Tatum,*
    408 U.S. 1 (1972).................................................................................................. 7

*Lewis v. Bentley,*
    No. 2:16-CV-690-RDP, 2017 WL 432464 (N.D. Ala. Feb. 1, 2017)................................ 15, 16

*Lewis v. Governor of Ala.,*
    944 F.3d 1287 (11th Cir. 2019) (en banc) ........................................................... 15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)............................................................................................ 3

*Murthy v. Missouri,*
    603 U.S. 43 (2024).............................................................................................. 3

*Pickering v. Board of Ed. of Township High School Dist. 205,*
    391 U.S. 563 (1968)................................................................... 18, 20, 21, 22, 24, 27

*Plessy v. Ferguson,*
    163 U.S. 537 (1896)............................................................................................ 1

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995)...................................................................................... 22, 28

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) (en banc) ........................................................... 2

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ................................................................... 7, 11, 22

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023)............................................................................................ 1

*Suntrust Bank v. Houghton Mifflin Co.,*
    252 F.3d 1165 (11th Cir. 2001) .......................................................................... 29

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)...................................................................................... 7, 11

*Swain v. Junior,*
    958 F.3d 1081 (11th Cir. 2020) .......................................................................... 30

*Trump v. CASA,*
    145 S. Ct. 2540 (2025)........................................................................................ 1

*United States v. Lambert*,
   695 F.2d 536 (11th Cir. 1983) .................................................................................. 2, 4

*Urofsky v. Gilmore*,
   216 F.3d 401 (4th Cir. 2000) (en banc) .................................................... 24, 25, 27

*Vidal v. Elster*,
   602 U.S. 286 (2024) .............................................................................................. 24

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................... 3

*Wood v. Florida Department of Education*,
   -- F.4th --, No. 24-11239, 2025 WL 1819099 (11th Cir. July 2, 2025) ....... 2, 17, 19, 21, 22, 27

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ......................................................................... 4, 29

**Other Authorities**

67 C.J.S. *Officers* § 17 (Dec. 2024 Update) ................................................................ 16

*Ex Officio*, Black's Law Dictionary (12th ed. 2024) ................................................... 16

J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"*
   99 Yale L.J. 251 (1989) ........................................................................................ 25

Richard Hofstadter & Walter P. Metzger,
   *The Development of Academic Freedom in the United States* (1955) ..................... 25

*Safe Harbor*, Black's Law Dictionary (12th ed. 2024) ............................................. 29

W. Stuart Stuller, *High School Academic Freedom: The Evolution of a Fish Out of Water*,
   77 Neb. L. Rev. 301 (1998) ................................................................................... 25

**Rules**

Fed. R. Civ. P. 65(c) ..................................................................................................... 30

**Constitutional Provisions**

Ala. Const. Art. V, § 130 (2022) ................................................................................. 16

Ala. Const. Art. XIV, § 264 (2022) ............................................................................ 15

## INTRODUCTION

Alabama Act 2024-34 prohibits public university professors from compelling students to assent to certain "divisive concepts." One concept is "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." Act § 1(2)a. Another is "[t]hat individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin." *Id.* § 1(2)b. The remaining concepts are similarly abhorrent. As lead plaintiff Professor Simon recognized, "[t]here's nothing" actually "divisive about those concepts" because "no credible educator I could imagine would do those things." Tr. 160.

That has been Governor Ivey's position from the beginning. *Of course* public university professors should not force their students to parrot teachings of race supremacy. *Obviously* Alabama can prohibit its professors from doing so. For too much of its history, Alabama ignored the truth that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). That same Constitution does not require the State to pay professors to teach Alabama's youth to repeat the same mistake.

Yet here we are. The Plaintiff Professors all disclaim any intent to violate the Act, yet they still demand a preliminary injunction prohibiting enforcement of any part of the Act against anyone. *But see Trump v. CASA*, 145 S. Ct. 2540, 2548 (2025) (holding that "universal injunctions likely exceed the equitable authority that Congress has granted to federal courts" (cleaned up)). Their fear is that a student might misinterpret both their teaching and the Act and file a complaint that the university might investigate—as it does with any complaint—before clearing the professor of wrongdoing. And their argument is that professors are the real sovereign, endowed with certain unalienable rights that no other American has, that among them is the right to be paid by the public

to say whatever they want to in class so long as they incant that it is their professional judgment to say it.

This is all wrong, for all the reasons the Governor has said before and need not repeat. *See* Docs. 27 (PI Opp.), 32-1 (Mem. in Support of Mot. to Dismiss), 49 (Reply in Support of Mot. to Dismiss). This post-hearing brief will instead focus on (1) the effect of the evidence presented at the evidentiary hearing and (2) the effect of the Eleventh Circuit's intervening decision in *Wood v. Florida Department of Education*, -- F.4th --, No. 24-11239, 2025 WL 1819099 (11th Cir. July 2, 2025). The upshot remains the same: The Court should deny Plaintiffs' motion for a preliminary injunction and dismiss all of Plaintiffs' claims against Governor Ivey in her official capacity as Governor.

## ARGUMENT

Because it is Plaintiffs who seek the "extraordinary and drastic remedy" of a preliminary injunction," it is they who "must clearly carry the burden of persuasion" for each prerequisite to relief. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (quotation omitted). Plaintiffs must show that (1) they have "a substantial likelihood of success on the merits," (2) they will suffer "irreparable injury" unless the injunction issues, (3) the threatened injury to them "outweighs whatever damage the proposed injunction may cause the opposing party," and (4) "if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

Plaintiffs falter at each step. The evidence they presented at the hearing only undermines their claims of injury, torpedoing both their likelihood of establishing standing and their ability to show an imminent threat of irreparable harm. Their merits arguments likewise took a dive, with the Eleventh Circuit's decision in *Wood* offering yet additional authority for the unremarkable proposition that state universities can indeed control what their employees teach in class. Evidence

from the Board Defendants also confirmed that the universities appear to be implementing the Act in a constitutional way by treating all student organizations equally, without regard to viewpoint—just as the Act requires.

Then there are the equities, which Plaintiffs left largely unaddressed at the hearing. Given that all the Professor Plaintiffs expressly disclaimed any intent to do what the Act prohibits—and that, as Dr. Simon put it, "no credible educator I could imagine would do those things," Tr. 160—it is hard to see how Plaintiffs could possibly meet their burden of showing that an injunction would align with the public interest. Just the opposite is true: The public's elected representatives enacted the law to prohibit racialized indoctrination by public employees and ensure that the State's universities treat all students equally, no matter their ethnicity or skin color. The Constitution demands no less. The Court should deny the injunction.

