FILED

2025 Aug-13 PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **CASSANDRA SIMON et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:25-cv-00067-RDP** |
| | } | |
| **KAY IVEY, in her official capacity as** | } | |
| **Governor of Alabama and President Ex-** | } | |
| **Officio of the University of Alabama** | } | |
| **Board of Trustees, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the Opposed Motion for Preliminary Injunction filed by Plaintiffs Cassandra Simon, Dana Patton, Richard Fording, Sydney Testman, Miguel Luna, and the Alabama State Conference of the NAACP (collectively, "Plaintiffs"). (Doc. # 12). The Motion has been fully briefed. (Docs. # 12, 25, 26, 27, 31). The court held an evidentiary hearing on the Motion on June 25 and June 26, 2025, and entertained oral argument on July 2, 2025. The parties have also filed post-hearing briefing on the Motion. (Docs. # 74, 75, 76, 77, 78). After careful consideration and for the reasons outlined below, Plaintiffs' Motion for Preliminary Injunction (Doc. # 12) is due to be denied.

## I.    Introduction

This case involves Alabama Senate Bill 129 ("SB 129"), which Plaintiffs have attacked as unconstitutional under the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. (Doc. # 1). On January 14, 2025, Plaintiffs filed this lawsuit. (*Id.*). On January 30, 2025, Plaintiffs filed the instant Motion for Preliminary Injunction to enjoin Defendants from enforcing SB 129. (Doc. # 12). In support, Plaintiffs submitted declarations from Plaintiffs Simon, Luna, Testman, and Alabama

NAACP. (Docs. # 12-4, 12-5, 12-6, 12-7). Plaintiffs seek preliminary injunctive relief on claims under the First Amendment and the Due Process Clause of the Fourteenth Amendment only; they do not seek preliminary injunctive relief under the Equal Protection Clause of the Fourteenth Amendment. (Doc. # 12).

## II.    Findings of Fact

Below, the court summarizes the relevant findings of fact related to the passage of SB 129 and its impact on Plaintiffs. The court makes these findings after reviewing all the parties' papers, hearing from witnesses at the two-day hearing, and making credibility determinations as necessary.

### A.    Passage of SB 129[1]

On February 20, 2024, SB 129 was introduced to the Senate Committee on County and Municipal Government (Doc. # 58 at 4 ¶ 10) and eventually was approved by both houses of the Alabama Legislature. It was signed into law on March 19, 2024, and is codified as Alabama Code §§ 41-1-90 through 41-1-94. (*Id.* at 5 ¶ 11). It took effect on October 1, 2024. (*Id.*). Generally, the law prohibits public schools from finding or sponsoring "any diversity, equity, and inclusion program." *See* Ala. Code § 41-1-91(1), (2). It also prohibits teachers from requiring students in public schools, including colleges and universities, to assent to eight "divisive concepts." *See id*. § 41-1-90(3).

Under SB 129, "divisive concepts" are defined as "any of the following concepts":

a. That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior.

b. That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.

---

[1] Plaintiffs purport to challenge "SB 129" and attach the enrolled Senate Bill as an exhibit to their Motion for Preliminary Injunction. (*See* Doc. # 12-2). The enrolled Senate Bill was passed in both houses of the Alabama Legislature before it received Governor Ivey's signature and became Act 2024-34. As Governor Ivey notes, Plaintiffs likely mean to challenge the Act, not the Senate Bill. (*See* Doc. # 27 at 17 n.3). The court acknowledges this. Because Plaintiffs use the term SB 129 in their filings and briefing, the court refers to the Act as SB 129. But to be clear, when citing to SB 129, it refers to the Alabama Code or relevant code section.

c. That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.

d. That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.

e. That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin.

f. That fault, blame, or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.

g. That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.

h. That meritocracy or traits such as a hard work ethic are racist or sexist.

*Id*. § 41-1-90(2).

Additionally, SB 129 defines a "diversity, equity, and inclusion program" as the following:

Any program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this article. This term does not include programs, classes, trainings, seminars, or other events that are necessary to comply with applicable state law, federal law, or court order.

*Id.* § 41-1-90(3).

SB 129 also prohibits "[a] state agency, local board of education, or public institution of higher education" from engaging in the following activities:

(1) Sponsor any diversity, equity, and inclusion program or maintain any office, physical location, or department that promotes diversity, equity, and inclusion programs, as defined in Section 41-1-90.

(2) Direct or compel a student, employee, or contractor to personally affirm, adopt, or adhere to a divisive concept.

(3) Require its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept.

(4) Require a student, employee, or contractor to share his or her personal point of view on any divisive concept outside of an academic setting, as provided in Section 41-1-93(3)b.

(5) Require its students, employees, or contractors to participate, as part of any required curriculum or mandatory professional training, in an activity that involves lobbying at the state or local level for legislation related to a divisive concept.

(6) Penalize or discriminate against a student, employee, or contractor on the basis of his or her refusal to support, believe, endorse, embrace, confess, or otherwise assent to a divisive concept or diversity statement.

(7) Condition enrollment or attendance in a class, training, or orientation solely on the basis of race or color.

(8) Authorize or expend funding, or apply for or accept a grant, federal funding, or private funding, for the purpose of compelling assent to any divisive concept or any other purpose prohibited in this act, provided that such funding may be provided to student, faculty, or staff organizations or associations.

*Id.* § 41-1-91.

SB 129 states that universities "may discipline or terminate the employment of any employee or contractor who knowingly violates" SB 129, "provided that," as relevant here, "[a]ny disciplinary action or termination of an employee of a public institution of higher education shall remain subject to relevant policies established by the institution." *Id.* § 41-1-92(1).

SB 129 provides instructions on how to interpret the law and offers certain safe harbors:

Nothing in this article:

(1) Prevents student, staff, or faculty organizations or associations from hosting diversity, equity, and inclusion programs or discussions that may involve divisive concepts, provided that no state funds are used to sponsor these programs. If a student, staff, or faculty organization or association hosts an event pursuant to this subdivision, it shall identify the sponsor of the event at the event and in any advertisements relating to the event.

(2) Prevents an employee or a contractor of a state agency, local board of education, or public institution of higher education who provides, as part of his or her job duties, orientation, course work, or training from responding to questions that are raised by participants in the orientation, course work, or training and that pertain to divisive concepts or diversity, equity, and inclusion.

(3) a. Prohibits a public institution of higher education from providing any instruction or taking any action in furtherance of satisfying any accreditation standard or requirement.

b. Prohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept and otherwise comply with this article.

c. Prohibits the required collection or reporting of demographic data by public institutions of higher education.

(4) Prohibits the teaching of topics or historical events in a historically accurate context.

. . .

(6) Prevents state agencies from promoting racial, cultural, or ethnic diversity or inclusiveness, provided these efforts are consistent with the requirements of this article.

(7) Prohibits a public institution of higher education from providing space or ancillary services to any student or employee on a non-discriminatory basis, including, but not limited to, support and guidance to ensure compliance with applicable university policies and laws, assistance with security needs, and registration of events.

. . .

(9) May be construed to inhibit or violate the First Amendment rights of any student or employee, or to undermine the duty of a public institution of higher education to protect, to the greatest degree, academic freedom, intellectual diversity, and free expression.

*Id.* § 41-1-93.

SB 129 notes the Legislature's intent that "all constitutionally created boards of trustees comply with the requirements of th[e] article." *Id.* § 41-1-94.

## B.    The Parties

Plaintiffs here are Dr. Cassandra Simon, Dr. Dana Patton, and Dr. Richard Fording, professors at the University of Alabama ("UA") (collectively, "Professors"); Sydney Testman and Miguel Luna, students at the University of Alabama at Birmingham ("UAB") (collectively,

"Students"); and the Alabama State Conference of the National Association for the Advancement of Colored People, Inc. ("Alabama NAACP"), a national civil rights organization. (Doc. # 1).

Defendants here are the Board of Trustees of the University of Alabama ("the Board") and Governor Kay Ivey ("Governor Ivey"). (*Id.*). Governor Ivey is sued in her official capacity as the Governor of Alabama and in her official capacity as the President Ex-Officio of the Board. (*Id.*). The following Board members are sued in their official capacities as members of the Board: Scott Phelps, Mike Brock, Karen Brooks, Myla E. Calhoun, Ronald Gray, Jeff Gronberg, O.B. Grayson Hall, Jr., Barbara Humphrey, W. Davis Malone III, Evelyn VanSant Mauldin, Harris Morrissette, J. Steven Roy, Kenneth Simon, Marietta Urquhart,[2] and Kenneth Vandervoort. (*Id.*).

The Board is given broad management and control over the University of Alabama System,[3] including authority to govern students and matters associated with the termination and discipline of professors. (Doc. # 58 at 20-21 ¶ 96).

Governor Ivey made the following statement upon signing SB 129:

> My administration has and will continue to value Alabama's rich diversity, however, I refuse to allow a few bad actors on college campuses – or wherever else for that matter – to go under the acronym of DEI, using taxpayer funds, to push their liberal political movement counter to what the majority of Alabamians believe.

(*Id.* at 21 ¶ 98).

## C.    Training About SB 129 at UA

UA's fall 2024 semester began on August 21, 2024. (*Id.* at 11 ¶ 47). At the beginning of the semester, the UA College of Arts and Sciences held a legal training session for UA faculty. (*Id.* ¶ 48). The training session, which was conducted by a non-lawyer, incorporated a PowerPoint

---

[2] Marietta Urquhart no longer serves on the Board. Her seat was filled by Angus R. Cooper III. (Doc. # 58 at 4 n.1).

[3] The University of Alabama System consists of three operating divisions: UA, UAB, and the University of Alabama in Huntsville. (Doc. # 58 at 4 ¶ 1).

presentation, which presented information on UA's compliance with SB 129. (*Id.* ¶¶ 49-50; Doc. # 55-25 at 95-98). The introductory slide on the SB 129 information was entitled, "Alabama's Anti-DEI Law (aka SB 129 and Alabama Act 2024-34)" and included a link to UA's published Diversity, Equity and Inclusion ("DEI") guidance. (Docs. # 58 at 11 ¶ 50; 55-25 at 95 (citing https://deiguidance.ua.edu/)).

UA administrators also provided recommended disclaimer language for professors to add to their syllabi. (Doc. # 58 at 11 ¶ 51). The language stated the following:

> All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting. This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective scholarly lens designed to encourage critical thinking. Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered "divisive" under Alabama law, nor penalized for refusing to support or endorse such a concept. All students are strongly encouraged to think independently and analytically about all material presented in class and may express their views in a time, place, and manner consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry and expressions.

(*Id.*).

### D.    SB 129's Impact in UA's Classrooms

#### 1.    Professor Simon

Dr. Cassandra Simon ("Simon") is a tenured associate professor of social work at UA, and has taught there since 2000. (*Id.* at 5 ¶ 14). Simon's expertise and academic research focus on social justice, race relations, health disparities, community engagement, and human rights. (*Id.* ¶ 16). She teaches undergraduate and graduate courses in human behavior, family, and child welfare, and social justice. (*Id.* at 6 ¶ 18).

During UA's fall 2024 semester, Simon taught the course "Anti-Oppression and Social Justice." (*Id.* ¶ 19; Doc. # 56-1). She has been teaching this course at UA for twenty-five years. (Doc. # 72 at 130). The UA 2024-2025 Course Catalog provides this description of the course:

> This course examines issues related to the lived experiences of people based on age, culture, race, ethnicity, gender/gender identity/gender expression, sexual orientation, socioeconomic status/class, ability, religion/spirituality, and national origin. It is designed to introduce the student to social, economic, and political systems of power that serve to oppress communities that have been minoritized.

(Doc. # 56-1 at 2).

Simon stated that the course covers topics including, but not limited to, "[w]hite privilege, implicit bias, structural racism, mental health disparities, homophobia, racism, sexism, and systemic oppression of minority communities." (Doc. # 12-4 ¶ 14). She further explained that her instruction in the course "is rooted in the understanding that racism and sexism are deeply embedded in American society. [She] endeavor[s] to train future social workers about how the impact of systemic racism on their future clients cannot be divorced from their professional mission." (*Id.* ¶ 15).

Simon testified that she does not compel or direct her students to affirm, adopt, or adhere to any of the divisive concepts listed in SB 129, nor does she assign coursework that may advocate for them. (Doc. # 72 at 160-61). Indeed, at the hearing Simon made clear that she does not "direct or compel [her] students to affirm, adopt, or adhere to the concept of any race, color, religion, sex, ethnicity, or national origin as inherently superior or inferior." (*Id.* at 154). And, when provided with a copy of the Act, directed to examine the list of divisive concepts, and asked whether she "compel[s] or direct[s] [her] student to affirm, adopt, or adhere to any of them," she responded: "No." (*Id.* at 160-61). Indeed, in connection with this inquiry, Simon bluntly said: "Nobody should be doing that and no credible educator I could imagine would do those things." (*Id.* at 160). Nevertheless, she testified that she is concerned that her instruction on the topics in her course could be deemed to violate SB 129 because some of the readings and assignments in her course could be construed as involving divisive concepts. (*Id.*).

For example, Simon stated that she assigns course materials "that discuss how life and health outcomes are often influenced by racial and gender bias" and how "race- and gender-based stereotypes can exacerbate health disparities." (Doc. # 12-4 ¶¶ 16, 18). Additionally, when teaching on implicit bias, Simon has her students complete the Harvard Implicit Association Test, an online survey that attempts to identify participants' implicit associations by measuring their strength "between concepts (*e.g.*, Black people, gay people) and evaluations (*e.g.*, good, bad) or stereotypes (*e.g.*, athletic, clumsy)." (Doc. # 58 at 25 ¶ 12). And, when teaching on privilege, she assigns course materials on different forms of privilege such as "male privilege" and "social class privilege." (*Id.* ¶ 17; *see* Docs. # 70-3; 72 at 156-57). Simon explained that these are "controversial issues" and that "any of the things that [they] discuss [in class] could potentially be viewed by somebody as forcing people to assent . . ." (Doc. # 72 at 156). Simon is concerned that these course materials may violate SB 129 because they could be construed as espousing the following divisive concepts: Alabama Code §§ 41-1-90(2)(d),[4] (e),[5] (f),[6] (g),[7] and (h).[8] (*Id.* at 160; *see also* 12-4 ¶¶ 16-18).[9]

Simon also stated that she shows her students episodes from the documentary *Eyes on the Prize*, which details the civil rights history of the United States, and the documentary *Slavery by*

---

[4] "That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously." Ala. Code § 41-1-90(2)(d).

[5] "That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin." *Id.* § 41-1-90(2)(e).

[6] "That fault, blame or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin." *Id.* § 41-1-90(2)(f).

[7] "That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin." *Id.* § 41-1-90(2)(g).

[8] "That meritocracy or traits such as hard work ethic are racist or sexist." *Id.* § 41-1-90(2)(h).

[9] SB 129's divisive concepts are codified at Alabama Code § 41-1-90(2). In the Act, they are subdivided using letters a-h. In their briefing, the parties have used parentheticals when referencing these subdivisions (*e.g.*, a is (a), b is (b), c is (c), etc.). As that technique makes it easier to cite to and distinguish the citations to the subdivisions, the court does the same.

*Another Name*, which "challenges the belief that American slavery ended with the Emancipation Proclamation." (Doc. # 12-4 ¶ 19). Although she stated that her "courses do not explicitly assign blame or guilt to any individual students, it is not uncommon for some students to react with feelings of guilt after watching these films." (*Id.*). And, for that reason, Simon is concerned that showing these films will be deemed to violate divisive concepts (e), (g), and (f). (*Id.*).

Simon also explained that she is concerned about SB 129 as it relates to her in-class instruction because she does not understand what it prohibits. (Doc. # 72 at 161). She testified that the law is "just vague and confusing." (*Id.*). Simon further testified that she has not received any guidance on SB 129 from UA except for "a couple of workshops" and "some web pages up." (*Id.* at 163).

When asked about SB 129's safe harbor provisions, Simon testified that they do not mitigate her concerns about the law. (*Id.* at 162). For example, when asked about the safe harbor provision that states, "Nothing in this article . . . [p]rohibits the teaching of topics or historical events in a historically accurate context[,]" Simon replied, "who gets to determine what's a historically accurate context? I mean, I think I do that, but every time I present something that may be uncomfortable and new for the students, there is a concern that they may somehow misconstrue it . . . ." (*Id.*). When asked about the safe harbor provision, which states "[n]othing in this article . . . [p]rohibits a public institution of higher education from authorizing the teaching or discussion of any divisive concept in an objective manner and without endorsement . . . . [,]" she replied, "again, who gets to decide whether or not it's objective or not?" (*Id.* at 163). Simon testified that she has not received any guidance from UA defining the terms in the safe harbor provisions. (*Id.*).

In her declaration, Simon claims she cannot determine what portions of her teaching may violate SB 129. (Doc. # 12-4 ¶ 22). Although she realizes that SB 129 permits her to discuss "divisive concepts" in an "objective manner and without endorsement," she stated, "I do not know

what it means to discuss a divisive concept 'in an objective manner' and 'without endorsement.'" (*Id.* ¶¶ 22-23). She explained, "[f]or example, there is robust empirical evidence of implicit bias, white privilege, and the absence of a colorblind meritocracy. I am unable to determine whether continuing to present these scholarly findings, and assigning readings on these subjects, would violate SB 129." (*Id.* ¶ 23).

At the evidentiary hearing, the Board acknowledged that a professor may assign reading materials where another speaker or writer advocates for a divisive concept. (Doc. # 72 at 155). Specifically, the Board stated that its position "is that professors, using their academic freedom and their judgment as professors, are absolutely entitled to assign course material that may have different opinions on divisive concepts." (*Id.*). Further, the Board clarified that as to SB 129, the issue is when professors personally advocate for something or require student assent to something that would be a divisive concept. (*Id.*). Governor Ivey agreed with the Board's statements. (*Id.* at 156).

Among Simon's assignments in her course "Anti-Oppression and Social Justice" is an advocacy project where students choose a social issue they are passionate about that involves "social change and civic engagement." (*Id.* at 138; *see also* Doc. # 56-1 at 5). Simon testified that this project has been a part of the course for over twenty years. (Doc. # 72 at 136). Simon added that the students select their own project topic; in fact, Simon leaves the classroom when the students are deciding to avoid influencing them. (*Id.* at 141). Examples of past projects include educating people about the historical significance of Foster Auditorium, establishing a historical marker in Montgomery to commemorate the march from Selma to Montgomery during the Civil Rights Movement, and looking into how UA could be more accurate in its inclusion of Black Americans' history on campus. (*Id.* at 137). Simon testified that the advocacy project is important

for the students to complete so that they may be "actively involved citizens in [their] communities to effect change" and understand the importance of social justice in social work. (*Id.* at 138).

The project is a graded requirement for the course, but Simon testified that if a student does not want to participate in the chosen project, he or she can talk to Simon about doing an alternative project. (*Id.* at 171). This process is not included in Simon's syllabus, but she explained that "[she and the class] talk about it from day one." (*Id.* at 139; *see also* Docs. # 56-1 (Simon's fall 2024 syllabus); 70-2 (Simon's spring 2025 syllabus)). Simon added that in the twenty years that she has included the project in her course, no student has chosen to complete an alternative project. (Doc. # 72 at 168).

In the fall 2024 semester, Simon's students chose to conduct a sit-in protesting SB 129 for their advocacy project. (*Id.* at 140; Doc. # 12-4 ¶ 28). Simon testified that it took the students six weeks to decide on SB 129 as the topic. (Doc. # 72 at 140). She further testified that she was not present when the students made their final selection for the project topic. (*Id.*). Simon's students informed her that "through their project, they hoped not only to voice their opposition to SB 129 but also to receive information from the University about how students' needs would be accommodated" after its passage. (*Id.* at 176).

The sit-in was scheduled for November 13, 2024. (Doc. # 12-4 ¶ 28). The day before it was scheduled to take place, Simon received an email from Dr. Schnavia Hatcher ("Hatcher"), Dean of the School of Social Work at UA. (Doc. # 55-11 at 9). Hatcher informed Simon that she had seen a flyer promoting the sit-in and wanted to know if the students had complied with university policy regarding the reservation of event space for the sit-in. (*Id.*). Hatcher also asked Simon if she was cancelling a class session or requiring students to participate in the sit-in. (*Id.* at 6). Simon responded to the email and informed Hatcher that the students had completed a grounds permit but

were told they did not need approval to use the grounds for the event. (*Id.* at 8). Simon also told

Hatcher that she was not cancelling class or "forcing any students to participate."[10] (*Id.* at 6).

After this email exchange, Hatcher emailed Simon the morning of the sit-in and instructed

her to cancel the project. (*Id.* at 5). Hatcher included Dr. Jim Dalton ("Dalton"), Executive Vice

President and Provost at UA, in the email. (*Id.* at 4-5). Hatcher wrote the following in her email:

> Despite the way you've framed it, it is difficult to see how this exercise is not tied
> to the classroom or does not create a situation where students are being forced to
> assert a position and/or unwillingly take part in political activity. Similarly, the way
> this has been organized runs afoul of the Board's commitment to institutional
> neutrality.
>
> . . .
>
> Please know that your students are more than welcome to independently –
> completely separate from any academic exercise – take advantage of the numerous
> opportunities the University provides to express themselves on campus, including
> their personal opposition to the new law. . . . Likewise, you are personally free to
> engage in political activity as a private citizen if done in a manner consistent with
> the terms of the Faculty Handbook . . . . Such political activity, however, has no
> place in the classroom and this standard predates the passage of SB129.

(*Id.* at 5).

Hatcher's statement on "the Board's commitment to institutional neutrality" is in reference

to the Board's Resolution titled "Recognizing Commitment to Institutional Neutrality and

Freedom of Speech and Expression" that was adopted in September 2024.[11] (Doc. # 69-1). The

Resolution states, in relevant part:

> [T]o safeguard the freedom of speech and expression for members of the System
> community, the System itself must remain neutral on political and social issues
> unless the issue directly affects any aspect of the System's core operations. Taking
> institutional positions on an issue or making statements about it risks alienating
> members of the System community and destroying the intellectually independent
> environment upon which the System thrives. It is for the Board to decide what

---

[10] Simon testified that before this she had not received any inquiries about whether her students were required
to participate in the advocacy project. (Doc. # 72 at 145). She also noted that previous advocacy projects had been
completed during class time. (*Id.*).

[11] The Board submitted a statement on its position regarding institutional neutrality and what role, if any,
institutional neutrality played in guiding the Board's decision on matters relating to this lawsuit. (Doc. # 74-1).

issues directly affect aspects of the System's core operations, so members of the System community exercising their First Amendment rights should make clear they do not speak on behalf of the System, its component divisions, or any administrative unit within the System.

(*Id.* at 2).

In her email, Hatcher also quoted the following language from the UA Faculty Handbook: "It is the responsibility of faculty members to recognize failure to comply with specific policies and procedures could lead to progressive disciplinary actions up to and including termination." (Doc. # 55-11 at 5; *see also* Doc. # 56-7 (UA Faculty Handbook)).

After receiving Hatcher's email, Simon formally cancelled the sit-in. (Doc. # 12-4 ¶ 33). She testified that after receiving the email from Hatcher, she felt that the message being conveyed to her was the following: "Cancel the sit-in or [you will] be disciplined in some way and possibly lose [your] job." (Doc. # 72 at 147).

Simon also responded to Hatcher's email and expressed her confusion over the cancellation of the sit-in. (Doc. # 55-11 at 3-4). Simon asked Hatcher to clarify "how because it is tied to the classroom it is inappropriate or violates the new law and guidelines" and how the sit-in was considered political. (*Id.* at 4). Simon also asked Hatcher to "identify the specific policy or policies with which I have overlooked or not complied and could result in disciplinary action." (*Id.*).

Dalton responded to Simon's email and stated that the sit-in could be "viewed as: sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept, and/or other portions of the law." (*Id.* at 2).

Based on Dalton's email, Simon did not understand which divisive concept was implicated by the sit-in or why the sit-in could be considered sponsoring a diversity, equity, and inclusion program in violation of SB 129. (Doc. # 72 at 152).

14

Dalton's deposition was taken and submitted as part of the preliminary injunction record.

(Doc. # 69-7). He testified to his concern about the sit-in assignment:

> I viewed it, as I said before, as I said in my email to Dr. Simon within this thread, that it appeared to me to be a case where it was tacitly requiring a student to assent to an opinion, which I don't consider appropriate per our institutional neutrality statement or according to [SB] 129.

(*Id.* at 56;[12] *see also* Doc. # 69-1 (UA's Resolution "Recognizing Commitment to Institutional Neutrality and Freedom of Speech and Expression")). Dalton was concerned that because Simon was not in the classroom when students made their "choice" about the project topic, there was no assurance that each student actually agreed to the project.

> When you have students that are, as part of a class assignment, are being asked to speak to a specific political opinion, I don't think there's any way to determine that all the students that were participating in that actually agreed with it. There's a certain level of peer pressure and other things that could happen . . . where students don't feel the authority, the strength to stand up and say no to something in a classroom because it is part of the grade, it's part of what the other student groups want to do.
>
> At that point I thought, well, there's no way to determine that all the students are participating in this survey necessarily – this protest, I'm sorry, necessarily agree with it. And so to me that is tacitly requiring that they agree with this political opinion as opposed to having some way to confirm or deny.

(Doc. # 69-7 at 57-58).

And particularly relevant to Dalton was that participation in the sit-in was specifically tied to a grade.

> Q: So the issue with the sit-in was it being a part of the curriculum of a course?
>
> A: Yes. As I said, the issue for me was requiring affirmation or assent with that opinion.
>
> Q: That is tied to curricular choices?
>
> A: And tied to a grade, right. So if you have to participate in this sit-in in order to get a grade on the assignment and get the grade that you want in the class, that can put a student who perhaps disagrees with that opinion in a difficult position.

---

[12] Citations to the depositions of Dalton and Dr. Mary Wallace are to the minuscript page of the transcript.

Q: And if students were given a chance to opt out, would that change your opinion?

A: I think that would be a step in the right direction.

(*Id.* at 59).

Dalton also testified about his concern that an assigned and graded sit-in would violate UA's institutional neutrality principles.

Q: In your opinion, is a divisive concept the same thing as a political opinion?

A: No, not always. And we are leaving out the discussion of institutional neutrality that we started on to begin with as well. There's Senate Bill 129, and then our view on institutional neutrality is again any conversation should be able to happen in a classroom. I hope they are.

(*Id.* at 61; *see also* Doc. # 69-1).

Related to the concerns over institutional neutrality, Simon testified that she did not think requiring the class to participate in the sit-in violated the University's Resolution on institutional neutrality since the students chose the project. (Doc. # 72 at 181). She also testified that she did not think institutional neutrality "should be forced upon students" because it "takes away . . . the students' academic freedom, and it prevents the professor from being able to work with the students." (*Id.* at 182). Simon further testified that previous projects in the class had not run afoul to UA's commitment to institutional neutrality. (*Id.* at 152).

Simon testified that as an employee of UA, she is subject to its policies and procedures and is bound by the Faculty Handbook and UA's Resolution on the commitment to institutional neutrality. (*Id.* at 164; *see also* Docs. # 56-7; 69-1). She further testified that she understands the University decides what is ultimately taught at the school and that professors do not have "free rein to say whatever they want in the classroom." (Doc. # 72 at 164-65).

In her email to Hatcher and Dalton, Simon also expressed concerns about accreditation standards for the School of Social Work.[13] (*Id*. at 150; Doc. # 55-11 at 4). Simon testified that she was concerned that the cancellation of the sit-in violated several of the competencies in the accreditation standards. (Doc. # 72 at 150; *see also* Doc. # 59-10 (Educational Policy and Accreditation Standards for Baccalaureate and Master's Social Work Programs)). She explained that if her coursework does not adhere to the competencies, then the school might lose its accreditation. (Doc. # 72 at 150). Even so, Simon "wholeheartedly" agreed that the accreditation standards do not require students to participate in a sit-in or protest and that the accreditation standards can "[m]ost definitely" be met without requiring students to participate in a protest.[14] (*Id*. at 183-84).

Although Simon formally cancelled the sit-in assignment, a group of students still gathered at UA's Denny Chimes on November 13, 2024 to protest SB 129. (Docs. # 58 at 7 ¶ 25; 56-3 ¶ 8). Simon's students later held a rescheduled sit-in protest on November 18, 2024, which was unrelated to Simon's course or for a grade. (Docs. # 58 at 8 ¶ 26-27; 12-4 ¶ 36; 56-3 ¶ 9). UA had no issue with the *students*' decision to hold a sit-in and no one contends or believes that a student protest (even one in which Simon engaged) would implicate SB 129 in any way.

In the undisputed facts of the parties' joint report, they agreed that UA did not discipline Simon in relation to the sit-in project.[15] (Doc. # 58 at 8 ¶ 28).

_____

[13] The Council on Social Work Education ("CSWE") governs the accreditation of baccalaureate and master's social work programs in the United States. (Doc. # 58 at 8 ¶ 30). CSWE's Commission on Accreditation evaluates programs according to the 2022 Educational and Policy Accreditation Standards ("EPAS"), which establishes thresholds for professional competence. (*Id.*; *see also* Doc. # 55-10). UA's School of Social Work is currently accredited by CSWE. (Doc. # 58 at 8 ¶ 31).

[14] In any event, SB 129 has a provision that expressly provides that nothing in its text prohibits a university from providing instruction to satisfy any accreditation standard or requirement. Ala. Code § 41-1-93(3)a.

[15] Notwithstanding that stipulation, when asked at the hearing whether she had been disciplined by UA for the project, Simon testified that she had been "verbally disciplined and threatened with future disciplinary action" "in the email from Dean Hatcher." (Doc. # 72 at 185). She added that the email from Hatcher "took away [her] academic freedom, which is a form of discipline . . . when you're in academia and you teach at the collegiate level[,] academic freedom is a cornerstone of teaching at the college level." (*Id.*). The court discredits her testimony. She was directed

Simon taught the same course, "Anti-Oppression and Social Justice," in the spring 2025 semester. (*Id.* ¶ 29; Docs. # 56-3 ¶ 11; 70-2). She included the advocacy project as a required assignment. (Doc. # 70-2 at 9). Related to the project, Simon's spring 2025 syllabus states:

> **For your projects, there is no political indoctrination**, as students develop and choose what campaigns to work on. Furthermore, my role is to offer guidance about strategy and tactics, university policy, and to help students consider the variety of options available, with the students deciding on how to best move forward.

(*Id.*) (emphasis in original).

Simon still teaches at UA and plans to teach "Anti-Oppression and Social Justice" in the fall 2025 semester. (Doc. # 72 at 191-92). The University has never told Simon that she cannot use the books, documentaries, or the Harvard Implicit Association Test in her class. (*Id.* at 192). Other than telling her to cancel the sit-in, UA has not specifically directed Simon about what to teach or otherwise do in her class. (*Id.*).

## 2.    Professor Patton

Dr. Dana Patton ("Patton") is a tenured professor of political science at UA where she has taught since 2011. (Doc. # 58 at 8 ¶ 32). Patton's expertise and academic research focus on health policy, social policy, gender politics, leadership, and state politics and policy. (*Id.* ¶ 33). She teaches the following courses, among others: "Understanding Poverty," "Social Investment and the Role of Innovation," "Systemic Change Through Social Entrepreneurship," and "The Politics of Health Policy." (*Id.* at 9 ¶ 36).