## I.    Plaintiffs Largely Failed To Demonstrate Any Harm From The Act And Failed Entirely To Show A Likelihood Of Imminent Irreparable Harm.

"At the preliminary injunction stage," a "plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). The standing elements are well known: (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Because "[s]tanding is not dispensed in gross," Plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). They must do that for each and every provision of the Act they challenge, whether facially or as applied. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006).

In addition to showing a likelihood of standing, Plaintiffs must also show that they will suffer "imminent irreparable harm" unless they obtain emergency injunctive relief. *Wreal, LLC v.*

*Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). That is because "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* Showing a likelihood of success on the merits—including a likelihood of standing—does "not obviate the necessity to show irreparable harm." *Lambert*, 695 F.2d at 540.

The evidence Plaintiffs presented at the hearing falls short of showing either a likelihood of standing or an imminent irreparable harm. Most of the Plaintiffs could not show that they were injured by *any* provision of the Act, and *no* Plaintiff could establish a threat of imminent irreparable harm or that her purported injury flows from, or could be redressed by, Governor Ivey in her official capacity as Governor.

### A.    The Professor Plaintiffs Fear Meritless Student Complaints, Not Unlawful Enforcement of the Act.

The evidentiary hearing was helpful in understanding the Professor Plaintiffs' fears regarding the Act's enforcement and thus their claims of Article III injury and irreparable harm. Before the hearing, it was not entirely clear whether Plaintiffs intended to violate the Act or if their teaching put them in danger of punishment. Now Plaintiffs have answered those questions directly: No.

**1.** Professor Patton was clear both at the hearing and in her letter to UA: "I have never, in this class, or in any class I've taught in over 20 years, directed or compelled students to affirm, adopt, adhere to, or assent to a divisive concept." Tr. 39-40 (quoting Plaintiffs' Ex. 27). When asked by the Court to explain how she might teach about meritocracy and work ethic (the subject of divisive concept h), Professor Patton agreed that she does not "require students to assent to [her] view on that particular issue"—or, she added, "on any issue." Tr. 89. She explained that she simply expected students "to support their answer"—whatever it is—"with evidence, with fact, with citations." *Id.*

Professor Simon was likewise direct. Asked whether she "direct[s] or compel[s] [her] students to affirm, adopt, or adhere to the concept of any race, color, religion, sex, ethnicity, or national origin as inherently superior or inferior," her answer was simple: "No." Tr. 154. Provided a copy of the Act, told to examine the list of divisive concepts, and asked whether she "compel[s] or direct[s] [her] student to affirm, adopt, or adhere to any of them," she responded: "No." Tr. 160-61.

Professor Fording was more evasive, but even he made clear that he did not advocate for any of the Act's divisive concepts: "I do not explicitly, in my opinion, through my words and my lectures, compel a student to affirm, adopt, or adhere to a divisive concept." Tr. 265. He testified that "of the[] eight" listed concepts, "a reasonable person would maybe view" just one of the concepts "as endorsed in [his] course material, and that's the material on implicit prejudice." Tr. 208. He clarified, however, that his teaching of implicit prejudice did *not* endorse any of the divisive concepts; he just worried that someone might *mistakenly* think that it does:

> THE COURT:       [W]hat would it mean to endorse any of these divisive concepts in your mind? Because that's what we're focused on more than just the generalized issue of whether there's research that supports a point of view. But can you think of any circumstance where you would endorse any of the divisive concepts listed in Section 2?
>
> THE WITNESS:     Probably -- well, I think "d." If "d" is the one that implicates implicit prejudice, I think I'd probably get pretty close to endorsing that one.
>
> THE COURT:       And by that do you mean an individual's race, you would endorse that an individual's race -- by virtue of an individual's race, they are inherently racist?
>
> THE WITNESS:     Not in that kind of literal interpretation, but --
>
> THE COURT:       I'm just talking about the statement that by virtue of an individual's race, the individual is inherently racist.
>
> THE WITNESS:     So, no, I would never say that or endorse that specifically.

5

| THE COURT: | Or advocate that? |
|---|---|
| THE WITNESS: | But I feel that the theory of implicit prejudice can be interpreted as supporting that statement. |
| THE COURT: | That's your concern is if I teach what the social science suggests about implicit bias, I'm afraid someone may interpret that as me saying that an individual's race makes them inherently biased in one of these protected classifications? |
| THE WITNESS: | That's right, because implicit prejudice, according to the theory and the research, is close to being inherent. It exists at a subconscious level….. |

Tr. 307-08.

Professor Fording elaborated on this last point, explaining that implicit prejudice, as he taught it, was *not* inherent because it "comes from our socialization experience" and "different levels of exposure" to ideas that could lead to certain implicit prejudices. Tr. 309. He then agreed with the Court's summation: "But it's not inherent in the sense that it's based on race. It's inherent based upon what your social upbringing experience has been, and experience conditions both conscious and subconscious responses." *Id.*[1]

**2.** So the Professor Plaintiffs do not actually intend to violate the Act. Again, as Professor Simon put it: "Nobody should be doing that and no credible educator I could imagine would do those things." Tr. 160.

That does not end the inquiry. To establish injury in the First Amendment context, "a plaintiff need not show that its self-censored speech would definitely run afoul of a challenged law, but only that its speech is 'arguably proscribed.'" *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1216 (11th Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162

---

[1] Professor Patton, who also teaches about implicit bias in her classes, gave a similar response. *See, e.g.*, Tr. 120 (Professor Patton explaining that she instructs students that the existence of implicit bias "does not mean you are sexist" and "does not mean that you are racist").

(2014)). "In other words, self-censorship establishes standing when the operation or enforcement of the government policy would cause a reasonable would-be speaker to 'self-censor.'" *Id.* (cleaned up and citation omitted). While "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *Laird v. Tatum*, 408 U.S. 1, 14 (1972), a policy that "objectively chills' protected expression" can establish injury, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

The question here is whether the Professor Plaintiffs, having disclaimed any intent of actually violating the Act, nonetheless have an objectively reasonable fear of enforcement that would make a reasonable professor self-censor. Plaintiffs seem to offer two reasons for their self-censorship, but neither provides a reasonable basis for their actions.