Patton also serves as the Director of UA's Dr. Robert E. Witt University Fellows Program (the "Witt Fellows Program"), which is in the Honors College at UA and is made up of select UA students. (*Id.* at 9 ¶ 35; Doc. # 72 at 12). The Witt Fellows Program seeks to develop students "into

---

to cancel the sit-in because it was part of a graded assignment for her course and she did so. There was no discipline involved. Further, as detailed below, principles of academic freedom were not implicated when UA directed her to cancel the sit-in, and in any event a formal assignment to protest SB 129 would have impinged on UA's Resolution on institutional neutrality.

the next leaders of the world" as it prepares them for lives of leadership in and service to their community, state, nation, and world. (Docs. # 58 at 9 ¶ 35; 72 at 13).

As part of the Witt Fellows Program, students take Patton's "Understanding Poverty" course in the fall semester of their freshman year. (Doc. # 72 at 13-14). Patton's syllabus provides the following course description for "Understanding Poverty":

> This seminar will begin developing the students' understanding of and ability to discuss within diverse groups systemic injustices and the need for social change, as well as provide context for experience in meaningful community engagement in future semesters. Specifically, we will examine one of the most enduring social problems in the United States: poverty. Course-specific topics build from a survey of the conceptualization and measurement of poverty, as well as the demographic groups that are most likely to suffer from high poverty rates. We will review alternative explanations for poverty, focusing on the distinction between individual and structural explanations and how this distinction influences public discourse and the politics of poverty. We will explore in detail the major government programs aimed at alleviating poverty, including the major social insurance and public assistance programs, as well as health, education, and civil rights policies.

(Doc. # 55-18 at 1).

Patton testified that she lectures in the course and also uses five books and three documentaries to reinforce what she is lecturing on and provide a "humanizing aspect" to poverty. (Doc. # 72 at 16-17; *see also* Doc. # 55-18 at 2 (listing the required texts for "Understanding Poverty")). Patton explained that the course involves talking about many difficult topics: "We're talking about poverty. We're talking about race. We're talking about structural racism. We're talking about people being evicted from their homes and living on the street. We talk about [the] criminal justice system, bail, fee fines in courts." (Doc. # 72 at 21-22). Patton taught "Understanding Poverty" during UA's fall 2024 semester. (Docs. # 58 ¶ 37; 56-3    ¶ 12).

Patton testified that, before SB 129 going into effect, she did not receive any complaints from UA about her classroom lectures, her assigned readings, the viewpoints discussed in her courses, or her supervision of the Witt Fellows Program. (Doc. # 72 at 28). She testified that this changed after SB 129 went into effect on October 1, 2024. (*Id.*).

According to Patton, on October 8, 2024, she received a phone call from Tiffany Sippial ("Sippial"), the Dean of the Honors College, telling her that Chad Tindol ("Tindol"), UA's Chief Administrative Officer, had called Sippial requesting Patton's syllabus for her "Understanding Poverty" course "because there had been [a complaint made by multiple students] about it." (*Id.* at 28-29). A few days later, on October 14, Sippial called Patton again and informed her that she and Senior Associate Provost Luoheng Han ("Han") were requesting a meeting with her to discuss the complaint. (*Id.* at 29). Patton told Sippial that she wanted to see the complaint before attending a meeting with her and Han. (*Id.*). On October 15, Sippial forwarded Patton an email from Han and Dalton that contained a copy of the complaint, which had been initially emailed to Dalton. (*Id.*; *see also* Doc. # 55-20). The subject line of the email was: "divisive concepts embedded in UA Dr. Robert Witt Fellows Program." (Doc. # 55-20 at 2).

The complaint stated in relevant part:

I am following up on our conversation from a week or so ago regarding the disturbing shift of focus of our prestigious Dr[.] Robert Witt University Fellows program. After these testimonies and conversations, I think it is critical that this program is corrected next semester. I believe the Fellow[s] program may be in violation of our divisive concept legislation that went into effect Oct. 1. The problems stem from the teaching approach and materials selection of leader(s) of the fellowship program. . . .

I have had four freshm[e]n and one sophomore Fellow contact me to voice their concerns and disappointment with the program. Three freshmen have sent me recorded thoughts and I told them I would share them with university leaders and legislators that could be helpful in correcting the direction of the program. . . . The current program seems to have a focus on systemic racism, supporting anti racism, correcting social injustice and producing engaged global citizens (as opposed to patriotic Americans). The viewpoints in the required reading books are presented as the correct perspective and other opinions are shut down. The students have stated they feel unsafe, and scared to speak in class, unable to express their viewpoints in the classroom or in class assignments.

(*Id.*). The complaint also contained quotes from the students who voiced their concerns about the Witt Fellows Program. (*See id.* at 2-4). For example, the students complained that "everything is presented from a liberal standpoint and it must be accepted as fact" and that the course presented

"[n]o room for other viewpoints or opinions which often times feels very stifling." (*Id*. at 3). The complaint did not identify which divisive concepts or which provisions of SB 129 Patton purportedly violated. (*See id.*; Doc. # 72 at 31-32).

Patton testified that she was "completely shocked" after reading the allegations. (Doc. # 72 at 33). She testified, "I didn't know what to think. It did not at all represent how I teach my classes and what I do in the classroom." (*Id.*). She further testified that she regularly reviews the written feedback she receives about her "Understanding Poverty" course and the feedback she had received up to that point did not reflect what she read in the complaint. (*Id.* at 36-37).

On October 16, Patton met with Sippial and Han over Zoom. (*Id.* at 37). Patton testified that she asked for UA counsel to be present at this meeting but she "was told no, that there was no need to have UA counsel at that meeting." (*Id.* at 46).

After the meeting, Han asked Patton "to write up a summary of what [she] had told him during the meeting and the different things that [they] had talked about." (*Id.* at 38). Patton wrote the summary and sent it to Sippial who then sent it to Han on October 17. (*Id.*; *see also* Doc. # 55-21). The summary explained Patton's "approach to teaching the course ["Understanding Poverty"]." (Doc. # 55-21 at 1). In her summary, Patton stated that her lectures "draw from research findings in peer-reviewed academic journals" and that "[q]uestions are posed to the class to prompt discussion. If student comments are one sided, I ask if anyone has a different perspective or view to add to the discussion. If a student does not offer alternative views, I do." (*Id.*). She also stated, "I have never in this class, or in any class I've taught in over twenty years, directed or compelled students to affirm, adopt, adhere to, or assent to a 'divisive concept.'" (*Id.*).

A few hours after this summary was sent to him, Han emailed Patton and asked her to revise her statement and address nine line-items regarding the "Understanding Poverty" course. (Doc. # 72 at 40; *see also* Doc. # 55-22). For example, he asked her to provide the following

information: "[s]pecific examples of opportunities for classroom discussions of varying opinions, how the assigned readings 'offer diverse perspectives and encourage critical analysis,' and how you 'consciously avoid' compelling assent[,]" "[a]ny planned changes to the readings for future semesters[,]" and "[a]ny additional information that you shared with students this semester to clarify your position on open discussion." (Doc. # 55-22 at 1).

Provost Dalton testified that he asked Han for the additional information because Patton's initial summary "wasn't as granular and detailed as [he] would like. So [he] sent back some additional questions to Dr. Han to collect some more information to help . . . create [a] narrative response." (Doc. # 69-7 at 28). He further testified that his goal was to "collect information from Dr. Patton, also with Dean Sippial and provide a narrative back to actually defend Dr. Patton in terms of her ability to teach . . . on poverty in the classroom." (*Id.*). He also testified:

> My intention in reaching out to Dr. Patton, because I believe the information that she is teaching is important, was to try to gather information from her to help respond to this to go back and tell the complainant with a narrative that says we have looked at this; she is presenting things in a – in an unbiased way which provides the opportunity for discussion and debate.

(*Id.* at 21).

After receiving Han's email, Patton "felt very uncomfortable" with the questions because she felt like it was "bumping up against academic freedom." (Doc. # 72 at 41). Patton contacted Associate Provost for Academic Affairs Lesley Reid ("Reid"), asking her if they could meet because she "had an issue concerning the new DEI law."[16] (*Id.* at 42). They met the next day. (*Id.*). Reid informed Patton that she "agreed with [her] that there were concerns about academic freedom, and she said that she would go talk to Provost Dalton immediately about it." (*Id.* at 42-43).

After meeting with Reid, Patton spoke with Dalton briefly at a faculty luncheon. (*Id.* at 43). Dalton told Patton that she needed to answer the additional nine questions from Han and that he

---

[16] Reid and Patton appear to be both colleagues and friends. (Doc. # 72 at 43).

would also like her to complete a "template that [the Office of Academic Affairs] can use when other faculty are accused of violating SB 129 so that it will be easier for them to deal with gathering information in the future when there are future complaints." (*Id.* at 43-44). After speaking with Dalton, Patton again spoke with Reid, who informed Patton that she would need to answer the questions, but also offered to help her "craft a response to the complaint and find a way to answer the questions that would satisfy the complainant but still help [her] not feel like [her] academic freedom was being violated." (*Id.* at 44). Patton testified that she specifically asked Reid what would happen if she chose not to answer the questions or create the template; Reid told her that "disciplinary action could start, progressive discipline, and that ultimately [Patton could] be terminated regardless of [her] tenure status." (*Id.* at 45).

Patton met with Reid on October 21 to go through the nine questions. (*Id.*). They began making an outline that involved "the background of the course, why the course is offered, what's the purpose of the course, how [does Patton] lecture, where [does Patton] find [her] lecture material." (*Id.* at 46). Patton told Reid "multiple times" that "this [was] a lot of information that [had] nothing to do with SB 129." (*Id.*). Patton also asked Reid about who would receive the outline and whether this was "the normal procedure for dealing with student complaints, because [Reid] had said in an open forum that complaints against faculty about SB 129 would be handled like all other complaints." (*Id.* at 47-48).

Reid did not give Patton a definitive answer about who would receive the outline, and she told Patton that "this complaint was not being handled like all other complaints" as "no faculty member had ever been asked to write a document like this in response to a complaint and that clearly a very powerful person was behind this complaint for [Patton] to be asked to provide such extensive detail about [her] course." (*Id.* at 48). Patton testified that she did not know who the

"very powerful person" was, but she assumed it was "either a big donor at the University, a Board of Trustee[s] member, or a state legislator." (*Id.* at 48-49).

After this meeting, Patton emailed Reid, Dalton, Han, and Sippial and informed them that she was "unable to respond" to their request for additional information because she had "serious concerns that the requested information infringe[d] on [her] academic freedom and free speech rights." (Doc. # 69-2 at 5; *see also* Doc. # 72 at 49). Reid responded stating that Patton's input "allows the University to respond by centering the faculty member as the expert in pedagogy and their specific discipline." (Doc. # 69-2 at 4). She also stated that she did not perceive "a request for information such as this as an infringement on academic freedom," but "as an opportunity to educate those who don't know what we do as social scientists; to give them a glimpse into our classrooms and our research." (*Id.*). Reid further stated that Patton's response "would be for [the Provost's] use in responding to the inquiry, not something that would be provided to anyone externally, including the person making the complaint or any of [Patton's] students." (*Id.*).

When Patton refused to give written answers to the questions, Dalton had Reid contact her (Patton). (Doc. # 69-7 at 83). Patton was never disciplined or admonished for her refusal. (*Id.* at 30; *see also* Doc. # 69-2 at 4). Patton later met with Reid to discuss her decision not to respond to the information request. (Doc. # 72 at 50). Patton testified that Reid told her that "they never should have asked [her] to write that document" and "they made mistakes with how they handled [her] case." (*Id.* at 50-51). During that meeting, Patton and Reid crafted a response for Dalton to give to the person who initially complained about Patton's course. (*Id.* at 51). Reid also prepared a memorandum for Dalton summarizing her discussions with Patton. (Doc. # 69-7 at 80; *see also* Doc. # 69-3). Patton testified that during this meeting, she was given the opportunity to tell her side of the story to Reid. (Doc. # 72 at 118).

24

On November 16, 2024, Patton attended a UA football game and was in the President's Box at UA's football stadium when she was introduced to Alabama State Representative Danny Garrett ("Garrett"), who is Chair of the Ways and Means Committee for Education. (*Id.* at 53-54). Garrett inquired about the Witt Fellows Program, asking Patton, "Are you aware that there's a complaint about your program and do you know anything about it?" (*id.* at 55), to which Patton responded "[y]es, I am aware of that." (*Id.*). Then, Garrett asked Patton about the status of the complaint because he had not heard anything about it. (*Id.*). Patton informed Garrett that she had been in many meetings about the complaint and expressed confusion regarding why he had not been updated on the complaint's status. (*Id.*). She suggested that Garrett communicate with Dalton or Tindol to receive an update on the complaint. (*Id.*).

During their conversation, Patton expressed to Garrett that she is the professor and, as the professor, she selects the books that are used in her classes and that state legislators are not qualified to tell her what books to use. (*Id.* at 56). Patton invited Garrett and any other legislators who were interested in the Witt Fellows Program to come to UA and have a discussion with her. (*Id.* at 56-57). About halfway through Patton's conversation with Garrett, Sippial joined. (*Id.* at 59). Shortly after the conversation concluded, Sippial told Patton that they would meet with Tindol to discuss the conversation. (*Id.*).

Garrett later sent Patton the following text:

Hello, Dana. I enjoyed meeting you this afternoon and appreciate you taking time to visit. As we discussed, I will be working with Charlie Taylor [(the government liaison between UA and the state legislature)] to set up a time for you, the Honors College Dean and me to meet with a couple other legislators who have raised concerns. As I expressed today, my desire is to address/resolve concerns and avoid potential major issues in the future. Also, by separate texts I will send you some info that may provide you with a better perspective of my approach and thinking.

(Doc. # 70-14 at 1; *see also id.* at 2-4 (texts including links to articles discussing bipartisanship)).

Patton interpreted Garrett's text message as a threat: "He had made it clear that he controls the budget. He had told me that a state legislator was upset with my program. I had been asked about the books that I assign. He's saying we need to avoid major issues, we need compromise about my class and my decisions about it. It felt very much like a threat to me." (Doc. # 72 at 58). The court cannot credit that testimony because the text contained additional information in which it appears that Garrett was attempting to communicate that he is not a partisan and his view is that legislators should work across the aisle with their colleagues to solve problems. (Doc. # 70-14 at 2-4).

About a week after the football game, Patton, Tindol, Sippial, Dalton, and two members of UA counsel had a Zoom meeting where they discussed Patton's conversation with Garrett. (Doc. # 72 at 59). At the meeting, Patton also asked if UA had responded to Garrett about the complaint. (*Id.* at 60). UA said they had not. (*Id.*). Following the meeting, Patton continued to follow up with UA counsel about whether a response had been given to Garrett regarding the complaint. (*Id.*). Patton eventually heard from Charlie Taylor, who told her there would not be a need for an in-person meeting about the complaint. (*Id.* at 61). Patton testified that she has never seen a response addressed to Garrett or the complaint. (*Id.*).

Dalton testified that the investigation into Patton's teaching "ended up where [he] thought it would, which was [UA] standing on the ground that Dr. Patton has academic freedom to discuss these issues and that she has done so in an appropriate manner in the classroom." (Doc. # 69-7 at 80).

UA did not discipline Patton based on the complaint it received relating to her "Understanding Poverty" course or otherwise. (Docs. # 58 at 9 ¶ 39; 56-3 ¶ 15; 69-7 at 30; 72 at 63-64). Patton plans to teach "Understanding Poverty" again in the fall 2025 semester and

26

continues to be the Director of the Witt Fellows Program. (Docs. # 58 at 9 ¶ 38; 72 at 118, 122; 69-7 at 30).

When asked whether she has "any concerns about the potential for discipline and SB 129 in the future," Patton testified, "[y]es, I do." (Doc # 72 at 64). She explained that these concerns are based on her conversation with Reid, who "made it very clear that having tenure does not protect someone from disciplinary action." (*Id.*). She also expressed concern over what might happen if "another student or state legislator decides they don't like something [she is] teaching in a class and they want [her] to change it." (*Id.*).

Because of her concerns, Patton says she has changed how she teaches some of her courses. (*Id.* at 65). For example, she has stopped using the Harvard Implicit Association Test in her courses. (*Id.* at 65-66). Patton has also decided to limit her small group book discussions and not use the three documentaries she typically shows in "Understanding Poverty"  because she is concerned her students may experience feelings of guilt from these materials, which could lead to allegations that she violated SB 129. (*Id.* at 67-68). Specifically regarding the small group book discussions, Patton stated that she "can't control what students are talking about" and therefore is worried that if a student talks about something that suggests a violation of SB 129, she may be complained about "because [she's] in charge of the classroom." (*Id.* at 69). Patton also testified that she no longer posts her PowerPoint slides online for fear that the information on them will be taken out of context and could be construed as violative of SB 129. (*Id.*). Finally, Patton testified about how she no longer teaches certain theories in her courses because students may "perceive what [she] is teaching to be in violation of [SB 129] and make a complaint." (*Id.* at 71-72). She explained that "it's easier to not teach [the theories] than risk the complaint." (*Id.* at 72).

Although Patton testified that she felt "pressure" to change the readings and documentaries in her courses, no one at UA explicitly told her to make these changes. (*Id.* at 109, 111-12). She testified that she felt this pressure based on:

> The way that [SB 129] was applied to me and the way the complaint was investigated and the way that I was told that noncompliance can result in progressive discipline and termination regardless of your tenure status, the fact that legislators are involved in claiming that I violated this law, that I have divisive concepts embedded in my program, yet have not told me which ones . . . all of those things – even though no one said, Dr. Patton, change your class in this way . . . I have a fear, based on what happened to me, that there could be a complaint again. And so, yes, I am changing my courses for that reason.

(*Id.* at 113). She further testified that she decided to make the course changes out of "self-protection." (*Id.* at 119).

Patton also testified, "these students don't understand the law. The way it's written, students think if you're talking about race or gender, you're talking about something divisive and you are contrary to the law and let me just go report you because you've said something I don't like." (*Id.* at 70-71). The court finds this self-censorship stems from concerns about student complaints, not SB 129's requirements. This finding is supported by other evidence.

When asked about whether she is worried that the coursework she assigns "advocates for or requires assent to a divisive concept," Patton responded, "[y]es, absolutely, I do." (*Id.* at 73). She explained that her courses cover difficult topics, such as "structural racism, gender discrimination, redlining, housing discrimination, employment discrimination, health disparities based on race," which she testified "can be perceived as violating [a] divisive concept." (*Id.* at 73-74). Specifically, she testified that she is concerned that teaching about implicit biases could implicate divisive concepts (d), (f), and (g) of SB 129. (*Id.* at 74). For instance, she explained that when teaching about implicit associations and utilizing the Harvard Implicit Association Test, she cannot "control how students might perceive those," so for example, a student may subconsciously

come to believe that he is a sexist after learning about his implicit associations.[17] (*Id.* at 74-75). She also explained that when she teaches about these implicit associations, students sometimes learn that they actually have certain implicit associations, which makes them feel guilty or to blame, and that is something Patton cannot control. (*Id.* at 75). Additionally, Patton expressed concerns about violating divisive concept (e) of SB 129 when she teaches about the Civil Rights Movement and the legacy of slavery because teaching on these topics may lead white students to feel "inherently responsible for actions committed in the past." (*Id.*).

Patton was asked about whether the safe harbor provisions in SB 129 "mitigate [her] concerns about potentially violating SB 129" because they allow her to teach about divisive concepts in an objective manner and in a historically accurate context. (*Id.* at 77-78). Patton responded that although she teaches objectively and in a historically accurate context (*id.*), the safe harbor provisions do not mitigate her concerns:

> Because of what happened to [her] with the complaint being filed, with state legislators involved, wanting [her] to change aspects of [her] class, being accused of being in violation of the law with embedded divisive concepts in [her] program, but no one ever telling [her] what they actually were. This idea that the University secured carve-outs for academic freedom such as this really has not held up in [her] situation. [She doesn't] feel like [the safe harbor] gives [her] any protection whatsoever based on what [she] experienced.

(*Id.* at 76-77).

Patton also testified that she wished that SB 129's safe harbor provision on "teach[ing] topics in an objective manner without endorsement" was better defined. (*Id.* at 77). She expressed a concern that what she teaches could inherently look like "endorsement" because "it's very reasonable to think that students will feel that [she is] endorsing what [she is] teaching them, that [she] stand[s] behind what [she is] teaching them." (*Id.*).

---

[17] Patton admitted that the Harvard Implicit Association Test does not violate divisive concept (d) of SB 129, but she is still concerned that students could *construe* it as a violation. (Doc. # 72 at 121-22).

Patton was also asked about UA's Resolution on institutional neutrality. (*Id.* at 83). She testified that as an employee of UA, she is bound by the University's policies. (*Id.* at 95). Patton further testified that she understood that under the institutional neutrality policy there is a difference between speaking as professors representing the University and speaking as private citizens not representing the University. (*Id.* at 82). Additionally, she testified that under the policy, the University has an interest in protecting the educational experience of its students and a responsibility "not only to promote a lively and fearless freedom of debate and deliberation but also to protect that freedom when others attempt to restrict it." (*Id.*).

Patton agreed with UA's Resolution on institutional neutrality that "students should be able to express their opinions even if it offends their classmates" and "students shouldn't be required to express the same viewpoint as their professors or their fellow classmates in order to get a successful grade in a class." (*Id.* at 86). She testified that she does not require her students to agree with her in class and that doing so would be inappropriate. (*Id.*). Specifically as to SB 129, she testified that she has never required a student to say that a person's moral character is determined by their race or that meritocracy is racist. (*Id.* at 89, 92). She further testified that requiring that would not be a good teaching practice. (*Id.* at 94).

Patton also testified that both students and the University have academic freedom – which includes the University's ability to decide what courses are taught. (*Id.* at 95). Additionally, Patton testified that the University has an obligation to investigate when a student makes a complaint concerning their academic freedom in the classroom. (*Id.*). Such an investigation includes finding out what the facts are surrounding the complaint. (*Id.* at 97, 113, 122). She added that the University "can't stop students from making complaints." (*Id.* at 122). Patton specifically testified that the University "absolutely" had an obligation to investigate the complaint lodged against her "Understanding Poverty" course. (*Id.* at 97).

30

Again, Patton has never been disciplined by the University or told that she has violated SB 129. (*Id.* at 118). And, she is not aware of any other professor being disciplined at UA for violating SB 129. (*Id.* at 122). Despite this, she is still concerned that she will be accused of violating SB 129 and disciplined by the University. (*Id.* at 121).

### 3.    Professor Fording

Dr. Richard Fording ("Fording") is a professor of political science at UA where he has taught since 2011. (Docs. # 58 at 9-10 ¶¶ 42-43; 72 at 195). Fording's expertise and academic research focus on American politics and public policy administration. (Doc. # 58 at 10 ¶ 44). He primarily teaches courses about the intersection among race, ethnicity, and politics. (*Id.*). His teaching emphasizes how the politics of race and class affect the design of public policy and social welfare policies and perpetuate race and class inequalities. (*Id.*).

Fording attended UA's legal training on SB 129 in August 2024. (Doc. # 72 at 198). He testified that Dr. Lisa Dorr, a professor in the History Department and the College of Arts and Sciences Resource Liaison, offered the legal training. (Doc. # 73 at 65; *see also* Doc. # 55-25 at 1). Dorr is not a lawyer. (Doc. # 73 at 65). Fording noted that while in-person attendance of the training was not required, UA professors were required to pass quizzes related to the training "to show that [they] actually learned the material." (Doc. # 72 at 198-99). Fording explained that the training "cover[ed] a broad range of topics related to [the professors'] role as instructors . . . [such as] relationships with students . . . and issues related to academic freedom. And then new to the training . . . was a section on SB 129." (*Id.* at 199).

The PowerPoint slides that covered SB 129 advised that SB 129 "does not prohibit the discussion of 'divisive concepts' if they pertain to the topic of [a] course" and that professors "can require students to be familiar with these concepts and discuss them in class as long as it is done in an 'objective manner, without endorsement, and in a way that does not compel assent to the

concept.'" (Doc. # 55-25 at 97 (emphasis omitted)). Another slide recommended that professors "talk, don't test" on SB 129's divisive concepts. (*Id.* at 98; *see also* Doc. # 73 at 65). Fording testified that he understood from the legal training that students get to decide what it means to "compel assent" to SB 129's divisive concepts. (Doc. # 72 at 206). He explained his reasoning: "the fact that the University is telling us don't test on these topics because a student might . . . think they're being compelled to, you know, assent to it acknowledges . . . I think implicitly acknowledges that the student is able to subjectively define what it means to compel assent." (*Id.* at 206-07). The court does not credit this testimony. Both common sense and the specifics of the Patton investigation show that it is the University that reviews and decides if SB 129 is implicated by classroom instruction. Fording admitted that "talk, don't test" was a recommendation made by Dorr, a non-lawyer, and was not a mandatory requirement. (Doc. # 73 at 66). He also admitted that no one else from UA directed him only to talk, not to test. (*Id.*).

Fording stated that although there was a PowerPoint slide listing the divisive concepts, there was no other explanation by UA during the legal training about what the divisive concepts meant. (Doc # 72 at 201; *see also* Doc. # 55-25 at 96 (slide listing SB 129's divisive concepts)). Fording was asked, "After taking this legal training, did you have an understanding of how to teach the topics in your class without assignments or testing to avoid violating SB 129?" (Doc. # 72 at 202). Fording responded, "Well, it can't be done. . . . [Because] inherent in teaching is ensuring that your students are learning, and there's no way that you can do that without assessing their learning. And you have to do that through tests and assignments." (*Id.*). He further testified that his teachings may implicate divisive concepts. (*Id.*).

After SB 129 went into effect, Fording became aware of the situations involving Patton and Simon. (*Id.* at 210). For instance, Patton informed Fording about the complaint made against her in October 2024. (*Id.*). This incident made him worry that he may be disciplined under SB 129

because he teaches on "much of the same material" in his course "Politics of Poverty" that Patton covers in her course "Understanding Poverty." (*Id.* at 212). Fording learned about Simon's cancelled sit-in through UA's school newspaper, *The Crimson White*. (*Id.*). After learning about both of these incidents, Fording contacted John Petrovic ("Petrovic"), a colleague in the College of Education who is also in the faculty senate (but not a party in this case). (*Id.* at 213). After Fording contacted Petrovic about his concerns about the enforcement of SB 129 on campus, Petrovic emailed Dalton about how UA handled Simon's sit-in project. (*Id.*).

Petrovic's email stated in relevant part:

Dear Jim,

It is with great consternation and disappointment that I recently read the Crimson White story about Dr. Cassandra Simon's class in Social Work. I write to you to share my thoughts and the feelings of every other faculty member with whom I have spoken about this.

. . .

I am not sure why UA is interpreting this law so broadly (read: conservatively) . . . . The law does not prohibit promoting, discussing, defining, engaging with, understanding or otherwise teaching about key concepts in many fields, including "diversity," "equity," and "inclusion."

. . .

The pall of anxiety and fear inevitably leads to the pall of orthodoxy of which Justice Brennan warned us so many years ago in his defense of academic freedom.

(Doc. # 70-20 at 2-3).

Dalton responded:

Dear John,

Thanks for your message. I appreciate it. As I hope you know, I share everyone's concerns when external factors impact our institutional dependence or limit our academic freedom, curricular, co-curricular, academic support, and research programs. . . . To your point, this may likely be viewed or experienced as UA interpreting the law too broadly on many occasions. I frankly would rather be in the position of having cautioned scores of faculty regarding potential violations than meting out a single sanction for a confirmed violation. . . .

(*Id.* at 1).

Petrovic forwarded this email chain to Fording. (*Id.*; Doc. # 72 at 213). Fording testified that after receiving these emails, he was "surprised, shocked, [and] disappointed" and "[i]t confirmed for [him] what [he] was starting to . . . believe based on the legal training and then the experiences of Dr. Patton and Dr. Simon that the law was being interpreted very broadly both in terms of how to interpret compelling assent but also what a divisive concept is." (Doc. # 72 at 216). He added that the email from Dalton "confirmed for [him] that [Dalton] was okay with what he was doing in enforcing the law." (*Id.*). Based on Dalton's email (but not on any direction from anyone at UA), Fording had concerns about his courses and decided to change them. (*Id.* at 217).

Fording testified that outside the legal training he attended and Dalton's email to Petrovic, the State has not provided any guidance regarding SB 129. (Doc. # 73 at 38). But, Fording later testified that he "skim[med] through" UA's published guidance for professors on its website titled "Resources and Recommendations for Handling Difficult Topics in an Academic Setting" when evaluating what he planned to do in his courses. (*Id.* at 66-67; *see also* Doc. # 69-4).

At UA, the relevant courses Fording teaches are the following: "The Politics of Poverty," "Social Movements and U.S. Politics," and "The Politics of Voting Rights." (Doc. # 58 at 11 ¶ 52; *see* Docs. # 55-26 ("The Politics of Poverty" syllabus); 55-31 ("Social Movements and U.S. Politics" syllabus); 55-34 ("The Politics of Voting Rights" syllabus)). Fording testified that because of SB 129, he has stopped teaching "The Politics of Poverty" course and has altered the content in his other courses out of concern that the content may relate to SB 129's divisive concepts. (Docs. # 72 at 197; 73 at 18). Again, no one at UA advised him to do so. (Doc. # 73 at 83-84).

"The Politics of Poverty" course covered the meaning of poverty, why people are poor, and antipoverty social welfare programs in the United States. (*Id.* at 4-5). He also taught about institutional and structural explanations for poverty, which are supported by social science

research. (*Id.* at 10). He showed the documentary *Slavery by Another Name* and assigned course materials on racial prejudice as it relates to welfare policies. (*Id.* at 10-11, 14). Fording tested and assigned writing assignments on these topics. (*Id.* at 15-16; *see also* Doc. # 55-26).

Fording also taught on eugenics, a theory that certain traits are inheritable and related to one's race. (Doc. # 73 at 7). Although he does not personally advocate for this theory (*id.* at 64), he would assign coursework that advocates the arguments made in support of eugenics. (*Id.* at 7-8). Fording is concerned that teaching on eugenics could violate divisive concepts (a),[18] (b),[19] and (c).[20] (*Id.* at 39). For example, related to divisive concept (a), by teaching on the theory of eugenics, he is concerned he may be introducing students to the perspective that people of color and women are genetically inferior, and related to divisive concept (b), he is concerned he may be introducing students to the argument that because some groups are genetically inferior, it is permissible to discriminate against them. (*Id.*). Fording explained that it would be a bad practice for a professor to require students to agree with the theory of eugenics, but he added that it would be a bad practice not to teach it in general because students need to understand the theory. (*Id.* at 64). During the hearing on the preliminary injunction, the Board made clear that Fording can still teach about eugenics. (*Id.*).

Fording is also concerned that his course content in "The Politics of Poverty" involves all of the divisive concepts listed in SB 129. (*Id.* at 40). He testified that teaching about structural racism and the causes of poverty involves discussing justifications for these concepts, which could violate divisive concepts (a), (b), and (c). (*Id.*). Additionally, he is concerned that discussing these

---

[18] "That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." Ala. Code § 41-1-90(2)(a).

[19] "That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin." *Id.* § 41-1-90(2)(b).

[20] "That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin." *Id.* § 41-1-90(2)(c).

concepts could lead students to believe that white people are inherently responsible for past actions, which could lead his white students to feel implicated or guilty. (*Id.* at 41-43). Fording testified that he does not explicitly suggest that students should feel guilty, but he has personally seen students in his course express guilt after discussing structural racism and slavery in the United States. (*Id.* at 43).

Fording testified that he would continue teaching "The Politics of Poverty" if SB 129 did not exist. (*Id.* at 17-18). UA has not told Fording that he cannot teach the course. (*Id.* at 18). He made the decision not to teach "The Politics of Poverty" "based on everything that [he's] witnessed since [SB 129] has been implemented." (*Id.*).