**a.** The first potential basis Plaintiffs offer for their self-censorship is that they just have no idea what the Act means, making self-censorship the only way they can be sure they will not be punished for crossing a line they do not know exists. Thus, often right after testifying about how they do *not* violate the Act, the Professor Plaintiffs, prompted by counsel, dutifully asserted that they do not, in fact, know what the Act requires. *Compare, e.g.*, Tr. 160 (Professor Simon: "There's nothing divisive about those concepts listed in the [Act] – there's nothing divisive about them. Nobody should be doing that and no credible educator I could imagine would do those things."), *with* Tr. 161 (Professor Simon: "I just don't understand [the Act]. It's just vague and confusing."); *see* Tr. 77 (Professor Patton: "It's vague. It's not at all clear on what that means to me.").

This testimony was not credible. At their most candid, the Professor Plaintiffs were honest that they understood very well what the Act prohibits and what it does not. Professor Patton provides a good example. Following a complaint about her teaching (more on that next), Professor

Patton stopped posting her PowerPoint slides for students to access. She explained why—and it

was not because she was concerned that she could not understand the Act's prohibitions:

> [Professor Patton]:  So, for as long as I can remember, I have used PowerPoint, but my PowerPoint slides are really only typically a few words. So it's kind of like memory jogs for me and outlines for the students to help them with note-taking.…
>
> And then what I've always done for the longest time is post those on Blackboard. So Blackboard is our learning system where students submit things. But on October 21st, after, you know, I had been through that terrible week, I just thought, I have on my PowerPoint slides things like structural racism and its connection to health outcomes. I have things on my PowerPoint slides about infant mortality rates, African-American women, education levels, so just these kind of words to help me remember what I want to lecture about.
>
> *And I just thought, I have had, kind of, not great attendance, frankly, at that class in the fall, and I thought I am concerned, are students who aren't in class to hear the lecture, to get the context, are they going to look at that PowerPoint slide and think that I'm doing something wrong in class in violation of this law?*
>
> And, in fact, one of the class periods I was lecturing about this, I was talking about health disparities, I was talking about infant mortality rates of African-American women, I was talking about racial discrimination, and I was talking about things like structural racism. And I had a student interrupt me in midsentence and ask me, Dr. Patton, are you even allowed to talk about this stuff? Don't we have a new law, SB129, that says you can't talk about divisive stuff anymore? And I said, like, No, I can absolutely teach about these topics. But what that really did is it drove home the idea to me that these students don't understand this law.

Tr. 69-71 (emphasis added).

Notably, Professor Patton had no doubt about what the Act required, telling her student:

"No, I can absolutely teach about these topics." Yet Professor Patton used this episode to show

why she self-censors anyway: because a *student* might misinterpret both the Act and Professor

Patton's teaching and file a frivolous complaint. That fear has nothing to do with the Professors'

*own* understanding of the Act and everything to do with their *students'* misunderstanding. But subjective confusion by third parties cannot transfer to the Professors to make their self-censorship objectively reasonable.

**b.** Plaintiffs' real basis for their self-censorship is not their own understanding of the Act but their fear of frivolous student complaints. All the Professors said so.

Continue with Professor Patton, who was Plaintiffs' "Exhibit A" in this regard. She testified that in October 2024, shortly after the Act took effect, she was notified that UA had received a complaint about potential violations of the Act in one of her classes. Tr. 28-31. She agreed that the complaint warranted an investigation by the university. Tr. 97 ("I absolutely agree that if the complaint is lodged, the University has an obligation to investigate it.").

After receiving the complaint, Professor Patton met with UA administrators to answer questions, and they asked her to respond in writing to some of the specific concerns raised in the complaint. Tr. 40-41. Professor Patton refused, telling her supervisors: "I'm not submitting it." Tr. 49. She would "not write a document with [her] name on it." Tr. 51. The associate provost responded:

> I wish you would have reached out to me earlier in the week to discuss your continued concerns. We respond to every legitimate inquiry that we receive … thoroughly, and your input allows us to do that effectively. Your input allows the University to respond by centering the faculty member as the expert [on] pedagogy in the specific discipline.

Tr. 100. It is undisputed that UA never forced Professor Patton to respond in writing or disciplined her for her refusal to do so. Tr. 103.

UA then completed its investigation and notified Professor Patton that no disciplinary action would be taken against her. Tr. 64. The assistant provost defended Professor Patton's teaching in a memo and found that she did not violate any of the Act's provisions. Tr. 104-111. It is

undisputed that no UA administrator ever criticized how Professor Patton taught her class, instructed her to change any of her course materials, or disciplined her in any way. Tr. 111-119.

Still, Professor Patton became skittish. She testified that she changed how she taught and began self-censoring "to avoid having more complaints." Tr. 69. That became the theme of her testimony:

- "I am really concerned that [students] will perceive what I am teaching to be in violation of the law and make a complaint. So for me, I just – it's easier to not teach it than risk the complaint." Tr. 72.

- "I have a fear, based on what happened to me, that there could be a complaint again. And so, yes, I am changing my courses for that reason." Tr. 113.

- "I feel like I teach in a historically accurate context … but that has not prevented a complaint being brought against me." Tr. 78.

- "[I]f a student does not grasp what I am telling them about what the Harvard [Implicit Association Test] does and doesn't do, I am afraid that they will complain that Dr. Patton has made them take a test that says they are racist or sexist. And then that's a complaint and then I'm right back to where I was in the fall with all of this." Tr. 120.

The other Professor Plaintiffs offered their own variations on the theme. Professor Simon worried that if she "present[ed] something that may be uncomfortable and new for the students, there is a concern that they may somehow misconstrue it," think that the discussion violated the Act, and file a complaint. Tr. 162. Professor Fording worried that "students might be sensitive" or "misinterpret" his teaching, concluding: "I fear just getting into discussions about race and racial discrimination, historical or contemporary, you know, potentially subjects me to a complaint." Tr. 250.