Fording testified that he has made several changes to his course "Social Movements and U.S. Politics." (*Id.* at 20). For example, he stated that he has "reduced coverage" of the Black power movement, the Black Lives Matter movement, and the white nationalist movement by reducing the number of assigned readings and discussions on these movements. (*Id.* at 21-24). Fording testified that he is concerned that teaching on the Black Lives Matter movement would violate the following provisions of SB 129 – Alabama Code § 41-1-91(2)[21] and (3).[22] (*Id.* at 24). And, he is concerned that teaching on the white nationalist movement could violate divisive concepts (a), (b), and (c). (*Id.* at 39-40). Fording testified that he would still discuss these topics if SB 129 were not in effect. (*Id.* at 25).

Fording plans to teach "Social Movements and U.S. Politics" in the fall 2025 semester. (*Id.* at 25). Although he has made adjustments to how he teaches the course, he testified that he still

---

[21] "A state agency, local board of education, or public institution of higher education may not do any of the following: . . . Direct or compel a student, employee, or contractor to personally affirm, adopt, or adhere to a divisive concept." Ala. Code § 41-1-91(2).

[22] "A state agency, local board of education, or public institution of higher education may not do any of the following: . . . Require its students, employees, or contractors to attend or participate in any diversity, equity, and inclusion program or any training, orientation, or course work that advocates for or requires assent to a divisive concept." *Id.* § 41-1-91(3).

has concerns about the content he covers in the course, such as his coverage of the Civil Rights Movement. (*Id.* at 25-26).

Fording also testified that he has made several changes to his course "The Politics of Voting Rights." (*Id.* at 26). He explained that the course covers the history of voting rights and contemporary controversies surrounding election law. (*Id.* at 26-27). Fording testified that he fears teaching the history of Jim Crow and how election laws have stemmed from white supremacy, which is "all historical fact," could run afoul of SB 129. (*Id.* at 31). Fording explained that he is concerned that students may "misinterpret" what he says and what he means, which "happens all the time" because "even if you don't explicitly endorse something, students often attribute . . . that to the instructor." (*Id.*). As he put it: "I fear just getting into discussions about race and racial discrimination, historical or contemporary, you know, potentially subjects me to a complaint." (*Id.*). Fording is also concerned that teaching on historical racial discrimination and election laws could violate divisive concepts (b) and (c). (*Id.* at 44). He explained that teaching on explicit, intentional discrimination against African Americans includes teaching about the justifications people gave for such discrimination, which could violate those divisive concepts. (*Id.*). He also testified that teaching on implicit bias in the class could violate divisive concept (d). (*Id.* at 45). Fording plans to teach "The Politics of Voting Rights" in the spring 2026 semester. (*Id.* at 30).

Regarding his general concerns over SB 129, Fording testified that he does not explicitly compel his students to assent to his views, but he is concerned that students may interpret his instruction as compelling assent because since students are required to participate in class, they could interpret the coursework as compelling assent. (*Id.* at 46, 48-49). He explained that this concern is based on the University's handling of Patton's complaint and UA's legal training. (*Id.* at 46). Fording also explained that he has "confusion over how to define what it means to compel assent." (*Id.* at 47).

Fording also testified that he does not think that the University has a "firm understanding" of what a divisive concept is. (*Id.*). This belief is based on the complaint made against Patton because Fording did not think that her course involved a divisive concept, yet the complaint "was allowed to go forward and [Patton] got sort of dragged through the mud." (*Id.*). This testimony reflects a fundamental misunderstanding of the process involved in receiving and processing a complaint in general, and what occurred with respect to the Patton complaint in particular.[23]

When asked about the safe harbor provisions and his understanding about teaching topics in his courses in an objective manner without endorsement and without violating SB 129, Fording testified that many questions he asks his students involve divisive concepts and because there is not a clear answer based on the balance of the evidence for some topics, it could appear that he is endorsing an answer even though he is presenting the topic in an objective manner. (*Id.* at 50). Fording did admit, however, that it is the responsibility of professors to teach in an objective manner. (*Id.* at 87). Fording also expressed concern over the safe harbor that involves teaching in a historically accurate context. (*Id.* at 51). He explained that when he is discussing certain aspects of history with his students, they often have strong reactions to it and will express them in class, which could "end up potentially making students feel like [he is] endorsing a divisive concept or [the students] feel pressured to . . . adhere to one." (*Id.*).

---

[23] During his testimony, Fording seemed particularly dismissive of student complaints. (Doc. # 73 at 79-81). He testified that the University does not have an obligation to investigate every student complaint involving an alleged violation of academic freedom in the classroom. (*Id.* at 79). He explained that if the student makes a *credible* complaint, it should be investigated, but "[s]tudents complain about everything," so, in his opinion, the University should protect professors from frivolous complaints. (*Id.* at 79-81). But a university has no choice to do anything other than investigate a student complaint once it is received. It must determine whether the complaint is valid or not, a point with which Patton explicitly agreed with. In fact, student complaints should trigger a prompt investigation into what has occurred in the classroom. And, it is incumbent on all those involved to cooperate in any review of the matter. Patton testified that the University has an obligation to investigate when a student makes a complaint concerning his or her academic freedom in the classroom and such an investigation includes finding out what the facts are surrounding the complaint. (Doc. # 72 at 97, 113, 122). Patton added that the University cannot stop students from making complaints. (*Id.* at 122). As the Eleventh Circuit has pointed out, in the context of observing "the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid," the "University's interest is most obvious when student complaints suggest apparent coercion – even when not intended by the professor." *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991).

When asked how SB 129 has affected his duties as a professor, Fording testified that he cannot teach "some of the most important material without putting [himself] at risk[,]" that he is "walking on eggshells[,]" and he often has to "discourage discussion when [he] cover[s] the topics to the extent that [he] cover[s] them now." (*Id.* at 51-52). He further testified that he is confused about what could be interpreted as a divisive concept. (*Id.* at 52).

Although Fording has not talked to anyone in UA's Provost Office or Counsel Office about teaching on divisive concepts, he testified that based on the legal training he attended and the University's reaction to Patton's complaint, he believes UA has discouraged testing on divisive concepts. (*Id.* at 74, 78). Fording admitted that UA's official guidance states that professors can test on divisive concepts, but he thought that this conflicted with the legal training by Dorr, which he interpreted as "you put yourself at risk if you test." (*Id.* at 73-74; *see also* Doc. # 69-4 (UA's "Resources and Recommendations for Handling Difficult Topics in an Academic Setting")).

At the evidentiary hearing, Fording was asked about academic freedom at UA. (Doc. # 73 at 76). He testified that academic freedom involves the interests of professors, students, and the University, and that under academic freedom, students have a right to hold opinions about certain divisive topics, but their grades in courses should be based on their performance, not their beliefs. (*Id.* at 80-81). He agreed that academic freedom is a policy adopted by UA and that UA has a process to address violations of academic freedom. (*Id.* at 76-77; *see also* Doc. 56-7 at 88-109 (UA Faculty Handbook)).

### E.    SB 129's Impact on Organizations at UA

Plaintiff Alabama NAACP claims that SB 129 has caused harm to its members and to Alabama NAACP itself. (Doc. # 12-7 ¶ 7).

Alabama NAACP's mission is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and

accelerate the well-being, education, and economic security of Black people and all persons of color." (*Id.* ¶ 3). Alabama NAACP's membership is open to all races. (*Id.*).

Alabama NAACP has chapters at various universities throughout the state of Alabama, including UA ("the UA NAACP Chapter" or "the Chapter"). (*Id.* ¶ 8). The UA NAACP Chapter has around forty-five members, each of whom are students at UA. (*Id.*).

In the fall 2024 semester, UA closed the Black Student Union ("BSU") and Safe Zone Resource Center ("Safe Zone") office spaces. (Doc. # 58 at 20 ¶ 95). Both the BSU office and the Safe Zone office were located in the Student Center. (*Id.* ¶¶ 92-93). The BSU office was converted into a food pantry, open to all individuals, and the Safe Zone office became the Student Leadership Lounge. (Docs. # 1 ¶ 131; 56-3 ¶ 21; 73 at 200). Members of the UA NAACP Chapter attended events and spent time in both spaces. (Doc. # 12-7 ¶ 16).

The BSU's mission is stated as follows:

> To establish and innovate relationship opportunities and experiences for minority students at the University of Alabama. We also serve as a liaison between the minority student body and administration in efforts to uphold the values stated in the Capstone Creed. We serve our members by providing community service opportunities, mentoring relationships within BSU, and providing outlets for expression and discussion. We strive to address the issues that affect our community on campus, locally, and internationally. Our goal is to provide a safe and welcoming environment for all students who wish to be a part of it.

(*Id.* ¶ 13 (citing Black Student Union, My SOURCE, https:// mysource.ua.edu/organization/uabsu (last visited Jan. 28, 2025))). The BSU does not limit its membership events to any particular race, although it focuses on the needs of Black students at UA. (*Id.* ¶ 14). Prior to the closure of its office space, BSU held a variety of programming, including educational programs, social events, and charitable fundraisers in the BSU office. (*Id.*).

The Safe Zone "promotes equity and inclusion for LGBTQIA+ individuals at The University of Alabama. The Center provides educational outreach, community support and crisis intervention resources for LGBTQIA+ members of the University of Alabama community and

their allies." (*Id.* ¶ 15 (citing The University of Alabama Safe Zone Resource Center, Alabama LGBTQ+, www.alabamasafezone.com/archiveszrc (last visited Jan. 28, 2025))). It does not limit its membership or participation in its programming to LGBTQIA+ individuals. (*Id.*).

Again, before the closure of the BSU and Safe Zone offices, members of the UA NAACP Chapter attended events and spent time in both spaces. (*Id.* ¶ 16). In a declaration, Bernard Simelton ("Simelton"), President of Alabama NAACP, stated that he is concerned that the UA NAACP Chapter will be ineligible for university funding or university space on campus "in light of [UA's] decision to deny office space to the BSU and Safe Zone in compliance with SB 129" and that the UA NAACP Chapter will be deemed a DEI program. (*Id.* ¶ 17). Additionally, he stated he is concerned that "the loss of campus space will leave Black students and Black LGBTQIA+ students without places to congregate, network and organize affinity-related events." (*Id.*).

The UA NAACP Chapter operates a "speakers bureau" that arranges for on-campus speakers to come to UA. (*Id.* ¶ 10). Simelton stated that the "UA NAACP Chapter has hosted various events that could be considered violations of a 'divisive concept' prohibited in SB 129 and that the Chapter plans to hold similar events in the future." (*Id.*). Simelton also stated that "[w]ithout university funding, it would be difficult for the UA NAACP to host events and provide programming for its membership." (*Id.*).

Simelton also stated that Alabama NAACP and the UA NAACP Chapter "regularly address issues concerning structural racism – including implicit bias, white privilege, and the use of terms like 'meritocracy' to justify ongoing discrimination and exclusion – that may be considered prohibited 'divisive concepts' under SB 129." (*Id.* ¶ 18). Specifically, he is concerned that divisive concepts (b), (c), (d), (e), (f), (g), and (h) may be implicated. (*Id.*). He further stated that "[i]t would be impossible for the UA NAACP to avoid these issues in order to receive eligibility for university funding." (*Id.*).

Simelton also stated that "SB 129's prohibitions are vague, confusing, and difficult to understand," which makes it difficult for Alabama NAACP to determine whether its UA NAACP Chapter constitutes a "diversity, equity, and inclusion program" under SB 129 and "whether it is eligible for university funding and space." (*Id.* ¶ 19). He explained that it is "unclear" "whether Alabama NAACP and the UA NAACP – or events that [they] put on – would constitute '[a]ny program, class, training, seminar, or other event where attendance is based on an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation.'" (*Id.*).

At the hearing on the motion for preliminary injunction, Ja'Kobe Bibbs ("Bibbs") testified. (Doc. # 73 at 174). Bibbs is a junior at UA and also serves as the lead reorganizing member of the UA NAACP Chapter, meaning that he rechartered the Chapter on UA's campus. (*Id.* at 175). Bibbs also serves as the president of the UA NAACP Chapter. (*Id.* at 175). Bibbs testified that all members of the UA NAACP Chapter are members of Alabama NAACP. (*Id.* at 176).

Bibbs also testified that the BSU space was open to all students regardless of race or ethnicity and was not limited to members of the BSU. (*Id.* at 177). Bibbs was unaware of how or why the BSU initially received the office space, but he testified that the BSU was given the space around the late 2010s. (*Id.* at 210).

Bibbs testified that the BSU space was used "to foster connections and relationships." (*Id.* at 178). He said that before the closure of the BSU space, he used that office various times throughout the week and explained that it was "where [he] first cultivated the idea to really engage and recharter[] [UA's] NAACP Chapter." (*Id.*). Bibbs also testified that he formed relationships with four students at the BSU space who eventually became leaders in the UA NAACP Chapter: Student 1, Student 2, Student 3, and Student 4. (*Id.* at 178-80). Student 1 served as the Chapter's Events Coordinator, Student 2 served as the Chapter's Secretary, Student 3 served as the Chapter's Vice President, and Student 4 served as the Chapter's Press and Publicity Chair. (*Id.* at 178-81).

Bibbs further testified about mentorship at the BSU space, which led him to apply to UA's Blackburn Institute, a program that fosters and cultivates civic engagement in students at UA. (*Id.* at 180, 182). Bibbs described the BSU space as "invaluable" because it was a place where he and other Black students could go to talk about issues affecting them. (*Id.* at 186, 189-90).

At the hearing, Bibbs testified that the BSU space closed in summer 2024 because of the enactment of SB 129. (*Id.* at 182). He learned of this based on an article in *The Crimson White* that explained that the BSU and Safe Zone offices were closing due to SB 129. (*Id.* at 182-83; *see also* Doc. # 70-23). The article quoted Alex House, Associate Director of Communications for UA, who stated, "In accordance with state and federal laws, no University program, space, or benefit will contain impermissible restrictions, preferences, or limitations related to race, color, religion, sex, ethnicity, national origin, sexual orientation or gender identity." (Doc. # 70-23 at 1). In the article, House "added that the University met with student leaders of the BSU and organizations who used the Safe Zone to discuss the closures." (*Id.*).

Bibbs testified that the following student groups currently have dedicated space in the Student Center: the "Blackburn Institute, [the] Student Government Association, [and] Fraternity and Sorority Life." (Doc. # 73 at 204).

Bibbs explained that using the BSU or Safe Zone spaces did not cost money or require booking in advance; however, now that those spaces have closed, members of the UA NAACP have to reserve rooms on campus, which must be done in advance and sometimes costs money. (*Id.* at 187). He admitted that the UA NAACP Chapter could use other spaces on campus to meet, but he expressed concern over finding space that could accommodate large groups. (*Id.* at 201-03).

Bibbs described the events that the UA NAACP Chapter hosts. (*Id.* at 192). He explained that this past year, the Chapter had monthly general body meetings in collaboration with other

student organizations and hosted guest speakers. (*Id.*). The speakers discussed topics such as voting rights, gerrymandering, and how the Alabama legislative session works. (*Id.* at 192-94).

The UA NAACP Chapter also held an off-campus town hall event in 2024 regarding the impacts of SB 129. (*Id.* at 197). The event allowed students, professors, and members of the Tuscaloosa community to speak to officials about their experience with SB 129 and its impact on UA's campus. (*Id.* at 198). Bibbs testified that the event was held off campus because the UA NAACP Chapter was concerned it would be cancelled in light of the cancellation of Dr. Simon's sit-in project. (*Id.*). Bibbs also testified that the UA NAACP Chapter advisor expressed concerns that attending the event in her role as a UA employee could jeopardize her job. (*Id.* at 199).

Bibbs testified that the UA NAACP Chapter plans to host speakers during the upcoming school year. (*Id.* at 194). One event the Chapter hopes it can put on involves the oppression of African Americans and minorities in today's mass incarceration system. (*Id.* at 195). He stated that the Chapter plans to collaborate with Alabama NAACP on this event. (*Id.*).

Bibbs also testified that he would like to seek funding from UA for some of the Chapter's future events, but he has concerns that these events might be ineligible because they could relate to a divisive concept or constitute a DEI program under SB 129. (*Id.* at 196). Bibbs testified that his concerns stem from the closure of the BSU and Safe Zone office spaces. (*Id.* at 196-97).

Bibbs admitted that the UA NAACP Chapter has never applied to the Student Government Association for funding, nor has the Chapter ever been denied access to space on campus. (*Id.* at 208; *see also* Doc. # 56-3 ¶ 24).

### F.     UAB Students' Concerns

#### 1.     Sydney Testman

Sydney Testman ("Testman") is a Black woman and a rising senior at UAB where she is pursuing a bachelor's degree in political science and a master's degree in public administration.

(Docs. # 58 at 14 ¶¶ 62-63; 73 at 94). While at UAB, Testman has been involved in many organizations, such as the Social Justice Advocacy Council ("SJAC") and the Undergraduate Student Government Association ("USGA"). (Doc. # 73 at 94).

SJAC is a student organization at UAB whose mission is "to celebrate diversity of identity, broader cultural understanding, encourage unity, empower marginalized and underrepresented groups, educate about social justice and identity related issues, and promote intercultural interactions between all communities of people at UAB." (Doc. # 12-6 ¶ 5). It previously had two boards: a programming board and an affiliate board. (Docs. # 58 at 57 ¶ 147; 73 at 97-98). Testman testified that SJAC advanced its mission by hosting programming events on campus through its programming board and funding different student organizations on campus through its affiliate board. (Doc. # 73 at 95). From August 2023 to May 2024, Testman served as the Finance Coordinator for SJAC. (Doc. # 58 at 14 ¶ 64).

As the Finance Coordinator, Testman was part of SJAC's affiliate board. (Doc. # 73 at 96). In her role, Testman processed the organizations' funding requests. (*Id.*). The UAB administration did not have any input in how SJAC disbursed the funds to different student organizations. (*Id.*). In her position, Testman received two stipends a year, totaling $600, which went directly to pay her tuition balance. (*Id.*).

Prior to the enactment of SB 129, SJAC was a University Funded Organization ("UFO"), meaning it received funding directly from the University. (*Id.* at 96-97). Specifically, SJAC received its funding directly from the Student Multicultural and Diversity Programming ("SMDP") Office, which in turn received its funding from the Department of Student Affairs. (*Id.* at 98; Doc. # 58 at 19 ¶ 81). A UFO is defined as:

> [A] club or organization whose membership is composed of UAB students and is directly supported through a University department or division. The University Funded Organization's purpose aligns with that of the department or division and is directly advised and financially supported by that unit. University Funded

Organizations are required to participate in all registration processes in order to remain in good standing with the University.

(Doc. # 69-10 at 2).

In contrast, a Registered Student Organization ("RSO") is:

[A] club or organization whose membership is composed of UAB students. RSOs are created by students and supported by a voluntary faculty/staff advisor, as well as student governance. The University supports the creation of RSOs whose purposes and activities enhance the social, cultural, recreational, and educational functions of the University.

(*Id.*). Dr. Mary Wallace ("Wallace"), UAB's Assistant Vice President for Student Experience, explained the difference between UFOs and RSOs: "[An RSO] is independent of a department. They are able to register through the University and carry out their own mission, their own programming, their initiatives. . . . [UFOs], since they are part of a mission of a department, are funded through the department." (Doc. # 69-8 at 17-18). UFOs may use UAB's name and logo as part of their branding, but RSOs may not. (*Id.* at 19-21; *see also* Doc. # 26-1 at 9, 13).

UFOs receive automatic funding each semester from the UAB department or division that sponsors them, while RSOs must apply for funding on a semester-by-semester basis from the USGA. (Doc. # 26-1 at 3 ¶¶ 6-7). Thus, as a UFO, SJAC's funds were automatically allocated. (Doc. # 73 at 97). SJAC received around $10,000 annually,[24] which was split between its programming board and affiliate board with $5,000 allotted to programming events and $5,000 allotted to funding student organizations through the affiliate board. (*Id.* at 97-98). Before SB 129 was enacted, the two sources of university funding for RSOs were USGA and SJAC. (*Id.* at 105).

Every year, the SMDP Office held a retreat where student leaders in the office planned events for the year and took part in leadership development activities. (*Id.* at 98). In April 2024, student leaders like Testman received an email from Herbert Wilkerson, Director of the SMDP

---

[24] Testman's $600 stipend was separate from SJAC's $10,000 budget. (Doc. # 58 at 15 ¶ 65).

Office, stating that the SMDP retreat would be postponed due to the enactment of SB 129. (Doc. # 70-28 at 2). In July 2024, the SMDP retreat was formally cancelled. (Doc. # 70-29).

After the SMDP retreat was cancelled, a Zoom meeting took place with Wilkerson, Wallace, and members of SJAC. (Doc. # 73 at 100-01). In this meeting, SJAC members were told that the organization was being demoted from a UFO to an RSO. (*Id.* at 100). Testman testified that SJAC's members were told that the organization was losing its status as a UFO because "it was not compatible with SB 129." (*Id.* at 101). Wallace testified that she does not recall telling SJAC members that. (Doc. # 69-8 at 57-58). Wallace admitted that she had concerns that continuing to fund SJAC as a UFO and using state funding for SJAC could potentially violate SB 129. (*Id.* at 59). Wallace testified that she "does not know" whether the University considered SJAC to be a DEI program under SB 129. (*Id.* at 61).

In her deposition, Wallace explained that UAB made the decision to terminate SJAC as a UFO because "[SJAC] was operating in [the SMDP Office] that was closed, which meant it did not have a university status anymore. And so [UAB] advised them to register as [an RSO]." (*Id.* at 7, 22). Wallace testified that UAB made the decision to close the SMDP Office "based on the guidance that was provided." (*Id.* at 39). She explained, "[t]here were guidelines that were provided by the University that talked about the way in which things could be funded, and we made the decision to close the SMDP [O]ffice." (*Id.*).

Wallace testified that UAB's guidance was public and addressed state funding and divisive concepts. (*Id.*). The guidance was a UAB webpage titled "Guidance for Compliance with Federal Law and SB 129." (Doc. # 69-12).[25] It advised UAB students, faculty, and staff on compliance with recent changes to federal and state law, including the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) and SB

---

[25] The court notes that this guidance was originally posted on July 23, 2024, and was subsequently updated after the passage of SB 129. (*See* Doc. # 69-6).

129. (*Id.* at 1). The guidance stated that student organizations "may host DEI programs or discussions that involve 'divisive concepts,' provided that no state funds are used to sponsor any such program." (*Id.* at 4).

Wallace testified, "[b]ased on the guidance and what the University was providing at the time, yes. [She] believe[d] there were things that could potentially be considered divisive concepts" in relation to the SMDP Office. (Doc. # 69-8 at 41). When asked what elements of the SMDP Office were associated with a divisive concept, Wallace stated, "I think there was some programming that the office would undertake that was not viewpoint neutral, was very much geared toward diversity, equity, and inclusion and really connected to some of the guidance we received from the University to be considered divisive concepts." (*Id.* at 47). Wallace further testified that because it appeared that the SMDP Office may involve divisive concepts, there were concerns that continuing to use state funding for SMDP's programming could violate SB 129. (*Id.* at 47-49).

Wallace also testified that even before SB 129's enactment, UAB had plans to change the funding model of SJAC because it had concerns about RSOs "double dipping" in funding from both SJAC and the USGA. (*Id.* at 23). She stated that this change would have happened "regardless of SB 129." (*Id.*).

Testman testified that the affiliate board and the programming board were merged because SJAC no longer had funding to distribute, and she lost her role as Finance Coordinator. (Doc. # 73 at 101). Because Testman no longer had a role as the Finance Coordinator, she lost her $600 stipend. (*Id.*). She was told that a new role could be created for her within SJAC or she could be released from SJAC, but either way, she would not receive the stipend. (*Id.*).

When asked "about whether SJAC could still apply for University funding once it became an RSO[,]" Testman replied, "[m]y understanding is that [SJAC's] mission was not compatible

with University funding, so [it] wasn't eligible for University funding." (*Id.* at 101-102). Testman testified that since SJAC was demoted to an RSO, it has not applied for RSO university funding "because [it] felt similarly that since [it was] demoted from UFO to RSO, [it] similarly could not go to another pot of University money under the law." (*Id.* at 102).

Testman was also asked about how SJAC's programming changed since it became an RSO. (*Id.*). She testified that some events were cancelled and some were "severely downsized." (*Id.*). Testman also testified that because SJAC could no longer fund events put on by other student organizations many of those organizations' events were cancelled or downsized. (*Id.* at 103).

Testman further testified that she currently serves as the USGA Executive Vice President – a position she has held since August 2024. (Doc. # 58 at 14 ¶ 66). As a UFO, the USGA receives money directly from the University. (Doc. # 73 at 104). It distributes approximately $50,000 a year to fund RSOs. (*Id.*). Testman testified that amount is not enough to meet the RSO demand. (*Id.* at 105). She added that the most money an RSO has received from the USGA is around $3,000. (*Id.*).

In her capacity as Executive Vice President, Testman was involved in discussions about the fall 2024 budget. (*Id.*). These discussions took place in the spring 2024 semester as the budget is usually approved a semester in advance. (*Id.*). Testman testified that the allocation process for student organizations proceeded as usual in the spring 2024 semester because SB 129 had not been enacted yet. (*Id.* at 106).

When Testman returned for the fall 2024 semester, Wallace informed the USGA that the budget needed to be redone because "around half of the organizations that [the USGA] had promised funding to" "weren't eligible for funding" under SB 129. (*Id.*). Testman testified that she understood that these organizations could no longer receive university funding "[b]ecause their names could be perceived as divisive." (*Id.*). Testman stated in a declaration that "because of the

49

vagueness and ambiguity of key terms in SB 129" it is unclear what could constitute a "divisive concept" or a DEI program. (Doc. # 12-6 ¶¶ 14-15).

Wallace testified that she does not remember telling the USGA members that state funds could not be used to fund RSO events that could be deemed DEI programs under SB 129. (Doc. # 69-8 at 75). She further testified that after SB 129 was passed, in her advisory role over the USGA budget she had to "make sure that [the USGA] was following the guidance of the University that was publicly available and to also make sure that RSOs could still be funded."[26] (*Id.* at 77-78).

Wallace sought funding from other sources, such as UAB's Educational Foundation, which holds private funds. (*Id.* at 88; *see also* Doc. # 69-11 (summary on The UAB Educational Foundation)). Wallace testified that she requested around $85,000 for the academic year from the Foundation to allocate to certain RSOs that would no longer receive state funding. (Doc. # 69-8 at 95, 120). The Educational Foundation contributed $75,000. (*Id.* at 113). Wallace testified that all RSOs were able to apply for that funding. (*Id.* at 24). She has not told any of the students that their organizations could not apply or receive funding because of SB 129. (*Id.* at 24-25).

Testman testified that when Wallace met with the USGA she informed the organization that she had "sourced private community dollars" for the RSOs that would no longer receive state funds. (Doc. # 73 at 106). Based on this, the USGA reallocated its funding and divided the organizations into "private-dollar organizations" and "public-dollar organizations." (*Id.*). Testman testified that the organizations were not told whether they were receiving the private funding or the University funding. (*Id.* at 107). Additionally, she testified that the organizations that received private funding were allocated less money than they had received through University funding.

---

[26] Again, the guidance Wallace relied on was updated after the passage of SB 129. (*See* Doc. # 69-6). Previous language in the guidance, which advised that state funding could not be used for DEI activities, has been removed from the text of the current guidance. (*Compare* Doc. # 69-12 *with* Doc. # 69-6).

(*Id.*). For example, the Indian Cultural Organization received a $1,000 decrease in funding and First Love, a Christian organization that focuses on community service, received a fifty percent decrease in its funding. (*Id.*). Wallace testified that the funding the USGA received from UAB's Educational Foundation to distribute to certain RSOs was not available at the beginning of the fall 2024 semester but became available around October 1, 2024. (Doc. # 69-8 at 95).

SJAC could have received funding from the USGA in fall 2024, but the organization did not apply for funding because, as Testman testified, "the funding window had closed." (Doc. # 73 at 109). Wallace testified that "USGA has a funding model that, for new RSOs, they could apply for small amounts of money through USGA, even after the allocation process." (Doc. # 69-8 at 63). She stated that this amount was around $100. (*Id.* at 64).

SJAC also did not apply for funding from USGA in spring 2025. (Doc. # 73 at 109). Although Testman was aware of UAB's Educational Foundation funds, she testified that SJAC did not know that it would be eligible for those funds. (*Id.*). Testman also testified that she was not a member of SJAC in spring 2025, so she could not apply for funding on its behalf. (*Id.* at 110).

Although Wallace has not sought money from UAB's Educational Foundation since the initial request, she testified that she "intend[s] to clarify that [the Foundation is] going to move forward with the funding again for [the 2025-2026 academic year]." (Doc. # 69-8 at 121). However, she admitted that she cannot definitively say that the Foundation will provide funding for the 2025-2026 academic year. (*Id.* at 123).

### 2.    Miguel Luna

Miguel Luna ("Luna") is a gay Latino man and a senior at UAB where he is majoring in political science and history and minoring in Spanish. (Docs. # 58 at 15 ¶¶ 68-69; 73 at 120). His claims here relate to both his extracurricular activities and his academic courses at UAB. (Doc. #

1). The court first summarizes the facts relevant to Luna's extracurricular activities, then turns to his academic courses.

At UAB, Luna has been involved in the following organizations: USGA, SJAC, Queer Peers, and Esperanza. (Doc. # 73 at 120). Luna is a member of USGA's Executive Council. (*Id.* at 121). Before the 2024-2025 school year, the Executive Council met with Wallace and Dr. John Jones ("Jones"), Vice President of Student Affairs for UAB, about potential changes to student organization funding after the enactment of SB 129. (*Id.* at 122, 128). Luna testified that they discussed how "USGA would have to change some of its programs in the future because of SB 129 . . . some of the way[s] [the USGA] conducted business, but also the manner in which [the USGA] funded student organizations." (*Id.* at 128). Luna further testified that Wallace told the Executive Council that "[the USGA] would no longer be able to fund student organizations . . . whose mission[s] would be considered divisive or determined to have DEI involved in their missions and values." (*Id.*).

Luna testified that after these discussions, he was unclear about how SB 129 would affect student organization funding at UAB, but he understood that "there would be negative and grave effects." (*Id.* at 123). He further testified that he contacted Jones and Wallace asking for additional information about how SB 129 could impact student organization funding, but he never received a response from them. (*Id.* at 123, 125-26; *see also* Docs. # 70-25; 70-26).

Luna co-founded Esperanza along with another student. (Doc. # 73 at 129). It is a group for Latine students at UAB and describes its mission as follows: "To foster a sense of unity for all Hispanic/Latine students at UAB. We want to make sure students feel supported throughout their secondary education as well as encourage them to achieve the great things we know are possible." (Doc. # 55-43 at 1). Luna testified that Esperanza is "open to all UAB students regardless of their race or ethnic background." (Doc. # 73 at 129).

Luna currently serves as Esperanza's president. (*Id.*). As the president, Luna's responsibilities "include overseeing the general direction of the organization and also determining the manner in which [Esperanza] acquire[s] funding." (*Id.*).

Esperanza was officially recognized as an RSO before the start of the 2023-2024 school year. (*Id.* at 131). As discussed previously, before SB 129's enactment, an RSO could apply for funding from the USGA or SJAC. (*Id.*). The applications for USGA funding are due a semester in advance. (*Id.*; Doc. # 58 at 19 ¶ 78). The RSO funding application includes "[g]eneral information about the organization, about the applicant, and also a list of all programs and events that [the] organization is expected to have throughout the year, including [a specific budget]." (Doc. # 73 at 132; *see also* Doc. # 69-9 at 51-52 (UAB Student Organization Handbook detailing the funding application process)). As long as it is registered correctly, any RSO may submit a funding request to the USGA. (Doc. # 69-8 at 16).