The problem for Plaintiffs is that such fears do not present an objectively reasonable basis for a tenured professor to self-censor. To be sure, a student complaint will likely lead to some sort of investigation by the university, just as Professor Patton said it should. And while some investigations are so onerous or present such a power differential that the investigation itself can

constitute injury, Plaintiffs have presented no evidence that such is the case here. *Accord Susan B. Anthony List*, 573 U.S. at 165 (noting that the burdens of an investigation into alleged "false speech" during an election were "of particular concern" because of the impact the investigation itself would have on the election and electoral speech); *Speech First*, 32 F.4th at 1124 (reasoning that an "average college-aged student would be intimated—and thereby chilled from exercising her free-speech rights—by subjection to [a] bias-related-incidents policy").

The Fourth Circuit's decision in *Abbott v. Pastides* is instructive in this regard. *See* 900 F.3d 160 (4th Cir. 2018). In that case, two student groups at the University of South Carolina hosted a controversial "Free Speech Event" on campus, generating complaints from other students. *Id.* at 163. A university official met with one of the group's student leaders "to review the complaints" and, a few weeks later, notified the students that the matter had been resolved and no action would be taken. *Id.* The students sued, asserting that the university's investigation violated their First Amendment rights and chilled their future speech. *Id.*

The Fourth Circuit rejected the claims, holding, as relevant here, that "a threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative process itself imposes some significant burden, independent of any ultimate sanction." *Id.* at 179. The court explained that "[e]ven an objectively reasonable 'threat' that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of 'enforcement' or as the kind of 'extraordinarily intrusive' process that might make self-censorship an objectively reasonable response." *Id.* The court concluded: "[B]ecause the plaintiffs can point to no reason to think they will be subjected to some different and more onerous process not yet experienced or threatened, their

claim to injury by way of threatened 'process' is purely speculative and thus insufficient to estab-lish standing." *Id.*

That is just the kind of "harm" the Professor Plaintiffs allege here. The evidence presented at the hearing shows that UA responded appropriately in Professor Patton's case by investigating the complaint, meeting with Professor Patton, determining that she had not violated the Act, and letting her go on her way (even though she had directly refused her employer's direction to respond in writing). No reasonable adult faculty member would draw from this episode a need to self-censor.

### B.     Plaintiff Luna Did Not Show That the Act Is Causing His Professors To Self-Censor.

Turning to Plaintiffs' "right to receive information" claim, the testimony by Plaintiff Mi-guel Luna simply confirmed Governor Ivey's concern that Luna lacks standing to bring such a claim. *See* Doc. 27 at 19-22. As he did in his papers, Luna relied on a statement in a syllabus *assuring students* that they "are strongly encouraged to think independently and analytically" and will not be "required to assent or agree with any concept considered divisive under Alabama law" as evidence, somehow, that his professors are self-censoring. Tr. 377-78. He pointed to the sylla-bus's statement on objectivity—that "[t]his class may present difficult, objectionable, or contro-versial topics for consideration, but will do so through an objective, scholarly lens designed to encourage critical thinking"—as particularly alarming. Tr. 390. Based on the statement, he worried that "someone may view a professor's professional opinion or expertise as trying to require stu-dents to assent or agree to any concept if it's closely related to the course materials presented in the class." Tr. 390-91.

Luna's purported harm is thus based even more on conjecture than the Professor Plaintiffs'. Without any evidence at all, he worries that other students "may" misinterpret the Act and

classroom events and that such a misinterpretation could cause his professor to self-censor in some undefined way. Such naked speculation cannot establish a "likelihood" of injury-in-fact, much less imminent irreparable harm.

### C.    Plaintiff Testman Showed Injury But Not A Likelihood of Irreparable Harm.

Alone among Plaintiffs, Sydney Testman testified that she suffered a concrete injury when she lost a $600 stipend when UAB made SJAC an RSO. Tr. 315, 320. That likely suffices to establish injury-in-fact for standing purposes. But given that her injury is monetary, it is necessarily not irreparable, and thus cannot warrant the extraordinary remedy of a preliminary injunction (even if she could show a likelihood of success on the merits). *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

### D.    The NAACP Cannot Invoke Third-Party Standing Once Removed to Challenge Harms to Other Groups.

Though Plaintiffs nominally attempt to argue that the NAACP has organizational standing because the Act purportedly "threatens" its "ability to receive University funding and use University space," Doc. 31 at 15, its representative, Ja'Kobe Bibbs, confirmed at the hearing that this theory was not viable: UA NAACP has not applied for funding from UA and has never been denied access to a room. Tr. 427. As a result, it cannot show any injury to itself.

The NAACP's stronger argument is associational standing, but it still fails. Associational standing is a form of third-party standing, which is typically not recognized and thus must be narrowly construed when it is. The Supreme Court has explained that to establish associational standing an organization must show that (1) its "members would otherwise have standing to sue in their own right," (2) the interests the organization "seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the

13

participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 43 U.S. 333, 343 (1977).

The NAACP attempts to use associational standing to challenge the closure of (1) the Black Student Union's dedicated office space in the university center and (2) the Safe Zone Resource Center Space in the university center. According to Bibbs, he and other NAACP members regularly used the Black Student Union's dedicated space in the university center, which they cannot do anymore since the space closed. Tr. 395-97. Bibbs explained that the Black Student Union still exists as a student organization, just without the dedicated space it once had. Tr. 419. Bibbs also testified that he knew of one student member of the NAACP who "attended" or "used" the Safe Zone space. Tr. 410.

Plaintiffs have not demonstrated a likelihood that associational standing doctrine allows the NAACP to defend the rights of other organizations based on overlapping membership or participation. Typically, as Plaintiffs' counsel explained, the doctrine is invoked when an environmental organization sues to protect a member's interest in the local environment against some kind of direct harm. *See* 7/2 Tr. 90-91 (discussing *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000)). That makes sense (the theory goes) because the environment cannot sue on its own behalf, and the group's interests are directly aligned with its member's interest in keeping his local river from becoming polluted.

Here, by contrast, Plaintiffs attempt to invoke the doctrine to allow one student organization to defend another student organization based on shared membership or student participation. Because some its members were also affiliated with the Black Student Union, they argue, those students' interest in that organization passes through to the NAACP, allowing it to represent the

14

interests of the Black Student Union (and, presumably, any other organization its members interact with).