After Esperanza received approval to become an RSO, it did not apply for USGA funding because the application window had already closed. (Doc. # 73 at 132). However, Esperanza received funding from sources other than USGA during the 2023-2024 school year by "collaborat[ing] with organizations who received funding from SJAC and also through collaborations with different university administrative offices," such as the then-DEI Office and the SMDP Office. (*Id.* at 132-33; Doc. # 12-5 ¶¶ 18, 22). Luna testified that typically, the USGA is the only source from which organizations receive funding, but Esperanza had other sources of funding through its collaborations. (Doc. # 73 at 154). Luna explained that Esperanza did not apply for funding from the USGA for spring 2024 because "[Esperanza] had enough collaborations and we felt that some of the collaborations that we had with the administrative offices and with organizations that received funding from SJAC would continue, so we felt secure in the manner in which we were receiving funding already." (*Id.* at 165).

After the enactment of SB 129, Esperanza was no longer able to receive funding from collaborations with the DEI Office, the SMDP Office, or SJAC. (*Id.* at 134, 137). Luna testified that there were some events that he wished Esperanza had been able to host in the 2024-2025 school year, but the organization was unable to "[b]ecause of lack of funding and support from the previous links [Esperanza] had to organizations that helped fund [it]." (*Id.* at 140). During the school year, Esperanza hosted events but Luna paid for them out of pocket. (*Id.* at 138). He explained that before SB 129's enactment, it was not typical for students to pay out of pocket to fund student organization events because "[t]here was always an opportunity to apply for [USGA] funding or funding from SJAC." (*Id.*). Luna testified that because of this lack of funding, Esperanza lacked the ability to host certain events and saw a decline in programming attendance. (*Id.* at 134). Luna also testified that Esperanza cannot host events in the upcoming school year due to lack of funding. (*Id.* at 140).

Luna is aware that some student organizations received private funding rather than state funding. (*Id.* at 138). He testified that some organizations that received private funding were the Catholic Blazers, the Muslim Student Association, and the Spanish and Latino Student Association. (*Id.* at 139).

When asked, "[w]hat was your understanding of the factors that were considered to determine which of the groups were receiving the private funding?" Luna replied, "[t]hey were determined to receive private funding after their missions [were reviewed] . . . [and] whoever did review them determined them to be in line with divisive concepts or having divisive missions. And because of that, they were no longer able to receive state funding." (*Id.*). Luna was also asked whether any organizations that received private funding put on programming similar to Esperanza. (*Id.*). Luna replied that the Spanish and Latino Student Association did. (*Id.*).

Luna testified that he "didn't think" Esperanza would be eligible for USGA funding in the future. (*Id.* at 141). He based this on his experience on the USGA Executive Council and "witnessing other organizations with similar missions to [Esperanza], such as the Spanish and Latino Association, be denied state funding and other organizations that worked similarly in [Esperanza's] social-justice-related mission be denied University funding as well." (*Id.* at 140-41).

Luna testified that the loss of funding from the DEI Office and SJAC impacted him as an individual as it made him feel "unseen" and "unheard." (*Id.* at 143). As he explained it, he "felt as though the University no longer wanted to proactively interact with [him] or members of [his community] about honest issues that [they] face." (*Id.*). He also stated that "[w]ithout Esperanza's access to funding . . . I am deprived of the opportunity to network and associate with other students on issues of importance to the Latine community and to participate in programming about the Latine community. This severely restricts my ability to express my viewpoints about Latine individuals and my community at UAB." (Doc. # 12-5 ¶ 25).

The court asked Luna what steps would be involved in applying for funding through the USGA. (Doc. # 73 at 144). Luna responded that it would involve filling out a "simple application form and trying to plan ahead for [the organization's] programming and . . . events that [it is] expected to have throughout the year[,]" which would have likely taken a week to put together. (*Id.* at 145; *see also* Doc. # 58 at 18 ¶ 77). The court questioned why Luna did not want to fill out the application: "what would have been the downside of just submitting the application?" (Doc. # 73 at 147). Luna replied, "I guess that would have been time taken away trying to find other sources of funding, whether that was externally, other actors, other organizations, other third parties that weren't affiliated with UAB." (*Id.*). Luna added that it would have taken "a few weeks to a month" to "see if Esperanza would have even received [the] funding from the USGA" because the USGA must go through a process before allocating funds. (*Id.* at 153).

Again, when asked why Esperanza did not apply for USGA funding "when it knew that the Spanish and Latino Student Association had received funding" Luna replied, "[a]t the time, we didn't want to try to apply for any type of funding because we wanted our funding to be permanent and long-standing. We didn't want any type of temporary situation in relation to funding because we wanted our events to continue in the future and we didn't want to create new events every year." (*Id.* at 166). Luna also testified that based on his experience on USGA's Executive Council, when applying for funding as an RSO, student organizations did not receive the full amount of funding that they requested. (*Id.* at 154).

Luna was asked whether he told Wallace that the reason Esperanza did not apply for funding was to show damages in this case. (*Id.* at 164). He replied that he "[did not] recall." (*Id.*).

Regarding his academic courses, during UAB's fall 2024 semester, Luna enrolled in the course "Politics and Race in America" "to understand racial stratification within the United States and how it is influenced by politics" and that "[h]e particularly wanted to learn from the Professor about how race influences political behavior." (Doc. # 58 at 66 ¶ 202). He claims that in the course his professor "did not engage in and did not lead class discussions among the students on topics related to the impact of systemic racism on the U.S. government and its policies." (*Id.* ¶ 203).

Luna also enrolled in the course "Human Rights" in fall 2024, which pursuant to its syllabus, covered "key concepts and controversies in the study of human rights" as well as "the role that political actors – governments, institutions, and non-governmental institutions – have in protecting and/or abusing these rights." (Docs. # 55-40; 73 at 159). Luna claims that his professor, Dr. Robert Blanton ("Blanton"), "seemed wary of how he presented course materials to students, and did not provide instruction . . . or failed to lead class discussions on topics that could fall under SB 129." (Doc. # 58 at 66 ¶ 205). For example, Luna claims that Blanton "remained silent and did not engage in classroom discussions about human rights violations experienced by incarcerated

African Americans in the Alabama prison system." (*Id.*). Blanton also added the following disclaimer to the "Human Rights" syllabus:

> Note on Academic Freedom: All University faculty, instructors and teaching staff have the academic freedom to explore, discuss, and provide instruction on a wide range of topics in an academic setting. This class may present difficult, objectionable, or controversial topics for consideration, but will do so through an objective, scholarly lens designed to encourage critical thinking. Though students may be asked to share their personal views in the academic setting, no student will ever be required to assent or agree with any concept considered "divisive" under Alabama law, nor penalized for refusing to support or endorse such a concept. All students are strongly encouraged to think independently and analytically about all material presented in class and may express their views in a time, place, and manner, consistent with class organization and structure, and in accordance with the University's commitment to free and open thought, inquiry, and expressions.

(Doc. # 55-40 at 9).

During UAB's spring 2025 semester, Luna enrolled in Blanton's "Environmental Politics" course. (Docs. # 58 at 17 ¶ 74; 73 at 156; *see also* Doc. # 55-39 ("Environmental Politics" syllabus)). Luna claims he enrolled in the course "to learn about environmental justice and environmental policymaking, and particularly how race, class, and gender may affect inequitable outcomes with regard to environmental health." (Doc. # 58 at 66 ¶ 206). The "Environmental Politics" syllabus included the same disclaimer language as the "Human Rights" syllabus. (*Compare* Docs. # 55-39 *with* 55-40).

Luna stated that when he saw the disclaimer in his "Environmental Politics" syllabus, he "was a little stunned[]" and he "began to think about the ramifications this note could possibly have on [his] academic experience in the future and how it would affect some of [his] classes and how they were taught and the discussions [he] would possibly have in those . . . classes." (Doc. # 73 at 159). He also stated that it gave him "a little bit of anxiety for [his] future when [he] read [the disclaimer]." (*Id.*).

When asked, "[p]rior to SB 129 going into effect, have you ever seen a disclaimer that mentioned divisive concepts on a course syllabus before?[,]" Luna replied, "no." (*Id.*). However,

Luna later testified that he had noticed the same disclaimer in his "Human Rights" course syllabus. (*Id.* at 170). Luna testified that the disclaimer in the "Human Rights" course syllabus alarmed him, but "at the time that it was read, [SB 129] hadn't gone into effect yet." (*Id.*). He also testified that "Environmental Politics[] was a class that was newly put together, so I think it would have been more affected by certain regulations as it was being created and put together the previous semester and throughout when [SB 129] was taking effect . . . ." (*Id.*).

Luna was asked what alarmed him about the disclaimer. (*Id.* at 171). He stated, "I think the manner in which it says that difficult, objectionable, or controversial topics for consideration will be put forth through an objective and scholarly lens." (*Id.*). In response, the court asked, "[w]ould you rather they be put forth in a subjective and nonscholarly manner?" (*Id.*). Luna replied, "[n]o. I agree [that] it's a professor's responsibility to be objective, but I also think people take classes because they want to hear their professor's expertise on a particular subject and their professional opinion." (*Id.*). He further explained, "I think that someone may view a professor's professional opinion or expertise as trying to require students to assent or agree to any concept if it's closely related to the course materials presented in the class." (*Id.* at 171-72). Luna was then asked, "[h]ave you had that experience before SB 129 where you thought a teacher in grade school or a professor in college was presenting something in class, trying to get you to assent to it?[,]" Luna replied, "[n]o." (*Id.* at 172).

Both "Human Rights" and "Environmental Politics" were lecture and discussion-based courses. (*Id.* at 159-60). Luna testified that Blanton was "less active" in the classroom discussions in the "Environmental Politics" course compared to the "Human Rights" course. (*Id.* at 160-61). He explained that Blanton was "more eager to provide his professional opinion or expertise on different subjects and different discussions [the class] had in [the] 'Human Rights' course than in [the] 'Environmental Politics' course where it was primarily lecture-based." (*Id.* at 161).

Luna also testified that there were topics that he expected to learn about in "Environmental Politics" such as "environmental injustice as it relates to different communities," but "instead, those things were only mentioned." (*Id.* at 162). He also claimed that Blanton "did not engage in classroom discussion on topics such as the impacts of racism and government policy on environmental health." (Doc. # 58 at 66 ¶ 207).

Luna testified that he believes SB 129 could impact his ability to receive information about certain topics in the courses he will take in the fall 2025 semester. (Doc. # 73 at 163). For example, he is planning to take a "Politics of Constitutional Law" course and he is concerned that SB 129 will impact the class's "analysis of different constitutional rulings" or the class's "analysis of different cases as it relates to different gender, sexual orientation, or racial or ethnic minorities . . . ." (*Id.*).

In a declaration, Luna stated that his "ability to learn is materially hampered if a professor feels compelled to change their curriculum out of fear that teaching about a 'divisive concept' will be deemed an attempt to 'compel assent' to that concept." (Doc. # 12-5 ¶ 9). He also stated that "as a political science major, it is critically important for [him] to learn about structural racism, implicit bias, and [w]hite privilege," which "may fall within the definition of 'divisive concepts' that are prohibited in SB 129." (*Id.* ¶ 8).

## III.    Standard of Review

Plaintiffs' motion seeks a preliminary injunction under Federal Rule of Civil Procedure 65. A preliminary injunction is an extraordinary and drastic remedy. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). To obtain a preliminary injunction, Plaintiffs must establish: (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable injury in the absence of the proposed

preliminary injunction; (3) the threatened injury to the movant exceeds the damage that the preliminary injunction may cause the opposing party; and (4) the preliminary injunction would not disserve the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284-85 (11th Cir. 2020). Ultimately, "a preliminary injunction [should not] be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) (quoting *Robertson*, 147 F.3d at 1306).

A party's failure to establish any one of the essential elements will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements. *See Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)). That is, "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176.

## IV.  Analysis

Before addressing the merits of Plaintiffs' motion, the "court must satisfy itself that [a] plaintiff has standing" because "standing to sue implicates jurisdiction." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc). Accordingly, the court first evaluates whether Plaintiffs have standing to sue Governor Ivey in her capacity as Governor and then whether Plaintiffs have standing to sue the Board. The court evaluates standing as to the First Amendment claims, then turns to standing as to the Fourteenth Amendment claims. Finally, the court will consider the merits and whether Plaintiffs have established that they are entitled to preliminary injunctive relief.

### A.  Standing Requirements

Standing is the "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In essence the question of

standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Id.* The Eleventh Circuit has explained the requirements of standing as follows:

> Under Article III of the Constitution, our jurisdiction encompasses only "Cases" and "Controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements." [*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020)] (internal quotation marks and citation omitted). "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id.*

*City of S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023). As the party seeking the preliminary injunction, Plaintiffs bear the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation. At the preliminary injunction stage, [] the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citations and quotations omitted). Particularly relevant here, "because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1302 (11th Cir. 2007).

"[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Accordingly, the court must address whether each Plaintiff has established standing to assert that party's own claims. And in addition to ensuring that they have standing to pursue each claim, Plaintiffs must also demonstrate they have standing to enjoin enforcement of each provision of SB 129 they challenge. *CAMP Legal*

*Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006); *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253-54 (11th Cir. 2010).

###    B.    Standing to Sue Governor Ivey in her Capacity as Governor

Plaintiffs' allegations about Governor Ivey's actions in her official capacity as Governor are sparse. Plaintiffs have alleged that Governor Ivey "signed SB 129 into law." (Doc. # 1 ¶ 27). They also assert that "Governor Ivey also considers DEI to be a political viewpoint with which she disagrees" and that, after signing SB 129, she stated, "I refuse to allow a few bad actors on college campuses – or wherever else for that matter – to go under the acronym of DEI, using taxpayer funds, to push their liberal political movement counter to what the majority of Alabamians believe." (*Id.* ¶ 81). Plaintiffs also allege that Governor Ivey expressed her opinion that "woke" concepts like "systemic and structural racism" "have no place in Alabama classrooms at any age." (*Id.* ¶¶ 77-78).

SB 129 provides that "[a] state agency, local board of education, or public institution of higher education" is prohibited from doing certain things under the Act. *See* Ala. Code § 41-1-91. SB 129 also specifies that "[a]ll state agencies and political subdivisions, including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who knowingly violates this article," under certain circumstances. *Id.* § 41-1-92. SB 129 states that "[i]t is the intent of the Legislature that all constitutionally created boards of trustees comply with the requirements of this article." *Id.* § 41-1-94.

SB 129 specifies no role, statutory or otherwise, for the Governor or her office. *See generally id.* § 41-1-90, -94. Plaintiffs have not alleged or testified that the Governor or her office have played any role in enforcing SB 129. (Doc. # 1).

The question before the court, therefore, is whether these allegations are sufficient to establish standing to sue Governor Ivey in her official capacity as Governor. To establish standing to pursue their claims against Governor Ivey in her official capacity as Governor, Plaintiffs "must show, at the very least, that [Governor Ivey] has the authority to enforce the particular provision that [they have] challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla*., 8 F.4th 1198, 1201 (11th Cir. 2021). Put another way, "[w]hen traceability and redressability are at stake, the key questions are who caused the injury and how it can be remedied." *City of S. Miami*, 65 F.4th at 640-41 (citing *Jacobson*, 974 F.3d at 1253-54 (holding that there was no standing where the alleged injury was not caused by the defendant and the court's judgment on the defendant would not redress the injury)).

The injuries alleged in the Complaint and that Plaintiffs testified about at the evidentiary hearing did not stem from actions taken by the Governor in her official capacity. Rather, all of their perceived injuries stemmed from interactions with the leadership at their respective universities. (*See generally* Docs. # 1, 12-1, 72, 73). There is simply nothing in SB 129, the allegations of the Complaint, or the evidence presented at the evidentiary hearing that implicates Governor Ivey in any action taken in relation to SB 129 (other than her signing it after the Alabama Legislature passed it and her comments while doing so).[27] These allegations are insufficient to establish that Plaintiffs' alleged injuries are in any way traceable to Governor Ivey. *See City of S. Miami*, 65 F.4th at 645; *see also Lewis*, 944 F.3d at 1298-300 (holding that plaintiffs failed to prove standing where they did not establish a concrete threat of enforcement by the governor).

Moreover, as in *City of South Miami*, Plaintiffs have failed to establish redressability because Plaintiffs may be "harmed in the same manner whether the governor [is] enjoined or not." 65 F.4th at 645. This is because "public institutions of higher education" are prohibited from doing

---

[27] Plaintiffs' allegations regarding Governor Ivey's opinions on DEI and what she said about SB 129 have nothing to do with alleged actions taken under SB 129 against Plaintiffs. (Doc. # 1 ¶¶ 77-78, 81).

certain things under SB 129, and the Alabama Legislature set forth its "intent . . . that all constitutionally created boards of trustees comply with the requirements of [SB 129]." Ala. Code § 41-1-94. Thus, even if Governor Ivey in her official capacity as Governor was enjoined from enforcing SB 129, UA and UAB would still be governed by the prohibitions in SB 129. The fact remains that Plaintiffs have not even "conjured up [] a 'specter' of enforcement by [Governor Ivey]." *City of Miami*, 65 F.4th at 645 (citing *Lewis*, 944 F.3d at 1298). Therefore, they have failed to establish the redressability element of standing to sue her in her official capacity.

Finally, Governor Ivey's role as Governor "is a separate and distinct office" from her position as President Ex-Officio of the UA Board of Trustees. *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1324 (S.D. Ala.), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000); *see also Lee v. Macon Cnty. Bd. of Educ.*, 231 F. Supp. 743, 754 (M.D. Ala. 1964) (distinguishing Governor Wallace's actions in his capacity as Governor and as President Ex-Officio of the State Board of Education). Plaintiffs attempt to refute this by arguing that "there is just one Governor and when she acts as a Trustee, she remains the Governor." (Doc. # 75 at 16). But, this argument completely ignores caselaw that makes clear that her roles as Governor and President Ex-Officio are two distinct positions. *See Wilson*, 130 F. Supp. 2d at 1324. Accordingly, any action Governor Ivey took as President Ex-Officio of the Board is not traceable to her official role as Governor. Plaintiffs have therefore failed to establish the necessary traceability and redressability elements of standing to sue Governor Ivey in her official capacity as Governor.

Even if Plaintiffs had established that they have standing to sue Governor Ivey in her official capacity as Governor, the only action they allege she took in that capacity is signing SB 129 into law. Such a claim is barred. "Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law." *Women's Emergency Network v. Bush*, 323

F.3d 937, 950 (11th Cir. 2003) (citing *Sup. Ct. of Va. v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731-34 (1980)).

Plaintiffs argue that, "[a]lthough the Eleventh Amendment ordinarily bars claims against the state in federal court," the *Ex parte Young* exception to sovereign immunity should apply because Plaintiffs allege an ongoing violation and "the Governor has 'some connection' with the enforcement of the challenged statute." (Doc. # 43 at 26). However, as discussed above, the court has determined that Plaintiffs cannot establish the standing doctrine's traceability or redressability requirements in regard to Governor Ivey in her official capacity as Governor. In *Lewis v. Governor of Alabama*, the Eleventh Circuit rejected the idea that it should proceed to address whether the Attorney General is a proper defendant under *Ex parte Young* in those circumstances. 944 F.3d at 1295. That court held that "[b]ecause we conclude that plaintiffs have no standing [as plaintiffs did not establish traceability or redressability] – and thus that the federal courts have no jurisdiction over plaintiffs' lawsuit – we *will not proceed to consider* the ensuing questions whether the Attorney General is a proper defendant under *Ex parte Young*." *Id*. at 1295-96 (emphasis added). Thus, under *Lewis*, disposition of the traceability or redressability elements of standing render moot an *Ex parte Young* analysis. *Id*.

For all these reasons, Plaintiffs have not established that they have standing to sue Governor Ivey in her official capacity as Governor. Therefore, their request for injunctive relief against Governor Ivey and her office is due to be denied and she is due to be dismissed in her official capacity as Governor.

### C.        The Professors' Standing as to First Amendment Claims Against the Board[28]

Professors Simon, Patton, and Fording argue that "SB 129 threatens their First Amendment

right to engage in speech free from government-imposed viewpoint discrimination" and that it has

caused a chilling effect on their speech, which has led them to self-censor.[29] (Doc. # 43 at 12; *see*

*also* Docs. # 1 ¶¶ 226-32; 75 at 11-15). Again, to establish standing, a plaintiff must show (1) an

injury-in-fact; (2) that the injury is fairly traceable to the defendant; and (3) a favorable judgment

is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Defendants do not dispute that the Professors are subject to SB 129 and that their injuries

are traceable to the statute, which the Board has the authority to enforce. *See* Ala. Code § 41-1-92.

Nor do they dispute that the Professors' injuries would be redressed by enjoining their enforcement

of SB 129. For these reasons, the court only considers whether the Professors have shown an

injury-in-fact.

The Eleventh Circuit has made clear that when First Amendment rights are involved, the

injury-in-fact requirement is "loosely" applied. *Harrell*, 608 F.3d at 1254. Accordingly, "it is well

established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to

free expression or forgoes expression in order to avoid enforcement consequences. In such an

instance . . . , the injury is self-censorship.'" *Id.* (quoting *Pittman*, 267 F.3d at 1283). "In that

respect, a plaintiff need not show that its self-censored speech would definitely run afoul of a

challenged law, but only that its speech is 'arguably proscribed.'" *HM Fla.-ORL, LLC v. Governor*

---

[28] Because Plaintiffs have not established standing to sue Governor Ivey in her official capacity as Governor, the court only considers Plaintiffs' claims against her in her official capacity as President Ex-Officio of the Board. Governor Ivey is now included in the court's references to "the Board."

[29] The court notes that although many First Amendment claims involving "self-censorship" are typically pre-enforcement challenges, *see HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1216 (11th Cir. 2025); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, (N.D. Fla. 2022), this case is not a pre-enforcement challenge because it was filed after SB 129 took effect and two Plaintiffs assert that SB 129 has been enforced against them. (Doc. # 12-1; *see also* Doc. # 71 at 12 (Plaintiffs' counsel acknowledging that this action is not a pre-enforcement challenge)).

*of Fla.*, 137 F.4th 1207, 1216 (11th Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)). As our Circuit has stated, "to determine whether a First Amendment plaintiff has standing, we simply ask whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor – even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (internal quotations and citations omitted).

> In making that assessment, the threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive. The fundamental question under our precedent – as well as under the precedent of other courts that have decided similar "speech code" cases – is whether the challenged policy "objectively chills" protected expression.

*Id.*

Below, the court addresses whether each Professor has sufficiently established an injury-in-fact as to his or her First Amendment claim.

### 1.    Simon

Simon contends that she "faces the constitutionally untenable position of either self-censoring her classroom instruction or materials or facing severe consequences for violating [SB 129]." (Docs. # 12-1 at 3; 43 at 13). She further argues that "[t]his risk remains real, as [she] continues to teach the subject matter that places her in peril." (Doc. # 43 at 13). Simon also maintains that UA has forced her to cancel the sit-in project and threatened her with progressive discipline if she did not. (*Id.* at 14; Doc. # 12-1 at 3). As the court explains below, Simon has sufficiently established that SB 129 has "objectively chilled" her speech.

Simon asserts that her course "Anti-Oppression and Social Justice" "potentially implicates every one of SB 129's divisive concepts" because she teaches her students about "structural racism, implicit bias, [w]hite privilege, inequity of health care, and the lack of a color-blind meritocracy." (Doc. # 12-1 at 13; *see also* Doc. # 12-4 ¶¶ 16-20). Simon is concerned that every

time she explains one of these concepts, she runs the risk of violating SB 129 and thus risks discipline or termination. (Doc. # 12-1 at 13). Although she testified that she does not compel or direct her students to affirm, adopt, or adhere to any of SB 129's divisive concepts nor does she assign coursework that may advocate for them (Doc. # 72 at 160-61), she is worried that these topics may be *construed* as divisive concepts (b), (d), (e), (f), (g), and (h). (Doc. # 12-4 ¶¶ 16-19). Simon is also concerned that teaching on these concepts "runs the real risk of being deemed to 'advocate' in support of or 'compel assent' to SB 129's 'divisive concepts.'" (Doc. # 43 at 13). For these reasons, she contends, she has self-censored her speech in the classroom.

Although perhaps a close question,[30] the court's current view is that Simon may reasonably believe that the topics she teaches about, such as structural racism, implicit bias, and white privilege, could be confused with those "arguably proscribed" by SB 129's prohibition against requiring assent to concepts (b), (d), (e), (f), (g), and (h). *Speech First*, 32 F.4th at 1120 (quotation marks omitted). It is also reasonable for Simon to conclude that if she were to teach on these topics,[31] it might be confused with "direct[ing] or compel[ling]" students to "affirm, adopt, or adhere" to them, which would violate SB 129. *See* Ala. Code § 41-1-91(2). Therefore, the court concludes that Simon has made the necessary showing that her speech has been chilled as to her in-class teaching.

Simon also has standing to challenge the chilling effect of the cancellation of the sit-in project. The emails from Hatcher and Dalton about the cancellation underscore this point. Hatcher

---

[30] The resolution of standing questions related to each of the Professors should not be confused with the merits of their First Amendment claims. For standing purposes they have shown that their concerns about in-class instruction (which they say resulted in them engaging in self-censorship) are connected to UA's enforcement of SB 129. Again, when First Amendment rights are involved, this court "loosely" applies the injury-in-fact requirement. *Harrell*, 608 F.3d at 1254. A different, more exacting standard applies to their assertions that they are likely to succeed on the merits of their claims.

[31] Because Simon plans to teach "Anti-Oppression and Social Justice" in the fall 2025 semester (Doc. # 72 at 191-92), and she has not stated that she plans to make any changes to the course, it is reasonable to conclude that Simon will continue teaching on these topics.

stated in her email, "Despite the way you've framed it, it is difficult to see how this exercise is not tied to the classroom or does not create a situation where students are being forced to assert a position and/or unwillingly take part in political activity." (Doc. # 55-11 at 5). Hatcher directly referenced SB 129. (*Id.*); *see also* Ala. Code § 41-1-91. Dalton also referenced SB 129 in his email when he stated that the sit-in could be "viewed as: sponsoring a program that promotes DEI, tacitly requires a student's assent to a divisive concept, requires a student to attend or participate in course work that advocates for or requires assent to a divisive concept, and/or other portions of the law." (Doc. # 55-11 at 2); *see also* Ala. Code § 41-1-91(1), (3). Moreover, Hatcher quoted language from the UA Faculty Handbook about the possibility of "disciplinary actions up to and including termination" for failure to comply with policies. (Doc. # 55-11 at 2; *see also* Doc. # 56-7 (UA Faculty Handbook)). This email led Simon to believe that she had no choice but to cancel the sit-in or she could be terminated. (Doc. # 72 at 147).

The emails Simon received from Hatcher and Dalton both referenced (and she claims threatened) enforcement by citing to the UA Faculty Handbook and SB 129. As SB 129 has enforcement mechanisms and authorizes discipline against professors who violate the law, *see* Ala. Code § 41-1-92, there is evidence (again, at least for purposes of determining standing) that Simon reasonably feared enforcement and felt the need to self-censor while teaching. Defendants argue that Simon cannot show a real risk of enforcement or that any self-censorship would be "reasonable" because SB 129 does not prohibit teaching, discussions, or presenting on divisive concepts; rather, it only prohibits requiring or seeking assent to them. (Docs. # 27 at 27; 32-1 at 26). While they are correct that SB 129 allows professors to teach, discuss, and present on these concepts, the court cannot say that Simon does not feel an "objective chill" of her speech based on UA's cancellation of the sit-in project and her continued teaching on topics that could be construed as divisive concepts. Additionally, Simon's allegations that SB 129 is vague (an issue discussed

in more detail below) makes her self-censorship more reasonable as "a speech restriction's 'imprecision exacerbates its chilling effect.'" *HM Fla.-ORL*, 137 F.4th at 1217 (quoting *Speech First*, 32 F.4th at 1121); *see also id.* (discussing how the "consequence of vague speech laws" "affects [the] self-censorship standing analysis by making a broader range of self-censorship a 'reasonable' response.") (quoting *Speech First*, 32 F.4th at 1121). In reaching these conclusions the court has taken to heart *Harrell*'s teaching that the injury-in-fact requirement should be loosely applied in this situation. 608 F.3d at 1254.

Simon has shown that (1) she "intend[s] to engage in a course of conduct arguably affected with a constitutional interest; (2) her conduct is "arguably prescribed" by SB 129; and (3) she is subject to "a credible threat of enforcement." *Susan B. Anthony List*, 573 U.S. at 159, 162 (cleaned up). Accordingly, Simon has standing to challenge the Board's enforcement of the following provisions of SB 129: Alabama Code §§ 41-1-90(2)(b), (d), (e), (f), (g), (h) and 41-1-91(2).

## 2.    Patton

Patton asserts that because a student complaint was brought against her related to her "Understanding Poverty" course, she has "self-censored by removing certain materials from her courses that she fears may risk violating SB 129." (Doc. # 43 at 16 (citing Doc. # 1 ¶ 19)). She further maintains that this self-censoring is a product of the chilling effect of UA's enforcement of SB 129. (*Id.*).

The complaint against Patton's course involved concerns about the Witt Fellows Program (of which her course is a part) and how the Program "may be in violation of [SB 129]" as "[t]he viewpoints in the required reading books are presented as the correct perspective and other opinions are shut down." (Doc. # 55-20 at 2). The complaint further stated that "[t]he problems stem from the teaching approach and materials selection." (*Id.*).

The complaint did not identify which provisions of SB 129 Patton purportedly violated. But, the complaint stated that "I believe the Fellow[s] program may be in violation of our divisive concept legislation" and "[t]he current program seems to have a focus on systemic racism, supporting anti racism, correcting social injustice and producing engaged global citizens." (*Id.*; *see also* Doc. # 72 at 31-32). Patton testified that the topics in the course implicate divisive concepts (c), (d), (e), (f), (g), and (h) of SB 129. (Doc. # 43 at 16).

After being notified about the complaint, Patton met with various UA administrators who requested information on the course, including course materials, instruction procedures, and how open discussions are conducted in her class. (Doc. # 72 at 37-38, 43-44; *see also* Doc. # 55-22). At one point, Patton asked Reid about what would happen if she did not produce the information the administrators were asking for. (Doc. # 72 at 44). Reid informed Patton that "disciplinary action could start, progressive discipline, and that ultimately [Patton could] be terminated regardless of [her] tenure status." (*Id.*).

Around this time, Patton had a discussion with Garrett, who asked her about the complaint and her instruction in the Witt Fellows Program. (*Id.* at 53-55). Garrett also mentioned to Patton that, as House Chair of the Ways and Means Committee for Education, he was in charge of the education budget. (*Id.* at 56). Patton perceived this as a threat against the budget for the Witt Fellows Program. (*Id.*).

Although UA did not discipline Patton based on the complaint, Patton contends that the process of UA's investigation of the complaint and her conversation with Garrett caused her to "self-censor[]" by changing aspects of her course instruction. (*Id.* at 63-65). For example, she no longer uses the Harvard Implicit Association Test, has omitted certain documentaries from her instruction, and does not teach on certain theories. (*Id.* at 65-68, 71-72).

71

Patton contends that despite her self-censoring, she is still concerned she will be accused of violating SB 129 because she continues to teach on implicit bias, structural racism, gender discrimination, redlining, housing discrimination, employment discrimination, and health disparities based on race. (*Id.* at 73-74). She believes that discussion on these topics could be construed as advocating in support of SB 129's divisive concepts. (Doc. # 43 at 16-17).