This is not traditional associational standing. The Debate Club cannot represent the interests of the College Democrats just because their membership rosters overlap—even if it was at meetings of the College Democrats that students "fostere[d] connections and relationships" and "cultivated the idea to really engage" with the university's Debate Club. Tr. 397. Likewise, the NAACP cannot represent the interests of the Black Student Union and Safe Zone, even if some of its members happen to be involved in both (or all three) organizations. Plaintiffs' contrary view would stretch associational standing well beyond the limited form of third-party standing recognized by the Supreme Court. It would constitute a novel form of third-party standing once removed.

## II.    Plaintiffs Failed To Make a "Clear Showing" That Governor Ivey Is a Proper Party in Her Official Capacity as Governor.

Governor Ivey has already explained, at length, why she is an improper party in her official capacity as Governor. *See* Doc. 27 at 26-28; Doc. 32-1 at 24-26; Doc. 49 at 5-7. The short version is that Governor Ivey does not enforce the Act in her capacity as Governor and thus has neither caused any of Plaintiffs' purported injuries nor could she remedy them. This should not be controversial. *See, e.g.*, *Lewis v. Bentley*, No. 2:16-CV-690-RDP, 2017 WL 432464, at *5 (N.D. Ala. Feb. 1, 2017) ("Where a defendant occupies a position having no duty at all with regard to an Act, he cannot be properly made a party to a claim challenging the Act."), *aff'd on reh'g en banc sub nom.*, *Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) (en banc).

True, unlike the Attorney General in *Lewis*, the Governor wears two distinct hats: one as Governor and one as president *ex officio* of the UA Board of Trustees. *See* Ala. Const. Art. XIV, § 264 (2022). But Alabama law makes clear that those two hats are separate "offices" under the

Constitution. *See* Ala. Const. Art. V, § 130 (2022). Thus, while Governor Ivey may be a proper defendant in her role as president *ex officio* of the Board of Trustees, as *Governor*, she "occupies a position having no duty at all with regard to [the] Act." *Lewis*, 2017 WL 432464, at *5. That is presumably why the plaintiff in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), sued Governor Guy Hunt only in his "official capacit[y] as member[] of the Board of Trustees of the University of Alabama."

Plaintiffs here instead proceed under the theory that the Governor's position as Governor and her position as president *ex officio* of the Board of Trustees cannot be "untangled from each other." 7/2 Tr. 193. As Plaintiffs' counsel put it, Governor Ivey is on the board only "because of her capacity as the Governor," and "[i]f she was no longer the Governor, she would automatically lose that board position." *Id.* That much is undisputed—it is literally what "ex officio" means. *See Ex Officio*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("By virtue or because of an office."). But Plaintiffs' tautology says nothing about whether the general rule regarding such offices—that "where a public officer is declared by law by virtue of the office to be also, ex officio, the incumbent of another public office, the two offices are distinct and separate," 67 C.J.S. *Officers* § 17 (Dec. 2024 Update)—applies here. Indeed, Plaintiffs don't even acknowledge the rule. But the answer is straightforward: The rule applies. The Alabama Constitution recognizes that the Governor may hold "other office[s]" as "provided in this Constitution." Ala. Const. Art. V, § 130 (2022). What "other office[s]" are "provided in this Constitution"? Those that the Governor holds *ex officio*—"because of her capacity as the Governor," as Plaintiffs might say. That being so, Governor Ivey is not a proper party to this litigation in her capacity as Governor, and all claims against her in that capacity must be dismissed.

### III.    Plaintiffs Did Not Establish A Likelihood Of Success On The Merits.

#### A.    Public University Professors Are State Employees Subject to the State's Regulation of Its Own Speech in the Classroom.

Of Plaintiffs' claims for relief, this brief has the most to say about the Professor Plaintiffs' First Amendment claims because those claims have been most affected by the evidence presented at the hearing and the Eleventh Circuit's intervening decision in *Wood*. In that case, the Eleventh Circuit held that Florida can regulate a public high school teacher's in-class speech because Florida hired the teacher precisely to provide that speech—*i.e.*, to teach students. 2025 WL 1819099, at *3-4. When a teacher speaks in class "pursuant to her official duties," the Court held, she "speaks as a government employee, not a citizen." *Id.* at *4. As a result, her speech is considered government speech, not private speech, and the government may regulate its own speech even when it usually may not regulate the speech of others. *Id.*

There are two potential distinctions between this case and *Wood*. First, the Professor Plaintiffs here teach undergraduate students, typically aged 18-22, while the teacher in *Wood* taught high school, "generally 14 to 18 years old." *Id.* at *13 (Jordan, J., dissenting). Second, Plaintiffs here are tenured professors at a public university while the teacher in *Wood* taught at a public high school. Neither distinction makes a difference.

**1.** *Wood* took its marching orders from the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), so start there. *See* 2025 WL 1819099, at *2. In *Garcetti*, the Court considered the claim of a deputy district attorney who alleged that he was disciplined for writing a disposition memorandum disagreeing with a deputy sheriff's assertion of probable cause in a warrant affidavit. 547 U.S. at 413-15. He argued that the retaliation was unconstitutional because the memo he wrote was protected speech under the First Amendment. *Id.* at 415.

The Supreme Court began by reviewing settled law, beginning with its decisions in *Pickering v. Board of Ed. of Township High School Dist. 205*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). In *Pickering*, the Court explained, "the relevant speech was a teacher's letter to a local newspaper addressing issues including the funding policies of his school." 547 U.S. at 417. The Court identified "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech." *Id.* at 418. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* (citing *Pickering*, 391 U.S. at 568). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* (citing *Connick*, 461 U.S. at 147). "If the answer is yes, then the possibility of a First Amendment claim arises." *Id.* Only at that point does the question become "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citing *Pickering*, 391 U.S. at 568). "This consideration reflects the importance of the relationship between the speaker's expressions and employment," the Court explained, because "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*

The Court thus summarized the *Pickering-Connick* rule this way: "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419 (citing *Connick*, 461 U.S. at 147). "[W]hile the First Amendment invests public employees with certain rights," the Court concluded, "it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 420 (quoting *Connick*, 461 U.S. at 154).

Having set forth the established legal landscape, the *Garcetti* Court turned to the case before it, holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. That holding resolved the issue at hand because the plaintiff "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." *Id.* at 422. Rather, when "he went to work and performed the tasks he was paid to perform," the plaintiff "acted as a government employee," and "[t]he fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id.* Any "contrary rule," the Court said, "would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business." *Id.* at 423.