Although Patton was never disciplined by the University or told that she violated SB 129 (Doc. # 72 at 118), she says that her speech has been "objectively chilled." Patton had not received any student complaints before SB 129 was enacted. She teaches on concepts that she says may be perceived as related to the divisive concepts enumerated in SB 129 and Patton is also worried because students may complain that she endorses or requires assent to matters she teaches. She was already subjected to the complaint process and perceives that the conversation with Garrett was threatening. During their interactions, Reid conveyed the message that Patton could be subject to termination despite her tenure status. These events could reasonably chill speech and cause one to self-censor while teaching. Patton also alleges that SB 129 is vague. *See HM Fla.-ORL*, 137 F.4th at 1217.

Again, this is not a merits finding. Like Simon, Patton has shown that (1) she "intend[s] to engage in a course of conduct arguably affected with a constitutional interest; (2) her conduct is "arguably prescribed" by SB 129; and (3) she is subject to a credible threat of enforcement." *Susan B. Anthony List*, 573 U.S. at 159, 162 (cleaned up). Accordingly, Patton has standing to challenge the Board's enforcement of the following provisions of SB 129: Alabama Code §§ 41-1-90(2)(c), (d), (e), (f), (g), (h) and 41-1-91(2).

### 3.    Fording

Fording also asserts that in response to SB 129 he has engaged in self-censorship. (Doc. # 43 at 17 (citing Doc. # 1 ¶¶ 19, 105-08, 155)). Fording has not had a complaint or received any

direction from UA. But, he says he has self-censored based on his knowledge of Patton's and Simon's experiences and certain information on SB 129 provided by the UA administration, including UA's legal training on SB 129, part of which recommended that professors "talk, don't test" on divisive concepts. (Docs. # 72 at 210; 73 at 65; *see also* Doc. # 55-25 at 98).

Fording was aware of the complaint made against Patton. (Doc. # 72 at 210). Patton's experience made Fording concerned that he would be disciplined under SB 129 because he teaches on "much of the same material" in his course "Politics of Poverty" that Patton covers in her courses. (*Id.* at 212). Fording also learned about the cancellation of Simon's sit-in through UA's school newspaper, *The Crimson White*. (*Id.*). After learning about both of these incidents, Petrovic forwarded Fording an email from Dalton stating that he realized that "this may likely be viewed or experienced as UA interpreting the law too broadly on many occasions." (Doc. # 70-20 at 1).

Fording testified that Dalton's email "confirmed for [him] . . . that [SB 129] was being interpreted very broadly both in terms of how to interpret compelling assent but also what a divisive concept is." (Doc. # 72 at 216). Therefore, Fording had concerns about his courses and decided to alter them. (*Id.* at 217). Fording has stopped teaching "The Politics of Poverty" course because it may involve all of the divisive concepts listed in SB 129, and he has changed the content in his other courses out of concern that the content may relate to SB 129's divisive concepts. (Docs. # 72 at 197; 73 at 18, 40). He testified that he would continue teaching "The Politics of Poverty" if SB 129 did not exist. (Doc. # 73 at 40).

Fording reduced course materials and discussions on certain social movements in his course "Social Movements and U.S. Politics." (*Id.* at 20). Fording also made several changes to his course "The Politics of Voting Rights" out of fear that discussions on certain topics in the course could violate divisive concepts (a), (b), and (c). (*Id.* at 26, 44).

Because of SB 129, Fording has engaged in self-censorship in the classroom because many of the topics he teaches are arguably proscribed by the divisive concepts listed in SB 129. (Doc. # 1 ¶¶ 19, 105-08, 155). The Board argues that his self-censorship is not reasonable because Fording testified that he teaches in an objective manner and is thus shielded by SB 129's safe harbor provision. (Doc. # 74 at 25); *see* Ala. Code § 41-1-93(3)b. Nevertheless, the safe harbor provision does not eliminate the "objective chill" Fording has felt because of his knowledge of the complaint process Patton endured and the cancellation of Simon's sit-in – both of which resulted from UA's enforcement of SB 129. The "objective chill" is also reasonable in light of UA's legal training that recommended professors "talk, don't test" and Dalton's email discussing the broad interpretation of SB 129. Fording has thus self-censored due to a reasonable fear of discipline. Further, Fording's allegations that SB 129 is vague makes his self-censorship more reasonable. *See HM Fla.-ORL*, 137 F.4th at 1217.

The court repeats: this is not a merits finding. Fording, like Simon and Patton, has shown that (1) he "intend[s] to engage in a course of conduct arguably affected with a constitutional interest; (2) his conduct is "arguably prescribed" by SB 129; and (3) he is subject to a credible threat of enforcement." *Susan B. Anthony List*, 573 U.S. at 159, 162 (cleaned up). Accordingly, Fording has standing to challenge the Board's enforcement of the following provisions of SB 129: Alabama Code §§ 41-1-90(2)(a), (b), (c), (d), (e), (f), (g), (h) and 41-1-91(2).

### D.    The Students' Standing as to First Amendment Claims Against the Board

#### 1.    Testman

Testman asserts a First Amendment "loss of funding" claim related to SJAC's "demotion" from a UFO to an RSO. (Doc. # 12-6 ¶¶ 8-10; *see also* Doc. # 1 ¶¶ 245-51). She alleges that she was injured because she lost her position with SJAC, and therefore also lost a $600 stipend for work in that position. (Doc. # 43 at 20).

74

Wallace told Testman that SJAC could not continue receiving state funding because SJAC "was not compatible with SB 129" as it may be connected to "divisive concepts" or fall under SB 129's definition of a "diversity, equity and inclusion program." (Docs. # 1 at 49; 12-6 at ¶ 8; 73 at 101). Testman was informed of these changes in the summer of 2024. (Doc. # 73 at 100-01). At that point, the RSO budgets for the upcoming school year had already been approved. (*Id.* at 105).

SJAC could have received funding from the USGA in the fall of 2024, but it did not apply for funding because "the funding window had closed" and new RSOs could only apply for small amounts of money – around $100. (Docs. # 69-8 at 64; 73 at 109). SJAC also did not apply for funding from the USGA in the spring of 2025. (Doc. # 73 at 109).

Again, Testman has asserted a First Amendment loss of funding claim alleging that UAB revoked SJAC's status as a UFO because of its viewpoints. (Doc. # 1 at 78-79). She alleges that restricting funding in this manner constitutes impermissible viewpoint-based discrimination. (*Id.* at 79).

Testman has shown an injury-in-fact sufficient to establish standing based on the loss of her $600 stipend. Even Governor Ivey agrees that Testman has met this requirement. (Docs. # 27 at 33; 76 at 18). Testman has also established traceability for purposes of standing because she has shown that the loss of her $600 stipend was because of UAB's enforcement of SB 129.

Where Testman's standing falters, however, is related to redressability. If the court were to enjoin UAB's enforcement of SB 129, it would not redress her injury because such an order would not aid Testman here. Even if SJAC received UFO funding, no evidence was presented that Testman would be reinstated to the Finance Coordinator position or that SJAC would reinstate her $600 stipend.  Any injury Testman may assert related to SJAC's loss of funding suffers from the same problem. Even if the court enjoined UAB's enforcement of SB 129, it would not require UAB to reopen the SMDP Office or return SJAC to its previous UFO status. This is especially true

75

in light of Wallace's testimony that before SB 129's enactment, UAB had plans to change SJAC's funding model because it had concerns about RSOs "double dipping" in funding from both SJAC and the USGA. (Doc. # 69-8 at 23). She testified that this change would have happened "regardless of SB 129." (*Id.*).

Accordingly, Testman has not established standing to assert her loss of funding claim.[32]

### 2.    Luna

Luna asserts two First Amendment claims: (1) a "loss of funding" claim related to Esperanza; and (2) a "right to learn" claim. (Doc. # 1).

After the enactment of SB 129, Esperanza was no longer able to receive funding from the DEI Office, the SMDP Office, or SJAC. (Doc. # 73 at 134, 137). Luna testified that because of this lack of funding, Esperanza saw a decline in programming attendance and lacked the ability to host certain events. (*Id.* at 134).

Although Esperanza lost the ability to receive funding from these sources, it still had the ability to obtain funding from the USGA. (*Id.* at 137). Luna testified that Esperanza missed the funding application deadline for USGA in the fall 2024 semester and he "didn't think [Esperanza] would be eligible for any of those funds." (*Id.*).

Luna testified that Esperanza has never applied for USGA funding because he is "concerned that Esperanza, due to its focus on issues pertinent to Latine students, will be deemed a 'diversity, equity, and inclusion program' that is barred from University funding under SB 129."

---

[32] Additionally, the Board filed a Notice of Supplemental Authority stating that "it would not be prudent for the Board to reopen or reinstate" UAB's SMDP Office based on the Department of Justice's ("DOJ") recent guidance titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." (Doc. # 77; *see also* Doc. # 77-1). The guidance "clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as [DEI] programs." (Doc. # 77-1 at 2). The Board asserts that "[t]his new guidance speaks directly to the Board's concerns about reopening or reinstating" offices such as the SMDP Office. (Doc. # 77 at 2). Accordingly, the Board's reliance on the DOJ's guidance bolsters its argument that Testman lacks standing because she cannot establish the element of redressability related to her loss of funding claim. Plaintiffs responded (Doc. # 78) and their response is addressed below.

(*Id.* at 166). When Luna was specifically asked why Esperanza did not apply for USGA funding when it knew that the Spanish and Latino Student Association (an organization with similar goals and programming) had received funding (*Id.*), he replied that Esperanza "wanted [its] funding to be permanent and long-standing." (*Id.*).

Governor Ivey argues that Luna lacks standing to assert his "loss of funding" claim because Esperanza has neither applied for nor been denied funding. (Doc. # 27 at 32-22). The court agrees. Luna has not shown an injury-in-fact. While he claims that, at the time, he *thought* that Esperanza might be denied funding, he has not shown (and cannot show) a denial of funding because he never applied. "Such 'some day' intentions . . . do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. Luna's desire for Esperanza's funding to be permanent and long-standing does not save his claim. His injury remains entirely speculative and does not establish an injury-in-fact for standing purposes. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

That said, even if Luna had shown an injury-in-fact, he would still be unable to establish standing because, like Testman, he has not established redressability. Again, enjoining UAB's enforcement of SB 129 would not require UAB to reopen the SMDP Office or the DEI Office, or to reinstate SJAC to a UFO. Wallace testified that funding changes would have been made regardless of SB 129. *See Baughcum v. Jackson*, 92 F.4th 1024, 1033 (11th Cir. 2024) ("An injury must be traceable to the defendant and redressable by a court order against the defendant, not a third party."). Accordingly, Luna has not established standing to bring his "loss of funding" claim.

Next, the court considers Luna's "right to learn" claim. Luna alleges that he "has been harmed by the curriculum restrictions implemented by the [UA] system pursuant to enforcement of SB 129." (Doc. # 1 ¶ 234). He claims that, because of SB 129's enactment, he fears that professors will self-censor and that he will be "deprived of [his] right to receive information when

professors do not provide the full breadth of their knowledge, expertise, and scholarship for fear of promoting a banned viewpoint." (Doc. # 12-1 at 4, 7, 14).

Luna contends that he has "already witnessed the impacts of SB 129 on [his] professors and [his] classes." (Doc. # 12-5 at 5 ¶ 11). He opines that in his "Politics and Race in America" course, the professor "did not engage in and did not lead class discussions among the students on topics related to the impact of systemic racism on the U.S. government and its policies" and that in "Human Rights," the professor "seemed wary of how he presented course materials to his students, and did not provide instruction during or failed to lead class discussions on topics that could fall under SB 129." (Doc. # 58 at 66 ¶¶ 203, 205). He says that in "Environmental Politics," the professor was "less active" in the classroom discussions than he was in the fall 2024 semester while teaching "Human Rights." (Doc. # 73 at 160-61). There were topics that Luna states he expected to learn about in "Environmental Politics" such as "environmental injustice as it relates to different communities," but "those things were only [just] mentioned." (*Id.* at 162). Further, his professor "did not engage in classroom discussion on topics such as the impacts of racism and government policy on environmental health." (Doc. # 58 at 66 ¶ 207). He complains that the academic freedom disclaimer in his "Environmental Politics" syllabus gave him "anxiety for [his] future" as he worried that it would affect his academic experience. (Doc. # 73 at 159; *see also* Doc. # 55-40).

When asked what alarmed him about the disclaimer, Luna stated, "I think the manner in which it says that difficult, objectionable, or controversial topics for consideration will be put forth through an objective and scholarly lens." (Doc. # 73 at 171). He agreed that "it's a professor's responsibility to be objective, but I also think people take classes because they want to hear their professor's expertise on a particular subject and their professional opinion" and "someone may

view a professor's professional opinion or expertise as trying to require students to assent or agree to any concept if it's closely related to the course materials presented in the class." (*Id.* at 171-72).

Luna is concerned SB 129 could impact his ability to receive information in future courses, such as "Politics of Constitutional Law," and impact the class's "analysis of different constitutional rulings" or the class's "analysis of different cases as it relates to different gender, sexual orientation, or racial or ethnic minorities . . . ." (*Id.* at 162-63).

These assertions are insufficient to demonstrate an injury for purposes of standing on Luna's "right to learn" claim. Again, to establish an injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Luna's alleged injury is too conjectural to satisfy standing's requirements.

Luna is correct that his right to receive information is coextensive with the Professors' right to speak. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality) ("the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them") (emphasis in original). However, the fact that the Professors have established standing to assert their First Amendment claims does not save Luna's claim.

Luna asks the court to conclude that his professors' speech was objectively chilled because the courses involved topics that could be viewed as "divisive concepts," and his perception that the professors were "less active" in class and "did not engage in and did not lead class discussions." But these particular assertions are merely speculative. First, none of the Professors ever taught Luna. They teach at UA; Luna is a student at UAB. (Docs. # 58 at 15 ¶¶ 68-69; 73 at 120). Second, none of his professors at UAB have testified that they self-censored in the classes he perceived were affected, nor is there any record evidence they did so. He has not presented evidence that future harm is "impending" or will occur. *Susan B. Anthony List*, 573 U.S. at 158. Third, and to be

clear, the court discredits Luna's testimony that certain of his professors were holding back in what they taught in the classroom. His statements were conclusory and speculative. Luna did not give specifics and, as the court observed his testimony, it appeared he was attempting to shoehorn general observations into others' specific motives. Luna has presented only "speculat[ion] about the decisions of third parties," which is unsupported by any record evidence and is "no more than conjecture." *Murthy*, 603 U.S. at 72.

Additionally, Luna's testimony regarding the disclaimer placed in a syllabus by his professor does not tip the scales. His worry that such a disclaimer, or its cause, may affect his academic experience in class is again pure speculation. The disclaimer was present in syllabi for two different classes, one published before SB 129 went into effect and the other after. Therefore, Luna has not even illustrated that the disclaimer was a result of SB 129.

For all these reasons, Luna has not shown that he suffered a concrete injury sufficient to establish standing to assert his First Amendment "right to learn" claim.

### E.    Alabama NAACP's[33] Standing as to First Amendment Claim Against the Board

As the Supreme Court has recently explained, "where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Warth*, 422 U.S. at 511). Alabama NAACP has asserted claims under both approaches: organizational standing and associational standing (Doc. # 57 at 1). Below, the court addresses whether Alabama NAACP has established standing under either approach.

---

[33] In their post-hearing briefing, Plaintiffs seek to explain why the UA NAACP Chapter has standing, not Alabama NAACP. (Doc. # 75 at 40-42). To be clear, Alabama NAACP is a party here; the UA NAACP Chapter is not. (*See* Doc. # 1 ¶¶ 1, 24).

### 1.    Organizational Standing

The Supreme Court has consistently held that "organizations may have standing to sue on their own behalf for injuries they have sustained." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 393 (2024) (internal quotations and citation omitted). The organization need only satisfy "the usual standards for injury in fact, causation, and redressability that apply to [the] individuals [in its organization]." *Id.*

Alabama NAACP asserts that it "meets the requirements for organizational standing because the organization itself has been directly harmed by SB 129." (Doc. # 57 at 2). It claims that it suffered direct harm from SB 129 because (1) it "lost a valuable source of recruitment of student members and leaders at UA" due to the closure of the BSU space; (2) "given the vagueness of SB 129 and the actions of UA administrations," it "has a reasonable and credible concern that the UA NAACP Chapter will be deemed a prohibited DEI program under SB 129" and "there is a real risk that programming put on by the UA NAACP Chapter will be prohibited as DEI programming or, alternatively, as implicating 'divisive concepts' under SB 129 and thus deemed [to] be ineligible for university funding." (*Id.* at 9). Alabama NAACP asserts that "[e]ach of these injuries would alone be sufficient to confer organizational standing." (*Id.*). The court considers each of Alabama NAACP's alleged injuries, in turn.

Related to Alabama NAACP's first alleged injury, the organization highlights that the "UA NAACP Chapter President Ja'Kobe Bibbs formed relationships with . . . individuals at the BSU space who he recruited to become members of the UA NAACP Chapter Board." (*Id.* at 9).[34] Bibbs testified about four individuals – Students 1, 2, 3, and 4, each of whom assumed Chapter leadership roles – who he formed connections with while in the BSU space. (Doc. # 73 at 178-81).

---

[34] To be clear, all members of the UA NAACP Chapter are members of Alabama NAACP according to Bibbs's testimony. (Doc. # 73 at 176).

Alabama NAACP has not asserted that it has suffered any change in recruitment or a reduction in revenue. Rather, the organization emphasizes that it has "lost a valuable source of recruitment of dues paying members and leaders" due to the closure of the BSU space. (Doc. # 57 at 9). To support its organizational standing argument, Alabama NAACP cites *Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073 (N.D. Fla. 2004), which in turn cited *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), for the proposition that "an organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." *Fla. Democratic Party*, 342 F. Supp. at 1079 (citing *Havens*, 455 U.S. at 379). However, *Havens* is inapposite because in that case, the plaintiff alleged that it had already been "perceptibly impaired" in its "ability to provide counseling and referral services," and "has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Havens*, 455 U.S. at 379 (cleaned up) (citation omitted). Alabama NAACP has not alleged that it has suffered any monetary or recruitment injury, nor has it alleged that it has devoted additional monetary or other resources to counteract the effects of the BSU space closure.

Having said that, Alabama NAACP's allegations about the expected impact on recruiting dues-paying members is a different question, which the court separately evaluates. It claims an imminent injury related to an expected loss of revenue. To show that an injury is imminent, a plaintiff must show that the "injury is *certainly* impending." *Clapper*, 568 at 409 (quoting *Lujan*, 504 U.S. at 565) (emphasis in original). Bibbs recruited several students using the BSU space, and those students eventually served on the UA NAACP Chapter Executive Board. The loss of the BSU space as a recruitment resource suggests an impending monetary injury. So, the court assumes that the injury-in-fact requirement is met.

The court is not convinced, however, that Alabama NAACP's injury is redressable. If the court enjoined UA's enforcement of SB 129, the BSU space may not reopen because there is

evidence the closure of the space was not solely caused by SB 129, but was also due to federal law. (*See* Doc. # 70-23 at 1 (quoting the Associate Director of Communications for UA: "In accordance with state and federal laws, no University program, space, or benefit will contain impermissible restrictions, preferences, or limitations related to race, color, religion, sex, ethnicity, national origin, sexual orientation or gender identity.")). At this point, the court concludes the record is not sufficiently developed as to why the BSU space was closed; therefore, Plaintiffs have not met their burden establishing the redressability element of standing on this injury.

Reviewing the Board's supplemental authority, there is at least a question whether the Board will be in a position to reopen the space based on the DOJ's recent guidance. Plaintiffs responded to the Board's Notice. (Doc. # 78). They assert that the Board's reliance on the DOJ's guidance "falls short of establishing that reopening the BSU and Safe Zone spaces would violate federal law." (*Id.* at 2). The court is not persuaded by this argument. It is not at all clear to the court whether requiring the Board to reopen these spaces would violate federal law. At a minimum, it would be problematic if the court directed the Board to take action that the United States may claim violates federal law. For that reason, at this stage, the prudent course is not to order the Board to reopen the spaces. The court will re-entertain such a request once there is more clarity on this issue – assuming Plaintiffs can meet the other requirements of their requested relief. (Doc. # 77; *see also* Doc. # 77-1).

The court next considers Alabama NAACP's "fear that it will be deemed a prohibited DEI program or associated with a divisive concept under SB 129." (Doc. # 57 at 10). The organization contends that the UA NAACP Chapter "has hosted – and intends to host in the future – speakers addressing topics concerning racial gerrymandering and implicit bias, among others." (*Id.* at 11). Additionally, Alabama NAACP asserts that because of SB 129, it has had to move events off

campus and that the UA NAACP Chapter's faculty advisor stated that "she could not attend its off-campus event due to her own fears of repercussions under SB 129." (*Id*. at 13).

Alabama NAACP relies on the Eleventh Circuit's holding in *Harrell* to support its argument that because of the "vague language in SB 129 and Defendants' enforcement thereof," Alabama NAACP's speech has been chilled. (*Id*. at 11). *Harrell* involved a state bar association's rule about attorney advertising and an attorney's argument that the rule was vague and chilled his commercial speech. The Eleventh Circuit held that "to substantiate this claimed self-censorship injury, [the plaintiff] must establish that: (1) he seriously wishes to advertise his services; (2) such advertising would arguably be affected by the rules, but the rules are *at least arguably vague* as they apply to him, and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Harrell*, 608 F.3d at 1254 (citations omitted) (emphasis in original).

Applying this test to the claims asserted by Alabama NAACP, the organization has asserted that it seriously wishes "to host events that could be deemed 'DEI programs' or to implicate 'divisive concepts' at the University of Alabama campus." (Doc. # 57 at 12). This satisfies the first factor. Alabama NAACP has also argued that holding such events, which would "potentially include debate about whether it is valuable to teach students the concepts of systemic racism, meritocracy, and implicit bias, implicating various of the 'divisive concepts,'" would be affected by SB 129. (*Id.*). SB 129 prohibits a "public institution of higher education" from "sponsor[ing] any diversity, equity, and inclusion program," which could include "[a]ny program, class training, seminar, or other event where attendance is based on an individual's race, sex, gender identify, ethnicity, national origin, or sexual orientation, or that otherwise violates this article." *See* Ala. Code § 41-1-91(1); *id.* § 41-1-90(3). SB 129 also prohibits "public institutions of higher education" from "expend[ing] funding . . . for the purpose of compelling assent to any divisive concept." *Id.* § 41-1-91(7). An event held by Alabama NAACP could arguably (if not likely) be affected by the

rules against compelling assent to any divisive concept, and therefore the second *Harrell* factor is satisfied. Finally, because the BSU and Safe Zone spaces were closed even though they did not restrict membership based on race or sexual orientation, there is at least a *minimal* probability that SB 129 would be enforced against the UA NAACP. As the Eleventh Circuit noted in *Harrell*, "[i]f a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." 608 F.3d at 1257 (citation omitted). Therefore, the third factor is also satisfied. Because all three *Harrell* factors have been satisfied, Alabama NAACP has shown an injury-in-fact as to its programming.

Alabama NAACP has also satisfied the traceability and redressability requirements for standing. The "chilling effects" it has experienced are traceable to SB 129, and if the court enjoined UA's enforcement of SB 129, its injury would be redressed.

Accordingly, Alabama NAACP has organizational standing to challenge the Board's enforcement of the following provisions of SB 129: Alabama Code §§ 41-1-90(3), 41-1-91(1), 41-1-91(7).

### 2.     Associational Standing

For an organization to have associational standing to bring suit on behalf of its members, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

To satisfy the first prong of the *Hunt* associational standing test, "organizational plaintiffs need not establish that all of their members" have been injured, but must point to at least one member who would have standing. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008)).

As the Supreme Court has made clear, an organization must "make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). When pointing to the member or members who have standing, the organizational plaintiff may rely on pseudonyms, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024), or on a specific allegation "that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right." *Doe v. Stincer*, 175 F.3d 879, 885 (11th Cir. 1999).

Here, Alabama NAACP has identified one named member – Bibbs – who testified at the evidentiary hearing that he had frequently visited the BSU space to socialize, receive mentorship from, and discuss race-related topics with other students. (Doc. # 73 at 178, 180, 182, 186, 189-90; *see also* Doc. # 57 at 5). Bibbs also identified Students 1, 2, 3, and 4, who all eventually became leaders in the UA NAACP Chapter. (Doc. # 73 at 178-80). Plaintiffs assert that "[h]ad the BSU space not been closed as a result of SB 129, Bibbs and other UA NAACP Chapter members would have continued to use the space to build relationships and further participation and membership in the UA NAACP Chapter." (Doc. # 57 at 6). Bibbs also testified about a student member of the UA NAACP Chapter who had used the Safe Zone space. (Doc. # 73 at 191). The identification of Bibbs, along with his testimony pointing to Students 1, 2, 3, and 4 by pseudonym, is sufficient to identify a member.

The next question is whether the claimed injuries of these identified UA NAACP Chapter members would confer standing if they sued individually. Again, to have standing, a plaintiff must have suffered an injury-in-fact, which must be concrete. *Lujan*, 504 U.S. at 560. Here, the harm is not monetary or physical, so it is an intangible injury. To be concrete, an intangible injury must have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425 (citing *Spokeo*, 578 U.S. at 340-41). The Supreme

Court has recognized an injury to "aesthetic, conservational, and recreational . . . values" as providing a basis for lawsuits. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000). Therefore, the loss of a recreational space such as the BSU or the Safe Zone is a concrete injury.

Along with the requirement that it be concrete, a plaintiff must also show that the injury is particularized and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Because the *individual* Alabama NAACP members were no longer able to use the BSU and Safe Zone spaces, this injury affects the members in a "personal and individual way," *Laufer v. Arpan LLC*, 29 F.4th 1268, 1272 (11th Cir. 2023), and thus it is particularized. Finally, the closures are actual and not hypothetical – they have already happened.

Considering the other standing requirements, the closure of the BSU and Safe Zone spaces is traceable to SB 129 and the Board's enforcement of the statute. After all, the Board has control over the use of university space. (Doc. # 58 at 20-21 ¶ 96). So far, so good.

Where Alabama NAACP's standing assertions falter relates to the requirement that it show that its injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561. According to an article in *The Crimson White*, the BSU and Safe Zone spaces were closed because of SB 129 *and* other "federal laws." (Doc. # 70-23 at 1). As stated previously, the record on why the spaces were closed has not been factually developed enough for the court to say whether enjoining UA's enforcement of SB 129 would require the University to reopen the spaces. If there are indeed other reasons outside of SB 129 that led to the closures of the spaces, then Alabama NAACP may not be able to show redressability. At this stage, the court simply does not have enough information to determine whether the injury is redressable, a necessary requirement that must be shown (and one

in which Plaintiffs bear the burden to show) to proceed to the merits of this case.[35] Notwithstanding this shortcoming, the court will consider the other prongs of the *Hunt* test.

Moving to the second prong of the *Hunt* associational test, the question is whether the interests Alabama NAACP seeks to protect are germane to the organization's purpose. Alabama NAACP's stated mission "is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." (Doc. # 12-7 ¶ 3). The BSU's mission is "to establish and innovate relationship opportunities and experience for minority students" as well as to "serve our members by providing community service opportunities, mentoring relationships within BSU, and providing outlets for expression and discussion." (Doc. # 57 at 4-5 (quoting Black Student Union, My SOURCE, https://mysource.ua.edu/organization/uabsu last visited May 21, 2025))). The BSU's mission is also "to provide a safe and welcome environment for all students who wish to be a part of it." (*Id.* at 5) (quotations to Black Student Union omitted). Preserving access to the BSU space is therefore germane to Alabama NAACP's purpose because, according to its mission statement, the BSU promotes "social inclusion" and works to "accelerate the well-being, education, and economic security of Black people and all persons of color." (Doc. # 12-7 ¶ 3).

More tenuous is the question of the germaneness to the organization's purpose of preserving access to the Safe Zone, which again is "a physical space with programming for LGBTQIA students at UA." (Doc. # 1 ¶ 129). According to a declaration by Simelton, the President of Alabama NAACP, the Safe Zone provided "educational outreach, community support and crisis intervention resources for LGBTQIA+ members of The University of Alabama community and

---

[35] The Board's supplemental authority buttresses this point as the Board notes it may not be in a position to reopen the BSU and Safe Zone spaces based on the DOJ's recent guidance. (*See infra*; Doc. # 77; *see also* Doc. # 77-1).

their allies," (Doc. # 12-7 ¶ 15). The mission of Alabama NAACP is defined to include achieving "equity . . . and social inclusion by advancing policies and practices that expand human and civil rights, [and] eliminate discrimination . . . of Black people and all persons of color." (Doc. # 12-7 ¶ 3). There may be some question about whether the phrase "of Black people and all persons of color" applies to the earlier listed items in the sentence "policies and practices that expand human and civil rights" and "eliminate discrimination"). But even if so, it is undisputed that Black students (including an Alabama NAACP member) used the Safe Zone, and therefore preserving student access to the Safe Zone seems, at least in some respect, to be germane to the organization's purpose of improving social inclusion and eliminating discrimination.

The final *Hunt* prong is also met here because neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. This is because the relief requested is injunctive relief, and not monetary damages. Awarding injunctive relief would not require an individualized member-by-member inquiry.

The fact remains, however, that because Alabama NAACP has not met its burden on the first prong of the *Hunt* test, the organization has not established associational standing to bring its First Amendment claim.

### F.    Plaintiffs' Standing as to Fourteenth Amendment Claims Against the Board

Plaintiffs allege that SB 129 is unconstitutionally vague "on its face" and that this vagueness has resulted in arbitrary and inconsistent enforcement. (Doc. # 1 ¶¶ 9, 261, 263). Plaintiffs also allege that the Board has enacted unconstitutionally vague policies in its attempt to enforce SB 129. (*Id.* ¶ 259).

The Board argues that Plaintiffs lack standing to bring this claim. (*See* Doc. # 74 at 45-47). First, they contend that the Professors have not "demonstrated an intent to engage in speech affected by SB 129, nor do they face a credible threat of enforcement." (*Id.* at 46). Second, they

contend that the Students lack standing because they have not shown that SB 129 is enforceable against them (as in, they cannot be disciplined or terminated like the Professors can). (*Id.*). Third, they contend that Alabama NAACP lacks standing because enjoining SB 129 would not redress its associational injury. (*Id.*).

As the Eleventh Circuit has held, "vagueness challenges under the First Amendment have their own standing standards." *HM Fla.-ORL*, 137 F.4th at 1216. This standing test requires a plaintiff to show that: "(1) he seriously wishes to [speak]; (2) such [speech] would arguably be affected by the rules, but the rules are *at least arguably vague* as they apply to him[;] and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Id.* (quoting *Harrell*, 608 F.3d at 1254) (alterations and emphasis in original).

The Professors, who allege that they have self-censored due to the vagueness of SB 129 and the University's enforcement policies, have demonstrated they have standing under this test. The Professors have presented testimony that they seriously wish to speak in ways that could be affected either by SB 129 or by the University's interpretation and enforcement of it, and that there is at least a minimal probability that the rules will be enforced if violated.[36] The Professors have therefore satisfied their constitutional minimum of showing they have standing to bring their Fourteenth Amendment vagueness claims.

The Students allege that they "face confusion as to which student groups can be funded under SB 129 and why a group's mission violates divisive concepts." (Doc. # 1 ¶ 261). Because the Students do not allege that they have self-censored, the normal standing test applies. As neither Testman nor Luna have established standing to bring their First Amendment loss of funding claims, they also lack standing to assert their vagueness claims related to the loss of funding. As

---

[36] For this reason, at least as it relates to a standing analysis, it is of no moment that the Professors have denied any intention of compelling student assent to any of the divisive concepts.