The Court made one caveat to its ruling. Responding to Justice Souter's concern in his dissenting opinion that the Court's decision "may have important ramifications for academic freedom, at least as a constitutional value," the Court reserved ruling on that question: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425.

**2.** *Garcetti* thus purported to leave unresolved some of the same questions left unanswered by *Wood*. But as Justice Souter rightly recognized in dissent, the Court's reasoning could not be so artificially confined. *See* 547 U.S. at 438 (noting that the Court's reasoning would apply to "even the teaching of a public university professor" because "teachers necessarily speak and write 'pursuant to … official duties'" (alteration in original)). There is nothing in the Court's opinion suggesting that a different rule should apply to university professors.

Indeed, the Court's review of established caselaw confirms that such a carve out would require a massive rewriting of First Amendment jurisprudence. Though Plaintiffs continue to make their novel argument that strict scrutiny applies to government regulations of public professors' in-class speech, *see* Doc. 31 at 18 n.20, all of the cases they cite for the proposition that "government speech principles" have no application "to in-class instruction at the university level" applied *Pickering* balancing instead. *Compare* Doc. 43 at 21-23 (Plaintiffs' listing of cases), *with* Doc. 49 at 11 n.2 (Governor Ivey's discussion of same cases). *Pickering* balancing is not strict scrutiny. And *Pickering* balancing necessarily entails determining at step one whether the employee—in *Pickering*, a teacher; here, a professor—spoke "as a citizen on matters of public concern," or, instead, "as an employee upon matters only of person interest." *Connick*, 461 U.S. at 147; *see Garcetti*, 547 U.S. at 418. That rule is no invention of the *Garcetti* Court, but the longstanding test set forth over forty years ago in *Pickering* and *Connick*. Thus, *Pickering* itself assumes that "government speech principles" indeed have application "to in-class instruction at the university level." *Contra* Doc. 43 at 21-22. *Garcetti* was no extension of *Pickering*; it was an application of it.

Were there doubt on this score, *Bishop* resolves it. In that case, UA restricted a physiology professor from interjecting his religious beliefs in class and from hosting an optional class devoted to a "Christian Perspective" on human physiology. *See* 926 F.2d at 1069. To the professor, his remarks were relevant to his teaching and his professional views on human physiology because they "covered various aspects of the human body." *Id.* at 1068-69.

The Eleventh Circuit resolved the dispute by applying *Pickering* balancing. As the Court explained, under *Pickering*, "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through

its employees." *Id.* at 1072 (citing *Pickering*, 391 U.S. at 568). The Court thus considered three factors to determine whether the professor was speaking "as a citizen" or "as an employee" and to balance any remaining competing considerations.

The first two factors went directly to the "citizen or employee" query under *Pickering*. "First and foremost," the Court explained, "we consider the context: the university classroom during specific in-class time," "the visage of the classroom as part of a university course in an after-class meeting," and the "coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* at 1074. "Second, it follows, we consider the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than … those of other persons" given its "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.*

Before addressing *Bishop*'s third factor—academic freedom, discussed in detail below—it is worth pausing here to note that *Bishop*'s first two factors foreclose three of Plaintiffs' arguments regarding the application of *Garcetti* and *Wood*. The first, as already discussed, is Plaintiffs' contention that "government speech principles" have no bearing when it comes to "in-class instruction at the university level." Doc. 43 at 21-22. That is plainly wrong; both of *Bishop*'s first two factors are aimed at precisely that inquiry.

Plaintiffs' second argument is that *Wood* is distinguishable because it concerned a high school teacher rather than a university professor. *See* 7/2 Tr. 110-11. But the *Bishop* Court recognized that it was drawing from cases that "dealt with students at the secondary level." *Id.* at 1075. Even so, the Court explained, "insofar as it covers the extent to which an institution may limit in-school expressions which suggest the school's approval"—*i.e.*, are made in the course of a teacher's job duties—the Court expressly adopted such reasoning "as suitable to our ends, even at

the university level." *Id.* In part, in can be surmised, that was because the difference between a teenager in high school and a teenager or early-twenty-something in college did not counteract the "coercive effect upon students that a professor's speech inherently possesses." *Id.* at 1074; *see also Speech First*, 32 F.4th at 1124 (discussing fear of coercion that the "average college-aged student" would have).

Plaintiffs' third argument is that an entirely different test applies here because, "[i]n *Bishop*, the university sought to impose a viewpoint neutral restraint on *all* religious content that was un-related to the course, regardless of the viewpoint," whereas here "SB 129 is a viewpoint-based restriction on professor speech." Doc. 43 at 26. But *Bishop* also involved viewpoint discrimination. The Court said so explicitly: "By its memo to Dr. Bishop, the University s[ought] to prevent him from presenting his *religious viewpoint* during instructional time, even to the extent that it repre-sents his professional opinion about his subject matter." 926 F.2d at 1077 (emphasis added). Yet the Court applied *Pickering* balancing, not strict scrutiny. Why? Because the regulation concerned "the University's own speech, which is controlled by different principles." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995).[2]

Based primarily on its consideration of the first two factors, the *Bishop* Court ruled that UA could restrict its employees' in-class speech. Though "Dr. Bishop's sincerity cannot be doubted," the Court explained, "his educational judgment can be questioned and redirected by the University when he is acting under its auspices as a course instructor, but not when he acts as an independent educator or researcher." 926 F.2d at 1076-77; *accord Wood*, 2025 WL 1819099, at

---

[2] Plus, if Plaintiffs were right that Dr. Bishop's speech was "unrelated to the course," Doc. 43 at 26, that would only make it more, not less, likely that the speech would be protected because it would be more likely that Dr. Bishop was speaking "as a citizen" rather than "as an employee," thus advancing him to the second prong of *Pickering* balancing.

*3-4 (ruling that when a teacher speaks in class "pursuant to her official duties," she "speaks as a government employee, not a citizen"). *Bishop*'s rule is thus straightforward: When a professor "and the University disagree about a matter of content in the courses he teaches," "even to the extent that it represents his professional opinion about his subject matter," "[t]he University must have the final say in such a dispute." *Bishop*, 926 F.2d at 1076-77. Again: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077.

**3.** So what about academic freedom? The *Bishop* Court addressed this, too. In its third factor, it "consider[ed] the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." 926 F.2d at 1075. "There are abundant cases which acclaim academic freedom," the Court recognized, "[p]erhaps the most applicable" being "*Keyishian v. Board of Regents*, 385 U.S. 589 (1967), in which Justice Brennan wrote: 'Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.'" *Id.* (quoting *Keyishian*, 385 U.S. at 603).