Luna has not demonstrated standing as to his "right to learn" claim, he cannot pursue a vagueness challenge on that claim.

Alabama NAACP alleges that it has "been harmed by the vagueness associated with . . . funding and space restrictions." (Doc. # 1 ¶ 259). As discussed above, Alabama NAACP at least has organizational standing related to its chilled speech and concerns that its funding would be revoked. First, the organization has alleged that it wishes to engage in speech (including "programs, classes, trainings, seminars, and other events") that are arguably affected by either SB 129 or the University's interpretation of it. (*Id.* ¶ 161). It has also shown that there is at least a minimal probability of enforcement[37] against an organization that violates the University's policies or SB 129. Indeed, Alabama NAACP notes that the University has already taken action on campus under SB 129 – it closed the BSU and Safe Zone spaces and took some action against Patton and Simon. Alabama NAACP has demonstrated standing to assert this claim.

### G.    Likelihood of Success on the Merits of the Underlying Case

In light of its rulings on standing,[38] the court turns to whether Plaintiffs have established the requisite elements to warrant a preliminary injunction. Again, to obtain a preliminary injunction, Plaintiffs as the movants must establish: (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable injury in the absence of the proposed preliminary injunction; (3) on balance, the threatened injury to the movant exceeds the damage that the preliminary injunction may cause the opposing party; and (4) the preliminary injunction would not disserve the public interest. *Swain*, 961 F.3d at 1284-85. This court begins by analyzing whether Plaintiffs have shown a substantial likelihood of success on the merits. Typically "when a plaintiff

---

[37] The Board argues that Alabama NAACP lacks standing "based on the simple fact that SB 129's prohibitions are not enforceable against [it]." (Doc. # 74 at 46). This argument is meritless. Although Alabama NAACP may not be formally "disciplined" or "terminated" for violating SB 129, *see* Ala. Code § 41-1-92, as discussed above, the enforcement of the statute may still affect the organization.

[38] Although the court has determined that both Testman and Luna lack standing to seek preliminary injunctive relief, the court nevertheless evaluates their claims on the merits below.

fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction." *Pittman*, 267 F.3d at 1292 (citing *Church*, 40 F.3d at 1342-47; *Cuban Am. Bar Ass'n Inc. v. Christopher*, 43 F.3d 1412, 1424 (11th Cir. 1995)). The court also examines the requirement of irreparable harm, at least with respect to some of the claims.

The court first tackles the Professors' free-speech claims related to classroom instruction and addresses Luna's corresponding "right to learn" claim. Thereafter, the court turns to the Students' and Alabama NAACP's extracurricular funding and use of facility claims. And finally, the court analyzes the Plaintiffs' Fourteenth Amendment claims.

       **1.**     **First Amendment Claims**

             **a.**    **The Professors' First Amendment Claims Related to In-Class Instruction**

Central to the Professors' claims is the First Amendment, which as relevant here, prohibits government actors from "mak[ing] any law . . . abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court began applying the First Amendment to the states via the incorporation doctrine a century ago. *Gitlow v. New York*, 268 U.S. 652 (1925). The Court has since published numerous landmark decisions interpreting that constitutional amendment's text. These decisions make clear that the right to speak is not absolute. *See e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Miller v. California*, 413 U.S. 15 (1973); *Virginia v. Black*, 538 U.S. 343 (2003). Further, different lines of First Amendment doctrine have evolved from various Supreme Court and Eleventh Circuit decisions. So, the first question the court must answer is what precedential decisions apply to the claims presented here.

When First Amendment speech claims are made by public employees, one line of cases applies a two-step balancing test that measures the interests of a government employee's right to

speak against a governmental employer's interests in efficiently delivering public services. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 142 (1983).

Another series of decisions have focused on the "role the speaker occupied"[39] and how a court should analyze "speech" of government employees when that speech is made under their official duties. *E.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286 (11th Cir. 2025).

Finally, nearly thirty-five years ago, after *Pickering* and *Connick* but before *Garcetti* and *Wood,* the Eleventh Circuit issued an opinion in a case involving a professor's speech that is perhaps most directly relevant (and closer factually) to this case. *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991). There, the court constructed a unique balancing test that is to be applied on a case-by-case basis when a university seeks to regulate a professor's in-class speech. *Id.* at 1073. That balancing answers two of the critical questions presented here: (1) who decides what is taught in the classroom and (2) "to what degree a [University] may control classroom instruction before touching the First Amendment rights of a [professor]." *Id.*

To undertake a thorough analysis of the Professors' First Amendment claims, the court first evaluates *Pickering* and *Connick*, then assesses *Garcetti* and *Wood,* and lastly applies the unique balancing test our Circuit formulated in *Bishop*. As will be seen, no matter which cases the Professors' First Amendment claims are examined under, the result is the same. Their First Amendment claims fail.

### (1)    The *Pickering/Connick* Analysis

The Professors enjoy limited First Amendment protections on campus because they do not "shed their constitutional [free speech rights] at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). At the same time, the government has a "countervailing

---

[39] *See Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015).

interest in controlling the operation of its workplaces." *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (citing *Pickering*, 391 U.S. at 568). When those interests are in tension, a court must "balance . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

To balance these competing interests, the Supreme Court established a two-step test in *Pickering* and *Connick* that is used to determine whether a public employee's speech is protected by the First Amendment. *Alves*, 804 F.3d at 1159. At step one, the court must determine whether the employee spoke (1) as a citizen and (2) on a matter of public concern. *Pickering,* 391 U.S. at 568; *Connick*, 461 U.S. at 142. If the employee makes both showings, the second step of that test involves balancing those competing interests. *Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 145.

(a)    *Pickering*/*Connick* – **Step One**

The court reviews the two prongs of the first step in reverse order because the second prong (whether the Professors have spoken on matters of public concern) is easily resolved here. As the *Connick* Court explained, to be of public concern an employee's speech must "relat[e] to a[] matter of political, social, or other concern to the community." 461 U.S. at 146. Here, there is no dispute that the professors' speech relates to a matter of public concern. (Doc. # 74 at 29 n.9). The Professors' speech involves such topics as social justice, health policy, state politics, and public policy administration, which are clearly related to matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("speech is of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or, when it 'is a subject of general interest and of value and concern to the public.'") (citing *Connick*, 461 U.S. at 146 and *San Diego v. Roe*, 543 U.S. 77, 83-85 (2004) (per curiam)).

94

The dispositive inquiry then, at least at this stage of the court's analysis, is not at the second prong but at the first prong—whether the Professors' speech is made as private citizens or, alternatively, in their role as university employees. In other words, squarely in contest here is "*Connick*'s directive to consider whether the speech at issue was made primarily in the employee's role as a citizen, or primarily in the role of employee." *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) (citing *Connick*, 461 U.S. at 147). For even when speech relates to a matter of public concern, First Amendment protection remains unavailable if "a public employee speaks not as a citizen [ ] but instead as an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147; *see also Alves*, 804 F.3d at 1160. The court "must therefore discern the purpose [or context] of the employee's speech – that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993). So, the court begins with context.

University professors wear many hats. They may be paid to conduct research, publish writings and other scholarship, advise students, serve on committees, secure grants, present at symposia and conferences, and perform any number of other professional assignments. But, the primary role of an educator is to teach. Of course, most (but not all) teaching occurs in the classroom.[40] To be clear, in the context of evaluating the Professors' free-speech teaching claims, the plain text of SB 129 only regulates in-class teaching. In her briefing, Governor Ivey puts it this way: the Professors' free-speech claims connected to classroom instruction fail because the Professors are "not teaching students as a private citizen, but as a state employee – at a state university, in a state classroom, on the State's time, and paid by the State's dime." (Doc. # 27 at 40).

---

[40] *See Bishop*, 926 F.2d at 1076-77 (distinguishing between matters of content in classroom teaching and actions taken as an "independent educator").

With this context in view and bearing in mind that this case focuses on the Board's enforcement of SB 129, the court briefly pauses to review what the Professors' First Amendment claims here do not involve. First, this case does not concern questions about any limitations on private colleges or universities. This is because SB 129 does not apply to private schools. *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) (evaluating a law's application to private actors). Second, this case does not involve questions about what limits public university professors face with respect to their job duties or other activities outside the classroom. Third, this case has no bearing on what reading assignments professors may assign to students. At the hearing, both Governor Ivey and the Board conceded that nothing in SB 129 speaks to assigned readings. (Doc. # 72 at 155). SB 129 does not prohibit the discussion of any divisive concept in the classroom. Moreover, the statute contains a safe harbor provision that permits such teaching so long as it is undertaken "in an objective manner and without endorsement." Ala. Code § 41-1-93(3)b. Fourth, there is no strength added to the Professors' case simply because the Alabama Legislature passed SB 129 and the Board did not independently prohibit the teaching of these divisive concepts. The Board has the authority to enforce the Act, and that is what is challenged here.[41]

Turning back to the first prong in step one of *Pickering/Connick*, the binary choice of whether the Professors speak as citizens or themselves does not fit well. When teaching students in the classroom, university professors are not speaking as private citizens. Nor are they speaking only for themselves. They are being paid by the State to teach college students. They are being hired and compensated for their in-class speech. So, the question is whether there is a third category in play here. In other words, how should step on be assessed when an employee is speaking, even on matters of public concern, as part of her official duties as a government employee? To properly

---

[41] Indeed, the Board could have, without any benefit or limitations of legislation, implemented government-speech regulations with respect to professors in its classrooms. (Doc. # 26 at 7).

analyze these threshold questions, the "court considers 'the content, form and context of a given statement, as revealed by the whole record.'" *Morgan*, 6 F.3d at 754 (citing *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir. 1991) (in turn citing *Connick*, 461 U.S. at 147-48)). In doing so, the court must consider whether the Professors are engaged in government speech while working in the classroom.

- **Do *Garcetti* and *Wood* Apply to Step One of the *Pickering/Connick* Test Here?**

In *Garcetti*, the Supreme Court added a threshold inquiry (much like that which the court is invited to consider today) to the test established by *Pickering* and *Connick*. The plaintiff was a deputy district attorney who drafted an internal memorandum recommending dismissal of a particular prosecution. *Garcetti,* 547 U.S. at 414. The plaintiff claimed that after drafting this memorandum he faced a series of retaliatory employment actions in violation of his rights under the First and Fourteenth Amendments. *Id.* at 415. The Court held that the plaintiff's First Amendment claim failed because he was not speaking as a citizen when he wrote the memo; rather, he was speaking under his official responsibilities as a government employee. *Id.* at 424. The Court reasoned that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. The Court's holding clarified that public employees are not speaking as citizens when they make statements pursuant to their official duties. *Id.* at 421; *see also id.* (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").

97

The question is how do these cases – *Pickering*, *Connick*, and *Garcetti* – fit together. Reading them alongside one another, there are three buckets that a government employee asserting a First Amendment claim may fall within.

- First, the employee speaks as a private citizen on a matter of public concern. This is protected First Amendment speech.

- Second, the employee speaks as an employee/private citizen on a matter of personal interest. This is not protected First Amendment speech.

- Third, the employee speaks as an employee and as part of her official duties on a matter of public concern. This is the situation that *Garcetti* addressed. In those situations, if *Garcetti* applies, the employee's speech receives no First Amendment protection.

This third scenario characterizes the question presented here. If *Garcetti's* government-speech rule controls here – that is, if the Professors are merely engaged as government speakers and speaking as part of their official duties while teaching students in the classroom – their First Amendment claims necessarily fail. There does not appear to be a dispute about whether the Professors' in-class instruction is speech made as part of their official duties. They are hired and paid to teach in class. The real question is whether they should be treated differently than other government employees who speak as part of their duties but whose speech is not protected under *Garcetti*.

Governor Ivey and the Board urge this court to apply *Garcetti* and conclude that the Professors are not communicating as private citizens when they teach students as part of their employment. (Docs. # 26 at 11, 13; 27 at 38-46; 74 at 28-29; 76 at 24).

Plaintiffs did not address *Garcetti* in their motion or opening brief, but now say that case does not apply to the Professors' in-class speech. They assert that in *Garcetti* "the majority's holding . . . *explicitly exempted* 'expression related to academic scholarship or classroom

instruction'" from the government-speech rule created in that case. (Doc. # 31 at 11) (emphasis added). That is an overreach.[42]

In *Garcetti*, the Supreme Court merely declined to decide an issue not even before it: "whether [its government speech] analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching." 547 U.S. at 425.[43] That issue was not presented to the Court – so, there simply could not have been any basis for the Court to rule that there is an academic exemption or carveout. To be sure, the Court mentioned, in dicta, that "expression related to academic scholarship *or* classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* (emphasis added). *Garcetti's* application in the academic setting remained an open question.[44]

---

[42] Plaintiffs may have been unduly influenced by the problematic analysis of the district court in *Pernell v. Florida Board of Governors of State University System*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), a case they rely heavily upon and which is detailed below. In *Pernell*, the court acknowledged that the Supreme Court in *Garcetti* expressly declined to decide whether its government-speech rule would apply in the same manner to a case involving scholarship or teaching. *Id.* at 1240 (citing *Garcetti*, 547 U.S. at 425). But when the State of Florida argued that the court should apply *Garcetti*, curiously, the district court accused the State of "[r]efusing to take 'no' for an answer." *Id.* ("Defendants assert this court must apply *Garcetti's* reasoning to the professor speech issue here, notwithstanding the Supreme Court's explicit refusal to do so"). The Supreme Court did not refuse to extend *Garcetti* to academic speech. It left the issue open to be decided another day. Plaintiffs' and the *Pernell* court's assumption (or assertion) to the contrary cuts no ice at all. There is a stark difference between leaving a question undecided and carving out an exemption to a rule formulated in a case. The *Pernell* court's "refusing to take no for an answer" language ignores that the Supreme Court did not say yes or no to the question.

[43] As the Court put it: "Justice Souter suggests today's decision may have important ramifications for academic freedom, at least as a constitutional value. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425 (internal citation omitted).

[44] It is worth asking this question about *Garcetti*: why did the Court leave open the question of *Garcetti's* application in the academic setting? In short, it appears that it was in direct response to a dissenting opinion by Justice Souter who was concerned about "imperil[ing] First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write pursuant to . . . official duties." *Id.* at 438 (Souter, J., dissenting) (internal citation and quotations omitted). Justice Souter's worry about academic freedom was not a new concept for the Supreme Court. In various decisions, some of which were decided during the Cold War era, *e.g.*, *Keyishian v. Board of Regents*, 385 U.S. 589 (1967) and *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), the Court discussed the importance of academic freedom. Of course, *Keyishian* and *Sweezy* addressed restrictions on extracurricular affiliations and tasks (including some of those listed above); therefore, their actual holdings are simply inapposite here. Those cases may lend some guidance, but they are easily distinguishable. And, whatever may be said about the nature and contours of it, the Eleventh Circuit has also recognized "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1075. However, as the Eleventh Circuit held in *Bishop*, although academic freedom plays an "invaluable role," "particularly at the post-

Of course, the question is no longer open in our Circuit, at least as applied to secondary educators. Recently, the Eleventh Circuit applied *Garcetti* to a high school math teacher.[45] *Wood,* 142 F.4th 1286. In *Wood*, a transgender teacher sued to enjoin the enforcement of a Florida statute which prevented her from providing her preferred pronouns in the classroom. *Id.* at 1288. The plaintiff argued that the statute violated her First Amendment right to free speech. *Id.* The Eleventh Circuit applied a "two-step framework grounded in the Supreme Court's decisions in [*Pickering* and *Garcetti*]." *Id.* at 1289. The court explained the framework:

> At step one, the employee must show that in expressing herself she is (or was) speaking both (a) as a citizen – rather than in her capacity as a government employee – (b) about a matter of public – rather than private – concern. *See Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015). If the employee survives step one, she must then demonstrate, at step two, that her interest in speaking outweighs the state's interest in promoting the efficient delivery of public services. *See Pickering*, 391 U.S. at 568.

*Id.* at 1289-90.

Applying this framework, the Eleventh Circuit concluded that the *Wood* plaintiff's case failed on the first prong of step one because she was engaging in government speech – *i.e.*, she could not show that "she was speaking as a private citizen rather than a government employee." *Id.* The *Wood* court found it important that in *Garcetti* "the Court emphasized that the 'controlling factor' is whether the employee made her statements 'pursuant to [her] official duties.'" *Id.* at 1290 (quoting *Garcetti*, 547 U.S. at 421) (alterations in *Wood*). Similarly, the panel noted that in *Alves* our Circuit quoted *Garcetti*, "observ[ing] that when a public employee speaks 'in the course of performing [her] job' she does so 'pursuant to [her] employment responsibilities.'" *Id.* (quoting *Alves*, 804 F.3d at 1164) (alterations in *Wood*). The court reasoned that "[w]hen a public-school

---

secondary level," it is not an independent First Amendment right. *Id.*; *accord Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) (en banc). And, as will be seen, it does not mean the institution cannot decide what is taught in its classrooms.

[45] Our Circuit has applied *Garcetti* to university employees, but to be clear, that case did not involve classroom instruction. *Alves*, 804 F.3d at 1154-59.

teacher speaks in the course of performing [her] job – *i.e.*, speaking to [her] class in [her] classroom during class hours – she does so pursuant to her official duties and therefore speaks as a government employee, not a citizen." *Id.* at 1291-92 (internal quotations and citation omitted).

In *Wood*, Judge Jordan dissented, but even he acknowledged the State's right to exercise "some authority" over "curricular instruction." *Compare id.* at 1292 ("our dissenting colleague conflates a teacher's 'official duties,' *Garcetti*, 574 U.S. at 421, with 'curricular' instruction'") *with id.* at 1299 (Jordan, J., dissenting) ("We have said that the government has 'some authority over the conduct of teachers in and out of the classroom that *significantly bears on the curriculum*.'") (quoting *Bishop*, 926 F.2d at 1074) (emphasis in original). Indeed, as Judge Jordan put it, "[t]here is an elementary difference between teacher in-class speech which is curricular, and teacher in-class speech which is non-curricular"). *Id.* at 1300 (internal quotations and citation omitted). *See also Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007) (concluding that where speech is "curricular in nature" it is "not protected by the First Amendment"). The distinction Judge Jordan drew in his *Wood* dissent inexorably flows from the manner in which the Supreme Court has defined curriculum: "activities, or matters that are 'supervised by faculty members and designed to impart particular knowledge or skills to student participants . . . .'" 142 F.4th at 1300 (Jordan, J., dissenting) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484. U.S. 260, 271 (1988)). If, as this court reads it, Judge Jordan was line drawing between the State's right to control curricular matters (*e.g.*, in-class teaching), but not non-curricular matters (*e.g.*, in-class use of a teacher's preferred personal pronouns), that means all three judges in *Wood* would agree that when a high school teacher is involved in the curricular activity of instructing her class, she is engaged in government speech.[46]

---

[46] These principles are not without support in Supreme Court jurisprudence. In the Supreme Court's seminal decision in *Rosenberger v. Rector & Visitors of the University of Virginia*, the Court made clear that "[w]hen the University determines the content of the education it provides, it is the University speaking, and [the Constitution] permit[s] the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists

Outside of its decision in *Alves*, which dealt with much different facts than this case, the Eleventh Circuit has not had an occasion to decide whether *Garcetti* applies to college professors. Plaintiffs note that while *Garcetti* has frequently been applied to high school teachers, other circuits have stopped short of applying it to post-secondary instructors. Plaintiffs urge this court not to depart from the unanimity of circuits that have concluded *Garcetti* does not apply to university professors.

Five circuits have declined to apply *Garcetti* in a post-secondary educator's First Amendment case. *Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023). A review of these cases reveals, however, that they are either distinguishable (they did not deal with curricular speech in the classroom),[47] or the courts' rationales are wholly inconsistent with Eleventh Circuit precedent.[48]

---

private entities to convey its own message." 515 U.S. 819, 833 (1995). And, when the government is the speaker, it may "regulate the content of what is or is not expressed[,]" including imposing viewpoint-based restrictions. *Id.* at 834. The Court emphasized the point: "A holding that [a] University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* The Court made this same distinction a few years after deciding *Rosenberger*: "Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties," "principles applicable to government speech" likely govern. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

[47] *Adams*, 640 F.3d 550 (associate professor claiming he was denied tenure because of external writings); *Demers*, 746 F.3d 402 (professor claiming he was retaliated against because he authored a pamphlet and because of a draft of an in-progress book).

[48] *Meriwether* dealt with a challenge by a professor disciplined for not complying with his university's policy regarding preferred pronouns. 992 F.3d at 498-99. The panel leaned heavily on the professor's academic freedom rights while oddly omitting the fact that its own circuit precedent made clear that, "to the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) (quoting *Urofsky*, 216 F.3d at 410). Even putting aside the *Meriwether* court's failure to follow its own binding case law, its rationale decidedly departs from our Circuit's precedent in *Bishop* (and likely *Wood*, as well). There appears to be some level of dissonance between *Meriwether* and both *Wood* (which held, that a public school could prohibit a high school educator from referring to herself using a preferred personal pronoun) and *Bishop* (which concluded that "as a public employer, [a] [u]niversity may reasonably restrict the speech rights of employees more readily than those of other persons."). 926 F. 2d at 1074.

Notwithstanding what other circuits have said, the court reads our Circuit's precedent as strongly suggesting that the Professors' in-class instruction constitutes government speech. First, "the speech at issue 'owes its existence' to the employee[s'] professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421). It is "speech that [the] employee[s] ma[k]e in accordance with or in furtherance of the ordinary responsibilities of [their] employment." *Alves*, 804 F.3d at 1162. The Board can regulate the topics and courses that educators teach. *See Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1520-25 (11th Cir. 1989). And, the Board has "authority over the conduct of teachers *in and out of the classroom* that significantly bears on the curriculum, or that gives the appearance of endorsement by [them]."[49] *Bishop*, 926 F.2d at 1074 (emphasis added). Because "a teacher's speech can be taken as directly and deliberately representative of the school," an employer has an interest "in scrutinizing expressions that 'the public might reasonably perceive to bear [its] imprimatur.'" *Id.* at 1073 (quoting *Roberts v. Madigan*, 921 F.2d 1047, 1057 (10th Cir. 1990))

---

*Kilborn* involved a suit by a law professor disciplined for including an expurgated racial slur on an exam. 131 F.4th at 554. The *Kilborn* panel leaned on *Garcetti's* language not deciding whether its newly minted government-speech rule applied to scholarship or teaching. *Id.* at 557. In doing so, the court focused on concerns about imperiling academic freedom in colleges and universities *id.* (citing *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting)), and said it declined the invitation to extend *Garcetti* in this way "when the Supreme Court was unwilling to do so." *Id.* at 558. (Of course, that is an inapt characterization of what the Court did in *Garcetti*. It never said the rule did not apply, only that it was not reaching the question). But, this court has little question that the outcome in *Kilborn* would (or, at least, should) have been different if *Bishop* were prior Seventh Circuit precedent.

In *Heim*, the Second Circuit rejected a professor's First Amendment challenge to a university's rejection of his candidacy for teaching positions, owing in substantial part to the fact that he endorsed Keynesian economics, an approach the economics department at the State University of New York at Albany believed to be outdated. 81 F.4th 212. The court applied *Pickering* balancing and concluded that the plaintiff's First Amendment retaliation claim could not withstand that test. *Id.* at 221. But, it concluded that while *Garcetti* addressed "government speech," that is, speech that "'[o]wed' its very 'existence'" to the employee's job duties, *id.* at 226 (quoting *Garcetti*, 547 U.S. at 421-22), "professors at public universities are paid – if perhaps not exclusively, then predominately – to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines." *Id.* at 226-27. It simply does not square with the Eleventh Circuit's decidedly different approach to balancing the question of "who decides" when it comes to academic in-class instruction.

[49] Setting the curriculum is just the start of it. Both the Legislature and the Board have "authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum, or that gives the appearance of endorsement by [them]." *Bishop*, 926 F. 2d at 1074. Educators' First Amendment rights therefore do not "extend to choosing their own curriculum or classroom management techniques, in contravention of school policy or dictates." *Edwards v. Calif. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.).

(alteration in *Bishop*). So, unlike the law in those other courts, in this Circuit when there is a dispute about what is taught in the classroom, the university's interests outweigh those of a professor, and the professor's interest in academic freedom and free speech do not displace the university's interest inside the classroom. *Id.* at 1076.

*Wood* only strengthens this conclusion. That decision characterized all classroom speech – even non-curricular speech – as government speech.

Plaintiffs attempt to distinguish *Wood* because that case involved a high school setting. (Doc. # 75 at 20). Defendants disagree, asserting *Wood* applies here. (*See* Docs. # 74 at 28; 76 at 22-33). The court must examine whether there is a meaningful difference between a high school teacher's curricular speech and that of a university professor. One basis to distinguish the two is to note that high school students are younger, may be a captive audience, and could be more easily coerced, as compared to university students. But, that contrast does not hold up under *Bishop*, which took care to note the coercive effect a university professor's speech inherently has on college students. *Bishop*, 926 F.2d at 1074.

The other basis for a distinction (at least the one that occurs to this court) relates to the assertion that *Garcetti* doesn't apply to college professors because they enjoy greater academic freedom than do their high school counterparts. The natural extension of this argument is that post-secondary educators are privileged above all other governmental employees because every other government employee is subject to *Garcetti's* rule. Yet that assertion is problematic for a few reasons. (1) There is no legal basis for concluding that the First Amendment protects a university professor's academic freedom in the way the Professors suggest. Historical evidence suggests that the original public meaning of the First Amendment did not incorporate Plaintiffs' idea of academic freedom protections for university professors. As the Fourth Circuit explained, academic freedom only emerged in the American higher education after 1915, and even then, it was

construed "as a professional norm, not a legal one." *Urofsky v. Gilmore*, 216 F.3d at 410-11. (2) The better reasoned circuit cases (including our own Circuit's) that have described academic freedom have recognized it as primarily belonging to the university – not individual professors. *See, e.g.*, *Bishop*, 926 F.2d at 1077; *Urofsky*, 216 F.3d at 410; *Edwards*, 151 F.3d at 492 ("academic freedom ha[s] been described" only "as a university's freedom"); *Johnson-Kurek*, 423 F.3d at 593 ("the right inheres in the University, not in individual professors."). An expansive academic freedom doctrine giving professors unique rights over and above their employers would risk undermining institutional governance by privileging professors' speech rights over those of students and the public, whose interests the university also serves.[50] (3) Somewhat relatedly, incanting the phrase "academic freedom" does not justify giving unique treatment to one subgroup of government employees. Singling out professors for special constitutional treatment would create inequities among public employees, including subsets of the government workforce whose jobs involve expressive work. (4) Such a broad grant of "academic freedom" rights on professors is simply inconsistent with *Bishop*. There, the Eleventh Circuit analyzed the professors' interests in academic freedom but still came to the firm conclusion that the government's view must hold sway when there is disagreement about what is taught in the university classroom. *Bishop*, 926 F.2d at 1077.

After review, the court concludes (in a matter that would be one of first impression if decided by our Circuit) that the Professors were not speaking as private citizens while teaching in their respective classrooms. But, as will be seen, even putting aside this conclusion, Plaintiffs' claims still fail. First, even if Plaintiffs' in-class teaching is not government speech, they still lose

---

[50] *Keyishian* discussed the dangers of a pall of orthodoxy being cast on universities by way of loyalty oath requirements. 385 U.S. at 603. A broad expansion of professor rights in the classroom would risk running headlong into a different type of pall of orthodoxy wherein professors require (or indoctrinate) their students to assent to their views. Granting professors a special exception from the government-speech rule would diminish a university's (and, here, the Board's) ability to ensure courses serve the educational purpose for which the public pays.

at step two of the *Pickering*/*Connick* balancing test. And second, as discussed later in this opinion, notwithstanding *Garcetti*, the Professors cannot steer around this circuit's *Bishop* decision. The court addresses those points below.

> **(b)** **Even if Plaintiffs Survive Step One, Full *Pickering*/*Connick* Balancing at Step Two Favors Defendants**

The court next proceeds to step two of the *Pickering*/*Connick* balancing analysis. As discussed below, even if Plaintiffs could manage to work past step one, their free-speech claims still come up short. This is because any interest they have in compelling or requiring assent to SB 129's divisive concepts does not outweigh those of the Board in this case. *Pickering*, 391 U.S. at 568.

At step two, the court must balance the Professors' rights to freedom of speech against "the [Board's] interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. The Supreme Court has also held that universities have a right "to make academic judgments as to how best to allocate scarce resources or 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Widmar v. Vincent*, 454 U.S. 263, 278 (1981) (quoting *Sweezy*, 354 U.S. at 263).

Here, the Board has enforced SB 129. And, in passing that law, the State of Alabama has concluded that the divisive concepts listed in SB 129 are invidiously discriminatory and that its professors should not advocate these concepts in Alabama's public classrooms nor should professors coerce their students into assenting to these beliefs. The Alabama Legislature has therefore prohibited its public educators from indoctrinating students with these concepts or requiring them to agree with their validity. Ala. Code § 41-1-91. Importantly, SB 129 does not banish all teaching or discussion of these concepts from campus or, for that matter, even from the

classroom. To the contrary, it expressly permits classroom instruction that includes "discussion" of the listed concepts so long as the "instruction is given in an objective manner without endorsement" of the concepts. *Id.* § 41-1-93(3)b. And, SB 129 applies only to "instruction." Nothing in the Act prevents the Board's educators from advocating these concepts, or any other personal views they may hold, in publications, speeches, or other activities outside their teaching responsibilities, nor has the Board prohibited that. Dalton succinctly addressed this point in his testimony: "We have to be [in] a place where education not indoctrination can occur at our universities." (Doc. # 69-7 at 62).

The court easily concludes that balancing weighs in favor of the interests of the Board. The Board clearly has an interest in regulating the type of classroom indoctrination forbidden by SB 129. First, when asked in the hearing whether they would ever advocate or compel assent to any of these concepts in their class, each of the Professors said they would not. (Docs. # 72 at 89, 92, 160-61; 73 at 46, 48-49). That is hardly surprising. The Supreme Court has recently stated that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Students for Fair Admissions*, 600 U.S. at 230 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). "Distinctions between citizens solely because of their ancestry" are "odious to a free people whose institutions are founded upon the doctrine of equality." *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (internal quotations and citation omitted). The Constitution demands that there be equal treatment of individuals, "'without regard to any differences of race, of color, or of nationality.'" *Students for Fair Admissions*, 600 U.S. at 206 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). The divisive concepts listed in SB 129 fail to "treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 946 (1995) (internal citation and quotations omitted). After all, the Supreme Court has on more than one occasion criticized the Alabama Legislature for its past

discriminatory motives. There is sound reason that the same legislature, and the Board, would now be committed to "eliminati[ng] all official state sources of invidious racial discrimination." *Students for Fair Admissions*, 600 U.S. at 206. This includes prohibiting the teaching of racially "discriminatory" concepts in public university classrooms.

These same principles apply regardless of viewpoint – that is, regardless of whether professors want to teach and students want to learn that minorities should be discriminated against by majorities, or majorities should be discriminated against by minorities. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313 (2025) (the Supreme Court holding that there is not a heightened standard for showing discrimination against a member of a majority group as compared to establishing discrimination against a member of a minority group). The State and its universities have interests in efficiently and effectively promoting a policy that there will be no discrimination in their classrooms. The Professors have been clear in this case that they have not taught these divisive concepts nor do they plan to teach them. (Docs. # 72 at 92, 94, 160-61; 73 at 43, 64). But, even if it could be said there is room for debate about whether these concepts are valid, the Alabama Legislature and the Board have an interest in making sure that, in the State's classrooms, the educators it employs are not coercing students to agree with these principles.