While recognizing these lofty pronouncements in cases concerning loyalty oaths and other ills "offensive to a free society," the Eleventh Circuit emphasized that cases like *Keyishian* "cannot be extrapolated to deny schools command of their own courses." *Id.* at 1075. "Though we are mindful of the invaluable role academic freedom plays in our public schools," the Court concluded, "we do not find support to conclude that academic freedom is an independent First Amendment right." *Id.*

That answers the question reserved by *Garcetti*. If academic freedom is not "an independent First Amendment right," then it cannot conjure a *sui generis* rule protecting professors' speech over everyone else's. Plaintiffs have pointed to nothing in the First Amendment that would suggest

that the Framers set university professors apart for special treatment that no other American receives. Academic freedom may be a "transcendent value to all of us," but it does not transform university professors into sovereign citizens.

Unsurprisingly, the original public meaning of the First Amendment confirms this. Courts regularly turn to "history and tradition" to define "the scope of the First Amendment" in areas of unsettled doctrine. *Vidal v. Elster*, 602 U.S. 286, 301 (2024); *accord City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). That is just what the en banc Fourth Circuit did in *Urofsky v. Gilmore* to determine the relationship of academic freedom to the First Amendment. 216 F.3d 401 (4th Cir. 2000) (en banc). Its conclusion? "[T]he best that can be said for [the professors'] claim that the Constitution protects the academic freedom of an individual professor is that teachers were the first public employees to be afforded the now-universal protection against dismissal for the exercise of First Amendment rights. Nothing in Supreme Court jurisprudence suggests that the 'right' claimed by [the professors] extends any further." *Id.* at 415.

At issue in *Urofsky* was a Virginia statute restricting state employees from accessing sexually explicit material on state computers. *Id.* at 404. Six university professors challenged the statute as a First Amendment violation to their academic freedom to access the prohibited materials for their academic work. *Id.* at 405-06. The Fourth Circuit first applied *Pickering* balancing, noting that "[t]he threshold inquiry" is "whether the Act regulates speech by state employees in their capacity as citizens upon matters of public concern." *Id.* at 406. It concluded that "[t]he speech at issue here—access to certain materials using computers owned or leased by the state for the purpose of carrying out employment duties—is clearly made in the employee's role as employee" and that, "[t]herefore, the challenged aspect of the Act does not regulate the speech of the citizenry in general, but rather the speech of state employees in their capacity as employees." *Id.* at 408-09.

The court then turned to the professors' argument "that even if the Act is valid as to the majority of state employees[,] it violates the First Amendment academic freedom rights of professors at state colleges and universities, and thus is invalid as to them." *Id.* at 409 (footnote omitted). As the Professor Plaintiffs do here, the professors in *Urofsky* argued "that a university professor possesses a constitutional right to determine for himself, without the input of the university (and perhaps even contrary to the university's desires), the subjects of his research, writing, and teaching." *Id.* at 409-10. The Fourth Circuit properly rejected this argument for two reasons: It did not comport with the original understanding of the First Amendment, and it went far beyond the Supreme Court's description of academic freedom.

As to the first reason, the court explained that "[p]rior to the late nineteenth century, institutions of higher education in this country were not considered centers of research and scholarship, but rather were viewed as a means of passing received wisdom on to the next generation." *Id.* at 410 (citing Richard Hofstadter & Walter P. Metzger, *The Development of Academic Freedom in the United States* 278-79 (1955), & W. Stuart Stuller, *High School Academic Freedom: The Evolution of a Fish Out of Water*, 77 Neb. L. Rev. 301, 307-08 (1998)). "[A]cademic freedom as we know it simply had no meaning." *Id.* (alteration in original) (quoting J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 269 (1989)).

The concept of "academic freedom," the court continued, came to America only in the late nineteenth century, "as Americans who had studied at German universities sought to remodel American universities in the German image." *Id.* That included the German notion of "*Lehrfreiheit*," or "freedom to teach"—the "notion that professors should be free to conduct research and publish findings without fear of reproof from the church or state," as well as "the authority to determine the content of courses and lectures." *Id.* Only in 1915 did the American Association of

University Professors first adopt the concept of "*Lehrfreiheit* to the American university." *Id.* "The principles adopted in the 1915 report were later codified in a 1940 Statement of Principles on Academic Freedom and Tenure promulgated by the AAUP and the Association of American Colleges." *Id.* at 411.

Conclusion: Academic freedom was *not* part of the original public meaning of the First Amendment when it was ratified in 1791 or when it was incorporated to apply to the States in 1868.

Turning next to the Supreme Court's discussion of academic freedom, the Fourth Circuit recognized that "homage has been paid to the ideal of academic freedom in a number of Supreme Court opinions, often with reference to the First Amendment." *Id.* at 411-12 (collecting decisions). After reviewing these decisions, though, the Fourth Circuit noted that "[d]espite these accolades, the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom." *Id.* Rather, the court explained, the Supreme Court's discussion of academic freedom as a potential First Amendment concern was anachronistic dicta.

In addition, the court continued, when the Supreme Court did discuss academic freedom, it did so not to extol a "right of academic freedom that belongs to the professor as an individual," but rather to discuss a university's own "institutional right of self-governance in academic affairs." *Id.* at 412; *see id.* at 411-15 (extensively discussing Supreme Court cases concerning academic freedom); *id.* at 415 ("[S]ince declaring that public employees, including teachers, do not forfeit First Amendment rights upon accepting public employment, the [Supreme] Court has focused its discussions of academic freedom solely on issues of institutional autonomy."). For these reasons, the Fourth Circuit rejected the professors' claims and held that the State could regulate their academic speech at the public universities.

To be sure, *Urofsky* is only persuasive authority for this Court. But it is very persuasive. It addresses head on the question later left open by *Garcetti* and convincingly demonstrates that neither Supreme Court precedent nor the First Amendment recognizes the Plaintiff Professors' asserted right to ultimate control of their in-class speech. That is unsurprising. Any other rule would make university professors a law unto themselves with special protections that no other American has. "Such a result is manifestly at odds with a constitutional system premised on equality." *Urofsky*, 216 F.3d at 412 n.14.