### (2)    Defendants Also Win Under the Three-Part Contextual Balancing Test Adopted in *Bishop*

Finally, regardless of the outcome of any *Pickering*/*Connick*/*Garcetti* analysis, Plaintiffs' First Amendment claim flounders on what is, without question, a case that is both precedential and on point. In *Bishop*, [51] our Circuit constructed a unique balancing test designed to assess free-speech claims made by university professors related to in-class instruction. In applying that test, the *Bishop* court determined that UA's viewpoint-based restriction on the professor's in-class speech was subject to the mildest form of scrutiny – is it "reasonable." It specifically held that

---

[51] Like *Garcetti*, *Bishop* was not cited by Plaintiffs in their motion or opening brief.

when restrictions are placed on class instruction because of concerns about coercion of students, those limits are reasonable. *Bishop*, 926 F.3d at 1074.

In *Bishop*, a UA professor brought a section 1983 action challenging a work requirement that he refrain from interjecting his personal (religious) views during instructional time. *Id.* at 1070. A judge on this court granted the professor's motion for summary judgment, finding that those directions violated his First Amendment rights. *Id.* The Eleventh Circuit reversed, holding that UA's direction did not infringe the professor's First Amendment rights. *Id.* at 1078.

The Eleventh Circuit explained that the key question is "to what degree a [University] may control classroom instruction before touching the First Amendment rights of a [professor]." *Id.* at 1073. The court recognized that "neither professors nor students 'shed their constitutional rights to [free speech] at the schoolhouse gate'" *id.* (quoting *Tinker*, 393 U.S. at 506) (alterations in *Bishop*), but a "State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* (quoting *Pickering*, 391 U.S. at 568). The question in *Bishop* was how these competing interests should be balanced when a dispute arises about what should be taught. The court ultimately held that a professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom." *Id.* at 1076.

After discussing cases that address the issue of academic freedom, the *Bishop* court explicitly rejected the argument that academic freedom is an independent constitutional right. *Id.* at 1075 ("Though we are mindful of the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right."). The Eleventh Circuit also concluded that it "must frame [its] own analysis to determine the sufficiency of the University's interests in restricting [the professor's] expression in the classroom." *Id.* In fashioning the proper balance of

the respective interests, the *Bishop* court took as its "polestar" the "concern for the 'basic educational mission' of the [University] which gives it authority by the use of 'reasonable restrictions' over in-class speech that it could not censor outside the classroom," as set out in *Hazelwood School District v. Kuhlmeier*.[52] *Id.* This court is called on to assess the same question here.

The *Bishop* court considered several factors. "First and foremost, [it] consider[ed] the context: the university classroom during specific in-class time . . . ." *Id.* In that context, the court accounted for "the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* Notably, the court observed that the "University's interest is most obvious when student complaints suggest apparent coercion – even when not intended by the professor." *Id.* "Second," the court stated, "it follows [that] we consider the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons." *Id.* The court explained this point further:

> As a place of schooling with a teaching mission, we consider the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time. Tangential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university.

*Id.* "Last and somewhat countervailing" the court noted "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075. Although noting that a number of cases discuss academic freedom, the court singled out the Supreme Court's decision in *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), a decision that dealt with "that brand of regulation most offensive to free society: loyalty oaths." *Bishop*, 926 F.2d at 1075. *Keyishian* is a seminal case. Still, the *Bishop* court noted that its "pronouncements about academic

---

[52] 484 U.S. 260, 266-67 (1988).

freedom in that context, however, cannot be extrapolated to deny schools command of their own courses." *Id.*[53]

Again, the *Bishop* court concluded that a professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom." *Id.* at 1076. It held that when a professor and the University "disagree about a matter of content in the courses [taught,]" "[t]he University must have the final say in such a dispute." *Id.* And, that final say includes the authority to direct the professor to refrain from expressing certain "viewpoints in the classroom." *Id.* at 1077. Here, there is no reason to depart from *Bishop's* reasoning, its holding, and its obvious binding application.

Plaintiffs attempt to dismiss *Bishop* by saying it involved the professor plaintiff "making assertions about his religious beliefs, which were irrelevant" to his exercise physiology course. (Doc. # 31 at 28). That is, they claim that this case is distinguishable because "Defendants have not alleged that [any of the Professors] attempted to interject into [their] classroom[s] any material that is outside the scope of [their] course[s]." (*Id.* at 29). But, that reading of *Bishop* is misplaced. *Bishop* involved a professor "express[ing] certain personal (perhaps even professional) opinions about his work that happen to have a religious source." *Bishop*, 926 F.2d at 1076. Although he taught a physiology course, his discussions on religion were related to that course and were not "irrelevant" as Plaintiffs contend. In fact, even in rejecting his claim, the court acknowledged Dr. Bishop's "educational judgment." *Id.*

Nor can *Bishop* be ignored here because the instructor introduced religion into his classroom. The Eleventh Circuit specifically stated several times in its opinion that it was dealing

---

[53] The panel also referenced other decisions from our Circuit in support of this proposition. *Bishop*, 926 F.2d at 1075 (citing *Ala. Student Party v. Student Gov't Ass'n*, 867 F.2d 1344, 1347 (11th Cir. 1989) (noting that a university's judgement on matters related to its control of its own courses enjoys deference, including the reasonable regulation of activities in furtherance of its own educational mission); *Virgil*, 862 F.2d at 1520 (citing *Kuhlmeier* and determining that "[i]n matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity")).

with Dr. Bishop's free-speech claim, not any establishment or free-exercise claim. For example, the court noted, "[t]hough the religion clauses are implicated because of the indisputably religious character of Dr. Bishop's remarks, the primary analysis that must be made here ascends from the cases that discuss the free speech rights of public teachers." *Id.* at 1072 (footnote omitted); *see also id.* at 1076 ("Dr. Bishop has expressed certain personal (perhaps even professional) opinions about his work that happen to have a religious source") (footnote omitted); *id.* ("Under the analysis by which we have examined the University's action, we do not discover an infringement of Dr. Bishop's free speech rights."); *id.* at 1077 ("the religious facets of this case cloud its true countenance"); *id.* ("the University's restrictions of him are not directed at his efforts to practice religion, per se, but rather are directed at his practice of teaching") (emphasis omitted); *id.* ("we see no free exercise question"). Accordingly, as it relates to the Board's interest in regulating in-class speech, this case stands on all fours with *Bishop*. The question here comes down to this: who decides what is, and is not, taught in Alabama's college classrooms – individual educators or their employer? In this Circuit, that question is an easy one. *Bishop* authoritatively decided that professors do not have a First Amendment right to override their employer's decisions about the content of classroom instruction. *Bishop's* holding resolves this case.

The gravamen of the Professors' First Amendment claim is that the Constitution entitles *them* to decide the content of the instruction they offer when teaching the State's prescribed curriculum, in the State's classroom, for a State paycheck. But again, the *Bishop* decision *already balanced* the First Amendment interests in this precise context – concluding, again, that "[t]he University necessarily has dominion over what is taught by its professors." *Id.* at 1078 (emphasis added). Although the court has, in the interest of completeness, analyzed *Pickering/Connick*, *Garcetti*, and *Wood*, and looked at decisions from other circuits, *Bishop's* holding, standing alone, is the beginning and end of the proper analysis of the Professor's First Amendment claim. To the

extent that the Professors disagree with the Board about what should be taught in the classrooms, the Board has the "final say." *Id.* at 1076.

No matter how Plaintiffs seek to spin it, *Bishop* balanced the academic freedom interests of the University,[54] its students, and its professors. It characterized this unique environment as the "tightrope upon which the University [finds] itself perched." *Id.* at 1069. In the absence (at least in this circuit) of any independent right to academic freedom protected by the First Amendment, *Bishop* recognized that the government must be allowed to balance these competing interests as they see fit.

The *Bishop* court made another apt observation, and one that is particularly applicable here: judges must respect a university's interests in deciding what is taught in the public classroom. *See id.* at 1075 ("[W]e cannot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators."). This spotlights three points. First, we must be particularly cognizant that judges are not legislators, board members, or educators. Of course, there are times when a court must step in. This is not one of them. Second, many arguments opposing legislative or Board control of classroom speech involve a litany of potential negative consequences or a collection of worse case scenarios. But those concerns conflate whether a legislature or a Board of Trustees *should* exercise authority to reach conclusions about course content with the very different question of whether they have the *authority* to do so. "Should" does not equal "can."

---

[54] Only the Board and its members remain parties here. The State and Governor Ivey in her gubernatorial office are not before the court. But, in any event, Plaintiffs have not suggested that *Bishop* or institutional principles of academic freedom permit a state university or the Board, but *not* the state legislature to regulate professors' in-class speech. Nor would any such suggestion have merit. The notion that "[u]universities, as subordinate organs of the State, have First Amendment rights against" or above "the State or its voters" is antithetical to any proper understanding of State sovereignty. *See Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006). Even *Grutter*, which stated that "universities occupy a special niche in our constitutional tradition," nevertheless acknowledged that States are entitled to regulate universities. *Grutter v. Bollinger*, 539 U.S. 306, 329, 342 (2003). And a majority of the Supreme Court, in a four-member plurality opinion and a concurring opinion, later confirmed that the academic freedom of universities described in *Grutter* does not make them enclaves free from regulation by voters or their elected representatives. *See Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 301 (plurality); *id.* at 317 (Scalia, J., concurring).

Third, and relatedly, universities are incentivized to be mindful of their professors' interests in academic freedom in a manner unrelated to the First Amendment. The wrong balancing could lead university educators to take their talents elsewhere. *Id.* ("[T]he University will serve its own interests as well as those of its professors in pursuit of academic freedom . . . [Q]uality faculty members will be hard to attract and retain if they are to be shackled in much of what they do.").[55] Judicial intervention in matters like these must proceed with caution.

Applying the first *Bishop* factor, the Professors' free-speech claims all relate to "the university classroom during specific in-class time." *Id.* at 1074. Patton claims that the investigation of student complaints chilled her in-class instruction; Simon makes similar claims and adds that the cancellation of a graded advocacy project chilled her in-class instruction; and Fording claims that these incidents and information from UA's administration chilled his selection of class content. In addition, the evidence here illustrates that UA students could have felt coerced by their professors' speech. Related to Patton's speech, student complaints spelled out concerns that the required reading presented certain viewpoints as "the correct perspective and other opinions are shut down," and that "students have stated they feel unsafe, and scared to speak in class, unable to express their viewpoints in the classroom or in class assignments." (Doc. # 55-20 at 2). Related to Simon's speech, although she testified that students can talk to her about doing an alternative advocacy project if they disagree with the chosen one, that is not put in writing and no student has ever chosen to complete an alternative project during the twenty years Simon has required this project in her course. (Doc. # 72 at 168). Related to Fording's speech, he testified that he had concerns that students could interpret his teaching as endorsing an answer about divisive concepts or compelling assent because they are required to participate in class. (Doc. # 73 at 46, 48-50).

---

[55] This point is like the one made by Chief Judge William Pryor in *Mech v. School Board of Palm Beach County, Florida*. 806 F.3d 1070 (11th Cir. 2015). There the plaintiff's redress was through the political process, not the courts. *Id.* at 1079.

These claims all relate to the context of in-class instruction and demonstrate the risk of apparent coercion of students. The first *Bishop* factor is met.

Applying the second *Bishop* factor, the University is in the position of a public employer, meaning that it has the "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Bishop*, 926 F.3d at 1074. Here, the University has done so. Plaintiffs complain that Dalton stated in an email that "this may likely be viewed or experienced as UA interpreting the law too broadly on many occasions." (Doc. # 70-20 at 1). But, Plaintiffs have not shown that UA or the Board has unreasonably controlled the content of its curriculum based on its position as a public employer. Patton only claimed that she had to meet with UA administrators several times and provide information about her course – she was never disciplined or told that she violated SB 129. (Doc. # 72 at 37-38, 43-44, 118). This was a reasonable exercise of oversight over course curriculum to ensure that students were not being coerced as numerous complaints suggested. Notably, she was never directed to change her curriculum. Simon only claimed was that she was told (she says under threat of termination) to cancel her graded student advocacy project.[56] (*See* Doc. # 55-11 at 4-5). Again, this was a reasonable exercise of control over course curriculum to ensure that students would not feel coerced into advocating for a belief with which they disagreed, especially given that the project was tied to a grade and that students had never opted out of a chosen project.[57] Fording, who mainly had secondhand accounts of the

---

[56] That is an overstatement. The evidence shows that Simon inquired as to what would occur if she refused the direction. The response referenced UA's discipline process. There was not a unilateral threat of termination.

[57] As Dalton explained, there is a separate reason why UA was justified in directing Simon to cancel the sit-in assignment – UA's Resolution on institutional neutrality. (Doc. # 69-1). The Resolution went into effect before SB 129 (Doc. # 71 at 153), and states in relevant part:

> [T]o safeguard the freedom of speech and expression for members of the System community, the System itself must remain neutral on political and social issues unless the issue directly affects any aspect of the System's core operations. Taking institutional positions on an issue or making statements about it risks alienating members of the System community and destroying the intellectually independent environment upon which the System thrives. It is for the Board to decide what issues directly affect aspects of the System's core operations, so members of the System

matters with Patton and Simon, claims that he *interpreted* these incidents as threatening and also felt chilled by an email and the suggestion of "talk don't test" from UA's legal training. (Doc. # 73 at 65). Even if this could be construed as the University exercising control over Fording's curriculum, he has not demonstrated how such control would be unreasonable in light of the University's desire to protect students from indoctrination or professor coercion.

The final *Bishop* factor, "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment," *Bishop*, 926 F.3d at 1075, does not shift the scales in the Professors' favor. This is because academic freedom cuts three ways: in favor of the University, professors, and students. The University's enforcement of SB 129 is a reasonable way to achieve the goal of protecting institutional and student academic freedom.

A university's interests in managing classroom speech is heightened when there are concerns about the coercive effect of an instructor's speech. *Id.* at 1074. Some courts have expressed concerns about a pall of orthodoxy emanating from an institution. *E.g.*, *Meriwether*, 992 F.3d at 503. But, in *Bishop*, the Eleventh Circuit was concerned about an instructor-driven pall of orthodoxy and explained why universities may have legitimate concerns in this area. 926 F.2d at 1074. These "interest[s] [are] most obvious when student complaints suggest apparent coercion – even when not intended by the professor." *Id.*

Examining the Professors' claims against the facial text of the statute, the outcome of *Bishop* becomes even clearer. The Professors do not believe their teaching violates the SB 129 and

---

community exercising their First Amendment rights should make clear they do not speak on behalf of the System, its component divisions, or any administrative unit within the System.

(Doc. # 69-1 at 2).

This Resolution is not unique to public universities in Alabama. (Doc. # 71 at 185). The Board had the authority to implement this Resolution. *See* Ala. Const. art. XIV § 264. Based on the Resolution's language, it is reasonable to conclude that Dalton was concerned that the sit-in involved a political issue and was anything but neutral. (Doc. # 69-7 at 17). Accordingly, although the University had the right to cancel the sit-in based on its broad authority over in-class instruction, the University also had the right to cancel the sit-in based on institutional neutrality.

116

that they do not intend to violate the Act. (Docs. # 72 at 39-40, 154, 160-61; 73 at 46). To varying degrees, they have each disclaimed any interest in teaching any of the divisive concepts in the classroom. (Docs. # 72 at 92, 94, 160-61; 73 at 43, 64). They also testified that they teach in an objective manner. (Docs. # 72 at 77; 73 at 87). Nevertheless, based on the cancellation of Simon's class sit-in project and the complaint about Patton's teaching (along with the investigation that followed), the Professors fear that their teaching could be considered to advocate some of the prohibited divisive concepts. They admit, however, that the recent changes made to their course materials and teaching were made due to this fear, rather than any discipline, direction from a University administrator, or requirement of the Board. As was made clear at the evidentiary hearing:

> Mr. Ezelle: The University's position is that professors, using their academic freedom and their judgment as professors, are absolutely entitled to assign course material that may have different opinions on divisive concepts.

> The Court: But the distinction would be, does SB 129 prevent the professor from personally advocating for something or requiring student assent to something that would be a divisive concept?

> Mr. Ezelle: Correct. That's absolutely what the University would be looking for, particularly on the requiring student assent, you know, to a particular position, because I think Section 4 of the statute in the safe harbor gives a lot of room for professors to be able to teach all of the topics in their class that may fall under a divisive topic, you know, to do that without bending the law.

> The Court: Mr. Bowdre, are you reading SB 129 similarly?

> Mr. Bowdre: Yes, Your Honor, I do.

(Doc. # 72 at 155-56).

Again, when a professor and the University "disagree about a matter of content in the courses [taught,]" "[t]he University must have the final say in such a dispute." *Bishop*, 926 F.3d at 1076. And, that final say includes the authority to direct the professor to refrain from expressing certain "viewpoints in the classroom." *Id.* at 1077. Here, particularly because the Professors have

no interest in engaging in teaching or scholarship that would violate SB 129, there is no reason to depart from *Bishop's* reasoning, its holding, and its obvious binding application.

### (3)    Plaintiffs' Reliance on *Pernell* is Misplaced

Plaintiffs rely heavily on the district court's opinion in *Pernell v. Florida Board of Governors of State University System*. 641 F. Supp. 3d 1218 (N.D. Fla. 2022).[58] That reliance is misplaced. First, *Pernell* is neither precedential nor persuasive. Second, in some important respects, the Florida statute that court reviewed differs from SB 129.

Although the *Pernell* court recognized that "*Bishop* remains the binding authority" on university professors' free-speech claims, *id.* at 1243, it read *Bishop* to mean precisely the opposite of what it actually says – and says in the plainest of language. That court reasoned that a State has the authority to determine the content of curriculum, but once it does so it cannot manage what a professor says in class so long as their in-class speech is within the scope of the assigned course's curriculum. *Id.* at 1242. But, that interpretation turns *Bishop's* holding upside down. It cannot be reconciled with *Bishop's* clear pronouncement that when there is a dispute about what is taught in the classrooms, the government has "the final say." 926 F.2d at 1076. It is the government's conclusions about what is taught in the classroom that must hold sway.

The *Pernell* court also suggested that *Bishop* is distinguishable because (1) *Bishop* involved a single professor and (2) the facts of *Bishop* "implicate[d] Establishment Clause concerns." 641 F. Supp. 3d at 1271. On the first point, that attempt to distinguish *Bishop* wholly ignores *Bishop's* broad and unqualified pronouncement that "[t]he University necessarily has dominion over what is taught by its *professors* and may so manage *them*." 926 F.2d at 1078 (emphasis added). And, as to the second point, for the same reasons that Plaintiffs' attempt to dismiss *Bishop* as a one-off related to concerns about the Establishment Clause fails, the *Pernell* court's faulty reasoning fails.

---

[58] *Pernell* is on appeal before the Eleventh Circuit. *See Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992 (11th Cir. argued June 14, 2024).

The *Bishop* court was clear: it held that the government's decision "was reasonable and within its powers to control the content of curriculum in the classroom, *regardless of the Establishment Clause*." *Id.* (emphasis added); *see id.* at 1077 ("we do not reach the establishment questions raised by Dr. Bishop's conduct.").

Besides its unsound reasoning, there are at least two reasons to say that SB 129 and the issues surrounding its divisive concepts are distinguishable from *Pernell*. First, there is no suggestion that SB 129 limits any teaching of concepts related to the pros and cons of affirmative action. In *Pernell*, the court specifically considered concept 6 of the Florida statute, which the court found bars the in-class discussion of affirmative action. 641 F. Supp. 3d at 1233-34; *see also* Fla. Stat. § 1000.05-4(a)(6) (prohibiting "instruction that espouses, promotes, advances, inculcates, or compels such student . . . [that] [a] person, by virtue or his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion."). Yet SB 129 does not prohibit any sort of discussion about affirmative action in the classroom. The only divisive concept in SB 129 that comes close in text to the Florida statute's concept 6 is the following divisive concept in SB 129: "That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin." Ala. Code § 41-1-90(2)(b). Clearly, Florida's concept 6 and SB 129's concept (2)(b) are materially different in the context of whether they address affirmative action. SB 129's concept (2)(b) simply does not; Florida's concept 6 does. SB 129's concept (2)(b) articulates a concept that no sound instructor would teach on, that we should tolerate distinctions. Indeed, concept (2)(b) only prohibits such indoctrination that individuals should be discriminated against based on their immutable characteristics, a teaching that, again, is "odious to a free people whose institutions are founded upon the doctrine of equality." *Loving*, 388 U.S. at 11 (internal quotations

and citation omitted). Nothing in concept (2)(b) prohibits instruction about the theories of affirmative action.

Second, and even more significantly, the *Pernell* court seemed to understand that the concepts barred by the Florida statute were matters that professors may actually teach in Florida classrooms. 641 F. Supp. 3d at 1254-59. That may or may not be so. But, in any event, that is not the situation here.[59] (Docs. # 72 at 92, 94, 160-61; 73 at 43, 64).

Even if these two distinctions were not present here, this court would reject the rationale of *Pernell* root and branch. It is readily apparent that court was not enamored with *Bishop* to begin with, and tried mightily to come to the exact opposite outcome that *Bishop* dictates.[60]

### (4)    Luna's First Amendment "Right to Learn" Claim

The court has already determined that Luna lacks standing to bring his First Amendment "right to learn" claim. Even if he did, the claim would fail on its merits. Luna's First Amendment "right to learn" claim is coextensive with the Professors' right to speak claims. *See Pico*, 457 U.S. at 867 ("the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them") (emphasis in original); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (discussing "the right to receive information and ideas"). He claims the right to receive the same speech that the Professors contend they have the right to proffer in the classroom. That is a critical point. Both the Professors' and Luna's First Amendment claims relate to in-class teaching. Therefore, for the same

---

[59] The *Pernell* court also seemed to assume that the Florida statute would prohibit professors from presenting academically valid instruction on matters relating to the history of race in America. Nothing in SB 129 prohibits such instruction.

[60] The *Pernell* court implicitly criticized *Bishop. See* 641 F. Supp. 3d at 1268 ("For better or worse, *Bishop* guides this Court's analysis."). It also characterized the statute and the State of Florida's arguments in various negative ways: "disorienting," Orwellian, "doublespeak"; "Frankenstein's monster"; and "positively dystopian." 641 F. Supp. 3d at 1234, 1230 & n.1, 1235 n.11, 1268 n.47. It also referred to college professors as "priests of democracy," which may say something about that court's predisposition on these issues. *Id.* at 1291. To be clear, contrary to the *Pernell* court's hyperbole, the arguments made here are grounded in binding circuit precedent.

reasons that the Professors' free-speech claims fail, Luna's right to learn claim under the First Amendment also fails.

### b. Testman's and Luna's First Amendment Funding Claims

### (1) Testman

Even though the court has concluded that Testman lacks standing to assert her loss of funding claim, to conduct a thorough analysis, it addresses the merits of her claim.

Testman has alleged that, in interpreting SB 129, UAB made discriminatory funding decisions based on an organization's viewpoint. (Doc. # 1 at 79). "[C]ontent- and viewpoint-based speech restriction[s]" are "impermissible." *Speech First*, 32 F.4th at 1125. "[A] regulation is content-based if it 'suppress[es], disadvantage[s], or impose[s] differential burdens upon speech because of its content[.] *Id.* at 1126 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)). "Viewpoint discrimination is even more anathematic to the First Amendment[:]"

> "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 [] (1995) (citation omitted).

*Id.*

The government may not "choose[] winners and losers in the marketplace of ideas[.]" *Id.* But, Testman claims SB 129 does exactly that by prohibiting UAB from funding organizations that advocate for diversity, equity, and inclusion. *See* Ala. Code § 41-1-91(1). More specifically, it prohibits public institutions of higher education from sponsoring "any diversity, equity, and inclusion program" and "maintain[ing] any office [or] department that *promotes* diversity, equity, and inclusion programs." *Id.* That provision is the key indicator of SB 129's viewpoint discrimination. SB 129 prohibits UAB from sponsoring programs or organizations that "*promote*"

diversity, equity, and inclusion. However, it does not prohibit sponsoring programs or organizations that advocate *against* diversity, equity, and inclusion.

"'The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate.'" *Speech First*, 32 F.4th at 1127 (quoting *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment)). Notably, the Eleventh Circuit has "emphasized "'that the dangers of viewpoint discrimination are heightened in the university setting.'" *Id.* at 1127 n.6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (in turn citing *Rosenberger*, 515 U.S. 819 (1995))).

Plaintiffs allege that UAB has informed students that certain student cultural, affinity, and social-justice related student groups cannot receive funding due to UAB's interpretation of SB 129. (Doc. # 1 ¶ 126). In contrast, Plaintiffs allege other RSOs that are not connected to "viewpoints perceived to relate to Black identity [or diversity, equity, and inclusion] – such as the Economics Student Association, the Environmental Council, First Fellows, the Latter-Day Saints Student Organization, the Philosophy Club and the Saint Thomas More Society – are still able to receive state university funding under SB 129." (*Id.* ¶ 215). So, Plaintiffs allege that UAB made funding decisions for RSOs "based on the purported viewpoints of those organizations and/or their members." (*Id.* ¶ 249).

In *Gay Lesbian Bisexual Alliance v. Pryor*, the Eleventh Circuit considered a First Amendment challenge to Alabama Code § 16-1-28. 110 F.3d at 1545. In its decision, the court examined the Supreme Court's decisions in *Rosenberger*, which involved the University of Virginia's ("UVA") refusal to fund a student newspaper with a Christian viewpoint. 110 F.3d at 1548 (citing *Rosenberger*, 515 U.S. at 823). "Justice Kennedy, writing for the [*Rosenberger*] majority, explained that when a university makes funds available to encourage student expression,

122

the university creates a limited public forum." *Id.* at 1549 (citing *Rosenberger*, 515 U.S. at 829).

"A university may determine what subjects are appropriate for the forum, but the university may

not proscribe positions students choose to take on those subjects." *Id*. As the Eleventh Circuit

further explained:

> The Supreme Court discussed this important distinction in *Rosenberger* and made
> clear that content discrimination is permissible "if it preserves the purposes of the
> limited forum." [*Rosenberger*, 515 U.S. at 830]. Viewpoint discrimination,
> however, is impermissible "when directed against speech that is otherwise within
> the forum's limitations." *Id*. Thus, a university might limit the funds it makes
> available for student activities to those involving Shakespearean literature. Within
> such a framework, however, the university could not deny funding to critical
> interpretations of Shakespeare.

*Id*. This is true "even in public forums created by the state." *Id*. (citing *Rosenberger*, 515 U.S. at

829).

The Board argues that, in *Rosenberger*, UVA had two types of student organizations that

are analogous to the UFOs and RSOs at UAB. The organization at issue in *Rosenberger* was a

"Contracted Independent Organization," or "CIO," at UVA. CIO status at UVA was available to

all student groups, and CIOs could apply for funding from the Student Activities Fund ("SAF").

515 U.S. at 824. SAF funds were allocated by UVA's Student Council. *Id.* At issue in *Rosenberger*

was the Student Council's denial of a funding request on the stated grounds that the student

publication was a "religious activity." *Id*. at 827.

The Supreme Court held that the SAF funding was a "limited public forum," and that the

denial of funding constituted an impermissible viewpoint restriction. *Id*. at 829-30 ("Once it has

opened a limited forum . . . the State must respect the lawful boundaries it has itself set."); *id*. at

834 (viewpoint restrictions are improper when funds are meant "to encourage a diversity of views

from private speakers"). However, the *Rosenberger* Court made clear that when a university

disburses funds to promote its own favored message, it may determine the content of its speech.

123

*Id*. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").

UVA's CIOs are independent of the University. *Id*. at 834-35 ("[S]tudent groups eligible for SAF support are not the University's agents, are not subject to its control, and are not its responsibility.") Thus, RSOs at UAB are analogous to the CIOs in *Rosenberger* because they are independent of UAB and receive their budget from a fund that is available to all student organizations that apply. *Id*. at 834. (Docs. # 69-10 at 2; 26-1 ¶ 6-7).

UFOs on the other hand are associated with a University department or division and funding is available because their purposes align with the funding department or division. (Doc. # 69-10 at 2). The Board asserts that, under *Rosenberger*, UFO funding is the equivalent of the "University's own speech" rather than a limited public forum. (Doc. # 26 at 28) (citing *Rosenberger*, 515 U.S. at 834). It further asserts that Testman is unlikely to succeed on her First Amendment claims relating to student organization funding because she has no First Amendment right for UAB to endorse SJAC's purpose, as UFO funding is government speech rather than a limited public forum. (*Id*.) (citing *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021)). The Board argues that the Students (1) have not alleged that their organizations were denied the opportunity to receive USGA funding, and (2) do not contend that they even attempted to apply for USGA funding for the spring 2025 semester. (*Id*. at 29).

Plaintiffs respond that UFOs at UAB are similar to the CIOs in *Rosenberger* because UAB's UFOs, like SJAC, were not controlled and directed by the University. (Doc. # 31 at 39). While it existed as a UFO, SJAC was completely student-organized and directed without any paid university instructors or administrators controlling the student speech. (Doc. # 73 at 96). As Finance Coordinator of SJAC, Testman exercised her discretion to distribute money to RSOs for social justice programming and UAB never overrode her decisions. (*Id*.). Then, after SB 129 went

into effect, UAB began to impose viewpoint-based restrictions under which UAB canceled SJAC's UFO status, eliminated its UFO funding, and this resulted in the cancellation of Testman's $600 stipend. UAB determined that, under SB 129, SJAC could not continue receiving state funding because SJAC may be connected to "divisive concepts" or fall under SB 129's definition a program that promotes "diversity, equity and inclusion." (Docs. # 1 at 49; 12-6 ¶ 8; 73 at 100-02). Because SJAC was associated with this particular viewpoint, it was "demoted" from a UFO to an RSO and lost significant funding that it had previously received. With the loss of that funding, Testman's stipend was eliminated. The court concludes that (if she had standing) Testman would have a likelihood of success on the merits of the claim that this viewpoint-based discrimination in funding is unconstitutional. But, that is only one of the elements she must establish.

When no showing of irreparable injury is made, a court need not examine all of four prongs of the preliminary injunction analysis. *Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684, 686 (11th Cir. 2019) (citing *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). The next prong the court considers is whether the harm is irreparable. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. Both of Testman's alleged injuries involve money – the loss of her $600 stipend and SJAC's loss of funding. These types of deprivations can be undone by monetary remedies; they do not qualify as irreparable. For this reason, even if Testman had standing and a likelihood of success on the merits of her First Amendment claim, she would not be entitled to preliminary injunctive relief.

### (2)    Luna

Even if the court concluded that Luna had standing (which, to be clear, he does not), his "loss of funding" claim would be analyzed in the same manner as Testman's. Luna may show that he is likely to succeed on the meris of his funding claim; however, Esperanza's injury, like SJAC's,

is just that – a loss of funding, which can be addressed by monetary remedies. Therefore, Luna would not be able to show an irreparable harm to be entitled to preliminary injunctive relief.

### c.    Alabama NAACP's First Amendment Freedom of Association Claim

Alabama NAACP has alleged that Defendants violated its freedom of expressive association by terminating Alabama NAACP's members' access to the BSU and Safe Zone spaces. (Docs. # 12-1 at 14-18; 75 at 46-47). The Board responds that the choice to rescind the BSU and Safe Zone's dedicated physical spaces represents only the loss of a favored status and not viewpoint-based discrimination. (Docs. # 26 at 31; 27 at 52-53; 74 at 44-45).