**4.** This returns us to *Wood* and Plaintiffs' asserted bases for distinguishing it. There is nothing in the *Pickering-Connick-Garcetti* caselaw to suggest that the First Amendment offers greater protections to university professors than it does to high school teachers when they are speaking to students as part of their job duties. If were there doubt on that score, *Bishop* resolves it and *Urofsky* confirms that resolution. *Wood*'s test—and result—thus applies here with full force: "When a public-school [university professor] speaks in the course of performing her job—*i.e.*, speaking to her class in her classroom during class hours—she does so pursuant to her official duties and therefore speaks as a government employee, not a citizen." 2025 WL 1819099, at *4. That is the case with the Professor Plaintiffs here.

One more note on *Wood*: The Professor Plaintiffs would lose even under Judge Jordan's dissenting opinion in that case. Judge Jordan would distinguish between "teacher in-class speech which is curricular[] and teacher in-class speech which is noncurricular." *Id.* at *10 (Jordan, J., dissenting) (quoting *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) (en banc) (Luttig, J., concurring)). The former could be regulated as employee speech, he reasoned, while the latter would qualify as individual speech under *Pickering. See id.* at *10-11. Such a distinction would not help Plaintiffs because it is undisputed that the Professor Plaintiffs want to

fully control their *curricular speech*. 7/2 Tr. 113 (Mr. Ingram: "I think, for the purpose of our litigation, all of our speech is curricular that is being censored by SB129."). Even under Judge Jordan's proposed test, Plaintiffs could not show a likelihood of success on the merits.

### B.  Plaintiffs Failed to Establish a Likelihood of Success On Their Other Claims.

The evidentiary hearing confirmed that Plaintiffs are also unlikely to succeed on the merits of their other claims. Governor Ivey has already addressed those claims at length and will not flood the Court with more paper by repeating those arguments here. *See* Doc. 27 at 36-37 (discussing Luna's "right to receive information" claim), 37-43 (discussing student organization funding claims), 43-49 (vagueness); Doc. 49 at 12-13 (student organization funding), 14-15 (vagueness). Two points will suffice.

*First*, Governor Ivey's position has always been that the Act is best read to require state universities to treat all student organizations alike, without regard to their viewpoints. *See* Doc. 27 at 37-43. While the Act prohibits universities from directly "sponsor[ing]" a DEI program or any other activity that violates the Act, they may still provide general "funding" to student organizations *not* directly "sponsored" by the university, no matter their viewpoint. *See* Act § 2(1), (8); *id.* § 4(1). Funding organizations without regard to viewpoint comports with Supreme Court's teaching in *Rosenberger* and is, accordingly, the best reading of the Act. *See Henry v. Att'y Gen. of Ala.*, 45 F.4th 1272, 1291 (11th Cir. 2022) (instructing courts to "uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities" (quotations omitted)). Whatever their past practice, UAB's and UA's policies align with this reading. *See* Board Defendants' Exhibit 14. Plaintiffs are thus unlikely to succeed in demonstrating either that the Act itself or the Board's policies are unconstitutional.

*Second*, Plaintiffs cannot show that the Act is unconstitutionally vague. Binding precedents have rejected vagueness concerns about statutes that were far more ambiguous or difficult to parse

than Alabama's Act. In *Arnett v. Kennedy*, for example, the Supreme Court rejected a public em-

ployee's argument that an employment provision "authorizing removal or suspension without pay

'for such cause as will promote the efficiency of the service'" was "vague and overbroad." 416

U.S. 134, 156 (1974). The former Fifth Circuit in *Garrett v. Matthews* rejected a claim by a UA

professor who argued that "the term 'adequate cause' [was] too vague to meet due process stand-

ards" for revoking tenure. 625 F.2d 658, 660 (5th Cir. 1980). If those provisions are not vague,

then the Act is certainly not vague, particularly since it adds additional protections by way of a

mens rea requirement and a safe harbor provision (which, it bears emphasizing, "afford[s] protec-

tion from liability or penalty"[3] and cannot impose *additional* requirements to Section 2's prohibi-

tions). For reasons still unknown, Plaintiffs may not *like* what the Act says, but their testimony

made apparent that they know what it prohibits.

## IV.    The Other Preliminary Injunction Factors Weigh Against Plaintiffs.

In addition to failing to show a likelihood of success on the merits, Plaintiffs fail to

"clearly" establish that they are entitled to the "extraordinary and drastic remedy" of a preliminary

injunction. *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001). The

balance of the equities weighs decisively against them.

First, it is still the case that Plaintiffs' delay alone "militates against a finding of irreparable

harm." *Wreal, LLC*, 840 F.3d at 1248. The Governor signed the Act on March 20, 2024. The law

took effect at the beginning of October. Yet Plaintiffs waited until mid-January 2025 to file suit—

and then delayed an additional two weeks to seek relief from purportedly "imminent, irreparable

harm." *Id.* (quotation omitted). Their actions belie their claims. Plaintiffs' "failure to act with speed

---

[3] *Safe Harbor*, BLACK'S LAW DICTIONARY (12th ed. 2024).

or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.*

Second, Plaintiffs cannot show that an injunction upending the now-well-established status quo would be in the public interest. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). That is particularly true here, where the people's representatives enacted a law to thwart racial discrimination on public campuses and prevent public university professors from "cast[ing] a pall of orthodoxy over the classroom"[4] by compelling their students to assent to noxious beliefs at odds with our nation's promise of equality. Plaintiffs are not entitled to a preliminary injunction.[5]

## CONCLUSION

For these reasons, and those provided in Governor Ivey's other briefing, the Court should deny Plaintiffs' request for a preliminary injunction and dismiss all claims against Governor Ivey in her official capacity as Governor.

---

[4] *Keyishian*, 385 U.S. at 603.

[5] If the Court does issue an injunction, that injunction should be narrow, bind only the proper parties to this action, and require Plaintiffs to post a bond. *See* Rule 65(c) ("The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (Emphasis added.)).

Date: July 23, 2025                         Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

<u>s/ A. Barrett Bowdre</u>
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

George Muirhead (ASB-7345-K00L)
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
George.Muirhead@AlabamaAG.gov

*Counsel for Defendant Kay Ivey in her official capacity as Governor of Alabama*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document using the Court's CM/ECF system on July 23, 2025, which will serve all counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendant Kay Ivey in her official capacity as Governor of Alabama*