The Supreme Court has recognized the freedom of association as a right "implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972). This freedom encompasses the right to expressive association, which is the "freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). When expressive association clashes with a public university's restrictions on access to its space, the Supreme Court employs a "forum" analysis to determine whether those restrictions are constitutional. *Christian Legal Soc. Chapter Univ. Calif. v. Martinez*, 561 U.S. 661, 680 (2010).

The Supreme Court has recognized "four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215-17 (2015)). A traditional public forum is typically a "'street or a park'" "'which has immemorially been held in trust for the use of the public . . . .'" *Walker*, 576 U.S. at 215 (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983)). A designated public forum is space that "'has not traditionally been regarded as a public forum'" but which the government has 'intentionally opened up for that

purpose.'" *Id.* (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). A limited public forum "exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829) (alterations in *Walker*). Lastly, a nonpublic forum is "a space that is not by tradition or designation a forum for public communication." *Perry Ed Ass'n*, 460 U.S. at 46.

Plaintiffs assert that UA "created a limited public forum by providing spaces to the BSU and Safe Zone, among other organizations." (Doc. # 75 at 47; *see also* Doc. # 31 at 46 n.34). However, the court cannot deduce from Plaintiffs' argument or the record evidence whether a limited public forum was indeed created by the University. The factual record related to how and why the University first provided these spaces to the BSU and Safe Zone is underdeveloped, as is the record as to why the spaces were closed. There is evidence that the spaces were closed due to SB 129 and other "federal laws." (Doc. # 70-23 at 1). The Board has recently provided the court with supplemental authority that indicates, regardless of SB 129's effect, reopening the BSU or Safe Zone offices in the UA Student Center may be in violation of federal funding requirements (and may subject UA to being found in violation of federal law – or worse, risk UA's access to federal funding). (Doc. # 77; *see* Doc. # 77-1). Plaintiffs disagree. (Doc. # 78). Although this is only recent guidance from the Department of Justice, the parties and court are well aware that the current Administration has consistently taken the position that preferential treatment based on race violates a number of laws.

To be clear, the court's analysis is not entangled by the question of whether federal enforcement of laws in the DEI context is appropriate. Rather, even separate from redressability questions (analyzed above), the question here is whether Alabama NAACP has carried its burden. It must show it is likely to succeed on the merits of its association claim and its challenge to SB 129. But, there is a gap in its proof that SB 129 is what caused the closure of the BSU and the Safe

Zone. The court understands that this gap may be closed with further discovery and more fact-intensive advocacy. At this preliminary injunctive stage, even fully accounting for their response (Doc.  # 78), Plaintiffs have not carried their burden of showing a likelihood of success on the merits; therefore, the court cannot conclude that the record before it warrants a preliminary order removing the food pantry and Student Leadership Lounge from those spaces so that the BSU and Safe Zone can re-occupy them.

Finally, regarding funding access, Alabama NAACP has not alleged that UA has prohibited the BSU or Safe Zone from applying for or receiving funds or from reserving space to hold on-campus events. Because there is no evidence that this has occurred, any claim that the Board abridged Alabama NAACP's freedom of association through funding restrictions is unlikely to succeed on the merits.

### 2.    Fourteenth Amendment Claims

Plaintiffs also claim that SB 129 and the universities' implementation of it are void for vagueness. (Doc. # 1 ¶¶ 258-63). "Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). "Generally, the void for vagueness doctrine encompasses 'at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

Plaintiffs contend that SB 129 implicates both due process concerns. Specifically, Plaintiffs argue that SB 129 is unconstitutionally vague on its face and that this vagueness has resulted in its

arbitrary and inconsistent enforcement. (Doc. # 1 ¶¶ 9, 261, 263). Plaintiffs also argue that the Board has enacted unconstitutionally vague policies in its attempt to enforce SB 129. (*Id.* ¶ 259).

### a.    Who are the Proper Defendants as to Plaintiffs' Void for Vagueness Challenge?

The Board contends that Plaintiffs cannot assert a void for vagueness challenge against them because it is based on the text of SB 129. (Doc. # 26 at 6 n.1). They argue that they cannot be liable for the vagueness of a statute they had no hand in drafting or enacting. However, this argument misses the fact that Plaintiffs' void for vagueness claim also challenges the *Board's* enforcement of SB 129. (*See* Doc. # 1 ¶ 259).

A plaintiff may bring a void for vagueness challenge against a government actor who is enforcing an allegedly vague law. *See FCC*, 567 U.S. at 244 (recognizing a right to sue the Federal Communications Commission for their policy enacting a federal law); *Lewis*, 944 F.3d at 1298 (recognizing that a plaintiff may sue a state attorney general if the attorney general is enforcing or has threatened to enforce a law); *Matsumoto v. Labrador*, 122 F.4th 787, 795 (9th Cir. 2024) (holding that in a challenge to an Idaho criminal law, "the Idaho attorney general is a proper defendant under *Ex parte Young*, 209 U.S. 123 (1909)"). Similarly, the Board, which includes Governor Ivey as its President Ex-Officio, is tasked with enforcing SB 129 over the University of Alabama System, which includes UA and UAB. (Doc. # 58 at 4 ¶ 1). Plaintiffs' alleged injuries are traceable to the Board's enforcement of SB 129. *See Support Working Animals*, 8 F.4th at 1202. For these reasons, Plaintiffs may bring their void for vagueness claim against the Board.

### b.    Reasonable Opportunity to Understand

The court first evaluates Plaintiffs' claim that SB 129 is unconstitutionally vague on its face because it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." (Doc. # 12-1 at 20). In a facial challenge to the vagueness of a law, "assuming the enactment implicates no constitutionally protected conduct, [a federal

court] should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Vill. of Hoffman Est. v. Flipside*, 455 U.S. 489, 494-95 (1982). Of course, while "[v]ague laws in any area suffer a constitutional infirmity," "[w]hen First Amendment rights are involved," a federal court must "look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966). To determine whether an enactment implicates constitutionally protected conduct, a court evaluates whether it "infringes" on constitutional rights. *See Flipside*, 455 U.S. at 495-96. As the court has already discussed, Plaintiffs have not shown that SB 129 infringes on their First Amendment rights, so the appropriate standard is whether SB 129 is impermissibly vague in all (or the majority) of its applications. *Id.* at 494-95; *see also United States v. Raines*, 362 U.S. 17, 23 (1960).

The next question is how a court should evaluate vagueness. Again, "[u]nder the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones*, 975 F.3d at 1046. "In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (in turn citing *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974))). The touchstone is whether "ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *O'Laughlin*, 30 F.4th at 1055 (quoting *Bongiovanni*, 961 F.2d at 1136). As the Supreme Court has explained, "a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *United States v. Williams*, 553 U.S. 285, 306 (2008). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common

intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *FCC*, 567 U.S. at 253 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

Plaintiffs have pointed to the following terms they contend are vague: (1) allowing the teaching of divisive concepts in an "objective manner and without endorsement" or in a "historically accurate context" (Doc. # 1 ¶ 9); (2) prohibiting a public institution of higher education from "compel[ling]" assent or "advocat[ing] for" divisive concepts (*id.* ¶ 148); (3) authorizing discipline or termination of an employee who "knowingly violates" SB 129 (*id.*); (4) prohibiting a public institution from "sponsoring diversity, equity, and inclusion programs" (*id.* ¶ 211-12); (5) incorporating a "broad and vague definition of diversity, equity, and inclusion" (*id.*); and (6) defining as "divisive" the concept "[t]hat any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior." (Doc. # 12-1 at 22). The court evaluates these arguments, in turn.

### (1)    "Objective Manner" and "Historically Accurate"

Plaintiffs first argue that the safe harbor provisions allowing the teaching of divisive concepts in an "objective manner and without endorsement" or in a "historically accurate context" are vague. (Doc. # 1 ¶ 9). Plaintiffs contend that this court should adopt the district court court's reasoning in *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022), which concluded that a safe harbor provision permitting discussion of divisive concepts "in an objective manner without endorsement" was vague. (Doc. # 12-1 at 22). But, the Eleventh Circuit opinion affirming *Honeyfund* on other grounds explicitly refused to address the vagueness challenge. *See Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1283 n.6 (11th Cir. 2024). So, the court is left with a district court opinion that is not authoritative. It is not persuasive either.

131

A person of common intelligence does not need to guess at the meaning of "objective." *See FCC*, 567 U.S. at 253. "When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) (citing *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)). This court rejects the *Honeyfund* court's apparent view that "objective" is a loaded term. 622 F. Supp. 3d at 1183-84; *see also Pernell*, 641 F. Supp. 3d at 1286 (reaching the same conclusion). That position ignores centuries of well-established law on which the term objective has been used by courts and applied by juries.

Courts routinely use dictionaries to confirm that allegedly vague language in fact has an "ordinary meaning" that "is readily understandable." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020). Webster's Third New International Dictionary defines "objective" as "expressing or involving the use of facts without distortion by personal feelings or prejudices." *Objective*, Webster's Third New International Dictionary 1556 (1993). For years, this Circuit's Pattern Jury Instructions have repeatedly instructed juries – ordinary people drawn randomly from communities – to apply this term, instructing them to determine when an action or belief is "objectively reasonable," or to distinguish "objective" conditions from a "plaintiff's subjective feelings." *See, e.g.*, Pattern Jury Instructions, Civil Cases, Eleventh Circuit (2013 revision) 4.19, 4.22 cmt. 2. Of course, "[w]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words. Rather, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (cleaned up).

In the context of SB 129, this term remains clear: "Nothing in this [Act] . . . [p]rohibits a public institution of higher education from authorizing the teaching or discussion of any divisive

concept in an objective manner and without endorsement as part of a larger course of academic instruction, provided the institution and its employees do not compel assent to any divisive concept . . . ." Ala. Code § 41-1-93(3)b. That language, "without endorsement," makes clear that the meaning of "objective" as used in SB 129 means, among other things, that a professor should present facts (not feelings) and, at a minimum, be balanced in educating students about a divisive concept. The proviso in the section further clarifies that "objective" means professors should "not compel assent to any divisive concept." *See id.* This language is not vague because it is clear "as to what fact[s] must be proved" if a professor's discipline is at issue. *Williams*, 553 U.S. at 306. To violate SB 129 a professor must (1) present a divisive concept by way of indoctrination; or (2) require a student's assent to that concept.

The second challenged provision in the safe harbor states: "Nothing in this [Act] . . . Prohibits the teaching of topics or historical events in a historically accurate context." Ala. Code § 41-1-93(4). Plaintiffs' Complaint asserts that "there is no indication in the legislation as to how to determine whether something is . . . 'historically accurate'" because "for many of the topics covered by SB 129, there are multiple viewpoints and lines of scholarship." (Doc. # 1 ¶ 9). Simon's declaration states that "[i]t is unclear to me whether teaching about structural racism and white privilege – and how they have been intentionally built into many of our country's institutions throughout our history – would violate SB 129 or whether such teaching would [] fall within the exception allowing the teaching of historical events in a 'historically accurate context.'" (Doc. # 12-4 ¶ 25).

As the Supreme Court has emphasized, because lawmakers are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Therefore, "no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an

area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). If Simon wishes to teach about structural racism and white privilege in a way that implicates a divisive concept, she can avoid going "perilously close" to SB 129's prohibitions by complying with the safe harbor provision. Again, even if Simon's curriculum presents divisive concepts, the safe harbor provision would protect her as long as she presents those concepts objectively, without compelling assent to them. There is a reasonable expectation that university professors, who receive years of education and training, should be able to instruct on even the most sensitive of topics in an objective way that incorporates authentic presentation of the historical events that bear on those topics. This gives the Professors "fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin*, 30 F.4th at 1055.

### (2)    "Compel Assent" and "Advocate for"

Plaintiffs also challenge SB 129's prohibition on "compel[ling]" assent or "advocat[ing] for" divisive concepts. (Doc. # 1 ¶ 148). Patton alleges that this language has prompted her not to instruct her students about the "Fundamental Causes" theory, which asserts "that socioeconomic status is a fundamental cause of health disparities," and "that racism should also be considered a fundamental cause of these disparities." (*Id.* ¶ 98). Fording alleges that "due to SB 129, he [believes he] can no longer discuss 'implicit' bias in his courses because a student's discomfort may lead to a complaint that he is advocating for, directing, or compelling certain students to adhere to the concept that they are 'inherently racist, sexist, or oppressive, whether consciously or subconsciously.'" (*Id.* ¶ 108).

In this context, "compel" means "to urge irresistibly by moral or social pressure." *Compel*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/compel (last accessed July 8, 2025). As Governor Ivey points out, "compel" is used elsewhere in Alabama statutes without any apparent widespread challenge to its meaning. (*See*

Doc. # 27 at 59 (citing Ala. Code § 15-21-30(a))). "Assent" means "the accepting as true or certain of something (as a doctrine or conclusion) proposed for belief." *Assent*, Webster's Third New International Dictionary 131 (1993). In context, this means that a professor may not urge a student "irresistibly by moral or social pressure" to accept divisive concepts as true. To "advocate" in the context of SB 129 means "to plead in favor of" or to "support or recommend publicly." *Advocate*, Webster's Third New International Dictionary 32 (1993).

These terms are not impermissibly vague, much less vague in all of their applications. They adequately put the Professors on notice of what conduct could put them at risk of discharge. If, for example, Patton indoctrinates her students to believe that white people or Black people as a class are at fault for racial health disparities, she would violate SB 129's prohibition against advocating for a divisive concept. If, alternatively, the theory she teaches about is that there is empirical evidence that racism may be a cause for health disparities, or if she frames such teaching as merely a theory, she would not violate SB 129. Similarly, if Fording frames implicit bias as a theory, or if his instruction makes clear that he does not believe one's race makes them "inherently racist, sexist, or oppressive, whether consciously or subconsciously," he would not have violated SB 129. This is not hard. If Simon, Patton, or Fording are struggling with these and other requirements, they would do well to consider Dalton's words: "We have to be a place where education and not indoctrination can occur at our universities." (Doc. # 69-7 at 62). The possibility of imagining some nuanced close calls related to divisive concepts does not mean that these terms are unconstitutionally vague in *all* of their applications. Because "men of common intelligence" do not need to "guess" at the meaning of the words "compel assent" in SB 129, Plaintiffs' argument fails.

### (3)    "Diversity, Equity, and Inclusion"

Plaintiffs also argue that SB 129's definition of "diversity, equity, and inclusion programs" is impermissibly vague because the language "makes it impossible to discern what does, and does not, fall within" that concept. (Doc. # 12-1 at 20). For example, Plaintiffs allege that "[a]lthough Esperanza membership is open to all UAB students regardless of race or ethnicity, its members are primarily Latine, and its stated focus is on issues of importance to Latine students. Due to SB 129's vague definition of a Diversity, Equity and Inclusion program, Esperanza has a credible fear that it will be prohibited from existing." (Doc. # 31 at 19).

SB 129 defines "diversity, equity, and inclusion programs" as "[a]ny program, class, training, seminar, or other event where attendance is *based on* an individual's race, sex, gender identity, ethnicity, national origin, or sexual orientation, or that otherwise violates this article." Ala. Code § 41-1-90(3) (emphasis added). It adds that "[t]his term does not include programs, classes, trainings, seminars or other events that are necessary to comply with applicable state law, federal law, or court order." *Id.*

Plaintiffs fail to explain what they find vague in this definition. The words are plain. For example, the term "based on" is utilized in several federal laws, *see, e.g.*, 28 U.S.C. § 1605(a)(2) (Foreign Sovereign Immunities Act of 1976); 15 U.S.C. § 1681m(a) (Fair Credit Reporting Act), and the Supreme Court has had no trouble defining the meaning of "based on," explaining that the phrase "indicates a but-for causal relationship and thus a necessary logical condition." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63 (2007); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993) (explaining that the "only reasonable reading of the [] term calls for something more than a mere connection with, or relation to"). Applying this definition to Esperanza, to be "based on" race or ethnicity, the group would need to require that for membership in that organization,

individuals must be Latine. Esperanza clearly does not require this; therefore, it is readily apparent to the court that the group is not in violation of SB 129.

### (4)    "Divisive Concepts"

Plaintiffs also challenge the vagueness of the eight "divisive concepts" in SB 129. (Doc. # 1 ¶¶ 261-62). Plaintiffs contend that Plaintiff Simon's course "Anti-Oppression and Social Justice" "likely implicates all of SB 129's 'divisive concepts.'" (Doc. # 12-1 at 3). To support their argument, Plaintiffs refer to *Pernell* (*id.* at 4-5), the Eleventh Circuit's decision in *Honeyfund*, 94 F.4th 1272, as well as the Northern District of California's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). (*Id.* at 21-23). Plaintiffs emphasize that UA itself has been unable to clarify the meaning of the eight divisive concepts, as their published guidance "merely recites language from SB 129 itself." (Doc. # 1 ¶ 150).

Again, the divisive concepts in SB 129 include the following:

a. That any race, color, religion, sex, ethnicity, or national origin is inherently superior or inferior.

b. That individuals should be discriminated against or adversely treated because of their race, color, religion, sex, ethnicity, or national origin.

c. That the moral character of an individual is determined by his or her race, color, religion, sex, ethnicity, or national origin.

d. That, by virtue of an individual's race, color, religion, sex, ethnicity, or national origin, the individual is inherently racist, sexist, or oppressive, whether consciously or subconsciously.

e. That individuals, by virtue of race, color, religion, sex, ethnicity, or national origin, are inherently responsible for actions committed in the past by other members of the same race, color, religion, sex, ethnicity, or national origin.

f. That fault, blame or bias should be assigned to members of a race, color, religion, sex, ethnicity, or national origin, on the basis of race, color, religion, sex, ethnicity, or national origin.

g. That any individual should accept, acknowledge, affirm, or assent to a sense of guilt, complicity, or a need to apologize on the basis of his or her race, color, religion, sex, ethnicity, or national origin.

137

h. That meritocracy or traits such as a hard work ethic are racist or sexist.

Ala. Code § 41-1-90.

Plaintiffs first challenge divisive concept (a). They argue that district courts found similar language to be vague in *Honeyfund*, *Pernell*, and *Santa Cruz*. (Doc. # 12-1 at 22). *Santa Cruz* was an out-of-circuit district court case. Both the *Honeyfund* and *Pernell* decisions interpreted the phrase "morally superior." *See Honeyfund*, 622 F. Supp. 3d at 1168-69; *Pernell*, 641 F. Supp. 3d at 1231. The *Honeyfund* district court discussed Merriam-Webster's definition of that phrase: "conforming to right standards of behavior." 622 F. Supp. 3d at 1181. The court concluded that this language was vague because it is impossible for a person to know "[w]hat is a 'right' standard of behavior." *Id.* at 1181-82. Here, however, SB 129 uses the term "inherently," a word with a completely different (and clearer) meaning. This distinguishes *Honeyfund* from this case.

In the context of SB 129, the phrase "inherently superior" is not vague. Plaintiffs bear the burden on a motion for preliminary injunction to show why they are likely to succeed on the merits, and they have not done so in this context as they have failed to explain why this language is vague. This phrase is readily understood. "Inherent" means "belonging by nature or settled habit." *Inherent*, Webster's Third New International Dictionary 1163 (1993). And "superior" means "of more importance, value, usefulness, or merit." *Superior*, Webster's Third New International Dictionary 2294 (1993). To be "inherently superior" means that one is more important or valuable by nature (or, in this context, solely because of race). A professor who teaches that people of a certain race often acquire negative biases or racist tendencies after they are born based on their life experiences does not teach that such a racial group is inherently inferior; to be "inherent" means that a quality exists by *nature* and not by *experience*.

Plaintiffs have proffered no argument about divisive concept (b) and indeed, it is hard for the court to imagine a professor who teaches that people of certain races, colors, religions, sexes,

ethnicities, or national origins *should be* discriminated against because of such an identity. But, aside from its implausibility, the court sees no vague words here – "because of" is a commonly used statutory term connoting but-for causation, *see Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) (quoting 42 U.S.C. § 2000e-2(a)(1)); *id.* at 656 ("the ordinary meaning of 'because of' is 'by reason of' or 'on account of'") (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)), and the meaning of "discriminate" is also clear.

Nor is divisive concept (c) vague. The court rejects the mental gymnastics in which the district court in *Honeyfund* engaged. Plaintiffs argue that this language is vague because Patton fears that class discussions that will follow a two-week service trip to Marion, Alabama "may be viewed as espousing the prohibited viewpoint that the moral character of an individual can be determined by attributes such as their race." (Doc. # 1 ¶ 103). Once again, Plaintiffs have not carried their burden of explaining how the *language* in concept (c) is vague. Indeed, it is not; concept (c) plainly puts the Professors on notice of what conduct puts them at risk of discharge. For example, teaching that the moral character of Marion residents is determined by their race and not by their choices (or even past experiences) would violate SB 129. But, who would teach that?

Plaintiffs argue that divisive concept (d) is vague because it is unclear to the Professors whether the idea of implicit bias, or the administration of the Harvard Implicit Association Test, could implicate that concept. (Doc. # 1 ¶¶ 95, 108). During the evidentiary hearing, the Professors clarified that the most concerning words in (d) were "consciously or subconsciously." (Docs. # 72 at 119-20; 73 at 89). As they explained it, implicit bias is subconscious, so they worry that teaching about subconscious biases could suggest that such biases are inherent *and* "by virtue of" race. (Docs. # 72 at 119-20; 73 at 89). To the court (and, the court believes, to a person of ordinary intelligence), that assertion falls flat. It is clear what does and does not implicate concept (d). A person "of common intelligence" does not need to guess at the meaning of "consciously or

subconsciously." Indeed, the Professors appear to have a strong grasp on the difference between conscious and subconscious racism, as they testified that the Harvard Implicit Association Test is used to highlight *subconscious* racism. As discussed above, the word "inherently" is not vague. And "by virtue of" is related to "because of," which the court has already discussed. *See By Virtue Of*, Webster's Third New International Dictionary 2556 (1993) (defining as "through the force of").[61] Therefore, a plain read of SB 129 indicates that a professor would violate (d) if, when they teach about implicit bias, they tell students that a person who is born into "race A" is by their very nature racist *because* they were born into "race A." Divisive concept (d) is thus not impermissibly vague.

Plaintiffs argue that divisive concept (e) is vague because Patton "believes information about convict leasing or other historical and contemporary practices that could make students feel upset may be prohibited by SB 129 because students may perceive her instruction to be an endorsement of the prohibited view that white people are inherently responsible, or should feel shame, for past actions." (Doc. # 1 ¶ 102). Fording alleges that teaching about "historical discrimination against Black voters and how that suppression has continued into the present" could "be interpreted to violate" divisive concept (e). (*Id.* ¶ 106). Beyond offering these examples, Plaintiffs do not explain why the language used in concept (e) is vague. The word "responsible" in this context means "creditable or chargeable with the result." *Responsible*, Webster's Third New International Dictionary 1935 (1993). And the language of "by virtue of" and "inherently" have been used in other non-vague portions of SB 129. Thus, based on the ordinary meaning of these words in (e), "men of common intelligence" do not need to guess at their meaning, *FCC*, 567 U.S. at 253 (quoting *Connally*, 269 U.S. at 391), and even if there is uncertainty as to whether a teaching

---

[61] Other dictionaries define "by virtue of" as "because of." *By Virtue Of*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/by-virtue-of (last visited August 7, 2025).

implicates (e), it is at least clear what facts must be proved. Namely, whether a professor has taught that an individual is "creditable or chargeable with the result" of a past racist action based solely on their race.

Plaintiffs do not specifically allege that concepts (f), (g), or (h) are vague, so they have not carried their burden of explaining why they have a substantial likelihood of success on that point.

Finally, the scienter[62] requirement of "knowingly violates" reduces any vagueness concerns Plaintiffs may have because it limits liability under SB 129 to only those actors with awareness or intention. *See Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns.") (citation omitted); *see also Flipside*, 455 U.S. at 499 n.14 (listing cases). In context, SB 129 provides: "All state agencies and political subdivisions, including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who *knowingly* violates this article." Ala. Code § 41-1-92 (emphasis added). Therefore, the Professors would be subject to discipline for violation of SB 129 only if they knew they were indoctrinating or requiring assent to a divisive concept and intentionally did so. In contrast, if instead they merely taught accidentally on a divisive concept or if students were only confused that this had occurred, there would be no violation of SB 129.

To the extent that Plaintiffs argue that the term "knowingly violates" is vague, as discussed below, they are mistaken. They argue that "[w]ithout understanding the parameters of what constitutes a violation of SB 129, the Professors do not know how to avoid violating the law and, thus, avoid termination or discipline for any violation." (Doc. # 1 ¶ 156). But, as the court has explained, it is clear what constitutes a violation of SB 129.

---

[62] The term "scienter" typically refers to a criminal responsibility, but in this case and others it can refer to civil responsibility, and implies a "degree of knowledge necessary to make a person [] responsible for his or her acts." *Ruan v. United States*, 597 U.S. 450, 458 (2022).

### (5) "Knowingly Violates"

Plaintiffs also argue that the scienter[63] requirement of SB 129 – "knowingly violates" – is unconstitutionally vague. In context, SB 129 provides: "All state agencies and political subdivisions, including local boards of education and public institutions of higher education, may discipline or terminate the employment of any employee or contractor who knowingly violates this [Act]." Ala. Code § 41-1-92. Far from adding to the vagueness of SB 129, this scienter requirement actually reduces vagueness concerns because it limits liability under SB 129 to only those persons who act with awareness or intention. *See Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns.") (citation omitted); *see also Flipside*, 455 U.S. at 499 n.14 (listing cases); *Jones*, 975 F.3d at 1047 (11th Cir. 2020) ("even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement."). And, in any event, Plaintiffs' true vagueness challenge is not directed at the meaning of the term "knowingly violates," but instead at how that term interacts with the rest of SB 129. For example, Plaintiffs argue that "[w]ithout understanding the parameters of what constitutes a violation of SB 129, the Professors do not know how to avoid violating the law and, thus, avoid termination or discipline for any violation." (Doc. # 1 ¶ 156). This argument misses the target.

The phrase "knowingly violates" is simply not void for vagueness. It plainly encompasses a mens rea standard that has a clear and settled meaning in law. Under longstanding precedent, "knowingly" requires that a person be aware of the facts or circumstances that render their conduct impermissible. This term is derived from common law and (similar to the word "objective") has been used by courts, juries, and ordinary people for centuries. By requiring proof of actual

---

[63] The term "scienter" typically refers to a criminal responsibility, but in this case and others it can refer to civil responsibility, and implies a "degree of knowledge necessary to make a person [] responsible for his or her acts." *Ruan v. United States*, 597 U.S. 450, 458 (2022).

awareness, the phrase provides fair notice to individuals about the kind of conduct that will result in a violation, allowing them to conform their behavior to the law. It also constrains enforcement discretion by demanding evidence of a culpable mental state, thereby avoiding arbitrary or discriminatory application. The same is true for the term "violate." There is nothing novel or ambiguous about that word either. Contrary to Plaintiffs' position, "knowingly violates" satisfies due process by giving both ordinary people and enforcement officials clear guidance on what conduct is prohibited by the Act.

### c.    Arbitrary and Discriminatory Enforcement

"As always, enforcement requires the exercise of some degree of police judgment." *Grayned*, 408 U.S. at 114. On the other hand, a statute cannot provide such unfettered discretion that enforcers of the law could decide on a case-by-case basis what is illegal. *See Chicago v. Morales*, 527 U.S. 41, 61 (1999). Laws therefore must provide "explicit standards for those who apply them," *Grayned*, 408 U.S. at 108-09, as well as "minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). The focus of this second prong in the void-for-vagueness inquiry is therefore on the text of the law and not on the history of enforcement. *See Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 387 (11th Cir. 1991) ("discriminatory enforcement does not necessarily mean that the ordinance that is being enforced is itself void-for-vagueness").

Plaintiffs focus on the history of enforcement as it has affected them. The Students allege that they were injured due to "the vagueness associated with curricular, funding, and space restrictions implemented by the University of Alabama system pursuant to enforcement of SB 129." (Doc. # 1 ¶ 259). The Professors allege they were threatened with discipline if they did not alter their curriculum, answer questions about their classes, cancel class projects, or elect not to teach certain classes. Luna is also concerned that he will "not receive a robust and comprehensive

education" due to professor censorship. Alabama NAACP says it was harmed "through limitations on student chapter's ability to receive university funding and to secure university space" due to purported violations of SB 129; and that at least seven student organizations arbitrarily lost funding and resources because of concerns about SB 129 violations. (Docs. # 1 ¶¶ 8, 122, 125, 129, 131; 12-1 at 23-25).

Even if Plaintiffs had challenged SB 129 as lacking explicit standards or minimal guidelines, a review of the text reveals that the law provides both. Each of the eight divisive concepts and a "diversity, equity, and inclusion program" are defined with terms that make clear what is prohibited. The Act includes objective terms about what is prohibited (such as requiring student assent to a divisive concept); there is a scienter requirement (which is frequently upheld in civil and criminal laws); and there is a safe harbor that permits teaching about these concepts in an objective manner and in a historically accurate context.

Plaintiffs have not carried their burden of showing otherwise. Plaintiffs' allegations of arbitrary enforcement do not satisfy the void-for-vagueness standard. UA was explicit when it told Simon she could not, as a graded component of her class, require students to protest SB 129. That project not only compelled students to engage in the protest but also infringed on UA's position on institutional neutrality.

The Professors argue that UA has not been clear (or fair) in how they have interpreted and implemented SB 129. Just the opposite. First, at the beginning of any implementation, there are moving parts. That does not make for a vagueness challenge. Second, Dalton is very interested in implementing guardrails to keep his faculty from running into problems. (Doc. # 69-7 at 62). Third, the UA administration accommodated Patton in its very first investigation of allegations that SB 129 was violated. They were empathetic to her concerns about putting her responses to questions in writing. It was readily apparent that they were approaching the investigation in a manner that

144

indicates they viewed her teaching as important and were trying to fairly answer the students complaints, not find a violation.[64]

As explained above, Luna has not shown a credible concern about professor censorship; therefore, Plaintiffs have not shown that this warrants an arbitrary enforcement analysis. And Plaintiffs have not highlighted specific language in SB 129 that they believe lacks explicit standards about the decision to provide funding to student groups.

Upon review of the relevant language in SB 129, the court concludes that it contains both guidelines and explicit standards. For example, SB 129 prohibits a university from sponsoring "any diversity, equity, and inclusion program" or from maintaining "any office, physical location, or department that promotes diversity, equity and inclusion." *See* Ala. Code § 41-1-91(1). To sponsor means to "assume[] responsibility for some other person or thing." *Sponsor*, Webster's Third New International Dictionary 2204 (1993). It was thus not an arbitrary application of SB 129 for UA to revoke a physical location on campus because they believed the BSU and Safe Zone were programs promoting diversity, equity, and inclusion. UAB also applied explicit standards when it demoted SJAC from UFO to RSO status, as a UFO connoted a greater sense of responsibility and sponsorship than did an RSO.

For all of these reasons, and after careful review, the court concludes that Plaintiffs have not carried their burden of showing a substantial likelihood of success on their void-for-vagueness challenge.

---

[64] Finally, despite the arguments of Plaintiffs that SB 129 and its enforcement is arbitrary and unfair, it is noteworthy that in the ten plus months that that Act has been in effect, the only times it has been enforced – or even at issue – as it relates to in-class instruction are those situations involving Patton and Simon. In both instances, UA tried to implement guardrails that were intended to avoid anyone being in violation. This hardly is the parade of horribles that its opponents likely predicted.

**V.     Conclusion**

For all these reasons, the court concludes that Plaintiffs have not established the requirements for the issuance of a preliminary injunction against the Board's enforcement of SB 129. Therefore, their Motion (Doc. # 12) is due to be denied. An order reflecting this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this August 13, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE

146